FILED UNDER SEAL

# Exhibit 8

**Confidential Deposition Transcript:**

**Albert Antoine**

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.                                    CONFIDENTIAL
ANTOINE, ALBERT

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                 JACKSONVILLE DIVISION

 3
    Winn-Dixie Stores, Inc., and
 4  Bi-Lo Holdings, LLC,

 5      Plaintiffs,
                                    Case Number:
 6  v.                              3:15-cv-01143-BJD-PDB

 7  Southeast Milk, Inc., et al.,

 8      Defendants.
    _____/
 9

10
    * * * * * * * * * * * * * * * * * * * * * * * * *
11

12
    DEPOSITION OF:      ALBERT ANTOINE
13
    DATE TAKEN:         JUNE 2, 2017
14
    TIME:               9:05 A.M. UNTIL 11:15 A.M.
15
    LOCATION:           LATHAM, SHUKER, EDEN & BEAUDINE, LLP
16                      111 N. MAGNOLIA AVENUE,
                        SUITE 1400
17                      ORLANDO, FLORIDA  32801

18  REPORTED BY:        DIANE C. ROBERTS
                        FLORIDA PROFESSIONAL REPORTER
19

20
         EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DECLARED
21       CONFIDENTIAL AND ARE SEALED UNDER SEPARATE COVER

22

23

24

25
```



Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.  
ANTOINE, ALBERT

CONFIDENTIAL  
2..5

## Page 2

```
 1            A P P E A R A N C E S
 2   MARK S. HAMILL, ESQUIRE
       OF:  Ahern & Associates, P.C.
 3          Three First National Plaza
            70 West Madison St.
 4          Suite 1400
            Chicago, Illinois  60601
 5          mark.hamill@ahernandassociatespc.com
 6            Attorney for the Plaintiff
 7
     MICHAEL J. BEAUDINE, ESQUIRE
 8     OF:  Latham, Shuker, Eden & Beaudine, LLP
            111 North Magnolia Avenue,
 9          Suite 1400
            Orlando, Florida  32801
10          beaudine@lseblaw.com
11            Attorney for Defendant Southeast Milk, Inc.
12
     LUCY S. CLIPPINGER, ESQUIRE
13     OF:  Baker & Miller, PLLC
            2401 Pennsylvania Avenue N.W.,
14          Suite 300
            Washington, D.C.  20037
15          lclippinger@bakerandmiller.com
16            Attorney for Defendant Dairy Farmers of America
```

## Page 3

```
 1                    I N D E X
                                                 PAGE
 2
     TESTIMONY OF ALBERT ANTOINE
 3     Direct Examination by Mr. Hamill...............7
 4   CERTIFICATE OF OATH............................57
 5   CERTIFICATE OF DEPOSITION TRANSCRIPT...........58
 6   ERRATA SHEET...................................59
 7   NOTIFICATION LETTER............................60
 8
 9           S T I P U L A T I O N S
10      It is hereby stipulated and agreed by and between
11   the counsel for the respective parties and the deponent
12   that the reading and signing of the deposition
13   transcript be reserved.
```

## Page 4

```
 1             E X H I B I T S
                                                 PAGE
 2   PLAINTIFFS' EXHIBIT NUMBER 1
       (Discovery Deposition Notice to Defendant
 3      Southeast Milk, Inc.)..........................9
 4   PLAINTIFFS' EXHIBIT NUMBER 2
       (Plaintiffs' First Request for Production of
 5      Documents, Electronically Stored Information,
        and Tangible Things)..........................10
 6
     PLAINTIFFS' EXHIBIT NUMBER 3
 7     (Defendant Southeast Milk, Inc.'s, Responses to
        Plaintiffs' First Request for Production of
 8      Documents)....................................10
 9   PLAINTIFFS' EXHIBIT NUMBER 4
       (Plaintiffs' Second Request for Production of
10      Documents, Electronically Stored Information,
        and Tangible Things)..........................10
11
     PLAINTIFFS' EXHIBIT NUMBER 5
12     (Defendant Southeast Milk, Inc.'s, Responses to
        Plaintiffs' Second Request for Production of
13      Documents)....................................10
14   PLAINTIFFS' EXHIBIT NUMBER 6
       (Plaintiffs' Second Request for Production of
15      Documents, Electronically Stored Information,
        and Tangible Things)..........................10
16
     PLAINTIFFS' EXHIBIT NUMBER 7
17     (Defendant Southeast Milk, Inc.'s, Responses to
        Plaintiffs' Third Request for Production of
18      Documents)....................................10
19   PLAINTIFFS' EXHIBIT NUMBER 8
       (Plaintiffs' First Set of Interrogatories)......10
20
     PLAINTIFFS' EXHIBIT NUMBER 9
21     (Defendant Southeast Milk, Inc.'s, Answers to
        Plaintiffs' First Set of Interrogatories)......10
22
     PLAINTIFFS' EXHIBIT NUMBER 10
23     (Plaintiffs' Second Set of Interrogatories).....10
24   PLAINTIFFS' EXHIBIT NUMBER 11
       (Defendant Southeast Milk, Inc.'s, Answers to
25      Plaintiffs' Second Set of Interrogatories).....10
```

## Page 5

```
 1             E X H I B I T S (CONT.)
                                                 PAGE
 2   PLAINTIFFS' EXHIBIT NUMBER 12
       (Organizational Charts)........................15
 3
     PLAINTIFFS' EXHIBIT NUMBER 13
 4     (HR Records, Reports & Retention Guide).........25
 5   PLAINTIFFS' EXHIBIT NUMBER 14
       (List of Antitrust Matters where Joe Wright or
 6      Calvin Covington Gave a Deposition)............33
 7   PLAINTIFFS' EXHIBIT NUMBER 15
       (Document with Multiple Bates Numbers)..........37
 8
     PLAINTIFFS' EXHIBIT NUMBER 16
 9     (Report of the Chief Executive Officer to the
        Board of Directors, Dated August 11, 2009).....39
10
     PLAINTIFFS' EXHIBIT NUMBER 17
11     (Activity Report of President Joe Wright,
        Dated September 14, 2004)......................41
12
     PLAINTIFFS' EXHIBIT NUMBER 18
13     (Summary of the Requests for Production)........43
```

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
6..9

Page 6

1  PROCEEDINGS
2       * * *
3       COURT REPORTER: Raise your right hand to be
4  sworn. Do you solemnly swear the testimony you're
5  about to give will be the truth, the whole truth,
6  and nothing but the truth, so help you God?
7       THE WITNESS: I do.
8       COURT REPORTER: Thank you.
9  THEREUPON,
10           ALBERT ANTOINE,
11 having been produced and first duly sworn as a witness,
12 was examined and testified upon his oath as follows:
13      MR. BEAUDINE: Before we get started, I need
14 to note something for the record. There is a
15 stipulated confidentiality agreement in place, that
16 the parties agreed to in early August 2016. And SMI
17 invokes its rights with respect to Paragraph 4(d),
18 which allowed -- it provides that the designation
19 of confidential material, or highly confidential
20 material, for the purposes of this agreement, may
21 be made in the following manner.
22      And under Subparagraph (d), it provides, (ii),
23 by written notice sent to all counsel of record for
24 the parties within 15 business days after receipt
25 of the transcript of the deposition. And that same

Page 7

1  subparagraph provides, "All transcripts shall be
2  considered highly confidential, and subject to this
3  agreement, until expiration of the 15-day period
4  described in this paragraph. Any testimony
5  designated as confidential, or highly confidential,
6  shall be marked and treated in the same manner as
7  documents covered by this agreement."
8       So, SMI does intend to invoke its rights to
9  follow these procedures and designate portions of
10 this deposition transcript as either confidential,
11 or highly confidential, by providing written notice
12 to all counsel of record within 15 business days
13 after SMI receives a copy of the transcript of the
14 deposition. And until such time, the transcript
15 shall be considered highly confidential and subject
16 to the agreement, accordingly.
17      Thank you.
18      MR. HAMILL: Has the witness been sworn?
19      COURT REPORTER: Yes.
20          DIRECT EXAMINATION
21 BY MR. HAMILL:
22 Q. Good morning, Mr. Antoine.
23 A. Morning.
24 Q. My name is Mark Hamill, and I'm here
25 representing the Plaintiffs in this case, who are

Page 8

1  Winn-Dixie Stores and Bi-Lo Holdings. And I have some
2  questions to ask of Southeast Milk, about its document
3  production to the Plaintiffs in this case. And SMI has
4  designated you, along with some others, to testify on
5  its behalf. So, I wanted to just take a few minutes to
6  set the stage before we get into a lot of the questions
7  and answers.
8       So, first of all, is it okay with you if I
9  refer to Southeast Milk, Inc., as SMI, today?
10 A. Sure.
11 Q. So, we'll be on the same page?
12 A. Sure.
13 Q. And the case is about the Herd Retirement
14 Program, which was part of the Cooperatives Working
15 Together Program from the National Milk Producers
16 Federation. But, for the most part, my questions are
17 not about the substance of the case, or the substance of
18 the materials that we might see in the documents. But,
19 it's about SMI's document production, itself. So, we
20 might get into some business details, but the bottom
21 line is really the document production efforts and what
22 was behind that.
23      So, if you'll look at Exhibit 1, in the binder,
24 there, I've set out some topics for this deposition, in
25 the deposition notice. Have you seen Exhibit 1 before

Page 9

1  today?
2  A. Yes.
3     (The document was received and attached to the
4     transcript as Plaintiffs' Exhibit Number 1.)
5  BY MR. HAMILL:
6  Q. All right. And the topics for today's
7  deposition begin on Page 9. So, those will be the
8  topics. We won't be proceeding in an exact order. But,
9  I think, for the topics that you've been designated on,
10 it looks like they will be pretty much clustered in the
11 early part of this.
12 A. Okay.
13 Q. Do you understand that you are here today to
14 testify on behalf of SMI?
15 A. Yes.
16 Q. So, I'll be asking, in this deposition, not
17 just for your personal knowledge, but for information
18 that you are aware of, that SMI, itself, has in its own
19 possession. Do you understand that?
20 A. Not really.
21 Q. So, you're testifying on behalf of the company.
22 A. Yes.
23 Q. And to the extent that you have been able to
24 inform yourself about what the company knows, you'll be
25 testifying from the company's knowledge, not limited to



Case 3:15-cv-01143-BJD-JBT   Document 112   Filed 08/30/17   Page 5 of 17 PageID 1452

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
10..13

Page 10

1  just what you might have in your own personal knowledge.
2     A. Okay. Maybe I'm dense, but I'm not
3  understanding how I can know that about SMI and it not
4  being personal knowledge.
5     Q. Well, if you've gone out and talked to people
6  for purposes of this deposition, you might have learned
7  things, you know, to get educated for the deposition,
8  that you would have not otherwise known. So, maybe
9  something happened in -- we'll just pick a year --
10 maybe, 2000, that you weren't involved in. But, for
11 this deposition, you learned it. So, you can testify
12 about it, on behalf of the company.
13    A. Okay.
14    Q. Okay. So, you can set that aside, for now, but
15 we might come back to it later. Then, as I noted for
16 counsel, Exhibits 2 through 11 are also in the binder,
17 and those are the requests for production, and the
18 responses and Interrogatories and the answers that have
19 been given in the case. Given the nature of the
20 deposition, I just thought I'd put them in the record.
21    (The documents were received and attached to the
22    transcript as Plaintiffs' Exhibit Number 2 through
23    Plaintiffs' Exhibit Number 11.)
24 BY MR. HAMILL:
25    Q. So, putting that intro aside, I want to move on

Page 11

1  to some rules of the road for the deposition, so we can
2  make sure we're on the same page as we go. So, have you
3  ever testified at a deposition before today?
4     A. Yes.
5     Q. How many times have you testified?
6     A. I don't remember the exact number.
7     Q. Approximately?
8     A. More than five and probably fewer than 50.
9     Q. Okay. So you're experienced, on it?
10    A. Somewhat.
11    Q. Have you testified at trial?
12    A. I have.
13    Q. Have you testified in business matters
14 involving Southeast Milk, or in matters outside of
15 Southeast Milk, or both?
16    A. Definitely matters outside of Southeast Milk.
17 And one matter, I think, indirectly related to Southeast
18 Milk. I was an employee of Southeast Milk.
19    Q. Okay. So, a short list, here. But, we need
20 for just one person to talk, at a time, so that
21 Ms. Roberts can take down a clean transcript for us.
22 Okay?
23    A. Okay.
24    Q. You will have to answer out loud.
25    A. Yes. Instead of nodding my head, got it.

Page 12

1     Q. Thank you. You're welcome to nod your head,
2  but Ms. Roberts might take down, "witness nods," or
3  "nods." But, you definitely have to answer out loud, at
4  least. So, if a question is unclear to you, or doesn't
5  seem to make sense to you, will you ask me to clarify or
6  rephrase?
7     A. Yes.
8     Q. And, then, some of my questions today will
9  touch on matters where you may have had conversations
10 with either Mr. Beaudine, or Ms. Taylor, or other
11 lawyers for Southeast Milk, but I, at no time, will be
12 asking you to tell me anything that was asked or said in
13 those conversations. Okay?
14    A. Okay.
15    Q. And then, we can take a break, at any time
16 today, when you would like, or anybody else in the room
17 would like. The only exception to that is when a
18 question is pending. But, if there needs to be a
19 conversation between you and counsel, about the
20 attorney/client privilege, or conversations that you've
21 had with counsel, then we can do that, even if there's a
22 question pending. Okay?
23    A. Okay.
24    Q. Then, Mr. Beaudine will object, from time to
25 time today, to my questions. Unless he instructs you to

Page 13

1  not answer, on the basis of privilege, you will be
2  required to answer.
3     A. Okay.
4     Q. And then, sometimes witnesses lose track of the
5  questions, when the objection, and the discussion about
6  the objection, goes on. If that happens, you can just
7  ask me to repeat the question. All right?
8     A. Sure.
9     Q. So, that's it, for the rules of the road. I
10 just want to get some background about, you know, who
11 you are, at Southeast Milk.
12       So, what's your -- can you give me -- I guess
13 you can either work forward or backwards, but what's
14 your current position at Southeast Milk, and maybe go
15 back in time, to -- you know, the relevant period for
16 this case started in 2000, so that's really the
17 timeframe that I'm interested in. So, you can either
18 work forward, from 2000, or, backwards, from 2017.
19    A. Well, it's going to be pretty easy.
20    Q. All right.
21    A. I was employed, in 2001, as the Chief Financial
22 Officer, at SMI. And, today, I am the Chief Financial
23 Officer.
24    Q. Okay. And then, again, setting aside the
25 content of any communications that you've had with



Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
14..17

Page 14

1 counsel, what steps did you take to prepare for this
2 deposition?
3   A.  The first steps involved a conversation with
4 counsel, to review the documents that were sent through
5 the file and with the courts.  And to talk about who,
6 within the company, would be able to address the issues,
7 or the specific requests, there, and to set assignments
8 to be carried out.
9   Q.  Okay.  I'm focusing on the topics that I think
10 you must have assigned to yourself.  What steps did you
11 take to prepare on the topics that you've assigned to
12 yourself?
13   A.  Can you repeat that?
14   Q.  Sure.  You've been designated on Topics 1
15 through 6 and 9 and 22.  So, my question is, did you
16 talk to any -- did you go out and talk to, maybe,
17 somebody in IT, or others, to gather information to
18 assist you in testifying on behalf of the company?
19   A.  I didn't really talk to anyone within the
20 company, to prepare for those questions, other than our
21 attorney.
22   Q.  Okay.  Did you review any documents, to prepare
23 for the questions?
24   A.  I did go back and review the documents that I
25 was required to collect and submit to the attorney.

Page 15

1   Q.  Approximately how much time did you spend
2 preparing?
3   A.  I'll give you a range.  Four to six hours.

Page 16

1   Q.  Okay.  Mr. Antoine, I want to ask you some
2 questions about the organizational structure and the
3 scope of IT operations at SMI, to get an overview.
4      Ms. Roberts has handed you what has been marked
5 as Exhibit 12.  And these are a series of organizational
6 charts with the Bates Numbers SMI-174 through 178.
7   A.  Okay.
8      (The document was received and attached to the
9     transcript as Plaintiffs' Exhibit Number 12.)
10 BY MR. HAMILL:
11   Q.  I have a couple of preliminary questions about
12 this.  So, then, throughout the deposition, I'll just be
13 referring to the Bates number, there, at the bottom of
14 the page.  So, on 174, looking at the top, it's labeled,
15 "Southeast Milk, Inc., Policy and Procedure Manual."
16      And my question to you is whether this Page 174
17 is part of a larger document?
18   A.  I'm not sure that I understand what you mean
19 by, "larger document."
20   Q.  Okay.  So, then, if you look down on the bottom
21 left, it seems to be labeled with a Page Number of 6.
22 The top left identifies this as Policy Number 8, and it
23 seems that Page 175 is Page 11 of the same document.
24   A.  Okay.
25   Q.  All right.  But, those are the only two pages

Page 17

1 that are from -- these two pages seem to go together,
2 but they are the only two such pages that were produced
3 to Plaintiffs.  And my question is whether there's a
4 larger document that these two pages of Exhibit 12 were
5 drawn from?
6   A.  Certainly, at one time, there would have been.
7   Q.  Okay.  And does that document still exist, at
8 Southeast Milk?
9   A.  I do not know.  Not to my knowledge.
10   Q.  How could you find out if it does still exist?
11   A.  Given the number of changes in the organization
12 since 2004, I'm not sure that I could find out.
13   Q.  Is there a version of this document that -- of
14 the fuller document, of the policy and procedure manual,
15 still in existence, that would cover a period up through
16 and including 2013?
17   A.  There would be a policy and procedure manual,
18 but it would not necessarily be an outgrowth of a
19 document from 2004.
20   Q.  Okay.  So, there would be a policy and
21 procedure manual -- is there a policy and procedure
22 manual, now, at Southeast Milk?
23   A.  Yes.
24   Q.  So, Southeast Milk has a copy of that document?
25   A.  Yes.

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
18..21

Page 18
1  Q. And – okay. Does Southeast Milk have any
2  prior versions of that document?
3  A. I do not know.
4  Q. And, I mean, I realize some of these questions
5  are very detailed. But, again, for the purpose of this
6  deposition, I'm trying to understand what documents
7  might exist at the company, as well as what documents
8  were produced, and the steps that were taken. So, I
9  kind of have to ask some detailed questions, so that we
10 could come forward and be specific about what we might
11 want in our request.
12      So, again, looking at Page 174, this particular
13 document has a date of March 15th, 2004. Thinking about
14 the current policy and procedures manual, do some of the
15 policies and procedures in that manual go back in time
16 into the 2013 or 2010 timeframe?
17 A. I do not know.
18 Q. Okay. Would you look at -- compare Page 175
19 with Page 178. And I'm just wanting to find out if you
20 could tell, by looking at those two pages, which is the
21 most recent?
22 A. I can't really tell.
23 Q. All right. That's understandable. There's not
24 many clues. I'm going to ask you some -- why don't we
25 put this on Page 175, then. And Page 175 shows the

Page 19
1  Manager of Information and Technology reporting up to
2  you, as Chief Financial Officer. Is that still the
3  case, today?
4  A. Yes.
5  Q. Who is -- who holds the Manager of Information
6  and Technology position, today?
7  A. Danielle Weaver.
8  Q. Has Information and Technology reported up to
9  you all the time, since 2001, that you've been at SMI?
10 A. Yes.
11 Q. Okay. Sorry to jump around. Before
12 Ms. Weaver, who was the Manager of Information
13 Technology?
14 A. Justin Lazanowski.
15 Q. And before Mr. Lazanowski, who was it?
16 A. There wasn't.
17 Q. All right. In this part of the deposition, I
18 want to get a better sense of the Information and
19 Technology environment at Southeast Milk. And, again,
20 we're focused on the time period mostly of 2003 through
21 2010, and then there was some data -- invoice data,
22 et cetera, through 2013. So, when you hear me say,
23 "2003 through 2010," it's a larger body of documents,
24 and probably a larger body of relevance and concern.
25 And -- but a little bit through 2013, on invoicing data.

Page 20
1  But, were pretty comfortable with invoicing data.
2      So, I just want to get a context of the network
3  of the IT environment at Southeast Milk, focusing on
4  2003 through 2010. So, 2003, through 2010, were there
5  network drives at Southeast Milk?
6  A. Yes.
7  Q. I'm sorry to ask insanely detailed questions --
8  I'm not admitting they're insanely detailed, but they're
9  going to sound that way. Is -- can you -- to the best
10 you can recall, can you name them off?
11 A. I cannot.
12 Q. Okay. Were there more than one, in place, at
13 any single time?
14 A. All that we would have had, would have been
15 there in the Belleview location. And from 2003 to 2010,
16 the period that you're focused on, Justin Lazanowski
17 would have been the manager over IT. I did not, then,
18 and do not, now, get into the weeds, so to speak. So, I
19 could not tell you how many network drives we had, or,
20 even now, have.
21
22
23
24
25

Page 21
1  Q. Okay. I mean, Ms. Weaver has been designated,
2  as well, for Topic 1, so she might have some more
3  detailed information. And then, during that 2003
4  through 2010 timeframe, were you, yourself, saving
5  documents onto the network drive?
6  A. Yes.
7  Q. Did any of those documents relate to Winn-Dixie
8  or Bi-Lo Holdings?
9  A. By "documents," are you referring to email
10 communication?
11 Q. I'm -- throughout the day, I'm going to refer
12 to electronic -- non-email electronic documents, email
13 documents, and hardcopy paper documents. So, why don't
14 we just focus, with this question, about documents that
15 you saved to the network drive as the non-email
16 electronic documents. And my question is whether any of
17 those non-email electronic documents related to
18 Winn-Dixie or Bi-Lo?
19 A. No.
20 Q. Did any of them relate to the Herd Retirement
21 Program or Cooperatives Working Together?
22 A. No.
23 Q. Did any of them relate to National Milk
24 Producers Federation?
25 A. No.

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
22..25

Page 22

1 Q. What kinds of documents did you save to the
2 network drive?
3 A. I may have saved some email communication with
4 accounts payable supervisors or someone further up the
5 organization. Those emails would have been related to
6 collection efforts to get Winn-Dixie to pay bills.
7 Q. And I want to make sure I understand. When
8 you -- you said you might have saved emails to the
9 network drive?
10 A. To the network. Maybe you need to define what
11 you mean by, "network drive."
12 Q. Well, I'm thinking of something other than,
13 say, the mail server, itself. Something other than the
14 mail program. Maybe, if you were looking at -- if you
15 prepared a document in Word, or Excel, saved it on the
16 network drive. And then went on over to email, prepared
17 an email, put it -- and attached that document. It's
18 possible that the document would be both -- that the
19 attachment would both be in the email, and sitting on
20 the email server, and also sitting on the network drive.
21 A. Okay.
22 Q. And then, conversely, you received an email
23 that has an attachment. You decided you want to save
24 the attachment separate from the email, so you can get
25 back at it a little easier, or whatever, so you save it

Page 23

1 over onto the network drive.
2     So, you said that you were saving emails on the
3 network drive. Were you saving attachments that were
4 sent or received via email, on the network drive?
5     MR. BEAUDINE: Object to the form. Go ahead
6     and answer, if you can.
7     THE WITNESS: Generally, during that time, my
8     involvement with Winn-Dixie would have been limited
9     to discussions with their accounts payable folks.
10    So, I could easily have saved an email that I sent
11    them, either requesting payment, or following up on
12    a request for payment. But, documents, I doubt that
13    I would have saved.

Page 24

1 BY MR. HAMILL:
2 Q. Okay. Would you -- same exhibit, 12. Would
3 you look at Page 177? Now, I note that this has, in the
4 center, "Chief Executive Officer, Paul Bikowitz." Does
5 that help you provide an approximate date for this
6 particular page?
7 A. It would help me give a range.
8 Q. Could you do that?
9 A. The document would -- would purportedly be 2010
10 or subsequent.
11 Q. Now, again, this is similar to a set of
12 questions that I asked earlier. This page, do you know
13 if this Page 177 is part of -- came -- was drawn from a
14 larger document?
15 A. I don't know for certain.
16 Q. And then, I noticed that Joe Wright, who is a
17 board member -- I believe he's Chairman of the Board and
18 he's President -- is not listed on this chart. Do you
19 know why that is?
20 A. Sure. This chart is meant to describe the
21 corporate structure of the cooperative, itself. As you
22 can see, it references the Board of Directors. Joe
23 Wright would be the President of that Board. So, he
24 wouldn't be listed in any detail, because it's not the
25 purpose of this document.

Page 25

1 Q. Is Joe Wright an officer of Southeast Milk,
2 Inc., aside from being President of the Board?
3 A. I'm not sure what you mean by that question.
4 Q. Okay. Well, I've seen Joe Wright being
5 identified as President of Southeast Milk, and as
6 Chairman of the Board, but I have not ever heard of
7 him being referred to as President of the Board. And
8 I'm trying to determine whether he had any function as
9 President, in addition to serving as President of the
10 Board?
11 A. Joe Wright has not, and, to my knowledge, never
12 is, directly involved in the day-to-day management or
13 operation of the cooperative, itself. And, so, there is
14 a distinction between the cooperative, itself, versus
15 the overseers of that cooperative. So, his involvement,
16 to the best of my knowledge, is relegated in that
17 function, not in the daily operations.
18 Q. And does Southeast Milk maintain back-up tapes,
19 or back-ups, of its information technology assets,
20 whether it's a network drive, or a mail server, or other
21 IT assets?
22 A. We do back up the data.
23 Q. Okay. And were back-ups being made in the 2003
24 through 2010 timeframe?
25 A. To the best of my knowledge, yes.



Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.  
ANTOINE, ALBERT

CONFIDENTIAL  
26..29

**Page 26**

1  Q.  Do any of those back-ups still exist, at the
2  company?
3  A.  I do not know that answer.
4  Q.  Would Ms. Weaver know?
5  A.  Yes.
6  Q.  Does Southeast Milk have policies or procedures
7  concerning how personnel are to use the network drive
8  for saving documents?
9  A.  I'm not sure I would characterize it as
10 policies and procedures. We do have guidelines.
11 Q.  Okay. And what do those guidelines state,
12 about using the network drive to save documents?
13 A.  All of our -- the work that's associated to
14 Southeast Milk, we are to work on, and save anything
15 that would be saved, to the network. And we're
16 discouraged from saving any information to any other
17 type of equipment.
18 Q.  Do you follow those guidelines?
19 A.  I do.
20
21
22
23
24
25

**Page 27**

1  Q.  Mr. Antoine, the court reporter has handed you
2  a document that has been marked as Exhibit 13. It's
3  called, "HR Records, Reports & Retention Guide," another
4  resource from Employers Association Forum, Inc. It has
5  a date, on the bottom right, that appears to be April
6  2012, and it has Bates Numbers SMI-179 through 210.
7  Have you seen this document before?
8  A.  I have.
9  (The document was received and attached to the
10    transcript as Plaintiffs' Exhibit Number 13.)
11 BY MR. HAMILL:
12 Q.  And can you tell me what -- all right, then.
13 Is this a document that is used at Southeast Milk?
14 A.  Yes.
15 Q.  And what is it used for?
16 A.  It is a guideline that departments may use, in
17 terms of retention for information.
18 Q.  Do you see the reference, on Page 179, to
19 04/12?
20 A.  I do.
21 Q.  Do you know whether that's the date of this
22 document?
23 A.  I don't.
24 Q.  Do you know when Southeast Milk began using
25 this document?

**Page 28**

1  A.  I don't.
2  Q.  Do you know whether Southeast Milk had any
3  document in use before this document?
4  A.  I don't recall any.
5  Q.  Who, at Southeast Milk, initiated the use of
6  this document, at the cooperative?
7  A.  I don't know that I can go back to who
8  specifically started using this document.
9  Q.  Can you tell me who, generally?
10 A.  It could have been the director over the Human
11 Resources. It may have been the CEO. Could have been
12 myself. Which, it wasn't. Perhaps, the administrative
13 assistant to the CEO.
14 Q.  Okay. Is this document used beyond just Human
15 Resources, at Southeast Milk?
16 A.  The information in the document, which I did
17 review before this deposition, has some of the
18 guidelines that are used within the other areas. The
19 one area I can speak specifically to is the general
20 accounting period.
21 Q.  Do you know -- so, this document was produced
22 to Plaintiffs, in this litigation. Do you know from
23 whom the document was collected?
24 A.  I'm the one who pulled the document.
25 Q.  Okay. And aside from this retention guide,

**Page 29**

1  does Southeast Milk have other document retention
2  policies?
3     MR. BEAUDINE:  Object to the form. You can
4     answer.
5     THE WITNESS:  Again, I wouldn't characterize
6     it as a policy. There are guidelines that are
7     followed -- primarily, various departments -- and,
8     to the best of my knowledge, because some documents
9     that would be listed in this listing, as an example,
10    wouldn't relate to every department. So, various
11    departments would have -- for their specific
12    documents, they would follow the guidelines as it
13    related to that department.
14 BY MR. HAMILL:
15 Q.  Are there guidelines that relate to -- at
16 Southeast Milk, that relate to saving documents, by
17 either Calvin Covington or people that work directly
18 with him?
19 A.  Can you ask the question, again?
20 Q.  All right. While Mr. Covington was at
21 Southeast Milk, did he follow -- would he have been
22 expected to follow the set of guidelines here in
23 Exhibit 13?
24 A.  Since Mr. Covington was the CEO, I can't really
25 speak for what he followed or didn't follow.



Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
30..33

Page 30

1  Q. What about speaking for yourself, Albert
2  Antoine. Did you follow these guidelines?
3  A. Yes.
4  Q. And what about Mr. Joe Wright, did he follow
5  these guidelines?
6  A. I could not speak for Joe Wright.
7  Q. Again, I'm focusing on the 2003 to 2010
8  timeframe. Did Southeast Milk ask its Board members to
9  follow any set of document retention guidelines?
10  A. I wouldn't know whether that request went to
11  the Board or not.
12  Q. Is there somebody who would know?
13  A. I couldn't begin to tell you.
14  Q. Turn to Pages 191 through 192. And there's a
15  section entitled, "Electronic Discovery," and I want to
16  ask specifically about the three bullets that appear at
17  the top of Page 192.
18  A. Okay.
19  Q. Has Southeast Milk implemented the steps that
20  are listed in the three bullets that are appearing at
21  the top of Page 192?
22  A. Not to my knowledge.
23  Q. Has Southeast Milk implemented any other set of
24  guidelines related to electronic Discovery?
25      MR. BEAUDINE: Object to the form.

Page 31

1      THE WITNESS: Not to my knowledge.
2  BY MR. HAMILL:
3  Q. Okay. You can set that down, I guess.
4      For non-email electronic documents that are on
5  the network drive, does Southeast Milk establish a
6  retention period for those documents?
7  A. When you say "Southeast Milk," that would
8  indicate some form of a policy that would be corporate
9  wide. And to that end, no.
10  Q. What about particular departments within
11  Southeast Milk?
12  A. Individual departments would handle the
13  retention based on their specific needs and as guided
14  by -- typically, the idea behind retention, to the best
15  of my knowledge, has been the requirements of outside
16  regulatory bodies or for some legal matter. And, again,
17  it would be done on a departmental basis, not as a
18  corporate policy.
19  Q. And what were the guidelines in effect for the
20  accounting department?
21  A. If you would look at the documents you gave to
22  me, as an example, SMI-193, checks, as an example, which
23  would be relative to the accounting department. Seven
24  years, that's what the accounting department would
25  typically do. So, documents related to the accounting

Page 32

1  department would be retained on the basis listed here.
2  Q. So, from time to time throughout 2003 through
3  2010, Calvin Covington, at Southeast Milk, Joe Wright,
4  who's on the Board, and maybe others, would receive
5  communications from National Milk Producers Federation.
6  Are there any guidelines that address the retention of
7  communications from National Milk Producers Federation?
8  A. First of all, it would be an assumption, on
9  my part, to say that Calvin Covington or Joe Wright
10  received communications from National Milk. That is not
11  the type of communication I would have been a party to,
12  so I couldn't know that, in the first place. And,
13  secondarily, we certainly would not have a policy that
14  stated, communication from National Milk is to be
15  retained some period of time.
16  Q. Is that also true concerning communications
17  from National Milk, specifically related to the
18  Cooperatives Working Together Program?
19  A. Again, to my knowledge, and since I would not
20  have been in the direct communications line for the CWT,
21  or Cooperatives Working Together Program, I'm not aware
22  of any policy, position, or statement, that said,
23  emails, documents, or any form of communication, was to
24  be retained for any period of time.
25  Q. Okay. I appreciate the answer. And, again,

Page 33

1  I'm trying to also understand -- primarily trying to
2  understand what Southeast Milk knows, information that
3  is in the possession of the entire company. Not just
4  one individual, but, also, that you have.
5      So, is there somebody at Southeast Milk who
6  would know whether there were guidelines related to
7  saving communications to or from National Milk or
8  specifically related to CWT?
9  A. If there is, I do not know who that would be.
10  Q. And I have the same question about whether
11  Southeast Milk had guidelines for retaining documents
12  related to either -- and I think you know the acronyms,
13  DCMA or SDCA?
14  A. Not aware of any such policies.
15  Q. And the same question about whether Southeast
16  had guidelines related to saving documents concerning
17  either Winn-Dixie or Bi-Lo?
18  A. Same answer.
19  Q. And then, to the extent that they exist, would
20  documents about -- would guidelines about hardcopy paper
21  documents, and their retention, be found in Exhibit 13?
22  A. On a department-by-department basis, the
23  guidelines for the non-electronics would have been
24  followed.
25  Q. So, we are specifically concerned about



Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
34..37

Page 34

1 communications and other documents from Mr. Covington
2 and Mr. Wright and some from yourself, as well. So,
3 when you say, Mr. Covington, when you say -- I mean, was
4 he in part of a department?
5   A.  Calvin Covington was the Chief Executive
6 Officer, and he had direct reports to him. I'm not sure
7 that I would characterize it as a department, per se.
8   Q.  I think you testified earlier that you weren't
9 aware of whether there were any guidelines in place, or
10 followed, specifically related to Mr. Covington?
11      MR. BEAUDINE: Object to the form.
12      MR. HAMILL: Is that true?
13      MR. BEAUDINE: Object to the form.
14      THE WITNESS: I would not -- I'm not aware of
15   any specific guidelines that would have been
16   directed at Calvin Covington.
17 BY MR. HAMILL:
18   Q.  Okay. So, set aside Exhibit 13, for now.
19   A.  Okay.

Page 35

1   Q.  Mr. Antoine, the court reporter has handed you
2 Exhibit 14.
3   (The document was received and attached to the
4   transcript as Plaintiffs' Exhibit Number 14.)
5 BY MR. HAMILL:
6   Q.  This is a list that I prepared, myself, to
7 assist us in the deposition, today. And it's a list of
8 antitrust matters where Joe Wright or Calvin Covington
9 gave a deposition.
10      You have the National Dairy Holdings case from
11 around 2003. The DFA Cartelization case from around
12 2005. Florida Attorney General Antitrust CID from
13 around 2006. And the, In Re, Southeastern Milk
14 Antitrust Litigation from around 2008.
15      I'm going to ask you generally and I'm going to
16 get into some specifics. And my question is whether
17 Southeast Milk has -- still has, in its possession, any
18 of the documents that it produced in any of the four
19 matters listed here on Exhibit 14?
20   A.  I do not know.
21   Q.  And did Southeast Milk attempt to determine, as
22 part of responding to their requests for production that
23 were made in this case, whether it still has any
24 documents that it produced in the matters listed on
25 Exhibit 14?

Page 36

1   A.  When we had the discussion that I referred to
2 earlier, to identify the various document requests, and
3 we determined to set action items up for individuals, I
4 would have to assume that they did a broad enough
5 search, that, if there were any relevant documents,
6 whether they're in these cases or outside of these
7 cases, then those documents would have been provided.
8   Q.  What is the basis for that assumption?
9   A.  Well, the basis for that assumption is, each of
10 us were tasked with providing those documents. In the
11 discussion, there was no parachute out of that. It was
12 strictly to find the documents, provide them to our
13 attorneys, as they would relate to each of those line
14 items. So, I have no reason to doubt that that was
15 done.
16   Q.  I'm just not familiar with what you mean by,
17 "parachute out."
18   A.  In other words, there was no option of not
19 providing the documents.
20   Q.  And, so, it seems -- and tell me if this is a
21 fair characterization. You seem to be saying that, if a
22 document existed otherwise, that might also have been
23 produced in one of these four litigations, you would
24 have found it wherever it was residing, outside of -- in
25 a litigation file?

Page 37

1      MR. BEAUDINE: Object to the form. You can
2   answer.
3      THE WITNESS: I'm saying that we received a
4   request for documents from the court, which we
5   considered to be serious. And after having the
6   discussion, after assigning action items, each
7   individual, to the best of my knowledge, would have
8   gone away and simply looked for any relevant
9   document to that court's request and then provide
10   that to the attorney. Whether it was inside,
11   outside, is irrelevant.
12 BY MR. HAMILL:
13   Q.  Okay. Let's take a step back and continue with
14 this. Who, at Southeast Milk, did provide documents to
15 the attorneys?
16   A.  I provided documents. I believe Shana would
17 have provided some documents.
18   Q.  That's Shana Wooten?
19   A.  Correct. Danielle, I believe, would have
20 provided some.
21   Q.  That's Danielle Weaver?
22   A.  Correct.
23   Q.  Okay.
24   A.  I didn't confirm this, but I would assume
25 Calvin Covington provided documents. And Joe Wright



Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
38..41

Page 38

1 would have provided documents.
2   Q. Anybody else?
3   A. Not that I'm specifically aware of.
4   Q. Okay. So, you identified five people. I'm
5 just going to go through them one by one.
6   A. Okay.
7   Q. Did you, yourself, go back into any folder, or
8 files, from any of the four litigations listed -- or the
9 four matters listed on Exhibit 14?
10  A. I did not.
11  Q. And do you have any such files?
12  A. I do not.
13  Q. And it's the same questions for Ms. Wooten.
14 Did she go back into any files or folders from these
15 four litigations?
16  A. You would have to ask her that question.
17  Q. Same for Ms. Weaver?
18  A. Yes.
19  Q. Same for Mr. Covington?
20  A. Yes.
21  Q. And same for Mr. Wright?
22  A. Correct.
23
24
25

Page 39

1   Q. Mr. Antoine, the court reporter has handed you
2 a document that's been marked as Exhibit 15, with Bates
3 Label SMI-1499, and then, on the back, which is SMI-316.
4      And, again, I'm not really going to ask about
5 the substance, so you don't have to read the notes,
6 themselves.
7   A. Okay.
8      (The document was received and attached to the
9      transcript as Plaintiffs' Exhibit Number 15.)
10 BY MR. HAMILL:
11  Q. I'm just trying to -- I want to find out, sort
12 of, the extent of your knowledge on some of these
13 matters.
14     So -- well, focusing on SMI-1499, do you see,
15 on the bottom right, there's a small -- I believe this
16 is a Bates number, and it has a number of PJW-0475. Do
17 you see that?
18  A. I do.
19  Q. All right. Who was the document custodian for
20 the production of this document to Plaintiffs in this
21 case for PJW-0475, now labeled SMI-1499?
22  A. I don't know.
23  Q. Do you know from what file it came?
24  A. I do not.
25  Q. Who, at Southeast Milk, would know?

Page 40

1   A. I have no idea.
2   Q. Then, for SMI-316, who was the -- I'm going to
3 use the term "document custodian," which refers to the
4 person that provided the document to the attorneys for
5 potential production in the case. Who was the document
6 custodian for SMI-316, in this case?
7   A. I don't know.
8   Q. From what file was SMI-316 taken, for
9 production in this case?
10  A. I don't know.
11  Q. And then you see -- at the bottom right, you
12 can -- well, you can see, from the exhibit, at one time,
13 this was marked as a deposition exhibit in one of the
14 antitrust matters where Mr. Covington testified. But,
15 then, it has a series of Bates numbers on it, so it's
16 been produced multiple times.
17     And this is -- my question, slightly different,
18 here, is -- and you may not know this, I understand
19 that, but I'm just trying to figure out which
20 litigations relate to which of these Bates numbers.
21  A. Okay.
22  Q. So, there's one -- so -- I don't know if it
23 helps, to look at them together. One starts with the
24 prefix of just, "SMI." The next one over starts with
25 the prefix of, "i-SMI." And then, there's another

Page 41

1 one -- I know it's sort of written over, but, that is --
2 it starts with, "confidential," and it has the number,
3 then, "SMI-CID."
4     So, for those three Bates prefixes, SMI, i-SMI,
5 and SMI-CID, are you able to -- do you know which
6 litigations or which matters those prefixes relate?
7   A. I do not.
8   Q. Okay. Mr. Antoine, the court reporter has
9 handed you Exhibit 16, with the Bates Numbers SMI-11311
10 through 312. And it's a report from the CEO to the
11 Board of Directors, dated August 11th, 2009.
12     (The document was received and attached to the
13     transcript as Plaintiffs' Exhibit Number 16.)
14 BY MR. HAMILL:
15  Q. My question has to do with the very last bullet
16 point, on Page 312. In 2009, the CEO would have been
17 Mr. Covington. Is that right?
18  A. Correct.
19  Q. Now, in the last bullet point, Mr. Covington is
20 referring -- is describing attorneys who came on site,
21 primarily to his office, Marta's office, and a storage
22 area, going through files. Do you know who the
23 reference is to Marta?
24  A. At that time, that would have been the
25 assistant to the CEO.



Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.  
ANTOINE, ALBERT

CONFIDENTIAL  
42..45

Page 42

1  Q. That's a female, Marta?
2  A. She is, yes.
3  Q. And what is her last name?
4  A. I don't remember her last name. Sorry.
5  Q. I understand. Then, there's a reference to a
6  storage area?
7  A. Yes.
8  Q. Do you know what that reference is?
9  A. We have a storage area. But, whether this is
10 referring to that storage area or another one, I could
11 not say for sure.
12  Q. Okay. Let's take a pause and I'm going to ask
13 you about that storage area. What is the storage area
14 that you're aware of?
15  A. It is an area where we store paper documents
16 from the various departments throughout Southeast Milk.
17 And it's periodically purged, based on the previous
18 document we were looking at, which identifies a
19 retention guideline.
20  Q. Is that onsite, in Belleview?
21  A. It's in Belleview, but it's not on our site.
22  Q. Where is it?
23  A. It's three or four miles away.
24  Q. Can you describe it? Is it a separate building
25 that the company owns or leases, or -- what is it?

Page 43

1  A. It is not owned by the company. It is a rented
2  space from another company.
3  Q. What is the size of the space that SMI rents?
4  A. (No response.)
5  Q. I mean, approximately.
6  A. I --
7  Q. Is it --
8  A. I'm not sure what the size is.
9  Q. We know it's bigger than a bread box.
10  A. Bigger than a bread box, but not as big as a
11 skyscraper.
12  Q. Right.
13  A. Just to give you a guess, the floor space could
14 be 10 by 15, 10 by 20, something like that.
15  Q. Okay. Fair enough. I understand. But, have
16 you been there, yourself?
17  A. I've been there myself, yes.
18  Q. Okay. And then, Mr. Covington goes on to
19 describe that a total of 82 boxes were taken for
20 scanning. My question is whether SMI has, now, today,
21 either the 82 boxes of physical hardcopy documents or
22 the results of the scanning of those documents?
23  A. I don't know.
24  Q. Who would know?
25  A. I'm not sure.

Page 44

1  Q. Mr. Antoine, Ms. Roberts has handed to you
2  Exhibit 17, with Bates Numbers SMI-9193 through 9195.
3     (The document was received and attached to the
4     transcript as Plaintiffs' Exhibit Number 17.)
5  BY MR. HAMILL:
6  Q. The first page of which is the Activity Report
7  of Joe Wright, September 2004. The second of which
8  begins -- I think these documents -- this was produced
9  as a single PDF to Plaintiffs. But, the second page
10 starts the "Report of Chief Executive Officer Calvin
11 Covington," from September 14th, 2004.
12      My question is going to be about the last
13 paragraph on the first page, on Line 3, and it's similar
14 to the questions that I had about the previous exhibit.
15 In the second to the last line, Mr. Wright refers to
16 organizing multiple boxes of old files. And it goes on,
17 "so the records might be of use as evidence." Same
18 questions. Does SMI, today, have those files?
19  A. I don't know.

Page 45

1  Q. You can set that aside. Give me a second.
2     MR. HAMILL: Is anybody interested in taking a
3  break?
4     MR. BEAUDINE: It's up to you.
5     THE WITNESS: It's up to you. I'm good.
6     MR. HAMILL: Okay.
7     Mr. Antoine, Ms. Roberts has handed you what
8  has been marked as Exhibit 18. This is a document
9  that I prepared, again, to assist with the questions
10 today, and it's a summary of the requests for
11 production. I just wanted to get a number of them
12 onto a single page, so we can focus on them.
13    (The document was received and attached to the
14    transcript as Plaintiff's Exhibit Number 18.)
15 BY MR. HAMILL:
16  Q. Column A are documents where Southeast Milk
17 responded that, they searched, but they did not have
18 any.
19  A. Okay.
20  Q. And Column B is where Southeast Milk said that
21 they would produce documents. So, they had some
22 documents and would go about gathering and producing
23 them. So, there are two different categories. The
24 questioning is somewhat similar, but I just want to
25 focus on some of them individually, to understand the



Orange Legal  
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
46..49

Page 46

1 efforts that the company made to identify, first,
2 especially Column A, whether it had the documents. And
3 then, for the ones that it did produce, what it did to
4 collect and produce them.
5  So, specifically, for Column A, you see, I put
6 in parens, after the item. Like, the first one is RFP
7 Number 28, which we asked for documents concerning why
8 the Herd Retirement Program was developed or operated
9 and then ended?
10  So, my question is -- so, for example, this is
11 a request where the company responded it didn't have any
12 documents to produce. My question is, what did the
13 company -- what steps did the company take to identify
14 whether it, in fact, had any documents that were
15 responsive to request Number 28?
16  MR. BEAUDINE: I'm going to object, just
17  because of foundational problems with the question,
18  or the line of questioning, with respect to
19  Column A. SMI did not simply state that it did not
20  have documents responsive to those requests for
21  production, but, instead, initiated or started its
22  responses by noting a variety of objections. And
23  then stated, subject to its objections, could not
24  locate certain documents.
25  But, for instance, in request Number 30 --

Page 47

1 well, let's say, 42, there was a request for all
2 public communications, or private speeches, or
3 presentations by a defendant concerning the Herd
4 Retirement Program, or the supply, demand, or price,
5 for milk products. SMI asserted a number of
6 objections in response to that request, including
7 the request for documents concerning the supply,
8 demand, or price, for milk products, as overly
9 broad, unduly burdensome, vague, and ambiguous. And
10 then said, subject to -- without waiving their
11 objections, after a reasonably diligent search, SMI
12 cannot locate any documents in its possession,
13 custody, or control, in response to this request.
14  The starting point was a very overly broad
15 request, asking for documents that generally applied
16 to the supply, demand, or price, for milk products.
17 And on its face, it would make it impossible to find
18 documents that were responsive, without looking
19 through each and every electronic, or non-electronic
20 document, in possession of SMI, which, under the
21 proportionality limitation in Rule 26, SMI is not
22 required to undertake. And so, to that extent, the
23 Column A is not -- does not properly disclose the
24 subject objections that were asserted by SMI, and
25 SMI did not simply state it did not locate the

Page 48

1 responsive documents.
2  Subject to that objection, you can answer the
3  question, if you can.
4  THE WITNESS: Can you restate the question?
5  MR. HAMILL: Sure. All right. And it's true,
6  the company made a number of objections to all of
7  the document requests, about being broad, or
8  burdensome, or vague, or ambiguous, and so forth.
9  And you're welcome to go look at the individual
10  documents. I thought this would be a little easier,
11  just working off the single page.
12 BY MR. HAMILL:
13 Q. So, my question is, for example -- well, I'm
14 going to focus on a few of these. The first one is
15 Request Number 28, top left, which is, what steps did
16 the company take to identify whether it had documents
17 about the Herd Program, why it was developed, operated,
18 or ended?
19 A. Well, as I stated earlier, we reviewed the
20 requests that were made, in a conversation, and we
21 identified individuals who would be better positioned
22 to collect the data, whatever the forum was, whether it
23 was not relevant, if it was in the subject matter for
24 that person. Then, they would then go away from that
25 meeting and speak with individuals, or do searches,

Page 49

1 themselves, to identify what documents, what information
2 would be available, that would be relevant to those
3 subject matters assigned to them. So, I have every
4 reason to believe that every individual would have done
5 just that.
6 Q. Are you able to provide any specifics about
7 that process directly concerning Request Number 28?
8 A. Since I was not assigned Number 28, I cannot
9 speak specifically to Number 28. I can just simply tell
10 you what each of us would have gone away to do.
11 Q. Who was assigned Number 28?
12 A. I believe it was Calvin Covington.
13 Q. Who made the assignments?
14 A. It was a collective effort, with our attorneys
15 involved.
16 Q. Okay. Would you scan through Column A, and
17 tell me which of -- well, let me ask you this question.
18 Would it be possible for you to name off, if we just
19 went through each one of them individually, who was
20 assigned each of the RFPs? Some of them, you might
21 recall. Some of them, you may not. I mean, I don't
22 want to be unreasonable.
23 A. I can look at them, based on the subject
24 matter, and say who I believe it would have been.
25 Q. Will you do that?



Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
50..53

Page 50

1  A. But I'm not sure that I'm going to be
2 100 percent, anyway.
3  Q. Understood. So, start with the first column,
4 then we'll go down. Just name off the RFP number and
5 person or persons.
6  A. Since each of these questions in the left-hand
7 column are related to the CWT program, that would have
8 more than likely been Calvin Covington.
9  Q. Okay.
10  A. Okay. Next column?
11  Q. Yes, sir. Thank you.
12  A. Documents reflecting -- that would have been
13 me -- the organizational structure.
14  Q. So, 18 is -- I'll say, Antoine.
15  A. The minutes, et cetera, I believe, was Calvin.
16  Q. So, 19 is Covington?
17  A. The next one, I'm not even sure what "OOP"
18 stands for.
19  Q. Those are over-order premiums?
20  A. Okay. Over-order premiums. Again, probably
21 Calvin.
22  Q. So, 23, Covington.
23  A. Next one, Calvin.
24  Q. 27, Covington.
25  A. The communications with government entities, I

Page 51

1 don't recall that one.
2  Q. Okay. 33, does not recall.
3  A. Calvin.
4  Q. 37, Covington.
5  A. I would assume the attorneys would have dealt
6 with that one.
7  Q. Okay. 57, attorneys.
8  A. Again, Calvin.
9  Q. Okay. 65, Covington.
10  A. Over-order premiums, again, would be Calvin.
11  Q. Okay. 77, Covington.
12  A. 78 is still over-order premiums, so, Calvin.
13 And the last one, I do not know. I don't recall.
14  Q. Okay. So, 80 and 81 is, doesn't recall.
15 All right. Well, a lot of these were Mr. Covington.
16 For Column A, what steps did Mr. Covington take to
17 identify whether he had any documents that were
18 responsive?
19  A. He would have taken, I assume, the same steps
20 everyone would have taken. And that would be to go
21 away and try to identify what source might contain the
22 documentation or individual that might have knowledge of
23 the documentation.
24  Q. Did Mr. Covington actually tell you what he
25 did?

Page 52

1  A. He did not.
2  Q. The same question for Column B. Do you know
3 what steps Mr. Covington -- no, here, in Column B, are
4 documents that SMI said it would produce, subject to
5 its various objections. Do you know what steps
6 Mr. Covington took to identify, collect, and produce
7 documents for Column B?
8  A. The same as I've stated before.
9  Q. And I have the same question, follow-up, on
10 that, which is, did Mr. Covington actually tell you what
11 he did?
12  A. He did not.
13  Q. And in connection with you preparing to testify
14 today on behalf of Southeast Milk, did you ask him?
15  A. I did not.
16  Q. Okay. And then, for the top of Column B, which
17 is RFP Number 18, you assigned that one -- or, that was
18 assigned to you. And what steps did you take to
19 identify documents concerning SMI's organizational
20 structure?
21  A. I knew that I had some organizational charts
22 from the past. So, I searched for those, found them,
23 and then I had a discussion with our HR manager, to see
24 if there was any -- anything that I was missing, and
25 then produced them to the attorney.

Page 53

1  Q. You can set that one aside. Moving on to a
2 different subject matter, which relates to antitrust
3 policy, compliance, and training. Did SMI have a
4 written antitrust policy in effect during 2003 through
5 2010?
6  A. Anything related to antitrust would have been
7 handled by Peter Latham, out of our law firm.
8  Q. Okay. But, I'm not sure that that probably
9 answered the question.
10  A. Okay. Then, the answer is, no, we did not
11 have a cooperative -- rather, an organization-specific
12 written policy. However, it was addressed by our
13 attorney, Peter Latham.
14  Q. Well, without disclosing any of the subject --
15 anything he said, or any specific advice that was
16 requested, did Mr. Latham make presentations to SMI
17 concerning antitrust matters?
18  A. He did at least two, that I'm aware of. And it
19 could have been three.
20  Q. Did he distribute written materials?
21  A. I don't recall written materials. I'm not
22 sure, to be honest.
23  Q. When Mr. Latham made presentations about
24 antitrust, did those include cooperative members, aside
25 from -- in addition to cooperative members that were on



Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.  CONFIDENTIAL
ANTOINE, ALBERT  54..57

Page 54
1  the Board of Directors?
2  A. I don't know, for sure.
3  Q. In connection with responding to the request
4  for production, did SMI ask Mr. Latham whether he had
5  any documents that were responsive to Request Number 22,
6  about antitrust policy and compliance?
7  A. Peter Latham was on that call, and he would
8  have been assigned that task as a result of that
9  conversation.
10  Q. Okay. I'll just -- I'm not going to go further
11  on that, because -- I don't want to get into anything
12  that is potentially privilege, so I will just leave it
13  at that. I have a similar question, just slightly
14  different, which is whether SMI had participated in
15  antitrust compliance training during 2003 through 2010?
16  A. The training that I'm aware of is the one just
17  spoken of, with the presentations that were presented by
18  Peter Latham.
19  Q. And those presentations included compliance
20  matters?
21  A. Yes.
22
23
24
25

Page 55
1  Q. Okay. Another subject matter, which is the
2  use of the Discovery vendors by Southeast Milk in
3  this case. Setting aside any work that was done by
4  Mr. Beaudine's law firm, did SMI use any outside
5  vendors, like e-Discovery vendors, to assist with
6  document Discovery in this case?
7  A. Not to my knowledge.
8  Q. Would who know?
9  A. Well, I would think I would know.
10  Q. Well, is there a reason you can't answer that
11  with a yes or a no?
12  A. No, we did not.
13  Q. All right.
14     MR. HAMILL: Okay. I think that's all the
15  questions that I have for Mr. Antoine, except to the
16  extent that Ms. Wooten or Ms. Weaver refers me back
17  to Mr. Antoine, in which case we might have to have
18  follow-up.
19     THE WITNESS: Okay.
20     MR. HAMILL: I don't know if counsel has
21  questions.
22     MR. BEAUDINE: No questions.
23     MS. CLIPPINGER: No questions.
24     MR. BEAUDINE: We will -- if it's ordered, we
25  will take a copy.

Page 56
1     MR. HAMILL: We'll be ordering the transcript.
2     COURT REPORTER: Mr. Beaudine, do you want a
3  copy?
4     MR. BEAUDINE: Sure.
5     MR. HAMILL: We want a rough, as well.
6     COURT REPORTER: A rough by Monday, and the
7  transcript in regular time?
8     MR. HAMILL: Yes.
9  (The deposition was concluded at 11:15 a.m.)

Page 57
1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA  )
4  COUNTY OF ORANGE  )
5
6     I, Diane C. Roberts, FPR, Notary Public, State
7  of Florida, certify that Albert Antoine personally
8  appeared before me on June 2, 2017, and was duly sworn.
9
10  Signed this 10th day of June, 2017.
11
12
13              *Diane C. Roberts*
              _____
              Diane C. Roberts
14              Florida Professional Reporter
              Notary Public, State of Florida
15              My Commission Number GG042541
              Expires on 10-31-2020.
16
17
18              Type of Identification Produced:
              Driver's License


Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
ANTOINE, ALBERT

CONFIDENTIAL
58..60

Page 58

```
 1         CERTIFICATE OF DEPOSITION TRANSCRIPT
 2
 3   STATE OF FLORIDA    )
 4   COUNTY OF ORANGE    )
 5
 6        I, Diane C. Roberts, FPR, Notary Public, State of
 7   Florida, was authorized to and did stenographically
 8   report the deposition of Albert Antoine, that a review
 9   of the transcript was requested; and that the foregoing
10   transcript, Pages 5 through 56, is a true and accurate
11   record of my stenographic notes.
12        I FURTHER CERTIFY that I am not a relative, or
13   employee, or attorney, or counsel of any of the parties,
14   nor am I a relative or employee of any of the parties'
15   attorney or counsel connected with the action, nor am I
16   financially interested in the action.
17
18   DATED this 10th day of June, 2017.
19
20
21
                          _____
22                           Diane C. Roberts, FPR
23
24
25
```

Page 59

```
 1              E R R A T A   S H E E T
        DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE
 2           IN RE:  WINN DIXIE VS. SOUTHEAST MILK
              CASE NO: 3:15-cv-01143-BJD-PDB
 3           6/2/17 DEPOSITION OF ALBERT ANTOINE
        I, Albert Antoine, wish to make the following
 4   corrections:
 5   PAGE     LINE           CORRECTION
 6   _____
 7   _____
 8   _____
 9   _____
10   _____._____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22        Under penalties of perjury, I declare that I have
     read the foregoing document, and the facts stated are
23   true.
24   _____  _____
        DATE           NAME OF DEPONENT
25
```

Page 60

```
                                         June 14, 2017
Albert Antoine
c/o Michael J. Beaudine, Esquire
Latham, Shuker, Eden & Beaudine, LLP
111 North Magnolia Avenue,
Suite 1400
Orlando, Florida  32801
In Re:  6/2/17 Deposition of Albert Antoine
        Winn-Dixie vs. Southeast Milk
Dear Sir:
     This letter is to advise that the transcript for the
above-referenced deposition has been completed and is
available for review.  Please contact our office at
(800) 275-7991 to make arrangements for read and sign,
or sign below to waive review of this transcript.
     It is suggested that the review of this transcript
be completed within 30 days of your receipt of this
letter, as considered reasonable under the Federal Rules
listed below; however, there is no Florida Statute to
this regard.
     The original of this transcript has been forwarded
to the ordering party.  And your errata sheet, once
reviewed, will be forwarded to all ordering parties for
inclusion in the transcript.
                         Sincerely,
                         Diane C. Roberts, FPR
                         Orange Legal, Inc.
cc:  Mark S. Hamill, Esquire
Waiver:  I,_____, hereby waive the reading
& signing of my deposition transcript.

_____    _____
Deponent Signature              Date
Federal Civil Procedure Rule 30(e)
Florida Civil Procedure Rule 1.310(e)
```

