FILED UNDER SEAL

# Exhibit 10

**Confidential Deposition Transcript:**

**Danielle Weaver**

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al. CONFIDENTIAL
WEAVER, DANIELLE

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Winn-Dixie Stores, Inc., and
Bi-Lo Holdings, LLC,

Plaintiffs,

Case Number:
3:15-cv-01143-BJD-PDB

v.

Southeast Milk, Inc., et al.,

Defendants.
_________________________________/

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF: DANIELLE WEAVER

DATE TAKEN: JUNE 2, 2017

TIME: 1:15 P.M. UNTIL 2:20 P.M.

LOCATION: LATHAM, SHUKER, EDEN & BEAUDINE, LLP
111 N. MAGNOLIA AVENUE,
SUITE 1400
ORLANDO, FLORIDA 32801

REPORTED BY: DIANE C. ROBERTS
FLORIDA PROFESSIONAL REPORTER

EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DECLARED CONFIDENTIAL AND ARE SEALED UNDER SEPARATE COVER

ORANGELEGAL

Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WEAVER, DANIELLE

CONFIDENTIAL
2..5

Page 2

A P P E A R A N C E S

MARK S. HAMILL, ESQUIRE
OF: Ahern & Associates, P.C.
Three First National Plaza
70 West Madison St.
Suite 1400
Chicago, Illinois 60601
mark.hamill@ahernandassociatespc.com
Attorney for the Plaintiff

MICHAEL J. BEAUDINE, ESQUIRE
OF: Latham, Shuker, Eden & Beaudine, LLP
111 North Magnolia Avenue,
Suite 1400
Orlando, Florida 32801
beaudine@lseblaw.com
Attorney for Defendant Southeast Milk, Inc.

LUCY S. CLIPPINGER, ESQUIRE
OF: Baker & Miller, PLLC
2401 Pennsylvania Avenue N.W.,
Suite 300
Washington, D.C. 20037
lclippinger@bakerandmiller.com
Attorney for Defendant Dairy Farmers of America

Page 3

I N D E X

PAGE

TESTIMONY OF DANIELLE WEAVER
Direct Examination by Mr. Hamill................7
CERTIFICATE OF OATH.............................33
CERTIFICATE OF DEPOSITION TRANSCRIPT............34
ERRATA SHEET....................................35
NOTIFICATION LETTER.............................36

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the counsel for the respective parties and the deponent that the reading and signing of the deposition transcript be reserved.

Page 4

E X H I B I T S

PAGE

PLAINTIFFS' EXHIBIT NUMBER 24
(Email Chain between Calvin Covington and Joe Wright)..................................25
PLAINTIFFS' EXHIBIT NUMBER 25
(Declaration of Danielle Weaver for Southeast Milk, Inc.)..................................27
PLAINTIFFS' EXHIBIT NUMBER 26
(NMPF eMails to Joe Wright Not Produced By SMI).29

Page 5

PROCEEDINGS

* * *

COURT REPORTER: Raise your right hand to be sworn. Do you solemnly swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

COURT REPORTER: Thank you.

THEREUPON,

DANIELLE WEAVER,

having been produced and first duly sworn as a witness, was examined and testified upon his oath as follows:

MR. BEAUDINE: For the record, SMI would like to restate and incorporate its statement regarding the applicability of the stipulated confidentiality agreement in this case. And rather than restating what we stated at the beginning of the portion of the deposition given by Albert Antoine, we will, with the consent of Plaintiffs' counsel, just copy and paste what I stated there, right here.

MR. HAMILL: Very good. Thank you.

MR. BEAUDINE: "Before we get started, I need to note something for the record. There is a stipulated confidentiality agreement in place, that the parties agreed to in early August 2016. And SMI

Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al. CONFIDENTIAL
WEAVER, DANIELLE 6..9

Page 6

invokes its rights with respect to Paragraph 4(d), which allowed -- it provides that the designation of confidential material, or highly confidential material, for the purposes of this agreement, may be made in the following manner.

And under Subparagraph (d), it provides, (ii), by written notice sent to all counsel of record for the parties within 15 business days after receipt of the transcript of the deposition. And that same subparagraph provides, "All transcripts shall be considered highly confidential, and subject to this agreement, until expiration of the 15-day period described in this paragraph. Any testimony designated as confidential, or highly confidential, shall be marked and treated in the same manner as documents covered by this agreement."

So, SMI does intend to invoke its rights to follow these procedures and designate portions of this deposition transcript as either confidential, or highly confidential, by providing written notice to all counsel of record within 15 business days after SMI receives a copy of the transcript of the deposition. And until such time, the transcript shall be considered highly confidential and subject to the agreement, accordingly.

Page 7

Thank you."

DIRECT EXAMINATION

BY MR. HAMILL:

Q. Good afternoon, Ms. Weaver.
A. Good afternoon.
Q. My name is Mark Hamill, and I'm representing the Plaintiffs in this case, who are Winn Dixie and Bi-Lo. I have some questions, this afternoon, for Southeast Milk, about their document production in this case. And Southeast Milk has designated you to testify for the cooperative, on their behalf, on some of the topics that we will be discussing. So, I want to take a few moments to set the stage, before we get into more the questions and answers. Okay?
A. Okay.
Q. First of all, is it okay with you if I refer to Southeast Milk, Inc., as SMI, today?
A. Yes.
Q. Now, the case is about the Herd Retirement Program, Cooperatives Working Together, which was from the National Milk Producers Federation. But, we won't be getting into the substance of the case, and my questions, instead, will be about the document production efforts and some background to help support Plaintiffs' understanding of those efforts.

Page 8

A. Now, we've set out the topics for the deposition in the notice which is in front of you, here, in Exhibit 1. And have you seen Exhibit 1, before today? Take your time and look through it, if you would like.
A. I believe so.
Q. You can set it aside, then.
And do you understand, then, that you are here to testify on behalf of Southeast Milk, which is beyond just what you have on your own personal knowledge, but information and knowledge that Southeast Milk would possess. Do you understand that?
A. Yes.
Q. Okay. Have you ever testified at deposition before today?
A. No.
Q. All right. How about, have you testified at trial before today?
A. No.
Q. Just a couple of ground rules, to help things move along. First of all, Ms. Roberts will be taking everything down. And for her to do that best is, one person talk at a time. Okay?
A. Okay.
Q. And then, again, to be able to take things

Page 9

down, so that we're clear, to answer out loud, with a yes or no, or whatever else you want to say. Okay?
A. Yes.
Q. Okay. Now, if any of my questions are unclear, or don't seem to make sense to you, will you ask me to rephrase or to clarify?
A. Yes.
Q. Okay. Some of the questions that I have today might touch on conversations that you, or somebody else have had, with either Mr. Beaudine, or Ms. Taylor, or another attorney. But, if you think that is the case, I just want to be clear, I would never be asking for you to tell me contents of those conversations. I might ask if there was -- if a conversation occurred, but I would not want you to go on and discuss the subject matter or what was actually said. Okay?
A. Yes.
Q. Okay. Now, we can take a break, at any time, if you would like, or anybody else in the room would like. And the exception to that is, we don't take breaks when a question is pending. But, if you need to refer or talk with Mr. Beaudine about a privilege question, or communications that were had with counsel, then we can do that at any time. Okay?
A. Yes.

ORANGELEGAL

Orange Legal
800-275-7991

Page 10

Q. Now, Mr. Beaudine or Ms. Clippinger may have some objections this afternoon. Generally speaking, you will have to answer the question after the objection, unless Mr. Beaudine instructs you not to answer, which will be based on client privilege. Okay?
A. Yes.
Q. Okay. Now, what happens, after all the objecting, is, the witnesses forget the question. And if that happens, you can just ask me to repeat the question. Okay?
A. Yes.
Q. All right. Those are the ground rules. It's helpful if we could just understand a little bit about who you are, before we get into the rest of the deposition, so let's start with that. What is your job title, at Southeast Milk?
A. IT Network Manager.
Q. How long have you had that title?
A. Since November 2016.
Q. Okay. What was your position before -- when did you start with the company?
A. January 2006.
Q. Okay. When you joined Southeast Milk, what was your job title then?
A. Systems assistant.

Page 11

Q. And then, what was your next job title after systems assistant?
A. Network administrator.
Q. Network administrator. Is that your current title?
A. No, I'm sorry, network administrative supervisor.
Q. Then, what was your next title after that?
A. IT Network Manager.
Q. Okay. Did you take over the IT Network Manager position from Jason Lazanowski?
A. No.
Q. Who did you take it over from?
A. Justin Lazanowski.
Q. I'm sorry, Justin. So, did you take it over from Justin?
A. Yes.
Q. All right. I want to ask you a little bit about what you did to prepare for the deposition here today. So, not what you did on the document production, but what you did to prepare to testify today. Aside from counsel, did you talk to anybody to obtain information for the deposition?
A. No.
Q. Did you review any documents, to obtain information for the deposition?

Page 12

A. I reviewed my deposition.
Q. Your Declaration?
A. My Declaration, I'm sorry.
Q. Did you review anything else?
A. No.
Q. Okay. I want to get a little bit of an overview and maybe some details on the IT operations at Southeast Milk. So, in your current position, do you oversee the entire department?
A. Yes.
Q. How many people are in the department?
A. Three.
Q. And then, I want to ask about network drives. And if you can think back through, from 2006 -- I know it's hard -- we could either do it working forward, from 2006, or backwards, to present, whichever is easiest for you. I'd like to just get an understanding of what network drives were present at Southeast Milk. So, the first question is, say, 2006 forward, did Southeast Milk use a network drive?
A. I'm not sure.
Q. Is that because you're not sure what a network drive is, or --
A. Well, my position was different then.

Page 13

Q. Okay.
A. I wouldn't have been privy to certain things.
Q. Well, when -- when did you take over as network admin supervisor?
A. Sometime in 2010.
Q. Do you need water?
A. No. I'm sorry.
Q. That's all right. Do you remember approximately when, in 2010?
A. I believe it would have been sometime after September 2010.
Q. Okay. Well, in your work as either systems assistant, or network admin supervisor, were you -- did you save documents to a network drive?
A. Yes.
Q. And did you save documents to just one network drive or to more than one?
A. Can you clarify what you mean by, "network drive?"
Q. Sure. Say, a shared drive, that is made available for users to save documents that they prepare on their desktops, for use later -- potentially, for sharing in the department -- and that would be separate from, say, a mail server. But, you know, a document, a repository for non-email electronic documents.

A. Yes, I would have saved to a network drive.
**Q. Okay. To more than one?**
A. Yes.
**Q. Okay. To which network drives did you share -- did you save documents?**
A. I would have saved to a department drive, and I probably would have saved to my designated area.
**Q. And then, how about the configuration today? How many network drives are there?**
A. There would be two.
**Q. Does SMI have back-ups for -- from the network drives, that go back to the period of 2010 or before?**
A. No.
**Q. And in your work at SMI, since 2006, have you followed a set of document retention guidelines?**
A. No.
**Q. Do you know whether any of the network drives at SMI, today, contain either copies, electronic copies, of any materials that SMI produced, in -- in any prior litigations?**
A. Can you repeat that?
**Q. All right. Well, let me give you -- let me show you this list, make it a little easier. Here's Exhibit 13 (sic).**
A. Exhibit 14.

**Q. So, Ms. Weaver, I've handed you Exhibit 14, and it's a list of some litigations, or government investigations, where either Joe Wright, or Calvin Covington, gave a deposition. These are specific litigations that I have in mind.**
**And when I ask whether the network drives at Southeast Milk contain a copy of any of the materials that were produced by SMI, Joe Wright, or Calvin Covington, in these four matters --**
A. I wouldn't know.
**Q. -- who would know?**
A. I don't know.
**Q. All right. You can set that aside. Thank you.**
**I want to ask about non-email electronic documents and what people at SMI did. Did SMI collect non-email electronic documents for production in this case?**
A. Can you repeat that?
**Q. So, I'll break it down a little bit. We call -- the people that documents were collected from, potentially, to have the documents produced, we call them document custodians. And I'm asking about electronic documents other than email. So, for example, the kind of documents that might be on a computer network drive, or on a local drive, okay, are you with me so far?**

A. Yes, I understand.
**Q. And my question is, who were the document custodians for the non-email electronic documents?**
A. The individual person?
**Q. Yes.**
A. The individual person.
**Q. Who were they?**
A. The individual person.
**Q. Do you recall their names?**
A. I just don't understand what you're asking me.
**Q. Well, let me back up. Did SMI collect non-email electronic documents for production in this case?**
A. Not that I'm aware of.
**Q. Okay. I want to ask you about email. So, to the best that you can, from 2006 forward, can you identify for me, please, what email systems SMI used?**
A. We had an exchange server.
**Q. Okay. And did SMI use the exchange server from, say, 2006, forward?**
A. I believe it was used -- in 2006, when I came, they had an exchange server.
**Q. Okay. And did that change, at some point in time?**

A. Yes.
**Q. What was the change and when did it happen?**
A. In September 2012, we switched to a Microsoft cloud email system.
**Q. Okay. And did this switch to the Microsoft cloud result in the loss of any email?**
A. What do you mean by, "loss?"
**Q. Did the switch, to -- and what I mean is that the email would no longer be available to either the user or to anybody at Southeast Milk who would otherwise have access to it?**
A. Yes.
**Q. It did result in a loss?**
A. To some people, yes.
**Q. But, not to all people?**
A. No.
**Q. Okay. And was that -- okay. And what people did not have a loss of their email?**
A. The people who stayed with SMI. The current employees did not have a loss.
**Q. But, employees who had left the company, at the time of the switchover to the cloud, their email was lost. Is that correct?**
A. Yes.
**Q. But, otherwise, the email continued to be**



Page 18

available. Is that correct?
A. I believe so.
Q. And what is the -- in the system, today, what is the -- is there a -- an enforced document retention window?
MR. BEAUDINE: Object to the form.
THE WITNESS: Can you clarify that?
BY MR. HAMILL:
Q. Sure. So, in the system today, does the system automatically -- for example, does the system automatically delete email after a certain time period?
A. (No response.)
Q. You know, older than 180 days, older than a year, et cetera?
A. Yes.
Q. Okay. What are those time windows? Those retention periods?
A. I believe it's, if you throw something in the trash, your trash bin, it will delete it from the trash bin after a certain period of time.
Q. Is there a similar deletion feature for email that is not in the trash?
A. No.
Q. Are you aware of email -- changes to the email system that might have occurred, if there were any, from

Page 19

2000 through 2006?
A. No.
Q. Okay. I want to ask you about the collection of email for Calvin Covington, Albert Antoine, and Shana Wooten. And, specifically, I had understood that the email for those three people was produced, in this case, from archives.
And, so, my question is, first of all, was the email for Calvin Covington, Albert Antoine, and Shana Wooten, that was produced in this case, produced from archives?
A. Some of it was.
Q. And --
A. But --
Q. I'm sorry, go on. All right. Some was and some was not?
A. Yes.
Q. Can you delineate? Can you just describe for us what email -- why some was produced from archives and the others were produced from live cloud environment. Is that right?
A. That's correct.
Q. Why was there a distinction?
A. When we migrated to the cloud, Calvin Covington was no longer an active employee.

Page 20

Q. But, Albert Antoine and Shana Wooten were?
A. That's correct.
Q. Okay. So, let me ask you it this way. The email that SMI produced, in this case, for Calvin Covington, came from an archive. Correct?
A. It came from a post office.
Q. Okay. What was the post office?
A. It was a -- it was what you call an archive.
Q. Is that an archive -- is that a post office for archive that SMI had control of, or that Mr. Covington had control of?
A. SMI.
Q. And then, was the email for Albert Antoine and Shana Wooten produced only from the live environment?
A. No.
Q. It was produced both from the archive and live environment?
A. That's correct.
Q. And why did SMI produce, from both archive and a live environment, for Mr. Antoine and Ms. Wooten?
A. The timeframe of the request.
Q. Okay. Can you elaborate? What was it about the timeframe that made it necessary to use both the archive and the live?
A. We migrated in 2012. And the request asked me

Page 21

to go back further, and, so, I used the back -- the archive, to make sure I covered the time period on their request.
Q. Okay. I thought I understand, from what you said earlier -- I might have misunderstood -- that Mr. Antoine and Ms. Wooten's email, at the time of the switchover to the cloud, which was in 2012, that all their email would have been pulled forward, into the cloud?
A. I believe I said, "That I know of." So, for those two people, to make sure, I also looked at the archive.
Q. When the archive was made, did the archive for Mr. Covington, and Mr. Antoine, and Ms. Wooten, capture all of their email that was existing at the time of the archive?
A. Yes.
Q. Okay. I want to just ask maybe a couple more questions about the archive, and the live, for Mr. Antoine and Ms. Wooten. Did SMI go back to the archive -- did you go back to the archive, for Mr. Antoine and Ms. Wooten, because it just -- as a double check, on the live, or because you knew that there would be gaps in the live that you had to cover by going back to the archive?

Page 22

A. I wasn't sure.
**Q. And then, the email right before, for Mr. Covington Mr. Antoine and Ms. Wooten, that was gathered for review and potential production, was it -- from SMI's efforts, was that email filtered or analyzed using search terms?**
A. Yes.
**Q. Are those the same search terms that were later used for the first review of Mr. Wright's laptop?**
A. Yes.
**Q. For the Antoine and Wooten emails, did SMI, before handing any documents over to counsel, have to duplicate the emails, if there were any duplication for any email that might have been both in the archive and also in the live environment?**
MR. BEAUDINE: Object to the form.
THE WITNESS: I don't understand the question.
BY MR. HAMILL:
**Q. Well, did SMI check for duplication of emails, for example, for Mr. Antoine, that were gathered both from the archive and the live system?**
A. No.
**Q. If -- do you know who Maggie Murphy is?**
A. Yes.
**Q. Do you know who Tom Pittman is?**

Page 23

A. Yes.
**Q. Okay. Let's just use those two as an example. If the Plaintiffs -- if I were to ask SMI to search its live email for Maggie Murphy, or Tom Pittman, for email from 2010, is that a search that SMI could run, today?**
A. Can you clarify?
**Q. I can ask it in a general way. For any current employee, if Plaintiffs were to ask that SMI make that current employee a document custodian -- and we'll just assume the employee was working at the company in 2010 -- would SMI be able to go into its cloud environment, or otherwise, and pull email for that person?**
A. No.
**Q. Why not?**
A. For Maggie Murphy or Tom Pittman?
**Q. Well, how about for Maggie Murphy, why not?**
A. She's no longer an employee.
**Q. She's no longer an employee. What about Tom Pittman?**
A. No.
**Q. Because --**
A. He's no longer an employee.
**Q. What about Bryce Kelly?**
A. No.

Page 24

**Q. Because --**
A. He's no longer an employee.
**Q. What about Marta Gonzalez?**
A. No.
**Q. Because --**
A. She's no longer an employee.
**Q. What about for a current employee?**
A. That would depend.
**Q. Okay. On what?**
A. If the employee kept relevant documents.
**Q. No, I understand that. I'm just -- just, generally, if we had a current employee, who is currently at SMI, was also at SMI in 2010, all right? Now, maybe the search would yield nothing, but my question is whether that person's email could be searched?**
A. Yes.
**Q. For the Microsoft cloud environment, what happens to the email of departing employees?**
A. They are held for a while and then they are deleted.
**Q. Do you know what time period they are held for?**
A. That depends on the time period I'm given.
**Q. Okay. You may not know this, but I'm going to ask and just see. When did Maggie Murphy leave SMI?**

Page 25

A. I don't know.
**Q. Do you know when Tom Pittman left?**
A. No.
**Q. Do you know when Bryce Kelly left?**
A. No.
**Q. You mentioned the post office archive?**
A. Yes.
**Q. For what people are there post office archives?**
A. Certain director level and above.
**Q. Can you tell me their names?**
A. I don't know them all, off the top of my head.
**Q. Do you know how many there were?**
A. Less than 15.
**Q. Less than 15?**
A. Yes.
**Q. Okay. That's for you.**
A. Okay.

CONFIDENTIAL

Q. Ms. Weaver, the court reporter has handed you Exhibit 24, which has Bates Number SMI-13362 through 13363.

(The document was received and attached to the transcript as Plaintiffs' Exhibit Number 24.)

BY MR. HAMILL:

Q. It's an email chain between Calvin Covington and Joe Wright. And if you look at Page 13363, the back page -- it's the email message that's in the middle of the page -- it starts with a forwarded message. You see Calvin Covington is emailing from his CompuServe address, @CS.com. He is e-mailing Joe Wright, which is the PJW@strato.net email. And then Calvin is copying his own AT&T address. Do you see that?

A. Yes.

Q. All right. And the subject matter is about a DCMA, which I believe is a marketing agency in common for milk. So, it's a business email.

A. Okay.

Q. My question is, did SMI take any steps to collect business email from Mr. Covington's CompuServe or AT&T addresses?

MR. BEAUDINE: Object to the form. If this pertains to Topic 21, we further object, because it presumes that Mr. Covington generated so-called

CONFIDENTIAL

responsive email, from personal email account, on which Covington allegedly conducted SMI business, which is flatly false. In December of 2010, Mr. Covington was no longer affiliated, in any capacity, with SMI, having left SMI at the end of February 2010. Subject to my objection, you can answer, if you know the answer.

THE WITNESS: Can you restate the question?

BY MR. HAMILL:

Q. Right. The question is whether SMI took any steps to collect and to produce email from Mr. Covington's CompuServe or AT&T email addresses.

A. I don't know.

Q. Is there somebody else who would know?

A. I don't know.

(There was a brief recess.)

BY MR. HAMILL:

Q. Okay. Ms. Weaver, the court reporter has handed you Exhibit 25, which contains both your first Declaration and your second Declaration.

A. Okay.

(The document was received and attached to the transcript as Plaintiffs' Exhibit Number 25.)

BY MR. HAMILL:

Q. And then, I would just want to -- I want to ask you -- again, you are testifying on behalf of Southeast Milk, today -- whether Southeast Milk agrees that the statements made in these declarations are true or false.

So, for example, we'll just start with Paragraph 1 of your first Declaration, testifying on behalf of Southeast Milk. Is Paragraph 1 of your Declaration true or false?

A. True.

Q. And I'm going to -- I don't want to ask you separately about each one, it will just be a little bit odd. But, take your time and scan through them. Is it true or false, for Paragraphs 2 through 15 of the Declaration -- of your first Declaration?

A. Yes.

Q. Okay. So, Paragraphs 2 through 15 are true,

correct?

A. Yes.

Q. So, then, it's the same question for the second Declaration. Testifying on behalf of SMI, Paragraphs 1 through 20, true or false?

A. True.

Q. Okay. I want to ask you about Paragraph 14 from the second Declaration.

A. Okay.

Q. So, in Paragraph 14 of the second Declaration, you state that you did not take any steps to retrieve non-email documents from Mr. Wright's laptop. Have you taken any steps, since the time that you wrote this Declaration, to retrieve the non-email documents from Mr. Wright's laptop?

A. No.

Q. Has SMI inquired, of Mr. Wright, about whether there potentially are business-related documents on the hard drive of that laptop?

A. I don't know.



Page 30

CONFIDENTIAL

Q. Okay. So, Ms. Weaver, the court reporter has handed you Exhibit 26. It contains 10 emails that were produced to Plaintiffs, in this case, from National Milk Producers Federation. You can see that from the Bates stamp at the bottom, and the cover pages, a little summary of the emails that I put together.
A. (Nods head affirmatively.)
(The document was received and attached to the transcript as Plaintiffs' Exhibit Number 26.)
BY MR. HAMILL:
Q. And I searched SMI's document production for these same e-mails, but they were not present. And, so, I want to ask you about one in particular, using it as an example, which would be the last one, the very last page. So, the three last pages, NMPF-26453.
A. Okay.
Q. All right. And you see it's an email from Anuja Miner, on behalf of Jerry Kozak.
A. Okay.
Q. And then, you see the date is February 9th of 2009, and it has a long list of email recipients. But, in the last full line, in and around the middle, you see Joseph Wright?
A. I don't have my reading glasses on.
Q. Here, Joe Wright.

Page 31

A. Okay. All right. Yes, I see.
Q. And the subject is, "CWT Committee Conference Call Agenda and Materials." And then, if this document was intended to have an attachment, it doesn't. It was produced without it.
And my question is, is SMI aware of reason that this email, NMPF-26453, would not have been produced by SMI, in this case?
A. No, I don't know why.

Page 32

Q. Okay. You can set that aside.
Joe Wright happens to be an attorney, as well as a dairy farmer, so I looked up his information on the Florida Bar website. And, there, he lists a Gmail address for his email address. Whereas, previously, I know he was using the strato.net address. Do you know when Mr. Wright began using the gmail address?
A. No.
Q. Did you ask him?
A. No.
Q. Okay.
MR. HAMILL: Thank you for coming in. Unless counsel has any questions?
MR. BEAUDINE: No questions.
MS. CLIPPINGER: No questions.
MR. BEAUDINE: We'll order a copy.
COURT REPORTER: Read and sign or waive?
MR. BEAUDINE: Read.
COURT REPORTER: Ordering it?
MR. HAMILL: Yes. Rough, by Monday.
COURT REPORTER: Mr. Beaudine, would you like a copy?
MR. BEAUDINE: Yes, regular time.
(The deposition was concluded at 2:20 p.m.)

Page 33

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF ORANGE )

I, Diane C. Roberts, FPR, Notary Public, State of Florida, certify that Danielle Weaver personally appeared before me on June 2, 2017, and was duly sworn.

Signed this 10th day of June, 2017.

Diane C. Roberts
Diane C. Roberts
Florida Professional Reporter
Notary Public, State of Florida
My Commission Number GG042541
Expires on 10-31-2020.

Type of Identification Produced:
Driver's License

Page 34

CERTIFICATE OF DEPOSITION TRANSCRIPT

STATE OF FLORIDA )
COUNTY OF ORANGE )

I, Diane C. Roberts, FPR, Notary Public, State of Florida, was authorized to and did stenographically report the deposition of Danielle Weaver, that a review of the transcript was requested; and that the foregoing transcript, Pages 5 through 32, is a true and accurate record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, or employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 10th day of June, 2017.

*Diane C. Roberts*

Diane C. Roberts, FPR

Page 35

E R R A T A S H E E T

DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE

IN RE: WINN DIXIE VS. SOUTHEAST MILK

CASE NO: 3:15-cv-01143-BJD-PDB

6/2/17 DEPOSITION OF DANIELLE WEAVER

I, Danielle Weaver, wish to make the following corrections:

PAGE LINE CORRECTION

__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________
__________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document, and the facts stated are true.

__________________________________________________
DATE NAME OF DEPONENT

Page 36

June 14, 2017

Danielle Weaver
c/o Michael J. Beaudine, Esquire
Latham, Shuker, Eden & Beaudine, LLP
111 North Magnolia Avenue,
Suite 1400
Orlando, Florida 32801

In Re: 6/2/17 Deposition of Danielle Weaver
Winn-Dixie vs. Southeast Milk

Dear Ma'am:

This letter is to advise that the transcript for the above-referenced deposition has been completed and is available for review. Please contact our office at (800) 275-7991 to make arrangements for read and sign, or sign below to waive review of this transcript.

It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under the Federal Rules listed below; however, there is no Florida Statute to this regard.

The original of this transcript has been forwarded to the ordering party. And your errata sheet, once reviewed, will be forwarded to all ordering parties for inclusion in the transcript.

Sincerely,
Diane C. Roberts, FPR
Orange Legal, Inc.

cc: Mark S. Hamill, Esquire

Waiver: I,__________________, hereby waive the reading & signing of my deposition transcript.

____________________ _______________
Deponent Signature Date

Federal Civil Procedure Rule 30(e)
Florida Civil Procedure Rule 1.310(e)