FILED UNDER SEAL

# Exhibit 9

**Confidential Deposition Transcript:**

**Shana Wooten**

```
 1              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                  JACKSONVILLE DIVISION

 3
    Winn-Dixie Stores, Inc., and
 4  Bi-Lo Holdings, LLC,

 5       Plaintiffs,
                                     Case Number:
 6  v.                               3:15-cv-01143-BJD-PDB

 7  Southeast Milk, Inc., et al.,

 8       Defendants.
    _____/
 9

10
        * * * * * * * * * * * * * * * * * * * * * * * * *
11

12
    DEPOSITION OF:       SHANA WOOTEN
13
    DATE TAKEN:          JUNE 2, 2017
14
    TIME:                11:15 A.M. UNTIL 12:13 P.M.
15
    LOCATION:            LATHAM, SHUKER, EDEN & BEAUDINE, LLP
16                       111 N. MAGNOLIA AVENUE,
                         SUITE 1400
17                       ORLANDO, FLORIDA   32801

18  REPORTED BY:         DIANE C. ROBERTS
                         FLORIDA PROFESSIONAL REPORTER
19

20
        EXCERPTS OF THIS TRANSCRIPT HAVE BEEN DECLARED
21      CONFIDENTIAL AND ARE SEALED UNDER SEPARATE COVER

22

23

24

25
```



Orange Legal  
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
2..5

Page 2

```
 1           A P P E A R A N C E S
 2  MARK S. HAMILL, ESQUIRE
      OF:  Ahern & Associates, P.C.
 3        Three First National Plaza
          70 West Madison St.
 4        Suite 1400
          Chicago, Illinois  60601
 5        mark.hamill@ahernandassociatespc.com
 6           Attorney for the Plaintiff
 7
    MICHAEL J. BEAUDINE, ESQUIRE
 8    OF:  Latham, Shuker, Eden & Beaudine, LLP
          111 North Magnolia Avenue,
 9        Suite 1400
          Orlando, Florida  32801
10        beaudine@lseblaw.com
11           Attorney for Defendant Southeast Milk, Inc.
12
    LUCY S. CLIPPINGER, ESQUIRE
13    OF:  Baker & Miller, PLLC
          2401 Pennsylvania Avenue N.W.,
14        Suite 300
          Washington, D.C.  20037
15        lclippinger@bakerandmiller.com
16           Attorney for Defendant Dairy Farmers of America
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1             E X H I B I T S
                                                      PAGE
 2  PLAINTIFFS' EXHIBIT NUMBER 19
     (Excerpts of the Deposition Transcript of
 3    Joseph Patrick Wright and Calvin Covington).....17
 4  PLAINTIFFS' EXHIBIT NUMBER 20
     (Declaration of Shana Wooten for Southeast
 5    Milk, Inc.).....................................28
 6  PLAINTIFFS' EXHIBIT NUMBER 21
     (Southeast Milk, Inc., Minutes of Board of
 7    Directors Meeting, Dated July 10, 2007, Ocala,
      Florida)........................................30
 8
    PLAINTIFFS' EXHIBIT NUMBER 22
 9   (Email from Jana Unterman to Calvin Covington,
      Re, Attachment, Training Agenda)................30
10
    PLAINTIFFS' EXHIBIT NUMBER 23
11   (Southeast Milk, Inc., Minutes of Board of
      Directors Meeting, Dated August 12, 2008,
12    Plant City, Florida)............................32
```

Page 3

```
 1              I N D E X
                                                 PAGE
 2
    TESTIMONY OF SHANA WOOTEN
 3    Direct Examination by Mr. Hamill................7
 4  CERTIFICATE OF OATH.............................35
 5  CERTIFICATE OF DEPOSITION TRANSCRIPT............36
 6  ERRATA SHEET....................................37
 7  NOTIFICATION LETTER.............................38
 8
 9         S T I P U L A T I O N S
10      It is hereby stipulated and agreed by and between
11  the counsel for the respective parties and the deponent
12  that the reading and signing of the deposition
13  transcript be reserved.
```

Page 5

1           P R O C E E D I N G S
2                *   *   *
3       COURT REPORTER: Raise your right hand to be
4   sworn. Do you solemnly swear the testimony you're
5   about to give will be the truth, the whole truth,
6   and nothing but the truth, so help you God.
7       THE WITNESS: Yes.
8       COURT REPORTER: Thank you.
9 THEREUPON,
10         SHANA WOOTEN,
11 having been produced and first duly sworn as a witness,
12 was examined and testified upon his oath as follows:
13      MR. BEAUDINE: For the record, we stated, at
14  the outset of the previous portion of the deposition
15  given by Albert Antoine, SMI's position with respect
16  to the stipulated confidentiality agreement. And
17  with the agreement of Plaintiffs' counsel, we'd like
18  to just copy and paste what I said in the previous
19  portion here, so that it's repeated, verbatim. Is
20  that fine?
21      MR. HAMILL: Yes.
22      MR. BEAUDINE: Thank you.
23      "Before we get started, I need to note
24  something for the record. There is a stipulated
25  confidentiality agreement in place, that the parties

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
6..9

Page 6
1  agreed to in early August 2016. And SMI invokes
2  its rights with respect to Paragraph 4(d), which
3  allowed -- it provides that the designation of
4  confidential material, or highly confidential
5  material, for the purposes of this agreement, may
6  be made in the following manner.
7      And under Subparagraph (d), it provides, (ii),
8  by written notice sent to all counsel of record for
9  the parties within 15 business days after receipt
10 of the transcript of the deposition. And that same
11 subparagraph provides, "All transcripts shall be
12 considered highly confidential, and subject to this
13 agreement, until expiration of the 15-day period
14 described in this paragraph. Any testimony
15 designated as confidential, or highly confidential,
16 shall be marked and treated in the same manner as
17 documents covered by this agreement."
18     So, SMI does intend to invoke its rights to
19 follow these procedures and designate portions of
20 this deposition transcript as either confidential,
21 or highly confidential, by providing written notice
22 to all counsel of record within 15 business days
23 after SMI receives a copy of the transcript of the
24 deposition. And until such time, the transcript
25 shall be considered highly confidential and subject

Page 7
1  to the agreement, accordingly.
2      Thank you."
3          DIRECT EXAMINATION
4  BY MR. HAMILL:
5  Q. Good morning, Ms. Wooten.
6  A. Good morning.
7  Q. My name is Mark Hamill, and I represent the
8  Plaintiffs in this case, which are Winn-Dixie and Bi-Lo.
9  And I have some questions for Southeast Milk, the
10 cooperative, itself, about document production to
11 Plaintiffs in the case. And SMI has designated you,
12 along with Mr. Antoine and Ms. Weaver, to testify for
13 them. So, I just wanted to take a few minutes to set
14 the stage a little bit, so that we can be on the same
15 page, before we get into the questions and answers.
16     First, is it okay with you if I refer to
17 Southeast Milk, Inc., as SMI?
18 A. Yes.
19 Q. The case is about the Herd Retirement Program,
20 and the Cooperatives Working Together Program, that were
21 sponsored from the National Milk Producers Federation.
22 But, I'm not going to get into the substance of the
23 case. For the most part, my questions are about the
24 document production efforts.
25     So, I set out the topics for today in a

Page 8
1  deposition notice, and you have it in front of you,
2  here, in this binder, as Exhibit 1. Take a moment, and
3  I'm going to ask you if you have seen Exhibit 1 before
4  today.
5  A. Yes.
6  Q. Okay. Those are the topics, and you've been
7  designated on several of them. I'm going to work
8  through the topics, but not necessarily in sequence.
9  So, you can just put that aside.
10 A. Okay.
11 Q. Do you understand that you're here today to
12 testify on behalf of Southeast Milk, rather than in your
13 own personal capacity?
14 A. Yes.
15 Q. So, what I'm interested in today is not just
16 your own personal information that you obtained from
17 what you, yourself, did, over the course of time, but as
18 well as anything you might have learned to help prepare
19 you to testify on behalf of the company. Do you
20 understand that?
21 A. Yes.
22 Q. Have you ever testified at a deposition before?
23 A. No.
24 Q. Okay. And have you ever testified at trial
25 before?

Page 9
1  A. No.
2  Q. All right. Well, this one is kind of low
3  key -- it's not going to be that intense -- but, I do
4  have a lot of detailed questions. They're not meant to
5  trick you, in any way, and they're not meant to
6  embarrass you, by not knowing things. I do have to kind
7  of just learn what you do know. So, a few rules of the
8  road. We have Ms. Roberts, here, and she's taking down
9  the transcript. And she does her work best if only one
10 person speaks at a time. Okay?
11 A. Um-hum.
12 Q. Okay. And the other is that you have to answer
13 out loud.
14 A. Yes.
15 Q. So, "um-hum" is kind of -- she just writes,
16 "um-hum." So, yes and no are better.
17 A. Got it.
18 Q. So, if a question is not clear to you, or does
19 not make sense, will you ask me to clarify or rephrase?
20 A. Yes.
21 Q. Some of my questions today will touch on
22 matters where you may have had a conversation with
23 either Mr. Beaudine, or Ms. Taylor, or others. Other
24 attorneys. And I do not want -- I'm not meaning to ask
25 you the contents of any of those conversations. I might



Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
10..13

Page 10
1  ask if a conservation occurred, or whatever. But, I'm
2  not going to be asking about the content of those,
3  because those are privileged.
4      A.  Okay.
5      Q.  We can take a break, at any time that anybody
6  would like to, except we don't take breaks when the
7  question is pending. However, if you need to confer
8  with counsel about questions on the privilege
9  communications, then we can do that at any time.
10     A.  Okay.
11     Q.  Now, Mr. Beaudine or Ms. Clippinger will object
12 to some of my questions today. Unless Mr. Beaudine
13 instructs you not to answer based on privilege, you will
14 be instructed to answer.
15     A.  Okay.
16     Q.  Sometimes, witnesses completely lose track of
17 the question after all the objecting goes on. If that
18 happens, just ask me to repeat the question. Okay?
19     A.  Okay.
20     Q.  Now, I just want to get a little bit of
21 background on you. What is your position, at Southeast
22 Milk?
23     A.  Director of Milk Marketing Services.
24     Q.  Okay. And just, generally, can you just tell
25 us, overall, what that entails, in terms of what you do?

Page 11
1      A.  I manage a Producer Payroll Department, a Lab
2  Department, Traffic Field Services. And then, I assist
3  with the Board packets for the producers, as well.
4      Q.  How long have you been with Southeast Milk?
5      A.  Nineteen years.
6      Q.  When did you become Director of Milk Marketing
7  Services?
8      A.  End of 2016.
9      Q.  What was your position before that?
10     A.  Milk marketing -- no, Milk Procurement Manager.
11     Q.  Were the duties similar to your current
12 position?
13     A.  Yes.
14     Q.  And what did you have -- what was the position
15 before Milk Procurement Manager?
16     A.  Can you repeat the question?
17     Q.  Did you have a job title before Milk
18 Procurement Manager?
19     A.  Producer Payroll Manager.
20     Q.  Producer payroll. When did you transition from
21 Producer Payroll to the next role?
22     A.  I believe, 2011. I'm not sure.
23     Q.  Okay. And what about -- what was your position
24 before producer payroll?
25     A.  I believe it was producer payroll data entry.

Page 12
1      Q.  Had you been assisting with Board packets
2  throughout your entire tenure at Southeast Milk?
3      A.  No.
4      Q.  When did you start assisting with the Board
5  packets?
6      A.  For the past six or seven months.
7      Q.  Okay. Who was doing it before you?
8      A.  Rosemary Jones.
9      Q.  Is Ms. Jones still at the company?
10     A.  No.
11     Q.  What was her position? What was her title?
12     A.  Executive secretary.
13     Q.  To Mr. Covington, or someone else?
14     A.  To the CEO, yes.
15     Q.  I'm sorry, right.
16     A.  Right.
17     Q.  How long was Ms. Jones in that position?
18     A.  I believe, five years.
19     Q.  And do you know who was in there before
20 Ms. Jones?
21     A.  I do not.
22     Q.  I want to learn a little bit about some of the
23 steps that you took to obtain information to assist you
24 to testify for today. What steps did you take to obtain
25 information for today's deposition?

Page 13
1      A.  Can you be more specific? What information?
2      Q.  I'm sorry. Did you talk to anybody to obtain
3  information?
4      A.  No.
5      Q.  Did you review any documents to obtain
6  information?
7      A.  Yes.
8      Q.  Okay. What documents did you -- did any of
9  those documents -- well, what documents did you look at?
10     A.  The Board packets, and, I believe, the
11 invoices, and the pricing letters. That is the
12 information that I assisted, at the time.
13     Q.  Approximately how much time did you spend
14 preparing?
15     A.  Weeks, possibly.
16     Q.  A week?
17     A.  Weeks.
18     Q.  To prepare for this deposition?
19     A.  Yes.
20     Q.  And were you preparing full time, during that?
21     A.  Can you clarify that question?
22     Q.  Well, I want to get a sense of the number of
23 hours. You said, weeks. Was it 40 hours a week, or 10
24 hours a week?
25     A.  Ten hours a week.



Orange Legal
800-275-7991

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
14..17

### Page 14

1  Q. So, for two weeks, or three weeks, or how long?
2  A. I need clarification, when you're saying, "this
3  deposition." So, I'm -- I guess I need clarification.
4  What information -- this specific deposition, what
5  information I provided for it?
6  Q. Okay. Well, the notice for deposition went out
7  on May 9th.
8  A. Um-hum.
9  Q. And then, at some point after May 9th, you were
10 identified as somebody who would give a deposition on
11 behalf of the company.
12 A. (Nods head affirmatively.)
13 Q. Okay. So, from that point forward, right? I
14 know you're going to talk about the Board packets,
15 you're going to talk about some other materials, and
16 some questions about from May 9th, forward. And then,
17 you're going to have to sit here on behalf of the
18 company. How much time did you spend to get ready, so
19 you can know the topic?
20 A. So, let me clarify, then. It was only about a
21 week. So, I would say a couple of hours every day for a
22 week span.
23
24
25

### Page 15
CONFIDENTIAL

1  Q. Gotcha. Thank you. Okay. Let me hand you --
2  this has already been marked as Exhibit 13, okay?
3      Ms. Wooten, I've handed you a document that
4  has been marked as Exhibit 13, and it has Bates Number
5  SMI-179 through 210. Do you see the Bates number at the
6  very bottom of the page?
7  A. I do, yeah.
8  Q. They were added on, you know, to assist in the
9  production of the documents, to keep track of what was
10 produced. Have you seen this document before today?
11 A. No.
12 Q. Okay. I'm not going to ask you questions about
13 the document, itself. You said that you took -- that
14 you began assisting with Board packets after Ms. Jones?
15 A. Correct.
16 Q. And did Ms. Jones convey to you any document
17 retention policies and guidelines that you should follow
18 into a network?
19 A. No.
20 Q. Did Mr. Covington?
21 A. No.
22 Q. Did anybody?
23 A. No.
24
25

### Page 16

1  Q. I want to hand you Exhibit 14.
2      Now, Ms. Wooten, Exhibit 14 is a document that
3  I prepared, to assist with the questions today. It is
4  a list of documents where either Mr. Joe Wright, or
5  Mr. Calvin Covington, gave a deposition in some previous
6  matters, either with the Department of Justice, or the
7  Florida Attorney General, or within a civil matter in a
8  Federal Court in Tennessee.
9      And my question is whether you, yourself, in
10 connection with SMI producing documents in this case,
11 searched any files that the company might have from
12 these four litigations?
13 A. I believe so, yes.
14 Q. Okay. So, was -- do you recognize all four of
15 them, or any one in particular?
16 A. I'm sorry, repeat the original question.
17 Q. So, what I'm trying to get at is, really, if
18 the company has documents from these four litigations
19 collected in a place. And, if so, whether the company
20 went and looked for those, to see if there were any
21 documents that were -- should maybe be given over to the
22 attorneys for potential production.
23     MR. BEAUDINE: Object to the form. You can
24 answer, if you can.
25     THE WITNESS: Well, I was going to say that I

### Page 17

1  I'm not familiar with any of these. I was
2  requested, to see if I can find testimony from
3  either of them on any of these. And I could not
4  find them.
5  BY MR. HAMILL:
6  Q. Okay. And I don't want to ask if you -- I
7  don't want to ask if you were asked to look for the
8  documents. Instead, I want to ask whether you
9  actually -- setting aside the transcripts, whether you
10 actually did look for documents for any of these four
11 litigations. So, that's my question. Did you look for
12 documents from any of these four litigations, aside from
13 the transcripts?
14 A. No.
15 Q. Did Mr. Wright, or Mr. Covington, ask you to
16 look for any of their prior documents that they produced
17 in any prior litigations?
18 A. No.
19
20
21
22
23
24
25



Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
18..21

Page 18
CONFIDENTIAL
1   Q. Okay. Ms. Wooten, I've handed you what has
2   been marked as Exhibit 19. It's the -- it's excerpts
3   from two deposition transcripts, beginning with
4   SMI-12272, which is the deposition transcript of
5   Joseph Patrick Wright. And then, SMI-12623, deposition
6   of Calvin Covington. And they're both from 2009.
7       (The document was received and attached to the
8       transcript as Plaintiffs' Exhibit Number 19.)
9   BY MR. HAMILL:
10  Q. And I just would refer you to the list of
11  exhibits, for example, again at Page 276. And does SMI
12  have these exhibits?
13  A. I would not know.
14  Q. Did you look for the exhibits?
15  A. No.
16  Q. Okay.
17  A. If I may interject. It's referring to Board
18  minutes, minutes of Board meeting. So, what's -- are
19  you only referring to Page 1, SMI-012276?
20  Q. Well, I'm referring generally to all the
21  exhibits. Now, I understand that some of the documents
22  may have existed in another file. But, my question is
23  whether, as a collection, these exhibits exist at SMI?
24      MR. BEAUDINE: You're asking her whether the
25      exhibits to the depositions of Calvin Covington and

Page 19
CONFIDENTIAL
1   Joe Wright, in this 2009 Southeastern Milk antitrust
2   litigation, are retained by SMI, in their files?
3       MR. HAMILL: Yes. In their own file, at the
4       company.
5       THE WITNESS: I'm not sure that I'm
6       understanding your specific question.
7   BY MR. HAMILL:
8   Q. All right. My question is whether or not
9   there's a file or a folder that would contain all of
10  these deposition exhibits, as a collection.
11  A. No, not to my knowledge. Okay. I'm
12  comfortable with it, as of now.

Page 20
1   Q. All right. You can put that aside.
2       Do you -- who -- I'm going to refer to document
3   custodians as people at Southeast Milk from whom files
4   were gathered, so that they could be given to attorneys
5   potentially for production in this case?
6   A. Okay.
7   Q. We call them document custodians. They're
8   people, but we call them document custodians. And I'm
9   going to do it in a couple of different categories. The
10  first is, for hard copy paper documents. So, my
11  question is, who were -- were there any document
12  custodians at Southeast Milk, for hard copy paper
13  documents, for production in this case.
14  A. Yes.
15  Q. Who were those people?
16  A. Myself.
17  Q. Anybody else?
18  A. Reception.
19  Q. Reception?
20  A. Yes.
21  Q. Anybody else?
22  A. No.
23  Q. What documents were -- what documents were
24  collected from reception?
25  A. I apologize. I gave documents to reception, to

Page 21
1   give them to counsel.
2   Q. Okay. So, we'll cross that one off.
3   A. Sorry.
4   Q. That's okay. And, maybe, by category or type,
5   what documents did you hand over? What documents did
6   you give to reception?
7   A. Board packets. Board minutes. I think that's
8   it.
9   Q. Okay. Did you, yourself, go gather up those
10  Board packets?
11  A. Yes.
12  Q. Were they in -- present, in the office, at
13  Belleview, or did you have to go to the offsite?
14  A. Yes, they were in Belleview.
15  Q. And were they in a storage room, or in a --
16  somewhere else?
17  A. Storage room.
18  Q. Okay. And is it a storage room that's devoted
19  to documents?
20  A. Yes.
21  Q. How large is it?
22  A. I could not -- I do not know.
23  Q. Fair enough. All right. And then, I want to
24  ask about a different category of documents. Not email,
25  but non-email electronic documents.

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
22..25

Page 22

1   So, the question is, were there document
2 custodians, at Southeast Milk, for non-email electronic
3 documents?
4   A. Ask the question again?
5   Q. All right. Did SMI collect up documents,
6 non-email electronic documents, from anybody, for
7 production in this case?
8      MR. BEAUDINE: Object to the form.
9      THE WITNESS: Shall I still answer this
10   question?
11 BY MR. HAMILL:
12   Q. Yes, if you can. When he says, "object to
13 form," he means maybe it is confusing or unclear. And
14 if it is, to you, then I'll try again.
15   A. Yes. If you could try again, please.
16   Q. Right. We talked about the hardcopies.
17   A. Um-hum.
18   Q. You said you were the document custodian?
19   A. Um-hum.
20   Q. Similarly, now, I want to talk about electronic
21 documents that were not email.
22   A. Okay.
23   Q. And get a list of who the document custodians
24 were for that.
25   A. For this case?

Page 23

1   Q. Yes.
2   A. That were sent for this case?
3   Q. Yes.
4   A. Yes, there were. Is that what you're asking?
5   Q. Yes. And who were they?
6   A. Myself.
7   Q. Were there others?
8   A. Is there a list of what I provided? So, I can
9 recall the --
10   Q. I don't have a list.
11   A. I do not know.
12   Q. So, the non-email electronic documents -- I'm
13 going to call them electronic documents.
14   A. Okay.
15   Q. The electronic documents that were gathered,
16 where did you go to get those?
17   A. Our network.
18   Q. What documents did you retrieve?
19   A. Minutes, for -- other than the Board minutes,
20 other -- those minutes.
21   Q. The SDCA and the DCMA minutes?
22   A. Correct.
23   Q. All right. Any other documents?
24   A. Can I ask you a question? I don't know how to
25 go about -- I'm trying to get myself familiar with

Page 24

1 something. So --
2   Q. Well, ask me the question.
3      MR. BEAUDINE: Are you trying to remember what
4   you gathered?
5      THE WITNESS: Yes. I'm trying to remember if
6   we're talking only Board minutes, like what I've
7   done in the past month. So, SDCA, DCMA minutes, I'm
8   referring to those.
9      MR. BEAUDINE: I think he's really asking --
10   going back to a point in time when we started the
11   production effort, any non-email electronic
12   documents that you can recall there being.
13      THE WITNESS: Oh. Yes.
14 BY MR. HAMILL:
15   Q. I'm sorry. So, you gathered up some -- you
16 gathered up the SDCA and DCMA minutes?
17   A. Yes.
18   Q. From the network?
19   A. Correct.
20   Q. Did you gather up any other documents?
21   A. Yes.
22   Q. What were those?
23   A. Pricing letters.
24   Q. Any others?
25   A. Not that I can recall.

Page 25

1   Q. Okay. I want to focus on the pricing letters.
2 And to the best that you can recall -- and I understand
3 you may not --
4   A. Okay.
5   Q. -- what was the folder structure in which you
6 found those pricing letters? You'd have to go in and
7 click on folder, and then maybe click another. How did
8 you navigate -- what folders did you navigate to, to get
9 to those pricing letters.
10   A. You're asking for details?
11   Q. Yes.
12   A. Our shared network, producer payroll, pricing
13 letters.
14   Q. Thank you.
15   A. Um-hum.
16      THE WITNESS: May I get some water?
17      MR. BEAUDINE: Sure. We have some, right up
18   there.
19 BY MR. HAMILL:
20   Q. Well, I wanted to ask you about four people and
21 specifically whether they were document custodians for
22 either hardcopy or electronic documents.
23   A. (Nods head affirmatively.)
24   Q. So, was Maggie Murphy a document custodian?
25   A. For this case?



Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.  
WOOTEN, SHANA

CONFIDENTIAL  
26..29

Page 26

1  Q. Yes.
2  A. For this deposition?
3  Q. Not for the -- for the case. So, the
4  deposition is about the production of documents --
5  A. Got it.
6  Q. -- going back in time to the beginning of
7  the -- like, sometime last year, I think. That's what
8  we're asking about.
9  A. Okay.
10  Q. So, set aside -- I'm done asking you about what
11  you did to prepare to testify today, and now I'm into
12  asking about what the company did to produce documents.
13  A. Okay.
14  Q. And my question is whether Maggie Murphy was a
15  document custodian for either hardcopy or electronic
16  documents?
17  A. No.
18  Q. Okay. The same question for Tom Pittman?
19  A. I do not know.
20  Q. Same question for Bryce Kelly?
21  A. I do not know.
22  Q. And same question for Marta Gonzalez?
23  A. Yes.
24  Q. She was a document custodian?
25  A. Yes.

Page 27

1  Q. All right. And what documents were collected
2  from Ms. Gonzalez?
3  A. Sorry. So, the answer is, no. Sorry.
4  Q. That's all right. I asked you about where you
5  went to get the pricing letters.
6  A. Um-hum. Yes.
7  Q. And you were able to identify a very specific
8  location.
9  A. Okay.
10  Q. And I have a similar kind of question about
11  documents related either to the National Milk Producers
12  Federation or the Cooperatives Working Together Program.
13  And my question is whether there's any specific
14  locations, either on the network, or in the storage
15  room, or elsewhere, where documents about the National
16  Milk Producers Federation, or the Cooperatives Working
17  Together Program, are kept in place?
18  A. I would not know.
19  Q. Does SMI have files related to member farmers
20  who retired cows under the Herd Retirement Program?
21  A. I'm not sure.
22  MR. HAMILL: Mr. Beaudine, for 13, I know you
23  have an objection. But, subject to the objection,
24  who would you designate?
25  MR. BEAUDINE: I think the problem with 13 is,

Page 28

1  it refers to something that wasn't requested. And
2  we've already covered Joe Wright's handwritten
3  notes, through prior motion practice. You can ask
4  her questions, but we're talking about document
5  production efforts for the purposes of this
6  deposition. And because those handwritten notes,
7  either as a total collection, or some subset, were
8  not a prior -- were not the subject of a prior
9  request for production, it's inappropriate for the
10  deposition. That was the basis of the objection.
11  MR. HAMILL: Okay. So, Ms. Wooten, does SMI
12  have a copy of handwritten notes taken by
13  Joe Wright?
14  THE WITNESS: I would not know.
15  BY MR. HAMILL:
16  Q. Same question for Calvin Covington?
17  A. I would not know.
18  Q. Same question for John Peachy?
19  A. I would not know.
20  Q. And the same question for Dale Eade?
21  A. I would not know.
22  Q. Did SMI take any steps to locate handwritten
23  notes taken by Joe Wright?
24  A. I would not know that.
25  Q. Same question for Calvin Covington. Did SMI

Page 29

1  take any steps to locate handwritten notes written by
2  Calvin Covington?
3  A. I would not know that.
4  Q. All right. Okay.
5  Ms. Wooten, Ms. Roberts has handed you
6  Exhibit 20, which is the Declaration of Shana Wooten,
7  for Southeast Milk, Inc., executed on May 5th, 2017?
8  (The document was received and attached to the
9  transcript as Plaintiffs' Exhibit Number 20.)
10  BY MR. HAMILL:
11  Q. Now, I want to ask you, testifying on behalf
12  of Southeast Milk, does Southeast Milk agree with these
13  statements that are made in this Declaration?
14  MR. BEAUDINE: Object to the form. But, you
15  can answer it, if you're able to.
16  THE WITNESS: All right. I would not know how
17  to answer that.
18  BY MR. HAMILL:
19  Q. So, when I read this document, I just wasn't
20  sure whether these were your own personal statements,
21  or whether they were meant to be statements of Southeast
22  Milk, and that's why I'm asking the question.
23  So, I will rephrase to a question, which is
24  whether Southeast Milk adopts, today, for its own
25  testimony, the statements that are made here in this



Orange Legal  
800-275-7991

Case 3:15-cv-01143-BJD-JBT  Document 112-2  Filed 08/30/17  Page 10 of 12 PageID 1485

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA
CONFIDENTIAL
30..33

Page 30

1 Declaration?
2     MR. BEAUDINE: Object to the form.
3     THE WITNESS: I still don't understand the
4 question.
5 BY MR. HAMILL:
6  Q. Okay. So, let's just go paragraph by
7 paragraph. And I want you to, again, just recall that
8 you're testifying for Southeast Milk. Okay?
9  A. Yes.
10  Q. Paragraph 1. Is Paragraph 1 a true statement
11 or a false statement?
12  A. True.
13  Q. Same for Paragraph 2?
14  A. True.
15  Q. Same for 3?
16  A. True.
17  Q. So, then, can we just -- same for 4 through 8?
18  A. True.
19  Q. Okay. Thank you.
20
21
22
23
24
25

Page 31
CONFIDENTIAL
1     Ms. Wooten, the court reporter has handed you
2 a document that has been marked as Exhibit 21. It has
3 Bates Numbers SMI-2048 through 2051. And they are
4 minutes of the Board of Directors Meeting of Southeast
5 Milk, Inc., dated July 10 of 2007.
6  A. (Nods head affirmatively.)
7     (The document was received and attached to the
8     transcript as Plaintiffs' Exhibit Number 21.)
9 BY MR. HAMILL:
10  Q. I want to ask you, on Page 2050, the second to
11 the last paragraph, that starts with the name of
12 Maggie Murphy, does Southeast Milk have a copy of the
13 video that is referenced in this paragraph?
14  A. I do not know.
15  Q. Is there somebody at Southeast Milk who would
16 know?
17  A. No.
18  Q. You can set that one aside.
19     Before I ask you about Exhibit 22, I want to
20 ask you, generally, whether SMI has documents concerning
21 any Board training seminars?
22  A. I would not know.
23  Q. Then, if you will look at Exhibit 22, which is
24 SMI-13489 through 491.
25     (The document was received and attached to the

Page 32
CONFIDENTIAL
1 transcript as Plaintiffs' Exhibit Number 22.)
2 BY MR. HAMILL:
3  Q. And there's an email from Jana Unterman, to
4 Calvin Covington, about "Attachment, training agenda."
5 Do you know whether the training that is referred to
6 here ever took place?
7  A. I do not know.
8  Q. Who would know?
9  A. Calvin Covington.
10  Q. Okay. Do you know who Jana Unterman is?
11  A. Yes.
12  Q. Who is she?
13  A. She used to be a consultant for Southeast Milk.
14  Q. And what did she consult about?
15  A. I wouldn't know everything.
16  Q. The ones that you do know?
17  A. She helped us implement our payroll -- one of
18 our payroll systems.
19  Q. Anything else? Do you know?
20  A. No.
21  Q. I just noticed that her email address also uses
22 the name, Jana Magee. Does she also go by Jana Magee?
23  A. I do not believe so.
24  Q. Okay. Have you, yourself, corresponded with
25 Jana Unterman, by email?

Page 33
CONFIDENTIAL
1  A. Yes.
2  Q. Do you know whether she uses a gmail address?
3  A. I do not know.
4  Q. Okay.
5     Ms. Wooten, I've handed you Exhibit 23, with
6 Bates Numbers SMI-2074 through 2077. And they are
7 minutes of the Board of Directors meeting of Southeast
8 Milk, from August 12th, 2008.
9     (The document was received and attached to the
10     transcript as Plaintiffs' Exhibit Number 23.)
11 BY MR. HAMILL:
12  Q. I want to ask you about the first full
13 paragraph at the top of Page 2075. Take a moment to
14 look at that, and then you can just look up if you're
15 ready.
16     All right. The second to the last sentence
17 refers to discussion about the CWT program. And then,
18 in the last sentence, the Chairman refers members to an
19 article that was recently authored by Ed Henderson.
20 Does SMI have a copy of the article by Ed Henderson?
21  A. Not to my knowledge.
22
23
24
25



Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
34..37

Page 34

1  Q.  Okay.  All right.  Great.  Thank you.
2      MR. HAMILL:  That's it, for me, unless counsel
3  has questions.
4      MR. BEAUDINE:  I have no questions.
5      MS. CLIPPINGER:  No questions.
6      COURT REPORTER:  Read this one?
7      MR. BEAUDINE:  Yes.
8      COURT REPORTER:  You want me to type this one,
9  too, regular time, with a rough by Monday?
10     MR. HAMILL:  Yes.  Yes.  Rough by Monday.
11     COURT REPORTER:  Mr. Beaudine, would you like
12  a copy?
13     MR. BEAUDINE:  Um-hum.  Regular time.
14  (The deposition was concluded at 12:13 p.m.)

Page 35

1                CERTIFICATE OF OATH
2
3  STATE OF FLORIDA    )
4  COUNTY OF ORANGE    )
5
6      I, Diane C. Roberts, FPR, Notary Public, State
7  of Florida, certify that Shana Wooten personally
8  appeared before me on June 2, 2017, and was duly sworn.
9
10 Signed this 10th day of June, 2017.
11
12
13          *Diane C. Roberts*
              Diane C. Roberts
14            Florida Professional Reporter
              Notary Public, State of Florida
15            My Commission Number GG042541
              Expires on 10-31-2020.
16
17
18            Type of Identification Produced:
              Driver's License

Page 36

1           CERTIFICATE OF DEPOSITION TRANSCRIPT
2
3  STATE OF FLORIDA    )
4  COUNTY OF ORANGE    )
5
6      I, Diane C. Roberts, FPR, Notary Public, State of
7  Florida, was authorized to and did stenographically
8  report the deposition of Shana Wooten, that a review of
9  the transcript was requested; and that the foregoing
10 transcript, Pages 5 through 34, is a true and accurate
11 record of my stenographic notes.
12     I FURTHER CERTIFY that I am not a relative, or
13 employee, or attorney, or counsel of any of the parties,
14 nor am I a relative or employee of any of the parties'
15 attorney or counsel connected with the action, nor am I
16 financially interested in the action.
17
18 DATED this 10th day of June, 2017.
19
20
21
                    *Diane C. Roberts*
22                  Diane C. Roberts, FPR

Page 37

1               E R R A T A   S H E E T
     DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE
2       IN RE:  WINN DIXIE VS. SOUTHEAST MILK
             CASE NO: 3:15-cv-01143-BJD-PDB
3         6/2/17 DEPOSITION OF SHANA WOOTEN
     I, Shana Wooten, wish to make the following
4  corrections:
5  PAGE      LINE             CORRECTION
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22     Under penalties of perjury, I declare that I have
   read the foregoing document, and the facts stated are
23 true.
24 _____
   DATE          NAME OF DEPONENT
25

Winn-Dixie Stores, Inc., et al. vs. Southeast Milk, Inc, et al.
WOOTEN, SHANA

CONFIDENTIAL
38

Page 38

June 14, 2017

Shana Wooten
c/o Michael J. Beaudine, Esquire
Latham, Shuker, Eden & Beaudine, LLP
111 North Magnolia Avenue,
Suite 1400
Orlando, Florida  32801
In Re:  6/2/17 Deposition of Shana Wooten
        Winn-Dixie vs. Southeast Milk
Dear Ma'am:
   This letter is to advise that the transcript for the
above-referenced deposition has been completed and is
available for review.  Please contact our office at
(800) 275-7991 to make arrangements for read and sign,
or sign below to waive review of this transcript.
   It is suggested that the review of this transcript
be completed within 30 days of your receipt of this
letter, as considered reasonable under the Federal Rules
listed below; however, there is no Florida Statute to
this regard.
   The original of this transcript has been forwarded
to the ordering party.  And your errata sheet, once
reviewed, will be forwarded to all ordering parties for
inclusion in the transcript.
                Sincerely,
                Diane C. Roberts, FPR
                Orange Legal, Inc.
cc:  Mark S. Hamill, Esquire
Waiver:  I,_____, hereby waive the reading
& signing of my deposition transcript.

_____    _____
Deponent Signature              Date
Federal Civil Procedure Rule 30(e)
Florida Civil Procedure Rule 1.310(e)

ORANGELEGAL

Orange Legal
800-275-7991