**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| WINN-DIXIE STORES, INC. and BI-LO HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SOUTHEAST MILK, INC., *et al.*, <br><br> Defendants. | Case No. 03:15-cv-1143-J-39-BJD-PDB |

**DEFENDANTS' MOTION AND SUPPORTING MEMORANDUM FOR**
**SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS AND STANDING**

**Introduction**

Between 2003 and 2010, Defendant National Milk Producers Federation ("NMPF") openly conducted a program known as "Cooperatives Working Together" or "CWT" for short, which was designed to assist the nation's dairy farmers who were struggling because of an oversupply of milk and resulting below-cost prices.  The CWT Program had two main components: a "herd retirement program" ("HRP") designed to reduce the number of milking cows, and an "export assistance program" ("EAP") designed to increase exports of dairy products.  Only the HRP, not the EAP, is being challenged in this case.

Nothing about the CWT Program or the HRP was in any way concealed from view. Quite the opposite, the Program was openly discussed with government authorities both before and after its implementation and was well publicized both in the dairy industries and the popular press.  In fact, the CWT Program was praised by the U.S. Department of Agriculture and members of Congress.  NMPF maintained a website that was open and easily accessible to the public, on which it published detailed program information and statistics throughout the duration of the HRP.  Despite the public nature of the HRP, and the fact that Plaintiff Winn-Dixie Stores, Inc.'s ("Winn-Dixie") own employees had knowledge of the HRP, Winn-Dixie waited until September 23, 2015, five years after the discontinuance of the HRP, to commence this antitrust action, alleging that the HRP unlawfully restrained trade. Winn-Dixie's claims are barred by the applicable four-year statute of limitations.

In addition, Winn-Dixie lacks standing (1) to pursue claims for damages for the raw milk that Winn-Dixie purchased for two dairy processing plants that it once owned and operated, because Winn-Dixie assigned those claims to an affiliate of Defendant Southeast

Milk, Inc. at the time Winn-Dixie sold the plants to that affiliate; and (2) to bring claims for its indirect purchases of fluid milk or other fresh dairy products from wholesale distributors.

## I.      Factual Background

### A.  The Parties

Defendants Southeast Milk, Inc. ("SMI"), Dairy Farmers of America, Inc. ("DFA"), Land O'Lakes, Inc. ("LOL"), and Agri-Mark, Inc. ("Agri-Mark") are agricultural cooperatives owned by dairy farmers.  (Am. Compl., ECF No. 56, ¶¶ 24-30.)  NMPF is a trade association comprised of dairy cooperative members, including the four cooperative defendants, and it managed the HRP program.  (*Id*.)

Winn-Dixie operates one of the largest grocery chains in the United States and purchases millions of dollars of dairy products each year.  (Declaration of Jill O'Toole ("O'Toole Decl."), Exs. 1 & 2 at ¶ 90.[1])  Winn-Dixie claims damages based on its purchases from Defendants of raw milk, fluid milk, and other fresh dairy products from 2003 through 2013.  (Am. Compl. ¶¶ 15, 18, 124-25.)

Winn-Dixie's damage claim for alleged overcharges in purchasing raw milk from one or more of the Defendants is based nearly entirely on its purchases of raw milk at two dairy processing plants that it previously owned in Hammond, Louisiana, and Plant City, Florida.[2]  Winn-Dixie alleges that those purchases were at supra-competitive prices supposedly caused by the HRP.  (Am. Compl. ¶¶ 15, 124-25.)  On April 30, 2008, Winn-

---

[1] All exhibits cited herein are attached to the Declaration of Jill O'Toole.

[2] (Ex. 3 at Resp. to Interrog. No. 2.)  Winn-Dixie acknowledges that its High Point, NC, plant did not purchase raw milk from Defendants.  (*See id.*)  Moreover, Winn-Dixie does not seek damages for its purchases, from SMI, of raw milk for its Miami, FL, processing plant prior to its closure in May 2004.  (Ex. 2, ¶ 90.)  Such claims would in any event be time-barred.  (*See infra* pp. 9-15.)

Dixie sold those plants and assigned claims asserted in this action for raw milk purchases for those plants to an affiliate of SMI, Sunshine State Dairy Farms ("Sunshine").  (Ex. 4 at Section 2.01.)  As a result, Winn-Dixie has no claim for those alleged overcharges.  After Winn-Dixie sold the plants to SMI, it no longer bought any raw milk and instead bought only finished dairy products.  (Ex. 5; *id.* at SMI-000033-36.)

### B.  The CWT Program and HRP

The CWT Program began out of a long-simmering crisis in the dairy industry. Prices and production of raw milk fluctuated wildly.  As the lows got lower, more farmers struggled to make ends meet as their costs of production exceeded the price of milk. (Declaration of Jerome Kozak ("Kozak Decl.") ¶ 6.)  To address the crisis, NMPF formed the CWT Program, which included both the HRP and the EAP, to strengthen and stabilize milk prices received by farmers.  (*Id.* ¶¶ 6, 21.)  The HRP aimed to reduce the number of milking cows by paying an incentive to farmers, who voluntarily chose to participate, to market their cows for beef rather than milking them.  (*Id.* ¶ 8.)  The HRP concluded in 2010. (*Id.* ¶ 21.)

### C.  Widespread Publicity Surrounding the HRP

The HRP was widely publicized in and outside of the dairy industry, including to government officials who supported the program.  (*Id.* ¶¶ 11-14.)  NMPF maintained a public website for the CWT Program that published detailed information about the operation of the HRP.  (*Id.* ¶ 17.)  This website included testimonials from top government officials.  (*Id.* ¶ 14.)  Each herd retirement was publicly announced.  (*Id.* ¶ 16, 17.)  The CWT website contemporaneously disclosed how many farmers submitted bids, how many bids were

accepted, how many cows would be culled, and estimated, based on economic modeling predictions, by approximately how much the nation's milk output would be reduced.  (*Id.* ¶ 17.)  The economic modeling on the CWT website was based mainly on the findings of Dr. Scott Brown, of the University of Missouri.  Dr. Brown estimated the impact of the HRP on the regulated prices of milk received by dairy farmers.  (*Id.*)  News releases on the website disclosed in real time Dr. Brown's analyses.  (*Id.*)

To further raise awareness, NMPF publicized the HRP in its newsletters and through advertisements and direct mailings.  (*Id.* ¶ 16.)  National newspapers covered the HRP extensively.  (Ex. 6.)  Newspapers in the area where Winn Dixie owned and operated raw milk processing plants also ran numerous articles discussing the HRP.  (Ex. 7.)

Trade publications ran countless articles about the HRP during its existence.  At least twenty articles about the HRP were published in Dairy Foods Magazine alone.  (Ex. 8.)  That magazine serves the companies that process, distribute, and market milk and dairy products and was subscribed to and read by several of Winn-Dixie's employees.  (Exs. 9, 10.)  Articles about the HRP appeared in other trade publications for the dairy industry and the beef industry.  (Exs. 11, 12.)

### D.  Government Input into the HRP

Government officials were well aware of the HRP and openly approved of the program.  NMPF met several times with representatives of the U.S. Department of Agriculture and members of Congress to discuss the program before it was implemented.  (Kozak Decl. ¶ 10.)   In November 2006, then-Secretary of Agriculture Michael Johanns praised NMPF on its establishment and implementation of the CWT Program, and stated

that "[i]t is refreshing to see dairy producers collaborating to address the overall balance of milk supply and demand through this voluntary program." (*Id.* ¶ 11.)  In March 2009, then-Secretary of Agriculture Thomas Vilsack also lauded the CWT Program.  (*Id.* ¶ 13.) Congressman Robert Goodlatte, as Chairman of the House Agriculture Committee, publicly endorsed CWT on the CWT website.  (*Id.* ¶ 14.)  Representatives of NMPF and Defendants testified about the HRP before the U.S. Congress.  (*Id.* ¶ 12.)  NMPF discussed the HRP in USDA news broadcasts.  (*Id.* ¶ 13.)  The HRP went unchallenged by government authorities who were fully aware of the program's existence and its purpose, including the U.S. Department of Justice's Antitrust Division.  (*Id.* ¶ 15.)

### E.  Winn-Dixie's Awareness of the HRP

Winn-Dixie's own employees were informed about the HRP.  For example, documents analyzing the second herd retirement of 2008 and its potential impact on milk prices were located on a Winn-Dixie network drive that was used by Winn-Dixie's Category Management Food team, and were produced by Winn-Dixie in this case.  (Exs. 43, 44, O'Toole Decl. ¶ 46.)  Winn-Dixie's public relations representative, Kathy Lussier, was quoted in a 2004 article in the Sarasota Herald Tribune addressing rising dairy prices.  The same article stated plainly that "[d]airy cooperatives, reacting to the 25-year low in milk prices last year, paid their members to voluntarily take more than 30,000 cows out of production," an unmistakable reference to the HRP.  (Ex. 13.)  In addition, Dwight Moore, Winn-Dixie's Director of Dairy Plant Operations from 2001 to 2004, acknowledged that he had heard about CWT, (Ex. 14, at 12:1-12; 37:14-38:18), and that while employed at Winn-Dixie, he would "keep up on what's going on in the [dairy] industry" by reading industry

publications such as Dairy Foods Magazine. (*Id.* at 37:21-25.) At least seven articles about the CWT Program appeared in Dairy Foods Magazine during Mr. Moore's tenure. (Ex. 8 (articles appearing between August 1, 2003 and April 1, 2004).) Donald Bernos, plant manager for Winn-Dixie's milk processing plants, and David Welch, Winn-Dixie's Merchandising Director for dairy, also subscribed to Dairy Foods Magazine, as did other Winn-Dixie employees. (Ex. 10.)

Mr. Bernos, who managed two of Winn-Dixie's dairy-processing plants between 2001 to 2008, admitted that he remembered hearing about "the program where they bought out farmers" on and off during his time as plant manager.[2] Other contemporaneous evidence shows that Defendant SMI communicated with Winn-Dixie that dairy farmers sell their herds to slaughter in times of low milk prices and were doing so at an increased rate. (Exs. 17, 18.)[3]

### F.   The Conclusion of the HRP

CWT conducted ten herd retirements between 2003 and 2010. Despite the HRP, national supplies of raw milk increased consistently throughout the period of the Program. (Ex. 45 ¶ 69.) By 2009, it became clear that the HRP was not having the desired effects on price levels or stability. (Kozak Decl. ¶ 19) The last herd retirement was completed in September 2010, and the HRP was discontinued that same year. (*Id.*)

---

[2] (Ex. 15 at 62:20-69:1.) Mr. Bernos testified that he thought it was a "federal" herd buyout program, but it is undisputed that the government-run Dairy Termination Program last took place in the 1980s, long before Mr. Bernos served as plant manager at Winn-Dixie. (*Id.* at 27:19-28:8; Ex. 18.)

[3] For example, in February 2009, days after the sixth herd retirement was completed, Graham Leary, Winn-Dixie's Vice President of Strategic Sourcing, reported a conversation with SMI's then-CEO, Calvin Covington, in which Mr. Covington asked Mr. Leary to share that "[t]here's an exodus from Dairy Farms," that "[i]n the U.S. West, slaughters cannot handle the volume of dairy cows," and that he "is forecasting a V shaped recovery of dairy prices, earliest Q4'09." (Ex. 17; *see* Am. Compl. ¶ 67 (sixth herd retirement completed by 2/17/09).)

### G.   The Class Action Cases

A succession of class action cases were filed against defendants Agri-Mark, DFA, LOL, and NMPF, but SMI was not a defendant in any of them.  The first was filed on January 6, 2012, on behalf of a class of direct purchasers seeking damages for purchases of "fluid milk products, and/or fresh dairy products (including, but not limited to, processed milk, cream, half & half, yogurt, dry milk, cottage cheese, cream cheese, sour cream, and ice cream) from January 4, 2008 to the present."  *Stephen L. LaFrance Holding Inc., et al. v. Nat'l Milk Prod. Fed., et al.*, Case No. 3:12-cv-00070 (E.D. Pa.) ("*LaFrance*").  (Ex. 19 ¶ 111.)  This case was dismissed voluntarily (Ex. 21), but another nearly identical case followed in December 2012.  *Blakeman v. Nat'l Milk Prod. Fed. et al.,* Case No. 3:12-cv-01246 (S.D. Ill.) ("*Blakeman*").  (Ex. 22.)  That case too was dismissed.  (Ex. 23.)  A third, nearly identical case was filed on May 20, 2013.  *First Impressions Salon, Inc. v. Nat'l Milk Prod. Fed. et al,* 3:13-cv-00454 (S.D. Ill.) ("*First Impressions*").  (Ex. 24.)

The *First Impressions* case is still active, although the class allegations were wholly rewritten in September 2015.  (*Compare* Ex. 25 ¶¶ 129 b-c *with* Ex. 24 ¶ 116.)  Those modifications effectively dropped all of the prior class claims and attempted to assert new claims for purchases of different products (cheese and butter, in addition to raw milk), and included a much broader group of sellers (including SMI) than were previously included. That amendment was untimely for purposes of this case, as set out below.

### H.  Winn-Dixie's Current Suit

On September 23, 2015, five years after the HRP was discontinued, Winn-Dixie (along with its parent company, Bi-Lo Holdings, LLC) brought this untimely antitrust suit.

Winn-Dixie largely copied the first *LaFrance* complaint, with little or no investigation of its own.  (C*ompare* Am. Compl. *with* Ex. 19; Ex. 28 at 154:4-158:10.)  Dozens of paragraphs of the Amended Complaint quote directly from information that had long been published on the CWT website.  (Am. Compl. ¶¶ 2, 5, 9-11, 14, 26, 35-94, 97, 103, 107.)

Winn-Dixie's suit attacks the HRP as an illegal and concealed conspiracy to reduce supply in order to raise the prices that it paid for "milk and other fresh milk products, including cream, half & half, yogurt, cottage cheese, cream cheese, and sour cream, purchased by retailers."  (Am. Compl. ¶ 1).  The Amended Complaint does not include butter or cheese in its definition of "fresh milk products."  (*Id.*)  Indeed, it makes no mention of cheese or butter whatsoever.

Winn-Dixie alleges that "CWT[] and its members have engaged in a continuing contract, combination and conspiracy to limit the production of raw farm milk through premature 'herd retirements.'"  (*Id.*)  Winn-Dixie further alleges that "[b]y manipulating the supply of raw farm milk through herd retirement, price competition has been suppressed" and, as a result, it has "paid supracompetitive prices for the over-order premiums" for the products it purchased from Defendants.  (*Id.* ¶ 15.)  The only conduct that Winn-Dixie challenges is the HRP, which ended in 2010.  (*Id.* ¶ 3).

## II.   <u>Winn-Dixie's Claims Are Time-Barred</u>

Winn-Dixie's Sherman Act claims are barred by the applicable four-year statute of limitations.  *See* 15 U.S.C. § 15b.  The challenged conduct ended in 2010, five years before Winn-Dixie brought suit.  Because Winn-Dixie's cause of action accrued no later than the

final herd retirement, the statute of limitations has run and its suit should be dismissed.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-339 (1971).

Winn-Dixie argues that the four-year statute of limitations has not run, or is tolled, because (1) Defendants' conduct represents a continuing antitrust violation; (2) Defendants fraudulently concealed their conduct; and (3) class action tolling rules should apply.  As discussed below, these arguments fail for all but a narrow sliver of Winn-Dixie's claims.

### A.  Winn-Dixie Cannot Establish a Continuing Antitrust Violation Within the Limitations Period

Winn-Dixie's claim accrued no later than September 2010, when Defendants completed the last herd retirement.  (Kozak Decl. ¶ 19.)  Winn-Dixie argues that the continuing violation doctrine extends its accrual period.  But that doctrine does not apply. "In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs **from the commission of the act.**"  *Zenith*, 401 U.S. at 338 (emphasis added).  The only "acts" for which Winn-Dixie claims damages are the herd retirements, and thus the statute of limitations began to run on upon the last herd retirement in September 2010.

Winn-Dixie may argue that it continued to pay higher prices after the last herd retirement as a result of the HRP, such that the continuing violation should include each purchase it made at an elevated price.  This is wrong.  Such claimed damages do not qualify as *overt acts* sufficient to restart the statute of limitations.  "[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations

9

action." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975); *id.* at 125 (plaintiff's complaint must be "based on continuing antitrust behavior, not merely the continuing damage it feels . . ."). In the absence of any anti-competitive conduct during the statutory period, Winn-Dixie's claims are time-barred. *See id.* at 129.[4]

Winn-Dixie may also attempt to rely on *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), amended in part, 211 F.3d 1224 (11th Cir. 2000) (mem.), but that case does not produce a different result. *Morton's* involved an alleged price-fixing conspiracy in which dairies fixed the prices of dairy products to commercial customers through collusive agreements. *Morton's* held that it was an issue of fact "whether the conspiracy continued into the limitations period by virtue of continued sales at fixed prices." *Id.* at 829. Given the nature of the challenged conduct in that case -- a direct agreement to fix prices -- in order for subsequent sales to be made at supracompetitive prices, the alleged price fixing conspiracy had to still be in effect when the sales were made. In contrast, here Winn-Dixie alleges that Defendants conspired to reduce the supply of raw milk through the HRP, which, Winn-Dixie alleges, ultimately affected the price of dairy products. But there is no evidence that the challenged conduct -- the herd retirements -- continued after the last herd retirement in September 2010. Instead, the undisputed evidence is that it did not.

---

[4] *Poster Exchange* remains binding precedent in the Eleventh Circuit. *See Omni Healthcare Inc. v. Health First, Inc.*, No. 13-CV-1509-ORL-37DAB, 2016 WL 4272164, at *10 (M.D. Fla. Aug. 13, 2016). *See also City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521, 523 (5th Cir. 1978) (subsequent purchases made within the limitations period did not toll a singular act of price-fixing that manifested in a contract entered into outside the limitations period); *Pilkington v. United Airlines*, 112 F.3d 1532, 1536–38 (11th Cir. 1997) (continued emotional distress felt by airline workers subject to harassment were not separate accruals of the statute of limitations for civil RICO claims, because "[i]t was the same injury that has been accumulating . . ."). Other circuits are in accord. *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 601 (6th Cir. 2014) (continued sales at supracompetitive prices resulting from a singular event (a merger) "do not constitute overt acts for purposes of the continuing violations doctrine").

**B.  Winn-Dixie Cannot Establish Fraudulent Concealment**

Winn-Dixie also seeks to equitably toll its untimely claims under the fraudulent concealment doctrine.  (Am. Compl. ¶¶ 109-21.)  To establish fraudulent concealment, a plaintiff must prove that "the defendants concealed the conduct complained of, and that [plaintiffs] failed, despite the exercise of due diligence on [their] part, to discover the facts that form the basis of [their] claim."  *Morton's,* 198 F.3d at 832 (quoting *In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1169 (5th Cir. 1979)).  As part of its burden, a plaintiff invoking the fraudulent concealment doctrine "must show affirmative actions by the defendant constituting concealment."  *Hill v. Texaco, Inc.*, 825 F.2d 333, 335 (11th Cir. 1987).  If such wrongful concealment is shown, then the plaintiffs must also show that they lacked notice of operative facts forming the basis of their claim, and that they exercised diligence to discover their claim.  *See In re Carbon Dioxide Antitrust Litig.*, No. MDL 940, 1993 WL 559779, at *1 (M.D. Fla. Nov. 17, 1993); *see also Morton*'s, 198 F.3d at 832.

Winn-Dixie cannot survive the first prong of the fraudulent concealment inquiry.  The overwhelming and undisputed evidence in this case is that Defendants sought to *publicize the HRP, not conceal it*.  Defendants are all agricultural cooperatives who, under the Capper-Volstead Act, are allowed to combine and act in concert for the benefit of their farmer members.  As such, there was no reason to conceal or hide their coordinated conduct.  Given the undisputed widespread, contemporaneous, and detailed publicity surrounding the HRP -- publicity largely driven by Defendants' *own efforts* to ensure all relevant parties were informed through, among many other things, a public website from which Winn-Dixie's complaint quotes extensively -- no wrongful concealment took place.  *See Hill*, 825 F.2d at

335-36 (affirming summary judgment where plaintiff lacked evidence of affirmative concealment).  Winn-Dixie's fraudulent concealment claim fails on this basis alone.

Winn-Dixie might point to *Morton's* to argue that only a jury can decide the fraudulent concealment issue.  But *Morton's*, notably, dealt only with the second and third prongs of the fraudulent concealment inquiry.  Unlike here, in *Morton's*, the defendants "secretly conduct[ed] meetings and confin[ed] to key individuals information."  198 F.3d at 826.  They did not contest that they engaged in affirmative concealment of their conspiracy, focusing instead on the notice and diligence prongs of the test.  *See id.* at 832.  And as to those prongs, the defendants could not point to any evidence that the plaintiffs had notice that they were impacted by defendants' conduct.[5]  Instead, the defendants argued that separate criminal and civil charges brought against them for rigging bids for school milk should have been sufficient notice to plaintiffs that defendants were also price fixing milk sold to commercial customers.  Unsurprisingly, the Eleventh Circuit declined to find, as a matter of law, that "notice of one wrong by a defendant triggers a duty for potential plaintiffs to investigate all other potential wrongs the defendant might be committing."  *Id.* at 834. *Morton's* is far removed from the facts here.

Though it is unnecessary for the court to consider whether Winn-Dixie lacked notice or exercised due diligence because it is undisputed that Defendants did nothing to conceal the HRP, the evidence is more than sufficient to find, as a matter of law, that Winn-Dixie was on notice of the HRP beginning in 2003 or 2004, or should have discovered it with reasonable

---

[5] *Morton's* noted that the standard for assessing whether there is a genuine dispute of facts related to notice and diligence is "applied with particular stringency where it is claimed that the defendant's conduct prevented the plaintiff from discovering his claim prior to the expiration of the limitations period." 198 F.3d at 832.

diligence.  In *Beef Industry*, the court concluded, on a much slimmer evidentiary record than

here, that the widespread publicity surrounding a related lawsuit (the "Bray" case), "was

more than adequate to establish beyond doubt that reasonably diligent cattlemen in the

plaintiffs' situation would have been aware, in the late 1960's, of the Bray allegations."  *Beef*

*Indus.,* 600 F.2d at 1170.  The court denied summary judgment, not because the amount of

public notice was insufficient, but because the content of that notice was limited to the

related lawsuit, which could be frivolous or baseless in terms of the conduct alleged.  *Id.* at

1171.  Here, in contrast, the undisputed facts show widespread, contemporaneous public

notice (including from Defendants themselves) of the actual conduct -- the HRP --

underlying Winn-Dixie's claims.  Winn-Dixie purchased millions of dollars of dairy products

every year.  Given how openly and publicly the HRP was conducted, Winn-Dixie cannot

simply say it buried its head in the sand for ten years.  Indeed, the record evidence

demonstrates Winn-Dixie's actual knowledge of the facts underlying the conduct challenged

in this action (*see supra* at 5-6), which acts as a complete legal bar to an assertion of

fraudulent concealment.  *See Crummer Co. v. DuPont*, 255 F.2d 425, 431 (5th Cir. 1958);

*Cotton v. Martin Cty., Fla*, 306 F. Supp. 2d 1182, 1186–87 (S.D. Fla. 2004).

### C.  Winn-Dixie's Claims Are Not Tolled By The Related Class Action Lawsuits

Winn-Dixie has claimed that it is entitled to class action tolling under *American Pipe*

*& Construction Co. v. Utah*, 414 U.S. 538 (1974), which extends tolling only to "asserted

members of [a] class."  *Id.* at 554.  Under *American Pipe*, the threshold question is whether

Winn-Dixie's claims were encompassed by a legally-valid, prior-filed class action pleading.

The claims in the prior class actions related to the HRP, on which Winn-Dixie may attempt

to rely, (Exs. 19, 22, 24, 25, 46, 47), must line up with the claims in the current suit across three dimensions: parties, products, and time period.  In Exhibit 48, Defendants have outlined those dimensions for each of the class action pleadings.  With one narrow exception, the vast majority of Winn-Dixie's claims are not encompassed by any of the prior class actions and are therefore barred by the statute of limitations.

### 1.    *First Impressions* **provides only limited tolling to Winn-Dixie**

*First Impressions* provides extremely narrow tolling for Winn-Dixie's claims based on purchases of fresh dairy products from Defendants Agri-Mark, DFA, and LOL ("Named Defendants" in *First Impressions*) on or after May 22, 2009.  Claims based on purchases made before that date are not tolled, nor are claims for any purchases from SMI, nor claims for purchases of raw milk, cheese, or butter.

*Raw Milk*.  *First Impressions* does not toll Winn-Dixie's claims for raw milk purchases.  The first three complaints in *First Impressions* asserted class action claims for direct purchases of raw milk from Agri-Mark, DFA, and LOL.  These claims were limited to the period available under the statute of limitations when the first *First Impressions* complaint was filed on May 10, 2013, as no fraudulent concealment was alleged therein. (Exs. 24, 25, 47.)  Therefore, under the four-year statute of limitations, the *First Impressions* classes' claims are limited to the period beginning May 10, 2009.[6]  But Winn-Dixie ceased purchasing raw milk from all Defendants in April 2008, when it sold the last of its dairy

---

[6] The *First Impressions* plaintiffs assert a class period beginning December 6, 2008, by improperly attempting to piggyback their claims on the *Blakeman* complaint's limitations period.  That is not permitted under *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018), as discussed in more detail below.  Regardless, raw milk claims were not pled in the *Blakeman* complaint, so it cannot under any circumstances serve to extend the limitations period for raw milk claims.  And even if the limitations period began in December 2008, that would not benefit Winn-Dixie, which ceased purchasing raw milk eight months earlier, in April 2008.

processing plants.  Thus, Winn-Dixie's raw milk claims fall outside the time period of the raw milk claims asserted in *First Impressions*.

> **Claims for Purchases from SMI and Claims for Cheese or Butter.**  The first three *First Impressions* complaints limited the class definition to purchases from the Named Defendants in that case.  Because SMI is not a named defendant in *First Impressions*, SMI purchases were not part of those class definitions.  The statute of limitations continued to run against all of Winn-Dixie's SMI claims.  *See, e.g., Rogers v. Nacchio*, No. 05-60667-CIV, 2006 WL 7997562, at *3 (S.D. Fla. June 6, 2010), *aff'd in part and dismissed in part*, 241 F. App'x 602 (11th Cir. 2007) (*American Pipe* tolling "only applies to defendants who were sued in the class action.").  The statute of limitations on those claims expired in September 2014.

The first class action complaint to expand the class definition to include purchases from all CWT members, not simply the Named Defendants therein (and thus include potential purchases from SMI) was the Third Amended *First Impressions* Complaint, filed on September 11, 2015.  Winn-Dixie's claims against SMI had already expired by that time.

Winn-Dixie's claims for cheese and butter purchases are not tolled for similar reasons.  The first complaint in *First Impressions* asserted claims on behalf of a class of persons who purchased directly "from one or more Defendants" raw milk, fluid milk, or "manufactured dairy products," where "manufactured dairy products" was defined identically to the term "fresh milk products" used in Winn-Dixie's complaint ("cream, half & half, yogurt, dry milk, cottage cheese, cream cheese, sour cream, and ice cream").  Cheese and

butter were not named as products encompassed by the class definition,[7] and the statute of limitations continued to run against all of Winn-Dixie's cheese and butter claims.  The statute of limitations on those claims expired in September 2014.  It was not until a full year later, on September 11, 2015, that the *First Impressions* plaintiffs amended their class definition to include entirely new groups of purchasers that were not members of the prior class.  None of the members of these classes (cheese and butter purchasers from CWT members) were members of the previous classes (fluid or fresh dairy product purchasers from Named Defendants).  Since these classes did not overlap, none of the members of the newly defined classes could claim *American Pipe* tolling based on any prior *First Impressions* pleadings. *See Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282–83 (11th Cir. 2003) (tolling does not apply to claims that were not "explicitly included" in the prior class actions).

Plaintiffs may claim that the amended claims in *First Impressions* were timely because they relate back to the original complaint.  But the relation back doctrine does not apply when the amendment seeks to expand the class definition to add new parties, with new claims, that were known and could have been brought at the time of the original filing. *See Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1132–33 (11th Cir. 2004).  Further, even as of late 2013 when Winn-Dixie asserts that it first learned of its potential claims against Defendants in this case, Winn-Dixie was on notice that its claims against SMI, and claims relating to butter and cheese, were not encompassed by the class pleadings and therefore not subject to *American Pipe* tolling.  Allowing Winn-Dixie to take advantage of

---

[7] Winn-Dixie may also try to claim that cheese and butter are among the identified "fresh" milk or dairy products.  This claim is wrong.  As Winn-Dixie's own expert testified, such products are not considered "fresh" in the dairy industry but are instead referred to as "storable."  (*See* Ex. 30, at 51:5–52:11; 71:1–76:2.)

the September 2015 amendment in *First Impressions*, after the statute of limitations on its claims had already run, would be prejudicial to SMI and the other Defendants who had no notice of these claims until Winn-Dixie brought this action in September 2015.[8]

  ***Fluid Milk and Fresh Dairy Products.***  Winn-Dixie did not buy processed fluid milk from any of the Named Defendants during the *First Impressions* claim period.  (Ex. 29 at Resp. to Req. for Admis. Nos. 5–8.)  The only processed fluid milk it purchased was from SMI, and as set out above, such purchases are not tolled by *First Impressions*.

  As to fresh dairy products, the *First Impressions* case did preserve, from May 10, 2013, through September 11, 2015, Winn-Dixie's claims for fresh dairy product purchases from the Named Defendants.  The limitations clock on these claims began to run again on September 11, 2015, when they were dropped by the class.  Winn-Dixie filed this action twelve days later on September 23, 2015.  Winn-Dixie may therefore appropriately claim *American Pipe* tolling on fresh dairy product purchases from the three Named Defendants beginning May 22, 2009.  These tolled claims encompass less than $100,000 of Winn-Dixie's claimed $21.4 million in damages.

  **2.  Winn-Dixie cannot piggyback its claims on *LaFrance* or *Blakeman***

  Winn-Dixie may not add to the *First Impressions* tolling period any tolling from earlier-filed class actions.  Recent authority from the Supreme Court makes clear that class action stacking or piggybacking is not permitted.  In *China Agritech*, the Supreme Court held

---

[8] An additional reason Winn-Dixie cannot rely on the cheese and butter classes in *First Impressions* is that Winn-Dixie brought this lawsuit before those classes were certified.  Plaintiffs are not entitled to class action tolling where they "file[] an individual action before the class action court makes a decision affecting class certification."  *See Rogers*, 2006 WL 7997562, at *3.  By filing before a certification decision, Winn-Dixie cannot credibly maintain that it relied on the pendency of the *First Impressions* class action.

that plaintiffs cannot piece together separate "successive class actions" to extend the

limitations period for their claims.  138 S. Ct. at 1811.  This is because "*American Pipe* does

not permit a plaintiff who waits out the statute of limitations to piggyback on an earlier,

timely filed class action."  *Id.* at 1806.  A plaintiff may rely on only *one* timely-filed class

action complaint to toll its limitations period under *American Pipe*.  Thus, the earlier filed

class action complaints in *LaFrance* and *Blakeman* cannot serve to extend tolling for

subsequent classes; they must be evaluated on their own.  Winn-Dixie cannot rely on either

of these cases because the statute of limitations ran on both of them before its complaint was

filed.[9]

### III.   <u>Winn-Dixie Lacks Standing to Bring Claims Based on Raw Milk Purchases</u>

Separate and apart from the statute of limitations issues, Winn-Dixie also lacks

standing to claim damages for the raw milk that it purchased at its former plants in

Hammond, Louisiana, and Plant City, Florida, because Winn-Dixie assigned those claims to

Sunshine when it sold the plants.  Winn-Dixie and certain of its affiliates entered into an

Asset Purchase Agreement with Sunshine and SMI on February 26, 2008 (effective April 30,

2008), pursuant to which Winn-Dixie sold its dairy plants to Sunshine and assigned all assets

"directly related" to such plants to Sunshine, with the exception of certain enumerated

"Excluded Assets."  (Ex. 4.)  The agreement expressly transferred and assigned the relevant

"Assets" from Winn-Dixie to Sunshine (*id.* § 2.01).  "Assets" are defined as:

---

[9] *LaFrance* was filed on January 4, 2012 and dismissed August 23, 2012, potentially affording Plaintiffs
approximately eight months of tolling.  *Blakeman* was filed on December 6, 2012 and dismissed July 24, 2013,
again affording Plaintiffs at most approximately eight months of tolling.  Winn-Dixie's claims here are
approximately one year too late, so neither case provides enough tolling to revive any claims.

> **all of the assets, properties and rights of Seller** (including all assignable
> guarantees, warranties, indemnities and similar rights of Seller with respect to
> any of the Assets), **of every type and description**, real, personal and mixed,
> **directly relating to the Dairy Plants**, including the Owned Real Estate, the
> Subleased Real Estate, the Inventories (other than finished product Inventories
> to be removed from the Dairy Plants by Seller for relocation to other locations
> of Seller), the Equipment, the Supplies, the General Property, the Intellectual
> Property (other than Intellectual Property comprising or related to the
> Excluded Assets), the Assumed Contracts, and other fixed or tangible assets
> **known or unknown**, fixed or unfixed, choate or inchoate, accrued, absolute,
> contingent or otherwise, wherever located and whether or not reflected on the
> books and records of the Seller, **excluding only the Excluded Assets**.

(*Id.* at Schedule A (emphasis added.))  During his deposition, Winn-Dixie's corporate

representative confirmed that "all of the assets relating to the two plants" were sold "except

for certain specifically identified excluded assets."  (Ex. 28 at 45:21-46:4.)  He also admitted

that raw milk sales from SMI "related directly" to the plants.  (*Id.* at 103.)

Winn-Dixie's legal claims based on its raw milk purchases at those plants are "assets"

that "directly relat[e] to" such plants.  And because the legal claims are not part of the

"Excluded Assets," (Ex. 4, Schedule A), then by the plain terms of the agreement the claims

were assigned to Sunshine.  *See Anaford AG v. Sharp Kemm P.A.*, No. 8:12-cv-1264-T-35-

TBM, 2013 WL 12156824, at *3 (M.D. Fla. Mar. 29, 2013) ("Under Florida law, 'an

unqualified assignment transfers to the assignee all the interests of the assignor in and to the

thing assigned.  The assignee steps into the shoes of the assignor and is subject to all equities

and defenses that could have been asserted against the assignor had the assignment not been

made.'") (internal citation omitted).[10]

---

[10]  *See also Forgione v. Dennis Pirtle Agency, Inc.*, 701 So. 2d 557, 559 (Fla. 1997) ("Under Florida law, parties
can assign causes of action derived from a contract or a statute.").  Indeed, the Florida legislature recognizes
that legal claims are "assets" that can be assigned.  *See* Fla. Stat. § 727.103 (2007).  And in the bankruptcy

## IV.  <u>Winn-Dixie's Indirect Claims Must Be Dismissed for Lack of Antitrust Standing</u>

Winn-Dixie also lacks standing to recover damages on purchases that it made indirectly.  Generally, a plaintiff has standing under the Clayton Act only to bring claims for purchases directly from the defendants and alleged co-conspirators.  A plaintiff, except in rare circumstance not present here, does not have standing to bring claims for purchases of the defendants' or co-conspirators' products purchased from others -- so called indirect purchases.  *See Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1285 (11th Cir. 2014).  As of May 1, 2013, Winn-Dixie stopped buying directly from Defendants, and instead began to purchase all dairy products indirectly from C&S Wholesale Grocers, Inc. ("C&S"). (Ex. 49 at Resp. to Interrog. No. 21.)

In his report, Winn-Dixie's expert John M. Connor, Ph.D., reviewed and relied upon a spreadsheet titled "Milk Purchases from C and S after warehouse transfer 2013.xlsx," which lists "Milk Purchases from C&S After Transfer of Warehouse Operations."  (Ex. 2 at 61 n.203 and Ex. C at 6.)  According to Dr. Connor, the spreadsheet shows fluid milk (Class I) purchases from C&S of $28.9 million after August 16, 2013, which he calculated to result in alleged damages of $888,190. (Ex. 2 at 60–61; *id.* at 65 n.209; *see also* Ex. 30 at 258:14–259:15.)  Winn-Dixie lacks standing to assert a claim for its indirect purchases of fluid milk from C&S after May 1, 2013, and those claims must be dismissed for lack of standing.

context, civil claims are deemed assets of the bankruptcy estate that pass from a debtor to a trustee.  *See Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017).

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

DATED:  August 20, 2018           Respectfully submitted,


By: */s/ Cindy A. Laquidara*

Florida Bar No. 394246
Email: cindy.laquidara@akerman.com
AKERMAN LLP
50 North Laura Street, Suite 3100
Jacksonville, FL 32202
Telephone: (904) 798-3700
Facsimile: (904) 798-3730

*Attorneys for Defendants National Milk Producers*
*Federation; Southeast Milk, Inc.; Dairy Farmers of*
*America, Inc.; Land O'Lakes, Inc.; and Agri-Mark, Inc.*

Jonathan B. Sallet
District of Columbia Bar No. 336198
John J. Kavanagh
New York Bar No. 2858074
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
jsallet@steptoe.com
jkavanagh@steptoe.com

*Attorneys for Defendant National Milk Producers*
*Federation aka Cooperatives Working Together*

Michael J. Beaudine, Esq.
Florida Bar No. 0772763
beaudine@lseblaw.com
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
111 N. Magnolia Avenue, Suite 1400

21

Orlando, FL 32801
Telephone: (407) 481-5800
Facsimile: (407) 481-5801

*Attorneys for Defendant Southeast Milk, Inc.*

W. Todd Miller
District of Columbia Bar No. 414930
Lucy S. Clippinger
New York Bar No. 5105796
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20037
Telephone: (202) 663-7820
Facsimile: (202) 663-7849
tmiller@bakerandmiller.com
lclippinger@bakerandmiller.com

*Attorneys for Defendant Dairy Farmers of America, Inc.*

Nathan P. Eimer
Illinois State Bar No. 00735353
Scott C. Solberg
Illinois State Bar No. 6204487
Ben E. Waldin
Illinois State Bar No. 6317991
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
neimer@eimerstahl.com
ssolberg@eimerstahl.com
bwaldin@eimerstahl.com

*Attorneys for Defendant Land O'Lakes, Inc.*

Jill M. O'Toole
Connecticut No. 414338
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5000

22

Facsimile: (860) 251-5218
jotoole@goodwin.com

*Attorneys for Defendant Agri-Mark, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on August 20, 2018, I electronically filed the foregoing with the Clerk of Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Cases of this Court by using the CM/ECF System, which will send a notice of electronic filing to all counsel of record.


DATED:  August 20, 2018                         _____*/s/ Cindy A. Laquidara*_____

                                                                *Attorneys for Defendants National Milk*
                                                                *Producers Federation; Southeast Milk, Inc.;*
                                                                *Dairy Farmers of America, Inc.; Land O'Lakes,*
                                                                *Inc.; and Agri-Mark, Inc.*