## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WINN-DIXIE STORES, INC., and BI-LO
HOLDING, LLC,

                      Plaintiffs,

   v.

SOUTHEAST MILK, INC., et al.,

                    Defendants.

Case No. 3:15-cv-01143-J-39-BJD-PDB

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE OR EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT**

**TABLE OF CONTENTS**

I.      THE APPLICABLE LAW ...................................................................................1
II.     DR. CONNOR USED A RELIABLE DATASET, THE BEST DATA
        AVAILABLE.............................................................................................3
III.    DR. CONNOR DID NOT ASSUME THAT THE HRP REDUCED THE
        SUPPLY OF RAW MILK AND HIS MODEL MEASURES FOR IT. ...10
IV.     DR. CONNOR'S MODEL DOES CALCULATE OVERCHARGES
        FOR OOPs.............................................................................................17
V.      CONCLUSION ...............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

Baker, Jonathan B. and Daniel L. Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique." *American Law and Economics Review* 1, no 1/2 (1999): 386-435.………………………………………………………………….……………………...11, 15

*Bazemore v. Friday,* 478 U.S. 385 (1986) ....................................................................................2,8-9

Brander, James A. and Thomas W. Ross, "Estimating Damages from Price-Fixing," in *Litigating Conspiracy: An Analysis of Competition Class Actions*, 2006, at 353-54………….3

*Cason-Mereda v. WHS of Michigan*, Inc. 2014 U.S. Dist. LEXIS 29447 (E.D. Mich. Mar. 7, 2014)…………...…………………………………………………………………………………...17

*City of Tuscaloosa v. Harcros Chemical*, 158 F.3d 548 (111th Cir. 1998) ....................................2

*Dugas v. 3M Company*, 2016 U.S. Dist. LEXIS 98916 (M.D. Fla. 2016) ......................................2

"Empirical Approaches in Assessing Class Certification in Direct Purchaser Price-Fixing Cases." *The Antitrust Review of the Americas*, 2010, p.23......…………………………………11

Forister, Eric and Samid Hussain. "Empirical Approaches in Assessing Class Certification in Direct Purchaser Price-Fixing Cases." *The Antitrust Review of the Americas*, 2010..……11

Greene, William H. *Econometric Analysis*. Seventh Edition. Boston: Prentice Hall, 2012.……15

Harrington, Jr., Joseph. "Behavioral Screening and the Detection of Cartels." *European Competition Law Annual 2006: Enforcement of Prohibition of Cartels*...……………………18

*In re High-Tech Employee Antitrust Litigation*, 2014 U.S. District LEXIS 47181 (N.D. Cal. 2014..…………………………………………………………………………………………17

*In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir. 2008)……………………………9

*In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262 (6th Cir. 2014)……………………9

*In re Processed Egg Products Antitrust Litigation*, slip op, Case No. 2:08-cv-2002 (E.D. Pa. Sept. 21, 2015)..…………………………………………………………………………………12

*Litigating Conspiracy: An Analysis of Competition Class Actions*, 2006, at 353-54 .....................3

*Maiz v. Virani,* 253 F.3d 641 (11th Cir. 2001) .............................................................................1

*Moecker v. Honeywell Int'l, Inc.,* 2001 U.S. Dist. LEXIS 12075 (M.D. Fla. 2001) .......................2

*Navelski v. Int'l Paper Co.,* 244 F. Supp. 3d 1275 (N.D. Fla. 2017)..............................................2

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK,* 326 F.3d 1333, 1341 (11th Cir. 2003) ............ 1, 2, 8

*Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ................................ 1-2

Rubinfeld, Daniel L. "Reference Guide on Multiple Regression." *Reference Manual on Scientific Evidence* (2018), 415-469…………………………………………………………15

Rubinfeld, Daniel L. "Quantitative Methods in Antitrust." *Issues in Competition Law and Policy* 723 (2008).....…………………………………………………………………………3, 11

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.* 608 F. Supp. 2d 1166 (N.D. Cal. 2009)... 12

*Universal Surveillance Corp. v. Checkpoint Systems*, 2015 U.S. Dist. LEXIS 147106 (S.D. Ohio 2015)......................................................................................................................................... 9

Defendants' motion to strike or exclude the opinions of Plaintiffs' expert, John M. Connor, Ph.D. (Dkt.# 190), should be denied because, contrary to Defendants' arguments, Dr. Connor (1) used data that would typically be considered reliable by economists for the purposes of a regression model, which was the best data available, (2) did not assume and did investigate whether the Herd Retirement Program ("HRP") reduced the supply of raw milk, which his model reliably shows that it did, and (3) did show that his regression model calculated overcharges for over-order premiums ("OOPs") for each of Class I, II, III, and IV. Finally, the case law is clear that it is not necessary for an economic expert to first calculate a reduction in supply before determining whether anticompetitive conduct had an effect on the price of the affected product, as long as his regression model properly accounts for the appropriate supply and demand factors for the product, as Dr. Connor's model does. *See infra*, p. 12, fn. 34. Therefore, Defendants' motion should be denied.

## I.      THE APPLICABLE LAW

"[A]lthough 'rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology"(*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK,* 326 F.3d 1333, 1341 (11th Cir. 2003)), "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011), quoting *Quiet Tech,* 326 F.3d at 1341. *See also Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir. 2001)("A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury"). "Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Tech,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596). "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld,* 654 F.3d at

1193*; Quiet Tech,* 326 F.3d at 1345 ("[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility" (quoting *Bazemore v. Friday,* 478 U.S. 385, 400 (1986)). This Court has applied this same approach. *Dugas v. 3M Company*, 2016 U.S. Dist. LEXIS 98916, at *17 (M.D. Fla. 2016)(citing *Rosenfeld*). In *Moecker v. Honeywell Int'l, Inc.,* 2001 U.S. Dist. LEXIS 12075 (M.D. Fla. 2001), the court held that "the focus of the Court's inquiry is not on the conclusions generated by the expert's methodology, but on the reasonableness of the expert's use of a particular method of analyzing the data obtained that the expert uses to draw his conclusion." *Id.* at *10 (citing *Kumho*).

In addition, where the expert employs an accepted scientific methodology, any flaws asserted in applying it go the weight of the opinion, not its admissibility. *Quiet-Tech,* 326 F.3d at 1345. *Quiet-Tech* stated that "[t]he identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Id.* (citing *Daubert*). Prior to making that statement, the Court noted that the expert employed an accepted methodology. *Id.* at 1343.[1]

In this case, the methodology employed was a reduced form multiple regression analysis model. Such a multiple regression analysis or model has been widely accepted by the courts, including the Supreme Court and the Eleventh Circuit. In *City of Tuscaloosa v. Harcros Chemical*, 158 F.3d 548, 566 (11th Cir. 1998), the Court stated that "multiple regression analysis [is] a methodology that is well established as reliable." *See also Bazemore*, 478 U.S. at 400-01 (a properly performed multiple regression analysis is an accepted method for determining causation and damages). In *Navelski v. Int'l Paper Co.,* 244 F. Supp. 3d 1275 (N.D. Fla. 2017), the court stated that courts have routinely found that "properly constructed regression models can provide

---

[1] "As for the reliability of CFD … this discipline had repeatedly been used to assess internal flows and … the results generated from these tests had been critically evaluated in peer-reviewed articles and studies." And "[C]ourt and scholarly commentators alike have recognized both implicitly and explicitly, the uses and benefits of CFD."

reliable support for expert conclusions." *Id.* at 1295. A reduced form multiple regression analysis is also widely accepted in the economics profession for determining if anticompetitive conduct impacted price.[2]  Since Dr. Connor employed a widely accepted scientific methodology, any arguments as to flaws in his model go to the weight of his opinions, not their admissibility.

## II.    DR. CONNOR USED A RELIABLE DATASET, THE BEST DATA AVAILABLE

It is well recognized in the economics profession that to estimate the conspiracy's effect on prices it is necessary to compare prices in a period when a conspiracy was not active to prices in a period when it was: the former period constituting a benchmark against which to assess the conspiracy's effect.[3] Dr. Ricchetti agrees with such an approach.[4] Dr. Connor adopted this approach, comparing the period 2000-2003 (before the HRP started) to the period 2003-2013 (during the HRP and three years following, when the effects of the slaughters on prices were still evident), using a regression model that accounted for market factors that differed between the two periods. Dr. Connor used the only set of data that covered the period of the anticompetitive conduct and also a benchmark period (Ex. 4, Connor Report ¶77): the OOP data produced by DFA which covers the period 2000-2013. Defendants now contend that he should have estimated the overcharge using either: 1) Winn-Dixie's purchase data; or 2) OOP data produced by SMI.[5]  As Dr. Connor described, Winn-Dixie's purchase data was produced for the period April 27, 2004 through August 16, 2013. Ex. 4, Connor Report ¶88. Since no benchmark is available as the HRP started in 2003, that dataset could not be used to estimate the overcharge. Similarly, he explained

---

[2] Ex. 1, Rubinfeld, Daniel L. "Quantitative Methods in Antitrust." *Issues in Competition Law and Policy* 723 (2008): 723- 742, at 724-725: describing how a "reduced-form multiple regression" is the "most common statistical method employed in antitrust litigation" and how it can be used to "explain the variation in the price of a product."
[3] Ex. 2, Brander, James A. and Thomas W. Ross, "Estimating Damages from Price-Fixing," in *Litigating Conspiracy: An Analysis of Competition Class Actions*, 2006, at 353-54: "The investigator will need data from both inside and outside the cartel period …").
[4] He admits that an economist would use data covering the time period before and during the anticompetitive conduct. Ex. 3, Deposition of Bryan Ricchetti, 265:7-15: "Q. As an economist, you would not use a dataset that did not go back to the before period or the benchmark period if you had available to you, data that did go back to the before or benchmark period, correct? A: As a general matter, you try to use as much data as you can in a reliable way."
[5] Defendants' Daubert Motion (Dkt#190), pp. 2, 5-6 ("DDM").

that the SMI "pricing data" could not be used because it was only produced for 2006-2013 and did not cover the entire period of the anticompetitive conduct, much less a benchmark period. Ex. 4, Connor Report ¶77, fn. 152.

In addition, the SMI "pricing data" were not actual transaction prices – they were price announcements.[6] Dr. Novakovic testified that transaction prices must be used in any economic analysis.[7] In contrast, the DFA OOP data was entitled "Class Premiums for Billing" referring to specific customers and specific plant locations, including the Southeast and Plaintiffs' Plant City and Hammond milk processing plants.[8] The data's title – "Class Premiums for Billing" – indicates that they reflected actual premiums charged to customers and Defendants' experts had no information that the DFA OOP data did not reflect premiums charged to customers.[9]

Moreover, contrary to Defendants' outrageous assertion that "Dr. Connor cited no documents or testimony regarding whether DFA sold raw milk to Winn-Dixie," DFA's own Class Premiums for Billing identified Winn-Dixie's Hammond milk processing plant as a location that it sold to. The data includes OOPs for "Superbrand, Hammond, LA" from January 2000-December 2013, and for "Superbrand, Plant City, FL" from January 2000-July 2005.[10] Additional evidence shows that DFA sold raw milk to Winn-Dixie's Hammond plant.[11] Finally, Donald Bernos testified

---

[6] Ex. 3, Ricchetti Dep. 257:18 – 258:3: "Q: So, the SMI price announcements were not transaction prices, correct? A: They were pricing letters. Q: So, they weren't transaction prices, correct? A: They were pricing letters. I didn't observe the transaction price."

[7] Ex. 5, Deposition of Andrew Novakovic 225:25-226:6: "Q …"Empirical analyses of over-order prices really needs to be done with actual transaction prices if there is to be any hope of accuracy." Do you see that? A. I do."

[8] Defendants misrepresent their own DFA OOP data, writing that "Dr. Connor's entire report is based on a spreadsheet maintained by DFA of announced OOPs for raw milk in selected cities" and the data constitute the "OOPs Defendant DFA charged to an average customer," (DDM pp. 2, 5). But the DFA OOP data are not just announced prices for "selected cities" or an "average customer," they are OOPs for billing to *specific* customers. Further, "Dr. Connor's entire report" does not rely on the dataset; it analyzed a multitude of data and documents.

[9] Ex. 5, Novakovic Dep. 227:19-228:7: "Q So, once again, the data was entitled class 1 premium for billing, correct? A I don't remember those words. Q Well, that's what it said? A Okay. Q And assuming that's what it said, then one could reasonably infer that that was the class 1 premium that was going to be actually billed to the customer, correct? A. That seems to be a reasonable statement to me."

[10] Ex. 7, Dairy Farmers of America. "Class Premiums for Billing." DFA2013-00037605.xls, DFAWD-00000030.xls.

[11] Documents used in this motion showed that DFA supplied raw milk to the Hammond plant. DDM, Exhibit U, DFA Pricing Announcements; Exhibit V, email from DFA to Winn-Dixie regarding raw milk sold to the Hammond plant.

that DFA supplied raw milk to the Hammond plant. Ex. 8, Deposition of Donald Bernos 11:6-17. Further, DFA continued to sell raw milk to SMI after it purchased the Hammond plant, using that raw milk to make processed milk sold to Plaintiffs.[12] SMI's agreement with Plaintiffs was a cost plus agreement, which specifically included the price of raw milk, including OOPs, separately, and a set conversion cost for the processed milk.[13] Therefore, the OOPs charged by DFA to SMI, contained in DFA's OOP data, are directly relevant to Plaintiffs' claim relating to processed milk.

Defendants argue that Dr. Connor merely "assumed…that the pricing from its largest supplier, SMI, was consistent with the DFA average price data" (DDM p. 6). However, contrary to Dr. Ricchetti,[14] Dr. Connor conducted a correlation analysis between the DFA OOP data and SMI price announcements finding them highly correlated.[15] Based on Dr. Connor's testing of the DFA OOP data and his rationale for using it, Defendants' argument should be rejected.

Defendants' other arguments should be rejected. First, contrary to Defendants' assertion about the quantity of raw milk used in each dairy product (DDM p. 6), Dr. Connor calculated the amount of raw milk used, employing conversion rates from the Wisconsin Milk Marketing Board, a nonprofit funded by dairy farmers.[16] Second, contrary to Defendants' outrageous assertion that "Dr. Connor has no evidence of the actual quantity of raw milk purchased by [Plaintiffs] from Defendants" (DDM pp. 10-11), Dr. Connor relied on data regarding Plaintiffs' purchases of processed dairy products, using raw milk supplied by SMI and DFA, from SMI in an exclusive supply agreement (*see infra*, fn. 13), with a pricing provision that specifically separated out, as a

---

[12] Ex. 9, SMI Supply Agreement, SMI-000130-135, 131, Ex. 8, Bernos Dep. 11:18-12:9.
[13] Ex. 9, SMI Supply Agreement (SMI-000130-135, at 131), Ex. 10, WD1143-000195-298 at 199: "For all fluid milk Products sold under this Supply Agreement the cost of the milk will be based upon the following: (a) The applicable Federal Milk Marketing Order ("FMMO") price issued by USDA…plus any applicable zone adjustments (based on the distribution destination for such milk Products), **over-order premiums** …" (emphasis added).
[14] Ex. 3, Ricchetti Dep. 260:3-9: "Q: You didn't do any analysis as to whether or not the SMI price announcements were correlated to the actual transaction prices...? A: I didn't do that analysis because I didn't think it was relevant."
[15] Ex. 4, Connor Report, ¶77, fn. 152.
[16] Ex. 11, Connor Rebuttal Report, ¶ 128.

separate cost, the price of raw milk (including the over-order premium) which was passed through to Plaintiffs. SMI also produced a tabulation of raw milk Plaintiffs purchased from SMI for the Plant City, Florida and Miami, Florida plants.[17] Ex. 29, SMI-016313-14.

Third, contrary to Defendants' assertion that Dr. Connor "fail[ed] to study raw milk purchase transactions at Winn Dixie's plants" (DDM p. 11), Dr. Connor did study raw milk purchase transactions using the DFA OOP data, which directly related to Plaintiffs' purchases of raw milk from DFA for their Hammond plant; in addition, he relied on the same DFA OOP data for Plant City, Florida and ran a correlation analysis which showed that the DFA OOP data was highly correlated with the SMI "pricing data" (price announcements) for Class I raw milk for cities contained within both datasets (or in close proximity) – a fact that Defendants conveniently omit. Ex. 4, Connor Report ¶77, n. 152. Furthermore, Defendants' assertion that Dr. Connor did not study the HRP's effect on processed milk, yogurt, cheese and butter, is incorrect and contradicted by the evidence. For purchases from SMI, from the Hammond plant (supplied by DFA) and the Plant City plant, Plaintiffs purchased processed milk in gallons, half gallons and other sizes, and ice cream, pursuant to SMI's exclusive supply agreement, which passed the price of raw milk through to Plaintiffs. Processed milk uses Class I raw milk and ice cream uses Class II. Ex. 4, Connor Report, ¶24. Thus, as to these purchases, Defendants' argument must be rejected.

With respect to all Classes of raw milk, as shown in Plaintiffs' Daubert motion ("PDM") and below, Defendants have admitted that the HRP raised the All-Milk price of all Classes of milk, not only Classes I and II, but also Classes III and IV (for cheese and butter, respectively).[18]

_____

[17] Defendants ignore that Dr. Connor limited the damage estimate to purchases from the Defendants, using Winn Dixie data that includes the quantity of "purchases from all vendors for raw milk, fluid milk and other dairy products that use Class I, II, III, and IV milk," and limiting damages to Defendant vendors (Ex. 4, Connor Report ¶88, 90). He also relied on the SMI supply agreement that provides that SMI will "supply WD Plant City with all of its fluid raw Milk." (Ex. 11, Connor Rebuttal Report ¶86; Ex. 9, SMI-000130-SMI000135, at 131.) Finally, DFA supplied WD's Hammond plant in Hammond, and Dr. Connor's analysis used this DFA data.

[18] Ex. 13, Deposition of John Wilson, January 8, 2015, 41:19-42:13 and 43:15-22 ("as we have less surplus milk going

Moreover, as seen in Plaintiffs' Daubert motion, Defendants admit that the All-Milk price includes OOPs, including the r-BST free premium and the fuel surcharge.[19] Thus, Defendants' own admissions contradict their contention that Class III and IV OOPs were not increased by the HRP. Further, Dr. Connor applies his model separately to Class I, II, III, and IV raw milk, finding that the HRP increased OOPs for each Class. Ex. 4, Connor Report ¶¶86-87, Tables 15 and 16.

Finally, Defendants' assertion that Dr. Connor used incorrect OOPs for Class III and IV because "most of the [Class III and IV] products purchased by Winn-Dixie from Agri-Mark, DFA, and Land O'Lakes came from processing facilities located far outside of the Southeast" (DDM p. 10),[20] does not mention Classes I and II. Thus, Defendants overreach by arguing, based on Classes III and IV, that "DFA OOP data in the Southeast were not representative of OOPs charged in other regions of the country." Their argument concerning Classes III and IV also ignores Dr. Connor's analysis on spatial integration, which is a well-known economic principle. Ex. 4, Connor Report ¶¶54-57, 78, Tables 8-11. Dr. Connor used the available data to demonstrate that: 1) Class I OOPs in Southeast cities and cities across the U.S. are correlated (using USDA and DFA data, both datasets only available for cities across the US for Class I milk and not for other Classes of milk) (Ex. 11, Connor Rebuttal Report ¶52-53, Table 14); 2) Class I, II, III and IV OOPs are each correlated across the three Southeast FMMOs (using DFA OOP data);[21] and, 3) within each of the three Southeast FMMOs, Class I, II, III and IV OOPs are correlated with each other (using DFA OOP data). Ex. 4, Connor Report ¶79, Tables 12-14. Defendants' only criticism relies on Dr. Ricchetti's purported analysis of data (for Class III and IV only) from a discontinued USDA report (not publicly available), which Dr. Connor shows is unreliable for calculating correlations because

---

into butter and powder plants, that tightened the supply by its very nature of the whole industry…if you do away with surplus milk, then you will elevate the price of the whole system. It floats all boats, if you will.")
[19] DFA admits that OOPs include r-BST free premiums and fuel surcharges. Ex. 13, Wilson Dep. 101:10-17.
[20] This argument relates to only 6.5% of Plaintiffs' damages. Ex. 4, Connor Report, Table 19.
[21] Ex. 4, Connor Report ¶78, Tables 8-11.

it is aggregated annual data and conflicts with the DFA and SMI data, in regions where the different datasets overlap. Ex. 11, Connor Rebuttal Report ¶¶ 115-116.

Thus, Dr. Connor has provided ample support for his opinion that raw milk OOPs are spatially integrated – that OOPs in the Southeast are representative of OOPs elsewhere. This supports his use of the DFA OOP data in the Southeast for Class III and IV milk, particularly as Defendants did not produce sufficient Class III and IV OOP data for regions outside the Southeast.[22] All of the above analysis and discussion of Defendants' challenges to Dr. Connor's use of data and his explanations highlight that those challenges go to the weight of his opinions, not their admissibility, under the clear precedent from the U.S. Supreme Court, the Eleventh Circuit and the Florida district courts and other district courts. *See Bazemore v. Friday.*, 478 U.S. 385 (1986); *Quiet-Tech DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333 (11th Cir. 2003). In *Quiet-Tech*, the Eleventh Circuit rejected a challenge to an expert's use of data where he used a recognized methodology and was alleged to have used improper variables and data. The Court concluded that such challenges go to the weight of the expert's opinion, not its admissibility:

> Although Quiet designates several additional elements of Frank's study as methodologically flawed, *see infra.*, and argues that his testimony … was unreliable, the foregoing analysis applies with equal force to these contentions; appellant's arguments go to the weight, not the admissibility, of the evidence he offered. [I]n summarizing several … arguments as to reliability, Quiet says that "Frank's failure to include all available flight test parameters in his model is fatal to any meaningful correlation of flight test results with computer results . . . ." [T]he Supreme Court … explicitly rejected the same argument …, holding that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 … (1986).

*Id.* (footnote omitted). More specifically, one of the "several additional elements" was the expert's failure to "validate" his results because he improperly chose the data used to test those results:

> Quiet argues that Frank improperly purported to "validate" his analysis with actual flight test data, as he (1) selected from the hundreds of flight tests … only two test runs made in May, 1998; and (2) disregarded significant portions of the data generated by the test flights.

---

[22] DFA did not produce any OOP data for Class III or IV in the regions that Dr. Ricchetti argues contain the majority of cheese and butter production, including Land O' Lake's operations (i.e., Mideast and Upper Midwest FMMO).

*Id.* at 1345 fn. 13. This holding is echoed in other decisions.[23] In *Universal Surveillance Corp. v. Checkpoint Systems*, 2015 U.S. Dist. LEXIS 147106 (S.D. Ohio 2015), the court rejected a challenge to the expert's use of data on grounds similar to *Quiet-Tech*. Thus, the court held:

> When the selection of certain data in an expert's analysis is challenged, but the expert provides a rationale supported by the record, the issue of whether the expert's conclusions are accurate or defensible goes to the weight of the evidence, not its admissibility.

*Id.* at *21-22. This holding applies directly here because Dr. Connor provided his rationale supported by the record, academic literature, which Defendants' experts acknowledge, and his correlation analysis of the DFA OOP data and SMI price announcements – for his selection of the DFA OOP data and rejection of the SMI price announcements (which did not cover the conspiracy period and benchmark period, and were not actual transaction prices). Moreover, Dr. Connor used data provided by Defendants. *Id.* at *27 ("Especially given that Checkpoint provided the transactional data …, the proper course is to let the jury decide whether Shehadeh's opinion based on that data is correct, not to exclude Shehadeh's opinion wholesale.").[24] Therefore, Defendants' arguments relating to the data Dr. Connor selected and used and what he did and did not study are not only incorrect and contradicted by the evidence, academic literature and statements of Defendants' experts, but also go to the weight of his opinions, not their admissibility.

---

[23] *See In re Scrap Metal,* 527 F.3d at 531 (finding expert's reasons for selecting certain data a matter for cross-examination, where expert offered a foundation for how he analyzed the data and there was no suggestion he "merely pulled the numbers comprising his calculations out of thin air"); *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 281 (6th Cir. 2014) (citations omitted) ("Including some facts while omitting others  goes to the accuracy of the conclusions, not to the reliability of the testimony.").

[24] The court also held: (1) "Ultimately, Shehadeh used Checkpoint's own data in a methodologically reasonable fashion; Checkpoint is free to challenge those methods on cross-examination" (*id.* at * 23 fn. 5); (2) "More important, Shehadeh's decision to simply use the price data … from Checkpoint, and not to 'correct' that price data [in his calculations], does not reflect any methodological error or make his opinion inadmissible" (*id.* at *23); and (3) "Here, there is a dispute regarding the reliability of Checkpoint's own data, and the parties will adduce evidence at trial whether the … cost entries are correct. In light of the Sixth Circuit's instruction that the accuracy of data underlying a reliable methodology normally goes to the weight of the opinion and not its admissibility, *see In re Scrap Metal*, 527 F.3d at 530, Shehadeh's opinion should not simply be excluded" (*id.* at *26-27).

## III.    DR. CONNOR DID NOT ASSUME THAT THE HRP REDUCED THE SUPPLY OF RAW MILK AND HIS MODEL MEASURES FOR IT

Defendants' arguments in Section B of their motion are based on at least two faulty premises: (1) Dr. Connor was required to first analyze whether the HRP reduced raw milk supply, and (2) the absence of certain variables and the selection of his control variables go to the admissibility of his opinions, rather than their weight. As to (1), as Defendants' experts admit, there is no requirement that an expert first analyze the reduction in supply before analyzing the effect of price, where the expert uses a regression model which accounts for the product's relevant supply and demand factors, as Dr. Connor has.[25] Dr. Connor's regression model is the standard econometric analysis in antitrust cases and in the academic literature, which Defendants' experts admit.[26] Furthermore, a properly constructed reduced form regression model accounting for relevant supply and demand factors would not show an increase in price without a reduction in supply, as Defendants' experts also admit. Thus, Dr. Ricchetti testified:

> Q. [A]ssuming that a regression model controls for relevant supply and demand factors, has an appropriate challenged conduct variable, and shows an effect on the price from the challenged conduct variable…that model establishes a causal relationship, correct?
>
> A. I agree with that in the hypothetical scenario of this model you're describing. … But, yes, I agree in principle that's possible. (Ex. 3, Ricchetti Dep. 20:8-18.)

Finally, Defendants' Motion contains this startling admission: "Dr. Connor's selection of control variables related to the supply and demand for raw milk … [is] a methodology that might fit a claim for damages for allegedly increased total milk prices." DDM pp. 15-16.[27] Therefore, as a regression model accounting for the relevant supply and demand factors, Dr. Connor's model

---

[25] Ex. 3, Ricchetti Dep. 31:22-32:1: "Q. You would agree … that many reduced-form regression models focus on the effect on price in antitrust cases … ? A. Yes, that's correct. You can focus on price, if you do it properly."

[26] Ex. 3, Ricchetti Dep. 16:20-17:5. See also Ex. 14, Ricchetti Report ¶93: "In order to calculate damages, Prof. Connor uses what he refers to as a "panel, fixed-effects, reduced-form price regression," which is a type of regression widely used in assessing antitrust damages. Properly implemented, such a model can be used to control for relevant supply and demand factors that can influence the prices at issue in the case, and then measure the incremental effect of the challenged conduct on price, controlling for the factors in the model."

[27] Dr. Novakovic also admitted that even the acceleration of dairy cow slaughters under the HRP would cause a reduction in supply. Ex. 5, Novakovic Dep. 270:14-271:1.

would not have found that the HRP increased OOPs unless it also reduced the supply of raw milk. Ex. 11, Connor Rebuttal Report, ¶¶18, 22.

Everything that Dr. Connor did in creating his reduced form regression model was consistent with accepted principles of the economics profession. First, he analyzed industry characteristics to assess whether an attempt at coordinated supply reduction would be expected to increase prices (he found that it would be expected to do so)[28] and the record evidence to evaluate whether Defendants behaved in an anticompetitive manner consistent with the alleged supply reduction (he found that they did and recorded how their scheme succeeded in reducing supply and increasing prices).[29] Next he tested the hypothesis that the supply reducing behavior did indeed increase prices and by how much.[30] The evaluation of industry characteristics and the record, before applying a regression model, is accepted economic practice.[31] Further, a reduced form regression model is based on (explicitly derived from) supply and demand equations – the most common, accepted method used to measure antitrust injury by economists, well-recognized by academic authorities:

> The most common statistical method employed in antitrust litigation involves the estimation of 'reduced-form' price equations…The model is called 'reduced form' because the price equation is derived from other more basic economic relationships relating to demand and supply.[32]

Defendants' experts agree (*see* fns. 25-6), as do Dr. Ricchetti's Cornerstone Research colleagues.[33]

---

[28] Ex. 4, Connor Report ¶11, §IV.A-B.

[29] Ex. 4, Connor Report ¶12, §IV.C, §V.

[30] Ex. 4, Connor Report ¶13, §VI, §VII.

[31] "Data analysis…interacts with the analysis of nonstatistical information. As more nonstatistical information is brought to bear, the systematic empirical evidence can often answer the key questions at issue in litigation more precisely," Ex. 15, Baker, Jonathan B. and Daniel L. Rubinfeld. "Empirical Methods in Antitrust Litigation: Review and Critique." *American Law and Economics Review* 1, no 1/2 (1999): 386-435, at p. 430.

[32] Ex. 1, Rubinfeld, "Quantitative Methods in Antitrust," supra fn 2, at 724-725.

[33] Ex. 16, Forister, Eric and Samid Hussain. "Empirical Approaches in Assessing Class Certification in Direct Purchaser Price-Fixing Cases." *The Antitrust Review of the Americas*, 2010, p. 23 ("Such a regression is … known as a reduced form regression, because it reduces the underlying relationships (that is, demand and supply relationships) into a single price equation. An economic expert may calculate damages as the amount of price inflation captured by a variable that spans the duration of the class period (a 'conspiracy' variable), while controlling for all relevant competitive supply and demand factors. … the effect of the 'conspiracy' variable may be interpreted as the average

Courts have also held that:

> In a reduced form price equation, price is 'expressed as a function of supply and demand variables.' … where this type of multiple regression analysis is used, 'plaintiff has controlled for changes in demand and supply determinants of price, and the resulting prediction on price during the conspiracy period takes into account influences other than the conspiracy that could serve to increase the… prices.'… [T]o the extent [the Expert's] prediction equation takes supply and demand variables into account as a function of price, it is acceptable… In sum, the law suggests that it is permissible for [the Expert] to use a reduced form price equation, which expresses price as a function of supply and demand, in order to control for changes in market conditions…Thus, to the extent that defendants challenge the accuracy or propriety of these variables, it is an issue that goes to the weight, rather than the admissibility, of [the Expert's] testimony.[34]

Dr. Connor's reduced-form pricing "model indicates that supply contracted" (Ex. 17, Deposition of John M. Connor, Ph.D., February 13, 2018, 165:11-12) because "[t]he quantity supplied is implicit in the model. We don't have to include it as a variable. The fact that cows removed increased the price is evidence that the supply contracted, the net supply." Ex. 17, Connor Dep. 166:20-24. Thus, Dr. Connor's model, using the number of cows killed in each herd retirement as a conspiracy variable, directly measures the HRP's incremental impact (or "net effect") on OOPs and therefore directly fits the Plaintiffs' theory of the case.[35,36] Therefore, by finding a price impact from the HRP, Dr. Connor's model indicates a supply reduction. Ex. 10, Connor Rebuttal Report ¶¶ 19-22. As he explained, because his model measures the HRP's ***net*** effect on price, it accounts for any supply response, reentry by farmers or that some of the cows culled may have been culled anyway. Ex. 11, Connor Rebuttal Report ¶ 8. Defendants consistently ignore this aspect of Dr. Connor's model.[37]

---

amount of price inflation that remains after controlling for all other variables in the regression model."

[34] *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.* 608 F. Supp. 2d 1166, 1200- 1201 (N.D. Cal. 2009). Finally, other courts have rejected Defendants' argument. *See In re Processed Egg Products Antitrust Litigation*, Case No. 08-2002, slip opinion, discussed at Plaintiffs' Daubert Motion, filed under seal, August 20, 2018, pp. 23-24, fn. 45.

[35] DFA admitted that "it doesn't take much of a change in either supply or demand to have dramatic consequences for prices. That's pretty much self-stated." Ex. 13, Wilson Dep. 64:25-65:18, Ex. 31, Wilson Dep., Exhibit 4.

[36] "Rather than *assuming* a supply reduction, my model instead directly measures the net effect of the CWT HRP on prices, while properly controlling for all relevant supply and demand characteristics. Thus, in finding that OOPs were higher than their but-for levels, my model also implies a milk supply reduction relative to but-for levels. This is entirely consistent with the facts and testimony in the record, which document that the primary goal of the CWT HRP was to increase prices through a net reduction in milk-cows," Ex. 11, Connor Rebuttal Report, p. 2.

[37] Defendants misrepresent Dr. Connor's testimony when arguing his results somehow show that a supply response

Several of Defendants' related arguments should be rejected. First, contrary to Defendants' assertion that "the HRP was ineffective and that the supply of raw milk increased despite it" (DDM p. 10), Dr. Connor found abundant evidence that supply was successfully reduced.[38] Second, contrary to Defendants' assertion that "The number of cows culled appears to have been unaffected by the HRP," what is relevant is not whether the total supply decreased/increased *over time*, but whether the total supply decreased/increased *relative to the but-for world* (*i.e.*, without CWT). Defendants rely only on Dr. Ricchetti's unscientific univariate analysis. As discussed in Plaintiff's Daubert motion, the univariate trend graphic is not a but-for analysis, which Dr. Ricchetti has not attempted, and he is not offering an opinion that the HRP did not reduce supply.[39] The only economist hired by *Defendants* to do a multivariate econometric analysis (*i.e.*, a *ceteris paribus* analysis) was Dr. Scott Brown, who found that the number of cows (and overall milk supply) were lower than they would have been without the CWT HRP (and the All-Milk price was increased relative to but-for levels as a result).[40] And, Defendants admit that milk production would have been higher without the HRP. Ex. 20, Kozak Dep. 47:7-48:17; Ex. 13, Wilson Dep., 60:22-61:5. Simply noting total changes in supply/prices over time is completely uninformative without a but-for analysis.[41] Even Dr. Novakovic agreed that preventing a price decline was itself a price effect.[42]

Third, Defendants argue that Dr. Connor used incorrect supply/demand variables citing Dr. Babb's paper "analyzing entirely different factors influencing OOPs, such as levels of competition,

undermined the HRP (DDM, p. 15). Dr. Connor testified that any supply response would take between 3-5 years. Ex. 12, Deposition of John M. Connor, Ph.D., June 22, 2018, 88:14-18.

[38] Ex. 11, Connor Rebuttal Report, ¶ 24. The same information contained in this paragraph in Dr. Connor's Rebuttal Report is reproduced in Exhibit 30 hereto, for the Court's convenience and ease of reference.

[39] "Q: So, in this case, you are not offering an opinion that the herd retirement program did not reduce supply of raw milk, correct? A: My analysis in this case does not address the question of whether there was no effect of the herd retirement program" Ex. 3 Ricchetti Dep. 72:2-4, 10-12.

[40] Ex. 18, Cooperatives Working Together. *CWT Committee Meeting*. June 8, 2010, NMPF0002599-2648, at -2617-2621; Ex. 19, Cooperatives Working Together. *The Economic Effects of the CWT Program*. October 8, 2012, NMPF0025083-88. Defendants embrace Dr. Brown's analysis in their Motion for Summary Judgment on Statute of Limitations and Standing (Dkt.#187), p.4.

[41] Dr. Novakovic agreed that a trend analysis, such as conducted by Dr. Ricchetti was not an economic analysis and showed nothing informative, Ex. 5, Novakovic Dep. 54:7-10.

[42] Ex. 5, Novakovic Dep. 258:21-24.

costs of procurement, and supply arrangements" (DDM p. 16). However, Dr. Novakovic, who cites Dr. Babb, stated that he was not contending that Dr. Connor's model was missing any variables.[43] Dr. Ricchetti testified that the supply and demand variables used by Dr. Connor are well-established variables relating to the supply and demand for milk.[44] Since Drs. Novakovic and Ricchetti made these statements, Defendants cannot now rely on Dr. Babb's article to contend that Dr. Connor's model is missing variables. Controlling for all of the supply/demand variables that influence milk supply without the HRP also controls for OOPs without the HRP. Defendants' marketing documents confirm that "[s]urplus milk … impacts profitability of cooperatives by reducing premiums and service charges on milk sold to processors and premiums that cooperatives are able to get on the dairy products that cooperatives make and market."[45] Also, Dr. Babb's paper is almost 30 years old, does not relate to how OOPs are determined in the Southeast before and during the HRP, and is not a critique of Dr. Connor's model. Moreover, Dr. Connor's model accounts for Dr. Babb's factors, either using explicit control variables or through his benchmark comparison: thus, factors present in the benchmark period and largely unchanged during the HRP period are accounted for. For instance, Defendants argue that Dr. Babb analyzes factors such as "levels of competition, costs of procurement, and supply arrangements." DDM, p. 16. Dr. Connor's model accounts for the "levels of competition" as that same level in the benchmark period, and it controls for any possible changes in competition, including a sensitivity test for SMA's formation and the DMS agreement.[46] Ex. 11, Connor Rebuttal Report ¶ 97, Table 21. Dr. Connor's model controls for the "cost of procurement" using milk production costs (hay, diesel, electricity prices, wages, and rBST usage) (Ex. 4, Connor Report ¶ 81), and there is no evidence that "supply arrangements" differed between the benchmark and collusion periods.

---

[43] Ex. 5, Novakovic Dep. 48:21-49:13.
[44] Ex. 3, Ricchetti Dep. 44:7-46:12.
[45] Ex. 21, Cooperatives Working Together. *Reasons to Join CWT in 2009*. DFA2013-00006544.
[46] Dr. Connor's benchmark period would also account for normal rates of culling before the HRP, thus isolating them from the HRP's effect. Ex. 4, Wilson Dep. 84:21-85:10, 87:8-21 (normal culling occurred before HRP).

Fourth, Defendants' argument that OOPs are only related to services provided by cooperatives is a new argument – not raised previously in their expert reports – and therefore cannot be considered.[47] Moreover, this argument is directly contradicted by DFA's corporate representative, who testified that OOPs represents a return (on investment) to the dairy farmer.[48] Finally, Dr. Connor controls for the services that cooperatives provide through his variables of wages, diesel fuel prices, electricity prices, and rBST usage.

Fifth, Defendants' experts did not identify any omitted variable in Dr. Connor's model. Ex. 11, Connor Rebuttal Report ¶ 17. Dr. Ricchetti testified "I did not investigate whether additional variables should be added…" (Ex. 3, Ricchetti Dep. 60:21-23), and Dr. Novakovic testified that he did not look at Dr. Connor's regression analysis because that was not his assignment.[49] Defendants' criticisms regarding "supply arrangements" are new, should not be considered, and are also wholly theoretical. Courts have rejected arguments based on speculation regarding supposedly important variables omitted from a regression model.[50] Moreover, the economics profession provides that omitted variable bias is only an issue if the omitted variable is correlated with the variable of interest (*i.e.*, the HRP): "Omitting variables that are not correlated with the variable of interest is, in general, less of a concern."[51] It is the Defendant's burden to show that a theoretically omitted variable makes a material difference to Dr. Connor's model; they have not

---

[47] Defendants misrepresent Dr. Connor's testimony, which actually states that OOPs "are a *return* for the services *and for the competitive and noncompetitive activities of the cooperatives.*" Ex. 12, Connor June Dep. 27:22-24 (emphasis added).

[48] Ex. 13, Wilson Dep. 78:17-22 ("that variance is based on the premiums that the cooperative is able to charge based on local competitive conditions, minus the expenses of marketing the milk. And hopefully there's something left over that enhances the milk check above the regulated price")

[49] Ex. 5, Novakovic Dep. 86:17-21.

[50] Ex. 15, Baker & Rubinfeld. "Empirical Methods in Antitrust Litigation: Review and Critique," supra fn. 33, at 396.

[51] Ex. 23, Rubinfeld, Daniel L. "Reference Guide on Multiple Regression." *Reference Manual on Scientific Evidence* (2018), 415-469, at 425. Econometrics textbooks have long established that a regression "model is only a simplification of reality. It will include the salient features of the relationship of interest but will leave unaccounted for influences that might well be present but are regarded as unimportant." (Ex. 22, Greene, William H. *Econometric Analysis*. Seventh Edition. Boston: Prentice Hall, 2012, p. 5). The discipline accepts that "[n]ot all possible [explanatory] variables that might influence the dependent variable [in this case, OOPs] can be included if the analysis is to be successful; some cannot be measured, and others may make little difference." Id.

done so and thus their criticism should be rejected. Finally, Dr. Connor has demonstrated that other variables can be included in the model and the results are unaffected,[52] performing sensitivity testing consistent with the standards of his profession.

Finally, contrary to Defendants' assertion that ineffective "cartels control only a small amount of the total supply"[53] and "the HRP affected only 1% of the market" (DDM, p. 14),[54] two-thirds of U.S. dairy farmers participated in the CWT, a threshold put in place to "minimize the free rider impact."[55] Dr. Ricchetti testified that (i) his reference to "1 percent of supply" referred to "the 1 percent of cows that were retired," (ii) MACs market share is around 80%-90% in the Southeast and have joint price setting power, and (iii) dairy farmers gain market power by joining cooperatives.[56] Defendants' market power, including power to set prices, equates to the power to control and restrict supply.[57] Also, although the HRP was voluntary for cooperatives, once a cooperative joined, its members had to fund the program. Ex. 12, Wilson Dep. 46:2-18; Ex. 5, Novakovic Dep., 166:18-167:1; Ex. 20, Kozak Dep. 112:23-113:3. Finally, Defendants' experts admitted that even a small reduction in supply will cause a large price increase and accelerating culling constitutes a supply reduction.[58]

---

[52] Ex. 11, Connor Rebuttal Report ¶ 97, Table 21, controlling for formation of SMA and the DMS agreement; Ex. 4, Connor Report ¶ 87, fn. 197-198, controlling for beef prices and net exports.

[53] Defendants misrepresent Dr. Connor's testimony on cartels (DDM, p. 14); nowhere does he testify that the HRP shared traits with ineffective cartels. To the contrary, he noted that the CWT controlled over 65% of the nation's milk production and that the HRP had an enforcement mechanism consistent with an effective cartel. Ex. 4, Connor Report ¶¶51, 56 (citing Ex. 14, Ricchetti Report ¶100), and fn. 98 (citing Kozak Dep. 112:23-113:3).

[54] Defendants attempt to conflate or confuse "market power" with "supply reduction." Ex. 10, Connor Rebuttal Report ¶57. However, it is nonsensical to equate "control of supply" with "supply reduction." Under Defendants' logic, the HRP would have to reduce supply by 50% in order for one to conclude that it controlled 50% of the market.

[55] Ex. 24, Cooperatives Working Together. *News*. March 2009, NMPF0013488-89, at 88. Ex. 25, Deposition of Thomas Wegner, January 22, 2015, 60:12-16.

[56] Ex. 3, Ricchetti Dep., 82:1-19, 85:9-18, 90:1-10, 91:19-24, 91:25-93:25. Dr. Novakovic agreed. Ex. 5, Novakovic Dep. 155:25-156:8.

[57] Dr. Ricchetti testified that market power can be exercised through either a price increase or a supply restraint, Ex. 3, Ricchetti Dep. 328:8-18.

[58] Dr. Novakovic agreed that the HRP "has an effect on supply" (Ex. 5, Novakovic Dep. 270:12-271:1). Dr. Scott Brown testified that "[d]airy markets tend to be very inelastic" meaning that "[s]mall changes in supplies can make for large movements in pricing when markets are very inelastic." (Ex. 26, Deposition of Dr. Scott Brown, November 7, 2014 46:1-3, 8-9.) Dr. Novakovic also testified that the demand and supply of milk is inelastic (Ex. 5, Novakovic

# IV.    DR. CONNOR'S MODEL DOES CALCULATE OVERCHARGES FOR OOPs

Contrary to Defendants' assertion that "Dr. Connor fails to show any damages were caused by the HRP instead of some other, legal price-setting activity," Dr. Connor's model isolates reliably the HRP's effect on OOPs from other factors, such as rising fuel costs and increased use of r-BST free milk. Defendants do not/cannot dispute that Dr. Connor's model controls for fuel prices and for rBST usage, but instead question whether his method for controlling for these variables is as good as their expert's method of merely subtracting the fuel surcharge and r-BST free premium from the OOPs. Dr. Connor's method is clearly superior, but regardless, this goes to the weight of Dr. Connor's analysis, not its admissibility. "[To the extent that defendants challenge the accuracy or propriety of the[] variables [included in the regression analysis], it is an issue that goes to the weight, rather than the admissibility, of [the Expert's] testimony." *Sun Microsystems,* 608 F. Supp. 2d at 1200-01.[59]

In addition, Defendants admit that the HRP's intended purpose and actual effect was to increase OOPs, including r-BST free premiums and fuel surcharges. According to DFA's corporate representative, the HRP reduced supply and increased the All-Milk Price for all Classes of raw milk, referring to a "rising tide floats all boats." See fn. 20. Since Defendants admit that the All-Milk Price includes OOPs, and r-BST free premiums and fuel surcharges are included in the OOPs,[60] it stands to reason that the HRP had the effect of increasing the r-BST free premiums and fuel surcharges. Dr. Connor's model tests whether OOPs in their entirety were increased by the HRP, by including controls for actual rBST usage and fuel costs. Defendants mere subtraction of

---

Dep. 198:21-199:18). There is ample academic literature confirming inelastic demand and inelastic supply. (Ex. 4, Connor Report ¶¶18, 34, 41; Ex. 11, Connor Rebuttal Report ¶¶65, 79)

[59] Defendants' citation to *Comcast* (DDM p. 17) is misplaced because Plaintiffs' claim is based on Dr. Connor's opinions. *Cason-Mereda v. WHS of Michigan, Inc.*, 2014 U.S. Dist. LEXIS 29447, *22-28. *See also In re High-Tech Employee Antitrust Litigation*, 2014 U.S. Dist. LEXIS 47181, at *72-75 (N.D. Cal. 2014)(unclear whether *Comcast* applies to *Daubert* inquiry).

[60] DFA admits that OOPs include r-BST free premiums and fuel surcharges. Ex. 13, Wilson Dep. 101:10-17.

the r-BST free premiums and fuel surcharges from the OOPs is not only contradicted by their admissions, but also misleading – Plaintiffs do not sue based on Defendants' decision to charge r-BST free premiums or fuel surcharges, but on the HRP's effect on OOPs. Finally, Defendants ignore their representatives' testimony and Dr. Novakovic that OOPs, including r-BST free premiums and fuel surcharges, are subject to competitive negotiation and affected by competition.

Defendants' argument that r-BST free premiums were flat and not set by market conditions is contradicted by the evidence.[61] First, SMI imposed a premium of 50¢ per hundredweight (cwt) in 2007, which was increased to 90¢/cwt in February 2008 by SMI and other cooperatives in the Southeast (DDM p. 17), when OOPs rose there (Ex. 14, Ricchetti Report, p. 31, Ex. 1), creating the inference such premiums increased when the HRP increased milk prices. Second, a DFA exhibit shows that these premiums varied across region, customers, and time.[62] They are also competitively negotiated, undermining Defendants' netting out them from OOPs (PDM pp. 13, 17-18). Dr. Novakovic admits that OOPs, including r-BST free premiums and fuel surcharges, are affected by competition.[63] Finally, that r-BST free premiums may have been flat does not mean that the HRP did not affect them; they could have decreased. Defendants admit that the HRP's purpose was to "stabilize" the price of milk. Economics and antitrust law recognize that stabilizing a price that would have gone down absent anticompetitive conduct is antitrust injury.[64] Dr. Novakovic agreed that preventing a price decline is a price effect. Ex. 5, Novakovic Dep. 258:21-24. According to DFA, the r-BST free premium's original purpose was to cover costs of handling

---

[61] Defendants misrepresent Dr. Connor's testimony, suggesting there is no evidence that the HRP affected r-BST free premiums (DDM pp. 19-20). While the HRP did not cause such premiums to exist, as stated in the excerpt, they were subject to negotiation and competitive conditions. Also, his model finds that the HRP increased OOPs, which included such premiums, while controlling for r-BST free milk. Ex. 12, Connor June Dep. 200-21-201:2, 197:17-198:20.

[62] In December 2007, one customer paid no surcharge for rBST-free milk while another paid a $0.35/cwt surcharge for rBST-free milk. Ex. 27, Wilson Dep., Ex. 2, at pp. 187 and 192.

[63] Ex. 5, Novakovic Dep. 189:6-8, 10-14: "Q. And over-order prices reflect local or regional competitive conditions, correct? A. Yes…That would be two things that one would normally associate with over-order prices…."

[64] "[T]he [citric acid] cartel significantly…raised price…until late 1992 [when] price became somewhat flat over time until it started to fall" (Ex. 28, Harrington, Jr., Joseph. "Behavioral Screening and the Detection of Cartels." *European Competition Law Annual 2006: Enforcement of Prohibition of Cartels*, p. 3).

r-BST and r-BST free milk, when the market became nearly fully r-BST free, those costs were no longer incurred, but the premium did not go down.[65] Based on economic principles, antitrust law, and the evidence, not only was the r-BST free premium not an "market event[] that had no connection to the HRP" (DDM p. 10), but also that it may have stayed the same after February 2008 does not indicate that the HRP did not affect it.

Defendants argue that the MACs market power to set OOPs, including r-BST free premiums, undermines Dr. Connor's "'competitive negotiation' theory." First, individual cooperatives reduced their r-BST free premiums in response to competition and MACs existed before the HRP so the benchmark period controls for this variable. In addition, Dr. Connor tested MACs market power, which did not materially change the model's results or did not withstand closer examination or testing. PDM p. 11, fn. 13.[66]

Defendants assert that Dr. Connor failed to account for: "a market-wide shift in demand for hormone-free fluid milk … the cooperatives charged their customers a uniform premium for rBST-free milk" (DDM p. 17), and "for Class II OOPs in the Southeast…largely not subject to the rBST free premium...all of Dr. Connor's overcharges are explained by fuel surcharges." DDM p. 19. However, Dr. Connor included two variables to control for these factors: USDA data on the percent of cows treated with rBST and regional fuel prices. Ex. 4, Connor Report ¶81. The USDA rBST usage data, reliable and consistent with other evidence, contradicts Defendants' arguments. Also, if there was a shift towards rBST-free milk, it was not a dramatic market-wide shift. There

---

[65] Ex. 13, Wilson Dep. 165:9-166:1 ("when…more of the farm milk was converted to bST-free … that improved the efficiencies. You no longer had to worry as much about segregation. … that's what allowed a good chunk of the premium to then go back to the farmer. Q. So…the efficiency improved, and yet the premium stayed the same; is that correct? The premium to the customer stayed the same, correct? A. that's correct"). *See also* Ex. 32, Deposition of Graham Leary, 32:12-21 (SMI told WD that r-BST premium would go down.)

[66] Contrary to Defendants' misrepresentation of his testimony arguing that his model cannot isolate the effect of joint-price setting from the HRP's effect (DDM, p. 20). Dr. Connor did not acknowledge that his model cannot separate joint price setting from the HRP, but testified that "whatever conduct…was responsible for the degree of market power continued" (Ex. 17, Connor Feb. Dep. 159:10-160:3). In addition, his benchmark period accounted for market power before and during the HRP (which Defendants acknowledge (DDM, p. 20)), as confirmed by his sensitivity test.

is evidence that the rBST-free premium began in 2003, and accounted for 2/3 of the market by July 2007.[67] Thus, the USDA data on rBST usage in each USDA farm region is a more reliable variable to control for these shifts, rather than merely subtracting 90¢/cwt from the OOP from 2008 on (when the largest herd retirements occurred from 2008-2010). Finally, Dr. Novakovic agreed that Dr. Connor's variable for rBST usage was a supply/demand variable.[68]

Defendants criticize the USDA rBST usage data as based on 5-year surveys,[69] as based upon surveys in 2000, 2005, and 2010. However, the USDA imputed (and published) the data for all years in between, and thus, the USDA data accounts for the increased usage of rBST- free milk (and costs associated with it). Contrary to Defendants' assertion that "Removing the rBST-free premium from Dr. Connor's model shows no damages for Class I purchases," merely subtracting any component from the price data (instead of controlling for it) is highly unorthodox.[70] Dr. Ricchetti cites no authority for this unusual treatment. PDM p. 12. In addition, there is no basis to subtract SMI's *announced* rBST-free premium and fuel surcharge from *DFA* OOP – *class premiums for billing*.[71] Since the DFA OOP data does not disaggregate rBST-free premiums or fuel surcharges, such calculation is not possible without an illogical leap that the prices paid are exactly equal to price announcements for all customers. Since there is ample evidence that rBST-free premiums and fuel surcharges are competitively negotiated, with all components of the OOPs, the better approach is to control for r-BST free milk and fuel costs, as Dr. Connor did.

## V.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to strike or exclude.

---

[67] DFA's corporate representative testified that rBST-free charges first occurred in February 2003 and by July 2007 approximately two-thirds of milk was rBST-free (Ex. 13, Wilson Dep. 134:7-9, 156:21-25).
[68] Ex. 5, Novakovic Dep. 59:12-19, 70:17-71:7.
[69] *See* DDM p. 18, fn. 7.
[70] Ex. 12, Connor June Dep. 165:24-166:7, 166:17-20.
[71] Dr. Ricchetti's subtraction of rBST-free and fuel surcharges from the OOP data incorrectly merge SMI price *announcements* with DFA OOP data used by Dr. Connor (Ex. 11, Connor Rebuttal Report ¶100, 105, 130).

Respectfully submitted September 10, 2018.

/s/ H. Timothy Gillis
H. Timothy Gillis, Trial Counsel
Florida Bar No. 133876
Shutts & Bowen LLP
1022 Park Street, Suite 308
Jacksonville, FL 32204
Phone: (904) 899-9926
Fax: (904) 899-9965
tgillis@shutts.com

Patrick J. Ahern
Ahern and Associates, P.C.
8 South Michigan Avenue
Suite 3600
Chicago, IL 60603
(312) 404-3760
patrick.ahern@ahernandassociatespc.com
(*Admitted Pro Hac Vice*)

*Attorneys for Plaintiffs Winn-Dixie
Stores, Inc., and Bi-Lo Holdings, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 10, 2018, I electronically filed the foregoing with the Clerk of Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Cases of this Court by using the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ H. Timothy Gillis
Attorney