**EXHIBIT 28**

## ASSET PURCHASE AGREEMENT
### [Dairy Plants]

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of February 26, 2008 (the "Effective Date"), by and among

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Winn-Dixie"),

**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company wholly-owned by Winn-Dixie ("Properties LLC"),

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company wholly-owned, indirectly, by Winn-Dixie ("Leasing LLC"),

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation wholly-owned by Winn-Dixie ("Logistics"),

**SUNSHINE STATE DAIRY FARMS, LLC**, a Florida limited liability company ("Sunshine"), and

**SOUTHEAST MILK, INC.**, a Florida agricultural marketing cooperative ("SMI").

Winn-Dixie, Properties LLC, Leasing LLC and Logistics sometimes collectively are referred to as "Seller".

Sunshine and SMI sometimes collectively are referred to as "Buyer".

### R E C I T A L S :

A.  Winn-Dixie is engaged in the retail supermarket business primarily in the southeastern United States and, in connection therewith, owns or leases, and operates, directly and through subsidiaries, retail supermarket facilities and related distribution and manufacturing facilities.

B.  Winn-Dixie and Properties LLC own approximately 14.72 acres of land and several buildings located on such land in Plant City, Hillsborough County, Florida, that constitutes the Owned Real Estate, a portion of which Winn-Dixie operates as an approximately 129,569 square foot dairy plant (the "Owned Plant") used for processing and packaging milk, other dairy products and other beverage products. Leasing LLC leases approximately 85.6 acres of land and several buildings located on such land in Hammond, Tangipahoa Parish, Louisiana, which constitutes the Leased Real Estate pursuant to the Lease. Logistics operates an approximately 49,272 square foot dairy plant (the "Leased Plant") on a portion of the Leased Real Estate, used for processing and packaging milk, other dairy products and other beverage products. The Owned Plant and the Leased Plant together are referred to as the "Dairy Plants."

C.  In connection with the operation of the Dairy Plants, Winn-Dixie or Logistics, as applicable, owns (i) inventories of certain raw materials, supplies, ingredients, work in process and packaging materials (collectively, but excluding any finished product inventories, the "Inventories") located in, or en route to, the Dairy Plants, (ii) the

machinery and equipment listed on **Schedule B** hereto, located in the Dairy Plants as well as any other machinery and equipment not listed on **Schedule B** hereto, located at the Dairy Plants and used in conjunction with the operation thereof (collectively, but excluding any equipment that is an Excluded Asset, the "Equipment"), and (iii) tools, plant supplies and furnishings located in the Dairy Plants (collectively, but excluding any tools, supplies and furnishings that are Excluded Assets, the "Supplies").

D.   Each of the Sellers desires to sell, convey, assign or sublease, as applicable, its respective interest in the Assets, as hereinafter described, and Sunshine desires to acquire or sublease, as applicable, the Assets, all upon the terms and subject to the conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.

## DEFINITION SCHEDULE; DISCLOSURE SCHEDULE

**Section 1.01** Defined Terms.   Capitalized terms not otherwise defined herein will have the meanings as set forth on the attached **Schedule A - _Schedule of Definitions._**

**Section 1.02** Disclosure Schedule.   Certain matters of disclosure relating to the Assets are set forth in that certain Seller Disclosure Memorandum as set forth on **Schedule C** hereto, (the "Seller Disclosure Memorandum"), which sets forth exceptions to the representations and warranties contained in **Article III** and certain other information called for by **Article III** and other provisions of this Agreement.

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

**Section 2.01** Transfer of Assets.   Upon the terms and subject to the conditions contained herein, on the Closing Date, as defined herein, Seller will sell, transfer, assign and deliver the Assets to Sunshine, and Sunshine will purchase, acquire and accept the Assets from Seller, for the purchase price specified in **Section 2.03**.   Excluded from the Assets herein are the Excluded Assets, ownership and possession of which will remain vested in Seller.

**Section 2.02** Assumed Liabilities.   From and after the Closing Date, Sunshine will, and SMI will cause Sunshine to, assume and pay, perform and discharge the Assumed Liabilities when due and/or required.   Notwithstanding the foregoing or anything set forth in this Agreement, Buyer does not assume and will not be deemed to have assumed the Retained Liabilities, and Seller will remain solely responsible for and discharge the Retained Liabilities following the Closing when due and/or required.

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

**Section 2.03** Purchase Price. The purchase price of the Assets will consist of $15,750,000 (the "Base Purchase Price") *plus* the Inventories Price, in an amount to be determined in accordance with **Section 2.09** and **Schedule F** hereto.

**Section 2.04** Payment of Purchase Price.

(a)   As specific consideration for Seller's agreement to sell the Assets to Sunshine in accordance with the terms and conditions of this Agreement, Sunshine will, and SMI will cause Sunshine to, deliver to Escrow Agent, no later than two Business Days after the Effective Date, an earnest money deposit in the amount of $3,000,000 (the "Deposit"). Sunshine will, and SMI will cause Sunshine to, make the Deposit by wire transfer to an account designated in writing by Escrow Agent. The Deposit will be subject to refund to Sunshine to the extent and in the circumstances described in this Agreement. The Deposit will be credited against the Base Purchase Price at the Closing and will be held in an escrow account maintained by Escrow Agent prior to the Closing. The Deposit will be held by Escrow Agent in an interest-bearing trust account (money market rates), with accrued interest thereon being deemed earned by SMI for state and federal income tax purposes. Regardless of disposition of the Deposit pursuant to the terms of this Agreement, all interest accrued thereon will be paid to SMI at the Closing or earlier termination of this Agreement. SMI's federal taxpayer identification number (FEIN) is 590769519. Sunshine is a disregarded entity for tax purposes.

(b)   On the Closing Date, Sunshine will, and SMI will cause Sunshine to, transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (net of the Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the Closing Statement) and the Inventories Price. On the Closing Date, Sunshine will, and SMI will cause Sunshine to, in each case subject to the conditions set forth in **Articles VI, VII and VIII**, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) and the Inventories Price to Seller (by wire transfer to an account designated in writing by Seller).

**Section 2.05** Allocation of Purchase Price. The Base Purchase Price and Inventories Price will be allocated to the Assets consistent with §1060 of the Code and in accordance with **Schedule D** hereto, to be completed by the parties at Closing. At least ten (10) days prior to Closing, Seller will provide to Sunshine a proposed allocation of the Assets, and Sunshine will have five (5) days after receipt of Seller's proposed allocation to reject such allocation and to provide to Seller its proposed allocation of the Assets. If Sunshine does not reject Seller's proposed allocation within such five (5) day period, then Sunshine will be deemed to have accepted Seller's proposed allocation. The parties hereto acknowledge that the agreed upon allocation represents the fair market value of the Assets and will be binding upon the parties hereto for federal and state tax purposes. Each party covenants to report gain or loss or cost basis, as the case may be, in a manner consistent with **Schedule D** hereto for federal and state tax purposes. The parties agree to adjust the allocation pursuant to an appraisal if Sunshine will secure an appraisal with respect to the Assets within ninety (90) days after the Closing Date. Within one hundred twenty (120) days after the Closing Date, the parties will exchange mutually acceptable and completed IRS Forms 8594, which they will use to report the transactions contemplated under this Agreement to the Internal Revenue Service in accordance with such allocation. The parties agree to adjust the

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

allocation reflected on **Schedule D** hereto in a manner consistent with any adjustments to the Inventories Price.

**Section 2.06** Closing; Closing Date.  The closing of the sale and purchase of the Assets contemplated hereby (the "Closing") will take place on the first Monday following that date which is 5 Business Days following satisfaction of all of the conditions set forth in **Article VIII** hereof, but no earlier than Monday, March 24 ,2008, and no later than Monday, June 16, 2008 (the "Outside Date"), subject to the rights of Buyer set forth in **Sections 5.04, 5.05, 5.06, 5.07 and 5.08** and the conditions set forth in **Articles VI, VII and VIII** by the payment of the Base Purchase Price and the Inventories Price pursuant to **Section 2.04** and the exchange of all documents required to be delivered pursuant to this Agreement on the Closing Date.  The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Sunshine and Seller based on satisfaction of the terms and conditions of this Agreement.  The date on which the Closing occurs is referred to herein as the "Closing Date".  The time of Closing will be deemed to be 12:01 a.m. on the Closing Date.

**Section 2.07** Transfer of Possession; Certain Deliveries.

(a)     With respect to the Owned Plant, Seller will deliver or cause to be delivered to Sunshine at the Closing the following fully and properly executed documents:

   (i)     A Title Affidavit, substantially in the form of **Exhibit A**, executed by Winn-Dixie and a Title Affidavit executed by Properties LLC, including an affidavit of non-foreign status, if required by Section 1445(b)(2) of the Foreign Investment and Real Property Tax Act, as amended;

   (ii)    An Assignment of Licenses, Permits and Approvals, substantially in the form of **Exhibit B**, executed by each applicable Seller, assigning to Sunshine any assignable Permits relating to the Owned Plant;

   (iii)   A Special Warranty Deed, substantially in the form of **Exhibit C**, executed by Winn-Dixie and a Special Warranty Deed executed by Properties LLC conveying the Owned Real Estate to Sunshine;

   (iv)    The Bill of Sale, substantially in the form of **Exhibit D**, executed by Winn-Dixie conveying the Inventories, the Equipment and the Supplies associated with the Owned Plant to Sunshine; and

   (v)     Evidence of termination of the Plant City Management Agreement.

(b)     With respect to the Subleased Real Estate, Seller will deliver or cause to be delivered to Sunshine at the Closing the following fully and properly executed documents:

   (i)     A Title Affidavit, substantially in the form of **Exhibit A**, executed by Leasing LLC, including an affidavit of non-foreign status, if required by Section 1445(b)(2) of the Foreign Investment and Real Property Tax Act, as amended;

4

(ii)    An Assignment of Licenses, Permits and Approvals, substantially in the form of **Exhibit B**, executed by each applicable Seller, assigning to Sunshine any assignable Permits relating to the Leased Plant;

(iii)    A Sublease Agreement, substantially in the form either of **Exhibit E-1** (if a Nondisturbance Agreement is not delivered at Closing as contemplated in **Section 2.07(f)**, hereinafter described as "Sublease A") or **Exhibit E-2** (if a Nondisturbance Agreement is delivered at Closing as contemplated in **Section 2.07(f)** or subsequent to Closing as contemplated in **Section 10.07**, hereinafter described as "Sublease B") ("Sublease A" and "Sublease B" sometimes together referred to as the "Sublease Agreement"), executed by Leasing LLC, subleasing the Subleased Real Estate to Sunshine, subject to the Lease;

(iv)    A lease estoppel certificate, substantially in the form of **Exhibit F**,, executed by Landlord, verifying the existence and current status of the Lease (the "Lease Estoppel Certificate");

(v)    Evidence of modification of the Hammond Management Agreement to remove the Subleased Real Estate from the encumbrance, force and effect of the Hammond Management Agreement; and

(vi)    The Bill of Sale, substantially in the form of **Exhibit D**, executed by Logistics conveying the Inventories, the Equipment and the Supplies associated with the Leased Plant to Sunshine.

(c)    With respect to the Assets in general, Seller will deliver or cause to be delivered to Sunshine at the Closing:

(i)    The Supply Contract, substantially in the form of **Exhibit G**, executed by Winn-Dixie's wholly-owned subsidiary, Winn-Dixie Procurement, Inc., a Florida corporation ("Procurement");

(ii)    An Assignment and Assumption Agreement, substantially in the form of **Exhibit H** (the "Assignment and Assumption Agreement") relating to the Assumed Contracts, executed by each applicable Seller entity;

(iii)    The Closing Statement, appropriately completed, executed by each applicable Seller entity;

(iv)    A Certificate, substantially in the form of **Exhibit J**, certifying to Buyer that all representations and warranties of Seller set forth in this Agreement are true and accurate, as of the Closing Date and that Seller has complied in all material respects with the duties and obligations provided in this Agreement;

(v)    An Incumbency Certificate, certifying the due capacity and authority of the individuals executing on behalf of Seller; and

(vi)    All other instruments of conveyance and transfer, or confirmation of the same, as may be necessary or reasonably requested by Buyer to convey, assign or sublease the Assets to Sunshine.

(d)     At the Closing, Sunshine will execute and deliver to Seller:

   (i)      The certificates to support any exemption from the imposition of sales tax on the transfer of the Assets;

   (ii)     The Supply Contract;

   (iii)    The Sublease Agreement;

   (iv)    The Assignment and Assumption Agreement;

   (v)     The Closing Statement;

   (vi)    A Certificate, substantially in the form of **Exhibit J**, certifying to Seller that all representations and warranties of Sunshine set forth in this Agreement are true and accurate, as of the Closing Date and that Sunshine has complied in all material respects with the duties and obligations provided in this Agreement;

   (vii)   An Incumbency Certificate, certifying the due capacity and authority of the individuals executing on behalf of Sunshine; and

   (viii)  All other instruments of conveyance and transfer, or confirmation of the same, as may be necessary or reasonably requested by Seller to convey, assign or sublease the Assets to Sunshine.

(e)     At the Closing, SMI will execute and deliver to Seller:

   (i)      The Guaranty of Supply Contract, substantially in the form of Exhibit H to the Supply Contract, guaranteeing Sunshine's obligations under the Supply Contract;

   (ii)     The Guaranty of Sublease Agreement, substantially in the form of Exhibit C to the Sublease Agreement, guaranteeing Sunshine's obligations under the Sublease Agreement;

   (iii)    A Certificate, substantially in the form of **Exhibit J**, certifying to Seller that all representations and warranties of SMI set forth in this Agreement are true and accurate, as of the Closing Date and that SMI has complied in all material respects with the duties and obligations provided in this Agreement;

   (iv)    An Incumbency Certificate, certifying the due capacity and authority of the individuals executing on behalf of SMI; and

   (v)     All other instruments of conveyance and transfer, or confirmation of the same, as may be necessary or reasonably requested by Seller to convey, assign or sublease the Assets to Sunshine.

(f)     Buyer and Seller will exercise diligent and good faith, commercially reasonable efforts to cause delivery, at Closing, of a Nondisturbance Agreement executed by Landlord, in form and content reasonably acceptable to Buyer, setting forth

Landlord's agreement to recognize Sunshine as a direct tenant of Landlord pursuant to the Sublease following a default by Leasing LLC that results in a termination of the Lease (the "Nondisturbance Agreement"); provided, however, that delivery of the Nondisturbance Agreement will not be a condition to the obligations of either Buyer or Seller to close the transactions contemplated by this Agreement.

**Section 2.08** Certain Transaction Costs.

(a)     Seller will pay (or be charged at Closing) for: (i) one-half the cost of the Title Commitment and title insurance policy to be issued thereunder associated with each of the conveyance of the Owned Real Estate and the sublease of that portion of the Leased Real Estate constituting the Subleased Real Estate, in the amount of the Base Purchase Price allocated to the Owned Real Estate and the subleased portion of the Leased Real Estate, respectively; (ii) one-half the cost of a Phase I Environmental Site Assessment for each of the Owned Real Estate and the Leased Real Estate; (iii) one-half the cost of the Survey for each of the Owned Real Estate and the Subleased Real Estate; (iv) brokerage or finder's fees payable to Seller's Broker; (v) the cost of terminating any Permits that are not assignable and/or that are not in fact assigned or transferred by Seller to Sunshine at Closing; (vi) one-half of documentary, intangibles, or other taxes in connection with the transfer of Assets constituting real or personal property (vii) one half the cost of transferring any Permits that are assignable and are in fact assigned or transferred by Seller to Sunshine; and (viii) attorneys' fees and costs payable to Seller's attorneys incurred in drafting or reviewing this Agreement and in completing the Closing.

(b)     Sunshine will, and SMI will cause Sunshine to, pay (or be charged at Closing) for: (i) one-half the cost of the Title Commitment and insurance policy to be issued thereunder associated with each of the conveyance of the Owned Real Estate and the sublease of that portion of the Leased Real Estate constituting the Subleased Real Estate, in the amount of the Base Purchase Price allocated to the Owned Real Estate and the subleased portion of the Leased Real Estate, respectively; provided the title commitment and policy are issued at minimum promulgated rates and 35% of the agent's portion of the premium is remitted to Sunshine; (ii) one-half the cost of a Phase I Environmental Site Assessment for each of the Owned Real Estate and the Leased Real Estate provided such one half does not exceed $6,000; (iii) one-half the cost of the Survey for each of the Owned Real Estate and the Subleased Real Estate provided such one half does not exceed $6,750; (iv) one-half of documentary, intangibles, or other taxes in connection with the transfer of the Assets constituting real or personal property; (v) documentary, intangibles, or other taxes in connection with Sunshine's financing of the acquisition of the Assets; (vi) recording of any documents necessary to complete the Closing; (vii) one-half the cost of transferring any Permits that are assignable and are in fact assigned or transferred by Seller to Sunshine, and the cost of obtaining any new Permits for Sunshine's operation of the Dairy Plants at Closing; (viii) Buyer's expenses of evaluating and investigating the feasibility of acquiring the Assets; (ix) Buyer's expenses in obtaining rail siding access, if applicable, and (x) attorneys' fees and costs payable to Buyer's attorneys incurred in drafting or reviewing this Agreement and in completing the Closing.

(c)     All ad valorem taxes real and personal property taxes for the year in which the Closing occurs will be prorated as of the Closing Date, based on the most recent ascertainable taxes (including current real estate tax assessments, millage rates and

any notice of proposed taxes).  The parties agree to a reproration and adjustment of the real and personal property taxes when the actual tax bill for the year of Closing is received, if the actual tax bill differs from the estimated tax amount by more than five percent (5%).

**Section 2.09** <u>Inventories Count and Valuation</u>.

(a)     At the regular close of Seller's business on the last Friday prior to the Closing Date (the "<u>Inventories Commencement Date</u>"), Seller will cease operations at the Dairy Plants (including the receipt, processing and shipping of the Inventories), and thereupon the parties will commence and diligently conduct a physical count of the Inventories (the "<u>Inventories Count</u>") beginning at a time to be mutually agreed by Seller and Sunshine and ending as soon as practicable thereafter, but in any event not later than 10:00 a.m. on the Closing Date.  Buyer and Seller each will have representatives present during the Inventories Count who will acknowledge in writing all computations before leaving the Dairy Plants.  The parties agree that the value of the Inventories will be determined in accordance with GAAP on a first-in, first-out basis consistent with Seller's past accounting practices, for all units and elements of Inventories on hand (as determined by the Inventories Count) immediately prior to the Closing, taking into account the costs associated with each stage of processing and production as reflected on such books and records (the "<u>Inventories Price</u>").  In addition to the standards and procedures in this <u>Section 2.09</u>, Buyer and Seller agree that the Inventories Count and valuation will be subject to the additional standards and procedures set forth on **Schedule F** hereto.

(b)     The Inventories Price payable on the Closing Date will be based on Seller's good faith estimates, with the actual Inventories Price to be determined in good faith by the parties (based on the Inventories Count and Seller's books and records) within thirty (30) days of the Closing Date with an appropriate adjustment to be paid by the appropriate party promptly after determination.

(c)     The parties agree to be cooperative and reasonable in connection with the Inventories Count.  If any dispute should arise as to the Inventories Count with respect to any item or items of the Inventories, Seller and Sunshine will, and SMI will cause Sunshine to, through good faith negotiations, attempt to resolve the dispute and determine the relevant Inventories Price.  Should the parties fail to resolve through negotiations any dispute with respect to any item or items of the Inventories, Seller and Sunshine agree, and SMI will cause Sunshine, to utilize the dispute resolution mechanism set forth in **Schedule F** hereto.

**Section 2.10** <u>Possession</u>.  Seller will turn over to Sunshine exclusive physical possession of the Dairy Plants (including, to the extent in Seller's possession, control or custody, all keys, combinations to safes, security codes and passwords), on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price and the Inventories Price.  Risk of loss will be transferred to Sunshine simultaneously with Seller's tender of possession of the Dairy Plants to Sunshine on the Closing Date.

8

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

**Section 3.01** Organization.  Each Seller entity is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease its properties and to conduct its business as it is presently being conducted and to enter into and to perform its obligations under or otherwise relating to this Agreement.  Each Seller entity is duly qualified and licensed as a foreign corporation or limited liability company to conduct the business conducted by it and is in good standing in each jurisdiction in which such qualification or licensing is necessary under applicable Law and where the failure to be so qualified or otherwise authorized would, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.02** Authorization.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate or entity action on the part of each Seller entity, and no other corporate or entity proceedings on the part of Seller are necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Seller and, assuming the due execution by the other parties hereto, constitutes the legal, valid and binding obligation of each Seller entity, enforceable against each of them in accordance with its terms.

**Section 3.03** Conflict or Violation.  Neither the execution nor delivery of this Agreement, the agreements and instruments attached hereto, nor the consummation of the transactions contemplated hereby by Seller will result in (a) a violation of or a conflict with any provision of the organizational documents of any Seller entity, (b) a breach of, or default under, any term or condition of, or otherwise cause any impairment of, any material Contract, indebtedness, franchise, Permit, authorization or concession to which any Seller entity is a party or is subject or by which any of their assets are bound, (c) a violation by any Seller entity of any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction, decree or award applicable to such companies, or (d) the imposition of any Encumbrance or other restriction on any of the Assets, other than Permitted Encumbrances.

**Section 3.04** Consents and Approvals.  No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by Seller on or prior to the Closing Date in connection with the execution, delivery and performance of this Agreement, the agreements and instruments attached hereto or the consummation of the transactions contemplated hereby.

**Section 3.05** Owned Real Estate.  Except for Encumbrances created to secure obligations incurred in connection with the Amended and Restated Credit Agreement, dated as of November 21, 2006, as amended, between Winn-Dixie, certain of its subsidiaries and certain lenders (the "Credit Agreement Liens"), Winn-Dixie and Properties LLC own fee simple title to the Owned Real Estate, free and clear of all Encumbrances, other than Permitted Encumbrances.

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

**Section 3.06** Leased Real Estate.

(a)    Leasing LLC is the owner and holder of a leasehold interest in the Leased Real Estate pursuant and subject to the Lease, free and clear of Monetary Defects.  Seller has delivered to Sunshine or SMI a true, correct and complete copy of the Lease (including all amendments, side letters, and any currently effective estoppel certificates and subordination and non-disturbance agreements with respect thereto) as in effect as of the Effective Date.

(b)    The Lease is valid and in full force and effect, and there are no subleases, licenses, occupancy agreements or assignment agreements in effect with respect to the Lease or the Leased Real Estate except as disclosed in the _Seller Disclosure Memorandum_.

(c)    Leasing LLC is not in default under the Lease, and to Seller's Knowledge: (i) no condition or occurrence exists, which, with the passage of time and/or the giving of notice, would constitute a default by Leasing LLC under the Lease; and (ii) Landlord is not in default under the Lease, and no condition or occurrence exists which, with the passage of time and/or the giving of notice, would constitute a default by Landlord under Lease.

(d)    Leasing LLC has the right to sublease the Leased Dairy to Sunshine pursuant to the Sublease Agreement, and no consent, approval or authorization of Landlord is required in connection with the execution, delivery and performance of the Sublease Agreement.

**Section 3.07** Real Estate Generally.  With respect to the Real Estate generally (exclusive of the Distribution Center), as of the Closing Date, except for Permitted Encumbrances:

(a)    Except as disclosed in Item 3.07 of the _Seller Disclosure Memorandum_, there are no pending or, to the Knowledge of Seller, threatened condemnation proceedings, lawsuits, or administrative actions;

(b)    There are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any party or parties any right of use or occupancy or any interest in, any portion of the Real Estate (exclusive of the Distribution Center), other than the Hammond Management Agreement, the Plant City Management Agreement and the Permitted Encumbrances; and

(c)    There are no outstanding options, contracts or rights of first refusal to purchase the Real Estate (exclusive of the Distribution Center), or any portion thereof or interest therein.

**Section 3.08** Title to and Status of Non-Real Estate Assets.

(a)    Except for the Credit Agreement Liens, Seller has good and marketable title to all of the Assets (other than the Real Estate, which is addressed in **Section 3.05 and Section 3.06**), free and clear of all Encumbrances other than Permitted Encumbrances, and the instruments of conveyance, and other endorsements and instruments of transfer and assignment contemplated by this Agreement are sufficient to transfer good and marketable title to the Assets (exclusive of the Owned

Real Estate and the Subleased Real Estate) to Sunshine at the Closing, free and clear of all Encumbrances other than Permitted Encumbrances.

(b)     Excepting the use of the Excluded Assets, the Assets are sufficient for the continued conduct of Seller's business with respect to the Dairy Plants after the Closing Date in substantially the same manner as conducted prior to the Closing Date.  Seller has not sold, assigned, moved or disposed of any assets, other than Excluded Assets, used in the Dairy Plants in contemplation of the transactions contemplated herein.

**Section 3.09** Inventories, Packaging and Supplies.   The Inventories do not include commercial unusable, obsolete or out of date items or damaged items or items that are commercial unusable due to excessive inventory.

**Section 3.10** Records.  The Records of Seller related to the Dairy Plants and the historical records identified on **Schedule M hereto** accurately and truly reflect the matters referred to therein in all material respects.  The records identified on **Schedule M hereto** that contain forecasts represent Seller's good faith estimates of the information contained therein.  Seller has given Buyer access to, and afforded Buyer the opportunity to make copies of, all Records to which such access was specifically requested by Buyer, other than Records subject to confidentiality restrictions or legal constraints (such as certain employee information).

**Section 3.11** Litigation.   Item 3.11 of the *Seller Disclosure Memorandum* contains a true, complete and correct list, caption and description of each pending lawsuit, claim, administrative proceeding, arbitration, labor dispute or governmental investigation or inspection to which any Seller entity is a party and that directly or indirectly involve or affect any of the Assets, the operations of the Dairy Plants, the occupancy of the Real Estate (exclusive of the Distribution Center), or Seller's ability to deliver the Assets, to Sunshine free and clear of Encumbrances other than Permitted Encumbrances, or Sunshine's ability to use the Assets, including the Dairy Plants, as currently used by Seller.  Except as disclosed in Item 3.11 of the *Seller Disclosure Memorandum*, to the Knowledge of Seller, there are no material (individually or in the aggregate) claims, legal actions or investigations threatened or contemplated against any Seller entity relating to the Assets or operations at the Dairy Plants.  Except as disclosed in Item 3.11 of the *Seller Disclosure Memorandum*, there are no orders, decrees, judgments or written agreements with any Governmental Authority to which any Seller entity is a party and that relate to the Assets or operations at the Dairy Plants or by which the Assets are bound.

**Section 3.12** Compliance with Law; Permit and Licenses.

(a)     Except as disclosed in Item 3.12(a) of the *Seller Disclosure Memorandum*, there are no pending, or to the Knowledge of Seller, threatened governmental citations that relate to the Assets or operations at the Dairy Plants.  To the Knowledge of Seller, there are no pending governmental investigations that relate to the Assets or operations at the Dairy Plants.

(b)     Seller's material Permits associated with the ownership and conduct of its business conducted at the Dairy Plants are listed on Item 3.12(b) of the *Seller Disclosure Memorandum*, and all such Permits are in full force and effect.  There is no pending or, to the Knowledge of Seller, threatened lawsuit, claim, administrative proceeding, arbitration, labor dispute or governmental investigation with respect to revocation,

cancellation, suspension or non-renewal of any such Permit, and there has occurred no event that (whether with notice or lapse of time or both) will result in such a revocation, cancellation, suspension or non-renewal thereof.

**Section 3.13** Conduct of Business.  Subsequent to June 27, 2007, and as of the Effective Date:

(a)     The business and affairs of the Dairy Plants have been conducted and carried on only in the ordinary course consistent with Seller's past practices; it being understood, however, that Seller intends to relocate all or substantially all finished product Inventories from the Dairy Plants to other locations of Seller at or prior to Closing, which is not in the ordinary course;

(b)     Except for personal property purchased, sold or leased in the ordinary course of business consistent with its past practices, Seller has not purchased, sold, leased, or otherwise acquired or disposed of any material properties or assets used in the Dairy Plants and there has been no finished goods build-up or delivery from the Dairy Plants not consistent with Seller's past practices;

(c)     Except as provided in the Key Employee Retention Agreement identified on **Schedule G** hereto, there has been no material increase or other change made in the rate or nature of the compensation, including wages, salaries, bonuses and benefits under any employee benefit plans, that has been paid, or will be paid or payable, by Seller or Sunshine to any employee employed at the Dairy Plants other than in the ordinary course of business consistent with Seller's past practices; and

(d)     Seller has not sustained or incurred any loss or damage (whether or not insured against) on account of fire, flood, accident or other calamity that has materially interfered or materially affected, or may materially interfere with or materially affect the Assets or the Dairy Plants.

(e)     Seller has kept and maintained all of the Equipment, Supplies, the Owned Plant and Leased Plant in good working order consistent with the standards of good manufacturing processes prevailing in the relevant industries.

**Section 3.14** Labor Matters.  No Seller entity is a party to any collective bargaining agreement with respect to either of the Dairy Plants or any of the employees employed by Seller who presently work at the Dairy Plants (the "Plant Employees").  To the Knowledge of Seller, there are no organizational efforts pending or threatened by any labor union with respect to the Plant Employees.  There are no material controversies pending or, to the Knowledge of Seller, threatened between Seller and any of the Plant Employees.  No Seller entity has, with respect to the Dairy Plants or the Plant Employees, committed, or engaged in, any material (individually or in the aggregate) unfair labor practices.  Seller has, with respect to the Dairy Plants, complied with all Laws relating to employment, wages, hours, working conditions, collective bargaining and the payment of social security, unemployment and similar taxes, and are not liable for any arrears of wages or any taxes or penalties for failure to comply with any of the foregoing; and, to the Knowledge of Seller, there are no proceedings, investigations or citations pending before any Governmental Authority relating to any failure so to comply thereto.  Item 3.14 of the Seller Disclosure Memorandum sets forth each Plant Employee's name, job description, rate of annual salary or wages, bonus and other compensation and/or benefit arrangements, accrued sick and vacation days, and

period of service for vesting as of the date thereof, and indicating whether each such Plant Employee is on short-term or long-term disability leave or on leave of absence pursuant to Seller's other policies, the Family and Medical Leave Act of 1993 or other similar local law.

**Section 3.15** Environmental Matters.   Except as disclosed in Item 3.15 of the *Seller Disclosure Memorandum*, to Seller's Knowledge, with respect to the Dairy Plants, there is no Legal Noncompliance with any Environmental Laws, including without limitation all Laws relating to (i) releases, discharges, emissions or disposal to air, water, land or ground water; (ii) the use, manufacture, importing, generation, treatment, handling or disposal of Hazardous Material; (iii) the exposure of persons to toxic, hazardous, harmful or other controlled, prohibited or regulated substances; and (iv) all judicial and administrative orders, injunctions, judgments, declarations, directives, notices or demands with respect to the foregoing matters.   Except as disclosed in Item 3.15 of the *Seller Disclosure Memorandum*, neither Seller nor any of its Affiliates is subject to any existing, pending or, to their Knowledge, threatened action, suit, claim, investigation, inquiry or proceeding, involving either of the Dairy Plants, by or before any Governmental Authority relating to Legal Noncompliance under any Environmental Law.  Except as disclosed in Item 3.15 of the *Seller Disclosure Memorandum*, there are no environmental conditions existing at either of the Dairy Plants resulting from Seller's operations or activities, past or present, that would constitute Legal Noncompliance or otherwise give rise to any on-site or off-site remedial obligation imposed on the Buyer or any of its Affiliates under any Environmental Laws.

**Section 3.16** No Brokers.   Neither Seller nor any Affiliate of Seller has employed, or is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement other than The Blackstone Group, L.P. ("Seller's Broker").  Seller agrees that it will be fully responsible for, and will indemnify Buyer against, the payment of any fees due to Seller's Broker, or to any other broker, finder, consultant or other intermediary claiming by, through or under Seller in connection with the transaction contemplated herein.

**Section 3.17** Contracts and Other Data.  Item 3.17 of the *Seller Disclosure Memorandum* sets forth, as of the date of this Agreement, a listing of all existing material Contracts (other than the Assumed Contracts, which are listed in **Schedule G** hereto, and other than those relating to Excluded Assets) in effect as of the date hereof, to which any Seller entity is a party with respect to the Dairy Plants or the Real Estate (exclusive of the Distribution Center), or to which any of the Assets are subject or bound, true and correct copies of which have been furnished to Sunshine or SMI, which include, without limitation, the following:

(a)     any agreement (or group of related agreements) for the lease of personal property to or from any Person;

(b)     any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services;

(c)     any agreement concerning a partnership, joint venture or other profit sharing arrangement;

(d)     any agreement pursuant to which a lien (other than the Credit Agreement Liens) is created with respect to any of the Assets;

Asset Purchase Agreement
Winn-Dixie Affiliates S/T SMI Affiliates
February 2008
SGRJAX\120494.10

(e)     any agreement concerning confidentiality or non-competition;

(f)     any agreement with any Plant Employee, including any collective bargaining agreement but excluding employee benefit plans of general application; and

(g)     any brokerage or distributor agreements;

provided, however, the above does not include Winn-Dixie's bank credit agreement or any related agreement, any insurance policy, or Contracts cancelable on thirty (30) days or less notice without adverse consequences.

**Section 3.18** Taxes.  Except as listed in Item 3.18 of the *Seller Disclosure Memorandum*, no deficiency for any taxes or claim for additional tax assessment by any Governmental Authority that if unsatisfied would result in an Encumbrance upon any of the Assets or would result in Buyer's incurring successor liability therefor under applicable Laws has been either (i) claimed or raised by any Governmental Authority in writing or (ii) to the Knowledge of Seller, proposed, asserted or assessed against Seller, nor has Seller granted any extension or waiver of any limitation period applicable to any such taxes or potential taxes.

**Section 3.19** Product Quality.   There are no defects in the quality of Inventories at the Dairy Plants and all Inventories are of merchantable quality, fit for or use in sale of food products meeting all applicable state and federal, laws, regulations and rules.  Except as listed in Item 3.19 of the *Seller Disclosure Memorandum*, there have been no recalls, withdrawals, returns, or destruction of any product, supplies, packaging materials or Inventories for the past twenty four (24) months, except minor matters involving less than 500 gallons of product or minor defects in supplies of packaging materials.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

**Section 4.01** Organization of Buyer.

(a)     Sunshine is a Florida limited liability company duly organized and validly existing under the laws of the State of Florida and has full power and authority to perform its obligations under or otherwise relating to this Agreement.  Sunshine is, or on the Closing Date will be, duly qualified and licensed to conduct business in the states of Florida and Louisiana.  Sunshine is not a tax-exempt entity within the meaning of Section 168(h) of the Code.

(b)     SMI is a Florida agricultural marketing cooperative duly organized and validly existing under the laws of the State of Florida and has full power and authority to perform its obligations under or otherwise relating to this Agreement.  SMI is not a tax-exempt entity within the meaning of Section 168(h) of the Code.

**Section 4.02** Authorization.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Buyer and, assuming the due execution by the other parties hereto, constitutes the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

(a)     Sunshine has delivered to Seller true, complete and correct copies of the Articles of Organization, Operating Agreement and member action of Sunshine authorizing Sunshine's execution and delivery of this Agreement and performance of the transactions contemplated hereby.

(b)     SMI has delivered to Seller true, complete and correct copies of the Articles of Incorporation, Bylaws and Resolutions of the Board of Directors of SMI authorizing SMI's execution and delivery of this Agreement and performance of the transactions contemplated hereby.

**Section 4.03** Conflict or Violation.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will result in (a) a violation of or a conflict with any provision of the organizational documents of Buyer, (b) a breach of, or a default under, any term or condition of, or otherwise cause any impairment of, any material Contract, indebtedness, franchise, Permit, authorization or concession to which Buyer is a party or is subject or by which any of its assets are bound, or (c) a violation by Buyer of any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction, decree or award applicable to Buyer.

**Section 4.04** Permits; Consents and Approvals.  Buyer has made all necessary and appropriate investigation into regulatory and permitting requirements for operation of the Dairy Plants and entry into the Supply Contract, and other than with respect to those Permits that are to be assigned by Seller to Sunshine at Closing, Buyer will have obtained, not later than the Closing Date (except to the extent governmental authorities will not issue such Permits pending consummation of the transaction herein contemplated), all other Permits required for the ownership or leasing of, and conduct of Sunshine's business at, the Dairy Plants.  Except with respect to the operating Permits contemplated above, no consent or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by Buyer on or prior to the Closing Date in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

**Section 4.05**  Legal Matters.  There is no legal action pending or, to the Knowledge of Buyer, threatened against Buyer relating to (i) the transactions contemplated by this Agreement, the Sublease Agreement or the Supply Contract, or (ii) questioning the validity of this Agreement, or Sunshine's subsequent performance of the Sublease Agreement or the Supply Contract, or of any action to be taken by any party pursuant hereto.

**Section 4.06** No Brokers.  Neither Buyer nor any of its Affiliates has employed, or is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement. Buyer agrees that it will be fully responsible for, and will indemnify Seller against, the payment of any fees due to

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

any broker, finder, consultant or other intermediary claiming by, through or under Buyer in connection with the transactions contemplated herein.

## ARTICLE V.

## ACTIONS BY SELLER AND BUYER
## PRIOR TO THE CLOSING DATE

**Section 5.01** Maintenance of Business and Preservation of Permits and Services.

(a)     Except as set forth in **Section 5.01(b)** below, from the Effective Date until the earlier of the Inventories Commencement Date or the termination of this Agreement in accordance with **Section 11.01(a)**, Seller will (i) conduct the business, maintenance and operations of the Dairy Plants in the ordinary course consistent with Seller's past practices, including no material increases in historical production levels of finished product inventory (post-bankruptcy), (ii) maintain levels of insurance on the Assets and the Dairy Plants at historical levels prior to the Effective Date, (iii) maintain its books, accounts and Records relating to the Assets in the usual manner consistent with Seller's past practices, (iv) keep and maintain all of the Equipment, Inventories and other physical Assets in good working order consistent with the standards of good manufacturing processes prevailing in the relevant industries, and (v) keep and maintain all other Assets consistent with historical operation. On the Inventories Commencement Date, Seller temporarily will suspend its business and operations for the purpose of allowing Sunshine and Seller to conduct the Inventories Count in preparation for Closing on the Closing Date. From the Inventories Commencement Date until Closing, Seller will not take any action that would result in, or knowingly permit to occur, any material change in the condition of the Assets as they were at the Inventories Commencement Date. Notwithstanding the foregoing, Buyer acknowledges that Seller will remove and relocate all or substantially all finished product Inventories from the Dairy Plants to other locations of Seller at or prior to Closing, and that such relocated Inventories will not be part of the Assets.

(b)     Milk Supply Agreement.  If Closing has not occurred on or before April 1, 2008, then on, and effective as of, such date (or such earlier date as may be agreed upon by the parties), Buyer and Seller will enter into a milk supply agreement to supply the Leased Plant, on terms substantially similar to those with Seller's current supplier to the Leased Plant, which milk supply agreement may be terminated by either party upon thirty (30) days notice.

**Section 5.02** Investigation by Buyer.  Between the Effective Date and the Closing Date, Seller will allow Buyer and its authorized agents and representatives access, upon reasonable notice and during normal business hours, to the Dairy Plants and to all reasonable requested information relating to the Assets, Employee Accruals and operations of Seller conducted at the Dairy Plants in connection with Buyer's review of matters related to Sunshine's purchase of the Assets, Sunshine's entry into the Sublease Agreement and Sunshine's assumption of the Assumed Contracts, and to verify the representations and warranties of Seller hereunder; provided, however, that any information obtained from Seller or any of its Affiliates in connection with such investigation and examination will be deemed to be subject to the confidentiality provisions set forth in **Section 11.11**, provided

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

further, however, no such visit, inspection, examination, or verification of information will affect in any manner any of the representations, warranties, covenants, agreements or stipulations of Seller under this Agreement or constitute any waiver thereof by Buyer. Buyer indemnifies and agrees to hold harmless Seller from and against any and all claims, including, without limitation, reasonable attorneys' fees, arising out of such investigations by Buyer or Buyer's agents, provided, however, Buyer will have no obligation to indemnify or hold Seller harmless from those claims arising out of: (i) the negligence or willful misconduct of Seller or any of its Affiliates, licensees, employees, agents, officers, or directors; (ii) a pre-existing condition of any of the Assets or the Leased Real Estate; or (iii) the existence of information obtained by Buyer as a result of its investigation.  Such indemnification will survive the expiration or termination of this Agreement and/or the Closing of the transactions contemplated by this Agreement.

**Section 5.03** Regulatory Matters; Third Party Consents.  From the Effective Date through the Closing Date, Seller and Buyer will cooperate and consult with each other and use their respective reasonable commercial efforts promptly to prepare and file all necessary documentation with, and to obtain as promptly as practicable all Permits of, all third parties and Governmental Authorities that are necessary or advisable to consummate the transactions contemplated by this Agreement and to ensure the successful transition of operations at the Dairy Plants to Sunshine, and each party will keep the other apprised of the status of matters relating to completion of the transactions contemplated herein.  The party responsible for any such filing will promptly deliver to the other party evidence of the filing of all applications, filings, registrations and notifications relating thereto, and any supplement, amendment or item of additional information in connection therewith.  In exercising the foregoing rights and obligations, Seller and Buyer will act reasonably and as promptly as practicable.

**Section 5.04** Title Insurance.  Within 30 days after the Effective Date, Seller will obtain and deliver to Buyer title insurance commitments (the "Title Commitments") from Fidelity National Title Insurance Company (the "Title Insurer"), issued through its authorized agent, Smith, Gambrell & Russell, LLP (the "Closing Agent"), committing to insure Sunshine's fee simple title to the Owned Real Estate, and subleasehold interest in that portion of the Leased Real Estate constituting the Leased Plant (the "Subleased Real Estate"), for the amount of the Base Purchase Price allocated to such real property interests, and stating all exceptions and conditions to such title, including the Permitted Encumbrances.  Buyer will have 15 days after receipt of the latest of the Title Commitments and the Surveys (as provided in **Section 5.05** below) within which to notify Seller in writing of any Material Defects in the title appearing in the Title Commitments.  Seller will have until the Closing Date to cure such title objections or defects so specified, and upon Seller's cure of the same, subject to Buyer's rights under **Sections 5.05, 5.06, 5.07 and 5.08** and to the conditions set forth in **Articles VI, VII and VIII**, the transaction will be closed as provided herein.  Seller will not be required to cure any Material Defects other than Monetary Defects.  If Seller fails or declines to cure said Material Defects within said period of time, Buyer may in its sole discretion either (a) terminate this Agreement; (b) waive such objections to such Material Defects and consummate the Closing and, if such objection is to a Monetary Defect, receive a reduction in the Base Purchase Price for the amount of such Monetary Defect; or (c) postpone the Closing for a reasonable time to allow Seller additional time to cure said Material Defects, and if thereafter Seller is still unable or declines to cure said Material Defects, at that time Buyer may elect either (a) or (b), as its exclusive remedy.

**Section 5.05** Surveys.   Within 30 days after the Effective Date, Seller will obtain and deliver to Buyer and Title Insurer current ALTA surveys of the Owned Real Estate and the Subleased Real Estate (the "Surveys").   The Surveys will be prepared by a licensed surveyor, prepared in accordance with ALTA standards for surveys and will also meet the minimum technical standards under the laws of the State in which the Owned Real Estate and the Subleased Real Estate is located, certified to Sunshine, Seller and Title Insurer, and show a metes and bounds legal description for the Owned Real Estate and the Subleased Real Estate, all buildings and improvements as well as the location of all Permitted Encumbrances capable of being located.   Buyer and Seller acknowledge that the legal description of the Subleased Real Estate is not determinable as of the Effective Date, and will be established by the applicable Survey, subject to Seller's approval, and Buyer's review in accordance with the procedures set forth below. Buyer will have 15 days after receipt of the latest of the Title Commitments and the Surveys to review the Surveys and to deliver written objections to the accuracy, completeness or consistency of the legal descriptions set forth in the Surveys and the Title Commitments, and to any Material Defect.   Seller will have until the Closing Date to cure any objections or defects so specified, and upon Seller's cure of the same, subject to Buyer's rights under **Sections 5.04, 5.06, 5.07 and 5.08** and to the conditions set forth in **Articles VI, VII and VIII**, the transaction will be closed as provided herein.   Seller will not be required to cure any survey defects or objections.   If Seller fails or declines to cure said objections or defects within said period of time, Buyer may in its sole discretion either (a) terminate this Agreement; (b) waive such objections or defects and consummate the Closing; or (c) postpone the Closing for a reasonable time to allow Seller additional time to cure said defects or objections, and if thereafter Seller is still unable or declines to cure said title defects or objections, at that time Buyer may elect either (a) or (b), as its exclusive remedy.

**Section 5.06** Environmental Site Assessments.   Seller has obtained and delivered to Buyer Phase I environmental site assessments, from Golder Associates, Inc., covering the Real Property (the "Phase I Assessments").   The Phase I Assessments will investigate, analyze and report with respect to those matters that current ASTM guidelines recommend should be included..   Buyer will have 15 days from the later of the Effective Date or that date on which both Phase I Assessments have been received to review the Phase I Assessments and to deliver written objections to any Environmental Defects disclosed in the Phase I Assessments.   Seller will have until the Closing Date to cure any Environmental Defects so specified, and upon Seller's cure the same, subject to Buyer's rights under **Sections 5.04, 5.05, 5.07 and 5.08** and to the conditions set forth in **Articles VI, VII and VIII**, the transaction will be closed as provided herein.   Seller will not be required to cure any Environmental Defects. If Seller fails or declines to cure said Environmental Defects within said period of time, Buyer may in its sole discretion either (a) terminate this Agreement; (b) waive such objections and consummate the Closing; or (c) postpone the Closing for a reasonable time to allow Seller additional time to cure said Environmental Defects, and if thereafter Seller is still unable or declines to cure said objections, at that time Buyer may elect either (a) or (b), as its exclusive remedy.

**Section 5.07** Later Title Exceptions.   In the event a title exception or encumbrance becomes of record or, to Seller's Knowledge, is created subsequent to the date of the Title Commitments and prior to Closing (a "Later Exception"), Buyer will have the right to notify Seller of such exception and thereupon postpone the Closing for a period of up to 30 days in order to give Seller sufficient time to satisfy, release, cure or remove such lien or exception. Upon Seller's cure, removal or bonding off of any such Later Exception, the Closing will, subject to Buyer's rights under **Sections 5.04, 5.05, 5.06 and 5.08** and to the conditions

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

set forth in **Articles VI, VII and VIII**, be scheduled upon five Business Days' prior written notice to Buyer. Seller will not be required to cure any Later Exceptions other than Monetary Defects. If Seller is unable or declines, within said 30 day period, to cure, remove, bond off or otherwise dispose of any Later Exception, Buyer may in its sole discretion either (a) terminate this Agreement; (b) waive such objection to the Later Exception and proceed with the Closing and, if such objection or defect is a Monetary Defect, receive a reduction in the Base Purchase Price for the amount of such Monetary Defect; or (c) postpone the Closing for a reasonable time to allow Seller additional time to remedy said Later Exception, and if thereafter Seller is unable or declines to remedy said Later Exception, at that time Buyer may elect either (a) or (b).

**Section 5.08** Loss by Fire or Other Casualty; Condemnation. In the event that, prior to the Closing, all or any of the Assets are destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of either of the Dairy Plants, Buyer will have the right, exercisable by giving notice of such decision to Seller within 10 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder. If Buyer does not exercise its right of termination and the Assets are sold to Sunshine pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it, provided that if the insurance proceeds received by Buyer in relation to any damaged or destroyed Assets are insufficient to cover the cost of repair or replacement of the damaged or destroyed Assets, then the Base Purchase Price will be reduced by the amount of such deficiency.

**Section 5.09** Notification of Certain Matters. Each party will give prompt written notice to the other party of (a) the occurrence, or failure to occur, of any event or existence of any condition that has caused or could reasonably be expected to cause any of its representations or warranties contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing Date and (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it hereunder.

If Buyer discovers any condition that affects the Real Property that is or may constitute an Environmental Defect, then Buyer promptly will notify Seller in writing of such condition and, unless required by Environmental Laws, will not contact or report to such condition to Governmental Authorities with respect to such condition without Seller's prior written consent. Following Buyer's written notification to Seller of such condition, Seller agrees to report the same to the applicable Governmental Authority to the extent required by Environmental Laws, and to provide a copy of said notification(s) to Buyer.

**Section 5.10** Condition of Assets; No Express or Implied Representations or Warranties.

(a)     Buyer acknowledges and agrees that upon Closing, the applicable Seller will sell, assign, sublease or convey, as applicable, to Sunshine and Sunshine will accept the Assets "AS IS, WHERE IS," without warranty of merchantability, suitability or fitness for a particular purpose, and with all faults, and there are no oral agreements, warranties or representations collateral to or affecting the property by Seller or any third party, except as provided in the representations and warranties of Seller

19

explicitly set forth in this Agreement or in the *Seller Disclosure Memorandum*.  Buyer further acknowledges and agrees that Seller is not making any representation or warranty whatsoever, express or implied, except those representations and warranties of Seller explicitly set forth in this Agreement or in the *Seller Disclosure Memorandum* or in any certificate or notice contemplated hereby and delivered by Seller in connection herewith.  Except as explicitly set forth herein, neither Seller nor any of its officers, directors, shareholders, employees, Affiliates or representatives has made or is making any representation, express or implied, as to the value of any of the Assets, or any warranty of merchantability, suitability or fitness for a particular purpose.

(b)   Except for the express representations and warranties set forth in **Article III** hereof, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered by or on behalf of Seller to Buyer in connection with the transaction contemplated hereby, including any materials, data or information contained in the Merrill Database.  In addition, Buyer acknowledges and accepts that **Schedule B** hereto may not be accurate and complete in non-material respects.  Except for the express representations and warranties set forth in **Article III** hereof, any materials, data and information provided to Buyer are as a convenience only and any reliance on or use of such materials, data or information by Buyer will be at the sole risk of Buyer.  Except for the express representations and warranties set forth in **Article III** hereof, Buyer has not relied and will not rely on, and neither Seller nor any Affiliate is liable for or bound by, any expressed or implied warranties, guaranties, statements, representations or information pertaining to the Assets or relating thereto provided or made available by or on behalf of Seller or any Affiliate, or any real estate broker or agent representing or purporting to represent Seller or any Affiliate, to whomever made or given, directly or indirectly, orally, in writing, or in electronic format.

**Section 5.11** Utilities; Rail Service.  To the extent practicable, the parties will notify the gas, water, telephone and electric utility companies serving the Dairy Plants that Sunshine will be responsible for the payment of all obligations incurred therefore on and after the Closing Date.  Seller will request such gas, water and electric utility companies to cause meters to be read as of the Closing Date, and Seller will be responsible for the payment of all charges for such services through such date pursuant to the Utility and Access Agreement attached hereto as **Exhibit K**.  Buyer acknowledges that continuing use of the Spur Tracks for rail siding service to the Real Estate may be subject to such terms, covenants and conditions as may be established by the Railroad from time to time for access to rail service, and may require Sunshine, or Sunshine and SMI, to enter into a new spur track agreement with the Railroad, in replacement or substitution of the Spur Track Agreements.

**Section 5.12**  Dairy Sewer Pretreatment Facilities. Seller's disclosures as set forth in the Seller Disclosure Memorandum include certain matters relating to impacts of Dairy Plant biological oxygen demand (BOD) effluent content on the City of Hammond public waste water utility system.  Buyer and Seller will cooperate in good faith in pursuing discussions with the City of Hammond to reach agreement on appropriate means and methods for achieving compliance with the City of Hammond's requirements for Dairy Plant effluent content and quality.  It will be a condition to the obligation of each of Buyer and Seller to close the transactions contemplated by this Agreement that the City of Hammond, Seller, Sunshine and SMI (either as a direct party or as a guarantor pursuant to terms substantially

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

similar to those of the Sublease Guaranty) will have entered into a written agreement (the "Sewer Pretreatment Agreement"), on or before April 30, 2008, on the material terms and conditions for the design, installation and connection of on-site sewer pretreatment facilities at the Dairy Plant to bring Dairy Plant effluent into full compliance with City of Hammond requirements (the "Dairy Sewer Pretreatment Facilities"). If by such date the parties have not entered into the Sewer Pretreatment Agreement, then either Buyer or Seller may in its sole discretion terminate this Agreement upon written notice to the other party given at any time before the Sewer Pretreatment Agreement is in effect and before the Closing.

**Section 5.13**  Seller Disclosure Supplements.  From time to time prior to the Closing, Seller will supplement or amend and deliver to Sunshine the *Seller Disclosure Memorandum* with respect to any matter of which Seller is or becomes aware that, if existing or occurring at or prior to the date hereof, would have been required to be set forth or described thereon or that is necessary to correct any information in the *Seller Disclosure Memorandum* that has been rendered inaccurate thereby.

**Section 5.14**  Further Assurances.  In addition to the actions required to be taken, and other documents and papers specifically required to be delivered, pursuant to this Agreement, each of the parties hereto will execute such documents and papers and take such further actions as may be reasonably required to carry out the provisions hereof and the transactions contemplated hereby.  Each party will, on or prior to the Closing Date, use reasonable commercial efforts, and cooperate with one another, in the most expeditious manner practicable to fulfill or obtain the fulfillment of the conditions contained in **Articles VI, VII, and VIII**.  In addition, the parties will cooperate with each other and use reasonable commercial efforts with respect to the availability of Materials and Supplies (as defined in the Supply Contract) to the Dairy Plants so that Sunshine can fulfill its obligations to Winn-Dixie under the Supply Contract beginning on the Effective Date.

**Section 5.15** Role as Counsel.  The parties acknowledge that Closing Agent also serves as Escrow Agent and as counsel to Seller.  In the event of a dispute between Seller and Buyer concerning this Agreement, Closing Agent may continue to serve both in its capacity as counsel to Seller, in its capacity as Escrow Agent and in its capacity as Closing Agent, it being understood that Closing Agent's duties and obligations are set forth by the Uniform Title Code and the laws of the State of Florida.

**ARTICLE VI.**

**CONDITIONS TO OBLIGATIONS OF SELLER**

In addition to the conditions set forth in **Article VIII**, the obligations of Seller to consummate the transactions contemplated hereby on the Closing Date are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived by Seller to the extent permitted by law:

**Section 6.01** Representations, Warranties and Covenants.  All representations and warranties of Buyer contained in this Agreement that are qualified as to materiality will be true and correct in all respects, and all representations and warranties of Buyer contained in this Agreement that are not qualified as to materiality will be true and correct in all material respects, on and as of the Closing Date as if such representations and warranties were made on and as of the Closing Date (except for any representation or warranty made or

21

given as of a specified date, which will have been true and correct as of such specified date, and except for any changes expressly permitted by Seller). Except for any changes expressly permitted by Seller, Buyer will have performed in all material respects all agreements and covenants required by this Agreement to be performed by it on or prior to the Closing Date, including, but not limited to, the delivery of all items required to be delivered by it pursuant to **Section 2.07**.

## ARTICLE VII.

## CONDITIONS TO OBLIGATIONS OF BUYER

In addition to the conditions set forth in **Article VIII**, the obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived by Buyer to the extent permitted by law:

**Section 7.01** Representations, Warranties and Covenants.   All representations and warranties of Seller contained in this Agreement (including those for which the *Seller Disclosure Memorandum* may have been supplemented or amended pursuant to **Section 5.13**) that are qualified as to materiality will be true and correct in all respects, and all representations and warranties of Seller contained in this Agreement that are not qualified as to materiality will be true and correct in all material respects, on and as of the Closing Date as if such representations and warranties were made on and as of the Closing Date (except for any representation or warranty made or given as of a specified date, which will have been true and correct as of such specified date, and except for any changes expressly permitted by Buyer).  If the *Seller Disclosure Memorandum* is supplemented or amended pursuant to **Section 5.13** prior to the Closing Date, Buyer, in its sole discretion, may terminate this Agreement by notice to Seller given within 5 Business Days following Buyer's receipt of such supplemented or amended *Seller Disclosure Memorandum*; however, if the Closing occurs, Buyer will be deemed to have waived any right or claim it may otherwise have or had on account of any matter so disclosed in such supplement or amendment. Except for any changes expressly permitted by Buyer, Seller will have performed in all material respects all agreements and covenants required by this Agreement to be performed by it on or prior to the Closing Date, including, but not limited to, the delivery of all items required to be delivered by it pursuant to **Section 2.07**.

**Section 7.02** Material Adverse Effect.  Since June 27, 2007, and on or prior to the Closing Date, there will have been no change in the Assets, either of the Dairy Plants, the conduct of business at either of the Dairy Plants or the financial condition or operations of any Seller entity, which change would result in a Material Adverse Effect.

## ARTICLE VIII.

## CONDITIONS TO OBLIGATIONS OF ALL PARTIES

The obligations of each of Seller and Buyer to consummate the transactions contemplated hereby are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any of which may be waived by either party, as to itself, to the extent permitted by law:

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

**Section 8.01** <u>No Litigation, Injunction or Restraint</u>.  No order, injunction or decree issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.  No proceeding initiated by any Governmental Authority or any third party seeking an injunction against any of the transactions contemplated by this Agreement will be pending.  No statute, rule, regulation, order, injunction or decree will have been enacted, entered, promulgated or enforced by any Governmental Authority that prohibits, restricts or makes illegal the consummation of the transactions contemplated by this Agreement.

**Section 8.02** <u>Consents</u>.  All material Permits required to be obtained prior to the Closing Date from any Governmental Authority or third party in connection with the consummation of the transactions contemplated hereby will have been obtained and such Permits will be in full force and effect.

**Section 8.03** .<u>Sewer Pretreatment Agreement</u>. The City of Hammond, Seller, Sunshine and SMI (either as a direct party or as a guarantor pursuant to terms substantially similar to those of the Sublease Guaranty) will have entered into the Sewer Pretreatment Agreement.

**ARTICLE IX.**

**<u>POST-CLOSING SURVIVAL AND INDEMNIFICATION</u>**

**Section 9.01** <u>Survival of Representations, Covenants and Agreements</u>.  The representations and warranties set forth in **Articles III and IV** will survive the Closing for the following periods: (a) **Sections 3.01 through 3.04** (inclusive) and **Sections 3.18 and 4.01 through 4.04** (inclusive) will survive until thirty (30) days after the expiration of the applicable statute of limitation and (b) period of eighteen months, except **Section 3.05 and Section 3.06(a)**, which will not survive the Closing but rather will be deemed merged into the Special Warranty Deed and Sublease Agreement, as applicable, on the Closing Date.  All covenants and other agreements contained in this Agreement will survive the Closing and be performed in accordance with their terms and any right with respect to indemnification therefor will continue in effect subject to the terms hereof.  Such covenants and the representations and warranties (except as provided above with respect to **Section 3.05 and Section 3.06(a)**) will not merge with and into the Special Warranty Deed or the Sublease Agreement delivered at the Closing.

**Section 9.02** <u>Indemnification</u>.

(a)    <u>Indemnification by Seller</u>.    After the Closing, Seller will jointly and severally indemnify Buyer and its officers, directors, employees and Affiliates (each, a "<u>Buyer Indemnitee</u>") against, and hold each Buyer Indemnitee harmless from all costs, losses, liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims), excluding any consequential, speculative, remote or punitive damages but including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (collectively, "<u>Damages</u>") arising from or out of:

   i)    Any claims asserted by a third party with respect to any debts, liabilities and obligations of Seller or any of its Affiliates of any nature (including but not

23

limited to the Retained Liabilities), whether accrued, absolute, contingent, or known or unknown on the date hereof, existing or arising on or resulting from events that occurred or failed to occur on or before the Closing Date, except (A) the Assumed Liabilities and, except to the extent otherwise provided in subsections (ii) and (iii) of this **Section 9.02(a)**, any liability, claim, obligation or expense that results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of law by Seller or any of its Affiliates;

ii) Any defect in any product manufactured at the Dairy Plants by Seller prior to the Closing Date, and liability from any product manufactured after the Closing Date using defective raw material(s) purchased by Sunshine from Seller pursuant to this Agreement where the liability arises as the result of such defective raw material(s);

iii) Any misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of Seller under this Agreement or from any misrepresentation in or omission from any Schedule or Exhibit required to be furnished by Seller pursuant to this Agreement; and

iv) Any actions, suits and proceedings incident to the enforcement or defense of any claim related to the foregoing subsections (i) - (iii).

(b) Indemnification by Buyer. After the Closing, Buyer will indemnify Seller and their Affiliates (each, a "Seller Indemnitee") against, and hold each Seller Indemnitee harmless from Damages arising from or out of:

i) Any defect in any product manufactured by Sunshine after the Closing Date, except liability from any product manufactured and sold after the Closing Date using defective raw material(s) purchased by Sunshine from Seller pursuant to this Agreement where the liability arises as the result of such defective raw material(s);

ii) Any inaccuracy or breach by Buyer of any of its representations and warranties, or any of its covenants or agreements, contained herein or in any Schedule or Exhibit attached hereto or in any document delivered in connection herewith by Buyer; and

iii) Any actions, suits and proceedings incident to the enforcement or defense of any claim related to the foregoing subsections (i) - (ii).

**Section 9.03** Indemnification Procedures.

(a) Upon any Person entitled to be indemnified under this **Article IX** (the "Indemnified Person") becoming aware of a fact, condition or event for which indemnification is provided under this **Article IX**, the Indemnified Person will with reasonable promptness notify the Person from whom indemnification is sought (the "Indemnifying Person") in writing of such fact, condition or event; provided that (subject to **Section 9.05**) the failure to provide such notice will not prejudice the Indemnified Person's right to indemnification hereunder except to the extent that the Indemnifying Person is actually prejudiced thereby. If such fact, condition or event

24

is the assertion of a claim by a third party, the Indemnifying Person will be entitled to participate in or take charge of the defense against such claim; provided, that the Indemnifying Person and its counsel will proceed with diligence and in good faith with respect thereto.  Notwithstanding the Indemnifying Person's election to assume the defense or investigation of such claim, the Indemnified Person will have the right to employ separate counsel and to participate in the defense or investigation of such claim, action or proceeding, provided the Indemnified Person will bear the expense of such separate counsel unless the Indemnifying Person will not have employed counsel to represent the Indemnified Person within a reasonable time after notice of the assertion of any such claim or institution of any such action or proceeding in which case the Indemnifying Person will bear the expense of such counsel.

(b)     Neither the Indemnified Person nor the Indemnifying Person will make any settlement of any claim that would give rise to liability on the part of the Indemnifying Person or Indemnified Person under this **Article IX** without the prior written consent of the other, which consent will not be unreasonably withheld, provided that an Indemnified Person will not be required to consent to any settlement involving the imposition of equitable remedies on it, or the imposition of any other material obligation on such Indemnified Person, other than financial obligations for which such Indemnified Person will, subject to **Section 9.06**, be indemnified hereunder.  No Indemnified Person will be required to consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Person of a release from all liability in respect to such claim or litigation.  Whenever the Indemnified Person or the Indemnifying Person receives a firm offer to settle a claim for which indemnification is sought under this **Article IX**, it will promptly notify the other of such offer.  If the Indemnifying Person refuses to accept such offer after receipt of such offer (or of notice thereof), such claim will continue to be contested and, if such claim is within the scope of the Indemnifying Person's indemnity contained in this **Article IX**, the Indemnified Person will be indemnified pursuant to the terms hereof.  If the Indemnifying Person notifies the Indemnified Person in writing that the Indemnifying Person desires to accept such offer, but the Indemnified Person refuses to accept such offer within 20 Business Days after receipt of such notice, the Indemnified Person may continue to contest such claim and, in such event, the total maximum liability of the Indemnifying Person to indemnify or otherwise reimburse the Indemnified Person hereunder with respect to such claim will be limited to and will not exceed the amount of such offer plus reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) to the date of notice that the Indemnifying Person desires to accept such offer, provided that this sentence will not apply to any settlement of any claim involving the imposition of equitable remedies or to any settlement imposing any material obligations on such Indemnified Person other than financial obligations for which such Indemnified Person will, subject to **Section 9.06**, be indemnified hereunder.

**Section 9.04** Exclusive Remedy.  This **Article IX** will apply only to, and will provide the sole and exclusive remedy for, any and all Damages sustained or incurred by any Indemnified Person after the Closing with respect to the representations and warranties of the Indemnifying Party under this Agreement and with respect to the covenants contained in this Agreement that are to be performed by the Indemnifying Party before the Closing Date, except for Damages sustained or incurred by an Indemnified Person as a result of

25

fraud by the Indemnifying Person.  Nothing contained in this **Article IX**, however, will limit in any way any party's right to seek or to obtain specific performance or other equitable remedies that may be sought and, to the extent appropriate, obtained in addition to and not in lieu of compensation for Damages.

**Section 9.05** Time Limitations.   The Indemnifying Person will have no Liability to the Indemnified Persons under or in connection with the inaccuracy or breach of any of the representations or warranties made by the Indemnifying Person, or any covenant to be performed before the Closing Date by the Indemnifying Person, contained in this Agreement unless written notice asserting (with reasonable specificity) an indemnification claim based thereon is given to the Indemnifying Person within the survival period set forth in **Section 9.01** with respect to such representation, warranty or covenant, if the Closing occurs, and within one year of the Effective Date if the Closing does not occur.

**Section 9.06** Limitations as to Amount.  The Indemnifying Person will have no Liability with respect to the matters described in **Sections 9.02(a) and 9.02(b)** until the total of all Damages with respect thereto exceeds $375,000, and then will have Liability only with respect to any and all further Damages that exceed such amount; provided, however, the $375,000 threshold contained in this **Section 9.06** will not apply to any Damages related to or arising from the following for which Liability under **Sections 9.02(a) or 9.02(b)** will accrue from the first dollar: (i) any claim sustained or incurred by an Indemnified Person as a result of an act(s) of fraud by the Indemnifying Person; or (ii) any claim based upon the breach of the obligations contained in **Section 10.01** or any breach of, or inaccuracy in, any representation contained in **Sections 3.01 through 3.04** (inclusive) and **Sections 3.14, 3.18 and 4.01 through 4.04** (inclusive).   In no event will the Liability of the Indemnifying Person, in the aggregate with the Liability of any Affiliate thereof, under **Sections 9.02(a) or 9.02(b)** exceed $5,000,000 except for liabilities related to claims under items (i) and (ii) in this **Section 9.06**, which will not be capped.

**Section 9.07** Subrogation.   Upon payment in full of any indemnification claim, or the payment of any judgment or settlement with respect to a third party claim, the Indemnifying Persons will be subrogated to the extent of such payment to the rights of the Indemnified Person against any Person with respect to the subject matter of such indemnification claim or third party claim.

### ARTICLE X.

### CERTAIN AGREEMENTS

**Section 10.01**          Employees.

(a)     Sunshine Offers.  Sunshine will, and SMI will cause Sunshine to, hire a sufficient number of Plant Employees at each of the Dairy Plants to the extent, if any, necessary to avoid the notice requirements of the Worker Adjustment and Retaining Notification Act (WARN Act) with respect to such Plant and will not terminate such employees' employment following the Closing except in circumstances that will not create liability to Seller under such Act.  In addition, prior to the Closing Date, Sunshine will, and SMI will cause Sunshine to, offer to hire at Closing at least 85% of the full-time employees of each Plant, and will continue to employ such employees for a period of not less than six months following Closing, other than as a result of (i)

dismissals of employees for cause in accordance with Sunshine's standard employment policies for ongoing operations, which will not be less beneficial to employees than the most beneficial standard employment policies of SMI, (ii) Sunshine's reasonable determination after the Closing Date that a significant reduction in the Product Requirements has occurred under the Supply Contract, and (iii) voluntary termination by any employee of such employment.  Such offers of employment will be on terms and conditions determined by Sunshine, consistent with its normal practices, which will not be less beneficial to employees than the most beneficial standard employment practices of SMI.  No later than two (2) Business Days prior to Closing, Sunshine will, and SMI will cause Sunshine to, deliver to Seller, in writing, a list identifying all Plant Employees who have been hired by Sunshine, or to whom offers of employment have been made by Sunshine.  Prior to the Closing Date, Buyer will not take any action to cause Seller to terminate the employment of any of the Plant Employees, and Seller will not be under any obligation to terminate the employment of any Plant Employee prior to the Closing Date.  Plant Employees accepting such offers of employment from Sunshine are herein called "Hired Employees" and all other employees, whether offered employment or not, will be called "Retained Employees."  In addition, Sunshine agrees for purposes of Sunshine's employee benefit, welfare, compensation, vacation and similar programs, and SMI agrees to cause Sunshine, to credit each of the Hired Employees with his or her years of service with Seller and its Affiliates for purposes of eligibility and vesting. Prior to Closing, Seller will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's operations, to arrange for personal interviews with Plant Employees in the presence of a Seller representative, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those Plant Employees who are interested to interview with Buyer.

(b)   <u>Seller Termination</u>. At the time of Closing, Seller will terminate and cease to employ the Hired Employees, and the Hired Employees will be removed from Seller's payroll, except as may otherwise be required by Law.  Seller will pay to such terminated Hired Employees all salary and wages for services performed prior to such time in accordance with applicable Law.  Seller will terminate effective as of the Closing Date the active participation of all of the Hired Employees in all of its employee benefit plans (except to the extent otherwise required by Law or the provisions of such plans).

(c)   <u>COBRA</u>.  Seller will retain, comply with and satisfy any obligations it may have under COBRA, to provide continuation coverage to, or with respect to, any Plant Employee in accordance with Law with respect to any "qualifying event" occurring on or before the Closing Date or resulting from the transactions contemplated herein, including provision of all required notices.

(d)   <u>Vacation; Sick Leave</u>.  Sunshine will, and SMI will cause Sunshine to, be responsible for any unused time off (including vacation and sick days) benefits or similar obligations accrued but unpaid on or before the Closing Date and payable to any Hired Employee.

(e)   <u>Payroll</u>.  Following the Closing Date in accordance with its normal procedures, Seller will process its payroll for the week preceding the Closing Date, including cutting paychecks, short term disability payments, withholding all required income and employment taxes and timely depositing all required income and employment tax

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

withholdings and payments with governmental authorities, accompanied by the required forms. Seller will be responsible for all wage information reports (W-2 Reports) for wages paid by Seller to the Hired Employees.

**Section 10.02**     Use of Name. From and after the Closing Date (and except as otherwise allowed under the Supply Contract), Buyer agrees not to use, or permit any Affiliate to use, any name or derivative thereof or any logos, trademarks or trade names associated therewith or otherwise owned or used by Winn-Dixie or its subsidiaries (such intellectual property being referred to as "Seller's Retained Names") in any manner or form, oral or visual, and within a reasonable time after Closing agrees to destroy any letterhead, stationery, materials, etc. at the Dairy Plants containing Seller's Retained Names.

**Section 10.03**     Access to Records after Closing Date. From and after the Closing Date, each of the parties will permit the other party reasonable access to any applicable Records in its possession, and the right to duplicate such Records, to the extent that the requesting party has a reasonable business purpose for requesting such access or duplication. Each party hereto will notify the other party if it becomes aware of any extension of any applicable statute of limitations related to such Records and neither party will permit the destruction of any such Records prior to the seventh anniversary of the creation of such Record. In addition, in the event and for so long as Winn-Dixie or Seller is actively contesting or defending against any third party action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Dairy Plants or its business or operations, Buyer at Seller's expense, will cooperate with Seller and its counsel in the defense or contest, make available their personnel, and provide such testimony and access to their books and records as will be reasonably necessary in connection with the defense or contest, subject to appropriate confidential measures Buyer reasonably requires. Notwithstanding any other provision of this **Section 10.03**, access to any Records may be denied to the requesting party if the other party is required under applicable Law to deny such access.

**Section 10.04**     Mail. Seller authorizes and empowers Buyer on and after the Closing Date to receive and open all mail received by Buyer relating to the Assets and to deal with the contents of such communications in any reasonable and proper manner. Seller will promptly deliver to Buyer any mail or other communication received by them after the Closing Date pertaining to the Assets or operation of the Dairy Plants on or after the Closing Date and any cash, checks or other instruments of payment in respect thereof. Notwithstanding the foregoing, Buyer will promptly deliver to Seller any mail or other communication received by it on or after the Closing Date pertaining to the operation of the Dairy Plants prior to the Closing Date and any cash, checks or other instruments of payment in respect thereof.

**Section 10.05**     Hammond Dairy Systems Segregation.

(a)     Generally; Systems Integrity. The parties acknowledge that as of the Effective Date the Subleased Real Estate is an integral part of the Leased Real Estate, and shares certain infrastructure, systems and utilities with the Distribution Center located on the Leased Real Estate. The parties intend that, following Closing, the Subleased Real Estate will be physically separated from the remainder of the Leased Real Estate

Asset Purchase Agreement
Winn-Dixie Affiliates S/T SMI Affiliates
February 2008
SGRJAX\120494.10

for proper operational integrity and security and, in furtherance of such physical separation, that certain infrastructure, systems and utilities presently shared by the Subleased Real Estate and the Distribution Center will be segregated pursuant to the terms and conditions set forth in this **Section 10.05** (such actions being referred to herein as the "Systems Segregation").

(b)   Segregation Requirements.   The Systems Segregation will involve the following infrastructure, systems and utilities serving the Leased Real Estate:

(i)   Boundaries.  Physical boundaries between the Subleased Real Estate and the Distribution Center will be established consistently with the legal description of the Subleased Real Estate attached as **Schedule K** hereto.   Existing boundary fencing will remain in place, and new fencing and gates will be installed along newly established boundaries, as generally depicted on attached **Schedule H** hereto (the "Fencing").

(ii)   Access Roads; Parking.   Seller will construct a new access road surface immediately south of the newly installed Fencing on the southerly boundary line of the Subleased Real Estate, to provide Seller with continuing vehicular and pedestrian access to the rear of the Distribution Center, as generally depicted on attached **Schedule H** hereto (the "Rear Access Relocation"). Subject to Sunshine's ability to obtain the necessary permits and approvals from the Governmental Authorities having auspices ("Access Permits"), Sunshine will, and SMI will cause Sunshine to, construct a new entry roadway providing direct ingress and egress between the Subleased Real Estate and the public right of way of U.S. Highway 190 within 270 days after Closing (the "Internal Access").   Additionally, Sunshine may, at its option, construct additional parking areas within the Subleased Real Estate boundaries to accommodate up to 40 passenger cars (the "Internal Parking"), it being understood, however, that Sunshine will be obligated, and SMI will cause Sunshine, to construct the Internal Parking contemporaneously with the Internal Access if the Internal Parking is required for the Subleased Real Estate to meet applicable parking ordinances or zoning codes.

(iii)   Security; Lighting.  Security for the Subleased Real Estate will be entirely self-contained and maintained separately from the Distribution Center (the "Dairy Security").  Any elements of the existing Dairy Security that operate as part of the Distribution Center security will be segregated, either by physical separation following installation of the Fencing, or by disconnection/rerouting of line-based systems (the "Security Separation").  Existing parking lot light poles and standards serving the Subleased Real Estate and Distribution Center will remain in place as shared facilities, and the costs of operation, maintenance and repair thereof will be considered a common expense to be apportioned between Sunshine and Leasing LLC as provided in the Sublease Agreement.   Buyer may at its option and expense install or construct additional or improved security gates, lighting, structures and facilities within the Subleased Real Estate boundaries to augment the Dairy Security (the "Additional Security Measures").

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

(iv)    <u>Fire Safety</u>.  The existing fire safety water source for the Subleased Real Estate will be disconnected and rerouted to establish a direct water supply to the Subleased Real Estate from the City of Hammond water main located in the U.S. Highway 190 right of way.  Seller will have the water supply properly tested by qualified professionals to assure adequacy to meet applicable Fire Code requirements.  To the extent a booster pump(s) or related equipment is necessary to meet applicable Fire Code requirements, Seller will, at its expense, cause such to be installed (the "<u>Fire Safety Reconnection</u>").  Following the Fire Safety Reconnection, water pressure for the Subleased Real Estate fire safety system must meet applicable Fire Code requirements.  Sunshine may at its option and expense install additional booster pumps to augment water pressure for the fire safety system (the "<u>Additional Fire Safety Measures</u>").

(v)    <u>Water Utilities</u>.  Potable water service to the Subleased Real Estate presently is self-contained and metered separately from the Distribution Center.  Accordingly, no additional action is required with respect to water utilities to accomplish the Systems Segregation.

(vi)    <u>Sewer Utilities</u>.  Sewer service for effluent originating from the Subleased Real Estate (the "<u>Dairy Sewer Service</u>") will continue to use lines, mains and a lift station in common with effluent originating from the Distribution Center for disposal to the City of Hammond waste water treatment system.  Due to the nature of operations at the Subleased Real Estate, the Subleased Real Estate effluent has materially different content from that of the Distribution Center.  The Systems Segregation will include installation of a monitoring station at the point of common connection between the Dairy Sewer Service and the sewer service for effluent originating from the Distribution Center (the "<u>Distribution Center Sewer Service</u>"), for the purpose of monitoring the content of effluent originating from the Subleased Real Estate (the "<u>Sewer Monitoring System</u>").  The Sublease Agreement hereto includes an appropriate indemnification by Sunshine, as sublessee and operator of the Leased Plant, in favor of Seller, as sublessor of the Leased Plant and lessee and operator of the Distribution Center, for private or governmental claims or demands made against Seller relating to adverse impacts of Dairy Sewer Service effluent on the Distribution Center Sewer Service or the City of Hammond waste water treatment system.  The foregoing Systems Segregation provisions for handling of Dairy Sewer Service and Distribution Center Sewer Service are separate and apart from the obligations relating to the Sewer Pretreatment Agreement as described in **Section 5.12** and **Section 10.06** hereof.

(vii)    <u>Electric Utilities</u>. The existing electric utility service to the Leased Real Estate will be segregated as appropriate to establish separately metered service to each of the Subleased Real Estate and the Distribution Center (the "<u>Electric Service Separation</u>"), which may include installation of new or replacement electric lines and facilities that will provide adequate electrical service to the Leased Plant consistent with historic use of lines and facilities.

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

    (viii)   <u>Gas Utilities</u>. The existing natural gas utility service to the Leased Real Estate will be segregated as appropriate to establish separately metered service to each of the Subleased Real Estate and the Distribution Center (the "<u>Gas Service Separation</u>"), which may include installation of new or replacement natural gas lines and facilities and, at Seller's option, removal of unused or redundant lines and facilities.

    (ix)   <u>Communication Systems</u>.   Telephone, cable and communication lines, equipment and software, if any, serving the Leased Real Estate will be segregated as appropriate to establish separately operable and accessible communication systems to each of the Subleased Real Estate and the Distribution Center (the "<u>Communication Systems Separation</u>"), which may include installation of new or replacement lines, equipment and facilities and, at Seller's option, removal of unused or redundant lines, equipment and facilities.

(c)   <u>Systems Segregation Implementation</u>.  Systems Segregation will be implemented as follows

    (i)   <u>Utilities</u>.   Seller will implement the Fire Safety Reconnection, the Sewer Monitoring System, the Electric Service Separation, the Gas Service Separation, and the Communication Systems Separation within reasonably corresponding time periods to each other, and in any event not later than 30 days following the Closing, at Seller's sole cost and expense, without contribution from Buyer;

    (ii)   <u>Access/Security Systems</u>.  Seller will implement the Fencing, the Rear Access Relocation, and the Security Separation within reasonably corresponding time periods to each other, and in any event not later than 270 days following the Closing, at Seller's sole cost and expense, without contribution from Buyer; it being understood, however, that if Sunshine is unable to obtain the Access Permits after diligent and commercially reasonable good faith efforts, then Seller's implementation of the Rear Access Relocation and Fencing will incorporate reasonable alternative access to the Subleased Real Estate using Seller's existing guest/employee driveway connection to US Highway 190;

    (iii)   <u>Sunshine's Additional Measures</u>.  Sunshine will, and SMI will cause Sunshine to, implement the Internal Access and the Internal Parking (if required to meet applicable parking and zoning codes) within the time period contemplated for implementation of Seller's actions as described in clause (ii) above, at Buyer's expense, without contribution from Seller, subject to Sunshine's receipt of all Access Permits and other applicable governmental licenses, permits and approvals; Buyer may implement the Internal Parking (if optional), the Additional Security Measures and the Additional Fire Safety Measures, contemporaneously with or following Seller's actions as described in clause (i) and clause (ii) above, at Sunshine's option and expense, without contribution from Seller; and

31

(iv)    <u>Compliance</u>.  All Systems Segregation actions must be conducted and completed in a good and workmanlike fashion, and in full compliance with applicable private and governmental requirements, codes, permits and inspections.

(d)    <u>Interim Systems Operations</u>. Subsequent to Closing and prior to implementation of each element of the Systems Segregation, Sunshine, as sublessee under the Sublease Agreement, will have the following privileges of joint use of existing infrastructure, systems and utilities presently shared by the Subleased Real Estate and the Distribution Center:

    (i)    <u>Access/Security Systems</u>.  Until the Fencing, the Rear Access Relocation, the Internal Access, the Internal Parking (if required to meet applicable parking and zoning codes) and the Security Separation are fully implemented, as provided in **Section 10.05(c)**, Sunshine, as operator of the Subleased Real Estate, and Logistics, as operator of the Distribution Center, will have joint use and enjoyment of existing roadways, access points, parking facilities and other access/security systems as reasonably necessary or appropriate to the operation of the Distribution Center and the Subleased Real Estate in the ordinary conduct of its respective business.  Such joint use will be subject to and in full compliance with Seller's security policies and procedures. Sunshine and Seller will allocate to each party its share of the cost of such access/security systems, based on the respective building floor areas of the Subleased Real Estate and Distribution Center.  Seller will pay the cost of such access/security systems, and Sunshine will, and SMI will cause Sunshine to, pay to Seller its allocated share of the cost of such systems paid for by Seller, within 15 days following rendition of a statement or invoice to Sunshine for such allocated costs, and if not so paid, then Seller may charge such costs to Sunshine as additional rent under the Sublease Agreement. Additionally, Seller will provide Sunshine similar temporary access as herein prescribed during construction of the Internal Access and the Internal Parking (if required to meet applicable parking and zoning codes).

    (ii)    <u>Utilities</u>.  Until each of the Fire Safety Reconnection, the Sewer Monitoring System, the Electric Service Separation, the Gas Service Separation, and the Communication Systems Separation, respectively, are fully implemented, as provided in **Section 10.05(c)**, Sunshine, as operator of the Leased Plant, and Seller, as operator of the Distribution Center, will have joint use and enjoyment, as applicable, of the existing fire safety, sewer, electric, gas and communications systems and facilities, as reasonably necessary or appropriate to the continuing operation of the Distribution Center and the Subleased Real Estate in the ordinary conduct of its respective business. Buyer and Seller will cooperate in good faith in allocating to each such party its reasonable share of the cost of such utility service, such allocation being made based on good faith estimates of each party's respective usage of such utility service, and in the absence of any such available estimates, then based on the respective building floor areas of the Subleased Real Estate and Distribution Center.  Seller will pay the cost of such utility service, and Sunshine will, and SMI will cause Sunshine to, pay to Seller its allocated share of the cost of such utility service paid for by Seller, within 15 days following rendition of a statement or invoice for such allocated costs, and if not so paid,

Asset Purchase Agreement
Winn-Dixie Affiliates S/T SMI Affiliates
February 2008
SGRJAX\120494.10

then Seller may charge such costs to Sunshine as additional rent under the Sublease Agreement.

**Section 10.06**      Dairy Sewer Pretreatment Facilities.

(a)      General Terms.  Sunshine, as sublessee and operator of the Leased Plant, and Seller, as lessee and operator of the Distribution Center, will cooperate in good faith in the planning, design, installation and connection of the Dairy Sewer Pretreatment Facilities in anticipation of effluent outflow from the Subleased Real Estate continuing at levels at or below Seller's recent historical levels of effluent production, and further in accordance with such other terms, covenants and conditions as Sunshine, Seller and the City of Hammond may agree as contemplated by **Section 5.12**.

(b)      Installation.  Seller will be responsible for the design and installation of the Dairy Sewer Pretreatment Facilities at the Subleased Real Estate in accordance with the terms of the Sewer Pretreatment Agreement and the standards set forth in **Section 10.06(a)**, pursuant to engineering, design and construction contracts between Seller and the applicable contractor or service provider.  Sunshine will, and SMI will cause Sunshine to, allow Seller reasonable access to the Subleased Real Estate for the purpose of such design and installation, and Seller and Sunshine will cooperate in a commercially reasonable and good faith manner to communicate with each other concerning the design and operational requirements for the Dairy Sewer Pretreatment Facilities, including terms and progress of negotiations with the City of Hammond, and Sunshine's potential need for augmenting the design and operational capacity of the Dairy Sewer Pretreatment Facilities in anticipation of effluent outflow from the Subleased Real Estate exceeding Seller's recent historical levels of effluent production.  Sunshine will, and SMI will cause Sunshine to, advise Seller of any proposed augmentation of the Dairy Sewer Pretreatment Facilities sufficiently in advance of entry into the Sewer Pretreatment Agreement to allow any such augmentation to be subsumed within the Sewer Pretreatment Agreement.  Thereupon Seller will design and install the Dairy Sewer Pretreatment Facilities consistent with Sunshine's request.   Upon completion of installation and initial operational testing of the Dairy Sewer Pretreatment Facilities, Seller will turn over to Sunshine, and Sunshine will, and SMI will cause Sunshine to, assume from Seller, full operational responsibility and control of the Dairy Sewer Pretreatment Facilities.

(c)      Cost.  Subject to the remaining provisions of this **Section 10.06(c)**, the design, engineering, construction, installation and initial operational testing of the Dairy Sewer Pretreatment Facilities will be at Seller's initial cost and expense.  All or a portion of Seller's costs incurred in connection with the Dairy Sewer Pretreatment Facilities will be subject to contribution by the City of Hammond pursuant to the Sewer Pretreatment Agreement (the "Utility Cost Contribution").  Buyer and Seller acknowledge that the Utility Cost Contribution, if any, may be made in the form of future credits to Sunshine against the cost of sewer service by the City of Hammond to the Subleased Real Estate, up to the full amount of the Utility Cost Contribution (the "Sewer Service Credits").  Sunshine will, and SMI will cause Sunshine to, be responsible for bearing the additional costs of design, engineering, construction, installation and initial operational testing attributable to design changes requested by Buyer to augment the Dairy Sewer Pretreatment Facilities as contemplated in **Section 10.06(b)** above (the "Augmentation Cost").  Sunshine will, and SMI will cause Sunshine to, pay the Augmentation Cost to Seller within 15 days following

33

rendition of a statement or invoice to Sunshine for such costs, and if not so paid, then Seller may charge such costs to Sunshine as additional rent under the Sublease Agreement.

(d)     Credit Rebate.  If the Utility Cost Contribution amount is determined or reasonably determinable as of the Closing Date, then Sunshine will, and SMI will cause Sunshine to, pay over to Seller at Closing, in addition to the Purchase Price, a supplemental payment equivalent to the Utility Cost Contribution, discounted to net present value using a discount rate equivalent to the most recent prime rate as announced by *The Wall Street Journal* as of such payment date (the "Discount Rate").  If the Utility Cost Contribution amount is not determined or reasonably determinable as of the Closing Date, then Sunshine will, and SMI will cause Sunshine to, pay over to Seller at such time as the Utility Cost Contribution amount is determined an amount equivalent to the Utility Cost Contribution, discounted to net present value at the time of payment using the Discount Rate, and if not so paid, then Seller may charge such amount to Sunshine as additional rent under the Sublease Agreement.  The foregoing provisions of this **Section 10.06(c)** will not apply to any portion of the Utility Cost Contribution that is associated with the Augmentation Cost, if any.

**Section 10.07**     Nondisturbance Agreement.  If a Nondisturbance Agreement is not delivered at Closing as contemplated by **Section 2.07(f)**, then Seller will continue after Closing to exercise diligent and good faith, commercially reasonable efforts to cause delivery, as soon as reasonably practicable, of a Nondisturbance Agreement, and Buyer will assist with such efforts.  If a Nondisturbance Agreement is obtained subsequent to Closing, then Sublease B will automatically replace and be substituted for Sublease A, and each of the parties will execute and deliver to the other Sublease B with a notation on it that it amends and replaces Sublease A in its entirety as of the date of obtaining the Nondisturbance Agreement.

## ARTICLE XI.

## MISCELLANEOUS

**Section 11.01**     Termination; Remedies.

(a)     This Agreement may be terminated and the transactions contemplated hereby abandoned on or prior to the Closing Date only as follows:

i)     by written consent of Seller and Buyer;

ii)     at the election of either Buyer or Seller if the other party has materially breached its obligations under this Agreement to the extent that the Closing could not reasonably be expected to occur by the Outside Date;

iii)     at the election of Seller (by 5 Business Days' prior notice to Buyer), if after taking into consideration the availability of those Permits that are assignable by Seller to Sunshine at Closing, it becomes not reasonable to expect that Sunshine will have obtained all other Permits necessary for Sunshine's use, occupancy and operation of the Dairy Plants, and performance of the Supply Contract, by the Outside Date;

34

iv) at the election of either Seller or Buyer, if an administrative action or proceeding is commenced by any Governmental Authority or third party complainant against Buyer or Seller that seeks to enjoin or prevent Buyer or Seller from consummating and/or performing the transactions contemplated in this Agreement, the Supply Contract or the Sublease Agreement, and such action or proceeding is not dismissed within 90 days after the filing thereof;

v) at the election of either Buyer or Seller (by notice given within 5 business days after the Outside Date), if the Closing will not have occurred on or before the Outside Date, in which case the parties will promptly instruct the Escrow Agent to return the Deposit and any interest earned thereon to Buyer, provided that no party will be entitled to terminate this Agreement pursuant to this clause (v) of **Section 11.01(a)**, if such party's failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date, in which case **Section 11.01(a)(ii)** will govern; or

vi) at the election of Buyer as provided in **Sections 5.04, 5.05, 5.06, 5.07, 5.08 and 7.01**, in which case the parties will promptly instruct the Escrow Agent to return the Deposit and any interest earned thereon to Buyer.

(b) Upon termination of this Agreement pursuant to **Section 11.01(a)** only the provisions of this **Article XI** and **Article XII** will continue in full force and effect.

(c) If this Agreement is terminated by Seller in accordance with the provisions of **Section 11.01(a)(ii)**, then Seller will be entitled, as its sole and exclusive remedy for such breach, to receive the Deposit as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Deposit is a reasonable estimate thereof.  Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity.  Seller's right to receive the Deposit is intended not as a penalty, but as full-liquidated damages.  The right to receive the Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it will not) sue Buyer for specific performance of this Agreement, or to recover any damages of any nature or description other than or in excess of the Deposit.  Buyer hereby waives and releases any right to (and hereby covenants that it will not) seek or claim a refund of the Deposit (or any part thereof) on the grounds that the amount of the Deposit is unreasonable and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.

(d) If this Agreement is terminated by Buyer in accordance with the provisions of **Section 11.01(a)(ii)**, then Buyer will be entitled to receive the Deposit and recover from Seller its actual demonstrated out-of-pocket expenses incurred in connection with this Agreement as Buyer's damages, up to an amount equivalent to the Deposit. Buyer waives and relinquishes any right to recover any damages of any nature or description in excess of an amount equivalent to the amount of the Deposit. Buyer hereby expressly waives and relinquishes any and all other remedies at law or in equity.

**Section 11.02**    <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement is intended or will be construed to give any Person, other than the parties hereto, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

**Section 11.03**    <u>Assignment</u>.   Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller.   Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**Section 11.04**    <u>Notices</u>.  All notices and other communications required or permitted hereunder will be in writing (including electronic or facsimile communications signed – which with respect to electronic communications will mean the sender's setting forth his, her or its name below the text of the communication – by the sender) and will be delivered personally, electronically transmitted or facsimiled (with confirmation of receipt immediately thereafter by telephone), sent by nationally recognized overnight courier (marked for overnight delivery), or sent by registered, certified or express mail, postage prepaid, return receipt requested, addressed as follows or to such other address as may be hereafter designated in a notice hereunder by the respective parties:

(a)    If to Seller:

> Winn-Dixie Stores, Inc.
> 5050 Edgewood Court
> Jacksonville, Florida 32254-3699
> Attn:  Office of General Counsel
> Fax No. 904-783-5651
> e-mail: *larryappel@winn-dixie.com*

and a copy to:

> Smith, Gambrell & Russell, LLP
> 50 N. Laura Street, Suite 2600
> Jacksonville, Florida  32202
> Attn:  Douglas G. Stanford
> Fax No. 904-598-6226
> e-mail: *dstanford@sgrlaw.com*

(b)  If to Buyer:

> Sunshine State Dairy Farms, LLC
> 1950 S. E. Highway 484
> Belleview, Florida 34420
> Fax No. (352) 307-5522
> e-mail: *ccovington@southeastmilk.org*

and a copy to:

> Latham, Shuker, Eden & Beaudine, LLP
> 390 North Orange Avenue, Suite 600
> Orlando, Florida 32801
> Fax No. (407) 481-5801
> Attn:  Peter G. Latham
> e-mail:  *platham@lseblaw.com*

(c)  If to Escrow Agent:

> Smith, Gambrell & Russell, LLP
> 50 N. Laura Street, Suite 2600
> Jacksonville, Florida  32202
> Attn:  Douglas G. Stanford
> Fax No. 904-598-6226
> e-mail:  *dstanford@sgrlaw.com*

All such notices and communications will (i) when delivered in person on any Business Day between the hours of 9:00 A.M. to 5:00 P.M. (local time at the place of receipt), be effective when delivered (or if delivered after 5:00 P.M. local time at the place of receipt, be effective on the next Business Day to occur), (ii) when electronically transmitted or telefaxed (provided receipt is immediately thereafter confirmed by telephone), in each case on any Business Day between the hours of 9:00 A.M. to 5:00 P.M. (local time at the place of receipt), be effective when transmitted (or if transmitted after 5:00 P.M. local time at the place of receipt, be effective on the next Business Day to occur), or (iii) if mailed, be effective three Business Days after the same has been deposited in the mails, postage prepaid, by registered or certified mail, return receipt requested, or (iv) if sent by a nationally recognized overnight courier service, be effective one Business Day after the same has been delivered to such courier service marked for overnight delivery; in each case addressed as aforesaid.

**Section 11.05**      Choice of Law.  This Agreement will be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Florida, without regard to principles of conflicts of laws.

**Section 11.06**      Consent to Jurisdiction.    The parties hereby irrevocably and unconditionally submit to the jurisdiction of the courts of the State of Florida and further irrevocably and unconditionally stipulate and agree that the Federal Courts in the State of Florida or the Circuit Court of the State of Florida in and for Duval County, Florida will have jurisdiction to hear and finally determine any dispute, claim, controversy or action arising out of or connected (directly or indirectly) with this Agreement or the transactions contemplated hereby.

**Section 11.07**      Entire Agreement; Amendments and Waivers.    Except as expressly provided in **Section 11.11(a)** below, this Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties.  No supplement, modification or waiver of this Agreement will be binding unless executed in writing by the parties hereto.  No waiver of any of the provisions of this

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

Agreement will be deemed or will constitute a waiver of any other provision hereof, nor will such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 11.08**     Counterparts.  This Agreement may be executed in counterparts and exchanged via facsimile, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**Section 11.09**     Invalidity.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement or any other such instrument.

**Section 11.10**     Publicity.  Each party agrees to notify the other prior to issuing any press release or making any public statement regarding the transactions contemplated hereby, and will attempt to obtain the reasonable approval of the other party prior to making such release or statement, except where such release or statement is required by applicable Law or pursuant to any listing agreement with, or the rules or regulations of, any securities exchange or any other regulatory requirement, in which case the disclosing party will endeavor to provide the other party with as much prior notice of the content of such release or statement as is reasonably practicable under the circumstances.

**Section 11.11**     Confidentiality; Non-disparagement.

(a)     Seller and SMI are parties to certain written confidentiality agreement(s) dated effective July 2, 2007, relating to the subject matter of this Agreement  (the "Confidentiality Agreement"), and which are intended to remain separate and distinct contractual obligations of the parties.  Sunshine hereby joins in and becomes a party to the Confidentiality Agreement with the same obligations of SMI thereunder as if Sunshine were a party to the Confidentiality Agreement from the original date therein.  In addition to the Confidentiality Agreement, from and after the Effective Date and through the Closing Date, Seller and Buyer agree to maintain in confidence, and will cause their respective directors, officers, employees, agents, and advisors to maintain in confidence, any written, oral, or other information obtained from any other party in connection with this Agreement or the transactions contemplated hereby, unless such information becomes publicly available through no fault of such party, the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the transactions contemplated herein, or the furnishing or use of such information is required by legal proceedings or otherwise by Law.  If this Agreement is terminated pursuant to **Section 11.01(a)**, each party will promptly return or, at its election, destroy (and, if destroyed, certify in writing such destruction to the other party or parties) as much of such written information as the other party may reasonably request.  To the extent of any conflict or inconsistency between the Confidentiality Agreement and the provisions of this **Section 11.11(a)**, the more restrictive provision will be controlling.

(b)     From and after the Effective Date, and for a period of one (1) year following Closing and thereafter to the extent provided in the Supply Contract or earlier termination of this Agreement, Seller and Buyer will not make or publish, instigate, assist or participate in, and will exercise commercially reasonable and good faith efforts to

cause their respective directors, officers, employees, agents, and advisors to refrain from making or publishing, or instigating, assisting or participating in, the making or publication of any statement that would or could disparage (whether or not such disparagement legally constitutes libel or slander) the other, its directors, officers, employees, agents, and advisors, or its services, affairs, or operations.

**Section 11.12**      Interpretation.   When reference is made in this Agreement to Sections, Appendices, Exhibits or Schedules, such reference is to the Sections, Appendices, Exhibits or Schedules of this Agreement unless otherwise indicated.  The headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation."  The phrase "the date hereof" and terms of similar import, unless the context otherwise requires, will be deemed to refer to the date set forth in the first paragraph of this Agreement.  The words "hereof", "herein", ""hereby" and other words of similar import refer to this Agreement as a whole unless otherwise indicated.  Whenever the singular is used herein, the same will include the plural, and whenever the plural is used herein, the same will include the singular, where appropriate.

**Section 11.13**      No Prejudice.  The parties have jointly prepared this Agreement and the terms hereof will not be construed in favor of or against any party on account of its participation in such preparation.

**Section 11.14**      Escrow Agent.

(a)   Duties.   By joining in the execution of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent.  Upon receipt, Escrow Agent will hold the Deposit in trust to be disposed of in accordance with the provisions of this Agreement.

(b)   Exculpation.   Escrow Agent will not be liable to either party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

(c)   Role as Counsel.  The parties acknowledge that Escrow Agent also serves as counsel to Seller.  In the event of a dispute between Seller and Buyer concerning this Agreement, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

(d)   Withdrawal.  No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the Closing or termination of this Agreement except in accordance with the terms of this Agreement.

(e)   Written Objection.  If a written objection is filed with Escrow Agent, or Escrow Agent otherwise is in doubt as to its duties, Escrow Agent may continue to hold the funds in escrow until the matter is resolved either by joint written direction from the parties or by the court having jurisdiction of the dispute or the Escrow Agent may interplead the same in the Circuit Court and be relieved of any and all liability therefor.  In any action or proceeding regarding the Deposit brought by Escrow Agent or to which Escrow Agent is made a party Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from Seller and Buyer contributing

39

equally, except where Escrow Agent is found liable for claims resulting from its own negligence or willful misconduct.

**Section 11.15**       Attorneys' Fees.   If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the losing or defaulting party will pay to the prevailing party reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution and defense of such action through trial and all stages of appeal.

**Section 11.16**       Time Of Essence.   Time is of the essence of each party's performance of this Agreement.

**Section 11.17**       Radon Gas.   Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.   Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.   Additional information regarding radon and radon testing may be obtained from your county health department.

**Section 11.18**       WAIVER OF TRIAL BY JURY.  BUYER AND SELLER EACH AGREE THAT THE NATURE OF THIS AGREEMENT MAKES A JURY DETERMINATION OF ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE ASSETS UNDESIRABLE. ACCORDINGLY, BUYER AND SELLER EACH SPECIFICALLY WAIVE ANY RIGHT TO A TRIAL BY JURY THAT EITHER OF THEM MAY HAVE IN ANY COURT WITH RESPECT TO ANY ACTION RELATING TO THIS AGREEMENT OR THE PROPERTY.   THE FOREGOING WAIVER IS MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY BY BOTH BUYER AND SELLER.

### [SIGNATURE PAGES TO FOLLOW]

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

**IN WITNESS WHEREOF,** each of the parties hereto has executed this Agreement, or has caused this Agreement to be duly executed on its respective behalf by its respective officers thereunto duly authorized, as of the Effective Date.

**SELLER:**

Name: _Maurice Serotlin Grimm_

Name: _Starla S. Stoesser_

**WINN-DIXIE STORES, INC.,** a Florida corporation

By: _____
Name: _ Bennett Nussbaum
Its:____ Senior Vice President and
Chief Financial Officer

Name: _Maurice Serotlin Grimm_

Name: _Starla S. Stoesser_

**WINN-DIXIE PROPERTIES, LLC,** a Florida limited liability company

By:    Winn-Dixie Stores, Inc., a Florida
corporation, its sole member

By: _____
Name: _ Bennett Nussbaum
Its:____ Vice President

Name: _Maurice Serotlin Grimm_

Name: _Starla S. Stoesser_

**WINN-DIXIE WAREHOUSE LEASING, LLC,** a Florida limited liability company

By:    Winn-Dixie Logistics, Inc., a Florida
corporation, its sole member

By: _____
Name: _ Bennett Nussbaum
Its:____ Vice President

Name: _Maurice Serotlin Grimm_

Name: _Starla S. Stoesser_

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

By: _____
Name: _ Bennett Nussbaum
Its:____ Vice President

41

LEGAL APPROVED
ATTY: LBA
DATE: 2/26/08

**BUYER:**

Name: _PETER G LATHAM_

Name: _Chiran KaSrawela_

Name: _PETER G. LATHAM_

Name: _CHARAG KHAROUNA_

**SOUTHEAST MILK, INC.,** a Florida agricultural marketing cooperative

By: _____
Name: Calvin Covington
Its:  Chief Executive Officer

**SUNSHINE STATE DAIRY FARMS, LLC,** a Florida limited liability company

By:   Southeast Milk, Inc., a Florida agricultural marketing cooperative, its sole member

By: _____
Name: Calvin Covington
Its:  Chief Executive Officer

42

**ESCROW AGENT:**

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Asset Purchase Agreement for the limited purposes stated herein as applicable to Escrow Agent.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: February 26, 2008

43

## INDEX OF SCHEDULES AND EXHIBITS TO
## ASSET PURCHASE AGREEMENT

| | |
|---|---|
| Schedule A | Definitions |
| Schedule B | Equipment List |
| Schedule C | Seller Disclosure Memorandum |
| Schedule D | Purchase Price Allocation |
| Schedule E | Intentionally Omitted |
| Schedule F | Inventories Procedure |
| Schedule G | Assumed Contracts |
| Schedule H | Systems Segregation Map |
| Schedule I | Employee Accruals |
| Schedule J | Excluded Equipment |
| Schedule K | Legal Description of Subleased Real Estate |
| Schedule L | Legal Description of Owned Real Estate |
| Schedule M | Records Constituting Assets and Records Upon which Buyer Relied |
| Schedule N | Buyer's and Seller's Personnel to Whom Knowledge Definition Applies |
| Exhibit A | Form of Title Affidavit |
| Exhibit B | Form of General Assignment of Licenses, Permits and Approvals |
| Exhibit C | Form of Special Warranty Deed |
| Exhibit D | Form of Bill of Sale |
| Exhibit E-1 | Form of Sublease Agreement (for use if a Nondisturbance Agreement is not delivered at Closing) |
| Exhibit E-2 | Form of Sublease Agreement (for use if a Nondisturbance Agreement is delivered at Closing) |
| Exhibit F | Form of Lease Estoppel Certificate |
| Exhibit G | Form of Supply Contract |
| Exhibit H | Form of Omnibus Assignment and Assumption Agreement |

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

**INDEX OF SCHEDULES AND EXHIBITS TO**
**ASSET PURCHASE AGREEMENT**
**(Cont.)**

Exhibit I            Form of Closing Statement

Exhibit J            Form of Closing Certificate

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

## SCHEDULE A

## DEFINITIONS

As used herein, the terms below will have the following meanings:

"Affiliate" means any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the Person specified, and in the case of Seller, will include without limitation Winn-Dixie, Properties LLC, Leasing LLC, and Logistics.

"Agreement" means this Asset Purchase Agreement, together with all Appendices, Schedules and Exhibits referenced herein.

"Assets" means all of the assets, properties and rights of Seller (including all assignable guarantees, warranties, indemnities and similar rights of Seller with respect to any of the Assets), of every type and description, real, personal and mixed, directly relating to the Dairy Plants, including the Owned Real Estate, the Subleased Real Estate, the Inventories (other than finished product Inventories to be removed from the Dairy Plants by Seller for relocation to other locations of Seller), the Equipment, the Supplies, the General Property, the Intellectual Property (other than Intellectual Property comprising or related to the Excluded Assets), the Assumed Contracts, and other fixed or tangible assets known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, wherever located and whether or not reflected on the books and records of the Seller, excluding only the Excluded Assets.

"Assumed Contracts" means the agreements, contracts, commitments and undertakings of Seller with respect to the Dairy Plants assumed by Sunshine, all of which are listed on **Schedule G** hereto, and any purchase orders or sales commitments of Seller made in the ordinary course with respect to the Dairy Plants that are open at the time of Closing and reasonably acceptable to Sunshine.

"Assumed Liabilities" will only mean the following: (i) the Employee Accruals applicable to the Hired Employees; and (ii) the executory obligations of Seller arising under the Lease (solely with respect to the Subleased Real Estate) and the Assumed Contracts following the Closing Date (but expressly excluding any liability, claim, obligation or expense that results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of law by Seller or any of its Affiliates).

"Bill of Sale" means the document transferring all right, title and interest in the Inventories, the Equipment and the Supplies associated with each of the Owned Plant and the Leased Plant, from Winn-Dixie or Logistics, as applicable, to Sunshine, in the form of **Exhibit D**.

"Business Day" means any day other than a Saturday, Sunday or day on which banking institutions in the City of New York are permitted or obligated by law to close.

46

"Closing Statement" means the statement in the form of **Exhibit I** reflecting the net amount due Seller for the Assets other than Inventories, after making the adjustments described in **Section 2.08**.

"COBRA" means the provisions of Code section 4980B and Part 6 of Subtitle B of Title I of ERISA.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Contracts" (or "Contract" as the context may require) means all agreements, contracts, commitments and undertakings, indentures, notes, bonds, loans, instruments, leases, mortgages or other binding arrangements.

"Distribution Center" means the warehousing and distribution center operated by Logistics on the Leased Real Estate, located adjacent to the Subleased Real Estate, and which presently shares certain infrastructure, systems and utilities with the Subleased Real Estate.

"Employee Accruals" means the liabilities of Seller related to the Hired Employees with respect to paid time off (including vacation pay and sick pay) as of the Closing Date and to be described by Seller (with respect to the Hired Employees) on **Schedule I** hereto at or prior to the Closing Date and verified on the books and records of Seller.

"Encumbrance" means any mortgage, deed of trust, lien (including, but not limited to, the Credit Agreement Liens), pledge, encumbrance, claim, lease, easement, license, option, right of first refusal, preemptive right, charge, security interest, conditional sales contract, restriction or other matter causing a defect or imperfection in title.

"Environmental Defects" means matters affecting the Assets that, by their nature or materiality, constitute Legal Noncompliance under Environmental Laws.

"Environmental Laws" means any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning environmental protection, discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into ambient air, water or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, and any other similar federal, state or local law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Smith, Gambrell & Russell, LLP, through its Jacksonville office.

"Excluded Assets" means any equipment (all of which is described on **Schedule J** hereto) leased under a lease that is not an Assumed Contract or otherwise not owned or

leased by Seller or its Affiliates, the equipment listed on **Schedule J** hereto, any non-assignable and non-transferable Contracts and Permits, over-the-road motor vehicles, any computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Assets, accounts receivable, all finished product Inventories to be removed by Seller at or prior to Closing, any of the Inventories excluded pursuant to the procedure set forth on **Schedule F** hereto, cash and cash equivalents and trademarks, trade names, logos or designs of Seller or its Affiliates, Records not customarily located at the Dairy Plants, all milk cases containing any Winn-Dixie trade name, and all Intellectual Property relating to any of the foregoing.

"GAAP" means generally accepted accounting principles in the United States applied consistently with Seller's past practices.

"General Property" means all customer and supplier lists, files, catalogues, brochures, pricing, books and records, telephone and fax numbers, computer programs, software and systems and other sales, general administrative and miscellaneous property of every kind and nature related to, and located at and used solely in conjunction with, the Dairy Plants, other than any of the foregoing that are, or are related to, the Excluded Assets.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, including, but not limited to those relating to or promulgated by the Food and Drug Administration and the United States Department of Agriculture any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

"Hammond Management Agreement" means that certain Exclusive Property Management Agreement between Winn-Dixie Warehouse Leasing, LLC and Winn-Dixie Logistics, Inc., dated November 21, 2006, relating to the Subleased Real Estate and adjacent Leased Real Estate.

"Hazardous Material" means any (i) hazardous substance, toxic substance, hazardous waste or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

"Intellectual Property" means all U.S. and foreign issued design patents and utility patents, and all pending applications relating to any inventions, and all reissues, divisions, continuations-in-part and extensions of them; all U.S. copyrights and copyright applications and all copyright renewals and extensions; and all material trade secrets, confidential business information and know-how including, without limitation, invention disclosures, new product development information, formulas, software, and vendor and customer lists that are used or employed by Seller at the Dairy Plants in the provision, production, or marketing of any services or products now provided, produced, or proposed to be provided,

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

produced, or marketed by Seller at the Dairy Plants. The Intellectual Property specifically includes the sole and exclusive right to assert claims, prosecute claims, collect damages and retain damages arising out of any past, present or future infringement, dilution, misappropriation or other violation, known or unknown, of the Intellectual Property, to the extent applicable, regardless of whether such claim as already been asserted against any third party by or on behalf of Seller.

"Knowledge" or "knows" or "known" or "aware" means, as to each of the parties hereto, that such party will be deemed to have knowledge or awareness of a particular matter if any of the respective individuals identified on **Schedule N** has actual knowledge or awareness of such matter or should have gained actual knowledge or awareness of a particular matter in the normal conduct of such individual's duties without independent inquiry.

"Landlord" means ZSF/WD Hammond, LLC, a Delaware limited liability company, which is the lessor under the Lease.

"Law" means any domestic or foreign federal, state or local statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

"Lease" means the Lease Agreement, dated August 10, 1999, between ZSF/WD Hammond, LLC, a Delaware limited liability company, as Lessor, and Winn-Dixie Louisiana, Inc., a Florida corporation, as the original Lessee, which Lessee was merged into Logistics which company subsequently assigned the Lease to Winn-Dixie Logistics, Inc., which company subsequently assigned the Lease to Leasing LLC, pursuant to which Leasing LLC holds a leasehold interest in the Leased Real Estate.

"Leased Real Estate" means the leasehold interests of Leasing LLC in the approximately 85.6 acres of land located in Hammond, Tangipahoa Parish, Louisiana, together with all interests of Leasing LLC in the buildings, structures, installations, fixtures and other improvements situated thereon and all easements, rights of way and other rights, interests and appurtenances of Leasing LLC therein or thereunto pertaining, as described in the Lease.

"Legal Noncompliance" means the threshold, level or standard of materiality for compliance with an Environmental Law at which a violation would be actionable under such Environmental Law to result in imposition of fines or penalties, to require the violating Person to report such violation to any Governmental Authority, or to require remedial action to cure such violation.   Violations of Environmental Laws that are de minimus or nonmaterial and thus not actionable would not constitute Legal Noncompliance.

"Liability or Liabilities," as the context may require, means any indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secure or unsecured, accrued, absolute, contingent or otherwise.

"Material Adverse Effect" means, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the use of the Assets (taken as a whole) of either of the Dairy

Asset Purchase Agreement
Winn-Dixie Affiliates S/T SMI Affiliates
February 2008
SGRJAX\120494.10

Plants, or continued operations of either of the Dairy Plants for their current use, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the beverage and dairy industry that do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles; or (e) any change in applicable Laws or the interpretation thereof.

"Material Defect" means a Monetary Defect, or any condition or circumstance affecting title to the Dairy Plants that either calls into question the validity of any Seller's interest in the Dairy Plants, Seller's ability to convey, assign and/or sublease good and marketable title to the Dairy Plants, or Sunshine's ability to use each Dairy Plant in continuation of its current uses as of the Effective Date. Material Defects do not include minor imperfections of title, if any, which, taken as whole, do not materially detract from the value or impair the use of the property subject thereto, or impair the operations of the Dairy Plants.

"Merrill Database" means the database of materials, data and information relating to the Owned Real Estate and Leased Real Estate as published for reference by authorized users at https://datasite.merrillcorp.com/bidder, reference "Project Hermitage," maintained by Merrill Corporation.

"Monetary Defect" means any encumbrance against title to the Dairy Plants that constitutes a lien for the payment of money, including any security interest, judgment lien, construction lien, tax lien or similar lien or encumbrance, excepting, however, Permitted Encumbrances.

"Owned Real Estate" means the approximately 14.72 acres of land located in Plant City, Hillsborough County, Florida, and described on **Schedule L** hereto, together with all interests of Winn-Dixie and Property LLC in the buildings, structures, installations, fixtures and other improvements situated thereon and all easements, rights of way and other rights, interests and appurtenances of Winn-Dixie and Properties LLC therein or thereunto pertaining.

"Permitted Encumbrances" means (a) liens for current taxes and assessments not yet due and payable (b) Encumbrances, other than Monetary Defects, shown on the Title Commitment, (c) Later Exceptions that are bonded off by Seller, or are waived by Buyer, under **Section 5.07**, (d) minor imperfections of title, if any, which, taken as whole, do not materially detract from the value or impair the use of the property subject thereto, or impair the operations of the Dairy Plants, (e) the Spur Tracks and the unrecorded Spur Track Agreements relating thereto, and (f) zoning laws, building restrictions and other land use restrictions that do not impair continuation of the present uses, as of the Effective Date, of the Dairy Plants.

"Permits" means all licenses, permits, orders, consents, approvals, registrations, authorizations, inspections, qualifications and filings under all federal, state, local or foreign laws and with all Governmental Authorities.

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

"Person" means any individual, partnership (limited or general), joint venture, corporation, company, limited liability company, trust, association, unincorporated organization, Governmental Authority or other entity.

"Plant City Management Agreement" means that certain Exclusive Property Management Agreement between Winn-Dixie Properties, LLC and Winn-Dixie Stores, Inc., dated November 21, 2006, relating to the Owned Plant.

"Railroad" means the rail service provider to the Real Estate pursuant to the applicable Spur Track Agreements relating to either the Owned Plant or the Leased Plant.

"Real Estate" means the Owned Real Estate and the Leased Real Estate, collectively.

"Retained Liabilities" means, with the exception of the Assumed Liabilities, any liability, debt, expense or obligation of, and/or claim against, Seller whatsoever, including without limitation any liability or obligation under any employment benefit plans other than in respect of the Employee Accruals.

"Records" means all records, manuals and documents in the possession of a Seller that are located at either of the Dairy Plants or elsewhere and that are utilized to administer, reflect, monitor, evidence or record information relating to the business or operations of the Dairy Plants, the other Assets or to the present or past Plant Employees.

"Special Warranty Deed" means the special warranty deeds by which Winn-Dixie and Properties LLC will convey to Sunshine title to the Owned Real Estate in the form of **Exhibit C**.

"Spur Track Agreements" means those certain agreements with the applicable Railroad Real Estate, pursuant to which such Railroad may provide rail service to the Real Estate over the Spur Tracks.

"Spur Tracks" means the railroad spur tracks located on the Real Estate as shown on the Survey.

"Subleased Real Estate" means that portion of the Leased Real Estate that is to be segregated from the Distribution Center pursuant to the Survey by use of fencing and gates and relocation and/or construction of interior entries, driveways and parking areas, to include approximately 12 acres of land together with the Leased Plant and its primary appurtenances and that will be subleased by Leasing LLC to Sunshine pursuant to the Sublease Agreement, subject to the Lease.

"Supply Contract" means the supply contract to be entered at Closing between Sunshine and Procurement, substantially in the form of **Exhibit G**.

"Title Affidavit" means the title affidavit substantially in the form of **Exhibit A**.

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

<u>Other Defined Terms</u>.  The following terms will have the meanings defined for such terms in the Sections as set forth below:

| Term | Section |
| --- | --- |
| Access Permits | 10.05(b)(ii) |
| Additional Fire Safety Measures | 10.05(b)(iv) |
| Additional Security Measures | 10.05(b)(iii) |
| Agreement | Recitals |
| Assignment and Assumption Agreement | 2.07(c)(ii) |
| Augmentation Cost | 10.06(b) |
| Base Purchase Price | 2.03 |
| Buyer | Recitals |
| Buyer Indemnitee | 9.02(a) |
| Closing | 2.06 |
| Closing Date | 2.06 |
| Communication Systems Separation | 10.05(b)(ix) |
| Credit Agreement Liens | 3.05 |
| Dairy Plants | Recitals |
| Dairy Security | 10.05(b)(iii) |
| Dairy Sewer Pretreatment Facilities | 5.12 |
| Dairy Sewer Service | 10.05(b)(vi) |
| Damages | 9.02(a) |
| Distribution Center Sewer Service | 10.05(b)(vi) |
| Electric Service Separation | 10.05(b)(vii) |
| Equipment | Recitals |
| Fencing | 10.05(b)(i) |
| Fire Safety Reconnection | 10.05(b)(iv) |
| Gas Service Separation | 10.05(b)(viii) |
| Hired Employees | 10.01(a) |
| Indemnified Person | 9.03(a) |
| Indemnifying Person | 9.03(a) |
| Internal Access and Parking | 10.05(b)(ii) |
| Inventories | Recitals |
| Inventories Count | 2.09(a) |
| Inventories Price | 2.09(a) |
| Later Exception | 5.07 |
| Leased Plant | Recitals |
| Leasing LLC | Recitals |
| Logistics | 5.06 |
| Monetary Defects | 3.05 |
| Nondisturbance Agreement | 10.07 |
| Owned Plant | Recitals |
| Outside Date | 2.06 |
| Phase I Assessment | Recitals |
| Plant Employees | 3.14 |
| Procurement | 2.07(c)(i) |
| Properties LLC | Recitals |
| Rear Access Relocation | 10.05(b)(ii) |
| Retained Employees | 10.01(a) |

Asset Purchase Agreement
Winn-Dixie Affiliates S/T SMI Affiliates
February 2008
SGRJAX\120494.10

| Term | Section |
|------|---------|
| Security Separation | 10.05(b)(iii) |
| Seller | Recitals |
| Seller Disclosure Memorandum | 1.02 |
| Seller Indemnitee | 9.02(b) |
| Seller's Retained Names | 10.02 |
| Sewer Monitoring System | 10.05(b)(vi) |
| Sewer Pretreatment Agreement | 5.12 |
| Sewer Service Credits | 10.06(b) |
| SMI | Recitals |
| Spur Tracks | 5.12 |
| Sublease Agreement | 2.07(b)(ii) |
| Sublease A | 2.07(b)(ii) |
| Sublease B | 2.07(b)(ii) |
| Sunshine | Recitals |
| Supplies | Recitals |
| Surveys | 5.05 |
| Systems Segregation | 10.05(a) |
| Title Commitments | 5.04 |
| Utility Cost Contribution | 10.06(b) |
| Winn-Dixie | Recitals |

## SCHEDULE A

## DEFINITIONS

As used herein, the terms below will have the following meanings:

"Affiliate" means any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the Person specified, and in the case of Seller, will include without limitation Winn-Dixie, Properties LLC, Leasing LLC, and Logistics.

"Agreement" means this Asset Purchase Agreement, together with all Appendices, Schedules and Exhibits referenced herein.

"Assets" means all of the assets, properties and rights of Seller (including all assignable guarantees, warranties, indemnities and similar rights of Seller with respect to any of the Assets), of every type and description, real, personal and mixed, directly relating to the Dairy Plants, including the Owned Real Estate, the Subleased Real Estate, the Inventories (other than finished product Inventories to be removed from the Dairy Plants by Seller for relocation to other locations of Seller), the Equipment, the Supplies, the General Property, the Intellectual Property (other than Intellectual Property comprising or related to the Excluded Assets), the Assumed Contracts, and other fixed or tangible assets known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, wherever located and whether or not reflected on the books and records of the Seller, excluding only the Excluded Assets.

"Assumed Contracts" means the agreements, contracts, commitments and undertakings of Seller with respect to the Dairy Plants assumed by Sunshine, all of which are listed on **Schedule G** hereto, and any purchase orders or sales commitments of Seller made in the ordinary course with respect to the Dairy Plants that are open at the time of Closing and reasonably acceptable to Sunshine.

"Assumed Liabilities" will only mean the following: (i) the Employee Accruals applicable to the Hired Employees; and (ii) the executory obligations of Seller arising under the Lease (solely with respect to the Subleased Real Estate) and the Assumed Contracts following the Closing Date (but expressly excluding any liability, claim, obligation or expense that results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of law by Seller or any of its Affiliates).

"Bill of Sale" means the document transferring all right, title and interest in the Inventories, the Equipment and the Supplies associated with each of the Owned Plant and the Leased Plant, from Winn-Dixie or Logistics, as applicable, to Sunshine, in the form of **Exhibit D**.

"Business Day" means any day other than a Saturday, Sunday or day on which banking institutions in the City of New York are permitted or obligated by law to close.

46

"Closing Statement" means the statement in the form of **Exhibit I** reflecting the net amount due Seller for the Assets other than Inventories, after making the adjustments described in **Section 2.08**.

"COBRA" means the provisions of Code section 4980B and Part 6 of Subtitle B of Title I of ERISA.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Contracts" (or "Contract" as the context may require) means all agreements, contracts, commitments and undertakings, indentures, notes, bonds, loans, instruments, leases, mortgages or other binding arrangements.

"Distribution Center" means the warehousing and distribution center operated by Logistics on the Leased Real Estate, located adjacent to the Subleased Real Estate, and which presently shares certain infrastructure, systems and utilities with the Subleased Real Estate.

"Employee Accruals" means the liabilities of Seller related to the Hired Employees with respect to paid time off (including vacation pay and sick pay) as of the Closing Date and to be described by Seller (with respect to the Hired Employees) on **Schedule I** hereto at or prior to the Closing Date and verified on the books and records of Seller.

"Encumbrance" means any mortgage, deed of trust, lien (including, but not limited to, the Credit Agreement Liens), pledge, encumbrance, claim, lease, easement, license, option, right of first refusal, preemptive right, charge, security interest, conditional sales contract, restriction or other matter causing a defect or imperfection in title.

"Environmental Defects" means matters affecting the Assets that, by their nature or materiality, constitute Legal Noncompliance under Environmental Laws.

"Environmental Laws" means any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning environmental protection, discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into ambient air, water or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, and any other similar federal, state or local law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Smith, Gambrell & Russell, LLP, through its Jacksonville office.

"Excluded Assets" means any equipment (all of which is described on **Schedule J** hereto) leased under a lease that is not an Assumed Contract or otherwise not owned or

47

leased by Seller or its Affiliates, the equipment listed on **Schedule J** hereto, any non-assignable and non-transferable Contracts and Permits, over-the-road motor vehicles, any computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Assets, accounts receivable, all finished product Inventories to be removed by Seller at or prior to Closing, any of the Inventories excluded pursuant to the procedure set forth on **Schedule F** hereto, cash and cash equivalents and trademarks, trade names, logos or designs of Seller or its Affiliates, Records not customarily located at the Dairy Plants, all milk cases containing any Winn-Dixie trade name, and all Intellectual Property relating to any of the foregoing.

"GAAP" means generally accepted accounting principles in the United States applied consistently with Seller's past practices.

"General Property" means all customer and supplier lists, files, catalogues, brochures, pricing, books and records, telephone and fax numbers, computer programs, software and systems and other sales, general administrative and miscellaneous property of every kind and nature related to, and located at and used solely in conjunction with, the Dairy Plants, other than any of the foregoing that are, or are related to, the Excluded Assets.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, including, but not limited to those relating to or promulgated by the Food and Drug Administration and the United States Department of Agriculture any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

"Hammond Management Agreement" means that certain Exclusive Property Management Agreement between Winn-Dixie Warehouse Leasing, LLC and Winn-Dixie Logistics, Inc., dated November 21, 2006, relating to the Subleased Real Estate and adjacent Leased Real Estate.

"Hazardous Material" means any (i) hazardous substance, toxic substance, hazardous waste or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

"Intellectual Property" means all U.S. and foreign issued design patents and utility patents, and all pending applications relating to any inventions, and all reissues, divisions, continuations-in-part and extensions of them; all U.S. copyrights and copyright applications and all copyright renewals and extensions; and all material trade secrets, confidential business information and know-how including, without limitation, invention disclosures, new product development information, formulas, software, and vendor and customer lists that are used or employed by Seller at the Dairy Plants in the provision, production, or marketing of any services or products now provided, produced, or proposed to be provided,

48

produced, or marketed by Seller at the Dairy Plants. The Intellectual Property specifically includes the sole and exclusive right to assert claims, prosecute claims, collect damages and retain damages arising out of any past, present or future infringement, dilution, misappropriation or other violation, known or unknown, of the Intellectual Property, to the extent applicable, regardless of whether such claim as already been asserted against any third party by or on behalf of Seller.

"Knowledge" or "knows" or "known" or "aware" means, as to each of the parties hereto, that such party will be deemed to have knowledge or awareness of a particular matter if any of the respective individuals identified on **Schedule N** has actual knowledge or awareness of such matter or should have gained actual knowledge or awareness of a particular matter in the normal conduct of such individual's duties without independent inquiry.

"Landlord" means ZSF/WD Hammond, LLC, a Delaware limited liability company, which is the lessor under the Lease.

"Law" means any domestic or foreign federal, state or local statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

"Lease" means the Lease Agreement, dated August 10, 1999, between ZSF/WD Hammond, LLC, a Delaware limited liability company, as Lessor, and Winn-Dixie Louisiana, Inc., a Florida corporation, as the original Lessee, which Lessee was merged into Logistics which company subsequently assigned the Lease to Winn-Dixie Logistics, Inc., which company subsequently assigned the Lease to Leasing LLC, pursuant to which Leasing LLC holds a leasehold interest in the Leased Real Estate.

"Leased Real Estate" means the leasehold interests of Leasing LLC in the approximately 85.6 acres of land located in Hammond, Tangipahoa Parish, Louisiana, together with all interests of Leasing LLC in the buildings, structures, installations, fixtures and other improvements situated thereon and all easements, rights of way and other rights, interests and appurtenances of Leasing LLC therein or thereunto pertaining, as described in the Lease.

"Legal Noncompliance" means the threshold, level or standard of materiality for compliance with an Environmental Law at which a violation would be actionable under such Environmental Law to result in imposition of fines or penalties, to require the violating Person to report such violation to any Governmental Authority, or to require remedial action to cure such violation.   Violations of Environmental Laws that are de minimus or nonmaterial and thus not actionable would not constitute Legal Noncompliance.

"Liability or Liabilities," as the context may require, means any indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secure or unsecured, accrued, absolute, contingent or otherwise.

"Material Adverse Effect" means, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the use of the Assets (taken as a whole) of either of the Dairy

Plants, or continued operations of either of the Dairy Plants for their current use, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the beverage and dairy industry that do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles; or (e) any change in applicable Laws or the interpretation thereof.

"Material Defect" means a Monetary Defect, or any condition or circumstance affecting title to the Dairy Plants that either calls into question the validity of any Seller's interest in the Dairy Plants, Seller's ability to convey, assign and/or sublease good and marketable title to the Dairy Plants, or Sunshine's ability to use each Dairy Plant in continuation of its current uses as of the Effective Date.  Material Defects do not include minor imperfections of title, if any, which, taken as whole, do not materially detract from the value or impair the use of the property subject thereto, or impair the operations of the Dairy Plants.

"Merrill Database" means the database of materials, data and information relating to the Owned Real Estate and Leased Real Estate as published for reference by authorized users at https://datasite.merrillcorp.com/bidder, reference "Project Hermitage," maintained by Merrill Corporation.

"Monetary Defect" means any encumbrance against title to the Dairy Plants that constitutes a lien for the payment of money, including any security interest, judgment lien, construction lien, tax lien or similar lien or encumbrance, excepting, however, Permitted Encumbrances.

"Owned Real Estate" means the approximately 14.72 acres of land located in Plant City, Hillsborough County, Florida, and described on **Schedule L** hereto, together with all interests of Winn-Dixie and Property LLC in the buildings, structures, installations, fixtures and other improvements situated thereon and all easements, rights of way and other rights, interests and appurtenances of Winn-Dixie and Properties LLC therein or thereunto pertaining.

"Permitted Encumbrances" means (a) liens for current taxes and assessments not yet due and payable (b) Encumbrances, other than Monetary Defects, shown on the Title Commitment, (c) Later Exceptions_that are bonded off by Seller, or are waived by Buyer, under **Section 5.07**, (d) minor imperfections of title, if any, which, taken as whole, do not materially detract from the value or impair the use of the property subject thereto, or impair the operations of the Dairy Plants, (e) the Spur Tracks and the unrecorded Spur Track Agreements relating thereto, and (f) zoning laws, building restrictions and other land use restrictions that do not impair continuation of the present uses, as of the Effective Date, of the Dairy Plants.

"Permits" means all licenses, permits, orders, consents, approvals, registrations, authorizations, inspections, qualifications and filings under all federal, state, local or foreign laws and with all Governmental Authorities.

Asset Purchase Agreement
Winn-Dixie Affiliates S/T SMI Affiliates
February 2008
SGRJAX\120494.10

"Person" means any individual, partnership (limited or general), joi___ corporation, company, limited liability company, trust, association, unin____ organization, Governmental Authority or other entity.

"Plant City Management Agreement" means that certain Exclusive ___ ___ Management Agreement between Winn-Dixie Properties, LLC and Winn-Dixie St___ dated November 21, 2006, relating to the Owned Plant.

"Railroad" means the rail service provider to the Real Estate pursu___ applicable Spur Track Agreements relating to either the Owned Plant or the Lea___ __

"Real Estate" means the Owned Real Estate and the Leased Real Estate, co___

"Retained Liabilities" means, with the exception of the Assumed L___ liability, debt, expense or obligation of, and/or claim against, Seller whatsoev___ __ without limitation any liability or obligation under any employment benefit plans o___ in respect of the Employee Accruals.

"Records" means all records, manuals and documents in the possessio___ that are located at either of the Dairy Plants or elsewhere and that are __ __ administer, reflect, monitor, evidence or record information relating to the ___ operations of the Dairy Plants, the other Assets or to the present or past Plant ___ __

"Special Warranty Deed" means the special warranty deeds by which W___ Properties LLC will convey to Sunshine title to the Owned Real Estate in the for__ __ __ **C**.

"Spur Track Agreements" means those certain agreements with th___ Railroad Real Estate, pursuant to which such Railroad may provide rail service __ __ Estate over the Spur Tracks.

"Spur Tracks" means the railroad spur tracks located on the Real Estate __ the Survey.

"Subleased Real Estate" means that portion of the Leased Real Estate ___ segregated from the Distribution Center pursuant to the Survey by use of fenc___ __ and relocation and/or construction of interior entries, driveways and park___ __ include approximately 12 acres of land together with the Leased Plant and i__ __ appurtenances and that will be subleased by Leasing LLC to Sunshine pursu___ __ Sublease Agreement, subject to the Lease.

"Supply Contract" means the supply contract to be entered at Closi__ __ __ Sunshine and Procurement, substantially in the form of **Exhibit G**.

"Title Affidavit" means the title affidavit substantially in the form of **Exhibit** A

51

<u>Other Defined Terms</u>.  The following terms will have the meanings defined for such terms in the Sections as set forth below:

| Term | Section |
|------|---------|
| Access Permits | 10.05(b)(ii) |
| Additional Fire Safety Measures | 10.05(b)(iv) |
| Additional Security Measures | 10.05(b)(iii) |
| Agreement | Recitals |
| Assignment and Assumption Agreement | 2.07(c)(ii) |
| Augmentation Cost | 10.06(b) |
| Base Purchase Price | 2.03 |
| Buyer | Recitals |
| Buyer Indemnitee | 9.02(a) |
| Closing | 2.06 |
| Closing Date | 2.06 |
| Communication Systems Separation | 10.05(b)(ix) |
| Credit Agreement Liens | 3.05 |
| Dairy Plants | Recitals |
| Dairy Security | 10.05(b)(iii) |
| Dairy Sewer Pretreatment Facilities | 5.12 |
| Dairy Sewer Service | 10.05(b)(vi) |
| Damages | 9.02(a) |
| Distribution Center Sewer Service | 10.05(b)(vi) |
| Electric Service Separation | 10.05(b)(vii) |
| Equipment | Recitals |
| Fencing | 10.05(b)(i) |
| Fire Safety Reconnection | 10.05(b)(iv) |
| Gas Service Separation | 10.05(b)(viii) |
| Hired Employees | 10.01(a) |
| Indemnified Person | 9.03(a) |
| Indemnifying Person | 9.03(a) |
| Internal Access and Parking | 10.05(b)(ii) |
| Inventories | Recitals |
| Inventories Count | 2.09(a) |
| Inventories Price | 2.09(a) |
| Later Exception | 5.07 |
| Leased Plant | Recitals |
| Leasing LLC | Recitals |
| Logistics | 5.06 |
| Monetary Defects | 3.05 |
| Nondisturbance Agreement | 10.07 |
| Owned Plant | Recitals |
| Outside Date | 2.06 |
| Phase I Assessment | Recitals |
| Plant Employees | 3.14 |
| Procurement | 2.07(c)(i) |
| Properties LLC | Recitals |
| Rear Access Relocation | 10.05(b)(ii) |
| Retained Employees | 10.01(a) |

ASSET PURCHASE AGREEMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
FEBRUARY 2008
SGRJAX\120494.10

| Term | Section |
|------|---------|
| Security Separation | 10.05(b)(iii) |
| Seller | Recitals |
| Seller Disclosure Memorandum | 1.02 |
| Seller Indemnitee | 9.02(b) |
| Seller's Retained Names | 10.02 |
| Sewer Monitoring System | 10.05(b)(vi) |
| Sewer Pretreatment Agreement | 5.12 |
| Sewer Service Credits | 10.06(b) |
| SMI | Recitals |
| Spur Tracks | 5.12 |
| Sublease Agreement | 2.07(b)(ii) |
| Sublease A | 2.07(b)(ii) |
| Sublease B | 2.07(b)(ii) |
| Sunshine | Recitals |
| Supplies | Recitals |
| Surveys | 5.05 |
| Systems Segregation | 10.05(a) |
| Title Commitments | 5.04 |
| Utility Cost Contribution | 10.06(b) |
| Winn-Dixie | Recitals |

## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep (DAIRY HAMMOND) | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/27/1960 MILK | 132610 MFEQP | MILK SRORAGE TANK NO 1 | 3,857.00 | 1,483.47 | 295.70 | 148.35 | 2,373.53 | NDP | MFG EQUIP | 10466637 |
| 7/27/1960 MILK | 132610 MFEQP | MILK STORAGE TANK NO 2 | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 | NDP | MFG EQUIP | 10466639 |
| 7/27/1960 MILK | 132610 MFEQP | MILK STORAGE NO 3 | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 | NDP | MFG EQUIP | 10476638 |
| 7/27/1960 MILK | 132610 MFEQP | LAB EQUIP PARTS FOR BOTTLE | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | NDP | MFG EQUIP | |
| 2/4/1970 MILK | 132610 MFEQP | FILLER | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | NDP | MFG EQUIP | EQ31613 |
| 7/26/1971 MILK | 132610 MFEQP | SILO MILK TANK 15000 GAL | 9,552.28 | 3,673.97 | 734.80 | 367.40 | 5,878.31 | NDP | MFG EQUIP | |
| 2/4/1976 | 132610 MFEQP | EQ FOR # GAL BLOWMOLD MACH NEW GALLON | 11,641.81 | 4,477.64 | 895.52 | 447.76 | 7,164.17 | NDP | MFG EQUIP | |
| 2/4/1976 MILK | 132610 MFEQP | BLOMOLD MACHINE | 43,283.54 | 16,647.51 | 3,329.50 | 1,664.75 | 26,636.03 | NDP | MFG EQUIP | |
| 2/4/1976 MILK | 132610 MFEQP | SILO MILK TANK NO 6 | 584.00 | 144.61 | 28.92 | 14.46 | 419.39 | NDP | MFG STRCTR | |
| 2/4/1976 MILK | 132610 MFEQP | SILO TANK NO 3 ADDITIONAL CHGS ON | 36.00 | 9.23 | 1.84 | 0.92 | 26.77 | NDP | MFG STRCTR | |
| 2/4/1976 | 132610 MFEQP | # GAL B | 1,760.00 | 684.61 | 136.92 | 68.46 | 1,095.39 | NDP | MFG EQUIP | |
| 7/26/1976 | 132610 MFEQP | HOMOGINIZER | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 | NDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | CORN SYRUP SYSTEM | 1,128.00 | 433.84 | 86.76 | 43.38 | 694.16 | NDP | MFG EQUIP | |
| 7/25/1979 MILK | 132610 MFEQP | SILO TANK 7 | 593.00 | 152.06 | 30.42 | 15.21 | 440.94 | NDP | MFG STRCTR | |
| 2/6/1980 GALL | 132610 MFEQP | DAIRY MOLDS | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | NDP | MFG EQUIP | |
| 7/23/1960 GALL | 132610 MFEQP | BLOWMOLDINGMACHINE | 43,283.54 | 16,647.51 | 3,329.50 | 1,664.75 | 26,636.03 | NDP | MFG EQUIP | 12277 |
| 7/23/1960 HALF | 132610 MFEQP | GAULIN HOMOGENIZER DAIRY MOLD FOR | 11,641.81 | 4,477.64 | 895.52 | 447.76 | 7,164.17 | NDP | MFG EQUIP | 1267023 |
| 7/23/1980 HALF | 132610 MFEQP | BLOW MOLDER | 6,865.17 | 2,640.43 | 528.08 | 264.04 | 4,224.74 | NDP | MFG EQUIP | |
| 7/22/1981 MILK | 132610 MFEQP | SILO NO 8 | 593.00 | 152.06 | 30.42 | 15.21 | 440.94 | NDP | MFG STRCTR | 886598 |
| 7/22/1981 MILK | 132610 MFEQP | SILO NO 9 | 593.00 | 152.06 | 30.42 | 15.21 | 440.94 | NDP | MFG STRCTR | |
| 7/22/1981 | 132610 MFEQP | BLOWMOLDING MACHINE EMULSION QUALITY | 6,567.38 | 2,525.92 | 505.18 | 252.59 | 4,041.46 | NDP | MFG EQUIP | |
| 7/22/1981 | 132610 MFEQP | ANALYZER | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 | NDP | MFG EQUIP | |
| 2/3/1982 MILK | 132610 MFEQP | SILO-8 | 356.00 | 136.93 | 27.38 | 13.69 | 219.07 | NDP | MFG EQUIP | |
| 2/3/1982 MILK | 132610 MFEQP | SILO-9 | 18.00 | 4.61 | 0.92 | 0.46 | 13.39 | NDP | MFG EQUIP | |
| 2/3/1982 MILK | 132610 MFEQP | MILK FILLER INSTALL FILLER | 14,925.50 | 5,740.58 | 1,148.12 | 574.06 | 9,184.92 | NDP | MFG EQUIP | |
| 2/3/1982 MILK | 132610 MFEQP | MACHINE | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 | NDP | MFG EQUIP | |
| 7/28/1982 MILK | 132610 MFEQP | NEW SUGAR TANK | 5,522.11 | 2,123.88 | 424.78 | 212.39 | 3,398.23 | NDP | MFG EQUIP | |

## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

DAIRY HAMMOND

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/28/1982 GALL | 132610 MFEQP | 1 GAL BLOW MOLD MACHINE CLEAN IN PLACE | 71,640.58 | 27,554.07 | 5,510.82 | 2,755.41 | 44,086.51 | NDP | MFG EQUIP | |
| 2/9/1983 MILK | 132610 MFEQP | ALFA-LAVAL- SYSTEM | 4,302.00 | 1,654.61 | 330.92 | 165.46 | 2,647.39 | NDP | MFG EQUIP | |
| 7/24/1985 MILK | 132610 MFEQP | ALFA-LAVAL- SEPERATOR | 38,805.69 | 14,925.28 | 2,985.06 | 1,492.53 | 23,880.41 | NDP | MFG EQUIP | 402784 |
| 7/24/1985 MILK | 132610 MFEQP | APU BARS & PLATES | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | NDP | MFG EQUIP | |
| 7/24/1985 MILK | 132610 MFEQP | CREAM COOLER | 1,543.00 | 593.47 | 118.70 | 59.35 | 949.53 | NDP | MFG EQUIP | |
| 7/24/1985 MILK | 132610 MFEQP | 6000 GAL CREAM STORAGE TAN | 1,306.00 | 502.31 | 100.46 | 50.23 | 803.69 | NDP | MFG EQUIP | |
| 2/5/1986 MILK | 132610 MFEQP | CREAM SEPARATOR PARTS FOR CREAM | 5,373.22 | 2,066.63 | 413.32 | 206.66 | 3,306.59 | NDP | MFG EQUIP | D-18375-2 |
| 2/5/1986 MILK | 132610 MFEQP | SEPERATOR | 6,567.38 | 2,525.92 | 505.18 | 252.59 | 4,041.46 | NDP | MFG EQUIP | |
| 7/23/1986 MILK | 132610 MFEQP | TANK CIP SYS-GAL & 1/2 GAL | 5,074.43 | 1,951.70 | 390.34 | 195.17 | 3,122.73 | NDP | MFG EQUIP | |
| 7/23/1986 MILK | 132610 MFEQP | FRT ON AIR DRYER- GAL&1/2 G | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | NDP | MFG EQUIP | |
| 7/23/1986 MILK | 132610 MFEQP | HEAT EXCHANGER- RAW MILK CH | 2,136.00 | 821.53 | 164.30 | 82.15 | 1,314.47 | NDP | MFG EQUIP | |
| 2/4/1987 MILK | 132610 MFEQP | CIP UNIT | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | NDP | MFG EQUIP | |
| 2/4/1987 MILK | 132610 MFEQP | CIP UNIT LABOR | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 | NDP | MFG EQUIP | |
| 3/2/1988 MILK | 132610 MFEQP | HTST PRESSURE SWITCH WATERMETER FOR | 445.00 | 171.16 | 34.24 | 17.12 | 273.84 | NDP | MFG EQUIP | |
| 6/29/1988 MILK | 132610 MFEQP | DRINK LINE | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 | NDP | MFG EQUIP | |
| 8/24/1988 MILK | 132610 MFEQP | PRESSURE WASHER | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 | NDP | MFG EQUIP | |
| 6/26/1989 MILK | 132610 MFEQP | LEVEL TANK-GAL & 1/2 GAL | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 | NDP | MFG EQUIP | |
| 6/28/1989 MILK | 132610 MFEQP | TWO TANK CIP SYSTEM GAL 1/2 GA | 7,163.96 | 2,755.38 | 551.08 | 275.54 | 4,408.58 | NDP | MFG EQUIP | |
| 3/7/1990 MILK | 132610 MFEQP | WASH TANK & FRT. | 1,662.00 | 639.23 | 127.84 | 63.92 | 1,022.77 | NDP | MFG EQUIP | |
| 9/18/1990 MILK | 132610 MFEQP | 40,000 GAL SILO TANK | 11,044.22 | 4,247.79 | 849.56 | 424.78 | 6,796.43 | NDP | MFG EQUIP | |
| 9/18/1990 MILK | 132610 MFEQP | 25,000 GAL SILO TANK | 8,656.91 | 3,329.59 | 665.92 | 332.96 | 5,327.32 | NDP | MFG EQUIP | |
| 8/19/1990 MILK | 132610 MFEQP | 15,000 GAL SILO TANK | 7,163.96 | 2,755.38 | 551.08 | 275.54 | 4,408.58 | NDP | MFG EQUIP | |
| 8/19/1990 MILK | 132610 MFEQP | 15,000 GAL SILO TANK | 7,163.96 | 2,755.38 | 551.08 | 275.54 | 4,408.58 | NDP | MFG EQUIP | |
| 9/19/1990 MILK | 132610 MFEQP | 15,000 GAL SILO TANK | 7,163.96 | 2,755.38 | 551.08 | 275.54 | 4,408.58 | NDP | MFG EQUIP | |
| 8/19/1990 MILK | 132610 MFEQP | PUMPS, PIPES, VALVES PROCESS CONTROLS | 38,805.69 | 14,925.28 | 2,985.06 | 1,492.53 | 23,880.41 | NDP | MFG EQUIP | |
| 8/19/1990 MILK | 132610 MFEQP | | 29,849.99 | 11,480.78 | 2,296.16 | 1,148.08 | 18,369.21 | NDP | MFG EQUIP | |

*(handwritten) UPGRADE ONLY*

## SCHEDULE B
## To Asset Purc...e Agreement

### EQUIPMENT LIST

DAIRY HAMMOND

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | Type | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | 83,581.18 | 32,146.59 | 6,429.32 | 3,214.66 | 51,434.59 | NDP MFG EQUIP | |
| 8/18/1990 MILK | 132610 MFEQP | ENGINEERING & INSTALLATION LIKWIFER & BLEND | | | | | | | |
| 9/16/1990 MILK | 132610 MFEQP | FUNNEL | 2,997.00 | 1,141.16 | 228.24 | 114.12 | 1,825.84 | NDP MFG EQUIP | |
| 9/19/1990 MILK | 132610 MFEQP | DAIRY LABLER | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 | NDP MFG EQUIP | 74197 |
| 9/19/1990 MILK | 132610 MFEQP | DAIRY LABLER | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 | NDP MFG EQUIP | 74201 |
| 9/19/1990 MILK | 132610 MFEQP | DAIRY LABLER | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 | NDP MFG EQUIP | 74198 |
| 9/15/1990 MILK | 132610 MFEQP | DOCK LEVELERS & SEALS | 3,412.00 | 1,312.31 | 262.46 | 131.23 | 2,099.69 | NDP MFG EQUIP | |
| 9/19/1990 MILK | 132610 MFEQP | 1/2 HP COOLAIR | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | NDP MFG EQUIP | |
| 9/19/1990 MILK | 132610 MFEQP | LOCKERS & FRT | 1,128.00 | 433.84 | 86.76 | 43.38 | 694.16 | NDP MFG EQUIP | |
| 9/18/1990 MILK | 132610 MFEQP | MACHINE ROOM VENTILATION SYSTE | 287.00 | 114.23 | 22.84 | 11.42 | 182.77 | NDP MFG EQUIP | |
| 9/19/1990 MILK | 132610 MFEQP | FR24 CHARGER | 386.00 | 148.47 | 29.70 | 14.85 | 237.53 | NDP MFG EQUIP | PIU90463 3 |
| 9/19/1990 MILK | 132610 MFEQP | FR06 CHARGER | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 | NDP MFG EQUIP | PIU90463 1 |
| 9/15/1990 HALF | 132610 MFEQP | RESIN SILO-1/2 GALLON LINE | 3,264.00 | 1,255.39 | 251.08 | 125.54 | 2,008.61 | NDP MFG EQUIP | |
| 8/10/1990 MILK | 132610 MFEQP | PALLET TRUCK | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 | NDP MFG EQUIP | D135U03169L |
| 9/19/1990 MILK | 132610 MFEQP | HYSTER LIFT TRUCK | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 | NDP MFG EQUIP | 4536L |
| 9/19/1990 MILK | 132610 MFEQP | RELOCATE MILK TANK RESIN SILO-GALLON LINE | 8,656.91 | 3,329.59 | 665.92 | 332.96 | 5,327.32 | NDP MFG EQUIP | |
| 9/15/1990 GALL | 132610 MFEQP | FERRO FIVE SERIES | 3,264.00 | 1,255.39 | 251.08 | 125.54 | 2,008.61 | NDP MFG EQUIP | |
| 9/18/1991 | 132610 MFEQP | CHARGER FERRO FIVE SERIES | 23,283.62 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | NDP MFG EQUIP | PIU91387 2 |
| 9/18/1991 | 132610 MFEQP | CHARGER FERRO FIVE SERIES | 23,283.62 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | NDP MFG EQUIP | PIU91367 3 |
| 9/16/1981 | 132610 MFEQP | CHARGER | 23,283.62 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | NDP MFG EQUIP | PIU91367 4 |
| 11/13/1991 | 132610 MFEQP | SCISSOR LIFT | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | NDP MFG EQUIP | 109121994 |
| 1/8/1992 | 132610 MFEQP | LIFT TRUCK | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | NDP MFG EQUIP | 5128M |
| 1/8/1992 | 132610 MFEQP | LIFT TRUCK | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | NDP MFG EQUIP | 5127M |
| 1/8/1992 | 132610 MFEQP | LIFT TRUCK | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | NDP MFG EQUIP | 5126M |
| 2/5/1992 | 132610 MFEQP | CANON TYPEWRITER | 89.00 | 34.23 | 6.84 | 3.42 | 54.77 | NDP MFG EQUIP | |
| 6/24/1992 | 132610 MFEQP | AUTOCLAVE | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 | NDP MFG EQUIP | |
| 6/24/1992 | 132610 MFEQP | BINOCULAR MICROSCOPE | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | NDP MFG EQUIP | |
| 4/28/1993 | 132610 MFEQP | PASTURIZER | 17,312.81 | 6,658.78 | 1,331.76 | 665.88 | 10,654.03 | NDP MFG EQUIP | |
| 4/28/1993 | 132610 MFEQP | BAGGER | 5,074.43 | 1,951.70 | 390.34 | 195.17 | 3,122.73 | NDP MFG EQUIP | |
| 4/28/1993 | 132610 MFEQP | BAGGER | 5,074.43 | 1,951.70 | 390.34 | 195.17 | 3,122.73 | NDP MFG EQUIP | |

Page 3

## SCHEDULE B
## To Asset Purc...e Agreement

### EQUIPMENT LIST

**DAIRY HAMMOND**

| Date | Category | Desc. | | Cost | Accum Depr | YTD Dep | Dep | NBV | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| 4/28/1993 | 132610 MFEQP | DE-BAGGER | | 5,074.43 | 1,951.70 | 390.34 | 195.17 | 3,122.73 NDP MFG EQUIP | |
| 4/28/1993 | 132610 MFEQP | DE-BAGGER | | 5,074.43 | 1,951.70 | 390.34 | 195.17 | 3,122.73 NDP MFG EQUIP | |
| 4/28/1993 | 132610 MFEQP | CEMENT TABLE W/ 3 BENCHES | | 42.00 | 16.16 | 3.24 | 1.62 | 25.84 NDP CAFETERIA | |
| 4/28/1993 | 132610 MFEQP | CEMENT TABLE WITH 3 BENCHES | | 42.00 | 16.16 | 3.24 | 1.62 | 25.84 NDP CAFETERIA | |
| 4/28/1993 | 132610 MFEQP | CEMENT TABLE WITH 3 BENCHES | | 42.00 | 16.16 | 3.24 | 1.62 | 25.84 NDP CAFETERIA | |
| 5/26/1993 | 132610 MFEQP | REFRACTOMETER | | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 NDP MFG EQUIP | |
| 6/30/1993 | 132610 MFEQP | AUXILIARY PANEL | | 2,492.00 | 958.47 | 191.70 | 95.85 | 1,533.53 NDP MFG EQUIP | |
| 6/2/1994 | 132610 MFEQP | ENERGY-FREE CASER | | 1,899.00 | 730.39 | 146.08 | 73.04 | 1,168.61 NDP MFG EQUIP | |
| 6/29/1994 | 132610 MFEQP | ENERGY-FREE CASER | | 1,899.00 | 730.39 | 146.08 | 73.04 | 1,168.61 NDP MFG EQUIP | |
| 9/21/1994 | 132610 MFEQP | BREAKER | | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 NDP UN ID MFG | |
| 9/21/1994 | 132610 MFEQP | BREAKER | | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 NDP UN ID MFG | |
| 9/21/1994 | 132610 MFEQP | BREAKER | | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 NDP UN ID MFG | |
| 9/21/1994 | 132610 MFEQP | TRANSFORMER | | 53.00 | 20.39 | 4.08 | 2.04 | 32.61 NDP UN ID MFG | |
| 8/21/1994 | 132610 MFEQP | BLOW MOLD TRIMMER | | 9,552.28 | 3,673.97 | 734.80 | 367.40 | 5,878.31 NDP MFG EQUIP | |
| 5/21/1994 | 132610 MFEQP | COOLING BED | | 2,492.00 | 958.47 | 191.70 | 95.85 | 1,533.53 NDP MFG EQUIP | |
| 5/21/1994 | 132610 MFEQP | ANNEAL UNIT | | 3,264.00 | 1,255.39 | 251.08 | 125.54 | 2,008.61 NDP MFG EQUIP | |
| 5/21/1994 | 132610 MFEQP | ANNEAL UNIT VACUMATIC BOTTLE | | 3,264.00 | 1,255.39 | 251.08 | 125.54 | 2,008.61 NDP MFG EQUIP | |
| 12/14/1994 | 132610 MFEQP | FILLER | | 19,104.55 | 7,347.91 | 1,469.58 | 734.79 | 11,756.65 NDP MFG EQUIP | |
| 12/14/1994 | 132610 MFEQP | DAIRY LABELER | | 949.00 | 365.00 | 73.00 | 36.50 | 584.00 NDP MFG EQUIP | |
| 12/14/1994 | 132610 MFEQP | HTST SYSTEM AND CONTROS | | 11,940.60 | 4,592.53 | 918.50 | 459.25 | 7,348.07 NDP MFG EQUIP | |
| 2/8/1995 | 132610 MFEQP | BASKET | | 2,255.00 | ~~173.46~~ | ~~92.10~~ | ~~44.68~~ | ~~657.21~~ NDP MFG EQUIP | |
| 3/8/1995 | 132610 MFEQP | FLO STATION | | 415.00 | 159.61 | 31.92 | 15.96 | 255.39 NDP MFG EQUIP | |
| 9/20/1995 | 132610 MFEQP | MILK OSCAN 50" VAPOR COMPRESSION | | 1,424.00 | 547.69 | 109.54 | 54.77 | 876.31 NDP MFG EQUIP | |
| 8/20/1995 | 132610 MFEQP | STILL | | 10,447.65 | 4,018.33 | 803.66 | 401.83 | 6,429.32 NDP MFG EQUIP | |
| 9/20/1995 | 132610 MFEQP | HEAT EXCHANGER | | 3,264.00 | 1,255.39 | 251.08 | 125.54 | 2,008.61 NDP MFG EQUIP | |
| 9/20/1995 | 132610 MFEQP | CARTRIDGE FILTER | | 356.00 | 136.93 | 27.38 | 13.69 | 219.07 NDP MFG EQUIP | |
| 9/20/1995 | 132610 MFEQP | AQUA VALVE | | 59.00 | 22.69 | 4.54 | 2.27 | 36.31 NDP MFG EQUIP | |
| 9/20/1995 | 132610 MFEQP | C/P TANK | | 475.00 | 182.69 | 36.54 | 18.27 | 292.31 NDP MFG EQUIP | |
| 10/18/1995 | 132610 MFEQP | WATER DISTILLIN UNIT OL 7000 MILK | | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 NDP MFG EQUIP | |
| 10/18/1995 | 132610 MFEQP | STANDARDINZING UN | | 5,373.22 | 2,066.63 | 413.32 | 206.66 | 3,306.59 NDP MFG EQUIP | |
| 10/18/1995 | 132610 MFEQP | FERRO CHARGER | | 23,283.62 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 NDP MFG EQUIP | IPIU855710 |

Page 4

## SCHEDULE B
## To Asset Purch ₃ Agreement

### EQUIPMENT LIST

DAIRY HAMMOND

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/15/1995 | 132610 MFEQP | MILK STANDARDIZING EQUI | 3,412.00 | 1,312.31 | 262.46 | 131.23 | 2,099.69 | NDP | MFG EQUIP | |
| 11/15/1995 | 132610 MFEQP | VAPOR COMPRESSION TWIN WATER | 14,925.50 | 5,740.58 | 1,148.12 | 574.06 | 9,184.92 | NDP | MFG EQUIP | 2621FA |
| 11/15/1995 | 132610 MFEQP | SOFTENERS FREIGHT LIFT BLOW | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 | NDP | MFG EQUIP | |
| 1/10/1996 | 132610 MFEQP | MOLD ROOM JUG STORAGE | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | NDP | MFG EQUIP | |
| 1/10/1996 | 132610 MFEQP | MEZZANNE | 4,006.00 | 770.39 | 154.08 | 77.04 | 3,235.61 | NDP | MFG STRCTR | |
| 1/10/1996 | 132610 MFEQP | MILKO SCAN | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 | NDP | MFG EQUIP | |
| 4/3/1998 | 132610 MFEQP | OREC OZONATOR UNIT | 3,115.00 | 1,198.09 | 239.62 | 119.81 | 1,916.91 | NDP | MFG EQUIP | |
| 8/18/1996 | 132610 MFEQP | CHILLER | 3,561.00 | 1,369.61 | 273.92 | 136.96 | 2,191.39 | NDP | MFG EQUIP | |
| 10/16/1996 | 132610 MFEQP | CHARGER | 297.00 | 114.23 | 22.84 | 11.42 | 182.77 | NDP | MFG EQUIP | |
| 10/16/1996 | 132610 MFEQP | BATTERY | 415.00 | 159.61 | 31.92 | 15.96 | 255.39 | NDP | MFG EQUIP | |
| 10/16/1996 | 132610 MFEQP | BATTERY | 415.00 | 159.61 | 31.92 | 15.96 | 255.39 | NDP | MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | CHILLER | 1,899.00 | 730.39 | 146.08 | 73.04 | 1,168.61 | NDP | MFG EQUIP | |
| 2/5/1997 | 132610 MFEQP | WATER SILO | 20,298.72 | 7,807.20 | 1,561.44 | 780.72 | 12,491.52 | NDP | MFG EQUIP | |
| 2/5/1997 | 132610 MFEQP | FORKLIFT | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 | NDP | MFG EQUIP | |
| 3/5/1997 | 132610 MFEQP | TESTER FOR WATER | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 | NDP | MFG EQUIP | 97011286L |
| 4/2/1997 | 132610 MFEQP | ELECTRONIC CHART RECORDER MT 3 | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 | NDP | MFG EQUIP | AB1101000001002 |
| 8/20/1997 | 132610 MFEQP | CLEAVER BROOKS BOILER | 9,851.07 | 3,788.87 | 757.78 | 378.89 | 6,062.20 | NDP | MFG EQUIP | OL096219;LX28475 |
| 8/16/1998 | 132610 MFEQP | OVERHEAD TROLLEY HOIST | 2,255.00 | 867.33 | 173.46 | 86.73 | 1,387.68 | NDP | MFG EQUIP | REPLACED |
| 8/16/1998 | 132610 MFEQP | FLOOR SCRUBBER | 1,662.00 | 639.23 | 127.84 | 63.92 | 1,022.77 | NDP | MFG EQUIP | |
| 1/6/1999 | 132610 MFEQP | REGRIND SYSTEM | 6,268.59 | 2,411.00 | 482.20 | 241.10 | 3,857.59 | NDP | MFG EQUIP | |
| 3/3/1999 | 132610 MFEQP | FIBER OPTIC CABINET | 356.00 | 91.29 | 18.26 | 9.13 | 264.71 | NDP | MFG EQUIP | |
| 3/3/1999 | 132610 MFEQP | RESKIN 20,000 MILK TANK | 17,312.81 | 4,439.18 | 887.84 | 443.92 | 12,873.63 | NDP | MFG EQUIP | |
| 4/28/1999 | 132610 MFEQP | FIBEROPTIC NETWORK SUPPORT | 6,268.59 | 1,607.32 | 321.46 | 160.73 | 4,661.27 | NDP | MFG EQUIP | 1000051111042;3219 |
| 7/19/1999 | 132610 MFEQP | KEPWARE LICENSING | 237.00 | 91.16 | 18.24 | 9.12 | 145.84 | NDP | MISC DP | |
| 5/4/2000 | 132610 MFEQP | AMMONIA RECIRCULATE PUMP | 13,731.34 | 2,640.63 | 528.12 | 264.06 | 11,090.71 | NDP | MFG EQUIP | |
| 4/27/2001 | 132610 MFEQP | ELECTRIC USAGE METER | 1,869.00 | 292.16 | 58.44 | 29.22 | 1,606.84 | NDP | MFG EQUIP | |

REMARKS

Page 5

SCHEDULE 2
To Asset Purchase Agreement

EQUIPMENT LIST

DAIRY HAMMOND

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/29/2001 | 132610 MFEQP | GALLON & 1/2 ASSEMBLY LINES | 28,656.83 | 4,408.73 | 881.74 | 440.87 | 24,248.10 | NDP | MFG EQUIP | |
| 7/31/2002 | 132610 MFEQP | NEC VT45 MULTIMEDIA PROJECTOR | 712.00 | 91.29 | 18.26 | 9.13 | 620.71 | NDP | MFG EQUIP | 2SO3567BJ |
| 8/2/2002 | 132610 MFEQP | REVERSE OSMOSIS | 46,268.44 | 5,931.85 | 1,186.35 | 593.18 | 40,336.59 | NDP | MFG EQUIP | |
| 10/31/2002 | 132610 MFEQP | DOWNTIME MONITORING SYSTEM | 1,543.00 | 197.83 | 39.56 | 19.78 | 1,345.17 | NDP | MFG EQUIP | |
| 2/10/2003 | 132610 MFEQP | MODULAR PART CABINET | 949.00 | 121.67 | 24.34 | 12.17 | 827.33 | NDP | MFG EQUIP | |
| 3/17/2003 | 132610 MFEQP | HP LASERJET 4200N PRINTER | 237.00 | 91.16 | 18.24 | 9.12 | 145.84 | NOL | PRINTER | SCNBX214754 |
| 6/16/2003 | 132610 MFEQP | MACHINE MONITORING EQUIPMENT | 5,969.80 | 656.01 | 131.20 | 65.60 | 5,313.79 | NDP | MFG EQUIP | |
| 6/16/2003 | 132610 MFEQP | CAP REPLACEMENT | 20,298.72 | 2,230.62 | 446.12 | 223.06 | 18,068.10 | NDP | MFG EQUIP | |
| 6/16/2003 | 132610 MFEQP | ONLINE UPGRADE 6 HEAD BLOWMOLD | 8,358.12 | 918.48 | 183.70 | 91.85 | 7,439.64 | NDP | MFG EQUIP | |
| 6/16/2003 | 132610 MFEQP | UPGRADE | 35,820.79 | 3,936.34 | 787.26 | 393.63 | 31,884.45 | NDP | MFG EQUIP | |
| 6/18/2003 | 132610 MFEQP | SEPARATOR PANEL | 14,925.50 | 1,640.18 | 328.04 | 164.02 | 13,285.32 | NDP | MFG EQUIP | |
| 5/26/2003 | 132610 MFEQP | HEAT EXCHANGER | 2,018.00 | 221.77 | 44.36 | 22.18 | 1,796.23 | NDP | MFG EQUIP | |
| 7/9/2003 | 132610 MFEQP | TRUE GLASS DOOR MERCHANDISER | 949.00 | 104.29 | 20.86 | 10.43 | 844.71 | | MISC | 3451707 |
| 8/5/2003 | 132610 MFEQP | 4TTP LABEL PRINTER | 326.00 | 125.40 | 25.08 | 12.54 | 200.60 | NDP | PRINTER | 1.0001E+12 |
| 8/26/2003 | 132610 MFEQP | 56X102 WD HAMMOND DAIRY SIGN | 1,662.00 | 182.63 | 38.52 | 18.26 | 1,479.37 | NDP | SIGNS | |
| 11/18/2003 | 132610 MFEQP | DOUGLAS BATTERY | 1,246.00 | 136.93 | 27.38 | 13.69 | 1,109.07 | NDP | MFG EQUIP | 30014329 |
| 11/18/2003 | 132610 MFEQP | DOUGLAS BATTERY | 1,246.00 | 136.93 | 27.38 | 13.69 | 1,109.07 | NDP | MFG EQUIP | 30014330 |
| 12/10/2003 | 132610 MFEQP | FORKLIFT | 9,253.49 | 1,016.89 | 203.38 | 101.69 | 8,236.60 | NDP | MISC | A814N02695A |
| 12/12/2003 | 132610 MFEQP | YALE FORKLIFT | 9,253.49 | 1,016.89 | 203.38 | 101.69 | 8,236.60 | NDP | MISC | A814N02700A |
| 12/12/2003 | 132610 MFEQP | YALE FORKLIFT | 9,253.49 | 1,016.89 | 203.38 | 101.69 | 8,236.60 | NDP | MISC | A814N02699A |
| 12/24/2003 | 132610 MFEQP | BATTERY | 1,068.00 | 117.37 | 23.48 | 11.74 | 950.63 | NDP | MFG EQUIP | 30034251 |
| 12/24/2003 | 132610 MFEQP | BATTERY | 1,068.00 | 117.37 | 23.48 | 11.74 | 950.63 | NDP | MFG EQUIP | 30034252 |
| 12/24/2003 | 132610 MFEQP | BATTERY | 1,068.00 | 117.37 | 23.48 | 11.74 | 950.63 | NDP | MFG EQUIP | 30034253 |
| 12/31/2003 | 132610 MFEQP | BATTERY CHARGER | 712.00 | 78.23 | 15.64 | 7.82 | 633.77 | NDP | MFG EQUIP | 30034254 |
| 1/9/2004 | 132610 MFEQP | PLATE HEAT EXCHANGER | 7,761.54 | 852.91 | 170.58 | 85.29 | 6,908.63 | HAM | MFG EQUIP | 15323 |
| 1/27/2004 | 132610 MFEQP | 3-TON ROOF-TOP A/C UNIT | 2,136.00 | 234.73 | 46.94 | 23.47 | 1,901.27 | NDP | MFG EQUIP | |
| 1/27/2004 | 132610 MFEQP | ROBOTICS | 137,311.36 | 15,089.17 | 3,017.84 | 1,508.92 | 122,222.19 | NDP | MFG EQUIP | |

Page 6

**Page 6 of 35**

## SCHEDULE B
## To Asset Purc...se Agreement

### EQUIPMENT LIST

DAIRY HAMMOND

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| 2/4/2004 | 132610 MFEQP | RELIEF VALVE INSULATION 2300N LASERJET | 80,596.28 | 8,856.73 | 1,771.34 | 885.67 | 71,739.55 | NDP MFG EQUIP | |
| 7/2/2004 | 132610 MFEQP | PRINTER/TRAY/FE AMONIA COMPRESOR | 178.00 | 45.64 | 9.12 | 4.56 | 132.36 | NOL PRINTER | CN6GH44622 |
| 7/8/2004 | 132610 MFEQP | MOTOR | 3,561.00 | 342.40 | 68.48 | 34.24 | 3,218.60 | HAM,M COMPRSRS | |
| 7/8/2004 | 132610 MFEQP | OPTIPLEX SX260 | 178.00 | 45.64 | 9.12 | 4.56 | 132.36 | NOL PC | G2KW751 |
| 12/28/2004 | 132610 MFEQP | HP LASERJET 4200N PRINTER | 237.00 | 60.79 | 12.16 | 6.08 | 176.21 | NDP PRINTER | SUSGNS0674 |
| 6/17/2005 | 132610 MFEQP | GEARBOX FOR BLOWMOLD | 5,522.11 | 471.98 | 94.40 | 47.20 | 5,050.13 | HAM,M MFG EQUIP | |
| 10/6/2005 | 132610 MFEQP | COMBUSTION ON BOILER | 2,967.00 | 253.59 | 50.72 | 25.36 | 2,713.41 | NDP MFG EQUIP | |
| 11/1/2005 | 132610 MFEQP | VIDEO JET LABELER METER MAGNETIC FLOW | 1,246.00 | 106.50 | 21.30 | 10.65 | 1,139.50 | HAM,M MFG EQUIP | 4090186 |
| 11/11/2005 | 132610 MFEQP | METER | 1,246.00 | 106.50 | 21.30 | 10.65 | 1,139.50 | HAM,M MFG EQUIP | |
| 12/11/2005 | 132610 MFEQP | FLOOR SCRUBBER | 4,006.00 | 513.59 | 102.72 | 51.36 | 3,492.41 | HAM,M MFG EQUIP | 4653 B30 |
| 12/6/2005 | 132610 MFEQP | SPRINKLER PUMP | 890.00 | 76.07 | 15.22 | 7.61 | 813.93 | NDP FLOOR MNTC | DJ2320 |
| 12/6/2005 | 132610 MFEQP | BLOWMOLD UPGRADE | 15,522.07 | 1,326.68 | 265.34 | 132.67 | 14,195.39 | NDP MFG EQUIP | |
| 3/22/2006 | 132610 MFEQP | HEAT EXCHANGER | 14,327.91 | 1,224.60 | 244.92 | 122.46 | 13,103.31 | HAM,M MFG EQUIP | |
| 4/5/2006 | 132610 MFEQP | BOILER REPLACEMENT ORANGE JUICE | 55,223.13 | 4,719.93 | 943.96 | 471.99 | 50,503.20 | HAM,M MFG EQUIP | |
| 4/25/2006 | 132610 MFEQP | CONCENTRATE PUMP | 6,567.38 | 505.18 | 101.04 | 50.52 | 6,062.20 | NDP MFG EQUIP | |
| 5/3/2006 | 132610 MFEQP | OZONE GENERATOR | 10,746.44 | 826.64 | 165.32 | 82.66 | 9,919.80 | NDP MFG EQUIP | |
| 5/4/2006 | 132610 MFEQP | VIDEO JET LABELER STAINLESS STEEL | 25,670.93 | 1,974.69 | 394.94 | 197.47 | 23,696.24 | NDP MFG EQUIP | 1231235 |
| 6/5/2006 | 132610 MFEQP | FLOOR DRAIN | 19,598.48 | 737.58 | 210.74 | 105.37 | 18,860.90 | NDP MISCELLANE | |
| 6/27/2006 | 132610 MFEQP | CIP CONTROLLER | 10,447.65 | 803.67 | 160.74 | 80.37 | 9,643.98 | NDP MFG EQUIP | |
| 8/28/2006 | 132610 MFEQP | RUN OFF CONVEYOR | 20,131.09 | 2,382.09 | 390.08 | 195.04 | 17,749.00 | NDP MFG EQUIP | |
| 10/1/2006 | 132610 MFEQP | PETRI FILM READER | 4,154.00 | 319.53 | 63.90 | 31.95 | 3,834.47 | NDP MFG EQUIP | 1052215 |
| 10/1/2006 | 132610 MFEQP | MILK CAPPER | 25,074.35 | 1,928.81 | 385.76 | 192.88 | 23,145.54 | NDP MFG EQUIP | |
| 10/1/2008 | 132610 MFEQP | AC DUCTS | 11,044.22 | 849.57 | 169.92 | 84.96 | 10,194.65 | NDP MFG EQUIP | |
| 1/15/2007 | 132610 MFEQP | DOCK LEVELERS | 32,775.00 | 2,016.94 | 504.24 | 252.12 | 30,758.06 | HAM,M LEVELERS | |
| 1/26/2007 | 132610 MFEQP | DOCK LEVELERS SIT DOWN RIDERS- | 24,530.00 | 1,509.54 | 377.38 | 188.69 | 23,020.46 | HAM,M LEVELERS | |
| 1/29/2007 | 132610 MFEQP | FORKLIFT SIT DOWN RIDERS- | 19,137.13 | 1,472.09 | 368.02 | 184.01 | 17,665.04 | HAM,M MISC | C814N01812D |
| 1/29/2007 | 132610 MFEQP | FORKLIFT | 19,137.13 | 1,472.09 | 368.02 | 184.01 | 17,665.04 | HAM,M MISC | C814N01799D |

## SCHEDULE B
### To Asset Purc...e Agreement

#### EQUIPMENT LIST

*DAIRY HAMMOND*

*SWITCHING EQUIPMENT* (handwritten)

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|
| 1/29/2007 | 132610 MFEQP | SIT DOWN RIDERS-FORKLIFT | 19,137.13 | 1,472.09 | 358.02 | 184.01 | 17,665.04 | HAM MISC   C81-N018050 |
| 1/29/2007 | 132610 MFEQP | STEPPER MOTOR LABELER | 16,660.61 | 800.99 | 320.40 | 160.20 | 15,859.62 | HAM MF DA   JN53227-1 |
| 1/31/2007 | 132610 MFEQP | REGRIND/GAGE METAL | 39,830.93 | 1,838.35 | 612.78 | 306.39 | 37,992.58 | HAM GRINDERS   43356443357 |
| 3/13/2007 | 132610 MFEQP | OMNICENTER PC CART GENERATOR | 1,118.20 | 103.21 | 34.40 | 17.20 | 1,014.99 | DP EXTERN   NOL NDP |
| 4/4/2007 | 132610 MFEQP | AIR COMPRESSOR, 100 HP | 135,185.27 | 6,239.32 | 6,183.93 | 6,185.47 | 128,945.95 | NOL NDP |
| 4/25/2007 | 132610 MFEQP | HP | 52,219.16 | 2,008.44 | 803.38 | 401.69 | 50,210.72 | HAM COMPRSRS |
| 6/6/2007 | 132610 MFEQP | HOMOGENIZER | 18,008.41 | 415.59 | 277.06 | 138.53 | 17,592.82 | HAM MFG EQUIP   NV7610 |
| 6/26/2007 | 132610 MFEQP | CROSS ARM SUPPORT | 2,929.00 | 45.42 | 45.42 | 22.71 | 2,883.58 | HAM MISC WH |
| 6/27/2007 | 132610 MFEQP | CROSS ARM SUPPORT | 7,048.00 | 109.28 | 109.28 | 54.64 | 6,938.72 | HAM MISC WH |
| | MFEQP Total | | 1,966,320.70 | 430,930.46 | 92,634.65 | 49,390.83 | 1,534,390.24 | |
| 11/16/2005 | 215510 OPLSU | STORE OPERATING LEASE | (213,471.18) | (9,659.33) | (1,931.86) | (965.93) | (203,811.85) | HAM MF DA |
| | OPLSU Total | | (213,471.18) | (9,659.33) | (1,931.86) | (965.93) | (203,811.85) | |
| 5/3/1989 | 132810 WHLHI | FABRICATED GLASSBOARD-CEILING | 119.00 | 30.51 | 6.10 | 3.05 | 88.49 | NDP CEILNGWAL |
| 5/3/1989 | 132810 WHLHI | CEILING REPAIR WORK BLOW MOLD ROOM | 24.00 | 6.16 | 1.24 | 0.62 | 17.84 | NDP CEILNGWAL |
| 9/21/1994 | 132810 WHLHI | EXPANSION OF BOTTLE STORAGE | 237.00 | 60.79 | 12.16 | 6.08 | 176.21 | NDP MISC LHI |
| 6/28/1995 | 132810 WHLHI | FABRICATED STEEL BOTTL STOR RO | 593.00 | 114.03 | 22.80 | 11.40 | 478.97 | NDP MISC LHI |
| 8/20/1995 | 132810 WHLHI | BOTTLE STORAGE ROOM | 1,662.00 | 319.61 | 63.92 | 31.96 | 1,342.39 | NDP MISC LHI |
| 10/18/1985 | 132810 WHLHI | TRIP UNIT | 9,253.49 | 1,779.52 | 355.90 | 177.95 | 7,473.97 | NDP MISC LHI |
| 10/18/1985 | 132810 WHLHI | COMPLETE BOTTLE | 326.00 | 62.69 | 12.54 | 6.27 | 263.31 | NDP ELECLIGHT |
| 1/10/1996 | 132810 WHLHI | STORAGE ROOM FLOOR DRAIN | 6,567.38 | 1,262.97 | 252.60 | 126.30 | 5,304.41 | NDP COLD ROOMS |
| 8/19/1998 | 132810 WHLHI | RESURFACE COOLER | 475.00 | 52.20 | 10.44 | 5.22 | 422.80 | NDP MISC LHI |
| 3/3/1989 | 132810 WHLHI | FLOOR PSM COMPLIANCE GALLON BLOWMOLD | 22,686.03 | 2,181.36 | 438.26 | 218.13 | 20,504.67 | NDP FLOORS |
| 3/31/1999 | 132810 WHLHI | MICROPROCESSOR | 21,491.87 | 2,066.52 | 413.30 | 206.65 | 19,425.35 | NDP MISC LHI |
| 12/16/1989 | 132810 WHLHI | DOORS | 10,746.44 | 1,033.31 | 206.68 | 103.33 | 9,713.13 | HAM MISC LHI |
| 6/27/2000 | 132810 WHLHI | | 12,537.18 | 1,071.57 | 214.32 | 107.16 | 11,465.61 | NDP MISC LHI |

Page 8

## SCHEDULE B
## To Asset Purc~ ~e Agreement

### EQUIPMENT LIST

DAIRY
HAMMOND

| | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/28/2001 | 132810 WHLHI | SUPPLY CONDENSER CATWALK RELIEF HEADER | 13,731.34 | 1,056.27 | 211.26 | 105.63 | 12,675.07 | NDP | MISC LHI | |
| 4/19/2002 | 132810 WHLHI | MODIFICATION | 8,954.69 | 626.21 | 125.24 | 62.62 | 8,328.48 | NDP | MISC LHI | |
| 4/26/2002 | 132810 WHLHI | ELECTRIC METER | 949.00 | 66.37 | 13.28 | 6.64 | 882.63 | NOL | MISC LHI | |
| 7/22/2002 | 132810 WHLHI | BLOW MOLD AC STRUCT STEEL & | 9,552.28 | 667.99 | 133.60 | 66.80 | 8,884.29 | NDP | MISC LHI | |
| 2/26/2004 | 132810 WHLHI | HYDRAULIC EQP | 8,656.91 | 554.92 | 110.98 | 55.49 | 8,101.99 | | HAMA WH STRCTR | |
| | WHLHI Total | | 128,562.61 | 13,013.00 | 2,602.60 | 1,301.30 | 115,549.61 | | | |
| | Grand Total | | 1,880,412.13 | 434,284.13 | 93,305.39 | 49,726.20 | 1,446,128.00 | | | |

CLICK ON THE **3** IN THE
UPPER LEFT CORNER
TO SEE DETAIL.
CLICK ON **1** FOR THE
GRAND TOTAL

Explanation/Additional
Description

Page 9

## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/25/1979 | 131030 BLDGS | BUILDING | 507,482.01 | 30,028.50 | 6,005.70 | 3,002.85 | 477,453.51 | TDP | BUILDINGS | |
| 4/28/1982 | 131030 BLDGS | OFFICE | 3,603.00 | 184.79 | 36.96 | 18.48 | 3,418.21 | TDP | BUILDINGS | |
| 5/26/1985 | 131030 BLDGS | STORAGE DOCK | 133,263.08 | 5,395.26 | 1,079.06 | 539.53 | 127,867.82 | TDP | BUILDINGS | |
| 6/25/1986 | 131030 BLDGS | BUILDING IMPROVEMENT | 255,925.00 | 9,843.30 | 1,968.66 | 984.33 | 246,082.30 | TDP | BUILDINGS | |
| 3/21/1983 | 131030 BLDGS | ALCOVE ROOM DOOR & CEILING PAN | 2,375.00 | 87.00 | 17.40 | 8.70 | 2,288.00 | TDP | BUILDINGS | |
| 4/27/1988 | 131030 BLDGS | TANK CORRIDOR & FOUNDATION | 25,496.89 | 933.96 | 186.80 | 93.40 | 24,562.93 | TDP | BUILDINGS | |
| 5/31/1989 | 131030 BLDGS | ENGINEERING LABOR & FEES | 6,458.73 | 225.84 | 45.16 | 22.58 | 6,232.89 | TDP | BUILDINGS | |
| 5/31/1989 | 131030 BLDGS | FEES FOR NEW ADDITION | 9,303.79 | 325.32 | 65.06 | 32.53 | 8,978.47 | TDP | BUILDINGS | |
| 5/3/1989 | 131030 BLDGS | GUTTER WORK | 1,502.00 | 52.51 | 10.50 | 5.25 | 1,449.49 | TDP | BUILDINGS | |
| 6/28/1986 | 131030 BLDGS | BAY ADDITION | 17,486.86 | 584.84 | 116.96 | 58.48 | 16,902.02 | TDP | BUILDINGS | |
| 6/26/1989 | 131030 BLDGS | BAY ADDITION | 13,637.78 | 455.11 | 91.22 | 45.61 | 13,181.67 | TDP | BUILDINGS | |
| 6/26/1989 | 131030 BLDGS | BAY ADDITION | 17,939.57 | 599.99 | 120.00 | 60.00 | 17,339.58 | TDP | BUILDINGS | |
| 6/27/1990 | 131030 BLDGS | REMODEL COSTS FOR LADIES BATHR | 409.00 | 13.11 | 2.62 | 1.31 | 395.89 | TDP | BUILDINGS | |
| 6/27/1990 | 131030 BLDGS | REMODEL COSTS FOR MEZZANINE | 1,571.00 | 50.36 | 10.08 | 5.04 | 1,520.64 | TDP | BUILDINGS | |
| 6/27/1990 | 131030 BLDGS | COST FOR MILK PLANT MODIFICATI | 33,870.09 | 1,085.60 | 217.12 | 108.56 | 32,784.49 | TDP | BUILDINGS | |
| 2/6/1991 | 131030 BLDGS | BLOWMOLD ROOM ADDITION | 39,981.74 | 1,281.48 | 256.30 | 128.15 | 38,700.26 | TDP | BUILDINGS | |
| 4/1/1992 | 131030 BLDGS | AIR CONDITIONER / | 356,835.69 | 10,979.57 | 2,195.92 | 1,097.95 | 345,856.12 | TDP | BUILDINGS | |
| 11/13/1996 | 131030 BLDGS | MILK ROOM BUILDING IMPROVEMENT- | 9,389.30 | 240.76 | 48.16 | 24.08 | 9,148.54 | TDP | BUILDINGS | |
| 12/10/1997 | 131030 BLDGS | ROOF | 12,232.35 | 303.52 | 60.70 | 30.35 | 11,928.83 | TDP | BUILDINGS | |
| 4/19/2002 | 131030 BLDGS | AMMONIA PIPING | 35,773.51 | 764.40 | 152.88 | 76.44 | 35,009.11 | TDP | BUILDINGS | |
| 5/23/2002 | 131030 BLDGS | UPGRADE RELIEF LINES | 2,411.00 | 51.51 | 10.30 | 5.15 | 2,359.49 | TDP | BUILDINGS | |
| 12/27/2002 | 131030 BLDGS | TRAINING ROOM DOORS | 1,440.00 | 30.79 | 6.16 | 3.08 | 1,409.21 | TDP | DOORS | |
| 6/5/2003 | 131030 BLDGS | FLOORING | 4,740.00 | 98.54 | 19.70 | 9.85 | 4,641.46 | TDP | FLOORS | |
| 6/5/2003 | 131030 BLDGS | CORRIDOR CEILING | 23,154.84 | 481.39 | 96.28 | 48.14 | 22,673.45 | TDP | CEILNGSWAL | |
| 6/17/2004 | 131030 BLDGS | WORM PIPE & INSULATION | 13,133.75 | 265.89 | 53.18 | 26.59 | 12,867.86 | TPA M | BUILDINGS | |
| 6/25/2004 | 131030 BLDGS | SILO PAINTING | 53,731.19 | 1,087.68 | 217.54 | 108.77 | 52,643.51 | ORL | BUILDINGS | |
| 6/28/2006 | 131030 BLDGS | PALLET FLOOR RACKS | 47,769.44 | 918.64 | 183.72 | 91.86 | 46,850.80 | TDP | BUILDINGS | |
| 9/1/2006 | 131030 BLDGS | MILK ROOM DOORS | 3,081.00 | 59.26 | 11.86 | 5.93 | 3,021.74 | TDP | DOORS | |
| 9/1/2005 | 131030 BLDGS | MILK ROOM DOORS | 2,196.00 | 42.23 | 8.44 | 4.22 | 2,153.77 | TDP | DOORS | 271840 1001 |
| 9/1/2005 | 131030 BLDGS | MILK ROOM DOORS | 2,196.00 | 42.23 | 8.44 | 4.22 | 2,153.77 | TDP | DOORS | 271840 1002 |
| 9/1/2005 | 131030 BLDGS | MILK DOORS | 2,196.00 | 42.23 | 8.44 | 4.22 | 2,153.77 | TDP | DOORS | 271840 1003 |

Page 1

SCHEDULE B
To Asset Purc[ha]se Agreement

EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/1/2006 | 131030 BLDGS | | MILK DOORS | 2,196.00 | 42.23 | 8.44 | 4.22 | 2,153.77 | TDP | DOORS | 271640/004 |
| 9/1/2006 | 131030 BLDGS | | MILK DOORS | 2,196.00 | 42.23 | 8.44 | 4.22 | 2,153.77 | TDP | DOORS | 271640/005 |
| 9/1/2006 | 131030 BLDGS | | MILK DOORS | 2,196.00 | 42.23 | 8.44 | 4.22 | 2,153.77 | TDP | DOORS | 271640/006 |
| 9/1/2006 | 131030 BLDGS | | MILK DOORS | 2,196.00 | 42.23 | 8.44 | 4.22 | 2,153.77 | TDP | DOORS | 271640/007 |
| | | BLDGS Total | | 1,649,370.21 | 66,725.53 | 13,345.08 | 6,672.54 | 1,582,644.68 | | | |
| 8/10/2001 | 131020 LNDIM | | STORM SYSTEM | - | - | - | - | - | TDP | LAND IMPRV | |
| 8/10/2001 | 131020 LNDIM | | ASPHALT SYSTEM | - | - | - | - | - | TDP | LAND IMPRV | |
| 8/10/2001 | 131020 LNDIM | | CONCRETE | - | - | - | - | - | TDP | LAND IMPRV | |
| 12/13/2005 | 131020 LNDIM | | PARKING LOT PAVING | - | - | - | - | - | TDP | PAVING | |
| | | LNDIM Total | | - | - | - | - | - | | | |
| 7/22/1970 | 132610 MFEQP | | HOIST AND TROLLEY | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | DUAL FILTER | 445.00 | 171.16 | 34.24 | 17.12 | 273.84 | TDP | MFG EQUIP | K416-2 | UPGRADE ONLY |
| 7/25/1979 | 132610 MFEQP | | RACKS | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | ELECTRIC HOIST CARRIER | 1,062.00 | 639.23 | 127.84 | 63.92 | 1,062.77 | TDP | MFG EQUIP | UPGRADE ONLY |
| 7/25/1979 | 132610 MFEQP | | SCHLUETER JET WASHER | 1,552.00 | 639.23 | 127.84 | 63.92 | 912.77 | TDP | MFG EQUIP | REPLACED |
| 7/25/1979 | 132610 MFEQP | | FEDERAL VACU MATIC FILLER | 1,246.00 | 479.23 | 95.84 | 47.92 | 766.77 | TDP | MFG EQUIP | REPLACED |
| 7/25/1979 | 132610 MFEQP | | FEDERAL VACU MATIC FILLER | 17,312.81 | 6,658.78 | 1,331.76 | 665.88 | 10,654.03 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | STORAGE TANK | 17,910.40 | 6,888.62 | 1,377.72 | 688.86 | 11,021.78 | TDP | MFG EQUIP | 150SVV79464 |
| 7/25/1979 | 132610 MFEQP | | STORAGE TANK | 8,059.33 | 3,099.75 | 619.56 | 309.98 | 4,959.58 | TDP | MFG EQUIP | 150SVV79465 |
| 7/25/1979 | 132610 MFEQP | | PROCESS AND CONTROL PANELS | 8,059.33 | 3,099.75 | 619.99 | 309.98 | 4,959.58 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | STORAGE TANK | 26,865.09 | 10,332.74 | 2,066.54 | 1,033.27 | 16,532.35 | TDP | MFG EQUIP | 100SVV79466 |
| 7/25/1979 | 132610 MFEQP | | STORAGE TANK | 6,865.17 | 2,640.43 | 528.08 | 264.04 | 4,224.74 | TDP | MFG EQUIP | 100SVV79467 |
| 7/25/1979 | 132610 MFEQP | | STORAGE TANK | 6,865.17 | 2,640.43 | 528.08 | 264.04 | 4,224.74 | TDP | MFG EQUIP | 250SVV79462 |
| 7/25/1979 | 132610 MFEQP | | STORAGE TANK | 10,148.86 | 3,903.41 | 780.68 | 390.34 | 6,245.45 | TDP | MFG EQUIP | 250SVV79463 |
| 7/25/1979 | 132610 MFEQP | | MILK TANK FITTINGS & TUBIN | 10,148.86 | 3,903.41 | 780.68 | 390.34 | 6,245.45 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | MISC FITTINGS & INSTALLAT'I | 10,447.65 | 4,018.33 | 803.66 | 401.83 | 6,429.32 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | HOOVER BLOW/MOLD MACHINE JO | 2,374.00 | 913.09 | 182.62 | 91.31 | -1,460.91 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | AIR SUPPLY REGRIND | 52,238.24 | 20,091.63 | 4,018.32 | 2,009.16 | 32,146.61 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | DUCT JO | 771.00 | 296.53 | 59.30 | 29.65 | 474.47 | TDP | MFG EQUIP | |
| 7/25/1979 | 132610 MFEQP | | CONVEYOR JO | 10,148.86 | 3,903.41 | 780.68 | 390.34 | 6,245.45 | TDP | MFG EQUIP | |
| 2/6/1980 | 132610 MFEQP | | 90 FOOT ACCUMULATION | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 | TDP | MFG EQUIP | |
| 2/6/1980 | 132610 MFEQP | | 25000 GALLON SILO TANK | 9,851.07 | 3,788.87 | 757.78 | 378.89 | 6,062.20 | TDP | MFG EQUIP | |

Page 2

SCHEDULE B
To Asset Pur‑‑se Agreement

EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/23/1980 | 132610 MFEQP | TRI CLOVER PUMP | 356.00 | 136.93 | 27.38 | 13.69 | 219.07 | TDP | MFG EQUIP | P2983 |
| 7/23/1980 | 132610 MFEQP | STEEL RACKS | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 | TDP | MFG EQUIP | |
| 2/4/1981 | 132610 MFEQP | EXHAUST FANS 2 | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | TDP | MFG EQUIP | |
| 2/4/1981 | 132610 MFEQP | BRYKOMETER BLENDER | 4,302.00 | 1,654.61 | 330.82 | 165.46 | 2,647.39 | TDP | MFG EQUIP | |
| 7/22/1981 | 132610 MFEQP | SILO STORAGE TANK | 9,283.49 | 3,589.02 | 711.80 | 355.90 | 5,694.47 | TDP | MFG EQUIP | 58 |
| 7/22/1981 | 132610 MFEQP | SILO STORAGE TANK | 9,253.49 | 3,559.02 | 711.80 | 355.90 | 5,694.47 | TDP | MFG EQUIP | 63 |
| 2/3/1982 | 132610 MFEQP | STORAGE RACKS | 949.00 | 365.00 | 73.00 | 36.50 | 584.00 | TDP | MFG EQUIP | |
| 2/3/1982 | 132610 MFEQP | AIR COMPRESSOR | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TDP | FLEET 648R | |
| 7/26/1982 | 132610 MFEQP | MILK TANK VALVES 4 | 949.00 | 365.00 | 73.00 | 36.50 | 584.00 | TDP | MFG EQUIP | 65 |
| 7/26/1982 | 132610 MFEQP | EXHAUST FAN | 85.00 | 34.23 | 6.84 | 3.42 | 54.77 | TDP | MFG EQUIP | |
| 7/26/1982 | 132610 MFEQP | MILK TANK | 9,851.07 | 3,788.87 | 757.78 | 378.89 | 6,062.20 | TDP | MFG EQUIP | |
| 2/9/1983 | 132610 MFEQP | MILK TANK | 9,851.07 | 3,788.87 | 757.78 | 378.89 | 6,062.20 | TDP | MFG EQUIP | |
| 2/9/1983 | 132610 MFEQP | LIQUID SUGAR METER | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 | TDP | MFG EQUIP | |
| | | PROCESS CONTROL | | | | | | | | 139542 |
| 2/9/1983 | 132610 MFEQP | PANELS | 1,662.00 | 639.23 | 127.84 | 63.92 | 1,022.77 | TDP | MFG EQUIP | |
| 2/5/1983 | 132610 MFEQP | LIQUID LEVEL MEASURE SYSTE | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 | TDP | MFG EQUIP | |
| 2/9/1983 | 132610 MFEQP | RITE HITE DOCK LEVELER | 564.00 | 216.93 | 43.38 | 21.69 | 347.07 | TDP | MFG EQUIP | |
| | 132610 MFEQP | | | | | | | TDP | MFG EQUIP | |
| 7/25/1984 | 132610 MFEQP | BLOWMOLD MACHINE | 77,611.38 | 28,850.52 | 5,970.10 | 2,985.05 | 47,760.86 | TDP | MFG EQUIP | 3524 |
| 7/25/1984 | 132610 MFEQP | AIR COMPRESSOR | 2,611.33 | 1,004.23 | 1,200.84 | 100.42 | 1,606.77 | TDP | MFG EQUIP | |
| 2/6/1985 | 132610 MFEQP | DOCK LEVELER | 23,283.82 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | TDP | MFG EQUIP | |
| 2/6/1985 | 132610 MFEQP | DOCK LEVELER | 23,283.82 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | TDP | MFG EQUIP | |
| 2/6/1985 | 132610 MFEQP | DOCK LEVELER | 23,283.82 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | TDP | MFG EQUIP | |
| 7/24/1985 | 132610 MFEQP | COMPRESSOR | 2,374.00 | 913.09 | 182.62 | 91.31 | 1,460.91 | TDP | MFG EQUIP | |
| 7/24/1985 | 132610 MFEQP | NEW COMPRESSER | 19,701.13 | 7,577.37 | 1,515.48 | 757.74 | 12,123.76 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | HOOKUP | 1,780.00 | 684.61 | 136.92 | 68.46 | 1,095.39 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | DOCK LEVELER | 23,283.82 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | FLOW DIVERSION VALVE | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | MILK COOLER PANEL | 1,009.00 | 388.09 | 77.62 | 38.81 | 620.91 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | WATER CHILLER | 19,104.55 | 7,347.91 | 1,469.58 | 734.79 | 11,756.65 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | OZONE MONITOR | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | DOCK SEALS | 386.00 | 148.47 | 29.70 | 14.85 | 237.53 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | HTS1 | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | BREAKER PANEL | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | TDP | MFG EQUIP | |
| 2/5/1986 | 132610 MFEQP | KING UNIT | 22,688.03 | 8,725.40 | 1,745.08 | 872.54 | 13,960.63 | TDP | MFG EQUIP | |
| 7/23/1986 | 132610 MFEQP | BALING MACHINE UNILOY BLOWMOLD | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 | TDP | MFG EQUIP | 0 |
| 7/23/1986 | 132610 MFEQP | MACHINE | 74,625.48 | 28,702.12 | 5,740.42 | 2,870.21 | 45,923.36 | TDP | MFG EQUIP | 1978 0 |

Page 3

## SCHEDULE B
### To Asset Purch : Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/23/1986 | o | 132610 MFEQP | BLOW/MOLD INSTALLATION | | | | | | | | | |
| 7/23/1986 | o | 132610 MFEQP | JO | 2,136.00 | 821.53 | 164.30 | 82.15 | 1,314.47 | TOP | MFG EQUIP | | |
| 7/23/1986 | o | 132610 MFEQP | ELECTRICAL CONTROL | 1,128.00 | 433.84 | 86.76 | 43.38 | 694.16 | TOP | MFG EQUIP | | |
| 7/23/1986 | | 132610 MFEQP | CHILLER | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 | TOP | MFG EQUIP | | |
| | | | ELECTROMAGNETIC | | | | | | | | | |
| 7/23/1986 | o | 132610 MFEQP | FLOWMETER | 2,374.00 | 913.09 | 182.62 | 91.31 | 1,460.91 | TOP | MFG EQUIP | 2214E | |
| 2/4/1987 | | 132610 MFEQP | PLATE HEAT EXCHANGER | 1,543.00 | 593.47 | 118.70 | 59.35 | 949.53 | TOP | MFG EQUIP | | |
| | | | ELECTRIC ROPE HOIST | | | | | | | | | |
| 2/4/1987 | | 132610 MFEQP | MONORA | 1,662.00 | 639.23 | 127.84 | 63.92 | 1,022.77 | TOP | MFG EQUIP | WC-087 | |
| 2/4/1987 | | 132610 MFEQP | HEAT EXCHANGER | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 | TOP | MFG EQUIP | | |
| 2/4/1987 ES | | 132610 MFEQP | MILK LINES | 2,492.00 | 958.47 | 191.70 | 95.86 | 1,533.53 | TOP | MFG EQUIP | | |
| 2/4/1987 | | 132610 MFEQP | BOTTLE CONVEYOR | 3,561.00 | 1,369.61 | 273.92 | 135.96 | 2,191.39 | TOP | MFG EQUIP | | |
| 2/4/1987 | | 132610 MFEQP | CASE CONVEYOR | 19,701.13 | 7,577.37 | 1,515.48 | 757.74 | 12,123.76 | TOP | MFG EQUIP | | |
| 2/4/1987 | | 132610 MFEQP | HEAT EXCHANGER | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 | TOP | MFG EQUIP, | | |
| 2/4/1987 | | 132610 MFEQP | DEPALLETIZER | 10,447.65 | 4,018.33 | 803.66 | 401.83 | 6,429.32 | TOP | MFG EQUIP | | |
| 2/4/1987 | | 132610 MFEQP | TOP-OUT UNSTACKER | 3,709.00 | 1,426.53 | 285.30 | 142.65 | 2,282.47 | TOP | MFG EQUIP | | |
| 2/4/1987 | | 132610 MFEQP | CASE CONVEYOR | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | TOP | MFG EQUIP | | |
| 2/4/1987 | | 132610 MFEQP | HYDRAULIC POWER UNIT | 1,365.00 | 525.00 | 105.00 | 52.50 | 840.00 | TOP | MFG EQUIP | | UPGRADE ONLY |
| 2/4/1987 | | 132610 MFEQP | ALFA LAVAL SEPARATOR | 29,849.99 | 11,480.78 | 2,296.16 | 1,148.08 | 18,369.21 | TOP | MFG EQUIP | | |
| 2/4/1987 | | 132610 MFEQP | CASE ROOM FEEDERS | 4,747.00 | 1,825.79 | 365.16 | 182.58 | 2,921.21 | TOP | MFG EQUIP | | |
| | | | WATER EQUIPMENT | | | | | | | | | |
| 1/6/1988 | | 132610 MFEQP | INSTALLATION | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 | TOP | MFG EQUIP | | |
| | | | FREIGHT ON ELECTRONIC | | | | | | | | | |
| 1/6/1988 | | 132610 MFEQP | INSTRUME | 42.00 | 16.16 | 3.24 | 1.62 | 25.84 | TOP | MFG EQUIP | | REPLACED |
| 2/3/1988 | | 132610 MFEQP | OZONE WATER TANK | | | | | | TOP | MFG EQUIP | | REPLACED |
| 2/3/1988 | | 132610 MFEQP | OZONE WATER TANK | | | | | | TOP | MFG EQUIP | | |
| 2/3/1988 | | 132610 MFEQP | SILO TANK | 18,506.97 | 7,118.08 | 1,423.52 | 711.81 | 11,388.89 | TOP | MFG EQUIP | | |
| | | | WATER TANK | | | | | | | | | |
| 3/2/1988 | | 132610 MFEQP | INSTALLATION | 53.00 | 20.39 | 4.08 | 2.04 | 32.61 | TOP | MFG EQUIP | | |
| 3/2/1988 | | 132610 MFEQP | WATER CONDITIONER | 4,302.00 | 1,654.61 | 330.92 | 165.46 | 2,647.39 | TOP | MFG EQUIP | | |
| | | | WASTE WATER SAND | | | | | | | | | |
| 3/2/1988 | | 132610 MFEQP | TRAP | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 | TOP | MFG EQUIP | | |
| | | | PROCESS TANK | | | | | | | | | |
| 3/2/1988 | | 132610 MFEQP | INSTALLATION | 4,599.00 | 1,768.84 | 353.76 | 176.88 | 2,830.16 | TOP | MFG EQUIP | | REPLACED |
| 3/2/1988 | | 132610 MFEQP | WASTE WATER SYSTEM | | | | | | TOP | MFG EQUIP | | |
| 3/2/1988 | | 132610 MFEQP | SQUARE D | 1,128.00 | 433.84 | 86.76 | 43.38 | 694.16 | TOP | MFG EQUIP | | |
| | | | WATER PLANT EXPANSION | | | | | | | | | |
| 3/30/1988 | | 132610 MFEQP | INSTALLATION DISTILLING | 771.00 | 296.53 | 59.30 | 29.65 | 474.47 | TOP | MFG EQUIP | | |
| 3/30/1988 | | 132610 MFEQP | UNIT | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 | TOP | MFG EQUIP | | |
| 3/30/1988 | | 132610 MFEQP | CABINETS/MILK LAB | 1,128.00 | 433.84 | 86.76 | 43.38 | 694.16 | TOP | MFG EQUIP | | |

Page 4

Page 13 of 35

## SCHEDULE B
## To Asset Purc___se Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/30/1988 | 132610 MFEQP | INSTALLATION OZONAT/WATER TANKS | 4,599.00 | 1,768.84 | 353.76 | 176.88 | 2,830.16 | TDP | MFG EQUIP | |
| 6/28/1988 | 132610 MFEQP | DAIRY PLANT PROCESS TANK INSTA | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 | TDP | MFG EQUIP | |
| 6/29/1988 | 132610 MFEQP | DAIRY PLANT PROCESS TANK INSTA | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 | TDP | NFG EQUIP | |
| 6/29/1988 | 132610 MFEQP | MAGNETIC FLOW METER TCM FORKLIFT MODEL | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | TDP | NFG EQUIP | |
| 11/14/1988 FKH | 132610 MFEQP | FORTS TCM FORKLIFT (FE-2515H2) | 2,957.00 | 1,141.16 | 229.24 | 114.12 | 1,825.84 | TDP | NFG EQUIP | SCRAPPED |
| 11/14/1989 FKH | 132610 MFEQP | FORTS TCM FORKLIFT (FE-2515H2) | 2,847.00 | 1,095.39 | 219.08 | 109.84 | 1,752.61 | TDP | NFG EQUIP | |
| | 132610 MFEQP | | 2,646.00 | | | | 1,760.61 | TDP | NFG EQUIP | |
| 5/3/1989 | 132610 MFEQP | INST OF SILO IMP TO EXISTING AIR SYSTEM | 890.00 | 342.31 | 68.46 | 34.23 | 547.69 | TDP | MFG EQUIP | |
| 5/3/1989 | 132610 MFEQP | SILO TANK SD-6225- | 1,749.00 | 134.53 | 26.90 | 13.45 | 1,614.47 | TDP | MFG STRCTR | |
| 5/3/1989 | 132610 MFEQP | 119/INST. | 11,641.81 | 4,477.64 | 895.52 | 447.76 | 7,164.17 | TDP | MFG EQUIP | |
| 5/3/1989 | 132610 MFEQP | LEVEL MONITOR INSTALL TYPE B LIQUID SAMPLER | 415.00 | 159.61 | 31.92 | 15.96 | 255.39 | TDP | MFG EQUIP | |
| 5/3/1989 | 132610 MFEQP | ELECTRICAL | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 | TDP | MFG EQUIP | |
| 5/3/1989 | 132610 MFEQP | INSTALLATION SILO TANK INSTALLATION | 779.00 | 59.93 | 11.98 | 5.99 | 719.07 | TDP | MFG STRCTR | |
| 6/28/1989 | 132610 MFEQP | TANKER RECEIVING BAY | 2,492.00 | 958.47 | 191.70 | 95.85 | 1,533.53 | TDP | NFG EQUIP | |
| 6/28/1989 | 132610 MFEQP | ADDITION TANKER RECEIVING BAY | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MFG EQUIP | |
| 6/28/1989 | 132610 MFEQP | ADDITION TANKER RECEIVING BAY | 297.00 | 114.23 | 22.84 | 11.42 | 182.77 | TDP | MFG EQUIP | |
| 6/28/1989 | 132610 MFEQP | ADDITION TANKER RECEIVING BAY | 1,424.00 | 547.69 | 109.54 | 54.77 | 876.31 | TDP | MFG EQUIP | |
| 6/28/1989 | 132610 MFEQP | ADDITION TANK 3 MODIFICATION | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 | TDP | MFG EQUIP | |
| 6/28/1989 | 132610 MFEQP | PROJECT PLUMBING FOR TANKER | 3,115.00 | 1,198.09 | 239.62 | 119.81 | 1,916.91 | TDP | MFG EQUIP | |
| 6/28/1989 | 132610 MFEQP | ADDITION REF. EQUIPMENT | 10,934.57 | 841.12 | 168.22 | 84.11 | 10,093.45 | TDP | MFG STRCTR | |
| 6/28/1989 | 132610 MFEQP | INSTALLATION MILK FILLER SYSTEM | 6,268.59 | 2,411.00 | 482.20 | 241.10 | 3,857.59 | TDP | MFG EQUIP | |
| 10/18/1989 | 132610 MFEQP | GWS57/3010 | 28,656.83 | 11,021.68 | 1,204.36 | 1,102.16 | 17,634.97 | TDP | MFG EQUIP | Only one on site |
| 2/7/1990 | 132610 MFEQP | LORD LABELER/PRINTER | 2,255.00 | 867.31 | 173.46 | 86.73 | 1,387.69 | TDP | MFG EQUIP | |
| 2/7/1990 | 132610 MFEQP | LORD LABELER/PRINTER | 2,255.00 | 867.31 | 173.46 | 85.78 | 1,332.69 | TDP | MFG EQUIP | |

Page 5

## SCHEDULE B
## To Asset Purch Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/7/1990 | 132610 | MFEQP | CONTINENTAL E40 CASE WASHER | 4,006.00 | 1,540.79 | 308.16 | 154.08 | 2,465.21 TDP | MFG EQUIP | |
| 6/27/1990 | 132610 | MFEQP | CASE WASHER SYSTEM | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 TDP | MFG EQUIP | |
| 6/27/1990 | 132610 | MFEQP | SILO CONSTRUCTION COSTS | 9,851.07 | 3,788.87 | 757.78 | 378.89 | 6,062.20 TDP | MFG EQUIP | |
| 6/27/1990 | 132610 | MFEQP | VERTICAL WATER STORAGE TANK | 4,451.00 | 1,711.93 | 342.38 | 171.19 | 2,739.07 TDP | MFG EQUIP | |
| 6/27/1990 | 132610 | MFEQP | EE CO COLT UNIT | 118.00 | 45.79 | 12.46 | 4.58 | GROC WH | | |
| 7/25/1990 | 132610 | MFEQP | KW BATTERY | 564.00 | 216.93 | 43.38 | 21.69 | 347.07 TDP | MFG EQUIP | CE4453 |
| 8/22/1990 FKLF | 132610 | MFEQP | TCM FORKLIFT MODEL FCB 15 H2 | | | | | | | *REPLACED* |
| 9/15/1990 | 132610 | MFEQP | K W CHARGER | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 TDP | MFG EQUIP | 74400870 |
| 9/19/1990 | 132610 | MFEQP | K W CHARGER | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 TDP | MFG EQUIP | I11008 |
| 9/19/1990 | 132610 | MFEQP | ADDITIONAL BOILER ROOM WORK | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 TDP | MFG EQUIP | I11009 |
| 11/14/1990 | 132610 | MFEQP | SPRING WATER TANK & INSTALLATI | 4,154.00 | 1,597.69 | 319.54 | 159.77 | 2,556.31 TDP | MFG EQUIP | |
| 11/14/1990 | 132610 | MFEQP | HYSTER MDE40XL LIFT | 11,343.02 | 4,362.70 | 872.54 | 436.27 | 6,980.32 TDP | MFG EQUIP | |
| 12/12/1990 | 132610 | MFEQP | TRCK-GL111 | 3,412.00 | 1,312.31 | 262.46 | 131.23 | 2,099.69 TDP | GROC WH | 13325L |
| 2/6/1991 | 132610 | MFEQP | 75H.P. AIR COMPRESSOR | 5,820.90 | 2,338.81 | 447.76 | 223.88 | 3,482.09 TDP | MFG EQUIP | |
| 5/1/1991 | 132610 | MFEQP | HOMELITE PUMP | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 TDP | GROC WH | |
| 6/26/1991 | 132610 | MFEQP | FILTER SYSTEM | 2,374.00 | 913.09 | 182.62 | 91.31 | 1,460.91 TDP | MFG EQUIP | |
| 1/13/1991 | 132610 | MFEQP | PLATES & RAILS FOR HTST | 12,537.18 | 4,822.00 | 964.40 | 482.20 | 7,715.18 TDP | MFG EQUIP | |
| 1/8/1992 | 132610 | MFEQP | BOTTLE FILLING LINE | 65,670.78 | 25,257.98 | 5,051.60 | 2,525.80 | 40,412.80 TDP | MFG EQUIP | |
| 4/1/1992 | 132610 | MFEQP | FILLING LINE | 31,342.94 | 12,054.98 | 2,411.00 | 1,205.50 | 19,287.96 TDP | MFG EQUIP | |
| 4/28/1992 | 132610 | MFEQP | PROCESSING ADDITION | 15,724.29 | 1,209.58 | 241.92 | 120.96 | 14,514.71 TDP | MFG STRCTR | |
| 5/27/1992 | 132610 | MFEQP | COP TANK | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 TDP | MFG EQUIP | |
| 8/19/1992 | 132610 | MFEQP | BATTERY CHRGR 12 CELL C&D 042 | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 TDP | GROC WH | GPU924058 |
| 8/18/1992 | 132610 | MFEQP | BATTERY CHRGR 12 CELL C&D 043 | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 TDP | GROC WH | GPU924094 |
| 11/11/1992 | 132610 | MFEQP | OZONE GENERATOR | 1,543.00 | 593.47 | 118.70 | 59.35 | 949.53 TDP | MFG EQUIP | |
| 3/3/1993 | 132610 | MFEQP | LABELING MACHINE | 2,374.00 | 913.09 | 182.62 | 91.31 | 1,460.91 TDP | MFG EQUIP | |
| 3/3/1993 | 132610 | MFEQP | PIPING VALVES | 15,522.07 | 5,970.03 | 1,194.00 | 597.00 | 9,552.04 TDP | MFG EQUIP | |
| 3/31/1993 | 132610 | MFEQP | REGRIND SYSTEM | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 TDP | MFG EQUIP | |
| 6/30/1993 | 132610 | MFEQP | SHED | 564.00 | 216.63 | 43.38 | 21.69 | 347.07 TDP | MFG EQUIP | |
| 7/28/1993 | 132610 | MFEQP | WATER BOOSTER PUMP PROPELLED ARTICUL | 3,709.00 | 1,426.53 | 285.30 | 142.65 | 2,282.47 TDP | MFG EQUIP | |
| 8/25/1993 | 132610 | MFEQP | MANLIFT | 5,074.43 | 1,951.70 | 390.34 | 195.17 | 3,122.73 TDP | GMD WHSE | |

## SCHEDULE B
### To Asset Purchase Agreement

EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/17/1993 | 132610 | MFEQP | MODEL IH-10L ULTRAVIOLET LIGHT | 2,136.00 | 821.53 | 164.30 | 82.15 | 1,314.47 | TOP | MFG STRCTR | |
| 1/12/1994 | 132610 | MFEQP | AMONIA CONDENSER | 7,761.54 | 2,985.21 | 597.04 | 288.52 | 4,776.33 | TOP | MFG EQUIP | |
| 3/8/1994 | 132610 | MFEQP | PAVING FOR PALLET STORAGE | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | TOP | MFG EQUIP | |
| 4/6/1994 | 132610 | MFEQP | PAVING | 47.00 | 18.09 | 3.62 | 1.81 | 28.91 | TOP | MFG EQUIP | |
| 4/6/1994 | 132610 | MFEQP | JUICE REFRACTOMETER | 2,967.00 | 1,141.16 | 228.24 | 114.12 | 1,825.84 | TOP | MFG EQUIP | |
| 5/4/1994 | 132610 | MFEQP | BALER | 1,246.00 | 305.03 | 95.84 | 47.92 | 766.77 | TOP | MFG EQUIP | |
| 5/4/1994 | 132610 | MFEQP | 1885F23 BATTERY | 504.00 | 193.84 | 38.76 | 19.38 | 310.16 | TOP | MFG EQUIP | XD461221 |
| 5/4/1994 | 132610 | MFEQP | 1885F23 BATTERY | 504.00 | 193.84 | 38.76 | 19.38 | 310.16 | TOP | MFG EQUIP | XD461222 |
| 5/4/1994 | 132610 | MFEQP | 1885F23 BATTERY | 504.00 | 193.84 | 38.76 | 19.38 | 310.16 | TOP | MFG EQUIP | XD461223 |
| 5/4/1994 | 132610 | MFEQP | LIFE PLUS CHARGER | 584.00 | 216.93 | 43.38 | 21.69 | 347.07 | TOP | MFG EQUIP | L04101 |
| 5/4/1994 | 132610 | MFEQP | LIFE PLUS CHARGER | 584.00 | 216.93 | 43.38 | 21.69 | 347.07 | TOP | MFG EQUIP | M14705 |
| 6/29/1994 FKLF | 132610 | MFEQP | HYSTER E 40XL FORK LIFT | 23,283.62 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | TOP | MFG EQUIP | C108V2152R-64844 |
| 6/29/1994 | 132610 | MFEQP | ANNEALING UNIT | 5,223.32 | 2,008.98 | 401.80 | 200.90 | 3,214.34 | TOP | MFG STRCTR | |
| 6/29/1994 | 132610 | MFEQP | BALER | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | TOP | MFG EQUIP | |
| 6/29/1994 | 132610 | MFEQP | MILK CASE INVERTERS | 1,780.00 | 684.61 | 136.92 | 68.46 | 1,095.39 | TOP | MFG STRCTR | |
| 10/19/1994 | 132610 | MFEQP | BOTTLE ELEVATOR | 3,115.00 | 1,198.09 | 239.62 | 119.81 | 1,916.91 | TOP | MFG EQUIP | ~~REPLACED~~ |
| 11/16/1994 | 132610 | MFEQP | COOLER FLOOR | 10,447.65 | 4,018.33 | 803.66 | 401.83 | 6,429.32 | TOP | MFG EQUIP | |
| 4/5/1995 | 132610 | MFEQP | SEWAGE EFFLUENT | 948.00 | 365.00 | 73.00 | 36.50 | 584.00 | TOP | MFG EQUIP | |
| 5/3/1995 | 132610 | MFEQP | CIP SYSTEM | 15,522.07 | 5,970.03 | 1,194.00 | 597.00 | 9,552.04 | TOP | MFG EQUIP | ~~REPLACED~~ |
| 6/28/1995 | 132610 | MFEQP | BAGGER AUTOMATIC BOTTLE | 7,163.96 | 2,755.38 | 551.08 | 275.54 | 4,408.58 | TOP | MFG EQUIP | |
| 6/28/1995 | 132610 | MFEQP | BLOWER EFFLUENT TANK | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 | TOP | MFG EQUIP | |
| 6/28/1995 BLOW | 132610 | MFEQP | PLASTIC RESIN STORAGE SILO | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 | TOP | MFG EQUIP | |
| 7/26/1995 | 132610 | MFEQP | BLOW MOLD | 9,253.49 | 3,559.02 | 711.80 | 355.90 | 5,694.47 | TOP | MFG EQUIP | |
| 9/20/1995 | 132610 | MFEQP | AIR CONDITIONER | 11,940.60 | 4,592.53 | 918.50 | 459.25 | 7,346.07 | TOP | MFG ENVRN | |
| 8/20/1995 | 132610 | MFEQP | INGREDIENT FEEDER3474 27681-8 | 13,133.75 | 5,051.42 | 1,010.28 | 505.14 | 8,082.33 | TOP | MFG EQUIP | |
| 10/18/1995 | 132610 | MFEQP | BATTERY CHARGER 24CELL C&D 853 | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TOP | PERISH WH | IPIU555510 |
| 10/18/1995 | 132610 | MFEQP | BATTERY CHARGER 24CELL C&D 853 | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TOP | PERISH WH | IPIU555511 |
| 10/18/1995 | 132610 | MFEQP | BATTERY CHARGER 24CELL C&D 854 | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TOP | PERISH WH | IPIU555512 |
| 12/31/1995 | 132610 | MFEQP | MILKO SCAN | 12,537.18 | 4,822.00 | 964.40 | 482.20 | 7,715.18 | TOP | MFG EQUIP | |
| 5/1/1996 | 132610 | MFEQP | FIFTH WHEEL | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 | TOP | MFG EQUIP | |

11513

## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

Page 8

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/26/1996 | 132610 MFEQP | PREMIUM JUICE LINE | 238,802.93 | 91,847.27 | 18,869.46 | 9,184.73 | 146,955.66 | TDP | MFG EQUIP | |
| 6/26/1996 BLOW | 132610 MFEQP | SILO TRANSFER SYSTEM | 534.00 | 205.39 | 41.08 | 20.54 | 328.61 | ASD | MFG EQUIP | |
| 8/21/1996 | 132610 MFEQP | KELVINATOR FREEZER | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 | TDP | MFG EQUIP | |
| | | PROCESS SAFETY | | | | | | | | |
| 9/18/1996 | 132610 MFEQP | MANAGEMENT | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 | TDP | MFG EQUIP | |
| 1/8/1997 | 132610 MFEQP | FORKLIFT BATTERY | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MFG EQUIP | |
| 1/8/1997 | 132610 MFEQP | FORKLIFT BATTERY | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MFG EQUIP | |
| 1/8/1997 | 132610 MFEQP | FORKLIFT BATTERY | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MFG EQUIP | |
| 1/8/1997 | 132610 MFEQP | FORKLIFT BATTERY | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MFG EQUIP | |
| 1/8/1997 | 132610 MFEQP | CHARGER | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MFG EQUIP | |
| 1/8/1997 | 132610 MFEQP | CHARGER | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MFG EQUIP | |
| 2/5/1997 | 132610 MFEQP | YALE FORKLIFT | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 | TDP | MFG EQUIP | |
| 2/5/1997 | 132610 MFEQP | YALE FORKLIFT | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 | TDP | MFG EQUIP | E108V0731BU |
| 2/5/1997 | 132610 MFEQP | YALE FORKLIFT | 2,848.00 | 1,095.39 | 219.08 | 109.54 | 1,752.61 | TDP | MFG EQUIP | E108V0732ZU |
| 2/5/1997 | 4125 | PIPE THREADER | 148.00 | 56.92 | 11.38 | 5.69 | 91.08 | TDP | MAINT DEPT | E108V05314T |
| 3/5/1997 | 132610 MFEQP | ORANGE JUICE TESTER | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TDP | MFG EQUIP | |
| 6/25/1997 | 132610 MFEQP | BLOW MOLD MACHINE | 122,386.87 | 47,071.87 | 9,414.38 | 4,707.19 | 75,315.00 | TDP | MFG EQUIP | |
| 6/25/1997 | 132610 MFEQP | ANNEALING UNIT | 3,264.00 | 1,255.39 | 251.08 | 125.54 | 2,008.61 | TDP | MFG EQUIP | |
| 6/25/1997 | 132610 MFEQP | LEAK DETECTOR | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | TDP | MFG EQUIP | |
| 6/25/1997 | 132610 MFEQP | DAIRY MOLDS | 4,886.00 | 1,883.09 | 376.62 | 188.31 | 3,012.91 | TDP | MFG EQUIP | |
| | | HOBART CHAMPION | | | | | | | | |
| 7/23/1997 | 132610 MFEQP | WELDER | 386.00 | 148.47 | 29.70 | 14.85 | 237.53 | TDP | MAINT DEPT | |
| 8/20/1997 | 132610 MFEQP | PROTABLE CONVEYOR FOR WATER | 2,492.00 | 958.47 | 191.70 | 95.85 | 1,533.53 | TDP | MFG EQUIP | |
| 10/15/1997 | 132610 MFEQP | FERRO FIVE FR SERIES BATTERY C | 297.00 | 114.22 | 22.84 | 11.42 | 182.78 | TDP | MISC WH | GPI-974460 |
| 10/15/1997 | 132610 MFEQP | FERRO FIVE FR SERIES BATTERY C | 297.00 | 114.22 | 22.84 | 11.42 | 182.78 | TDP | MISC WH | GPI-974461 |
| 10/15/1997 | 132610 MFEQP | FERRO FIVE FR SERIES BATTERY C | 297.00 | 114.22 | 22.84 | 11.42 | 182.78 | TDP | MISC WH | GPI-974462 |
| 10/15/1997 | 132610 MFEQP | FERRO FIVE FR SERIES BATTERY C | 297.00 | 114.22 | 22.84 | 11.42 | 182.78 | TDP | MISC WH | GPI-974463 |
| 10/15/1997 | 132610 MFEQP | BATTERY 12CELL C&D 85M | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TDP | GROC WH | 7H11888 |
| 10/15/1997 | 132610 MFEQP | BATTERY 12CELL C&D 104M | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TDP | GROC WH | 7H11889 |
| 10/15/1997 | 132610 MFEQP | LINCOLN WELDER | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TDP | MAINT DEPT | U197d0b4031 |
| 1/7/1998 | 132610 MFEQP | YALE FORKLIFT APS 362 IN LINE | 3,115.00 | 1,198.09 | 239.62 | 119.81 | 1,916.91 | TDP | MFG EQUIP | E108V05215T |
| 5/27/1998 | 132610 MFEQP | MONITORING SYS | 11,940.60 | 4,592.53 | 918.50 | 459.25 | 7,348.07 | TDP | MFG EQUIP | |

## SCHEDULE B
### To Asset Purc... e Agreement

#### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | | Desc. | Cost | Accum Depr | YTD Dep | Dep | NEW | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/24/1998 | 132610 | MFEQP | AIR DRYER | 2,450.00 | 958.47 | 151.70 | 35.85 | 1,533.53 TDP | MFG EQUIP | |
| 6/24/1998 | 132610 | MFEQP | MIST ELIMINATOR | 890.00 | 342.31 | 68.46 | 34.23 | 547.69 TDP | MFG EQUIP | |
| 6/24/1998 | 132610 | MFEQP | ROLLING LADDER | 59.00 | 22.69 | 4.54 | 2.27 | 36.31 TDP | MAINT DEPT | |
| 8/19/1998 | 132610 | MFEQP | FORKLIFT BATTERIES | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 TDP | MFG EQUIP | HDH 827255 |
| 8/19/1998 | 132610 | MFEQP | FORKLIFT BATTERIES | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 TDP | MFG EQUIP | EPD 822615 |
| 8/19/1998 | 132610 | MFEQP | FORKLIFT BATTERIES | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 TDP | MFG EQUIP | XE 680870 |
| 8/19/1998 | 132610 | MFEQP | FORKLIFT BATTERIES | 831.00 | 319.61 | 63.92 | 31.96 | 511.39 TDP | MFG EQUIP | XF462443 |
| 8/19/1998 | 132610 | MFEQP | TIME CLOCK SYSTEM | 2,848.00 | 1,094.39 | 219.08 | 109.54 | 1,752.61 TDP | MFG EQUIP | XF462442 |
| 8/19/1998 | 132610 | MFEQP | GLYCOL PLATE CHILLER | 10,447.65 | 4,018.33 | 803.66 | 401.83 | 6,429.32 TDP | MFG EQUIP | *REPLACED* |
| 8/19/1998 | 132610 | MFEQP | BATTERY | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 TDP | MFG EQUIP | EPD822615 |
| 8/19/1998 | 132610 | MFEQP | BATTERY | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 TDP | MFG EQUIP | EPD822616 |
| 2/3/1999 | 132610 | MFEQP | SILO AMMONIA HEADERS | 7,761.54 | 2,985.21 | 597.04 | 298.52 | 4,776.33 TDP | MFG EQUIP | |
| 2/3/1999 | 132610 | MFEQP | SILO & AMMONIA HEADERS | 7,761.54 | 2,985.21 | 597.04 | 298.52 | 4,776.33 TDP | MFG EQUIP | |
| 3/31/1999 | 132610 | MFEQP | PH WASTEWATER MONITORING | 6,865.17 | 1,760.31 | 352.06 | 176.03 | 5,104.86 TDP | MFG ENVIRN | |
| 6/30/1999 | 132610 | MFEQP | JUICE HTST CONTROL PANEL | 12,537.18 | 3,214.67 | 642.94 | 321.47 | 9,322.51 TDP | MFG EQUIP | |
| 9/14/1999 | 132610 | MFEQP | WHITE WALL MOUNT CABINET | 119.00 | 45.79 | 9.16 | 4.58 | 73.21 TDP | MISC DP | |
| 10/20/1999 | 132610 | MFEQP | SCISSOR LIFT | 1,128.00 | 289.22 | 57.84 | 28.92 | 838.78 TDP | MISC WH | |
| 3/23/2000 | 132610 | MFEQP | PSM PROJECT | 62,685.80 | 12,054.98 | 2,411.00 | 1,205.50 | 50,630.90 TDP | MFG EQUIP | |
| 5/11/2000 | 132610 | MFEQP | AMMONIA CONDENSER | 24,477.78 | 4,707.27 | 941.46 | 470.73 | 19,770.51 TDP | MFG EQUIP | |
| | 132610 | MFEQP | CASER,HOIST,& | | | | | | | *REPLACED* |
| 6/28/2000 | 132610 | MFEQP | COMPLIANCE FAT & GREASE SEPERATION | 6,865.17 | 1,320.22 | 264.04 | 132.02 | 5,544.95 TDP | MFG EQUIP | |
| 6/28/2000 | 132610 | MFEQP | ELECTRIC PALLET JACKS | 11,343.00 | 2,181.36 | 436.26 | 218.13 | 9,161.66 TDP | MFG EQUIP | |
| 6/28/2000 | 132610 | MFEQP | METAL DETECTOR | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 TDP | PALLETJACK | P465-0178482SFA |
| 6/28/2000 | 132610 | MFEQP | DUAL BACKFLOW PREVENTOR | 5,969.80 | 1,148.03 | 229.60 | 114.80 | 4,821.77 TDP | MFG EQUIP | |
| 10/9/2000 | 132610 | MFEQP | ORANGE JUICE COLORIMETER | 4,451.00 | 855.97 | 171.20 | 85.60 | 3,595.03 TDP | MISC | |
| 5/2/2001 | 132610 | MFEQP | AMMONIA SILO PIPING | 6,288.59 | 864.40 | 192.86 | 96.44 | 5,304.19 TDP | MFG EQUIP | |
| 5/24/2001 | 132610 | MFEQP | CASE WASHER | 80,113.00 | 12,325.19 | 2,465.18 | 1,232.59 | 67,787.81 TDP | MFG EQUIP | |
| 6/21/2001 | 132610 | MFEQP | SINGLE PALLET JACK | 29,848.99 | 4,592.31 | 918.46 | 459.23 | 25,257.68 TDP | MFG EQUIP | |
| 11/1/2001 | 132610 | MFEQP | CROWN#110P SINGLE PALLET JACK | 1,187.00 | 456.53 | 91.30 | 45.65 | 730.47 TDP | PALLETJACK | 6A193777 |
| 11/1/2001 | 132610 | MFEQP | CROWN#111P | 1,187.00 | 456.54 | 91.30 | 45.65 | 730.46 TDP | PALLETJACK | 6A193778 |

Page 9

## SCHEDULE B
## To Asset Purc    se Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

Handwritten notes: CARTS RELATED TO COSTCO PROMOTION, NEW LEASED. Carts sold.

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/7/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 10/7/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 10/7/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 10/7/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 10/28/2002 | 132610 MFEQP | BLOWMOLD CHILLER | 77,611.20 | 9,950.18 | 1,990.04 | 995.02 | 67,661.20 | TOP | MFG EQUIP | |
| 11/13/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/13/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/13/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/13/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/13/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/13/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/13/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/15/2002 | 132610 MFEQP | REPLACEMENT/CAP. WATER FILTER | 5,820.90 | 746.26 | 149.26 | 74.63 | 5,074.62 | TOP | MFG EQUIP | |
| 11/15/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/15/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/15/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 11/15/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TOP | MFG EQUIP | |

Page 10

# SCHEDULE B
## To Asset Purc...e Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TDP | 717 | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TDP | 719 | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TDP | 725 | |
| 12/12/2002 | 132610 MFEQP | BOSSY CART | 237.00 | 30.39 | 6.08 | 3.04 | 206.61 | TDP | 729 | |
| 4/18/2003 | 132610 MFEQP | LATITUDE C610 LAPTOP | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | TDP | | LAPTOP | 9KN8P21 |
| 4/21/2003 | 132610 MFEQP | LATITUDE C610 LAPTOP | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | TDP | | LAPTOP | H3XM4P21 |
| 5/14/2003 | 132610 MFEQP | HP COLOR LASERJET 4600N | 267.00 | 102.70 | 20.54 | 10.27 | 164.30 | TDP | | PRINTER | JPCKF32366 |
| 5/16/2003 | 132610 MFEQP | HP LASERJET 4200DTN | 267.00 | 102.70 | 20.54 | 10.27 | 164.30 | TDP | | PRINTER | CNDXA05120 |
| 5/16/2003 | 132610 MFEQP | HP LASERJET 4200DTN PRINTER | 267.00 | 102.70 | 20.54 | 10.27 | 164.30 | TDP | | PRINTER | CNDXA05115 |
| 5/23/2003 | 132610 MFEQP | EZ GO GOLF CART | 534.00 | 58.69 | 11.74 | 5.87 | 475.31 | TDP | | MISC WH | H2896-96415 |
| 6/5/2003 | 132610 MFEQP | ROOD TOP UNIT DOORS | 4,088.00 | 314.47 | 62.90 | 31.45 | 3,773.53 | TDP | | DOORS | |
| 6/17/2003 | 132610 MFEQP | MILK HTST PLATES | 14,925.50 | 1,640.18 | 328.04 | 164.00 | 13,285.32 | TDP | | TIC | |
| 6/17/2003 | 132610 MFEQP | JUICE HTST PLATES | 8,059.33 | 885.64 | 177.12 | 88.56 | 7,173.69 | TDP | | MFG EQUIP | |
| 6/17/2003 | 132610 MFEQP | COMPRESSED AIR DELIVERY SYSTEM | 29,253.41 | 3,214.67 | 642.94 | 321.47 | 26,038.74 | TDP | | MFG EQUIP | |
| 6/17/2003 | 132610 MFEQP | CAP REPLACEMENT | 35,820.79 | 3,936.34 | 767.26 | 393.63 | 31,884.45 | TDP | | MFG EQUIP | |
| 6/18/2003 | 132610 MFEQP | RECEIVER RE-CERTIFICATION | 10,746.44 | 1,180.93 | 236.18 | 118.09 | 9,565.51 | TDP | | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 762 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 765 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 766 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 767 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 768 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 769 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 770 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 771 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 772 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 773 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 774 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 775 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 776 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 777 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 778 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | 779 | MFG EQUIP | |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | | MFG EQUIP | |

Page 11

## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 758 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 758 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 768 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 784 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 785 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 786 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 787 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 788 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 789 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 790 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 791 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 792 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 793 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 794 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 795 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 796 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 797 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 798 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | 799 |
| 6/25/2003 | 132610 MFEQP | BOSSY CART | 267.00 | 29.33 | 5.86 | 2.93 | 237.67 | TDP | MFG EQUIP | |
| 6/26/2003 | 132610 MFEQP | IBM P4 PC | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 | TDP | PC | |
| 6/26/2003 | 132610 MFEQP | MECO DISTILLING UNIT | 128,358.66 | 14,105.12 | 2,821.02 | 1,410.51 | 114,251.54 | TDP | PC | KLWTWEK |
| 7/1/2003 | 132610 MFEQP | DOWNTIME MONITOR | 1,246.00 | 136.93 | 27.38 | 13.69 | 1,109.07 | TDP | MFG EQUIP | |
| 7/1/2003 | 132610 MFEQP | CASE HANDLING EQP | 220,892.53 | 24,273.89 | 4,854.78 | 2,427.39 | 196,618.64 | TDP | MFG EQUIP | |
| | | REENGINEERING TURNING | | | | | | | | |
| 7/1/2003 | 132610 MFEQP | FILLER 2 | 14,327.91 | 1,574.49 | 314.90 | 157.45 | 12,753.42 | TDP | MFG EQUIP | |
| 7/15/2003 | 132610 MFEQP | 8500 POWER METER | 2,374.00 | 260.89 | 52.18 | 26.09 | 2,113.11 | TDP | MFG EQUIP | PR-0306A031-02 |
| 7/15/2003 | 132610 MFEQP | 8400 POWER METER | 1,662.00 | 182.63 | 36.52 | 18.26 | 1,479.37 | TDP | MFG EQUIP | PR-0306A031-02 |
| 9/2/2003 | 132610 MFEQP | LANTRIX DS100 | 749.00 | | | | | | | |
| 9/17/2003 | 132610 MFEQP | PORTABLE MIX STATION | 10,746.44 | 1,180.83 | 236.18 | 118.09 | 9,565.61 | TDP | MISC | 7092 |
| 10/23/2003 | 132610 MFEQP | PORTABLE MIX STATION | 1,187.00 | 130.43 | 26.08 | 13.04 | 1,056.57 | ORL | MISC | 7092 |
| | | CASER LINE #4 MILK | | | | | | | | |
| 11/5/2003 | 132610 MFEQP | | 14,327.91 | 1,574.49 | 314.70 | 67.45 | 12,753.42 | TDP | MFG EQUIP | *REPLACED* |
| 1/26/2004 | 132610 MFEQP | OPTIPLEX SX260 | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 | TDP | PC | HT20041 |
| 2/5/2004 | 132610 MFEQP | PALLET JACK | 2,374.00 | 608.71 | 121.74 | 60.87 | 1,765.29 | TDP | PALLET/JACK | 6A21952 |
| 2/5/2004 | 132610 MFEQP | PALLET JACK | 2,374.00 | 608.71 | 121.74 | 60.87 | 1,765.29 | TDP | PALLET/JACK | 6A21953 |
| 2/5/2004 | 132610 MFEQP | PALLET JACK | 2,374.00 | 608.71 | 121.74 | 60.87 | 1,765.29 | TDP | PALLET/JACK | 6A21955 |
| 2/5/2004 | 132610 MFEQP | PALLET JACK | 2,374.00 | 608.71 | 121.74 | 60.87 | 1,765.29 | TDP | PALLET/JACK | 6A21956 |
| 2/23/2004 | 132610 MFEQP | CONDENSER | 50,745.28 | 5,576.39 | 1,115.28 | 557.64 | 45,168.89 | TDP | MFG EQUIP | |
| 2/24/2004 | 132610 MFEQP | OZONE GENERATOR | 25,074.35 | 2,755.41 | 551.08 | 275.54 | 22,318.94 | TDP | GENERATOR | 201804 |

Page 12

**Page 21 of 35**

## SCHEDULE B
## To Asset Purc[has]e Agreement

### EQUIPMENT LIST

DAIRY PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/5/2004 | 132610 MFEQP | 1-PORT T1/FRACTIONAL T1 | 297.00 | 57.11 | 11.42 | 5.71 | 239.89 | ORL | MISC DP | |
| 4/12/2004 | 132610 MFEQP | CHEMICAL LINES | 16,119.66 | 1,549.99 | 310.00 | 155.00 | 14,569.67 | ORL | MISC | |
| 5/14/2004 | 132610 MFEQP | UPDATE SEPARATOR CONTROLS | 11,343.02 | 1,090.68 | 218.14 | 109.07 | 10,252.34 | TDP | MISC | |
| 7/16/2004 | 132610 MFEQP | OPTIPLEX SX260 | 178.00 | 45.64 | 9.12 | 4.56 | 132.36 | TDP | PC | 39V9951 |
| 7/16/2004 | 132610 MFEQP | OPTIPLEX SX260 | 178.00 | 45.64 | 9.12 | 4.56 | 132.36 | TDP | PC | 78V9951 |
| 7/16/2004 | 132610 MFEQP | OPTIPLEX SX260 | 178.00 | 45.64 | 9.12 | 4.56 | 132.36 | TDP | PC | 89V9951 |
| 5/1/2004 | 132610 MFEQP | ROUTER W/T3 NETWORK MODULE | 1,187.00 | 304.37 | 60.88 | 30.44 | 882.63 | ORL | ROUTER | |
| 12/2/2004 | 132610 MFEQP | HP LASERJET 4200TN PRINTER | 237.00 | 60.79 | 12.16 | 6.08 | 176.21 | TDP | PRINTER | SUSGNV62044 |
| 12/26/2004 | 132610 MFEQP | HP LASERJET 4200N PRINTER | 237.00 | 60.79 | 12.16 | 6.08 | 176.21 | TDF | PRINTER, | SUSGN56G581 |
| 12/28/2004 | 132610 MFEQP | PRINTER | 237.00 | 60.79 | 12.16 | 6.08 | 176.21 | TDP | PRINTER | SUSGNX61276 |
| 1/7/2005 | 132610 MFEQP | OPTIPLEX GX270 | 208.00 | 53.34 | 10.66 | 5.33 | 154.66 | TDP | PC | H57AJ61 |
| 3/4/2005 | 132610 MFEQP | OPTIPLEX GX270 | 208.00 | 53.34 | 10.66 | 5.33 | 154.66 | TDP | PC | 1TT4J61 |
| | | AIR COMPRESSOR | 31,342.94 | 3,013.75 | 602.74 | 301.37 | 28,329.19 | TDP | COMPRSRS | 003-18501 |
| 4/30/2005 | 132610 MFEQP | MILKROOM PENTHOUSE COIL | 40,297.64 | 3,099.82 | 619.96 | 309.98 | 37,197.82 | TDP | COILS | |
| 6/28/2005 | 132610 MFEQP | DOCK LEVELERS & DOCK SEALS | 13,133.75 | 1,122.53 | 224.50 | 112.25 | 12,011.22 | TDP | MISC WH | |
| 6/28/2005 | | DOCK LEVELERS & DOCK SEALS | 148.00 | 12.64 | 2.52 | 1.26 | 135.36 | TDP | MISC WH | |
| 6/28/2005 | | ELECTRICAL CONTROLS | 5,969.80 | 510.24 | 102.04 | 51.02 | 5,459.56 | TDP | MISC WH | |
| 6/28/2005 | | ELECTRICAL CONTROLS | 25,074.35 | 2,143.10 | 428.62 | 214.31 | 22,931.25 | TDP | MISC WH | |
| 6/28/2005 | | REPIPE CIP SYSTEM | 5,969.80 | 510.24 | 102.04 | 51.02 | 5,459.56 | TDP | MISC WH | |
| 6/28/2005 | | REPIPE CIP SYSTEM | 6,865.17 | 586.77 | 117.36 | 58.68 | 6,278.40 | TDP | MISC WH | |
| 6/28/2005 | | REPIPE CIP SYSTEM | 49,253.34 | 4,209.69 | 841.94 | 420.97 | 45,043.65 | TDP | MISC WH | |
| 6/28/2005 | | INSTALL STAINLESS STEEL | 16,716.24 | 1,428.75 | 285.74 | 142.87 | 15,287.49 | TDP | MISC WH | |
| 6/28/2005 | 132610 MFEQP | FD LIN | 13,731.34 | 1,173.62 | 234.72 | 117.36 | 12,557.72 | TDP | MISC WH | |
| 6/28/2005 | 132610 MFEQP | AIR COMPRESSOR | 35,820.79 | 3,061.61 | 612.32 | 306.16 | 32,759.16 | TDP | MISC WH | |
| 6/28/2005 | 132610 MFEQP | AIR COMPRESSORS | 31,342.94 | 2,678.90 | 535.78 | 267.89 | 28,664.04 | TDP | MISC WH | |
| 9/1/2005 | 132610 MFEQP | DRIVE UNIT FOR CONVEYOR SYS | 1,662.00 | 142.06 | 28.42 | 14.21 | 1,519.94 | TDP | MFG EQUIP | |
| 3/3/2006 | 132610 MFEQP | WATER FILTER | 3,115.00 | 266.23 | 53.24 | 26.62 | 2,848.77 | TDP | MFG EQUIP | |
| 4/12/2006 | 132610 MFEQP | BATTERY CHARGING RACK | 2,255.00 | 173.47 | 34.70 | 17.35 | 2,081.53 | TDP | MFG EQUIP | |
| 5/3/2006 | 132610 MFEQP | BOILER STACK | 3,264.00 | 251.09 | 50.22 | 25.11 | 3,012.91 | TDP | MFG EQUIP | |

Page 13

## SCHEDULE B
## To Asset Purc...se Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/3/2006 | 132610 MFEQP | BOILER STACK | 3,264.00 | 251.09 | 50.22 | 25.11 | 3,012.91 | TDP | MFG EQUIP | |
| 6/15/2006 | 132610 MFEQP | FILLER #1 GALLON 266L | 7,163.96 | 551.09 | 110.22 | 55.11 | 6,612.87 | TDP | MFG EQUIP | |
| 6/15/2006 | 132610 MFEQP | FILL#2 GALLON 266R MILK | | | | | | | | |
| 6/15/2006 | 132610 MFEQP | CAPPER | 6,865.17 | 528.11 | 105.62 | 52.81 | 6,337.06 | TDP | MFG EQUIP | |
| 6/15/2006 | 132610 MFEQP | FILL#2 HALF GAL 266R | | | | | | | | |
| 6/15/2006 | 132610 MFEQP | MILK CAP | 6,865.17 | 528.11 | 105.62 | 52.81 | 6,337.06 | TDP | MFG EQUIP | |
| 6/15/2006 | 132610 MFEQP | FILL#2 GALLN 3010R MILK | | | | | | | | |
| 6/15/2006 | 132610 MFEQP | CAPPER | 8,059.33 | 619.96 | 124.00 | 62.00 | 7,439.37 | TDP | MFG EQUIP | REPLACED |
| 6/28/2006 | 132610 MFEQP | VIDEO JET PRINTER | | | 101.08 | 215.00 | | | | |
| 6/28/2006 | 132610 MFEQP | VIDEO JET PRINTER | 6,567.38 | 1,010.38 | 202.08 | 101.04 | 5,557.00 | TDP | PRINTER | |
| 6/28/2006 | 132610 MFEQP | VIDEO JET PRINTER | 6,567.38 | 1,010.38 | 202.08 | 101.04 | 5,557.00 | TDP | PRINTER | |
| 6/28/2006 | 132610 MFEQP | VIDEO JET PRINTER | 6,567.38 | 1,010.38 | 202.08 | 101.04 | 5,557.00 | TDP | PRINTER | |
| 6/28/2006 | 132610 MFEQP | REDUNDANT HOUSE | | | | | | | | |
| 6/28/2006 | 132610 MFEQP | FILTER | 12,537.18 | 964.40 | 192.88 | 96.44 | 11,572.78 | TDP | MFG EQUIP | |
| 6/28/2006 | 132610 MFEQP | DOCK LEVELER | 23,283.62 | 1,791.04 | 358.20 | 179.10 | 21,492.58 | TDP | MFG EQUIP | 10223131 |
| 6/28/2006 | 132610 MFEQP | DOCK LEVELER | 23,283.62 | 1,791.04 | 358.20 | 179.10 | 21,492.58 | TDP | MFG EQUIP | 10223132 |
| 6/28/2006 | 132610 MFEQP | DOCK LEVELER | 23,283.62 | 1,791.04 | 358.20 | 179.10 | 21,492.58 | TDP | MFG EQUIP | 10223133 |
| 6/28/2006 | 132610 MFEQP | DOCK LEVELER | 23,283.62 | 1,791.04 | 358.20 | 179.10 | 21,492.58 | TDP | MFG EQUIP | 10223134 |
| 6/28/2006 | 132610 MFEQP | DOCK LEVELER | 23,283.62 | 1,791.04 | 358.20 | 179.10 | 21,492.58 | TDP | MFG EQUIP | 10223135 |
| 6/28/2006 | 132610 MFEQP | DOCK LEVELER | 23,283.62 | 1,791.04 | 358.20 | 179.10 | 21,492.58 | TDP | MFG EQUIP | 10223136 |
| 6/28/2006 | 132610 MFEQP | VIDEO JET PRINTER | 4,154.00 | 639.09 | 127.82 | 63.91 | 3,514.91 | TDP | PRINTER | |
| 6/28/2006 | 132610 MFEQP | VIDEO JET LABELERS | 4,154.00 | 639.09 | 127.82 | 63.91 | 3,514.91 | TDP | PRINTER | UPH60701168 |
| 8/24/2006 | 132610 MFEQP | AMMONIA COMPRESSOR | 129,833.71 | 4,993.60 | 1,697.44 | 988.72 | 124,840.11 | TDP | COMPRESS | UPH60701169 |
| 9/18/2006 | 132610 MFEQP | Waste Water Treatment | 173,568.54 | 23,365.00 | 6,675.72 | 3,337.86 | 150,203.54 | ORL | MFG ENVRN | |
| 10/1/2006 | 132610 MFEQP | CRYOSCOPE | 3,867.00 | 296.69 | 59.34 | 29.67 | 3,560.31 | TDP | MFG EQUIP | MODEL -250 |
| 10/1/2006 | 132610 MFEQP | PETRI FILM READER | 4,154.00 | 319.53 | 63.90 | 31.95 | 3,834.47 | TDP | MFG EQUIP | |
| 10/1/2006 | 132610 MFEQP | AIR CONDITIONER | 3,709.00 | 285.31 | 57.06 | 28.53 | 3,423.69 | TDP | MFG ENVRN | 50TM-016-611YA |
| 10/1/2006 | 132610 MFEQP | LID | | | | | | | | |
| 10/8/2006 | 132610 MFEQP | UNSCRAMBLER/FEEDER | 26,362.07 | 2,420.10 | 509.40 | 254.70 | 23,941.97 | ORL | MISC | RU-569-2 |
| 11/1/2006 | 132610 MFEQP | Buttarfat Controller | 110,626.68 | 7,446.03 | 2,127.44 | 1,063.72 | 103,180.65 | ORL | UN ID MFG | |
| 1/11/2007 | 132610 MFEQP | Slide Caser | 99,319.14 | 5,987.87 | 1,517.58 | 758.79 | 93,331.27 | ORL | UN ID MFG | |
| 1/24/2007 | 132610 MFEQP | DOUGLAS 18-75/85-17 | 2,563.60 | 157.76 | 39.44 | 19.72 | 2,405.84 | TDP | BATTERIES | 60057968 |
| 1/24/2007 | 132610 MFEQP | DOUGLAS 18-75/85-17 | 2,563.60 | 157.76 | 39.44 | 19.72 | 2,405.84 | TDP | BATTERIES | 60057969 |
| 1/24/2007 | 132610 MFEQP | DOUGLAS 18-75/85-17 | 2,563.61 | 157.76 | 39.44 | 19.72 | 2,405.85 | TDP | BATTERIES | 60057870 |
| 1/24/2007 | 132610 MFEQP | DOUGLAS 18-75/85-17 | 2,563.61 | 157.76 | 39.44 | 19.72 | 2,405.85 | TDP | BATTERIES | 60057871 |
| 1/30/2007 | 132610 MFEQP | XEROX COPIER- AR-M350N | 1,244.85 | 76.61 | 19.16 | 9.58 | 1,168.24 | TDP | COPIERS | 26509524 |

Page 14

## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

DAIRY
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2007 | 132610 MFEQP | CANNON JR 40DS COPIER | 610.69 | 37.59 | | 4.70 | 573.10 | TDP | COPIERS | NQG17081 |
| 2/3/2007 | 132610 MFEQP | FORKLIFTS BATTERY | 2,563.80 | 197.20 | 49.30 | 24.65 | 2,366.40 | TDP | MISC | 66055845 |
| 2/8/2007 | 132610 MFEQP | FORKLIFT | 19,583.14 | 1,054.48 | 301.28 | 150.64 | 18,528.66 | TPA.MI MFG EQUIP | F114N01779E |
| 2/8/2007 | 132610 MFEQP | FORKLIFT | 19,583.14 | 1,054.48 | 301.28 | 150.64 | 18,528.66 | TPA.MI MFG EQUIP | F114N01781E |
| 2/8/2007 | 132610 MFEQP | FORKLIFT | 19,583.14 | 1,054.48 | 301.28 | 150.64 | 18,528.66 | TPA.MI MFG EQUIP | F114N01782E |
| 2/8/2007 | 132610 MFEQP | FORKLIFT | 19,583.14 | 1,054.48 | 301.28 | 150.64 | 18,528.66 | TPA.MI MFG EQUIP | F114N00770E |
| 2/8/2007 | 132610 MFEQP | FORKLIFT | 19,583.14 | 1,054.48 | 301.28 | 150.64 | 18,528.66 | TPA.MI MFG EQUIP | F114N01767E |
| 2/8/2007 | 132610 MFEQP | FORKLIFT | 19,583.14 | 1,054.48 | 301.28 | 150.64 | 18,528.66 | TPA.MI MFG EQUIP | F114N01780E |
| 2/8/2007 | 132610 MFEQP | FORKLIFT | 19,583.14 | 1,054.48 | 301.28 | 150.64 | 18,528.66 | TPA.MI MFG EQUIP | F114N01766E |
| 3/9/2007 | 132610 MFEQP | U.V. Sterilizer | 13,998.13 | 646.07 | 215.36 | 107.68 | 13,352.06 | TDP | MFG EQUIP | F114N01768E |
| 4/4/2007 | 132610 MFEQP | Condenser Installation | 103,490.00 | 11,941.15 | 3,980.38 | 1,990.19 | 91,548.85 | TDP | INSTALL |  |
| 5/2/2007 | 132610 MFEQP | Generator | 96,998.60 | 4,476.85 | 1,492.28 | 746.14 | 92,521.75 | TPA.MI MFG EQUIP |  |  |
| 5/2/2007 | 132610 MFEQP | BLOWM/OLD DRIVE | 28,801.15 | 1,107.74 | 443.10 | 221.55 | 27,693.41 | TDP | MFG EQUIP |  |
| 5/22/2007 | 132610 MFEQP | 3 LABELERS | 38,178.80 | 1,468.41 | 587.38 | 293.68 | 36,710.39 | TDP | MFG EQUIP |  |
| 5/22/2007 | 132610 MFEQP | UV STERILIZER | 3,520.34 | 135.40 | 54.16 | 27.08 | 3,384.94 | TDP | MFG EQUIP |  |
| 5/25/2007 | 132610 MFEQP | Jib Crane 02EQ0106507 | 17,166.05 | 528.19 | 264.10 | 132.05 | 16,637.86 | TDP | MFG EQUIP |  |
| 6/21/2007 | 132610 MFEQP | Sping Water Silo 12LH08407 | 56,370.17 | 1,300.86 | 867.24 | 433.62 | 55,069.31 | TPA.MI MFG EQUIP |  |  |
|  | MFEQP Total |  | 4,233,763.11 | 873,904.10 | 183,118.82 | 91,559.41 | 3,359,859.01 |  |  |  |
| 11/24/1999 | 132110 TRCTR | 1999 CAPACITY YARD TRACTOR | 17,312.81 | 6,658.78 | 1,331.76 | 665.88 | 10,654.03 | TDP | TRACTORS | 4LMBB213XL011586 |
|  | TRCTR Total |  | 37,013.94 | 14,236.15 | 2,847.24 | 1,423.62 | 22,777.79 |  |  |  |
| 7/27/1983 | 132140 TRLRS | GREAT DANE TRAILER | 1,365.00 | 525.00 | 105.00 | -52.50 | 840.00 | TDP | TRAILERS |  |
| 7/26/1995 | 132140 TRLRS | 41s SUPER II 30 MAX AIR CONDITIONE | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | TDP | TRAILERS | GA90250S066148 |
|  | TRLRS Total |  | 3,383.00 | 1,301.16 | 260.24 | 130.12 | 2,081.84 |  |  |  |
|  | Grand Total |  | 5,923,530.26 | 956,166.94 | 199,571.38 | 99,783.69 | 4,967,363.32 |  |  |  |

CLICK ON THE 3 IN THE
UPPER LEFT CORNER TO
SEE DETAIL
CLICK ON 1 FOR THE
GRAND TOTAL

*SwiTchinG EquiP*

Page 15

## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

ICE CREAM
PLANT CITY

| Date | Category | | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/5/1975 | 131030 | BLDGS | FACTORY BUILDING | 369,204.86 | 35,500.47 | 7,100.10 | 3,550.05 | 333,704.39 | TIC | BUILDINGS |
| 2/6/1980 | 131030 | BLDGS | BUILDING | 14,982.84 | 886.56 | 177.32 | 88.66 | 14,096.28 | TIC | BUILDINGS |
| 6/25/1986 | 131030 | BLDGS | IMPROVEMENT ROOF OVER FOR | 15,681.03 | 603.11 | 120.62 | 60.31 | 15,077.92 | TIC | BUILDINGS |
| 5/3/1989 | 131030 | BLDGS | BAY ADDITION REMODEL COSTS | 58,579.26 | 2,048.23 | 409.64 | 204.82 | 56,531.03 | TIC | BUILDINGS |
| 6/27/1990 | 131030 | BLDGS | FOR LAB. COST FOR ICE CREAM | 1,135.00 | 36.39 | 7.28 | 3.64 | 1,098.61 | TIC | BUILDINGS |
| 6/27/1990 | 131030 | BLDGS | LABORATORY AIR CONDITIONER / | 22,181.00 | 710.92 | 142.18 | 71.09 | 21,470.08 | TIC | BUILDINGS |
| 11/13/1996 | 131030 | BLDGS | SUPERBRAND ICE CREAM PLANT | 7,821.90 | 200.57 | 40.12 | 20.06 | 7,621.33 | TIC | BUILDINGS |
| 4/2/1997 | 131030 | BLDGS | EXPANSION | 998,285.00 | 24,771.33 | 4,954.26 | 2,477.13 | 973,513.67 | TIC | BUILDINGS |
| 3/23/2000 | 131030 | BLDGS | PSM PROJECT | 56,348.88 | 1,274.86 | 254.98 | 127.49 | 55,074.02 | TIC | BUILDINGS |
| 1/17/2002 | 131030 | BLDGS | AMMONIA PIPING UPGRADE RELIEF | 30,135.70 | 662.32 | 132.46 | 66.23 | 29,473.38 | TIC | BUILDINGS |
| 5/23/2002 | 131030 | BLDGS | LINES | 7,880.25 | 168.40 | 33.68 | 16.84 | 7,711.85 | TIC | BUILDINGS |
| | **BLDGS Total** | | | 1,582,235.72 | 66,863.16 | 13,372.64 | 6,686.32 | 1,515,372.56 | | |
| 2/5/1975 | 131010 | LAND | LAND | 776,109.77 | - | - | - | 776,109.77 | TPA | LAND |
| 2/3/1982 | 131010 | LAND | LAND | - | - | - | - | - | TPA | LAND |
| 7/23/1986 | 131010 | LAND | LAND | - | - | - | - | - | TPA | LAND |
| | **LAND Total** | | | 776,109.77 | | | | 776,109.77 | | |
| 2/5/1975 | 131020 | LNDIM | LAND IMPROVEMENTS | | | | | | TIC | LAND IMPRV |
| 12/15/1982 | 131020 | LNDIM | EMPLOYEE PARKING/ENTRANCE | - | - | - | - | - | TIC | LAND IMPRV |
| 1/7/1987 | 131020 | LNDIM | STORM RETENTION POND | - | - | - | - | - | TIC | LAND IMPRV |
| | **LNDIM Total** | | | | | | | | | |
| 2/9/1972 | 132610 | MFEQP | PROCESS PIPING | 28,059.25 | 10,792.02 | 2,158.40 | 1,079.20 | 17,267.23 | TIC | MFG EQUIP |
| 2/9/1972 | 132610 | MFEQP | POWER FEED WIRING | 13,731.34 | 5,281.29 | 1,066.26 | 528.13 | 8,450.05 | TIC | MFG EQUIP |
| 2/9/1972 | 132610 | MFEQP | RAIL FRAMING & MISC | 7,462.75 | 2,870.30 | 574.06 | 287.03 | 4,592.45 | TIC | MFG EQUIP |
| 2/7/1973 | 132610 | MFEQP | EQUIPMENT FOUNDATIONS | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | TIC | MFG EQUIP |

## SCHEDULE B
## To Asset Purc se Agreement

### EQUIPMENT LIST

ICE CREAM
PLANT CITY

| | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| 2/7/1973 | 132610 MFEQP | CONDENSER PLATFORM | 6,865.17 | 2,640.43 | 528.08 | 264.04 | 4,224.74 TIC | MFG EQUIP | |
| 7/24/1974 | 132610 MFEQP | FREEZER 33 D 241 | 22,686.03 | 8,725.40 | 1,745.08 | 872.54 | 13,960.63 TIC | MFG EQUIP | 5677 |
| 7/24/1974 | 132610 MFEQP | MIXING AND PROCESSING ROOM 2-COMPARTMENT | 23,283.62 | 8,955.23 | 1,761.04 | 895.52 | 14,328.39 TIC | MFG EQUIP | 929 |
| 7/24/1974 | 132610 MFEQP | SOLUTION TAN LEVELMATIC BAL | 1,543.00 | 593.47 | 118.70 | 59.35 | 949.53 TIC | MFG EQUIP | |
| 7/24/1974 | 132610 MFEQP | TANK 8418-5 JET WASHER AND | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 TIC | MFG EQUIP | |
| 7/24/1974 | 132610 MFEQP | SS WASH TAN | 2,374.00 | 913.09 | 182.62 | 91.31 | 1,460.91 TIC | MFG EQUIP | |
| 7/24/1974 | 132610 MFEQP | SILO TANK SVW-6000 | 4,747.00 | 1,825.79 | 365.16 | 182.58 | 2,921.21 TIC | MFG EQUIP | |
| 7/24/1974 | 132610 MFEQP | SILO TANK SVW-6000 ACCESSORIES FOR | 4,747.00 | 1,825.79 | 365.16 | 182.58 | 2,921.21 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | SILO TANK SHELVING RACKS | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | SILO TANK PARTS PLUS INSTA | 15,522.07 | 5,970.03 | 1,194.00 | 597.00 | 9,552.04 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | 3 PARSHALL FLUME /2 TIMERS | 8,358.12 | 3,214.67 | 642.94 | 321.47 | 5,143.45 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | PARTS FOR CREPACO | 475.00 | 182.69 | 36.54 | 18.27 | 292.31 TIC | MFG EQUIP | 7412A336OJ |
| 2/5/1975 | 132610 MFEQP | HARDENER CREPACO PLATE | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | HARDENER 35 CONTACTOR- | 38,805.69 | 14,925.28 | 2,985.06 | 1,492.53 | 23,880.41 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | SWITCH & 5-L45BY STEAM BOILER | 237.00 | 91.16 | 18.24 | 9.12 | 145.84 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | CB700-200 | 6,865.17 | 2,640.43 | 528.08 | 264.04 | 4,224.74 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | GUARD POSTS PORTABLE DOCK | 534.00 | 205.39 | 41.08 | 20.54 | 328.61 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | LIGHTS & WIR DOCK LEVELERS | 445.00 | 171.16 | 34.24 | 17.12 | 273.84 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | AND PITS DOOR SEALS | 1,543.00 | 593.47 | 118.70 | 59.35 | 949.53 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | CABINETS AND | 504.00 | 193.84 | 38.76 | 19.38 | 310.16 TIC | MFG EQUIP | |
| 2/5/1975 | 132610 MFEQP | LOCKERS | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 TIC | MFG EQUIP | |

Page 2

## SCHEDULE B
## To Asset Pur...se Agreement

### EQUIPMENT LIST

ICE CREAM
PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| 2/5/1975 | 132610 MFEQP | RAILROAD TANKER UNLOADING ELEVATED | 6,567.38 | 2,525.92 | 505.18 | 252.59 | 4,041.46 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | INGREDIENT TANK D &REFRIG E | 2,967.00 | 1,141.16 | 228.24 | 114.12 | 1,825.84 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | ICE CREAM FREEZER FACILITY | 298,503.91 | 114,809.17 | 22,961.84 | 11,480.92 | 183,694.74 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | PROCESSING PIT SANITATION | 4,154.00 | 1,597.69 | 319.54 | 159.77 | 2,556.31 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | SYSTEMS & EQUIP PROCESS PIPING | 3,115.00 | 1,198.09 | 239.62 | 119.81 | 1,916.91 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | SYSTEMS PROCESS | 38,805.69 | 14,925.28 | 2,985.06 | 1,492.53 | 23,880.41 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | ELEC.EQUIP & CONNE PROCESS WASTE | 74,625.48 | 28,702.12 | 5,740.42 | 2,870.21 | 45,923.36 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | SYSTEM PROCESS | 20,298.72 | 7,807.20 | 1,561.44 | 780.72 | 12,491.52 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | VENTILATION SYSTEM MILK TANKER | 14,925.50 | 5,740.58 | 1,148.12 | 574.06 | 9,184.92 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | UNLOADING STAT | 21,491.87 | 8,266.10 | 1,653.22 | 826.61 | 13,225.77 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | SUB-STRUCTURE | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | SUPER-STRUCTURE | 1,365.00 | 525.00 | 105.00 | 52.50 | 840.00 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | ROOF COVER | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | ELECTRICAL | 534.00 | 205.39 | 41.08 | 20.54 | 328.61 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | LIFT TRUCK RAMP | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | INGREDIENT DELIVERY ACCESS | 2,848.00 | 1,095.39 | 219.08 | 109.64 | 1,752.61 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | PROCESS GAS MAIN TRUCK PARKING | 5,223.32 | 2,008.98 | 401.80 | 200.90 | 3,214.34 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | AREA-CONCRET RAILROAD SIDING | 1,128.00 | 433.88 | 86.76 | 43.38 | 694.16 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | PROCESS WASTE SYSTEM | 11,940.60 | 4,592.53 | 918.50 | 459.25 | 7,348.07 | TIC | MFG EQUIP |
| 2/5/1975 | 132610 MFEQP | DRILL PRESS W/ CONTROLS | 4,154.00 | 1,597.69 | 319.54 | 159.77 | 2,556.31 | TIC | MFG EQUIP |
| 7/23/1975 | 132610 MFEQP | FLOAT ACTUATED | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 | TIC | MFG EQUIP 15-495 |
| 7/23/1975 | 132610 MFEQP | FLOWMETER | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 | TIC | MFG EQUIP J-2 |

SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

Column group header over YTD Dep: **ICE CREAM PLANT CITY**

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| 2/4/1976 | 132610 MFEQP | INLET FOR VOGT FREEZER | 178.00 | 68.47 | 13.70 | 6.85 | 109.53 TIC | MFG EQUIP | |
| 2/8/1978 | 132610 MFEQP | WATER CHILLER | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 TIC | MFG EQUIP | |
| 2/8/1978 | 132610 MFEQP | CONTROL PANE SOUTH BEND LATHE CREPACO | 1,365.00 | 525.00 | 105.00 | 52.50 | 840.00 TIC | MFG EQUIP | |
| 2/8/1978 | 132610 MFEQP | TANK/INSTALLATION 50 TON PRESS | 4,599.00 | 1,768.84 | 353.76 | 176.88 | 2,830.16 TIC | MFG EQUIP | |
| 2/7/1979 | 132610 MFEQP | GIRTON CAN WASHER | 326.00 | 125.39 | 25.08 | 12.54 | 200.61 TIC | MFG EQUIP | |
| 2/6/1980 | 132610 MFEQP | FRUCTOSE SYSTEM | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 TIC | MFG EQUIP | |
| 2/6/1980 | 132610 MFEQP | CORN SYRUP VESSEL | 3,857.00 | 1,483.47 | 296.70 | 148.35 | 2,373.53 TIC | MFG EQUIP | |
| 2/6/1980 | 132610 MFEQP | SIGN | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 TIC | MFG EQUIP | |
| 7/23/1980 | 132610 MFEQP | LIQUID CONTROL METER | 415.00 | 159.61 | 31.92 | 15.96 | 255.39 TIC | MFG EQUIP | |
| 7/23/1980 | 132610 MFEQP | INGREDIENT FEEDER | 5,074.43 | 1,951.70 | 390.34 | 195.17 | 3,122.73 TIC | MFG EQUIP | |
| 2/3/1982 | 132610 MFEQP | FERRO CHARGER | 23,283.62 | 8,855.23 | 1,791.04 | 895.52 | 14,328.39 TIC | MFG EQUIP | P1U812176 |
| 7/28/1982 | 132610 MFEQP | EXHAUST FAN CLARK | 89.00 | 34.23 | 6.84 | 3.42 | 54.77 TIC | MFG EQUIP | |
| 7/27/1983 | 132610 MFEQP | POWERWORKER | 1,187.00 | 456.53 | 91.30 | 45.65 | 730.47 TIC | MFG EQUIP | P4650522-S031FA |
| 2/8/1984 | 132610 MFEQP | SQUARE D 3 | 445.00 | 171.15 | 34.24 | 17.12 | 273.84 TIC | MFG EQUIP | |
| 2/8/1984 | 132610 MFEQP | SQUARE D 2 | 119.00 | 45.79 | 9.16 | 4.58 | 73.21 TIC | MFG EQUIP | |
| 2/8/1984 | 132610 MFEQP | SQUARE D 1 BOOSTER | 89.00 | 34.23 | 6.84 | 3.42 | 54.77 TIC | MFG EQUIP | |
| 7/25/1984 | 132610 MFEQP | AMERIO ICE CREAM PROD LINE | 9,253.49 | 3,559.02 | 711.80 | 355.90 | 5,694.47 TIC | MFG EQUIP | |
| 7/25/1984 | 132610 MFEQP | CREPACO FREEZER 3 COMPARTMENT | 71,640.58 | 27,554.07 | 5,510.82 | 2,755.41 | 44,086.51 TIC | MFG EQUIP | |
| 7/25/1984 | 132610 MFEQP | TANK | 71,640.58 | 27,554.07 | 5,510.82 | 2,755.41 | 44,086.51 TIC | MFG EQUIP | |
| 7/25/1984 | 132610 MFEQP | COMPRESSOR | 7,462.75 | 2,670.30 | 574.06 | 287.03 | 4,592.45 TIC | MFG EQUIP | |
| 7/25/1984 | 132610 MFEQP | SQUARE D CREPACO | 2,848.00 | 1,095.39- | 219.08 | 109.54 | 1,752.61 TIC | MFG EQUIP | |
| 2/6/1985 | 132610 MFEQP | INGREDIENT FEEDER | 89.00 | 34.23 | 6.84 | 3.42 | 54.77 TIC | MFG EQUIP | |
| 2/6/1985 | 132610 MFEQP | ICE CREAM RERUN SYSTEM | 5,223.32 | 2,008.98 | 401.60 | 200.90 | 3,214.34 TIC | MFG EQUIP | |
| 2/6/1985 | 132610 MFEQP | COMPRESSOR | 8,954.69 | 3,444.12 | 688.82 | 344.41 | 5,510.57 TIC | MFG EQUIP | |
| 7/24/1985 | 132610 MFEQP | PANEL | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 TIC | MFG EQUIP | |
| 7/24/1985 | 132610 MFEQP | BATTERY CHARGER | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 TIC | MFG EQUIP | FC3868 |

Page 4

**SCHEDULE B**
To Asset Pu⎯ase Agreement

EQUIPMENT LIST

ICE CREAM PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/24/1985 | 132610 MFEQP | BATTERY CHARGER | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 TIC | MFG EQUIP FC3869 | | SCRAPPED |
| ~~7/24/1985 FL~~ | ~~132610 MFEQP~~ | ~~MITSUBISHI FORKLIFT TRUCK~~ | ~~3,145.00~~ | ~~1,150.00~~ | ~~239.52~~ | ~~119.81~~ | | | | 6952 |
| 7/24/1985 | 132610 MFEQP | CENTRIFUGAL PUMP APV 2500 GPH PLATE AND FRA | 267.00 | 102.69 | 20.54 | 10.27 | 164.31 TIC | MFG EQUIP | | |
| 2/5/1986 | 132610 MFEQP | HEAT EXCHANGER | 8,656.91 | 3,329.59 | 665.92 | 332.96 | 5,327.32 TIC | MFG EQUIP | | |
| 2/5/1986 | 132610 MFEQP | KING UNIT | 6,567.38 | 2,525.92 | 505.18 | 252.59 | 4,041.46 TIC | MFG EQUIP | | |
| 7/23/1986 | 132610 MFEQP | 3000 GALLON TANK | 44,775.49 | 17,221.37 | 3,444.28 | 1,722.14 | 27,554.12 TIC | MFG EQUIP | | |
| 7/23/1986 0 | 132610 MFEQP | 3000 GALLON TANK | 7,163.96 | 2,755.38 | 551.08 | 275.54 | 4,408.58 TIC | MFG EQUIP | | |
| 7/23/1986 0 | 132610 MFEQP | 3000 GAL TANK | 7,163.96 | 2,755.38 | 551.08 | 275.54 | 4,408.58 TIC | MFG EQUIP | | |
| 7/23/1986 0 | 132610 MFEQP | 3000 GAL TANK | 1,365.00 | 525.00 | 105.00 | 52.50 | 840.00 TIC | MFG EQUIP | | |
| 7/23/1986 0 | 132610 MFEQP | BATCHING TANKS | 1,365.00 | 525.00 | 105.00 | 52.50 | 840.00 TIC | MFG EQUIP | | |
| 6/28/1988 | 132610 MFEQP | VCR-TRAINING | 356.00 | 136.93 | 27.38 | 13.69 | 219.07 TIC | MFG EQUIP | | |
| | 132610 MFEQP | CIP TEMP. | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 TIC | UN ID MFG | | |
| 5/3/1989 | 132610 MFEQP | CONTROLLERS IMPROVEMENT TO | 13,069.37 | 1,005.33 | 201.06 | 100.53 | 12,064.04 TIC | MFG STRCTR | | |
| 5/3/1989 | 132610 MFEQP | SANITATION SYST INSTALL CONDUIT | 2,374.00 | 913.09 | 182.62 | 91.31 | 1,460.91 TIC | MFG ENVRN | | |
| 5/3/1989 | 132610 MFEQP | TO PANEL INSTALL REF. | 148.00 | 56.93 | 11.38 | 5.69 | 91.07 TIC | MFG EQUIP | | |
| 5/3/1989 | 132610 MFEQP | EQUIPMENT | 29,253.41 | 11,251.31 | 2,250.26 | 1,125.13 | 18,002.10 TIC | MFG EQUIP | | |
| 5/3/1989 | 132610 MFEQP | LABOR & MATERIALS FOR MP 2100 HOOK UP CIP | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 TIC | MFG EQUIP | | |
| 5/3/1989 | 132610 MFEQP | SYSTEM REF. EQUIPMENT | 3,709.00 | 1,426.53 | 285.30 | 142.65 | 2,282.47 TIC | MFG EQUIP | | |
| 5/3/1989 | 132610 MFEQP | INSTALLATION ELECTRICAL | 2,136.00 | 821.53 | 164.30 | 82.15 | 1,314.47 TIC | MFG STRCTR | | |
| 5/31/1989 | 132610 MFEQP | INSTALLATION COMPLETE WORK IN ICE CREAM ROO | 2,348.00 | 180.61 | 36.12 | 18.06 | 2,167.39 TIC | MFG STRCTR | | |
| 5/31/1989 | 132610 MFEQP | ICE CREAM ROOM | 4,864.00 | 374.16 | 74.84 | 37.42 | 4,489.84 TIC | MFG STRCTR | | |
| 5/31/1989 | 132610 MFEQP | LABOR & MATERIALS NEW MIX TRANSFER LINE | 1,246.00 | 479.23 | 95.84 | 47.92 | 766.77 TIC | MFG EQUIP | | |
| 6/28/1989 | 132610 MFEQP | | 712.00 | 273.84 | 54.76 | 27.38 | 438.16 TIC | MFG EQUIP | | |
| 6/28/1989 | 132610 MFEQP | CONTROLS FOR NEW MIW TRANSFER | 297.00 | 114.23 | 22.84 | 11.42 | 182.77 TIC | MFG EQUIP | | |

Page 5