## SCHEDULE B
## To Asset Purchase Agreement

### EQUIPMENT LIST

ICE CREAM PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|
| 8/20/1989 | 132610 MFEQP | VIKING PUMP 15 HP 1750RPM | 1,662.00 | 639.23 | 127.84 | 63.92 | 1,022.77 TIC | MFG EQUIP 50E543-44 |
| 10/18/1989 | 132610 MFEQP | HI-LINE HIPIR KART STORAGE 4X3 | 1,306.00 | 502.31 | 100.46 | 50.23 | 803.69 TIC | MFG EQUIP |
| 11/15/1989 | 132610 MFEQP | AMMONIA (STORAGE) RECEIVER | 4,599.00 | 1,768.84 | 353.76 | 176.88 | 2,830.16 TIC | MFG EQUIP |
| 4/4/1990 | 132610 MFEQP | SQ. D 45T3H 45KVA TRANSFORMER | 208.00 | 80.00 | 16.00 | 8.00 | 128.00 TIC | MFG EQUIP |
| 6/27/1990 | 132610 MFEQP | SILO CONSTRUCTION COSTS | 22,089.45 | 8,495.93 | 1,699.18 | 849.59 | 13,593.52 TIC | MFG EQUIP |
| 11/14/1990 | 132610 MFEQP | HIGHLIFT SYSTEM | 2,492.00 | 958.47 | 191.70 | 95.85 | 1,533.53 TIC | MFG EQUIP |
| 2/6/1991 | 132610 MFEQP | PH METER & INSTALLATION | 504.00 | 193.84 | 38.76 | 19.38 | 310.16 TIC | MFG EQUIP    3740S |
| 11/13/1891 | 132610 MFEQP | CONTROL PANEL FOR HTST | 23,880.19 | 9,184.69 | 1,836.94 | 918.47 | 14,695.50 TIC | MFG EQUIP |
| 6/24/1992 | 132610 MFEQP | HEAT EXCHANGER DUST COLLECTION | 4,154.00 | 1,597.69 | 319.54 | 159.77 | 2,556.31 TIC | MFG EQUIP |
| 8/19/1992 | 132610 MFEQP | SYSTEM FORKLIFT | 5,223.32 | 2,008.98 | 401.80 | 200.90 | 3,214.34 TIC | MFG ENVIRN |
| 12/9/1992 FK | 132610 MFEQP | BATTERIES | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 TIC | MFG EQUIP |
| 3/3/1993 | 132610 MFEQP | FIRE PUMP | 13,731.34 | 5,281.29 | 1,056.28 | 528.13 | 8,450.05 TIC | MFG EQUIP |
| 3/3/1993 | 132610 MFEQP | TIMING PUMP | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 TIC | MFG EQUIP |
| 7/28/1983 | 132610 MFEQP | ROOFING | 2,255.00 | 867.31 | 173.46 | 86.73 | 1,387.69 TIC | MFG EQUIP |
| | 132610 MFEQP | ICE CREAM SILO | 15,522.07 | 5,870.03 | 1,194.00 | 597.00 | 9,552.04 TIC | MFG EQUIP |
| 7/28/1993 | 132610 MFEQP | ICE CREAM SEWAGE STABILIZATION | 34,327.84 | 13,203.01 | 2,640.60 | 1,320.30 | 21,124.83 TIC | MFG EQUIP |
| 1/12/1994 | 132610 MFEQP | WAUKESHA PUMP | 771.00 | 296.53 | 59.30 | 29.65 | 474.47 TIC | MFG EQUIP |
| 4/6/1994 | 132610 MFEQP | SOLIDS ANALYZER | 2,255.00 | 867.31 | 173.46 | 86.73 | 1,387.69 TIC | MFS STRCTLW1738 |
| 4/6/1994 | 132610 MFEQP | ICE CREAM MIX PUMP | 13,133.75 | 5,051.43 | 1,010.28 | 505.14 | 8,082.32 TIC | MFG EQUIP |
| 6/1/1994 | 132610 MFEQP | CUSTOM TABLE 30X72 | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 TIC | MFG EQUIP |
| 6/1/1994 | 132610 MFEQP | CUSTOM TABLE 30X72 | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 TIC | MFG EQUIP |
| 6/1/1994 | 132610 MFEQP | CUSTOM TABLE 30X72 | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 TIC | MFG EQUIP |
| 6/1/1994 | 132610 MFEQP | CUSTOM TABLE 30X72 | 36.00 | 13.84 | 2.76 | 1.38 | 22.18 TIC | MFG EQUIP |

## SCHEDULE B
### To Asset Pu    ase Agreement

EQUIPMENT LIST

ICE CREAM PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/1/1994 | 132610 MFEQP | CUSTOM TABLE 30X72 | 36.00 | 13.84 | 2.76 | 1.38 | 22.16 | TIC | MFG EQUIP | |
| 8/1/1994 | 132610 MFEQP | CHAIRS | 297.00 | 114.23 | 22.84 | 11.42 | 182.77 | TIC | MFG EQUIP | |
| 6/1/1994 | 132610 MFEQP | BREAKROOM FRONT | 2,611.00 | 1,004.23 | 200.84 | 100.42 | 1,606.77 | TIC | MFG EQUIP | |
| 6/29/1994 | 132610 MFEQP | MERCHANDISER ICE CREAM | 445.00 | 171.16 | 34.24 | 17.12 | 273.84 | TIC | MFG EQUIP | |
| 6/26/1994 | 132610 MFEQP | FREEZER | 2,018.00 | 776.16 | 155.24 | 77.62 | 1,241.84 | TIC | MFG STRCTR | |
| 6/29/1994 | 132610 MFEQP | CHAIRS | 119.00 | 45.79 | 9.16 | 4.58 | 73.21 | TIC | MFG EQUIP | |
| 10/1/1994 | 132610 MFEQP | CODE DATER | 5,223.32 | 2,008.98 | 401.80 | 200.90 | 3,214.34 | TIC | MFG EQUIP | |
| 10/18/1994 | 132610 MFEQP | NEOPOLITIN VALVE | 1,780.00 | 684.61 | 136.92 | 68.46 | 1,095.39 | TIC | MFG EQUIP | |
| 3/8/1995 | 132610 MFEQP | CORN SYRUP PUMP | 1,899.00 | 730.39 | 146.08 | 73.04 | 1,168.61 | TIC | MFG EQUIP | |
| 5/3/1995 | 132610 MFEQP | SHRINK WRAP MACHINE | 23,283.62 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | TIC | MFG EQUIP | |
| 6/28/1995 | 132610 MFEQP | PROCESSING ROOM LIGHTING | 4,006.00 | 1,640.79 | 308.16 | 154.08 | 2,465.21 | TIC | MFG EQUIP | |
| 6/28/1995 | 132610 MFEQP | MIX ROOM CEILING | 7,761.54 | 2,985.21 | 597.04 | 298.52 | 4,776.33 | TIC | MFG EQUIP | |
| 9/20/1995 | 132610 MFEQP | PROCESSING TANK | 11,940.60 | 4,592.53 | 918.50 | 459.25 | 7,348.07 | TIC | MFG EQUIP | |
| 10/18/1995 | 132610 MFEQP | BATTERIES 1B-C125-17 | 1,760.00 | 684.61 | 136.92 | 68.46 | 1,095.39 | TIC | MFG EQUIP | |
| 11/1/1995 | 132610 MFEQP | FORKLIFT | | | | | | | | |
| 12/13/1995 | 132610 MFEQP | 200 GALLON MIXER FRUIT FEEDER | 3,115.00 | 1,198.09 | 239.62 | 119.81 | 1,916.91 | TIC | MFG EQUIP | |
| 12/13/1995 | 132610 MFEQP | ICE CREAM RADIO | 12,537.18 | 4,822.00 | 964.40 | 482.20 | 7,715.18 | TIC | MFG EQUIP | |
| 12/13/1995 | 132610 MFEQP | SYSTEM INGREDIENT BLENDER | 1,484.00 | 570.79 | 114.16 | 57.08 | 913.21 | TIC | MFG EQUIP | |
| 6/26/1996 | 132610 MFEQP | SHANKLIN / | 5,522.11 | 2,123.88 | 424.78 | 212.39 | 3,386.23 | TIC | MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | SHRINKWRAP CONVEYOR / | 19,104.56 | 7,347.91 | 1,469.58 | 734.79 | 11,756.65 | TIC | MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | SHRINKWRAP FREEZER RACK SYSTEM | 11,641.81 | 4,477.64 | 895.52 | 447.76 | 7,164.17 | TIC | MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | METAL DETECTOR / 5 QUART | 26,268.51 | 10,103.27 | 2,020.66 | 1,010.33 | 16,165.24 | TIC | MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | PROCESS SYSTEM / 5 QUART | 2,967.00 | 1,141.16 | 228.24 | 114.12 | 1,825.84 | TIC | MFG EQUIP | |
| 11/13/1998 | 132610 MFEQP | BATTERY CHARGER/ 5 QUART | 55,223.13 | 21,239.66 | 4,247.94 | 2,123.97 | 33,983.47 | TIC | MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | 5 QUART | 593.00 | 228.09 | 45.62 | 22.81 | 384.91 | TIC | MFG EQUIP | |

## SCHEDULE B
## To Asset Purc...se Agreement

### EQUIPMENT LIST

ICE CREAM PLANT CITY

| Date | Category | Desc. | Cost | Accum Depr | YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| 11/13/1996 | 132610 MFEQP | BATTERY CHARGER/ 5 QUART | 593.00 | 228.09 | 45.62 | 22.81 | 364.91 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | BATTERY HANDLING SYSTEM / 5 QU | 237.00 | 91.16 | 18.24 | 9.12 | 145.84 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | SHRINK TUNNEL / 5 QUART | 1,246.00 | 479.23 | 95.84 | 47.92 | 766.77 | TIC MFG EQUIP | |
| 11/13/1998 | 132610 MFEQP | METERS / 5 QUART | 3,264.00 | 1,255.39 | 251.08 | 125.54 | 2,008.61 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | FLAVOR VATS / 5 QUART | 12,537.18 | 4,822.00 | 964.40 | 482.20 | 7,715.18 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | SILO STORAGE/ 5 QUART | 1,424.00 | 547.69 | 109.54 | 54.77 | 876.31 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | CONTROL SYSTEM / 5 QUART | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | MATERIAL HANDLING / 5 QUART | 13,731.34 | 5,281.29 | 1,056.26 | 528.13 | 8,450.05 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | ARPAC SHRINK BUNDLER / 5 QUART | 18,505.97 | 7,118.08 | 1,423.62 | 711.81 | 11,388.89 | TIC MFG EQUIP | |
| 11/13/1998 | 132610 MFEQP | APV ICE CREAM FREEZER / 5 QUAR | 46,268.44 | 17,795.54 | 3,559.10 | 1,779.55 | 28,472.90 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | CONVEYOR / 5 QUART | 14,925.50 | 5,740.58 | 1,148.12 | 574.06 | 9,184.92 | TIC MFG EQUIP | |
| 11/13/1996 | 132610 MFEQP | BLAST HARDENING/ 5 QUART | 113,431.17 | 43,627.38 | 8,725.48 | 4,362.74 | 69,803.79 | TIC MFG EQUIP | |
| 1/8/1997 | 132610 MFEQP | PALLET STRETCH WRAPPER | 9,253.49 | 3,559.02 | 711.80 | 355.90 | 5,694.47 | TIC MFG EQUIP | |
| 4/2/1997 | 132610 MFEQP | FRICK RWBII 177 COMPRESSOR | 43,283.54 | 16,647.51 | 3,329.50 | 1,664.75 | 26,636.03 | TIC MFG EQUIP | |
| 4/2/1997 | 132610 MFEQP | FRICK RWBII 399 BOOSTER COMPRE | 53,731.19 | 20,665.87 | 4,133.18 | 2,066.59 | 33,065.32 | TIC MFG EQUIP | UPGRADE ONLY |
| 4/2/1997 | 132610 MFEQP | FRIGID COIL ROOF TOP FREEZER U | 28,656.83 | 11,021.86 | 2,204.36 | 1,102.18 | 17,634.97 | TIC MFG EQUIP | |
| 4/2/1997 | 132610 MFEQP | FRIGID COIL HTS/T | 5,373.22 | 2,066.63 | 413.32 | 206.66 | 3,306.59 | TIC MFG EQUIP | |
| 4/2/1997 | 132610 MFEQP | DOCK UNITS IMECO | 13,133.75 | 5,051.43 | 1,010.28 | 505.14 | 8,082.32 | TIC MFG EQUIP | |
| 4/2/1997 | 132610 MFEQP | CONDENSERS APV GLYCOL | 5,969.80 | 2,296.09 | 459.22 | 229.61 | 3,673.71 | TIC MFG EQUIP | |
| 4/2/1997 | 132610 MFEQP | CHILLER CHILLER RESERVOIR TANK | 2,730.00 | 1,050.00 | 210.00 | 105.00 | 1,680.00 | TIC MFG EQUIP | |

## SCHEDULE B
## To Asset Pur...se Agreement

### EQUIPMENT LIST

|  | Category | Desc. | Cost | Accum Depr | ICE CREAM PLANT CITY YTD Dep | Dep | NBV |  |  | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/2/1997 | 132610 MFEQP | RECIRCULATOR PACKAGE | 17,312.81 | 6,658.78 | 1,331.76 | 665.88 | 10,654.03 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | GLYCOL PUMPS | 593.00 | 228.00 | 45.62 | 22.81 | 364.91 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | BALANCE TANK | 534.00 | 205.39 | 41.08 | 20.54 | 328.61 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | THERMO SYPHON RECEIVER | 771.00 | 296.53 | 59.30 | 29.65 | 474.47 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | PLATE CHILLER ACCUMULATOR | 771.00 | 296.53 | 59.30 | 29.65 | 474.47 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | HANK & CONTROL VAVLES | 12,537.18 | 4,822.00 | 964.40 | 482.20 | 7,715.18 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | UPGRADE PURGER | 653.00 | 251.16 | 50.24 | 25.12 | 401.84 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | PIPE,PIPE INSULATION,STANDS SCALE | 40,297.64 | 15,499.09 | 3,099.82 | 1,549.91 | 24,798.55 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | EQUIPMENTV5662 | 3,561.00 | 1,369.61 | 273.92 | 136.96 | 2,191.39 | TIC | MFG EQUIP |  |
| 4/2/1997 | 132610 MFEQP | MODEL 588 ICE CREAM FILLER | 12,537.18 | 4,822.00 | 964.40 | 482.20 | 7,715.18 | TIC | MFG EQUIP | UPGRADE ONLY |
| 4/2/1997 | 132610 MFEQP | MODEL 588 ICE CREAM FILLER | 12,537.18 | 4,822.00 | 964.40 | 482.20 | 7,715.18 | TIC | MFG EQUIP | UPGRADE ONLY |
| 4/2/1997 | 132610 MFEQP | MODEL 588 ICE CREAM FILLER | 17,312.81 | 6,658.78 | 1,331.76 | 665.88 | 10,654.03 | TIC | MFG EQUIP | UPGRADE ONLY |
| 4/2/1997 | 132610 MFEQP | MODEL 588 ICE CREAM FILLER GENERATOR | 17,312.81 | 6,658.78 | 1,331.76 | 665.88 | 10,654.03 | TIC | MFG EQUIP | UPGRADE ONLY |
| 4/30/1997 | 132610 MFEQP | HOUSING | 1,122.00 | 86.31 | 17.26 | 8.63 | 1,035.69 | TIC | MFG STRCTR |  |
| 4/30/1997 | 132610 MFEQP | 588 FILLERS | 534.00 | 205.39 | 41.08 | 20.54 | 328.61 | TIC | MFG STRCTR |  |
| 4/30/1997 | 132610 MFEQP | 588 FILLERS | 534.00 | 205.39 | 41.08 | 20.54 | 328.61 | TIC | MFG STRCTR |  |
| 5/28/1997 | 132610 MFEQP | STEP DOWN TRANSFORMER | 1,068.00 | 410.79 | 82.16 | 41.08 | 657.21 | TIC | MFG EQUIP |  |
| 8/20/1997 | 132610 MFEQP | HANSON AMMONIA PUMP | 2,255.00 | 867.31 | 173.46 | 86.73 | 1,387.69 | TIC | MFG EQUIP CH-79685 |  |
| 8/20/1997 | 132610 MFEQP | HANSON AMMONIA PUMP | 2,235.00 | 867.31 | 173.46 | 86.73 | 1,387.69 | TIC | MFG EQUIP CH-79686 |  |
| 1/7/1998 | 132610 MFEQP | YALE FORKLIFT | 3,115.00 | 1,198.09 | 239.62 | 119.81 | 1,916.91 | TIC | MFG EQUIP E108V09465 |  |
| 8/16/1998 | 132610 MFEQP | MACHINE ROOM CONTROL PANEL 1/2 GL RD | 23,880.19 | 9,184.69 | 1,836.94 | 918.47 | 14,695.50 | TIC | MFG EQUIP |  |
| 8/16/1998 | 132610 MFEQP | CONVEY/PACK SYSTEM | 48,253.34 | 18,943.60 | 3,768.72 | 1,894.36 | 30,309.74 | TIC | MFG EQUIP | UPGRADE ONLY |
| 11/11/1998 | 132610 MFEQP | METAL DETECTOR | 4,006.00 | 1,540.79 | 308.16 | 154.08 | 2,465.21 | TIC | MFG EQUIP |  |

Page 9

**Page 33 of 35**

SCHEDULE D
To Asset Pur...se Agreement

## EQUIPMENT LIST

| | Category | Desc. | Cost | Accum Depr | ICE CREAM PLANT CITY YTD Dep | Dep | NBV | | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/9/1998 | 132610 MFEQP | MIX HOMOGENIZER INGREDIENT | 23,283.62 | 8,955.23 | 1,791.04 | 895.52 | 14,328.39 | TIC | MFG EQUIP | |
| 1/6/1999 | 132610 MFEQP | FEEDER METAL DETECTOR | 16,716.24 | 6,429.34 | 1,285.86 | 642.93 | 10,286.90 | TIC | MFG EQUIP | |
| 3/31/1999 | 132610 MFEQP | SHRINKWRAP BUNDLER | 5,672.01 | 1,454.36 | 290.88 | 145.44 | 4,217.65 | TIC | MFG EQUIP | |
| 3/23/2000 | 132610 MFEQP | INGREDIENT PUMP | 29,253.41 | 5,625.67 | 1,125.14 | 562.57 | 23,627.74 | TIC | MFG EQUIP | |
| 6/28/2000 | 132610 MFEQP | AMMONIA REFRIG | 3,709.00 | 713.29 | 142.66 | 71.33 | 2,995.71 | TIC | MFG EQUIP | |
| 6/21/2001 | 132610 MFEQP | MOD (PSM) ICE CREAM FILLER | 25,074.35 | 3,857.59 | 771.52 | 385.76 | 21,216.76 | TIC | MFG EQUIP | |
| 6/21/2001 | 132610 MFEQP | CONDEN. SAFETY | 131,341.56 | 20,206.40 | 4,041.28 | 2,020.64 | 111,135.16 | TIC | MFG EQUIP | |
| 5/23/2002 | 132610 MFEQP | CATWALK AMMONIA TRANSFER | 34,327.84 | 4,401.00 | 880.20 | 440.10 | 29,926.84 | ORL | MFG EQUIP | |
| 5/30/2002 | 132610 MFEQP | PUMP ICE CREAM | 11,641.81 | 1,492.54 | 298.50 | 149.25 | 10,149.27 | ORL | MFG EQUIP | |
| 6/25/2002 | 132610 MFEQP | PROCESSING TANK ICE CREAM | 19,104.56 | 2,449.30 | 489.86 | 244.93 | 16,655.26 | ORL | MFG EQUIP | |
| 6/25/2002 | 132610 MFEQP | PROCESSING TANK ICE CREAM | 19,104.66 | 2,449.30 | 489.86 | 244.93 | 16,655.26 | ORL | MFG EQUIP | |
| 10/28/2002 | 132610 MFEQP | ICE CREAM FILLER REINSULATE BLAST | 5,522.11 | 707.96 | 141.60 | 70.80 | 4,814.15 | ORL | MFG EQUIP | |
| 11/27/2002 | 132610 MFEQP | FREEZER CIRCL ROOF TOP UNIT | 13,133.75 | 1,683.81 | 336.76 | 168.38 | 11,449.94 | ORL | MFG EQUIP | |
| 6/5/2003 | 132610 MFEQP | DOORS | 4,088.00 | 314.47 | 62.90 | 31.45 | 3,773.53 | TIC | DOORS | |
| 6/6/2003 | 132610 MFEQP | CAUSTIC WASTEWATER | 15,522.07 | 1,705.72 | 341.14 | 170.57 | 13,816.35 | TIC | MFG EQUIP | |
| 6/17/2003 | 132610 MFEQP | MIX HTIST PLATES | 8,059.93 | 886.64 | 177.12 | 88.56 | 7,173.69 | TIC | MFG EQUIP | |
| 6/17/2003 | 132610 MFEQP | ICE CREAM FILLER | 2,255.00 | 247.80 | 49.56 | 24.78 | 2,007.20 | TIC | MFG EQUIP | |
| 6/17/2003 | 132610 MFEQP | METAL DETECTOR | 14,925.50 | 1,640.18 | 328.04 | 164.02 | 13,285.32 | TIC | MFG EQUIP | |
| ~~3/12/2004~~ | ~~132610 MFEQP~~ | ~~FORKLIFT~~ | ~~13,731.24~~ | ~~1,508.00~~ | ~~301.13~~ | ~~150.57~~ | ~~12,222.72~~ | ~~TIC~~ | ~~MFG EQUIP~~ | ~~4001762~~ |
| ~~3/12/2004~~ | ~~132610 MFEQP~~ | ~~FORKLIFT~~ | ~~6,567.38~~ | ~~721.69~~ | ~~144.34~~ | ~~72.17~~ | ~~5,845.69~~ | ~~TIC~~ | ~~MFG EQUIP~~ | ~~4007763~~ |
| ~~3/12/2004~~ | ~~132610 MFEQP~~ | ~~FORKLIFT~~ | ~~6,567.38~~ | ~~721.69~~ | ~~144.34~~ | ~~72.17~~ | ~~5,845.69~~ | ~~TIC~~ | ~~MFG EQUIP~~ | ~~4001763~~ |
| ~~3/12/2004~~ | ~~132610 MFEQP~~ | ~~FORKLIFT~~ | ~~6,567.38~~ | ~~721.69~~ | ~~144.34~~ | ~~72.17~~ | ~~5,845.69~~ | ~~TIC~~ | ~~MISC WH~~ | ~~4007638~~ |
| 8/27/2005 | 132610 MFEQP | COMPRESSOR REPLACEMENT | 12,537.18 | 1,071.57 | 214.32 | 107.16 | 11,465.61 | TIC | MFG EQUIP | |
| 6/27/2005 | 132610 MFEQP | COMPRESSOR REPLACEMENT AMMONIA | 13,133.75 | 1,122.53 | 224.50 | 112.25 | 12,011.22 | TIC | MFG EQUIP | |
| 6/27/2005 | 132610 MFEQP | COMPRESSOR | 19,104.56 | 1,632.88 | 326.58 | 163.29 | 17,471.68 | TIC | MISC WH | |
| 6/27/2005 | 132610 MFEQP | COMPRESSOR REBUILD | 19,104.56 | 1,632.88 | 326.58 | 163.29 | 17,471.68 | TIC | MISC WH | |

Page 10

SCHEDULE D
To Asset Purchase Agreement

EQUIPMENT LIST

|  | Category | Desc. | Cost | Accum Depr | ICE CREAM PLANT CITY YTD Dep | Dep | NBV | | Explanation/Additional Description |
|---|---|---|---|---|---|---|---|---|---|
| 6/28/2005 | 132610 MFEQP | SEAL ATTIC ABOVE ICE CREAM PRC | 9,851.07 | 841.98 | 168.40 | 84.20 | 9,009.09 | TIC | MISC |
| 6/28/2005 | 132610 MFEQP | WATER SOFTNER | 8,656.91 | 739.92 | 147.98 | 73.99 | 7,916.99 | TIC | MISC |
| 6/29/2005 | 132610 MFEQP | P & IDS | 9,552.28 | 816.43 | 163.28 | 81.64 | 8,735.85 | TIC | MISC |
| 3/8/2008 | 132610 MFEQP | WATER FILTER | 17,312.81 | 1,479.72 | 295.94 | 147.97 | 15,833.09 | TIC | MFG EQUIP |
| 4/1/2007 | 132610 MFEQP | Generator | 48,098.11 | 2,217.07 | 740.02 | 370.01 | 45,881.04 | TPA,MF,DA | GENERATOR |
| 6/21/2007 | 132610 MFEQP | Fire Sprinkler 12LH018807 | 47,503.00 | 1,098.23 | 730.82 | 365.41 | 46,406.77 | TPA,MF,DA | MFG EQUIP |
| | MFEQP Total | | 2,667,188.95 | 861,846.90 | 173,197.54 | 86,598.77 | 1,805,242.05 | | |
| | Grand Total | | 5,025,534.44 | 928,810.06 | 186,570.18 | 93,285.09 | 4,096,724.38 | | |

CLICK ON THE 3 IN THE UPPER LEFT CORNER TO SEE DETAIL
CLICK ON 1 FOR THE GRAND TOTAL

Page 11

**SCHEDULE C**
**To Asset Purchase Agreement**

**SELLER DISCLOSURE MEMORANDUM**

**Hammond Dairy**

*Schedule 3.06*

None

*Schedule 3.07*

(a)     Waste water effluent discharge originating from the Dairy Plant located in Hammond, Louisiana, is the subject matter of ongoing studies and negotiations with the City of Hammond sewer utility. Due to irregular and high-content biological oxygen demand (BOD) effluent, the City Utility system has encountered periodic failures, resulting in EPA restrictions and potential penalties for noncompliance with plant operational requirements. Environmental engineering studies are underway to identify effective means of stabilizing Dairy Plant effluent through on-site sewer pretreatment facilities to be installed at the Dairy Plant. Engineering, design and cost details for an on-site pretreatment facility remain to be determined, and remain subject to review and approval by the City Utility. Further discussions with the City Utility will include consideration of possible cost-sharing between the Dairy Plant operator and the City of Hammond to cover the cost of the on-site pretreatment system. Cooperative efforts among the City Utility, Buyer and Seller relating to resolution of the foregoing issues are contemplated under the Asset Purchase Agreement, which includes entry into a Sewer Pretreatment Agreement among the parties on or before April 30, 2008.

*Schedule 3.08*

None

*Schedule 3.11*

- Wastewater Pumping and Pre-Treatment Agreement executed on June 22, 1989, between the City of Hammond, Louisiana and Louisiana Dix Properties, Inc.

- Waste water effluent discharge originating from the Dairy Plant located in Hammond, Louisiana, is the subject matter of ongoing studies and negotiations with the City of Hammond sewer utility. Due to irregular and high-content biological oxygen demand (BOD) effluent, the City Utility system has encountered periodic failures, resulting in EPA restrictions and potential penalties for noncompliance with plant operational requirements. Environmental engineering studies are underway to identify effective means of stabilizing Dairy Plant effluent through on-site sewer pretreatment facilities to be installed at the Dairy Plant. Engineering, design and cost details for an on-site pretreatment facility remain to be determined, and remain subject to review and approval by the City Utility. Further discussions with the City Utility will include consideration of possible cost-sharing between the Dairy Plant operator and the City of Hammond to cover the cost of the on-site pretreatment system. Cooperative efforts among the City Utility, Buyer and Seller relating to resolution of the foregoing

issues are contemplated under the Asset Purchase Agreement, which includes entry into a Sewer Pretreatment Agreement among the parties on or before April 30, 2008.

*Schedule 3.12*

(a)   Waste water effluent discharge originating from the Dairy Plant located in Hammond, Louisiana, is the subject matter of ongoing studies and negotiations with the City of Hammond sewer utility. Due to irregular and high-content biological oxygen demand (BOD) effluent, the City Utility system has encountered periodic failures, resulting in EPA restrictions and potential penalties for noncompliance with plant operational requirements. Environmental engineering studies are underway to identify effective means of stabilizing Dairy Plant effluent through on-site sewer pretreatment facilities to be installed at the Dairy Plant.  Engineering, design and cost details for an on-site pretreatment facility remain to be determined, and remain subject to review and approval by the City Utility.  Further discussions with the City Utility will include consideration of possible cost-sharing between the Dairy Plant operator and the City of Hammond to cover the cost of the on-site pretreatment system.  Cooperative efforts among the City Utility, Buyer and Seller relating to resolution of the foregoing issues are contemplated under the Asset Purchase Agreement, which includes entry into a Sewer Pretreatment Agreement among the parties on or before April 30, 2008.

(b)   Boiler Permit; MS Milk Processing Permit; State Bottle Soft Drink & Water; State Bottle Water Permit (MS); State Health Permit; State Milk Processing License; State Milk and Milk Product License (AL)

*Schedule 3.13*

None

*Schedule 3.14*

Labor Matters - See list as of 12/18 on the Merrill Site under item A.1.Y

*Schedule 3.15*

Waste water effluent discharge originating from the Dairy Plant located in Hammond, Louisiana, is the subject matter of ongoing studies and negotiations with the City of Hammond sewer utility.  Due to irregular and high-content biological oxygen demand (BOD) effluent, the City Utility system has encountered periodic failures, resulting in EPA restrictions and potential penalties for noncompliance with plant operational requirements. Environmental engineering studies are underway to identify effective means of stabilizing Dairy Plant effluent through on-site sewer pretreatment facilities to be installed at the Dairy Plant.  Engineering, design and cost details for an on-site pretreatment facility remain to be determined, and remain subject to review and approval by the City Utility.  Further discussions with the City Utility will include consideration of possible cost-sharing between the Dairy Plant operator and the City of Hammond to cover the cost of the on-site pretreatment system.  Cooperative efforts among the City Utility, Buyer and Seller relating to resolution of the foregoing issues are contemplated under the Asset Purchase Agreement, which includes entry into a Sewer Pretreatment Agreement among the parties on or before April 30, 2008.

*Schedule 3.17*

(a)   Agreements for the lease of personal property to or from any Person:

- Lease between Winn-Dixie and Liquibox, Inc. governing a 5-gallon water filler. *We have not located a copy of this Lease.*

(b)   Agreements for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services:

- Supply Agreement between Winn-Dixie Stores, Inc. and Thatcher Company governing cleaning products.

- Supply Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing plastic caps.

- Purchase and Sale Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine equipment.

- Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine placement.

- Trademark License Agreement between Winn-Dixie Stores, Inc. and MARBO, Inc. governing license to use TAMPICO trademark.

(e)   Agreement concerning confidentiality or non-competition:

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Pecan Deluxe Candy Company.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and ExxonMobile Chemical Company.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Peace River.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Thatcher Company.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and WS Packaging Group, Inc.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Chevron Phillips Company LP.

*Schedule 3.18*

None

**Plant City Dairy**

*Schedule 3.07*

None

*Schedule 3.08*

None

*Schedule 3.11*

- Winn-Dixie is a participating party in Peak Oil superfund site but Winn-Dixie's participation does not affect the property.

- An Effluent Quality Bond in the amount of $15,000 is being requested by the City of Plant City from Winn-Dixie to ensure that Winn-Dixie will (i) comply with Chapter 74 of the Plant City Code and all other applicable regulations relating to wastewater pollution control and (ii) pay all applicable charges assessed by the City.

- HESCO has made a claim against Winn-Dixie requesting payment of an alleged past due balance and purchase of inventory.  Winn-Dixie is denying these claims.

- Winn-Dixie and the Hillsborough County Tax Collector are in dispute governing payment of 2005 and 2006 real and personal property taxes due to Winn-Dixie's objection to such payment under its bankruptcy case No. 05-03817-3F1.  Winn-Dixie has in escrow with Smith, Gambrell & Russell, LLP, as Escrow Agent, the outstanding real property tax amounts due for 2005 and 2006, including all interest on such amounts, through March 31, 2008.  Pursuant to the terms and conditions of the governing Tax Escrow Letter, such escrowed funds will be disbursed either to (i) the Title Insurer, (ii) the tax collector upon Winn-Dixie's instruction, or (iii) to Winn-Dixie, strictly in compliance with the Tax Escrow Letter.  There is currently no escrow for the 2005 and 2006 personal property tax amounts.

*Schedule 3.12*

(a)   Winn-Dixie and the City of Plant City are coordinating efforts to construct and install a drainage apparatus to alleviate drainage issues at the Dairy.

(b)   Citrus Canning or Concentrate Registration; Citrus Fruit Dealer License; City Occupational License; County Occupational License; State Dealer in Agricultural Products; State Dairy Plant Registration (GA); State Manufacturing Plant Registration; State Milk Processing Registration; Underground Storage Tank; State Frozen Desert Permit (AL); State Frozen Desert Permit (FL); State Frozen Desert Permit (LA); State Frozen Desert Permit (MS); State Processing License Registration

*Schedule 3.13*

None

*Schedule 3.14*

- Employee filed charge on 9/9/04 with EEOC (Tampa Office). Employee alleges that she was terminated in retaliation for a complaint and because of gender. Matter was settled on January 22, 2007 in the context of the Winn-Dixie bankruptcy case.

- Charge was filed on 3/22/07 with Florida Commission on Human Relations. Employee alleged he was subjected to unequal treatment and a hostile environment and eventually was forced to resign his position due to his race, color and gender. A No Cause Determination was received from Florida Commission on Human Relations on 8/13/07.

- Labor Matters – See list as of 12/18 on the Merrill Site under item A.1.Y

*Schedule 3.15*

None

*Schedule 3.17*

(b)   Agreements for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services:

- Supply Agreement between Winn-Dixie Stores, Inc. and Burd & Fletcher governing folding cartons.

- Supply Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing plastic caps.

- Purchase and Sale Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine equipment.

- Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine placement.

- Supply Agreement between Winn-Dixie Stores, Inc. and Southern Gardens-Citrus Processing Corp. governing not-for concentrate orange juice.

- Supply Agreement between Winn-Dixie Stores, Inc. and Thatcher Company governing cleaning products.

- Purchase and Sale Agreement between Winn-Dixie Stores, Inc. and United Sugars Corporation governing liquid sucrose.

- Trademark License Agreement between Winn-Dixie Stores, Inc. and MARBO, Inc. governing license to use TAMPICO trademark.

- Supply Agreement between Siemens Water Technologies Corporation and Winn-Dixie Stores, Inc.

(e)   Agreement concerning confidentiality or non-competition:

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Pecan Deluxe Candy Company.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and ExxonMobile Chemical Company.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Peace River.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Thatcher Company.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and WS Packaging Group, Inc.

- Confidentiality Agreement between Winn-Dixie Stores, Inc. and Chevron Phillips Company LP.

## *Schedule 3.18*

Winn-Dixie and the Hillsborough County Tax Collector are in dispute governing payment of 2005 and 2006 real and personal property taxes due to Winn-Dixie's objection to such payment under its bankruptcy case No. 05-03817-3F1. Winn-Dixie has in escrow with Smith, Gambrell & Russell, LLP, as Escrow Agent, the outstanding real property tax amounts due for 2005 and 2006, including all interest on such amounts, through March 31, 2008. Pursuant to the terms and conditions of the governing Tax Escrow Letter, such escrowed funds will be disbursed either to (i) the Title Insurer, (ii) the tax collector upon Winn-Dixie's instruction, or (iii) to Winn-Dixie, strictly in compliance with the Tax Escrow Letter. There is currently no escrow for the 2005 and 2006 personal property tax amounts.

## *Schedule 3.19*

The chart attached as Exhibit A represents recalls, withdrawals, returns, or destruction of any product, supplies, packaging materials or Inventories for the past 24 months.

The water quality problems identified in Exhibit A are related to multiple contributing processing conditions. The quality problems became evident right after the change to a new cap which seemed to allow the mold growth to blossom. Several steps have been taken to address these quality issues in the short term, including a new Siemens drinking water system.

The new state of the art drinking water system is scheduled to be fully functional by March 1st. Siemens has assured a turn-key operation, complete with monitoring systems, standard operating procedures and intense operator training as well as service to the system. Siemens has also assured that the quality of the water will meet the guidelines of the International Bottled Water Association (IBWA), which is tighter than EPA or FDA standards for drinking water.

Since there was never any mold in any unlined caps in 30 years of bottling water at Winn-Dixie dairies with adequate water filtration systems, there is high confidence that the combination of an unlined cap and water from a modern, highly technologically advanced water purification system will result in problem free bottled water.

## Recalls/Withdrawals YTD 2007

| Date | Class | Reason | Item | Code | UPC | Facility | Qty. Destroyed |
|---|---|---|---|---|---|---|---|
| 01/10/07 | Withdrawal | Does not meet Winn-Dixie quality standards | Winn Dixie Drinking Water 1 Gallon | 207596 | 21140-29845 | Plant City | 44,362 gallons |
| | | Does not meet Winn-Dixie quality standards | Winn Dixie Drinking Water 2.5 Gallon | 207599 | 21140-29845 | | 3,776 gallons |
| 01/30/07 | Withdrawal | Does not meet Winn-Dixie quality standards | Winn Dixie Drinking Water 1 Gallon dtd 12-17-07 | 207596 | 21140-29845 | Plant City | 2,832 gallons |
| | | Does not meet Winn-Dixie quality standards | Winn Dixie Drinking Water 2.5 Gallon dtd 12-17-07 | 207599 | 21140-29845 | | 490 gallons |
| 08/17/07 | Withdrawal | Product may separate, giving poor appearance | Winn-Dixie Chocolate Milk | 785162 | 21140-29721 | Plant City | 534 gallons |
| 10/04/07 | Class I | Product may have almonds that are not declared | Prestige Chocolate Ice Cream | 786137 | 21140-27002 | Plant City | 382 cartons |
| 10/09/07 | Withdrawal | Does not meet Winn-Dixie quality standards | Winn-Dixie Drinking Water | 207596 | 21140-29845 | Plant City | 557,636 gallons |

## Recalls/Withdrawals YTD 2007 (cont.)

| Date | Class | Reason | Item | Code | UPC | Facility | Qty. Destroyed |
|------|-------|--------|------|------|-----|----------|----------------|
| 10/11/07 | Class I | Product may have almonds that are not declared | Prestige Chocolate Almond | 786140 | 21140-27005 | Plant City | 4,363 cartons |

## Recalls/Withdrawals YTD 2006

| Date | Class | Reason | Item | Code | UPC | Facility | Qty. Destroyed |
|------|-------|--------|------|------|-----|----------|----------------|
| 2/21/2006 | Withdrawal | Water may have higher than normal bacterial counts | Winn-Dixie Spring Water | 207669 | 21140-29848 | Hammond | 5,400 gallons |
| 11/28/2006 | Withdrawal | Does not meet Winn-Dixie quality standards | Winn-Dixie Drinking Water | 207596 | 21140-29845 | Plant City | 480,662 gallons |

**SCHEDULE D**
**To Asset Purchase Agreement**

**PURCHASE PRICE ALLOCATION**

Plant City Dairy:

Land and Building:     $8,032,500.00
Personal Property:     $5,642,500,00


Hammond Dairy:

Sublease:              $   500,000.00
Personal Property:     $1,575,000.00


**TOTAL ALLOCATION:**   **$15,750,000.00**

## SCHEDULE E
### To Asset Purchase Agreement


## INTENTIONALLY OMITTED

**SCHEDULE F**
**To Asset Purchase Agreement**

**INVENTORIES PROCEDURE**

In addition to the procedures outlined in **Section 2.09** of the Agreement, the following procedures shall apply to the Inventories Count and the determination of the final Inventories Price (in the event of any conflict between the provisions of the Agreement and this **Schedule F**, this **Schedule F** shall control):

**Additional Procedures**

All finished product inventories will be removed by Seller from the Dairy Plants prior to the Inventories Commencement Date.  To the extent any finished product inventories remain at the Dairy Plants at the time of commencement of the Inventories Count, all such remaining finished product inventories shall be excluded from the Inventories Count and the calculation of the Inventories Price.

The following items will be excluded from the calculation of the Inventories Price and, except as otherwise indicated, will constitute Excluded Assets under the Agreement:

- all finished product inventories, as noted above,

- any items that would constitute Inventories and are located at the Dairy Plants, are on order, or are en route to the Dairy Plants (or arrive at the Dairy Plants during the Inventories Count) for which Seller has not made payment and for which the obligation to pay will be transferred to Sunshine under the Agreement as an Assumed Contract, an Assumed Liability or otherwise (these items will constitute Assets),

- any items which are commercially unusable, obsolete, or out of date items or damaged items or items that are commercially unusable due to excessive inventory,

- any items which are not of merchantable quality fit for use in the sale of food products, and

- any items which do not meet all applicable state and federal, laws, regulation and rules.

To the extent any of the foregoing items which constitute Excluded Assets are not removed by Seller from the Dairy Plants within thirty (30) days of the Closing Date, Sunshine may dispose of any such items at Seller's expense.

Within twenty (20) days of the Closing Date, Seller shall propose to Sunshine a final Inventories Price based on the Inventories Count, together with the back-up detail and/or work papers utilized to arrive at such proposed final Inventories Price. Sunshine shall have ten (10) days from the receipt of the proposed final Inventories Price to agree or disagree with such proposed final Inventories Price.  If Sunshine notifies Seller that it agrees with the proposed final Inventories Price, or if Sunshine fails to deliver a notice of disagreement within the ten (10) day period, then the

proposed final Inventories Price shall be deemed to be the final Inventories Price and the appropriate adjustment to be paid shall be paid by the appropriate party (and, if the paying party is Sunshine, SMI shall cause Sunshine to make such payment) promptly after determination, but in no event later than five (5) Business Days after notice of agreement by Sunshine or the expiration of the ten (10) day period if Sunshine fails to deliver any notice.  In the event that Sunshine timely delivers notice that it disagrees with Seller's proposed final Inventories Price or the Inventories Count upon which it was based, then the following procedure will apply.

**Dispute Resolution Procedure**

In the event any dispute arises between the parties with respect to the Inventories Count or if Sunshine does not agree with the proposed final Inventories Price and timely delivers notice to such effect, Seller and Sunshine will, through good faith negotiations, and SMI will cause Sunshine to, attempt to resolve the dispute and determine the final Inventories Price, within fifteen (15) days of delivery of Sunshine's notice of disagreement (the "Settlement Period"). If Sunshine and Seller do not reach a resolution of all disagreements concerning the Inventories Count or the Inventories Price prior to the expiration of the Settlement Period, Sunshine and Seller will and SMI will cause Sunshine to, select a mutually acceptable accounting firm to resolve any remaining disagreements. If Sunshine and Seller are unable to agree on the choice of an accounting firm, they will, and SMI will cause Sunshine to, select a nationally recognized accounting firm by having their regular outside accounting firms select such firm, by lot, if necessary. The selected accounting firm will resolve any disagreements relative to the Inventories Count and the amount of the Inventories Price remaining unresolved between the parties at the time of submission to such accounting firm. The parties will provide the accounting firm, within ten (10) days of its selection, with a definitive statement of the position of each party with respect to each disagreement and will advise the accounting firm that the parties accept the accounting firm as the appropriate person to resolve their disagreements.  The accounting firm will have thirty (30) days to carry out a review of the disagreements and prepare a written statement of its determination regarding each disagreement. The determination of any accounting firm so selected will be set forth in writing and will be conclusive and binding upon the parties, and enforceable in any court having jurisdiction over the parties. Seller will revise the Inventories Price to reflect the determination of the accounting firm.  Once the final Inventories Price has been determined, either by the parties or by the accounting firm, the appropriate adjustment shall be paid by the appropriate party, as set forth under "Additional Procedures" above.  If Sunshine and Seller submit any disagreements to an accounting firm for resolution as provided in this **Schedule F**, Sunshine and Seller will, and SMI will cause Sunshine to, each bear their respective costs and expenses and will share equally in the fees and expenses of the selected accounting firm.

**SCHEDULE G**
**To Asset Purchase Agreement**

**ASSUMED CONTRACTS**

**Hammond Dairy**

1.   Raw Materials Supply Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing plastic caps.

2.   Purchase and Sale Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine equipment.

3.   Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine placement.

4.   Trademark License Agreement between Winn-Dixie Stores, Inc. and MARBO, Inc. governing license to use TAMPICO trademark.

5.   Supply Agreement between Winn-Dixie Stores, Inc. and Thatcher Company governing cleaning products.

6.   Lease between Winn-Dixie and Liquibox, Inc. governing a 5-gallon water filler.*

**Plant City Dairy**

1.   Supply Agreement between Winn-Dixie Stores, Inc. and Burd & Fletcher governing folding cartons.

2.   Raw Materials Supply Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing plastic caps.

3.   Purchase and Sale Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine equipment.

4.   Agreement between Winn-Dixie Stores, Inc. and Berry Plastics Corporation governing filling machine placement.

5.   Supply Agreement between Winn-Dixie Stores, Inc. and Southern Gardens-Citrus Processing Corp. governing not-for concentrate orange juice.

6.   Trademark License Agreement between Winn-Dixie Stores, Inc. and MARBO, Inc. governing license to use TAMPICO trademark.

7.   Supply Agreement between Winn-Dixie Stores, Inc. and Thatcher Company governing cleaning products.

8.   Purchase and Sale Agreement between Winn-Dixie Stores, Inc. and United Sugars Corporation governing liquid sucrose.

9.   Supply Agreement between Siemens Water Technologies Corporation and Winn-Dixie Stores, Inc.

*The assumption of this Lease is dependant upon SMI's ability to confirm the terms and conditions of this Lease to SMI's reasonable satisfaction.

## SCHEDULE H
To Asset Purchase Agreement

## SYSTEMS SEGREGATION MAP

## SCHEDULE H
### To Asset Purchase Agreement

### SYSTEMS SEGREGATION MAP



## SCHEDULE I
**To Asset Purchase Agreement**

## EMPLOYEE ACCRUALS

[To Be Completed At Closing]

## SCHEDULE J
### To Asset Purchase Agreement

### EXCLUDED EQUIPMENT

Plant City:

- WorkBrain

- Yard tractor owned by SMI

- AS/400 located at Winn-Dixie Headquarters used for development and testing relating to Plant City plant (a second AS/400 located at headquarters that is used to operate the Plant City plant is part of the Assets)

- AS/400 Software

- 12 parked semi/trailers located in Plant City yard, containing miscellaneous furniture and equipment not recently used in the operation of the plant

- 5-quart ice cream line leased from Berry Plastics (buckets and lids supplier) for nominal rent*

- 5-gallon water filler leased from Liquibox, Inc. (bottle supplier) for $500 per year*

- Over-the-road trucks and/or trailers temporarily located at the facility, e.g., for purposes of picking up product

Hammond:

- WorkBrain

- AS/400 Software

- Generator Model # 1820REOZDB; Serial #2100107, together with related 2006 flatbed Trailer VIN 1C9CK40386A681255

- Over-the-road trucks and/or trailers temporarily located at the facility, e.g., for purposes of picking up product

*These items of equipment are governed by contracts that are Assumed Contracts.

## SCHEDULE K
### To Asset Purchase Agreement

### LEGAL DESCRIPTION OF SUBLEASED REAL ESTATE

A CERTAIN PIECE OR PORTION OF GROUND SITUATED IN THE STATE OF LOUISIANA, TANGIPAHOA PARISH, PORTION OF SECTION 28, T 6 S, R 7 E, DESIGNATED AS LOT A AND MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCE FROM THE INTERSECTION OF THE NORTHWEST CORNER OF SECTION 28, T 6 S, R 7 E; THENCE S00°06'00"E A DISTANCE OF 59.40 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 190; THENCE ALONG SAID SOUTHERLY LINE N89°39'52"E A DISTANCE OF 138.41 FEET TO A POINT, THE POINT OF BEGINNING.

MEASURE THENCE FROM THE POINT OF THE BEGINNING ALONG SAID SOUTHERLY LINE N89°39'52"E A DISTANCE OF 465.00 FEET TO A POINT; THENCE S00°14'12"W A DISTANCE OF 308.00 FEET TO A POINT; THENCE N85°53'34"E A DISTANCE OF 36.72 FEET TO A POINT; THENCE S27°29'54"E A DISTANCE OF 115.35 FEET TO A POINT; THENCE S04°18'23"E A DISTANCE OF 342.00 FEET TO A POINT; THENCE S85°38'35"W A DISTANCE OF 559.00 FEET TO A POINT; THENCE N58°55'48"W A DISTANCE OF 106.70 FEET TO A POINT; THENCE WEST A DISTANCE OF 35.00 FEET TO A POINT; THENCE N00°04'21"W A DISTANCE OF 390.00 FEET TO A POINT; THENCE N75°32'31"E A DISTANCE OF 42.67 FEET TO A POINT, THENCE N14°20'38"W A DISTANCE OF 131.17 FEET TO A POINT; THENCE N03°59'04"W A DISTANCE OF 48.00 FEET TO A POINT; THENCE N89°39'52"E A DISTANCE OF 103.66 FEET TO A POINT; THENCE N00°14'12"W A DISTANCE OF 87.95 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE U.S. HIGHWAY 190, THE POINT OF BEGINNING.

LEGAL DESCRIPTION SUBJECT TO CHANGE BASED ON FINAL APPROVED SURVEY FROM BOCK & CLARK CORPORATION.

### SCHEDULE L
### To Asset Purchase Agreement

### LEGAL DESCRIPTION OF OWNED REAL ESTATE

Parcel 1

Commencing at the Northwest corner of the Northeast 1/4 of the Northeast 1/4 of Section 1, Township 29 South, Range 21 East, Hillsborough County, Florida; run thence North 89°39'28" East, along the North boundary of said Northeast 1/4 of the Northeast 1/4, for 44.08 feet to the Point of Beginning of the tract of land herein described; run thence South 37°42'45" East, for 37.27 feet to the beginning of a curve to the left, thence Southeasterly along said curve (having a radius of 463.34 feet, a chord bearing of South 50°24'15" East, a chord distance of 203.60 feet, and a central angle of 25°23'00"), for 205.27 feet; thence Southeasterly, along a curve to the left (having a radius of 1770.70 feet, a chord bearing of South 66°37'15" East, a chord distance of 217.74 feet, and a central angle of 7°03'00"), for 217.88 feet; thence Southeasterly, along a curve to the left (having a radius of 463.34 feet, a chord bearing of 76°53'30.5" East, a chord distance of 108.85 feet, and a central angle of 13°29'31") for 109.11 feet to the Northerly right of way line of Sidney Road; thence North 52°12'15" East along said Northerly right of way line, for 346.23 feet; thence North 37°42'45" West for 78.89 feet to the North boundary of the Northeast 1/4 of the Northeast 1/4 of said Section 1, Township 29 South, Range 21 East; thence North 37°42'45" West for 721.11 feet into the Southeast 1/4 of the Southeast 1/4 of Section 36, Township 28 South, Range 21 East; thence South 52°12'15" West for 565.0 feet; thence South 37°42'45" East for 288.78 feet to the Point of Beginning.

Parcel 2

Commence at the Southwest corner of the SE 1/4 of the SE 1/4 of Section 36, Township 28 South, Range 21 East, Hillsborough County, Florida; and run North 89°43' East, a distance of 44.08 feet; thence run North 37°45' West, a distance of 288.78 feet to the POINT OF BEGINNING; thence run North 37°45'00" West, a distance of 308.39 feet; thence run North 52°15'00" East, a distance of 565 feet; thence run South 37°45'00" East, a distance of 308.39 feet; thence run South 52°15'00" West, a distance of 565.00 feet to the POINT OF BEGINNING.

Parcel 3

Commence at the Southwest corner of the SE 1/4 of the SE 1/4 of Section 36, Township 28 South, Range 21 East, Hillsborough County, Florida; and run North 89°43' East, a distance of 44.08 feet; thence run North 37°45' West. a distance of 288.78 feet; thence run North 52°15' East, a distance of 565.00 feet to the POINT OF BEGINNING; thence run North 52°15' East, a distance of 272.25 feet; thence run North 37°45' West, a distance of 106.70 feet; thence run North 85°52' West, a distance of 302.09 feet; thence run South 52°15' West, a distance of 47.54 feet; thence run South 37°45' East, a distance of 308.39 feet to the POINT OF BEGINNING; less the North 30.0 feet for drainage easement.

**SCHEDULE M**
**To Asset Purchase Agreement**

**RECORDS CONSTITUTING ASSETS AND RECORDS UPON WHICH BUYER RELIED**

The following items provided to Buyer from the Merrill Database:

- Dairies MFG Liabilities

- Hammond Financials – FY2006 – FY2008

- Dairies Milk Crate Expense – FY2006 – FY2008

- Plant City Dairy Financials – FY2006 – FY2008

- Plant City Ice Cream Financials – FY2006 – FY2008

- Hammond Financials – Updated FY2007

- Dairies Aged Inventory Analysis

- Dairies Balance Sheet – Period 06 FY 2008

- Dairy Plants Associates – 12.18.07

- Dairies Fixed Assets – FY 2008 Period 06

- Dairies Shrink Data

- Dairies Sales Volumes

- Dairies Employee List – Title – Pay – Bonus

- Bernos – Severance Agreement (Dairies)

- Claims History (WC, AU & GL) – 7.29.03 – 8.22.07 (Fitzgerald, H)

- Winn-Dixie Stores Claim Totals – as of 1.2.08

- Plant City Tax Return 2007

- Hammond Tax Return 6.2007

- IT Overview – Manufacturing Systems

The following additional items:

- Construction in Progress – Detail (as provided to A. Antoine)

- Employee list updated February 25, 2008

- Fiscal Year 2008 Revised Forecast, dated December 11, 2007, for Hammond and Plant City (as supplied to C. Covington)

- January 21, 2008 Pro forma for Plant City and Hammond combined (as provided to C. Covington)

2

<u>**SCHEDULE N**</u>
**To Asset Purchase Agreement**

<u>BUYER'S AND SELLER'S PERSONNEL TO WHOM KNOWLEDGE DEFINITION APPLIES</u>

### PERSONS WITH "KNOWLEDGE" FOR BUYER

1. **Calvin Covington**, CEO, Southeast Milk, Inc.

2. **Albert Antoine**, CFO, Southeast Milk, Inc.

3. **Patricia Fogler**, Human Resources, Southeast Milk, Inc.

4. **Justin Lazanowski**, Management Information Systems, Southeast Milk, Inc.

5. **Mark Soehnlen,** Partner, Structura Architects, Ltd.

6. **Dan Soehnlen**, President, Superior Dairy, Inc.

### PERSONS WITH "KNOWLEDGE" FOR SELLER

1. **Donald Bernos**, Plant Manager, Hammond and Plant City Dairies

2. **Sheila Reinken**, Vice President, Finance & Treasurer

3. **Graham Leary**, Vice President, Strategic Sourcing

4. **Catherine Ibold**, Senior Director, Group Leader - Real Estate Law

5. **Anthony Austin**, Senior Vice President, Human Resources

**EXHIBIT A**
**To Asset Purchase Agreement**

FORM OF
SELLER'S TITLE AND NON-FOREIGN AFFIDAVIT

**SELLER'S TITLE AND NON-FOREIGN AFFIDAVIT**
[City, State]

STATE OF _____ )        _____ Commitment No. _____ (the "<u>Commitment</u>")
                )        Issued by _____ Title Insurance Company
COUNTY OF _____)        ("<u>Title Company</u>")

**BEFORE ME**, the undersigned Notary Public, on this _____ day of _____,
200_, personally appeared _____ (the "<u>Affiant</u>"), the _____
of _____, a _____ (the "<u>Company</u>"),
who being first duly sworn by me deposes and says:

1.    That the Affiant is at least eighteen (18) years of age and is competent, and is authorized by the Company, to execute this Affidavit.

2.    That, to the Company's knowledge, the Company is the lawful owner and holder of a fee simple/leasehold interest in that certain real property, lying, situate and being in _____ County/Parish, _____, as more particularly described in the attached <u>Exhibit A</u> (the "<u>Property</u>").

3.    That the Company has not contracted for, authorized, or directed that any work be done or materials supplied for work to be done on or about the Property for which a construction lien could attach to the Property pursuant to Florida Statutes, or, to the extent that any work has been done, such work has been paid for in full.

4.    That, except as shown on the Commitment, to the Company's knowledge, there are no encumbrances, mortgages, liens, claims, judgments, taxes, assessments, demands or bills outstanding and unpaid at this time against the Property, and that the Company has not taken any action or omitted to take any action that would result in the placement of any encumbrances, mortgages, liens, claims, judgments, taxes, assessments, demands or bills either outstanding or of record against the Property, of any nature, kind, or description whatsoever.

5.    That, except as shown on the Commitment, the Company is in sole possession of the Property and there is no person or entity owning or claiming to own any interest in the title to the Property or any appurtenance thereto adverse to that of the Company.

6.    That the Company has not taken any action or suffered any omission, and has no actual knowledge of any matters pending against the Company that could give rise to a lien or encumbrance that would attach to the Property between the date of the Commitment and the disbursing of the funds and the recording of the Deed.

7.    That the Company has not executed, and will not execute, any instrument that would adversely affect the title or interest to be insured by Title Company.

8.   That the Company understands that Title Company is disbursing funds related to the transaction for which this Affidavit is given prior to the recording of the Deed, and Title Company is relying on this Affidavit in so doing.

9.   That the Company is not a "foreign person" as defined under Section 1445 of the Internal Revenue Code, and the regulations thereunder, and that the Company understands that Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person, and that this Affidavit is given to inform Buyer that withholding of tax is not required upon the Company's disposition of a United States real property interest.

10.  That the Company is not a nonresident alien for purposes of United States income taxation.

11.  That the Company's address is 5050 Edgewood Court, Jacksonville, Florida 32254-3699 and Federal Employer Identification Number is _____.

12.  That the Company hereby indemnifies and agrees to protect, defend and hold harmless Title Company and Smith, Gambrell & Russell, LLP, as title agent ("Title Agent"), of and from any and all loss, costs, damages, claims or expense of any kind, including attorneys' and paralegals' fees, whether at trial or on appeal, which Title Company and Title Agent shall or may suffer, expend, incur, or become liable as a direct or indirect result of such parties' reliance on the statements made herein.

**AFFIANT:**

_____
Name: _____

STATE OF FLORIDA
COUNTY OF DUVAL

This instrument was acknowledged before me this ___ day of _____, 200_, by _____, the _____ of _____, a _____, on behalf of the _____. He/She either [____] is personally known to me or [____] has produced _____ as identification.

_____
Print Name:_____
Notary Public, State of _____
Commission No.:_____
My Commission Expires:_____

[NOTARY SEAL]

2

## EXHIBIT A
To Seller's Title and Non-Foreign Affidavit

**EXHIBIT B**
**To Asset Purchase Agreement**

FORM OF
GENERAL ASSIGNMENT OF LICENSES, PERMITS AND APPROVALS

**GENERAL ASSIGNMENT OF LICENSES, PERMITS**
**AND APPROVALS**
[Dairy Plants]

**THIS GENERAL ASSIGNMENT OF LICENSES, PERMITS AND APPROVALS** (this "General Assignment") is made effective as of _____, 2007 (the "Effective Date"), by

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Winn-Dixie"),

**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company wholly-owned by Winn-Dixie ("Properties LLC"),

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company wholly-owned, indirectly, by Winn-Dixie ("Leasing LLC"),

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation wholly-owned by Winn-Dixie ("Logistics" and, collectively with Winn-Dixie, Properties LLC, Leasing LLC and Logistics, "Assignor")), and

_____, a _____ ("Assignee").

**R E C I T A L S :**

A.    Assignor and Assignee are parties to that certain Asset Purchase Agreement dated effective _____, 2007 (the "Agreement"), pursuant to which Assignor has agreed to sell, convey, assign or sublease, as applicable, to Assignee its respective interest in the Assets described therein (the "Transaction").

B.    Assignor has previously obtained governmental and private licenses, permits or other authorizations or approvals as more particularly described on attached Exhibit A (the "Licenses") relating to the Assets, as defined in the Agreement.

C.    In furtherance of the Transaction, Assignor and Assignee desire to enter into this Assignment to evidence the assignment of the Licenses, to the extent assignable.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Assignment.   Assignor hereby conveys, transfers and assigns to Assignee all of Assignor's right, title and interest in and to the Licenses, to the extent assignable, in favor of or in the name of Assignor or in which Assignor has an interest, in connection with the ownership and operation of the Assets, and, to the extent applicable, Assignee hereby accepts and agrees to perform all duties, obligations and liabilities of the permittee or licensee under the assigned Licenses arising or accruing from and after the Effective Date.   Such assigned Licenses will include, without

limitation, certificates of occupancy, fire, health and safety code compliance certificates, zoning and land use compliance certificates, building operational licenses, business and service licenses, utility service permits or approvals, and environmental impact permits, relating to the Assets.

2.   <u>Further Assurances</u>.  Each party agrees to execute and deliver such other assignments, affidavits, instruments or certifications as any other party reasonably may request as necessary or appropriate to fully consummate the assignment of the Licenses, to the extent assignable, as set forth in this General Assignment.

3.   <u>Governing Law</u>.  This instrument shall be governed by and construed in accordance with the internal laws of the State of Florida.

4.   <u>Binding Effect</u>.  This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

[SIGNATURE PAGE FOLLOWS]

Exhibit B to Asset Purchase Agreement
Form of General Assignment of Licenses, Permits and Approvals
Dairy Plants Disposition
SGRJAX\114976.2

**IN WITNESS WHEREOF**, Assignor and Assignee each have caused this General Assignment to be executed by its duly authorized signatory as of the Effective Date.

**ASSIGNOR:**

**WINN-DIXIE STORES, INC.,** a Florida corporation

Name:_____

By:_____
Name: _____
Its:_____ President

Name:_____

**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company

Name:_____

By:   Winn-Dixie Stores, Inc., a Florida corporation, its sole member

Name:_____

By: _____
Name:_____
Its:_____ President

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company

Name:_____

By:   Winn-Dixie Logistics, Inc., a Florida corporation, its sole member

Name:_____

By: _____
Name:_____
Its:_____ President

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

Name:_____

By:_____
Name:
Its:_____ President

Name:_____

3

**ASSIGNEE:**

_____, a _____

By:_____

Name:

Its:_____

4

Exhibit A

Licenses

Exhibit B to Asset Purchase Agreement
Form of General Assignment of Licenses, Permits and Approvals
Dairy Plants Disposition
SGRJAX\1 14976.2

**EXHIBIT C**
**To Asset Purchase Agreement**

FORM
OF SPECIAL WARRANTY DEED

PREPARED BY AND RETURN TO:

DOUGLAS G. STANFORD, ESQUIRE
SMITH, GAMBRELL & RUSSELL, LLP
50 NORTH LAURA STREET, SUITE 2600
JACKSONVILLE, FLORIDA 32202

**SPECIAL WARRANTY DEED**

**THIS SPECIAL WARRANTY DEED**, is given this ___ day of _____, 200_, by

**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company, whose address is 5050 Edgewood Court, Jacksonville, Florida 32254-3699 ("Grantor"), to

_____, a _____, whose address is _____ ("Grantee").

**W I T N E S S E T H:**

**THAT** Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, to it in hand paid by Grantee, the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed unto Grantee, its successors and assigns, forever, that parcel or parcels of land, situate, lying and being in the County of Hillsborough, State of Florida, as more particularly described on Exhibit A attached hereto ("Property"), together with all tenements, easements, hereditaments and appurtenances belonging thereto.

**TO HAVE AND TO HOLD** the same unto Grantee in fee simple forever.

**AND** Grantor does hereby fully warrant the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other, subject, however, to the permitted encumbrances identified on attached Exhibit B.

**IN WITNESS WHEREOF**, Grantor has caused these presents to be executed in its name the day and year first above written.

Signed, sealed and delivered
in the presence of:

**GRANTOR:**

**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company

_____

Name:_____

By:   Winn-Dixie Stores, Inc., a Florida
      corporation, its sole member

_____

Name:_____

      By: _____
      Name:_____
      Its: _____

STATE OF _____
COUNTY OF _____

This instrument was acknowledged before me this \_\_ day of _____, 200\_, by _____, the _____ President of Winn-Dixie Stores, Inc., the sole member of Winn-Dixie Properties, LLC, a Florida limited liability company, on behalf of the company.   He/She either [\_\_\_] is personally known to me or [\_\_\_] has produced _____ as identification.

_____
Print Name:_____
Notary Public, State of _____
Commission No.:_____
My Commission Expires:_____

[NOTARY SEAL]

## EXHIBIT A

Legal Description

**EXHIBIT B**

<u>Schedule of Permitted Encumbrances</u>

1.    All assessments and taxes for the year 200_ and all subsequent years, which are not yet due and payable.

2.    [Other Permitted Encumbrances – to be added based on title examination]

**EXHIBIT D**
**To Asset Purchase Agreement**

FORM
OF BILL OF SALE

**BILL OF SALE**
[Property Name]

**THIS BILL OF SALE** is made effective as of the _____ day of _____, 2008, by and between _____, a _____ ("Seller"), and _____, a _____ ("Buyer").

By this Bill of Sale, Seller, in accordance with the terms and conditions of that certain Asset Purchase Agreement dated _____, 2008, (the "Asset Purchase Agreement"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, convey, assign and deliver unto Buyer, its successors and assigns, all of the Seller's right, title and interest in the Inventories, the Equipment and the Supplies, relating to the [identify Plant location], including, without limitation, those specifically described assets listed on attached Exhibit "A" (collectively, the "Personal Property"), to have and to hold the Personal Property unto Buyer, its successors and assigns, to and for its or their use, forever.

Seller represents and warrants to Buyer that Seller has good and lawful right, title and interest in the Personal Property and that the Personal Property is free and clear of any and all Encumbrances,  Nothing contained in this Bill of Sale shall be deemed to supersede or diminish any of the obligations, agreements, covenants, representations or warranties of Seller contained in the Asset Purchase Agreement.  Capitalized terms not otherwise defined in this Bill of Sale will have the meanings assigned to such terms in the Asset Purchase Agreement.  This Bill of Sale shall be governed in all respects by the laws of the State of Florida.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 2008.

**"SELLER"**

_____, a _____

By: _____
Name: _____
Title:_____

**EXHIBIT A**
**PERSONAL PROPERTY**

[TO BE DELIVERED BY SELLER / SELLER'S COUNSEL]

**EXHIBIT E-1**
**To Asset Purchase Agreement**

FORM
OF SUBLEASE AGREEMENT

(This Form for use without accompanying Nondisturbance Agreement with Lessor)

## SUBLEASE

**THIS SUBLEASE** is made as of _____, 2008 (the "Effective Date") by and between **WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company ("Sublessor"), and **SUNSHINE STATE DAIRY FARMS, LLC**, a Florida limited liability company ("Sublessee").

### R E C I T A L S :

A.    Sublessor is the owner of a leasehold estate in and to certain real property and improvements thereon located at 3925 Highway 190 West, Hammond, Tangipahoa Parish, Louisiana (the "Leased Facility), as more particularly described in, and pursuant to, that certain Lease Agreement dated August 10, 1999, between ZSF/WD Hammond, LLC, a Delaware limited liability company, as landlord ("Lessor") and Winn-Dixie Louisiana, Inc., whose interest therein previously was assigned from time to time and presently is invested in Sublessor, as tenant, as more particularly described on attached Exhibit A (the "Prime Lease").

B.    A memorandum or short form of the Prime Lease is recorded in Conveyance Book 883, page folio 523, as assigned and recorded in Official Records Book 1082, page 152, of the Official Records of Tangipahoa Parish, Louisiana.

C.    Sublessor desires to sublease to Sublessee and Sublessee desires to sublease from Sublessor a portion of the Leased Facility, as more particularly described on attached Exhibit B (the "Subleased Premises," which includes all improvements, easements, appurtenances, fixtures and equipment leased to Sublessor under the Prime Lease relating to such portion of the Leased Facility) on the terms, covenants and conditions set forth in this Sublease. The Subleased Premises includes an approximately 49,966 square foot dairy plant operated by Winn-Dixie Logistics, Inc., an affiliate of Sublessor, and used for processing and packaging milk, other dairy products and other beverage products, as transferred to Sublessee as of even date herewith pursuant to that certain Asset Purchase Agreement dated effective February ____, 2008, between Sublessor and its affiliates, as seller, and Sublessee and its affiliate, as buyer (the "Purchase Agreement").

D.    Sublessee, as "Supplier," and Sublessor's affiliate, Winn-Dixie Procurement, Inc., a Florida corporation, are parties to that certain Supply Contract dated of even date herewith (the "Supply Contract") for the purchase of fluid milk products and other dairy products (the "Milk Products") as well as other products, produced at the Subleased Premises and at Sublessee's dairy

Page 1 of 23

processing plant located in Plant City, Florida (together, the "Acquired Plants").

E.   Capitalized terms not otherwise defined herein will have the meanings assigned to such terms in the Prime Lease or the Purchase Agreement, as applicable, and in the event of any conflict between such terms, the definitions set forth in the Prime Lease will be controlling.

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements contained in this Sublease, Sublessor and Sublessee agree as follows:

1.   Subleased Premises.   Subject to and upon the terms and conditions hereinafter set forth, Sublessor does hereby Sublease and demise unto Sublessee, and Sublessee hereby Subleases from Sublessor, the Subleased Premises, together with the easements and other rights in and to use of the Common Areas (hereinafter defined), covered by and Subleased to Sublessor under the Prime Lease.

2.   Common Areas; Exclusive Systems.   Sublessee and its customers, contractors, agents, guests and invitees will have the non-exclusive use and enjoyment of the Common Areas in common with Sublessor, other owners, tenants and subtenants having lawful interests within the Leased Facility, and their customers, contractors, agents, guests, and invitees, subject to rules and regulations promulgated by Sublessor from time to time.   "Common Areas" will mean the following shared infrastructure, systems and facilities:

(a)   drainage facilities and retention/detention ponds, if any, located within the Leased Facility;

(b)   existing parking lot lighting located within the Leased Facility (but excluding any additional lighting installed by Sublessee within the Subleased Premises);

(c)   sewer utility lines and mains located within the Leased Facility, but excluding the Dairy Onsite Treatment Facility and the Dairy Sewer System, as defined in Section 7(e) below; and

(d)   during the Interim Operations Period, as defined in Section 7(i) below, the systems, facilities and utilities as described in Sections 7(a)–(h) below.

Certain Exclusive Systems within the Leased Facility are or will be dedicated solely to the use, benefit and enjoyment of Sublessee and its customers, contractors, agents, guests and invitees, as provided in and subject to Section 7 hereof, and will not be considered Common Areas.

3.   Sublease Term and Renewal Terms.   The initial term of this Sublease will commence on the Effective Date and will expire on that date which is five (5) years thereafter (the "Initial Term"), unless sooner terminated as hereinafter provided or by operation of law, subject, however, to the provisions of Section 11 hereof.  Following the Initial Term, Sublessee will have the option

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

of renewing this Sublease for each of ten (10) additional successive terms of one (1) year each, and a final renewal term thereafter terminating on August 30, 2024 (each a "Renewal Term"), provided that no default or event which with the passage of any applicable grace or cure period would constitute a default of Sublessee exists hereunder or of Sublessor under the Prime Lease as of the effective date of such renewal; it being understood, however, that Sublessee will be obligated to exercise each such renewal if, as of the expiration of the then-current term of this Sublease, the Supply Contract has not been terminated by either party thereto pursuant to the provisions of Section 1.a of the Supply Contract and Winn-Dixie Procurement, Inc. has not been released, pursuant to the provisions of clause (ii) of the first sentence of the second paragraph under "Other Price Considerations" in Schedule D to the Supply Contract, from its obligation to purchase its "Product Requirements" (as such term is defined in the Supply Contract) for fluid milk Products (as such term is defined in the Supply Contract). The Initial Term and each Renewal Term thereinafter collectively are referred to as the "Sublease Term," which will be governed by the terms and conditions of this Sublease. Sublessee's Rights Upon Renewal of Prime Lease.   If Sublessor exercises its option to renew the Prime Lease for any or all of its available five (5) successive five (5) year terms beyond the "Base Term" thereunder, then Sublessee will have the automatic right and option, in its sole discretion, to extend the term of this Sublease for an equal term to that term renewed by Sublessor (each an "Additional Term"); provided, however, that if Winn-Dixie Procurement, Inc. has a commitment extending at least one (1) year into the Additional Term to purchase at least forty million gallons of Milk Products from Sublessee at the Acquired Plants under the Supply Contract, then Sublessee will extend the term of this Sublease if Sublessor exercises its option to renew the Prime Lease.  Sublessor will provide Sublessee not less than twenty (20) months' prior written notice of its intent to exercise its right to renew the Prime Lease.  In the event Sublessor exercises its option to renew the Prime Lease, each such Additional Term will be governed by the terms of this Sublease.  If Sublessor declines to exercise its right to renew the Prime Lease and Sublessee nonetheless desires to continue in possession of the Subleased Premises, then upon Sublessee's reasonable request, Sublessor will cooperate in good faith with Sublessee in Sublessee's efforts to negotiate a direct lease between Lessor and Sublessee relating to the Subleased Premises; it being understood, however, that in no event will Sublessor be obligated to renew or extend the Prime Lease beyond the "Base Term" thereunder, or to remain obligated as a primary tenant, co-tenant, surety or guarantor under the Prime Lease or such direct lease entered between Lessor and Sublessee.

5.     Terms of Prime Lease.

   (a)     Obligations under Prime Lease.  This Sublease and Sublessee's interest in the Subleased Premises are subject and subordinate to the Prime Lease and any mortgage encumbering the Subleased Premises, and will not modify or alter any rights of Lessor contained in the Prime Lease.  Except as may be otherwise provided in this Sublease, all rights, privileges, obligations and duties contained in the Prime Lease are hereby imposed upon and granted to the respective parties to this Sublease, Sublessor herein being substituted for Lessor in the Prime

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

Lease, and Sublessee herein being substituted for the Lessee in the Prime Lease; provided, however, that Sublessee will not be required to make payments of Base Rent or Supplementary Rent, or any other payments under the Prime Lease. Except for the rent payment and other provisions of the Prime Lease, as to the Subleased Premises only and the rights and easements granted herein to Sublessee in the Common Areas, or as expressly provided to the contrary in this Sublease, Sublessee hereby assumes and agrees to comply with and be bound by all of the terms, covenants, and conditions of the Prime Lease and to do and perform all the terms, covenants, and conditions of the Prime Lease on the part of the "Lessee" therein to be performed and observed during the Sublease Term, including, without limitation, the provisions of Sections 8.01, 8.02 and 8.05 of the Prime Lease with respect to the Subleased Premises to the same extent as if Sublessee were the "Lessee" under the Prime Lease, insofar as same pertain and apply to the Subleased Premises. Notwithstanding anything contained in the Prime Lease, Sublessee does not assume or agree to be bound to the covenants, representations or warranties made by Sublessor in Sections 8.09 and 20.01 of the Prime Lease, it being understood that any related representations and warranties of Sublessee are set forth in <u>Section 12</u> hereof. Further, notwithstanding anything contained in the Prime Lease, Sublessee does not assume or agree to be bound to the covenants, representations or warranties made by Sublessor to Lessor accruing prior to the Effective Date of this Sublease, including, without limitation, the covenants made by Sublessor to Lessor in Sections 19.01 and 19.02 of the Prime Lease.

(b)   <u>Attornment to Lessor</u>. Upon any termination of the Prime Lease, Sublessee will be obligated, at Lessor's written election, if this Sublease has not been sooner terminated by its terms or otherwise by Sublessor and Sublessee, to attorn to and recognize Lessor as successor landlord under this Sublease, whereupon this Sublease will continue in full force and effect as a direct lease between Sublessee and Lessor, as landlord, upon all of the terms and conditions of this Sublease.

6.   <u>Rent; Supplementary Rent And Other Charges</u>.

(a)   <u>Base Rent</u>. During the Sublease Term, Sublessee will pay to Sublessor annual Base Rent in the amount of $500,000.00, payable in advance in equal installments of $41,666.67. Base Rent will be payable on the first day of each calendar month in lawful United States currency, together with any and all sales or use taxes levied upon the use or occupancy of the Subleased Premises and any rent or other charges payable hereunder. Base Rent does not include Sublessee's pro-rate share of Operating Expenses, as defined below. Base Rent will be due and payable beginning on the Effective Date and on the first day of each and every month thereafter throughout the Sublease Term, and will be paid without set off or deduction to Sublessor at its address above or such other address as Sublessor directs in writing. The monthly Base Rent for any partial month at the beginning of the

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

Sublease Term will equal the product of 1/365 of the annual Base Rent and the number of days in the partial month and will be due on the Effective Date. Payments of Base Rent for any fractional calendar month at the end of the Sublease Term similarly will be prorated.

(b) <u>Late Payment Provisions</u>. If any Base Rent or other payment due under this Sublease is not received by Sublessor within 10 days of the due date of such payment, Sublessee will pay in addition to such payment a late charge equal to two percent (2%) of the payment that is past due or $250, whichever is greater.   If any payment due from Sublessee will remain overdue for more than 10 days, interest will accrue daily on the past due amount from the date such amount was due until paid or judgment is entered at a rate equivalent to 12% percent per annum or the highest rate permitted by law, whichever is lesser.  Interest on the past due amount will be in addition to and not in lieu of the two percent (2%) percent late charge or any other remedy available to Sublessor.

(c) <u>Supplementary Rent</u>.   All charges payable by Sublessee under the terms of this Sublease other than Base Rent are called "<u>Supplementary Rent</u>." Unless this Sublease provides otherwise, all Supplementary Rent accrued through any given rental period will be paid with the next monthly installment of Base Rent. The term "<u>Rent</u>" will mean Base Rent and Supplementary Rent.

(d) <u>Supplementary Rent for Operating Expenses</u>.   In addition to the Base Rent payable under <u>Section 5(a)</u> hereof, Sublessee agrees to pay as Supplementary Rent its proportionate share of the Operating Expenses (hereinafter defined) for the Common Areas.  The proportionate share ("<u>Sublessee's Share</u>") to be paid by Sublessee will be a fraction, the numerator of which will be the floor area of the buildings located within the Subleased Premises and the denominator of which will be the gross floor area of all buildings located within the Leased Facility. Sublessee's Share is 4.17%.  Within 90 days after the end of each calendar year, Sublessor will send a statement of Operating Expenses to Sublessee for the prior year providing in reasonable detail a statement of all Operating Expenses incurred in the operation of the Leased Facility along with the amount representing Sublessee's Share. Sublessee will be given a credit against Sublessee's Share of future Operating Expenses payable for any overpayment of Operating Expenses that have been paid up to the time of said statement.   If Sublessee has underpaid, then Sublessee will pay the balance due to Sublessor within 30 days of the date of said statement unless the statement is rendered at the end of the Term in which case any overage due Sublessor will be paid by check at the time Sublessee delivers the Subleased Premises to Sublessor. Concurrently with the invoice described above, Sublessor will also provide an estimate of the Operating Expenses for the next calendar year and a statement of the estimated monthly Operating Expenses payable by Sublessee. "<u>Operating Expenses</u>" will mean any amounts paid or payable whether

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

by Sublessor or by others on behalf of Sublessor, arising out of Sublessor's maintenance, operation, repair, replacement (if such replacement is required under any governmental regulation that was not applicable to the Leased Facility as of the Effective Date) and administration of the Common Areas, including, without limitation, any costs and expenses incurred by Sublessor pursuant to Section 8(e)(i) hereof.

(e)  Supplementary Rent for Sewer Service Costs.  The Sewer Pretreatment Agreement, as contemplated under the Purchase Agreement, may provide that certain costs incurred by Sublessor in constructing or installing the Dairy Onsite Pretreatment Facility will be subject to reimbursement by Sublessee (as to the Augmentation Cost), or by the City of Hammond (as to the Utility Cost Contribution).  If the Augmentation Cost is not sooner paid pursuant to the Purchase Agreement, then Sublessor may charge the Augmentation Cost to Sublessee as Supplementary Rent.  If Sublessee's required payment to Sublessor relating to the Utility Cost Contribution is not sooner paid pursuant to the Purchase Agreement, then Sublessor may charge such amount to Sublessee as Supplementary Rent.

7.  Exclusive Systems.  The Subleased Premises shares certain infrastructure, systems and utilities with the remainder of the Leased Facility, which constitute Common Areas except to the extent such systems are segregated to provide exclusivity of such systems for the benefit of the Subleased Premises, as provided below (the "Exclusive Systems").

(a)  Access Roads; Parking.  Ingress and egress and parking facilities serving the Subleased Premises will be self-contained, and will be installed, operated and maintained by Sublessee at its cost and expense, except for temporary ingress and egress and parking rights as otherwise provided in this Section 7.  Sublessee is to construct certain roadways and parking facilities within the Subleased Premises pursuant to the Purchase Agreement.

(b)  Security; Lighting.  Security for the Subleased Premises will be self-contained, and will be installed, operated and maintained by Sublessee at its cost and expense, except for existing parking lot lighting serving the Subleased Premises and the Distribution Center, which lighting will remain in place as Common Areas.

(c)  Fire Safety.  Fire safety systems for the Subleased Premises will be self-contained, and will be operated and maintained by Sublessee at its cost and expense.  Connection of the fire safety systems to City of Hammond water sources will be made pursuant to the Purchase Agreement.

(d)  Potable Water Utilities.  Potable water service to the Subleased Premises is self-contained and metered; related water service to the Subleased Premises will be at Sublessee's cost and expense.

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

(e) <u>Dairy Sewer System</u>.  Existing sewer collection lines located on the Subleased Premises will be for the exclusive use of the Subleased Premises, and will feed into an onsite sewer pretreatment facility to be constructed or installed on the Subleased Premises (the "<u>Dairy Onsite Treatment Facility</u>") for the exclusive use of the Subleased Premises (collectively, the "<u>Dairy Sewer System</u>").  The Dairy Sewer System will feed pretreated effluent originating from the Subleased Premises into the Common Area sewer lines.  Construction or installation of the Dairy Onsite Treatment Facility, and operation of the Dairy Sewer System, will be pursuant to the Purchase Agreement and the Sewer Pretreatment Agreement as contemplated under the Purchase Agreement.  Related sewer service to the Subleased Premises will be at Sublessee's cost and expense.

(f) <u>Electric Utilities</u>.  Electric utility service to the Subleased Premises will be self-contained and metered; related electric service to the Subleased Premises will be at Sublessee's cost and expense.  Connection and metering of the electric utility lines and facilities with the utility service provider will be made pursuant to the Purchase Agreement.

(g) <u>Gas Utilities</u>.  Natural gas utility service to the Subleased Premises will be self-contained and metered; related natural gas service to the Subleased Premises will be at Sublessee's cost and expense.  Connection and metering of the gas lines and facilities with the utility service provider will be made pursuant to the Purchase Agreement.

(h) <u>Communication Systems</u>.  Telephone, cable and communication lines, equipment and software, if any, serving the Subleased Premises will be self-contained and metered, as appropriate; related communications services to the Subleased Premises will be at Sublessee's cost and expense.  Installation of new or replacement lines, equipment and facilities and removal of unused or redundant lines, equipment and facilities will be pursuant to the Purchase Agreement.

(i) <u>Interim Systems Operations as Common Areas</u>.  Subsequent to the Effective Date and prior to full operational status of each of the separate systems described in <u>Sections 7(a)–(h)</u> above (the "<u>Interim Operations Period</u>"), Sublessor and Sublessee will have joint use of existing access roads, parking, security, lighting, fire safety, water utilities, sewer utilities, electric utilities, gas utilities, and communications systems serving the Leased Facility as reasonably necessary or appropriate to the continuing operation of the Distribution Center and the Subleased Premises in the ordinary conduct of its respective business, subject to the terms of the Purchase Agreement, and subject to and in full compliance with Sublessor's security policies and procedures.  During the Interim Operations Period, Sublessee will contribute Sublessee's Share of the utility charges incurred by Sublessor in maintaining water, sewer,

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

electric, gas and communications utility service to the Leased Facility, as Supplementary Rent.

8.   Use Of Subleased Premises.

(a)   Permitted Uses. Sublessee may use and occupy the Subleased Premises only for food and beverage manufacturing and processing (the "Permitted Use"); provided, however, that to the extent that Sublessee no longer continues to supply Sublessor with Milk Products under the Supply Contract, then Sublessee may use and occupy the Subleased Premises for any other lawful purpose, subject only to the use restrictions contained in Section 8.01 of the Prime Lease. Sublessee will observe all reasonable rules and regulations established by Lessor or Sublessor from time to time for the Leased Facility or the Subleased Premises.

(b)   Specialized Equipment.   The Subleased Premises includes an ammonia-based refrigeration system together with operating manuals and protocols (the "Refrigeration System").   Operation, maintenance and repair of the Refrigeration System is a highly technical procedure that, if improperly conducted, may result in injury or death to persons, or damage to property.   Sublessor agrees to assist Sublessee in training Sublessee's personnel to operate and maintain the Refrigeration System, on a reasonable request basis.

(c)   Spur Track Usage. The Subleased Premises has available access to rail service over spur tracks served by Canadian National Railway (the "Railroad"). Sublessee's use of the spur tracks will be subject to such terms, covenants and conditions as may be established by the Railroad from time to time for access to rail service, and may require Sublessee to enter into a spur track agreement with the Railroad, all at Sublessee's sole cost and expense.

(d)   Alterations to Subleased Premises; No Attachment of Liens. Sublessee will make such alterations to the Subleased Premises as may be necessary to fully segregate the ground area of the Subleased Premises from the adjacent Leased Facility by use of fencing and gates and relocation and/or construction of interior entries, driveways and parking areas within the Subleased Premises, subject to Sublessee's right to non-exclusive use of the Common Areas.   The construction, installation, and payment for the alterations necessary to fully segregate the Subleased Premises will be pursuant to the Purchase Agreement, Sewer Pretreatment Agreement, and this Sublease, as applicable.   The Subleased Premises will be required to have direct access, and self-contained/self-provided security, parking and loading areas, without entry onto the adjacent portion of the Leased Facility not included in the Subleased Premises.   Such alterations, and any other alterations made by Sublessee to the Subleased Premises, will be performed in accordance with the terms and conditions of Sections 8.03 and 8.04 of the Prime Lease at Sublessee's sole cost and expense and will be made in a good and workmanlike manner, lien free and in

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

accordance with all applicable laws and regulations. SUBLESSEE WILL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND WILL PROMPTLY DISCHARGE, ANY LIEN, WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE EFFECTIVE DATE, ON THE SUBLEASED PREMISES OR ANY RENT, ADDITIONAL MONETARY OBLIGATIONS OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE. NOTICE IS HEREBY GIVEN THAT, TO THE EXTENT PROVIDED BY LAW, NEITHER THE OWNER (LESSOR) OR SUBLESSOR WILL BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO SUBLESSEE, OR TO ANYONE HOLDING THE SUBLEASED PREMISES THROUGH OR UNDER SUBLESSEE, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS WILL ATTACH TO OR AFFECT THE INTEREST OF LESSOR OR SUBLESSOR IN THE SUBLEASED PREMISES.

(e)     Compliance With Laws.

(i)      Sublessor's Compliance.  During the Sublease Term, Sublessor will be responsible for making any modifications to the Leased Facility and its appurtenances, excluding the Subleased Premises but including the Common Areas serving the Subleased Premises, required pursuant to the Prime Lease or pursuant to any federal, state or local laws, ordinances, building codes, and rules and regulations of governmental entities having jurisdiction over the Leased Facility, including but not limited to the Americans with Disabilities Act (the "ADA"), all regulations and orders promulgated pursuant to the ADA, and codes, rules and regulations of the Board of Fire Underwriters (collectively, "Applicable Laws"). Any modifications to Common Areas made by Sublessor pursuant to the provisions of this paragraph will initially be at Sublessor's expense; however, such expense may be included in Sublessor's Operating Expenses as set forth above.

(ii)     Sublessee's Compliance.  Sublessee will materially comply with all Applicable Laws with respect to the Subleased Premises, and will promptly comply with all governmental orders and directives for the correction, prevention, and abatement of nuisances in, upon, or connected with the Subleased Premises, all at Sublessee's sole expense.  Sublessee warrants that all improvements or alterations of the Subleased Premises made by Sublessee or Sublessee's employees, agents or contractors, either prior to Sublessee's occupancy of the Subleased Premises or at any time during the term of this Sublease, will comply with all Applicable Laws.  Sublessee will procure at its own expense all permits and licenses required for the transaction of its business in the Subleased Premises.  In addition, Sublessee warrants that its use and operation of the Subleased Premises will be in strict compliance with all Applicable Laws.  During the Sublease Term, Sublessee will, at

Page 9 of 23

its sole cost and expense, make any modifications to the Subleased Premises that may be required pursuant to any Applicable Laws.

(f)     <u>Hazardous Material</u>.   Throughout the Sublease Term, Sublessee will not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials (as hereinafter defined) on, under, in, above, to, or from the Subleased Premises, the Common Areas or, by actions of Sublessee or its employees, agents or licensees, the remainder of the Leased Facility other than in strict compliance with Applicable Laws and the terms of this Sublease and the Prime Lease.  For purposes of this provision, the term "<u>Hazardous Materials</u>" will mean and refer to any wastes, materials, or other substances of any kind or character that are or become regulated as hazardous or toxic waste or substances, or which require special handling or treatment, under any Applicable Laws.

If Sublessee's activities at the Subleased Premises or Sublessee's use of the Subleased Premises (a) results in a release of Hazardous Materials that is not in compliance with Applicable Laws or permits issued thereunder and requires Remediation (as defined herein) by governmental entities having jurisdiction; (b) gives rise to any claim or requires a response under common law or Applicable Laws or permits issued thereunder; (c) causes a significant public health effect and requires Remediation by governmental entities having jurisdiction; or (d) creates a nuisance as identified by governmental entities having jurisdiction, then Sublessee will, at its sole cost and expense:   (i) immediately provide verbal notice thereof to Sublessor as well as notice to Sublessor in the manner required by this Sublease, which notice will identify the Hazardous Materials involved and the emergency procedures taken or to be taken; and (ii) promptly take all action in response to such situation required by Applicable Laws, provided that Sublessee will first obtain Sublessor's approval of the remediation plan to be undertaken, which approval Sublessor agrees will not be unreasonably withheld, conditioned or delayed.

As used herein, "<u>Remediation</u>" will mean any and all activities required by governmental authorities, having jurisdiction, to identify, assess, test, characterize, sample, clean up, remove, neutralize, treat, abate, stabilize, or monitor environmental matters at a particular site and/or to dispose of any Hazardous Materials and/or any material containing any Hazardous Materials, including, without limitation, assessment, testing, sampling, quality control, modeling, consultants' analyses and reports, laboratory work, field tests, system installation, modification, operation, and maintenance, natural attenuation, acquisition of equipment, contract negotiation and execution, contract development and bidding, monitoring, transportation, and disposal.

(g)     <u>Quiet Enjoyment</u>.   Sublessor covenants and agrees that as long as Sublessee pays the Rent due hereunder and performs all other obligations to be performed by Sublessee hereunder, Sublessee will

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

peaceably and quietly enjoy the Subleased Premises subject to the terms hereof, the Purchase Agreement and the Prime Lease. Sublessor, at its sole cost and expense, will defend and indemnify Sublessee from and against any party claiming, by, through, or under Sublessor, but none other, any rights superior to Sublessee with respect to the Subleased Premises, except Lessor pursuant to the Prime Lease and Sublessor under this Sublease.

(h)     Access and Inspection.   Upon at least 24 hours prior written notice to Sublessee (except in an emergency in which event no written notice will be required), Sublessor, its agents, representatives, and contractors may enter the Subleased Premises at any reasonable time to inspect the Subleased Premises for the purpose of evaluating and confirming Sublessee's compliance with the Prime Lease and this Sublease, and the condition, occupancy and use of the Subleased Premises.   Any such entry will be subject to the reasonable security procedures of Sublessee, which will include accompaniment by Sublessee's representative during such entry.   In the event of a real or apparent emergency, Sublessor may enter the Subleased Premises without prior notice to Sublessee and without accompaniment by Sublessee's representative, but will be obligated to re-secure the Subleased Premises promptly following such entry, and will immediately following such entry notify Sublessee in writing of such action by Sublessor, the reason for such entry, and the findings and results of such entry.

9.     Indemnities.

(a)     Sublessee indemnifies and agrees to hold harmless Sublessor, its members, shareholders, directors, officers, employees, agents and contractors from and against any and all loss, costs, damages, claims, demands, obligations, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by or claimed against Sublessor or any of the foregoing parties as a result of:

(i)     Sublessee's failure to fulfill any obligations, conditions, covenants, representations, warranties, liabilities, duties, and/or obligations of Sublessee under this Sublease, including, without limitation, those obligations of Sublessee relating to compliance with the terms, covenants and conditions of the Prime Lease accruing on or after the Effective Date;

(ii)     Sublessee's or Sublessee's employees', agents', contractors' or invitees' negligence or willful misconduct; or

(iii)     disposal of effluent originating from the Subleased Premises into the City of Hammond waste water treatment facility from and after the Effective Date.

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

The foregoing indemnifications will survive the expiration or earlier termination of this Sublease.

(b)    Sublessee agrees that Sublessor will not be liable to Sublessee, its agents, employees or customers or to any other persons, for any injury or death to persons, damage to property or for any other loss of any kind in any way related to the Subleased Premises or the business conducted therein, regardless of the cause of said injury, damage or loss, except any losses occasioned by the negligent acts (but not omissions) or willful misconduct of Sublessor.

(c)    Sublessor indemnifies and agrees to hold harmless Sublessee, its shareholders, directors, officers, employees, agents and contractors from and against any and all claims, demands, obligations, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by or claimed against Sublessee or any of the foregoing parties as a result of Sublessor's failure to fulfill any obligations, conditions, covenants, representations, warranties, liabilities, duties, and/or obligations of "Lessee" under the Prime Lease accruing prior to the Effective Date. The foregoing indemnity will survive the expiration or earlier termination of this Sublease.

(d)    Except with respect to Sublessee's indemnification as provided in Section 9(a)(iii) above, which indemnification is given without regard to negligence or fault, Sublessor agrees that Sublessee will not be liable to Sublessor, its agents, employees or customers or to any other persons, for any injury or death to persons, damage to property or for any other loss of any kind in any way related to the Leased Facility (less the Subleased Premises) or the business conducted therein, regardless of the cause of said injury, damage or loss, except any losses occasioned by the negligent acts (but not omissions) or willful misconduct of Sublessee.

10.    Insurance. Sublessee will maintain at its sole expense, throughout the Term of this Sublease, as to the Subleased Premises only, such insurance policies as are required of "Lessee" under the Prime Lease without regard, however, to Section 9.01(b) of the Prime Lease. All such insurance will be written by companies meeting the requirements of the Prime Lease and that are reasonably acceptable to Sublessor naming Sublessor as an additional insured or loss payee. In addition to complying with the terms of the Prime Lease, Sublessee will deliver to Sublessor certificates evidencing that such insurance is in force on the Effective Date and such certificates will be maintained with Sublessor throughout the Sublease Term. The certificates will reflect a requirement of 30 days' prior written notice from the insurer to Sublessor of any cancellation or reduction in coverage and will comply with the terms of the Prime Lease, and will reflect that Sublessor is an additional insured or loss payee.

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

11. <u>Defaults and Remedies</u>.

    (a)   <u>Sublessee's Default</u>. Any act or omission of Sublessee that constitutes a default of "Lessee" under the Prime Lease will constitute a default on the part of Sublessee hereunder, and all remedies afforded Lessor in the event of default under the Prime Lease are also afforded Sublessor under this Sublease. Sublessee will be entitled to receive from Sublessor the same notices of default and opportunities to cure as provided to "Lessee" under the Prime Lease. Sublessor will have the right (but not the obligation) to cure any defaults by Sublessee under this Sublease to avoid a default by Sublessor under the Prime Lease. Without limiting the foregoing, the occurrence of any one or more of the following will constitute default under this Sublease by Sublessee:

        (i)   the failure to pay Rent when due, if the failure continues for 5 days after written notice of non-payment has been received by Sublessee from Sublessor;

        (ii)   the failure to perform any other provision of this Sublease, if such failure to perform is not cured within 30 days after written notice has been received by Sublessee from Sublessor, provided that, if the failure cannot reasonably cured within such 30-day period, then Sublessee will not be in default of this Sublease if Sublessee commences to cure the failure within such 30-day period and diligently and in good faith continues to prosecute such cure to completion; or

        (iii)   a default by Guarantor under the Guaranty; or

        (iv)   in the event Sublessee or Guarantor is adjudicated a bankrupt or insolvent, seeks or consents to the appointment of a receiver or trustee for itself or the Subleased Premises, files a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, makes a general assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they mature.

    (b)   <u>Sublessor's Remedies</u>. In the event of any default of Sublessee under this Sublease, Sublessor may exercise the rights and remedies available to Lessor under Sections 17.01(a), 17.01(b) and 17.01(g) of the Prime Lease. If Sublessee at any time fails to perform any of its non-monetary obligations under this Sublease within the applicable cure period following written notice from Sublessor to Sublessee, then Sublessor will have the right, but not the obligation, upon giving Sublessee at least 10 additional days' prior written notice of its election to do so (in the event of any emergency no prior notice will be required), to perform such obligations on behalf of and for the account of Sublessee and to take all such reasonable action to perform such obligations. The performance by Sublessor of any obligation will not constitute a release or waiver of Sublessee therefrom.

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

(c)   <u>Sublessor Default under Sublease and Prime Lease</u>. Sublessor will not be deemed to be in default under the Sublease by virtue of any default of Sublessor under the Prime Lease, which default of Sublessor was caused solely by the default of Sublessee under this Sublease; however, any other default in the Prime Lease will constitute a default if Lessor takes any action that adversely affects Sublessee's use, occupation or business conducted within the Subleased Premises. Sublessee will have the right (but not the obligation) to cure any defaults by Sublessor under the Prime Lease, and Sublessor agrees to deliver to Sublessee a copy of any notice (of default or otherwise) given by Lessor under or pursuant to the Prime Lease to Sublessor promptly following receipt thereof by Sublessor. In the event of any default of Sublessor under this Sublease or under the Prime Lease, Sublessee may exercise all of the rights and remedies available to it at law or in equity.

(d)   <u>Notices from Lessor</u>. Promptly upon its receipt of same, Sublessor will deliver to Sublessee copies of all notices and/or communications regarding the Prime Lease, Sublessee, this Sublease or Sublessee's occupancy of the Subleased Premises that Sublessor receives from Lessor. Promptly upon its receipt of same, Sublessee will deliver to Sublessor copies of all notices and/or communications regarding the Prime Lease, Sublessor, this Sublease or Sublessor's occupancy of the balance of the Leased Facility that Sublessee receives from Lessor.

(e)   <u>Lender's Right To Cure Sublessee's Breach</u>. Sublessor will endeavor to deliver to Sublessee's mortgage lender, as identified by Sublessee by written notice to Sublessor ("<u>Sublessee's Lender</u>"), contemporaneously with Sublessor's delivery to Sublessee, a copy of any written notice of Sublessee's default under this Sublease, in the same manner that such notice is provided to Sublessee at the address provided in <u>Section 17</u> hereof. Sublessor agrees that Sublessee's Lender will have the right to exercise a cure of such default under this Sublease within any available grace or cure period under this Sublease or the Prime Lease, as applicable. Sublessor agrees not to take any action to repossess the Subleased Premises or any action to terminate Sublessee's leasehold interest unless such default remains uncured following the passage of any such grace or cure period. If Lender timely cures any such default, Sublessor will permit Sublessee or Sublessee's Lender, as determined by Sublessee's Lender, to remain in possession of the Subleased Premises and agrees that this Sublease will remain in full force and effect.

(f)   <u>Sublease Guaranty</u>. Sublessee's payment and performance of its obligations under this Sublease will be guaranteed unconditionally by Sublessee's sole member, Southeast Milk, Inc., a Florida agricultural marketing cooperative ("<u>Guarantor</u>"), pursuant to a Guaranty of Sublease substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Guaranty</u>").

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

12.   <u>Representations and Warranties</u>.

    (a)   <u>Sublessor's Representations and Warranties</u>.

        (i)   <u>Organization</u>.   Sublessor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease its properties and to conduct its business as it is presently being conducted and to enter into and to perform its obligations under or otherwise relating to this Sublease. Sublessor is duly qualified and licensed as a foreign limited liability company to conduct the business conducted by it and is in good standing in the State of Louisiana.

        (ii)   <u>Authorization</u>.   Sublessor's execution, delivery and performance of this Sublease and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary company action on the part of Sublessor, and no other company proceedings on the part of Sublessor are necessary to authorize this Sublease and the transactions contemplated hereby.

        (iii)   <u>Prime Lease</u>.

            a.   Sublessor is the owner and holder of a leasehold interest in the Subleased Premises pursuant and subject to the Prime Lease.  The Prime Lease attached to this Sublease is a true, correct and complete copy of the Prime Lease (including all amendments, side letters, and any currently effective estoppel certificates and subordination and non-disturbance agreements with respect thereto) as in effect as of the Effective Date.

            b.   The Prime Lease is valid and in full force and effect, and there are no subleases, licenses, occupancy agreements or assignment agreements in effect with respect to the Prime Lease except this Sublease.

            c.   Sublessor is not in default under the Prime Lease, and to Sublessor's knowledge: (i) no condition or occurrence exists, which, with the passage of time and/or the giving of notice, would constitute a default by Sublessor under the Prime Lease; and (ii) Lessor is not in default under the Prime Lease, and no condition or occurrence exists which, with the passage of time and/or the giving of notice, would constitute a default by Lessor under the Prime Lease.

            d.   Sublessor has the right to sublease the Subleased Premises to Sublessee pursuant to this Sublease, and no

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

consent, approval or authorization of Lessor is required in connection with the execution, delivery and performance of this Sublease.

(b)   <u>Sublessee's Representations and Warranties</u>.

    (i)   <u>Organization</u>. Sublessee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease its properties and to conduct its business as it is presently being conducted and to enter into and to perform its obligations under or otherwise relating to this Sublease. Sublessee is duly qualified and licensed as a foreign limited liability company to conduct the business conducted by it and is in good standing in the State of Louisiana.

    (ii)   <u>Authorization</u>. Sublessee's execution, delivery and performance of this Sublease and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary company action on the part of Sublessee, and no other company proceedings on the part of Sublessee are necessary to authorize this Sublease and the transactions contemplated hereby.

    (iii)   <u>Tax Status</u>. Sublessee is not (i) a tax-exempt entity (within the meaning of Section 168(h) of the Code) or (ii) a debtor or debtor-in-possession in a voluntary or involuntary bankruptcy proceeding as of the Effective Date.

    (iv)   <u>Permits; Consents and Approvals</u>. Sublessee has made all necessary and appropriate investigation into regulatory and permitting requirements for operation of the Subleased Premises, and has all licenses and permits required for the leasing of, and conduct of, Sublessee's business at, the Subleased Premises. No consent or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by Buyer on or prior to the Closing Date in connection with the execution, delivery and performance of this Sublease or the consummation of the transactions contemplated hereby. For purposes of the foregoing, the term "<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, including, but not limited to those relating to or promulgated by the Food and Drug Administration and the United States Department of Agriculture any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

(v)   No Brokers.   Neither Sublessee nor any of its affiliates has employed, or is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Sublease.

13.   Modification of Prime Lease.   Sublessor will not modify or amend the Prime Lease during the Term without the prior written consent of Sublessee, which consent may be granted or withheld by Sublessee in its sole and absolute discretion.  In the event Sublessee desires a modification or amendment of the Prime Lease, Sublessor agrees to cooperate with Sublessee to obtain such modification from Lessor provided such modification does not increase the rental or other charges payable under or with respect to the Prime Lease, impose other obligations or risks on Sublessor (as "Lessee" under the Prime Lease or otherwise) that in Sublessor's good faith judgment are not immaterial, or increase the "Base Term" thereunder.

14.   Certain Rights of Lessee under Prime Lease.   Notwithstanding anything contained in this Sublease to the contrary, the following rights of Sublessor, as "Lessee" under the Prime Lease, may not be exercised by Sublessee without the express prior written consent of Sublessor, which may be granted or withheld by Sublessor in its sole and absolute discretion:

(a)   Lessee's right of offer, as set forth in Article 4 of the Prime Lease; and

(b)   Lessee's right to offer to substitute in connection with an Event of Loss, as set forth in Article 12 of the Prime Lease.

15.   Brokers.   Sublessor has not employed, nor is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with this Sublease other than The Blackstone Group, L.P. ("Sublessor's Broker"). Sublessee has not employed, nor is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with this Sublease. Sublessor will be responsible for payment of any brokerage or leasing fee payable to Sublessor's Broker.

16.   Assignment and Subletting; Consent of Sublessor.   Notwithstanding any provision in this Sublease to the contrary, Sublessee will not transfer, assign or sublet all of any portion of its interest under the Sublease to any third party or entity without the express prior written consent of Sublessor, which may be granted or withheld by Sublessor in its sole and absolute discretion, as long as Winn-Dixie Procurement, Inc., continues to purchase at least forty million gallons of Milk Products from Sublessee at the Acquired Plants under the Supply Contract; otherwise, Sublessee may transfer, assign or sublet all or any portion of its interest under the Sublease to any third party or entity with the consent of Sublessor which consent will not be unreasonably withheld.

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

17.  <u>Notices</u>.  All notices, consents, directions, approvals, instructions, requests and other communications required or permitted to be given pursuant to this Sublease will be in writing and will be given in the manner and with the effect provided in Section 25.03 of the Prime Lease, addressed to Sublessor or Sublessee at their respective addresses stated below, or at such other address as may be specified by a party by notice to the other party given in accordance with this <u>Section 17</u>:

If to Sublessor:

Winn-Dixie Warehouse Leasing, LLC
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904-783-5651

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Legal Department
Telefax No. 904-783 5138

If to Sublessee:

Sunshine State Dairy Farms, LLC
1950 S. E. Highway 484
Belleview, Florida 34420
Telefax No. 352-307-5522

With a copy to:

Southeast Milk, Inc.
1950 S. E. Highway 484
Belleview, Florida 34420
Telefax No. 352-307-5522

And:

Latham, Shuker, Eden & Beaudine, LLP
390 North Orange Avenue, Suite 600
Orlando, Florida 32801
Attn:  Peter G. Latham
Telefax No. 407-481-5801

18.  <u>Binding Effect</u>.  This Sublease will be binding upon and will inure to the benefit of Sublessor and Sublessee and their respective successors and assigns.

19.  <u>Further Assurances</u>.  Sublessor and Sublessee agree to execute and deliver any and all papers, documents and other assurances and to do any and all other acts and things reasonably necessary to implement and to give full force and effect to their agreements hereunder.

20.  <u>Modification of Sublease</u>.  This Sublease may only be modified by a written instrument or instruments executed by the party against which enforcement of the modification or termination is asserted.  Any alleged modification that is not in writing and signed by the party against which enforcement is sought will not be effective as to any party.

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

21.   Entire Agreement.  This Sublease, with specific reference to the Prime Lease, constitutes the entire understanding and agreement between Sublessor and Sublessee with respect to the sublease by Sublessee of the Subleased Premises and supersedes all prior written or oral understandings and agreements between Sublessor and Sublessee with respect thereto.

22.   Severability.  No determination by any court, governmental body or otherwise that any provision of this Sublease or any amendment hereof is invalid or unenforceable in any instance will affect the validity or enforceability of (i) any other such provision, or (ii) such provision in any circumstances not controlled by such determination. Each such provision will be valid and enforceable to the fullest extent allowed by, and will be construed wherever possible as being consistent with applicable law.

23.   Multiple Counterparts.   This Sublease may be executed in one or more counterparts, each of which will constitute an original, but all of which taken together will be considered one and the same document.

24.   Short Form Sublease.  Contemporaneously with the execution and delivery of this Sublease, Sublessor and Sublessee will execute and deliver a short form Sublease (the "Short Form Sublease") for purposes of placing third parties on record notice of Sublessee's subleasehold interest in the Subleased Premises under this Sublease, subject to the Prime Lease, and of certain material terms of this Sublease, including the provisions of Section 8(d) and Section 14 hereof.  Sublessor promptly thereafter will record the Short Form Sublease in the Recorder's Office, Tangipahoa Parish, Louisiana.   The Short Form Sublease will be deemed terminated as a matter of record upon the first to occur of (a) recordation of a written affidavit of an officer of Sublessor certifying that this Sublease has terminated pursuant to its terms prior to expiration of the Sublease Term, or (b) expiration of the Sublease Term.

25.   Time of the Essence.   Time is of the essence in the performance of the respective rights and obligations of Sublessor and Sublessee under this Sublease.

26.   Governing  Law;  Jurisdiction;  Venue.   The  interpretation,  validity,  and enforcement of this Sublease will be governed by and construed under the laws of the State of Louisiana. Sublessor and Sublessee submit to the non-exclusive personal jurisdiction of, and consent to venue in, the State of New York and the Federal Courts of the United States of America located in the State of New York (and any appellate courts taking appeals therefrom) for the enforcement of such person's obligations hereunder, and waive any and all personal rights under the law of any other state to object to jurisdiction within such state for the purposes of such action, suit, proceeding or litigation to enforce such obligations of Sublessor or Sublessee. Sublessor and Sublessee each waive and agree not to assert, as a defense in any action, suit or proceeding arising out of or relating to this Sublease: (i) that it is not subject to such jurisdiction or that such action, suit or proceeding may not be brought or is not maintainable in those courts or that it is exempt or immune from execution; (ii) that the action, suit or proceeding is brought in an inconvenient forum; or (iii) that the venue of the action, suit or proceeding is

EXHIBIT E-1 TO ASSET PURCHASE AGREEMENT
FORM OF SUBLEASE AGREEMENT (WITHOUT NONDISTURBANCE AGREEMENT)
WINN-DIXIE AFFILIATES S/T SUNSHINE STATE DAIRY FARMS, LLC
SGRJAX\121558.5

improper.  Sublessor and Sublessee each expressly waives any and all rights to trial by jury in any action or proceeding relating to the enforcement of this Sublease.

27.   Waiver of Trial by Jury.  Sublessor and Sublessee each acknowledge and agree that the nature of this Sublease makes a jury determination of any dispute arising out of this Sublease, the Prime Lease or the transactions contemplated herein or therein undesirable.   Accordingly, Sublessor and Sublessee each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Sublease, the Prime Lease or the transactions contemplated herein or therein.

28.   Continuation of Prime Lease.  Sublessor hereby covenants and agrees that it will abide by all of its obligations under the Prime Lease in all material respects, and that it will take all commercially reasonable actions as will be necessary to maintain the existence and effectiveness of the Prime Lease and Sublessor's interest thereunder through the "Base Term" thereunder. Sublessor further covenants that it will take all commercially reasonable actions to defend any claims by Lessor that Sublessor has breached the Prime Lease, and will pursue all commercially reasonable means of opposing any efforts by Lessor to terminate the Prime Lease or otherwise take any action that would diminish Sublessee's rights under this Sublease by reason of such breach. Sublessor agrees that it will not voluntarily modify or terminate the Prime Lease in a manner that reduces Sublessee's rights under this Sublease or increases Sublessee's obligations under this Sublease without Sublesee's prior written consent.

29.   Special Termination Events.

(a)   Termination of Prime Lease.  If for any reason whatsoever the term of the Prime Lease will be terminated during any term of this Sublease, this Sublease will thereupon be terminated and the parties will be relieved of any further liability or obligation under this Sublease, provided however, that if the Prime Lease terminates as a result of a default or breach by Sublessor or Sublessee under this Sublease and/or the Prime Lease, then the defaulting party will be liable to the non-defaulting party for all damages suffered as a result of such termination as provided herein.

(b)   Termination of Supply Contract. If (i) Winn-Dixie Procurement, Inc. is released, pursuant to the provisions of clause (ii) of the first sentence of the second paragraph under "Other Price Considerations" in Schedule D to the Supply Contract, from its obligation to purchase its "Product Requirements" (as such term is defined in the Supply Contract) for fluid milk Products (as such term is defined in the Supply Contract), then contemporaneously with the effective date of such release of obligations, Sublessee may elect to terminate this Sublease by written notice to Sublessor, or (ii) either party elects not to renew the Supply Contract upon expiration of the then-current term thereof, then contemporaneously with the effective date of termination or

EXHIBIT E-1 TO ASSET PURCHASE AGREEMENT
FORM OF SUBLEASE AGREEMENT (WITHOUT NONDISTURBANCE AGREEMENT)
WINN-DIXIE AFFILIATES S/T SUNSHINE STATE DAIRY FARMS, LLC
SGRJAX\121558.5

expiration of the Supply Contract, Sublessee may elect to terminate this Sublease by written notice to Sublessor; whereupon, in either such case, this Sublease will be terminated and the parties will be relieved of any further obligation under this Sublease except as provided in <u>clause (c)</u> below.

(c)     <u>Reservation of Remedies</u>.  Nothing contained in this <u>Section 29</u> will be construed as a waiver of Sublessee's right to seek, or its entitlement to, damages, specific performance, separate recovery of any payment of Rent made by Sublessee which is not due and payable in accordance with the terms of this Sublease, other remedies at law or equity and any combination thereof, as against Sublessor, on account of any failure of Sublessor to perform its obligations under this Sublease or on account of any act or omission of Sublessor or any other such Person or to enforce any judgment therefor.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

**IN WITNESS WHEREOF**, the parties hereto have executed this Sublease as of the dates given for their respective signatures below.

This Sublease signed this _____ day of _____, 2008, in Jacksonville, Florida, in the presence of the undersigned witnesses and Notary Public duly qualified in the County of Duval, State of Florida.

Witnesses:                                      **SUBLESSOR:**

                                         **WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company

                                      By:   Winn-Dixie Logistics, Inc., a Florida corporation, its sole member

_____
Print Name:_____
                                        By:_____
                                        Name: _____
                                        Title:_____

_____
Print Name:_____

                                    _____
                                    Print Name:_____
                                    **Notary Public**
                                    My Commission Expires:_____
                                    Commission No.:_____

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121558.5

This Sublease signed this _____ day of _____, 2008, in _____, Florida, in the presence of the undersigned witnesses and Notary Public duly qualified in the County of _____, State of Florida.

Witnesses:                                    **SUBLESSEE:**

                                              **SUNSHINE STATE DAIRY FARMS, LLC**, a Florida limited liability company

                                              By:   Southeast Milk, Inc., a Florida agricultural marketing cooperative, its sole member

_____                        By:_____
Print Name:_____                         Name: _____
                                                     Title:_____

_____
Print Name:_____

                         Print Name:_____
                         **Notary Public**
                         My Commission Expires:_____
                         Commission No.:_____

SCHEDULE OF ATTACHMENTS:

Exhibit A – Prime Lease
Exhibit B – Description of Subleased Premises
Exhibit C – Form of Guaranty of Sublease

Exhibit E-1 to Asset Purchase Agreement
Form of Sublease Agreement (without Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121556.5

**EXHIBIT E-2**
**To Asset Purchase Agreement**

FORM
OF SUBLEASE AGREEMENT

(This Form for use with accompanying Nondisturbance Agreement with Lessor)

**SUBLEASE**

**THIS SUBLEASE** is made as of _____, 2008 (the "Effective Date") by and between **WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company ("Sublessor"), and **SUNSHINE STATE DAIRY FARMS, LLC**, a Florida limited liability company ("Sublessee").

**R E C I T A L S :**

A.   Sublessor is the owner of a leasehold estate in and to certain real property and improvements thereon located at 3925 Highway 190 West, Hammond, Tangipahoa Parish, Louisiana (the "Leased Facility"), as more particularly described in, and pursuant to, that certain Lease Agreement dated August 10, 1999, between ZSF/WD Hammond, LLC, a Delaware limited liability company, as landlord ("Lessor") and Winn-Dixie Louisiana, Inc., whose interest therein previously was assigned from time to time and presently is invested in Sublessor, as tenant, as more particularly described on attached Exhibit A (the "Prime Lease").

B.   A memorandum or short form of the Prime Lease is recorded in Conveyance Book 883, page folio 523, as assigned and recorded in Official Records Book 1082, page 152, of the Official Records of Tangipahoa Parish, Louisiana.

C.   Sublessor desires to sublease to Sublessee and Sublessee desires to sublease from Sublessor a portion of the Leased Facility, as more particularly described on attached Exhibit B (the "Subleased Premises," which includes all improvements, easements, appurtenances, fixtures and equipment leased to Sublessor under the Prime Lease relating to such portion of the Leased Facility) on the terms, covenants and conditions set forth in this Sublease. The Subleased Premises includes an approximately 49,966 square foot dairy plant operated by Winn-Dixie Logistics, Inc., an affiliate of Sublessor, and used for processing and packaging milk, other dairy products and other beverage products, as transferred to Sublessee as of even date herewith pursuant to that certain Asset Purchase Agreement dated effective February ____, 2008, between Sublessor and its affiliates, as seller, and Sublessee and its affiliate, as buyer (the "Purchase Agreement").

D.   Sublessee, as "Supplier," and Sublessor's affiliate, Winn-Dixie Procurement, Inc., a Florida corporation, are parties to that certain Supply Contract dated of even date herewith (the "Supply Contract") for the purchase of fluid milk

Page 1 of 23

products and other dairy products (the "Milk Products"), as well as other products, produced at the Subleased Premises and at Sublessee's dairy processing plant located in Plant City, Florida (together, the "Acquired Plants").

E.   Capitalized terms not otherwise defined herein will have the meanings assigned to such terms in the Prime Lease or the Purchase Agreement, as applicable, and in the event of any conflict between such terms, the definitions set forth in the Prime Lease will be controlling

F.   Lessor and Sublessee have entered into that certain Nondisturbance and Attornment Agreement, dated as of _____ (the "Nondisturbance Agreement"), whereby Lessor has agreed to recognize Sublessee as direct tenant of Lessor pursuant to this Sublease following a default by Leasing LLC that results in a termination of the Lease, subject to the terms of the Nondisturbance Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements contained in this Sublease, Sublessor and Sublessee agree as follows:

1.   Subleased Premises.   Subject to and upon the terms and conditions hereinafter set forth, Sublessor does hereby Sublease and demise unto Sublessee, and Sublessee hereby Subleases from Sublessor, the Subleased Premises, together with the easements and other rights in and to use of the Common Areas (hereinafter defined), covered by and Subleased to Sublessor under the Prime Lease.

2.   Common Areas; Exclusive Systems.   Sublessee and its customers, contractors, agents, guests and invitees will have the non-exclusive use and enjoyment of the Common Areas in common with Sublessor, other owners, tenants and subtenants having lawful interests within the Leased Facility, and their customers, contractors, agents, guests, and invitees, subject to rules and regulations promulgated by Sublessor from time to time.   "Common Areas" will mean the following shared infrastructure, systems and facilities:

    (a)   drainage facilities and retention/detention ponds, if any, located within the Leased Facility;

    (b)   existing parking lot lighting located within the Leased Facility (but excluding any additional lighting installed by Sublessee within the Subleased Premises);

    (c)   sewer utility lines and mains located within the Leased Facility, but excluding the Dairy Onsite Treatment Facility and the Dairy Sewer System, as defined in Section 7(e) below; and

    (d)   during the Interim Operations Period, as defined in Section 7(i) below, the systems, facilities and utilities as described in Sections 7(a)–(h) below.

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

Certain Exclusive Systems within the Leased Facility are or will be dedicated solely to the use, benefit and enjoyment of Sublessee and its customers, contractors, agents, guests and invitees, as provided in and subject to <u>Section 7</u> hereof, and will not be considered Common Areas.

3.   <u>Sublease Term</u>.  The term of this Sublease will begin on the Effective Date and will terminate on August 30, 2024 (the "<u>Sublease Term</u>"), unless sooner terminated as hereinafter provided or by operation of law.  Sublessor and Sublessee acknowledge that the Sublease Term will expire on the date that is one day prior to the expiration of the initial lease term under the Prime Lease (the "Prime Term"), and that the Sublease Term will be subject to the Prime Term, and will end upon expiration of the Prime Term or earlier termination of the Prime Lease by whatever cause or for whatever reason, subject, however, to the provisions of <u>Section 11</u> hereof.<u>Sublessee's Rights Upon Renewal of Prime Lease</u>.  If Sublessor exercises its option to renew the Prime Lease for any or all of its available five (5) successive five (5) year terms beyond the "Base Term" thereunder, then Sublessee will have the automatic right and option, in its sole discretion, to extend the term of this Sublease for an equal term to that term renewed by Sublessor (each an "<u>Additional Term</u>"); provided, however, that if Winn-Dixie Procurement, Inc. has a commitment extending at least one (1) year into the Additional Term to purchase at least forty million gallons of Milk Products from Sublessee at the Acquired Plants under the Supply Contract, then Sublessee will extend the term of this Sublease if Sublessor exercises its option to renew the Prime Lease. Sublessor will provide Sublessee not less than twenty (20) months' prior written notice of its intent to exercise its right to renew the Prime Lease.  In the event Sublessor exercises its option to renew the Prime Lease, each such Additional Term will be governed by the terms of this Sublease.  If Sublessor declines to exercise its right to renew the Prime Lease and Sublessee nonetheless desires to continue in possession of the Subleased Premises, then upon Sublessee's reasonable request, Sublessor will cooperate in good faith with Sublessee in Sublessee's efforts to negotiate a direct lease between Lessor and Sublessee relating to the Subleased Premises; it being understood, however, that in no event will Sublessor be obligated to renew or extend the Prime Lease beyond the "Base Term" thereunder, or to remain obligated as a primary tenant, co-tenant, surety or guarantor under the Prime Lease or such direct lease entered between Lessor and Sublessee.

5.   <u>Terms of Prime Lease</u>.

(a)   <u>Obligations under Prime Lease</u>.  This Sublease and Sublessee's interest in the Subleased Premises are subject and subordinate to the Prime Lease and any mortgage encumbering the Subleased Premises, and will not modify or alter any rights of Lessor contained in the Prime Lease.   Except as may be otherwise provided in this Sublease, all rights, privileges, obligations and duties contained in the Prime Lease are hereby imposed upon and granted to the respective parties to this Sublease, Sublessor herein being substituted for Lessor in the Prime

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

Lease, and Sublessee herein being substituted for the Lessee in the Prime Lease; provided, however, that Sublessee will not be required to make payments of Base Rent or Supplementary Rent, or any other payments under the Prime Lease.  Except for the rent payment and other provisions of the Prime Lease, as to the Subleased Premises only and the rights and easements granted herein to Sublessee in the Common Areas, or as expressly provided to the contrary in this Sublease, Sublessee hereby assumes and agrees to comply with and be bound by all of the terms, covenants, and conditions of the Prime Lease and to do and perform all the terms, covenants, and conditions of the Prime Lease on the part of the "Lessee" therein to be performed and observed during the Sublease Term, including, without limitation, the provisions of Sections 8.01, 8.02 and 8.05 of the Prime Lease with respect to the Subleased Premises to the same extent as if Sublessee were the "Lessee" under the Prime Lease, insofar as same pertain and apply to the Subleased Premises.  Notwithstanding anything contained in the Prime Lease, Sublessee does not assume or agree to be bound to the covenants, representations or warranties made by Sublessor in Sections 8.09 and 20.01 of the Prime Lease, it being understood that any related representations and warranties of Sublessee are set forth in Section 12 hereof.  Further, notwithstanding anything contained in the Prime Lease, Sublessee does not assume or agree to be bound to the covenants, representations or warranties made by Sublessor to Lessor accruing prior to the Effective Date of this Sublease, including, without limitation, the covenants made by Sublessor to Lessor in Sections 19.01 and 19.02 of the Prime Lease.

(b)   Attornment to Lessor.  Upon any termination of the Prime Lease, Sublessee will be obligated, at Lessor's written election, if this Sublease has not been sooner terminated by its terms or otherwise by Sublessor and Sublessee, to attorn to and recognize Lessor as successor landlord under this Sublease, whereupon this Sublease will continue in full force and effect as a direct lease between Sublessee and Lessor, as landlord, upon all of the terms and conditions of this Sublease.

6.   Rent; Supplementary Rent And Other Charges.

(a)   Base Rent.  During the Sublease Term, Sublessee will pay to Sublessor annual Base Rent in the amount of $500,000.00, payable in advance in equal installments of $41,666.67.  Base Rent will be payable on the first day of each calendar month in lawful United States currency, together with any and all sales or use taxes levied upon the use or occupancy of the Subleased Premises and any rent or other charges payable hereunder.  Base Rent does not include Sublessee's pro-rate share of Operating Expenses, as defined below.  Base Rent will be due and payable beginning on the Effective Date and on the first day of each and every month thereafter throughout the Sublease Term, and will be paid without set off or deduction to Sublessor at its address

EXHIBIT E-2 TO ASSET PURCHASE AGREEMENT
FORM OF SUBLEASE AGREEMENT (WITH NONDISTURBANCE AGREEMENT)
WINN-DIXIE AFFILIATES S/T SUNSHINE STATE DAIRY FARMS, LLC
SGRJAX\121557.2

above or such other address as Sublessor directs in writing.   The monthly Base Rent for any partial month at the beginning of the Sublease Term will equal the product of 1/365 of the annual Base Rent and the number of days in the partial month and will be due on the Effective Date.   Payments of Base Rent for any fractional calendar month at the end of the Sublease Term similarly will be prorated.

(b)   Late Payment Provisions.   If any Base Rent or other payment due under this Sublease is not received by Sublessor within 10 days of the due date of such payment, Sublessee will pay in addition to such payment a late charge equal to two percent (2%) of the payment that is past due or $250, whichever is greater.   If any payment due from Sublessee will remain overdue for more than 10 days, interest will accrue daily on the past due amount from the date such amount was due until paid or judgment is entered at a rate equivalent to 12% percent per annum or the highest rate permitted by law, whichever is lesser.   Interest on the past due amount will be in addition to and not in lieu of the two percent (2%) percent late charge or any other remedy available to Sublessor.

(c)   Supplementary Rent.   All charges payable by Sublessee under the terms of this Sublease other than Base Rent are called "Supplementary Rent."   Unless this Sublease provides otherwise, all Supplementary Rent accrued through any given rental period will be paid with the next monthly installment of Base Rent. The term "Rent" will mean Base Rent and Supplementary Rent.

(d)   Supplementary Rent for Operating Expenses.   In addition to the Base Rent payable under Section 5(a) hereof, Sublessee agrees to pay as Supplementary Rent its proportionate share of the Operating Expenses (hereinafter defined) for the Common Areas.   The proportionate share ("Sublessee's Share") to be paid by Sublessee will be a fraction, the numerator of which will be the floor area of the buildings located within the Subleased Premises and the denominator of which will be the gross floor area of all buildings located within the Leased Facility. Sublessee's Share is 4.17%.   Within 90 days after the end of each calendar year, Sublessor will send a statement of Operating Expenses to Sublessee for the prior year providing in reasonable detail a statement of all Operating Expenses incurred in the operation of the Leased Facility along with the amount representing Sublessee's Share. Sublessee will be given a credit against Sublessee's Share of future Operating Expenses payable for any overpayment of Operating Expenses that have been paid up to the time of said statement.   If Sublessee has underpaid, then Sublessee will pay the balance due to Sublessor within 30 days of the date of said statement unless the statement is rendered at the end of the Term in which case any overage due Sublessor will be paid by check at the time Sublessee delivers the Subleased Premises to Sublessor. Concurrently with the invoice described above, Sublessor will also provide an estimate of the

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

Operating Expenses for the next calendar year and a statement of the estimated monthly Operating Expenses payable by Sublessee. "Operating Expenses" will mean any amounts paid or payable whether by Sublessor or by others on behalf of Sublessor, arising out of Sublessor's maintenance, operation, repair, replacement (if such replacement is required under any governmental regulation that was not applicable to the Leased Facility as of the Effective Date) and administration of the Common Areas, including, without limitation, any costs and expenses incurred by Sublessor pursuant to Section 8(e)(i) hereof.

(e)   Supplementary Rent for Sewer Service Costs.   The Sewer Pretreatment Agreement, as contemplated under the Purchase Agreement, may provide that certain costs incurred by Sublessor in constructing or installing the Dairy Onsite Pretreatment Facility will be subject to reimbursement by Sublessee (as to the Augmentation Cost), or by the City of Hammond (as to the Utility Cost Contribution). If the Augmentation Cost is not sooner paid pursuant to the Purchase Agreement, then Sublessor may charge the Augmentation Cost to Sublessee as Supplementary Rent. If Sublessee's required payment to Sublessor relating to the Utility Cost Contribution is not sooner paid pursuant to the Purchase Agreement, then Sublessor may charge such amount to Sublessee as Supplementary Rent.

7.   Exclusive Systems.   The Subleased Premises shares certain infrastructure, systems and utilities with the remainder of the Leased Facility, which constitute Common Areas except to the extent such systems are segregated to provide exclusivity of such systems for the benefit of the Subleased Premises, as provided below (the "Exclusive Systems").

(a)   Access Roads; Parking.   Ingress and egress and parking facilities serving the Subleased Premises will be self-contained, and will be installed, operated and maintained by Sublessee at its cost and expense, except for temporary ingress and egress and parking rights as otherwise provided in this Section 7.   Sublessee is to construct certain roadways and parking facilities within the Subleased Premises pursuant to the Purchase Agreement.

(b)   Security; Lighting.   Security for the Subleased Premises will be self-contained, and will be installed, operated and maintained by Sublessee at its cost and expense, except for existing parking lot lighting serving the Subleased Premises and the Distribution Center, which lighting will remain in place as Common Areas.

(c)   Fire Safety.   Fire safety systems for the Subleased Premises will be self-contained, and will be operated and maintained by Sublessee at its cost and expense. Connection of the fire safety systems to City of Hammond water sources will be made pursuant to the Purchase Agreement.

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

(d)  Potable Water Utilities.  Potable water service to the Subleased Premises is self-contained and metered; related water service to the Subleased Premises will be at Sublessee's cost and expense.

(e)  Dairy Sewer System.  Existing sewer collection lines located on the Subleased Premises will be for the exclusive use of the Subleased Premises, and will feed into an onsite sewer pretreatment facility to be constructed or installed on the Subleased Premises (the "Dairy Onsite Treatment Facility") for the exclusive use of the Subleased Premises (collectively, the "Dairy Sewer System").  The Dairy Sewer System will feed pretreated effluent originating from the Subleased Premises into the Common Area sewer lines.  Construction or installation of the Dairy Onsite Treatment Facility, and operation of the Dairy Sewer System, will be pursuant to the Purchase Agreement and the Sewer Pretreatment Agreement as contemplated under the Purchase Agreement.  Related sewer service to the Subleased Premises will be at Sublessee's cost and expense.

(f)  Electric Utilities.  Electric utility service to the Subleased Premises will be self-contained and metered; related electric service to the Subleased Premises will be at Sublessee's cost and expense. Connection and metering of the electric utility lines and facilities with the utility service provider will be made pursuant to the Purchase Agreement.

(g)  Gas Utilities.  Natural gas utility service to the Subleased Premises will be self-contained and metered; related natural gas service to the Subleased Premises will be at Sublessee's cost and expense. Connection and metering of the gas lines and facilities with the utility service provider will be made pursuant to the Purchase Agreement.

(h)  Communication Systems.  Telephone, cable and communication lines, equipment and software, if any, serving the Subleased Premises will be self-contained and metered, as appropriate; related communications services to the Subleased Premises will be at Sublessee's cost and expense.  Installation of new or replacement lines, equipment and facilities and removal of unused or redundant lines, equipment and facilities will be pursuant to the Purchase Agreement.

(i)  Interim Systems Operations as Common Areas.  Subsequent to the Effective Date and prior to full operational status of each of the separate systems described in Sections 7(a)–(h) above (the "Interim Operations Period"), Sublessor and Sublessee will have joint use of existing access roads, parking, security, lighting, fire safety, water utilities, sewer utilities, electric utilities, gas utilities, and communications systems serving the Leased Facility as reasonably necessary or appropriate to the continuing operation of the

EXHIBIT E-2 TO ASSET PURCHASE AGREEMENT
FORM OF SUBLEASE AGREEMENT (WITH NONDISTURBANCE AGREEMENT)
WINN-DIXIE AFFILIATES S/T SUNSHINE STATE DAIRY FARMS, LLC
SGRJAX\121557.2

Distribution Center and the Subleased Premises in the ordinary conduct of its respective business, subject to the terms of the Purchase Agreement and subject to and in full compliance with Sublessor's security policies and procedures.   During the Interim Operations Period, Sublessee will contribute Sublessee's Share of the utility charges incurred by Sublessor in maintaining water, sewer, electric, gas and communications utility service to the Leased Facility, as Supplementary Rent.

8.    Use Of Subleased Premises.

(a)    Permitted Uses.  Sublessee may use and occupy the Subleased Premises only for food and beverage manufacturing and processing (the "Permitted Use"); provided, however, that to the extent that Sublessee no longer continues to supply Sublessor with Milk Products under the Supply Contract, then Sublessee may use and occupy the Subleased Premises for any other lawful purpose, subject only to the use restrictions contained in Section 8.01 of the Prime Lease. Sublessee will observe all reasonable rules and regulations established by Lessor or Sublessor from time to time for the Leased Facility or the Subleased Premises.

(b)    Specialized Equipment.   The Subleased Premises includes an ammonia-based refrigeration system together with operating manuals and protocols (the "Refrigeration System").   Operation, maintenance and repair of the Refrigeration System is a highly technical procedure that, if improperly conducted, may result in injury or death to persons, or damage to property.   Sublessor agrees to assist Sublessee in training Sublessee's personnel to operate and maintain the Refrigeration System, on a reasonable request basis.

(c)    Spur Track Usage.  The Subleased Premises has available access to rail service over spur tracks served by Canadian National Railway (the "Railroad").  Sublessee's use of the spur tracks will be subject to such terms, covenants and conditions as may be established by the Railroad from time to time for access to rail service, and may require Sublessee to enter into a spur track agreement with the Railroad, all at Sublessee's sole cost and expense.

(d)    Alterations to Subleased Premises; No Attachment of Liens.  Sublessee will make such alterations to the Subleased Premises as may be necessary to fully segregate the ground area of the Subleased Premises from the adjacent Leased Facility by use of fencing and gates and relocation and/or construction of interior entries, driveways and parking areas within the Subleased Premises, subject to Sublessee's right to non-exclusive use of the Common Areas.  The construction, installation, and payment for the alterations necessary to fully segregate the Subleased Premises will be pursuant to the Purchase Agreement, Sewer Pretreatment Agreement, and this Sublease, as

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

applicable. The Subleased Premises will be required to have direct access, and self-contained/self-provided security, parking and loading areas, without entry onto the adjacent portion of the Leased Facility not included in the Subleased Premises. Such alterations, and any other alterations made by Sublessee to the Subleased Premises, will be performed in accordance with the terms and conditions of Sections 8.03 and 8.04 of the Prime Lease at Sublessee's sole cost and expense and will be made in a good and workmanlike manner, lien free and in accordance with all applicable laws and regulations. SUBLESSEE WILL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND WILL PROMPTLY DISCHARGE, ANY LIEN, WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE EFFECTIVE DATE, ON THE SUBLEASED PREMISES OR ANY RENT, ADDITIONAL MONETARY OBLIGATIONS OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE. NOTICE IS HEREBY GIVEN THAT, TO THE EXTENT PROVIDED BY LAW, NEITHER THE OWNER (LESSOR) OR SUBLESSOR WILL BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO SUBLESSEE, OR TO ANYONE HOLDING THE SUBLEASED PREMISES THROUGH OR UNDER SUBLESSEE, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS WILL ATTACH TO OR AFFECT THE INTEREST OF LESSOR OR SUBLESSOR IN THE SUBLEASED PREMISES.

(e)     Compliance With Laws.

(i)     Sublessor's Compliance.  During the Sublease Term, Sublessor will be responsible for making any modifications to the Leased Facility and its appurtenances, excluding the Subleased Premises but including the Common Areas serving the Subleased Premises, required pursuant to the Prime Lease or pursuant to any federal, state or local laws, ordinances, building codes, and rules and regulations of governmental entities having jurisdiction over the Leased Facility, including but not limited to the Americans with Disabilities Act (the "ADA"), all regulations and orders promulgated pursuant to the ADA, and codes, rules and regulations of the Board of Fire Underwriters (collectively, "Applicable Laws").     Any modifications to Common Areas made by Sublessor pursuant to the provisions of this paragraph will initially be at Sublessor's expense; however, such expense may be included in Sublessor's Operating Expenses as set forth above.

(ii)    Sublessee's Compliance.  Sublessee will materially comply with all Applicable Laws with respect to the Subleased Premises, and will promptly comply with all governmental orders and directives for the correction, prevention, and abatement of nuisances in, upon, or connected with the Subleased Premises, all at Sublessee's sole expense.  Sublessee warrants that all

EXHIBIT E-2 TO ASSET PURCHASE AGREEMENT
FORM OF SUBLEASE AGREEMENT (WITH NONDISTURBANCE AGREEMENT)
WINN-DIXIE AFFILIATES S/T SUNSHINE STATE DAIRY FARMS, LLC
SGRJAX\121557.2

improvements or alterations of the Subleased Premises made by Sublessee or Sublessee's employees, agents or contractors, either prior to Sublessee's occupancy of the Subleased Premises or at any time during the term of this Sublease, will comply with all Applicable Laws. Sublessee will procure at its own expense all permits and licenses required for the transaction of its business in the Subleased Premises. In addition, Sublessee warrants that its use and operation of the Subleased Premises will be in strict compliance with all Applicable Laws. During the Sublease Term, Sublessee will, at its sole cost and expense, make any modifications to the Subleased Premises that may be required pursuant to any Applicable Laws.

(f)     Hazardous Material. Throughout the Sublease Term, Sublessee will not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials (as hereinafter defined) on, under, in, above, to, or from the Subleased Premises, the Common Areas or, by actions of Sublessee or its employees, agents or licensees, the remainder of the Leased Facility other than in strict compliance with Applicable Laws and the terms of this Sublease and the Prime Lease. For purposes of this provision, the term "Hazardous Materials" will mean and refer to any wastes, materials, or other substances of any kind or character that are or become regulated as hazardous or toxic waste or substances, or which require special handling or treatment, under any Applicable Laws.

If Sublessee's activities at the Subleased Premises or Sublessee's use of the Subleased Premises (a) results in a release of Hazardous Materials that is not in compliance with Applicable Laws or permits issued thereunder and requires Remediation (as defined herein) by governmental entities having jurisdiction; (b) gives rise to any claim or requires a response under common law or Applicable Laws or permits issued thereunder; (c) causes a significant public health effect and requires Remediation by governmental entities having jurisdiction; or (d) creates a nuisance as identified by governmental entities having jurisdiction, then Sublessee will, at its sole cost and expense: (i) immediately provide verbal notice thereof to Sublessor as well as notice to Sublessor in the manner required by this Sublease, which notice will identify the Hazardous Materials involved and the emergency procedures taken or to be taken; and (ii) promptly take all action in response to such situation required by Applicable Laws, provided that Sublessee will first obtain Sublessor's approval of the remediation plan to be undertaken, which approval Sublessor agrees will not be unreasonably withheld, conditioned or delayed.

As used herein, "Remediation" will mean any and all activities required by governmental authorities, having jurisdiction, to identify, assess, test, characterize, sample, clean up, remove, neutralize, treat, abate,

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

stabilize, or monitor environmental matters at a particular site and/or to dispose of any Hazardous Materials and/or any material containing any Hazardous Materials, including, without limitation, assessment, testing, sampling, quality control, modeling, consultants' analyses and reports, laboratory work, field tests, system installation, modification, operation, and maintenance, natural attenuation, acquisition of equipment, contract negotiation and execution, contract development and bidding, monitoring, transportation, and disposal.

(g)     Quiet Enjoyment.  Sublessor covenants and agrees that as long as Sublessee pays the Rent due hereunder and performs all other obligations to be performed by Sublessee hereunder, Sublessee will peaceably and quietly enjoy the Subleased Premises subject to the terms hereof, the Purchase Agreement and the Prime Lease. Sublessor, at its sole cost and expense, will defend and indemnify Sublessee from and against any party claiming, by, through, or under Sublessor, but none other, any rights superior to Sublessee with respect to the Subleased Premises, except Lessor pursuant to the Prime Lease and Sublessor under this Sublease.

(h)     Access and Inspection.  Upon at least 24 hours prior written notice to Sublessee (except in an emergency in which event no written notice will be required), Sublessor, its agents, representatives, and contractors may enter the Subleased Premises at any reasonable time to inspect the Subleased Premises for the purpose of evaluating and confirming Sublessee's compliance with the Prime Lease and this Sublease, and the condition, occupancy and use of the Subleased Premises.  Any such entry will be subject to the reasonable security procedures of Sublessee, which will include accompaniment by Sublessee's representative during such entry. In the event of a real or apparent emergency, Sublessor may enter the Subleased Premises without prior notice to Sublessee and without accompaniment by Sublessee's representative, but will be obligated to re-secure the Subleased Premises promptly following such entry, and will immediately following such entry notify Sublessee in writing of such action by Sublessor, the reason for such entry, and the findings and results of such entry.

9.     Indemnities.

(a)     Sublessee indemnifies and agrees to hold harmless Sublessor, its members, shareholders, directors, officers, employees, agents and contractors from and against any and all loss, costs, damages, claims, demands, obligations, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by or claimed against Sublessor or any of the foregoing parties as a result of:

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

(i)     Sublessee's failure to fulfill any obligations, conditions, covenants, representations, warranties, liabilities, duties, and/or obligations of Sublessee under this Sublease, including, without limitation, those obligations of Sublessee relating to compliance with the terms, covenants and conditions of the Prime Lease accruing on or after the Effective Date;

(ii)    Sublessee's or Sublessee's employees', agents', contractors' or invitees' negligence or willful misconduct; or

(iii)   disposal of effluent originating from the Subleased Premises into the City of Hammond waste water treatment facility from and after the Effective Date.

The foregoing indemnifications will survive the expiration or earlier termination of this Sublease.

(b)     Sublessee agrees that Sublessor will not be liable to Sublessee, its agents, employees or customers or to any other persons, for any injury or death to persons, damage to property or for any other loss of any kind in any way related to the Subleased Premises or the business conducted therein, regardless of the cause of said injury, damage or loss, except any losses occasioned by the negligent acts (but not omissions) or willful misconduct of Sublessor.

(c)     Sublessor indemnifies and agrees to hold harmless Sublessee, its shareholders, directors, officers, employees, agents and contractors from and against any and all claims, demands, obligations, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by or claimed against Sublessee or any of the foregoing parties as a result of Sublessor's failure to fulfill any obligations, conditions, covenants, representations, warranties, liabilities, duties, and/or obligations of "Lessee" under the Prime Lease accruing prior to the Effective Date.  The foregoing indemnity will survive the expiration or earlier termination of this Sublease.

d.      Except with respect to Sublessee's indemnification as provided in Section 9(a)(iii) above, which indemnification is given without regard to negligence or fault, Sublessor agrees that Sublessee will not be liable to Sublessor, its agents, employees or customers or to any other persons, for any injury or death to persons, damage to property or for any other loss of any kind in any way related to the Leased Facility (less the Subleased Premises) or the business conducted therein, regardless of the cause of said injury, damage or loss, except any losses occasioned by the negligent acts (but not omissions) or willful misconduct of Sublessee.

10.  Insurance.  Sublessee will maintain at its sole expense, throughout the Term of this Sublease, as to the Subleased Premises only, such insurance policies

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

as are required of "Lessee" under the Prime Lease without regard, however, to Section 9.01(b) of the Prime Lease.  All such insurance will be written by companies meeting the requirements of the Prime Lease and that are reasonably acceptable to Sublessor naming Sublessor as an additional insured or loss payee.  In addition to complying with the terms of the Prime Lease, Sublessee will deliver to Sublessor certificates evidencing that such insurance is in force on the Effective Date and such certificates will be maintained with Sublessor throughout the Sublease Term.   The certificates will reflect a requirement of 30 days' prior written notice from the insurer to Sublessor of any cancellation or reduction in coverage and will comply with the terms of the Prime Lease, and will reflect that Sublessor is an additional insured or loss payee.

11.    Defaults and Remedies.

   (a)    Sublessee's Default.  Any act or omission of Sublessee that constitutes a default of "Lessee" under the Prime Lease will constitute a default on the part of Sublessee hereunder, and all remedies afforded Lessor in the event of default under the Prime Lease are also afforded Sublessor under this Sublease.   Sublessee will be entitled to receive from Sublessor the same notices of default and opportunities to cure as provided to "Lessee" under the Prime Lease.  Sublessor will have the right (but not the obligation) to cure any defaults by Sublessee under this Sublease to avoid a default by Sublessor under the Prime Lease.  Without limiting the foregoing, the occurrence of any one or more of the following will constitute default under this Sublease by Sublessee:

       (i)    the failure to pay Rent when due, if the failure continues for 5 days after written notice of non-payment has been received by Sublessee from Sublessor;

       (ii)    the failure to perform any other provision of this Sublease, if such failure to perform is not cured within 30 days after notice has been received by Sublessee from Sublessor, provided that, if the failure cannot reasonably cured within such 30-day period, then Sublessee will not be in default of this Sublease if Sublessee commences to cure the failure within such 30-day period and diligently and in good faith continues to prosecute such cure to completion; or

       (iii)    a default by Guarantor under the Guaranty; or

       (iv)    in the event Sublessee or Guarantor is adjudicated a bankrupt or insolvent, seeks or consents to the appointment of a receiver or trustee for itself or the Subleased Premises, files a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, makes a general assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they mature.

Page 13 of 23

(b)    <u>Sublessor's Remedies</u>.  In the event of any default of Sublessee under this Sublease, Sublessor may exercise the rights and remedies available to Lessor under Sections 17.01(a), 17.01(b) and 17.01(g) of the Prime Lease.  If Sublessee at any time fails to perform any of its non-monetary obligations under this Sublease within the applicable cure period following written notice from Sublessor to Sublessee, then Sublessor will have the right, but not the obligation, upon giving Sublessee at least 10 additional days' prior written notice of its election to do so (in the event of any emergency no prior notice will be required), to perform such obligations on behalf of and for the account of Sublessee and to take all such reasonable action to perform such obligations.  The performance by Sublessor of any obligation will not constitute a release or waiver of Sublessee therefrom.

(c)    <u>Sublessor Default under Sublease and Prime Lease</u>.  Sublessor will not be deemed to be in default under the Sublease by virtue of any default of Sublessor under the Prime Lease, which default of Sublessor was caused solely by the default of Sublessee under this Sublease; however, any other default in the Prime Lease will constitute a default if Lessor takes any action that adversely affects Sublessee's use, occupation or business conducted within the Subleased Premises.  Sublessee will have the right (but not the obligation) to cure any defaults by Sublessor under the Prime Lease, and Sublessor agrees to deliver to Sublessee a copy of any notice (of default or otherwise) given by Lessor under or pursuant to the Prime Lease to Sublessor promptly following receipt thereof by Sublessor.  In the event of any default of Sublessor under this Sublease or under the Prime Lease, Sublessee may exercise all of the rights and remedies available to it at law or in equity.

(d)    <u>Notices from Lessor</u>.  Promptly upon its receipt of same, Sublessor will deliver to Sublessee copies of all notices and/or communications regarding the Prime Lease, Sublessee, this Sublease or Sublessee's occupancy of the Subleased Premises that Sublessor receives from Lessor.  Promptly upon its receipt of same, Sublessee will deliver to Sublessor copies of all notices and/or communications regarding the Prime Lease, Sublessor, this Sublease or Sublessor's occupancy of the balance of the Leased Facility that Sublessee receives from Lessor.

(e)    <u>Lender's Right To Cure Sublessee's Breach</u>.  Sublessor will endeavor to deliver to Sublessee's mortgage lender, as identified by Sublessee by written notice to Sublessor ("<u>Sublessee's Lender</u>"), contemporaneously with Sublessor's delivery to Sublessee, a copy of any written notice of Sublessee's default under this Sublease, in the same manner that such notice is provided to Sublessee at the address provided in <u>Section 17</u> hereof.  Sublessor agrees that Sublessee's Lender will have the right to exercise a cure of such default under this Sublease within any available grace or cure period under this Sublease or the Prime Lease,

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

as applicable.  Sublessor agrees not to take any action to repossess the Subleased Premises or any action to terminate Sublessee's leasehold interest unless such default remains uncured following the passage of any such grace or cure period.  If Lender timely cures any such default, Sublessor will permit Sublessee or Sublessee's Lender, as determined by Sublessee's Lender, to remain in possession of the Subleased Premises and agrees that this Sublease will remain in full force and effect.

(f)     Sublease Guaranty.  Sublessee's payment and performance of its obligations under this Sublease will be guaranteed unconditionally by Sublessee's sole member, Southeast Milk, Inc., a Florida agricultural marketing cooperative ("Guarantor"), pursuant to a Guaranty of Sublease substantially in the form attached hereto as Exhibit C (the "Guaranty").

12.   Representations and Warranties.

(a)   Sublessor's Representations and Warranties.

(i)    Organization.  Sublessor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease its properties and to conduct its business as it is presently being conducted and to enter into and to perform its obligations under or otherwise relating to this Sublease. Sublessor is duly qualified and licensed as a foreign limited liability company to conduct the business conducted by it and is in good standing in the State of Louisiana.

(ii)   Authorization.  Sublessor's execution, delivery and performance of this Sublease and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary company action on the part of Sublessor, and no other company proceedings on the part of Sublessor are necessary to authorize this Sublease and the transactions contemplated hereby.

(iii)  Prime Lease.

a.    Sublessor is the owner and holder of a leasehold interest in the Subleased Premises pursuant and subject to the Prime Lease.  The Prime Lease attached to this Sublease is a true, correct and complete copy of the Prime Lease (including all amendments, side letters, and any currently  effective  estoppel  certificates  and subordination and non-disturbance agreements with respect thereto) as in effect as of the Effective Date.

Page 15 of 23

b.  The Prime Lease is valid and in full force and effect, and there are no subleases, licenses, occupancy agreements or assignment agreements in effect with respect to the Prime Lease except this Sublease.

c.  Sublessor is not in default under the Prime Lease, and to Sublessor's knowledge: (i) no condition or occurrence exists, which, with the passage of time and/or the giving of notice, would constitute a default by Sublessor under the Prime Lease; and (ii) Lessor is not in default under the Prime Lease, and no condition or occurrence exists which, with the passage of time and/or the giving of notice, would constitute a default by Lessor under the Prime Lease.

d.  Sublessor has the right to sublease the Subleased Premises to Sublessee pursuant to this Sublease, and no consent, approval or authorization of Lessor is required in connection with the execution, delivery and performance of this Sublease.

(b)  <u>Sublessee's Representations and Warranties</u>.

   (i)  <u>Organization</u>.  Sublessee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease its properties and to conduct its business as it is presently being conducted and to enter into and to perform its obligations under or otherwise relating to this Sublease. Sublessee is duly qualified and licensed as a foreign limited liability company to conduct the business conducted by it and is in good standing in the State of Louisiana.

   (ii)  <u>Authorization</u>.  Sublessee's execution, delivery and performance of this Sublease and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary company action on the part of Sublessee, and no other company proceedings on the part of Sublessee are necessary to authorize this Sublease and the transactions contemplated hereby.

   (iii)  <u>Tax Status</u>.  Sublessee is not (i) a tax-exempt entity (within the meaning of Section 168(h) of the Code) or (ii) a debtor or debtor-in-possession in a voluntary or involuntary bankruptcy proceeding as of the Effective Date.

   (iv)  <u>Permits; Consents and Approvals</u>.  Sublessee has made all necessary and appropriate investigation into regulatory and permitting requirements for operation of the Subleased

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

Premises, and has all licenses and permits required for the leasing of, and conduct of, Sublessee's business at, the Subleased Premises. No consent or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by Buyer on or prior to the Closing Date in connection with the execution, delivery and performance of this Sublease or the consummation of the transactions contemplated hereby. For purposes of the foregoing, the term "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, including, but not limited to those relating to or promulgated by the Food and Drug Administration and the United States Department of Agriculture any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

(v)   No Brokers.   Neither Sublessee nor any of its affiliates has employed, or is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Sublease.

13.   Modification of Prime Lease.   Sublessor will not modify or amend the Prime Lease during the Term without the prior written consent of Sublessee, which consent may be granted or withheld by Sublessee in its sole and absolute discretion.   In the event Sublessee desires a modification or amendment of the Prime Lease, Sublessor agrees to cooperate with Sublessee to obtain such modification from Lessor provided such modification does not increase the rental or other charges payable under or with respect to the Prime Lease, impose other obligations or risks on Sublessor (as "Lessee" under the Prime Lease or otherwise) that in Sublessor's good faith judgment are not immaterial, or increase the "Base Term" thereunder.

14.   Certain Rights of Lessee under Prime Lease.   Notwithstanding anything contained in this Sublease to the contrary, the following rights of Sublessor, as "Lessee" under the Prime Lease, may not be exercised by Sublessee without the express prior written consent of Sublessor, which may be granted or withheld by Sublessor in its sole and absolute discretion:

(a)   Lessee's right of offer, as set forth in Article 4 of the Prime Lease; and

(b)   Lessee's right to offer to substitute in connection with an Event of Loss, as set forth in Article 12 of the Prime Lease.

EXHIBIT E-2 TO ASSET PURCHASE AGREEMENT
FORM OF SUBLEASE AGREEMENT (WITH NONDISTURBANCE AGREEMENT)
WINN-DIXIE AFFILIATES S/T SUNSHINE STATE DAIRY FARMS, LLC
SGRJAX\121557.2

15.   <u>Brokers</u>. Sublessor has not employed, nor is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with this Sublease other than The Blackstone Group, L.P. ("<u>Sublessor's Broker</u>"). Sublessee has not employed, nor is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with this Sublease. Sublessor will be responsible for payment of any brokerage or leasing fee payable to Sublessor's Broker.

16.   <u>Assignment and Subletting; Consent of Sublessor</u>.   Notwithstanding any provision in this Sublease to the contrary, Sublessee will not transfer, assign or sublet all of any portion of its interest under the Sublease to any third party or entity without the express prior written consent of Sublessor, which may be granted or withheld by Sublessor in its sole and absolute discretion, as long as Winn-Dixie Procurement, Inc., continues to purchase at least forty million gallons of Milk Products from Sublessee at the Acquired Plants under the Supply Contract; otherwise, Sublessee may transfer, assign or sublet all or any portion of its interest under the Sublease to any third party or entity with the consent of Sublessor which consent will not be unreasonably withheld.

17.   <u>Notices</u>. All notices, consents, directions, approvals, instructions, requests and other communications required or permitted to be given pursuant to this Sublease will be in writing and will be given in the manner and with the effect provided in Section 25.03 of the Prime Lease, addressed to Sublessor or Sublessee at their respective addresses stated below, or at such other address as may be specified by a party by notice to the other party given in accordance with this <u>Section 17</u>:

| If to Sublessor: | Winn-Dixie Warehouse Leasing, LLC<br>5050 Edgewood Court<br>Jacksonville, Florida 32254-3699<br>Attn:  Office of General Counsel<br>Telefax No. 904-783-5651 |
|---|---|
| With a copy to: | Winn-Dixie Stores, Inc.<br>5050 Edgewood Court<br>Jacksonville, Florida 32254-3699<br>Attn:  Legal Department<br>Telefax No. 904-783 5138 |
| If to Sublessee: | Sunshine State Dairy Farms, LLC<br>1950 S. E. Highway 484<br>Belleview, Florida 34420<br>Telefax No. 352-307-5522 |

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\1 2 1 5 5 7.2

With a copy to: Southeast Milk, Inc.
1950 S. E. Highway 484
Belleview, Florida 34420
Telefax No. 352-307-5522

And: Latham, Shuker, Eden & Beaudine, LLP
390 North Orange Avenue, Suite 600
Orlando, Florida 32801
Attn: Peter G. Latham
Telefax No. 407-481-5801

18. Binding Effect. This Sublease will be binding upon and will inure to the benefit of Sublessor and Sublessee and their respective successors and assigns.

19. Further Assurances. Sublessor and Sublessee agree to execute and deliver any and all papers, documents and other assurances and to do any and all other acts and things reasonably necessary to implement and to give full force and effect to their agreements hereunder.

20. Modification of Sublease. This Sublease may only be modified by a written instrument or instruments executed by the party against which enforcement of the modification or termination is asserted. Any alleged modification that is not in writing and signed by the party against which enforcement is sought will not be effective as to any party.

21. Entire Agreement. This Sublease, with specific reference to the Prime Lease, and as modified by the Nondisturbance Agreement, constitutes the entire understanding and agreement between Sublessor and Sublessee with respect to the sublease by Sublessee of the Subleased Premises and supersedes all prior written or oral understandings and agreements between Sublessor and Sublessee with respect thereto.

22. Severability. No determination by any court, governmental body or otherwise that any provision of this Sublease or any amendment hereof is invalid or unenforceable in any instance will affect the validity or enforceability of (i) any other such provision, or (ii) such provision in any circumstances not controlled by such determination. Each such provision will be valid and enforceable to the fullest extent allowed by, and will be construed wherever possible as being consistent with applicable law.

23. Multiple Counterparts. This Sublease may be executed in one or more counterparts, each of which will constitute an original, but all of which taken together will be considered one and the same document.

24. Short Form Sublease. Contemporaneously with the execution and delivery of this Sublease, Sublessor and Sublessee will execute and deliver a short form Sublease (the "Short Form Sublease") for purposes of placing third parties on record notice of Sublessee's subleasehold interest in the Subleased Premises

under this Sublease, subject to the Prime Lease, and of certain material terms of this Sublease, including the provisions of Section 8(d) and Section 14 hereof. Sublessor promptly thereafter will record the Short Form Sublease in the Recorder's Office, Tangipahoa Parish, Louisiana. The Short Form Sublease will be deemed terminated as a matter of record upon the first to occur of (a) recordation of a written affidavit of an officer of Sublessor certifying that this Sublease has terminated pursuant to its terms prior to expiration of the Sublease Term, or (b) expiration of the Sublease Term.

25.     Time of the Essence.   Time is of the essence in the performance of the respective rights and obligations of Sublessor and Sublessee under this Sublease.

26.     Governing Law; Jurisdiction; Venue.    The interpretation, validity, and enforcement of this Sublease will be governed by and construed under the laws of the State of Louisiana. Sublessor and Sublessee submit to the non-exclusive personal jurisdiction of, and consent to venue in, the State of New York and the Federal Courts of the United States of America located in the State of New York (and any appellate courts taking appeals therefrom) for the enforcement of such person's obligations hereunder, and waive any and all personal rights under the law of any other state to object to jurisdiction within such state for the purposes of such action, suit, proceeding or litigation to enforce such obligations of Sublessor or Sublessee. Sublessor and Sublessee each waive and agree not to assert, as a defense in any action, suit or proceeding arising out of or relating to this Sublease: (i) that it is not subject to such jurisdiction or that such action, suit or proceeding may not be brought or is not maintainable in those courts or that it is exempt or immune from execution; (ii) that the action, suit or proceeding is brought in an inconvenient forum; or (iii) that the venue of the action, suit or proceeding is improper. Sublessor and Sublessee each expressly waives any and all rights to trial by jury in any action or proceeding relating to the enforcement of this Sublease.

27.     Waiver of Trial by Jury.   Sublessor and Sublessee each acknowledge and agree that the nature of this Sublease makes a jury determination of any dispute arising out of this Sublease, the Prime Lease or the transactions contemplated herein or therein undesirable.   Accordingly, Sublessor and Sublessee each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Sublease, the Prime Lease or the transactions contemplated herein or therein.

28.     Continuation of Prime Lease.  Sublessor hereby covenants and agrees that it will abide by all of its obligations under the Prime Lease in all material respects, and that it will take all commercially reasonable actions as will be necessary to maintain the existence and effectiveness of the Prime Lease and Sublessor's interest thereunder through the "Base Term" thereunder. Sublessor further covenants that it will take all commercially reasonable actions to defend any claims by Lessor that Sublessor has breached the Prime

Page 20 of 23

Lease, and will pursue all commercially reasonable means of opposing any efforts by Lessor to terminate the Prime Lease or otherwise take any action that would diminish Sublessee's rights under this Sublease by reason of such breach.  Sublessor agrees that it will not voluntarily modify or terminate the Prime Lease in a manner that reduces Sublessee's rights under this Sublease or increases Sublessee's obligations under this Sublease without Sublesee's prior written consent.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

**IN WITNESS WHEREOF**, the parties hereto have executed this Sublease as of the dates given for their respective signatures below.

This Sublease signed this _____ day of _____, 2008, in Jacksonville, Florida, in the presence of the undersigned witnesses and Notary Public duly qualified in the County of Duval, State of Florida.

Witnesses:

**SUBLESSOR:**

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company

By:   Winn-Dixie Logistics, Inc., a Florida corporation, its sole member

_____

Print Name:_____

By:_____
Name: _____
Title:_____

_____

Print Name:_____

_____

Print Name:_____
**Notary Public**
My Commission Expires:_____
Commission No.:_____

Page 22 of 23

This Sublease signed this _____ day of _____, 2008, in _____, Florida, in the presence of the undersigned witnesses and Notary Public duly qualified in the County of _____, State of Florida.

Witnesses:

**SUBLESSEE:**

**SUNSHINE STATE DAIRY FARMS, LLC,**
a Florida limited liability company

By:    Southeast Milk, Inc., a Florida
agricultural marketing cooperative,
its sole member

_____
Print Name:_____

By:_____
Name: _____
Title:_____

_____
Print Name:_____

_____
Print Name:_____
**Notary Public**
My Commission Expires:_____
Commission No.:_____

SCHEDULE OF ATTACHMENTS:

Exhibit A – Prime Lease
Exhibit B – Description of Subleased Premises
Exhibit C – Form of Guaranty of Sublease

Exhibit E-2 to Asset Purchase Agreement
Form of Sublease Agreement (with Nondisturbance Agreement)
Winn-Dixie Affiliates S/T Sunshine State Dairy Farms, LLC
SGRJAX\121557.2

## EXHIBIT C

to Sublease

Form of
## GUARANTY OF SUBLEASE

**THIS GUARANTY OF SUBLEASE** (this "<u>Guaranty</u>") is entered into as of _____, 2008, by

**SOUTHEAST MILK, INC.**, a Florida agricultural marketing cooperative ("<u>Guarantor</u>"), whose address is 1950 S. E. Highway 484, Belleview, Florida 34420,

for the benefit of

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company ("<u>Warehouse Leasing</u>"), **WINN-DIXIE LOGISTICS, INC.**, a Florida corporation ("<u>Logistics</u>"), and **WINN-DIXIE STORES, INC.**, a Florida corporation ("<u>Stores</u>"), whose address is 5050 Edgewood Court, Jacksonville, Florida 32254 (Warehouse Leasing, Logistics and Stores sometimes collectively are referred to as "<u>Winn-Dixie</u>").

### R E C I T A L S :

A.   Warehouse Leasing, as sublessor, and Sunshine State Dairy Farms, LLC, a Florida limited liability company, as sublessee ("<u>Sublessee</u>"), are parties to that certain Sublease dated of even date herewith (the "<u>Sublease</u>"), pursuant to which Warehouse Leasing has subleased to Sublessee the Subleased Premises as described therein.

B.   Guarantor is the sole member of Sublessee, and in such capacity will receive direct or indirect benefit from Sublessee's entry into the Sublease.

C.   As an inducement to Warehouse Leasing to enter into the Sublease with Sublessee, Guarantor has agreed to guaranty each of Sublessee's obligations, representations, warranties and covenants under the Sublease (the "<u>Obligations</u>") for the benefit of Winn-Dixie, as provided in this Guaranty.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Guarantor hereby agrees as follows:

### AGREEMENT

1.   Guarantor unconditionally guarantees, without deduction by reason of setoff, defense or counterclaim, to Winn-Dixie and its successors and assigns, Sublessee's full and punctual payment, performance and observance of each of the Obligations. This Guaranty is a present and continuing guaranty of payment, performance and observance and not of collectability of the Obligations, and Winn-Dixie will not be required to prosecute collection, enforcement or other remedies against Sublessee or any other guarantor of the Obligations, or to enforce or resort to any collateral securing the Obligations or other rights and remedies pertaining thereto, before seeking payment, performance or observance of the Obligations by Guarantor pursuant to this Guaranty.

2.   The following will constitute representations and warranties of Guarantor, and Guarantor hereby acknowledges that Warehouse Leasing is willing to accept this Guaranty and enter into the Sublease in reliance thereon:

a.   As of the date of this Guaranty, neither the execution and delivery of this Guaranty nor compliance with the terms and provisions hereof will violate any applicable law, rule, regulation, judgment, decree or order, or will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind that creates, represents, evidences or provides for any lien, charge or encumbrance upon any of the property or assets of Guarantor, or any other indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Guarantor is a party or to which Guarantor or the property of Guarantor may be subject.

b.   As of the date of this Guaranty, there are no litigation, arbitration, governmental or administrative proceedings, actions, examinations, claims or demands pending, or to the knowledge of Guarantor, threatened that could materially and adversely affect payment and performance of the obligations of Guarantor under this Guaranty.

c.   Neither this Guaranty nor any statement or certification as to facts previously furnished or required herein to be furnished to Winn-Dixie by Guarantor, contains any material inaccuracy or untruth in any representation, covenant or warranty or omits to state a fact material to this Guaranty.

3.   If Sublessee will at any time default in the payment, performance or observance of any of the Obligations to be made, kept, performed or observed by Sublessee, Guarantor will make, keep, perform and observe same, as the case may be, in the place and stead of Sublessee in accordance with and subject to the provisions (including but not limited to any notice and cure provision) of the Sublease.

4.   Any act of Winn-Dixie, or its successors or assigns, consisting of a waiver of any of the Obligations, or the giving of any consent to any manner or thing relating to the Sublease, or the granting of any indulgences or extension of time to Sublessee, may be done without notice to Guarantor and without releasing Guarantor from any of its obligations hereunder.

5.   The obligations of Guarantor hereunder will not be released by Winn-Dixie's receipt, application or release of any security given for the payment, performance or observance of any of the Obligations, nor by any modification of the Sublease or any of the Obligations, regardless of whether Guarantor consents thereto or receives notice thereof.

6.   The liability of Guarantor hereunder will in no way be affected by (a) the release or discharge of Sublessee in any creditor's receivership, bankruptcy or other proceeding; (b) the impairment, limitation or modification of the liability of Sublessee or the estate of Sublessee in bankruptcy, or of any remedy for the enforcement of the Obligations against Sublessee resulting from the operation of any present or future provision of the United States bankruptcy laws or other federal or state statute or from the decision in any court; (c) the rejection or disaffirmance of the Sublease in any such proceedings; (d) the assignment or transfer of the Sublease by Sublessee; (e) the exercise by Winn-Dixie of any of its rights or remedies reserved

2

under the Sublease or by law; or (f) any termination of the Sublease, unless such termination was caused by Sublessee pursuant to any of the rights of termination available to Sublessee under the Sublease.

7.   Guarantor further agrees that it may be joined in any action against Sublessee in connection with the Obligations and recovery may be had against Guarantor in any such action.

8.   Until all the Obligations to be made, kept, performed and observed by Sublessee are fully performed and observed and until all periods under applicable bankruptcy law for the contest of any payment by Guarantor or the Borrower as a preferential or fraudulent payment have expired, Guarantor (a) will have no right of subrogation against Sublessee by reason of any payments or performance by Guarantor hereunder; and (b) subordinates any liability or indebtedness of Sublessee now or hereafter held by Guarantor to the obligations of Sublessee to Winn-Dixie under the Sublease.

9.   Guarantor expressly and unconditionally waives all notices that may be required (i) by statute, rule of law or otherwise, now or hereafter in effect, to preserve intact any rights against Guarantor, including, without limitation, any demand, proof of notice of nonpayment or non-performance under the Sublease and notice of any event of default or any failure on the part of Sublessee, Guarantor or any other guarantor of the Obligations to perform or comply with any covenant, agreement, term or condition within the Sublease, (ii) any right to the enforcement, assertion or exercise against Sublessee, Guarantor or any other guarantor of the Obligations of any right or remedy conferred under the Sublease, (iii) any requirement of diligence on the part of any person or entity; (iv) any requirement on the part of Winn-Dixie to exhaust any remedies or to mitigate the damages resulting from any default under the Sublease, and (v) any notice of any disposition of any right or interest of Winn-Dixie under the Sublease.

10.   This Guaranty will apply to the Sublease, any modification or amendment thereof and to any assignment or other tenancy thereunder or to any holdover term following the term granted under the Sublease or any extension or renewal thereof, regardless of whether Guarantor consents thereto or receives notice thereof.

11.   Guarantor agrees that any and all present and future debts and obligations of the Sublessee to Guarantor are hereby subordinated to the claims of the Winn-Dixie.

12.   In the event this Guaranty will be held ineffective or unenforceable by any court of competent jurisdiction or in the event of any limitation of Guarantor's liability hereunder other than as expressly provided herein, then Guarantor will be deemed to be a direct tenant under the Sublease with the same force and effect as if Guarantor were expressly named as a joint and several tenant with Sublessee therein.

13.   No delay or failure on the part of Winn-Dixie to exercise any right, power or privilege under this Guaranty or the Sublease will operate as a waiver thereof, and no single or partial exercise of any right, power or privilege will preclude any other or further exercise thereof or the exercise of any other power or right, or be deemed to establish a custom or course of dealing or performance between the parties hereto or to the Sublease. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law. No notice to or demand on

3

Guarantor in any case will entitle Guarantor to any other or further notice or demand in the same, similar or other circumstance.

14. This instrument constitutes the entire agreement between Warehouse Leasing and Guarantor with respect to the subject matter hereof, superseding all prior oral or written agreements or understandings with respect thereto and may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and Warehouse Leasing.

15. This Guaranty and all claims or controversies arising out of or relating to this Guaranty will be governed by and construed in accordance with the laws of the State of Louisiana, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Louisiana. Venue for all actions arising from this Guaranty will be in the circuit court in and for Duval County, Florida.

16. Notice hereunder will be in writing and will be effective upon personal service, upon receipt of a facsimile transmission (provided that a conforming copy is simultaneously deposited for delivery via U.S. Mail), to the other party at its address set forth in the introductory paragraph of this Guaranty, except that under no circumstances will Warehouse Leasing be obligated to give Guarantor any notice not specifically required to be given by Warehouse Leasing pursuant to this Guaranty. Either party may by notice given as aforesaid designate a different address for notice purposes.

17. Facsimile transmissions of signatures will be accepted and binding as originals.

18. If any one or more of the provisions herein, or any application thereof, will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, will not in any way be affected or impaired thereby and will be enforced to the greatest extent permitted by law.

19. This Guaranty will inure to the benefit of Winn-Dixie and its successors and assigns. This Guaranty will be binding on Guarantor and the heirs, legatees, successors and assigns of Guarantor.  It is agreed that the liability of Guarantor hereunder is several and independent of any other guarantees or other obligations at any time in effect with respect to the Obligations or any part thereof and that the liability of Guarantor hereunder may be enforced regardless of the existence, validity, enforcement or nonenforcement of any such other guarantees or other obligations.

20. Guarantor waives every present and future defense (other than the defense of payment or performance in full), cause of action, counterclaim or setoff which Guarantor may now have or hereafter may have to any action by Winn-Dixie in enforcing this Guaranty. This provision is a material inducement for Warehouse Leasing's entry into the Sublease and acceptance of this Guaranty.

WINN-DIXIE/SOUTHEAST MILK
GUARANTY OF SUBLEASE
EXHIBIT C TO SUBLEASE
SGRJAX\121447.3

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the date first above written.

<div style="margin-left: 40%;">

**GUARANTOR:**

**SOUTHEAST MILK, INC.**, a Florida agricultural marketing cooperative


By: _____
Name: _____
Title: _____

</div>

WINN-DIXIE/SOUTHEAST MILK
GUARANTY OF SUBLEASE
EXHIBIT C TO SUBLEASE
SGRJAX\121447.3

**EXHIBIT F**
**To Asset Purchase Agreement**

FORM OF
LEASE ESTOPPEL CERTIFICATE

**LEASE ESTOPPEL CERTIFICATE**

_____, a _____ ("Lessor"), the hereby certifies that as of _____ (the "Certification Date"), the following is true and correct:

1.   The lease between Lessor and _____, a _____ ("Lessee"), dated as of _____, as amended from time to time (the "Lease"), is unmodified and in force and effect.

2.   The date to which the rent has been paid is _____.

3.   There is no default by Lessee in the payment of base rent or any other rent payable to Lessor hereunder, and there is no other existing default by either party with respect to which a notice of default has been served.

4.   To the knowledge of the signer, there are no setoffs, defenses or counterclaims against enforcement of the obligations to be performed hereunder existing in favor of the party executing such certificate.

5.   The term of the Lease commenced on August 10, 1999, and is scheduled to expire on August 31, 2024, unless renewed or terminated in accordance with the terms of the Lease.  Pursuant to the Lease, Lessee is entitled to renew the Lease for six (6) terms of five (5) years each.

LESSOR:

By: _____
Name:_____
Title: _____

STATE OF _____

COUNTY OF _____

This instrument was acknowledged before me this ___ day of _____, 200__, by
_____, the _____ of _____,
a _____, on behalf of the _____. He/She either [____] is
personally      known      to      me      or      [____]      has      produced
_____ as identification.

_____

Print Name:_____

Notary Public, State of _____

Commission No.:_____

My Commission Expires:_____

                              [NOTARY SEAL]

**EXHIBIT H**
**To Asset Purchase Agreement**

FORM OF
OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT

**OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT**

**THIS OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment and Assumption") is made effective as of _____, 2008 (the "Effective Date"), by

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Winn-Dixie"),

**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company wholly-owned by Winn-Dixie ("Properties LLC"),

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company wholly-owned, indirectly, by Winn-Dixie ("Leasing LLC"),

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation wholly-owned by Winn-Dixie ("Logistics" and, collectively with Winn-Dixie, Properties LLC, Leasing LLC and Logistics, "Assignor")), and

_____, a _____ ("Assignee").

**R E C I T A L S :**

A.      Assignor and Assignee are parties to that certain Asset Purchase Agreement dated effective _____, 2008 (the "Agreement"), pursuant to which Assignor has agreed to sell, convey, assign or sublease, as applicable, to Assignee its respective interest in the Assets described therein (the "Transaction"). All capitalized terms not expressly defined in this Assignment and Assumption will have the meanings assigned to such terms in the Agreement.

B.      Assignor has previously entered into agreements, contracts, commitments and undertakings relating to the Assets, as more particularly described on attached Exhibit A (the "Assumed Contracts").

C.      In furtherance of the Transaction, Assignor and Assignee desire to enter into this Assignment to evidence the assignment and assumption of the Assumed Contracts.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Assignment.

      a.      Assumed Contracts.  Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's right, title, and interest in the Assumed Contracts, and all of its duties, obligations and liabilities under the Assumed Contracts arising or accruing from and after the Effective Date, except as set forth in the attached

Exhibit B; it being understood, however, that Assignor will remain fully obligated for the payment and performance of any duties, obligations or liabilities accruing prior to the Effective Date.  Assignor indemnifies and agrees to hold Assignee harmless from all such obligations and liabilities under the Assumed Contracts arising or accruing prior to the Effective Date.

b.      Warranties.  Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's respective right, title, and interest in all warranties on any personal property to be conveyed under the Agreement, to the extent assignable, it being understood that Assignor will remain fully obligated for the payment and performance of any duties, obligations or liabilities accruing prior to the Effective Date.  Assignor agrees to indemnify and hold Assignee harmless from all such obligations and liabilities accruing prior to the Effective Date.

2.      Assumption.  Assignee expressly assumes all of the right, title, interest, duties, obligations and liabilities of Assignor under the Assumed Contracts arising or accruing from and after the Effective Date; it being understood, however, that Assignee will not have any liability or obligation for the payment or performance of any duties, obligations or liabilities accruing prior to the Effective Date.  Assignee indemnifies and agrees to hold Assignor harmless from all such obligations and liabilities under the Assumed Contracts arising or accruing from and after the Effective Date.

3.      Further Assurances.  Each party agrees to execute and deliver such other assignments, affidavits, instruments or certifications as any other party reasonably may request as necessary or appropriate to fully consummate the assignment and assumption of the Assumed Contracts set forth in this Assignment and Assumption.

4.      Governing Law.  This instrument shall be governed by and construed in accordance with the internal laws of the State of Florida.

5.      Binding Effect.  This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

**[SIGNATURE PAGES TO FOLLOW]**

Exhibit H to Asset Purchase Agreement
Form of Omnibus Assignment and Assumption Agreement (Assumed Contracts)
Dairy Plants Disposition
SGRJAX\114851.1

**IN WITNESS WHEREOF**, Assignor and Assignee each have caused this Assignment and Assumption to be executed by its duly authorized signatory as of the Effective Date.

**ASSIGNOR:**

**WINN-DIXIE STORES, INC.,** a Florida corporation

Name:_____

By:_____
Name: _____
Name:_____                Its:_____ President


**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company

Name:_____

By:    Winn-Dixie Stores, Inc., a Florida corporation, its sole member

Name:_____

By: _____
Name:_____
Its:_____ President

3

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company

Name:_____

By:   Winn-Dixie Logistics, Inc., a Florida corporation, its sole member

Name:_____

     By: _____
     Name:_____
     Its:_____ President


**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation

Name:_____

By:_____

Name:_____
Name:
Its:_____ President


**ASSIGNEE:**

_____, a _____

By:_____
Name:
Its:_____

4

## **Exhibit A**

**Assumed Contracts**

**Exhibit B**

Assignee does not assume and Assignor will retain any payment obligations under the following contract relating to work ordered prior to Closing, which payment will remain the obligation of Assignor:

Supply Agreement between Siemens Water Technologies Corporation and Winn-Dixie Stores, Inc. dated June 21, 2007.

6

**EXHIBIT I**
**to Asset Purchase Agreement**

**FORM OF CLOSING STATEMENT**

**SELLER:**

**BUYER:**

**TRANSACTION:**

**PURCHASE PRICE:**

**CLOSING DATE:**

**SELLER'S STATEMENT**

| | | | |
|---|---|---|---|
| **Total Purchase Price** | | $ | - |
| **Less Adjustments:** | | | |
| 1.  Seller's Prorated Share of Taxes | | | |
| **Total Adjustments:** | $           - | $ | - |
| **Less Closing Costs to be Paid by Seller:** | | | |
| 1.  Seller's Attorneys Fees & Costs (Smith, Gambrell & Russell, LLP) | | | |
| 2.  Surveyor's Fees (Name of Firm) | | | |
| 3.  Title Search Fees (Fidelity National Title Insurance Company) | | | |
| 4.  Title Insurance Premium (Fidelity National Title Insurance Company) | | | |
| 5.  Phase 1 Environmental Site Assessment (Name of Firm) | | | |
| 6.  Broker's Fee | $           - | | |
| **Total Seller's Closing Costs:** | $           - | $ | - |
| **TOTAL AMOUNT DUE TO SELLER:** | | $ | - |

## BUYER'S STATEMENT

**Total Purchase Price**                                                                $            -

**Less Adjustments:**
1.  Earnest Money Deposit Held by Escrow Agent
2.  Seller's Prorated Share of Taxes
      **Total Adjustments:**                        $            -        $            -

**Plus Closing Costs to be Paid by Buyer:**

1.  Buyer's Attorney's Fees & Costs
    (Name of Firm)
2.  Recording/Filing Fees
    (Document and Number of Pages)
    (Document and Number of Pages)
    (_____ County/Parish Clerk of Court)
3.  Transfer Tax
    (_____ County/Parish, _____)
      **Total Buyer's Closing Costs:**              $            -        $            -
**Amount Due from Buyer:**                                                        $            -
**Amount Due from Escrow Agent:**                                          $            -

**TOTAL AMOUNT DUE AT CLOSING:**                                    $            -

107241

The undersigned parties acknowledge and agree to the foregoing Closing Statement as of this _____ day of_____, 200\_, and hereby authorize Smith, Gambrell & Russell, LLP, as closing agent, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                              **BUYER:**


By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____

**Notes:**

(1) <u>200__ Prorations - Amounts Not Yet Paid and Payable</u>.  Prorations are based on estimate of 200__ real estate taxes derived from actual 200__ amounts paid by Seller. Buyer shall be responsible for the payment of such charges accruing from and after the closing date and subsequent years. Prorations are as follows:

### Real Estate Taxes

- 200__ Real Estate Taxes

- Per Diem Tax Amount $                    -

- Seller's Share of 200__ Taxes

   (dates) (# of days)   $_____-   $                    -

**Total Real Estate Taxes:**   $                    -

(1) <u>Adjustments</u>.  Seller and Buyer acknowledge and agree that any amounts reflected on this Closing Statement that are not determinable as of the Closing Date are based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

## DISBURSEMENT SCHEDULE

RECEIPTS:

| | | | | | |
|---|---|---|---|---|---|
| 1. | Cash Due From Buyer | $ | - | | |
| 2. | Amount Due from Escrow Agent | $ | - | | |

TOTAL CASH RECEIVED:    $   -    $      -

DISBURSEMENTS:

1. Smith, Gambrell & Russell, LLP     $   -
   (Seller's Attorneys Fees)
2. Name of Firm
   (Buyer's Attorneys Fees)
3. Environmental Site Assessment Company     $   -
   (Phase 1 ESA)
4. Surveyor     $   -
   (Surveyor's Fees)
5. Broker     $   -
   (Broker's Fee)
6. _____ County/Parish, _____     $   -
   (Transfer Tax and Recording Fees)
7. Seller     $   -
   (Seller's Proceeds)
8. Fidelity national Titl;e Insurance Company     #REF!
   (Title Search Fee, Title Premium and Recording Fees)

TOTAL DISBURSEMENTS:     #REF!

107241

**EXHIBIT J**
**To Asset Purchase Agreement**

<u>FORM OF</u>
<u>CLOSING CERTIFICATE</u>

**<u>CLOSING CERTIFICATE</u>**
[Dairies]

_____, a _____ corporation ("_____") hereby
certifies to _____, a _____ corporation ("_____"),
the following:

1.    The representations and warranties of _____ as set forth in that certain Asset
      Purchase Agreement dated effective _____, 2008, between Seller and Buyer
      (the "<u>Agreement</u>"), are true and correct in all material respects as of the date hereof
      with the same effect as though all such representations and warranties had been
      made on and as of such date.

2.    _____ has complied in all material respects with the duties and obligations
      provided in the Agreement as of the date hereof.

3.    This Certificate may be relied upon for the purposes and subject to the conditions
      stated in the Agreement.

**IN WITNESS WHEREOF**, the undersigned has caused this Certificate to be executed as of
_____, 2008.


                              _____, a _____
                              corporation


                              By:_____
                              Name: _____
                              Its: _____

**<u>EXHIBIT K</u>**
**To Asset Purchase Agreement**

**<u>INTENTIONALLY OMITTED</u>**

**AMENDMENT TO**
**ASSET PURCHASE AGREEMENT**

**THIS AMENDMENT TO ASSET PURCHASE AGREEMENT** (this "Amendment") is made effective as of April 30, 2008, by and among

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Winn-Dixie"),

**WINN-DIXIE PROPERTIES, LLC**, a Florida limited liability company wholly-owned by Winn-Dixie ("Properties LLC"),

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a Florida limited liability company wholly-owned, indirectly, by Winn-Dixie ("Leasing LLC"),

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation wholly-owned by Winn-Dixie ("Logistics"),

**SUNSHINE STATE DAIRY FARMS, LLC**, a Florida limited liability company ("Sunshine"), and

**SOUTHEAST MILK, INC.**, a Florida agricultural marketing cooperative ("SMI").

Winn-Dixie, Properties LLC, Leasing LLC and Logistics sometimes collectively are referred to as "Seller".

Sunshine and SMI sometimes collectively are referred to as "Buyer".

**RECITALS:**

A.   Seller and Buyer are parties to that certain Asset Purchase Agreement dated effective February 26, 2008 (the "Agreement"), pursuant to which each of the Sellers has agreed to sell, convey, assign or sublease, as applicable, its respective interest in the Assets, and Sunshine has agreed to acquire or sublease, as applicable, the Assets described therein.  Capitalized terms used in this Amendment and not defined herein shall have the meanings assigned to such terms in the Agreement.

B.   Seller and Buyer desire to amend the Agreement by this Amendment as hereinafter provided.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.   The first sentence of Recital C of the Agreement is revised hereby to state in full as follows:

In connection with the operation of the Dairy Plants, Winn-Dixie or Logistics, as applicable, owns (i) inventories of certain finished products, raw materials, supplies, ingredients, work in process and packaging materials (collectively, the "Inventories") located in, or en route to, the Dairy Plants, (ii) the machinery and equipment listed on **Schedule B** hereto, located in the Dairy Plants as well as any other machinery and equipment not listed on **Schedule B** hereto, located at the Dairy Plants and

used in conjunction with the operation thereof (collectively, but excluding any equipment that is an Excluded Asset, the "Equipment"), and (iii) tools, plant supplies and furnishings located in the Dairy Plants (collectively, but excluding any tools, supplies and furnishings that are Excluded Assets, the "Supplies").

2.      Section 2.06 of the Agreement is revised hereby to state in full as follows:

Closing; Closing Date.   The closing of the sale and purchase of the Assets contemplated hereby (the "Closing") will take place on April 30, 2008, or on such later date that is five (5) Business Days following satisfaction of all of the conditions set forth in **Article VIII**, but no later than Monday, June 16, 2008 (the "Outside Date"), subject to the rights of Buyer set forth in **Sections 5.04, 5.05, 5.06, 5.07 and 5.08** and the conditions set forth in **Articles VI, VII and VIII** by the payment of the Base Purchase Price and the Inventories Price pursuant to **Section 2.04** and the exchange of all documents required to be delivered pursuant to this Agreement on the Closing Date.  The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Sunshine and Seller based on satisfaction of the terms and conditions of this Agreement.  The date on which the Closing occurs is referred to herein as the "Closing Date".  The time of Closing will be deemed to be 11:59 p.m. on the Closing Date.

3.      Section 2.08(a)(i) of the Agreement is revised hereby to state in full as follows:

(i) one-half the cost of the Title Commitment and title insurance policy to be issued thereunder associated with each of the conveyance of the Owned Real Estate (including a Form 9 endorsement) and the sublease of that portion of the Leased Real Estate constituting the Subleased Real Estate, in the amount of the Base Purchase Price allocated to the Owned Real Estate and the subleased portion of the Leased Real Estate, respectively (excluding, however, the cost of any other owner's policy or lender's policy endorsements requested by Buyer);

4.      Section 2.08(b) of the Agreement is revised hereby to state in full as follows:

Sunshine will, and SMI will cause Sunshine to, pay (or be charged at Closing) for: (i) one-half the cost of the Title Commitment and insurance policy to be issued thereunder associated with each of the conveyance of the Owned Real Estate (including a Form 9 endorsement) and the sublease of that portion of the Leased Real Estate constituting the Subleased Real Estate, in the amount of the Base Purchase Price allocated to the Owned Real Estate, and in the amount of $2,500,000 as to the subleased portion of the Leased Real Estate, respectively; provided the title commitment and policy are issued at minimum promulgated rates and 35% of the agent's portion of the premium relating to the Owned Real Estate is remitted to Sunshine; (ii) the cost of any owner's title insurance policy endorsements requested by Buyer; (iii) the cost of any loan title insurance policy and related endorsements as may be requested by Buyer's mortgage lender; (iv) one-half the cost of a Phase I Environmental Site Assessment for each of the Owned Real Estate and the Leased Real Estate provided such one half does not exceed $6,000; (v) one-half the cost of the Survey for each of the Owned Real Estate and the Subleased Real Estate provided such one half does not exceed $6,750; (vi) one-half of documentary, intangibles, or other taxes in connection with the transfer of the Assets constituting real or personal property; (vii) documentary, intangibles, or other taxes in

2

connection with Sunshine's financing of the acquisition of the Assets; (viii) recording of any documents necessary to complete the Closing; (ix) one-half the cost of transferring any Permits that are assignable and are in fact assigned or transferred by Seller to Sunshine, and the cost of obtaining any new Permits for Sunshine's operation of the Dairy Plants at Closing; (x) Buyer's expenses of evaluating and investigating the feasibility of acquiring the Assets; (xi) Buyer's expenses in obtaining rail siding access, if applicable, and (xii) attorneys' fees and costs payable to Buyer's attorneys incurred in drafting or reviewing this Agreement and in completing the Closing.

5.   Section 2.08(c) of the Agreement is revised hereby to state in full as follows:

Ad valorem real and personal property taxes will be prorated as of the Closing Date as follows:

(i)   Owned Real Estate.  Ad valorem real and personal property taxes associated with the Owned Real Estate for the year 2008 are estimated at $115,175.43 and $143,079.50, respectively, based on the most recent ascertainable taxes (including current real estate tax assessments, millage rates and any notice of proposed taxes).  At Closing, the estimated 2008 taxes will be prorated between Seller (as to that portion of the tax year 2008 prior to and including the Closing Date) and Buyer (as to that portion of the tax year 2008 subsequent to the Closing Date), with an appropriate credit to Buyer for Seller's prorata share of such taxes.  Buyer will be responsible for payment of the 2008 taxes as and when due.

(ii)   Subleased Real Estate – Real Property Taxes.  Ad valorem real property taxes associated with the Subleased Real Estate for the year 2008 are estimated at $67,845.69 (based prorata on the actual gross 2007 ad valorem real property tax amount assessed against the Leased Real Estate in its entirety, assuming a 10:1 tax allocation between the Leased Real Estate and the Subleased Real Estate).  Ad valorem personal property taxes associated with the Subleased Real Estate for the year 2008 are estimated at $30,485.68 (based on the actual gross 2007 ad valorem personal property tax amount assessed against the Subleased Real Estate.  The foregoing stated amounts for real and personal property taxes are referred to herein as the "Stipulated 2008 Taxes").  At Closing, the Stipulated 2008 Taxes will be prorated between Seller (as to that portion of the tax year 2008 prior and including the Closing Date) and Buyer (as to that portion of the tax year 2008 subsequent to the Closing Date), with an appropriate credit to Seller for Buyer's prorata share of such taxes.  Seller will be responsible for payment of the Stipulated 2008 Taxes as and when due, as part of the aggregate tax amount assessed against the Leased Real Estate in its entirety. Commencing with the 2009 ad valorem tax year, Buyer will be responsible for payment of real and personal property taxes associated with the Subleased Real Estate, based on such separate tax assessment as may be imposed as a result of the Tax Parcel Cutout as defined in **Section 10.08** below.

(iii)   Post-Closing Reproration.  The parties agree to an adjustment of the real and personal property tax prorations when the actual 2008 tax bill for the year of Closing is received, if the actual tax bill differs from the estimated tax amount by more than five percent (5%).

6.    <u>Section 2.09</u> of the Agreement is revised hereby to state in full as follows:

During the Closing Date (the "<u>Inventories Commencement Date</u>"), Seller will cease operations at the Dairy Plants (including the receipt, processing and shipping of the Inventories), and thereupon the parties will commence and diligently conduct a physical count of the Inventories (the "<u>Inventories Count</u>") beginning at a time to be mutually agreed by Seller and Sunshine and ending as soon as practicable thereafter.   Buyer and Seller each will have representatives present during the Inventories Count who will acknowledge in writing all computations before leaving the Dairy Plants.  The parties agree that the unit values of the Inventories of finished products will be as agreed by Seller and Sunshine on or before the Closing Date and that the unit values of other Inventories will be determined in accordance with GAAP on a first-in, first-out basis consistent with Seller's past accounting practices, in each case for all units and elements of Inventories on hand (as determined by the Inventories Count), immediately prior to the Closing, taking into account the costs associated with each stage of processing and production as reflected on such books and records (the "<u>Inventories Price</u>").  In addition to the standards and procedures in this **Section 2.09**, Buyer and Seller agree that the Inventories Count and valuation will be subject to the additional standards and procedures set forth on **Schedule F** hereto.

7.    <u>Section 3.13(a) and (b)</u> of the Agreement are revised hereby to state in full as follows:

(a)    The business and affairs of the Dairy Plants have been conducted and carried on only in the ordinary course consistent with Seller's past practices; it being understood, however, that Seller may remove finished product Inventories from the Dairy Plants to other locations of Seller at or prior to Closing, or otherwise reduce the amount of such Inventories at the Dairy Plants, which actions are not in the ordinary course;

(b)    Except for personal property purchased, sold or leased in the ordinary course of business consistent with its past practices, Seller has not purchased, sold, leased, or otherwise acquired or disposed of any material properties or assets used in the Dairy Plants and, except as otherwise contemplated by **Section 3.13(a)**, there has been no finished goods build-up or delivery from the Dairy Plants not consistent with Seller's past practices.

8.    <u>Section 5.01(a)</u> of the Agreement is revised hereby to state in full as follows:

Except as set forth in **Section 5.01(b)** below, from the Effective Date until the earlier of the Inventories Commencement Date or the termination of this Agreement in accordance with **Section 11.01(a)**, Seller will (i) except as otherwise contemplated by **Section 3.13(a)**, conduct the business, maintenance and operations of the Dairy Plants in the ordinary course consistent with Seller's past practices, including no material increases in historical production levels of finished product inventory (post-bankruptcy), (ii) maintain levels of insurance on the Assets and the Dairy Plants at historical levels prior to the Effective Date, (iii) maintain its books, accounts and Records relating to the Assets in the usual manner consistent with Seller's past practices, (iv) keep and maintain all of the Equipment, Inventories and other physical Assets in good working order consistent with the standards of good manufacturing processes prevailing in the relevant industries, and (v) keep and maintain all other Assets consistent with historical operation.   On the Inventories

4

Commencement Date, Seller temporarily will suspend its business and operations for the purpose of allowing Sunshine and Seller to conduct the Inventories Count in preparation for Closing on the Closing Date.  From the Inventories Commencement Date until Closing, Seller will not take any action that would result in, or knowingly permit to occur, any material change in the condition of the Assets as they were at the Inventories Commencement Date.  Notwithstanding the foregoing, Buyer acknowledges that Seller may remove finished product Inventories from the Dairy Plants to other locations of Seller at or prior to Closing, or otherwise reduce the amount of such Inventories at the Dairy Plants, and that any such relocated Inventories will not be part of the Assets.

9.      Section 5.12 of the Agreement is revised hereby to state in full as follows:

Election under Wastewater Treatment Agreement.  If Closing is not consummated by May 31, 2008, for any reason whatsoever, unless otherwise agreed by SMI, Seller will cause Logistics to exercise one of its options under numbered paragraph 9 of the Wastewater Treatment Agreement either to terminate the Wastewater Treatment Agreement in its entirety or to cause Sunshine to be discharged and released as a party thereto.

10.     The Agreement is revised to add the following new Section 4.07:

Bankruptcy Proceedings. Sunshine is not a debtor or debtor-in-possession in a voluntary or involuntary bankruptcy proceeding.

11.     Section 8.03 of the Agreement is revised hereby to state in full as follows:

Wastewater Treatment Agreement. The Wastewater Treatment Agreement dated as of April 1, 2008, among City of Hammond, Winn-Dixie Logistics, Inc., and Sunshine State Dairy Farms, LLC (the "Wastewater Treatment Agreement") will be in full force and effect.

12.     The last sentence of Section 10.05(b) of the Agreement is revised hereby to state in full as follows:

Buyer may at its option and expense install or replace additional telephone, cable and communication lines, equipment and software within the Subleased Real Estate boundaries to augment the Communication Systems (the "Additional Communication Systems Measures").

13.     Section 10.05(c)(iii) of the Agreement is revised hereby to state in full as follows:

Sunshine's Additional Measures.  Sunshine will, and SMI will cause Sunshine to, implement the Internal Access and the Internal Parking (if required to meet applicable parking and zoning codes) within the time period contemplated for implementation of Seller's actions as described in clause (ii) above, at Buyer's expense, without contribution from Seller, subject to Sunshine's receipt of all Access Permits and other applicable governmental licenses, permits and approvals; Buyer may implement the Internal Parking (if optional), the Additional Security Measures, the Additional Fire Safety Measures and the Additional Communication Systems Measures, contemporaneously with or following Seller's actions as described in clause (i) and clause (ii) above, at Sunshine's option and expense, without contribution from Seller; and

5

14.   Section 10.06 of the Agreement is revised hereby to state in full as follows:

Wastewater Pretreatment Facilities.

(a)   General Terms.  Sunshine, as sublessee and operator of the Leased Plant, and
Seller, as lessee and operator of the Distribution Center, will cooperate in
good faith in the planning, design, installation and connection of the
Wastewater Pretreatment Facilities in anticipation of effluent outflow from the
Subleased Real Estate continuing at levels at or below Seller's recent
historical levels of effluent production, and further in accordance with such
other terms, covenants and conditions as Sunshine, Seller and the City of
Hammond may agree as contemplated by this **Section 10.06** and by the
Wastewater Treatment Agreement.

(b)   System Design.

(i)   Design Generally.   Seller will cause the Wastewater Pretreatment
Facilities to be designed for compliance with (A) the operational
requirements and specifications set forth in the Wastewater Treatment
Agreement as modified by **Schedule 10.06(b)** hereto consistent with
historical ranges of effluent volumes since January 1, 2007, and (B) the
"Hammond Dairy Pre-Treatment System Preliminary Design Basis
Document" attached as **Schedule O** hereto (the standards described in
clauses A and B above together being referred to as the "Pretreatment
Design Standard").  Following the Closing, Sunshine will and SMI will
cause Sunshine to allow Seller and its agents reasonable access to the
Subleased Real Estate for the purpose of such design activities, and
Seller and Sunshine will cooperate in a commercially reasonable and
good faith manner to communicate with each other concerning the
design and operational requirements for the Wastewater Pretreatment
Facilities consistent with the Pretreatment Design Standard.

(ii)   Preliminary Plans and Specifications.  Seller will submit preliminary plans
and specifications for the Wastewater Pretreatment Facilities which meet
the Pretreatment Design Standard to Sunshine not later than May 15,
2008, for Sunshine's review and approval, which approval will not be
unreasonably withheld, conditioned or delayed.  Sunshine will have a
period of ten (10) days after receipt of the preliminary plans and
specifications to notify Seller in writing of any comments or objections
thereto stated with reasonable specificity.  The review, comments or
objections by Sunshine or failure to review, comment or object will not
relieve Seller in any way from its obligations under **Section
10.06(b)(i)** to cause the Wastewater Pretreatment Facilities to be
designed consistent with the Pretreatment Design Standard.

(iii)   Revised Plans and Specifications.  If Sunshine timely notifies Seller of
any comments or objections to the preliminary plans and specifications,
then Seller will make such modifications and adjustments, if any, thereto
as Seller deems appropriate to reasonably address Sunshine's comments
or objections and/or compliance with Pretreatment Design Standard.
Seller will advise Sunshine promptly of any modifications or adjustments
that Seller does not intend to make, and if requested by Sunshine, the
parties will exercise commercially reasonable good faith efforts to

6

resolve any design dispute in consultation with the City of Hammond's senior staff. Following such modifications or adjustments, Seller will submit the revised plans and specifications to Sunshine for Sunshine's review and approval, which approval will not be unreasonably withheld, conditioned or delayed. Sunshine will have a period of five (5) Business Days after receipt of the revised plans and specifications to notify Seller in writing of Sunshine's approval thereof, or rejection thereof, as determined by Sunshine in a commercially reasonable, good faith manner. The review, comments or objections by Sunshine or failure to review, comment or object will not relieve Seller in any way from its obligations under **Section 10.06(b)(i)** to cause the Wastewater Pretreatment Facilities to be designed consistent with the Pretreatment Design Standard.

(iv)   Approved Plans and Specifications.   Upon approval of either the preliminary plans and specifications or the revised plans and specifications, as applicable, such plans and specifications as so approved (the "System Plans and Specifications") will be the basis for Seller's subsequent installation and construction of the Wastewater Pretreatment Facilities. The parties acknowledge and agree that time is of the essence in the preparation, review and approval of the plans and specifications, such that the approved System Plans and Specifications will be available for commencement of installation and construction of the Wastewater Pretreatment Facilities not later than June 15, 2008, pursuant to **Section 10.06(c)**.

(c)   Installation.   Seller will cause the Wastewater Pretreatment Facilities at the Subleased Real Estate to be installed, tested and commissioned in accordance with the terms of the Wastewater Treatment Agreement and the Pretreatment Design Standard. Sunshine will, and SMI will cause Sunshine to, allow Seller reasonable access to the Subleased Real Estate for the purpose of such installation and connection to Buyer's existing dairy production and effluent disposal systems.    Final commissioning of the Wastewater Pretreatment Facilities for normal operations in compliance with the Wastewater Treatment Agreement and applicable governmental permits ("System Commissioning") will occur not later than December 15, 2008 (the "Commissioning Deadline"), unless such deadline is extended as provided below.    Upon System Commissioning, Seller will turn over to Sunshine, and Sunshine will, and SMI will cause Sunshine to, accept and assume from Seller full operational responsibility and control of the Wastewater Pretreatment Facilities, subject to any post-closing liability of Seller identified in **Section 10.06(f)** and the Sublease. The Commissioning Deadline will be subject to automatic extension for any extension of time for System Commissioning authorized by the City of Hammond, or any other regulatory authority having auspices, pursuant to the Wastewater Treatment Agreement.

(d)   Cost.   Subject to the remaining provisions of this **Section 10.06(d)**, the design, engineering, construction, installation and initial operational testing of the Wastewater Pretreatment Facilities will be at Seller's sole cost and expense. All or a portion of Seller's costs incurred in connection with the Wastewater Pretreatment Facilities will be subject to contribution by the City of Hammond pursuant to, and over the time period specified in, the Wastewater Treatment Agreement (the "Utility Cost Contribution"). Buyer

7

and Seller acknowledge that the Utility Cost Contribution, if any, may be made in the form of future credits to Sunshine against the cost of wastewater service by the City of Hammond to the Subleased Real Estate, up to the full amount of the Utility Cost Contribution (the "Wastewater Service Credits").

(e)     Credit Rebate. If the Utility Cost Contribution amount is determined or reasonably determinable as of the Closing Date, then Sunshine will, and SMI will cause Sunshine to, pay over to Seller at Closing, in addition to the Purchase Price, a supplemental payment equivalent to the Utility Cost Contribution, discounted to net present value using a discount rate equivalent to the most recent prime rate as announced by The Wall Street Journal as of the last Business Day preceding the payment date (the "Discount Rate"). If the Utility Cost Contribution amount is not determined or reasonably determinable as of the Closing Date, then Sunshine will, and SMI will cause Sunshine to, pay over to Seller, within five Business Days of the date Utility Cost Contribution amount is determined, an amount equivalent to the Utility Cost Contribution, discounted to net present value at the time of payment using the Discount Rate, and if not so paid, then Seller may apply such amount as a credit against amounts owed by Seller to Sunshine under Supply Contract. As of the Closing Date, Buyer and Seller estimate that the Utility Cost Contribution will be $600,000, based on an estimated cost to design, engineer and construct the Wastewater Pretreatment System of at least $800,000, and the City of Hammond's undertaking pursuant to the Wastewater Treatment Agreement to allow Sunshine a monthly offset against wastewater treatment and water charges in an amount equivalent to 1/120 of that number which is 75% of the actual cost of the Wastewater Pretreatment Facility, up to a maximum offset of $600,000. Buyer and Seller agree to the sum of $466,000 as a good faith estimate of the net present value of the estimated Utility Cost Contribution, calculated on the basis of the Discount Rate, assuming a 120 month amortization and monthly payments of $5,000. In advance of final determination of the Utility Cost Contribution amount pursuant to the Wastewater Treatment Agreement, Sunshine will pay Winn-Dixie an amount equivalent to 47% of each invoice for design, engineering or construction costs associated with the Wastewater Pretreatment Facility within 10 days of Winn-Dixie's delivery of a copy of such invoice to Sunshine, up to an aggregate amount of $466,000. Promptly following System Commissioning, the parties agree to conduct a reconciliation of the total cost of the Wastewater Pretreatment System, the actual amount of the Utility Cost Contribution, the actual amount of Sunshine's available monthly offset, and the actual amounts paid by Sunshine to Winn-Dixie, to determine whether Sunshine's payments to Winn-Dixie were more or less than the amount payable to Winn-Dixie as the net present value of the Utility Cost Contribution. To the extent of any underpayment or overpayment, the parties agree to reimbursement or further payment, as appropriate, to reach the correct amount of such payment due to Winn-Dixie.

(f)     Commissioning Delay; Indemnification.

(i)     Surcharge Imposition. If the System Commissioning does not occur by the Commissioning Deadline and as a result of such delay, the City of Hammond or any other regulatory authority having auspices imposes any surcharge, fee or penalty as a condition to Sunshine's

8

disposal of effluent into the City of Hammond's wastewater treatment system, then Seller will indemnify and hold Sunshine harmless from the cost of such surcharges, fees or penalties, through the earlier of (A) the effective date of termination of the Sublease pursuant to Section 29 of the Sublease, or (B) the effective date of System Commissioning, but not afterwards.

(ii)     <u>Operating Limitations</u>.  If the System Commissioning does not occur by the Commissioning Deadline and as a result of such delay, the City of Hammond or any other regulatory authority having auspices acts to further curtail, limit, or restrict in any material respect Sunshine's ability to dispose of effluent into the City of Hammond's wastewater treatment system and, as a result, Sunshine's ability to continue its dairy operations at the Leased Plant in the ordinary course is materially affected; such impact on Buyer will be deemed to be a "Force Majeure Event" under the Supply Contract, and Seller will indemnify and hold Sunshine harmless from any and all damages, penalties, expenses or surcharges directly or indirectly relating to (x) Buyer's costs under the Sublease, including rent, additional rent and other amounts payable under the Sublease; (y) Buyer's costs of maintaining adequate on-site employees to man and supervise the Leased Plant; and (z) Buyer's costs of maintaining the Leased Plant, its equipment and facilities, in good working order and condition, in each case <u>net</u> of any revenues realized by Leased Plant operations, through the earlier of (A) the effective date of termination of the Sublease pursuant to Section 29 of the Sublease, or (B) the effective date of System Commissioning, but not afterwards.

(iii)    Excluded however from the indemnities in **Section 10.06(f)(i)** and **Section 10.06(f)(ii)** are any and all such losses, costs, damages or expenses to the extent they arise from the negligent acts or omissions, or from the misconduct, of Sunshine or its employees or agents, or from the failure of Sunshine to fulfill its obligations under **Section 10.06(b)(ii)** or **Section 10.06(b)(iii)**.

(g)     <u>Construction Agreements</u>.  Seller will negotiate, in good faith, commercially reasonable contracts for all design and construction work relating to the Wastewater Pretreatment Facilities (the "Construction Agreements") including, among other things, reasonable guarantees of completion and performance and acknowledgment of Sunshine as an express third party beneficiary thereby entitling Sunshine to directly enforce any such Construction Agreement.  Seller will provide Sunshine with copies of all Construction Agreements not later than five (5) Business Days prior to signing.  Sunshine will cooperate, promptly, to any request by Seller to review proposed language in any such Construction Agreement.

(h)     <u>As-Built Drawings; Warranties</u>.  Contemporaneously with System Commissioning, Seller will deliver to Sunshine (i) a full set of as-built drawings (including electronic CADD or similar versions thereof), operating manuals and warranties for the Wastewater Pretreatment Facilities, and (ii) a nonexclusive assignment of all warranties, both express and implied, that Seller may have with respect to the Construction Agreements, under terms

9

that will entitle Sunshine directly to the rights and benefits afforded by such warranties.

15.   A new <u>Section 10.08</u> is added to the Agreement hereby to state in full as follows:

<u>Special Agreements and Indemnities</u>.

(a)   <u>Hammond Spur Tracks</u>.  After diligent review of its records and inquiry with the rail service provider, Seller has been unable to locate or identify a Spur Track Agreement relating to the Spur Tracks serving the Subleased Real Estate.  Buyer acknowledges and agrees that it does not intend to use the Spur Tracks serving the Subleased Real Estate, and the parties further agree that it may be impractical to remove the unused Spur Tracks from the Subleased Real Estate.  Accordingly, Buyer and Seller agree that neither will use the Spur Tracks located on the Subleased Real Estate, and Buyer consents to the continuing presence of the Spur Tracks on the Subleased Real Estate, subject to such nonuse agreement, and further subject to the following indemnification.  Subject to Buyer's nonuse agreement above, after the Closing, Seller jointly and severally indemnifies and agrees to hold harmless Buyer and its officers, directors, employees and Affiliates from and against any claim asserted by the Railroad, or any Governmental Authority having auspices, for recovery of compensation or other charge relating to the use, existence, maintenance, repair, or removal of the Spur Tracks on the Subleased Real Estate, or any demand by the Railroad, or any Governmental Authority having auspices, for Buyer's removal, maintenance, repair or replacement of the Spur Tracks at Buyer's own expense.

(b)   <u>Tax Parcel Cutout</u>.  The Subleased Real Estate constitutes a portion of the Leased Real Estate for Tangipahoa Parish, Louisiana ad valorem real and personal property taxation purposes.  Seller will record a plan of subdivision with the Recorder's Office of Tangipahoa Parish, Louisiana, and will make such applications with the Tax Assessor's Office of Tangipahoa Parish, Louisiana, not later than December 31, 2008, as necessary to establish the Subleased Real Estate as a separate and distinct tax parcel from the remainder of the Leased Real Estate for ad valorem real and personal property tax purposes (the "<u>Tax Parcel Cutout</u>").  Buyer agrees to cooperate reasonably in Seller's efforts to accomplish the Tax Parcel Cutout, including providing Buyer's consent and joinder to the recordation of the plan of subdivision.  Buyer and Seller acknowledge that the Tax Parcel Cutout will become effective commencing with the 2009 ad valorem tax year.

16.   <u>Exhibit E-1</u> and <u>Exhibit E-2</u> to this Amendment are hereby substituted for <u>Exhibit E-1</u> and <u>Exhibit E-2</u> to the Agreement.

17.   <u>Exhibit G</u> to this Amendment is hereby substituted for <u>Exhibit G</u> to the Agreement.

18.   <u>Schedule G</u> to this Amendment is hereby substituted for <u>Schedule G</u> to the Agreement.

19.   <u>Schedule O</u> to this Amendment is added hereby as <u>Schedule O</u> to the Agreement.

20.   <u>Schedule 10.06(b)</u> to this Amendment is added hereby as <u>Schedule 10.06(b)</u> to the Agreement.

10

21.   The definition of Excluded Assets set forth in **Schedule A** to the Agreement is revised hereby to state in full as follows:

"Excluded Assets" means any equipment (all of which is described on **Schedule J** hereto) leased under a lease that is not an Assumed Contract or otherwise not owned or leased by Seller or its Affiliates, the equipment listed on **Schedule J** hereto, any non-assignable and non-transferable Contracts and Permits, over-the-road motor vehicles, any computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Assets, accounts receivable, all finished product Inventories to be removed by Seller at or prior to Closing, any of the Inventories excluded pursuant to the procedure set forth on **Schedule F** hereto, cash and cash equivalents and trademarks, trade names, logos or designs of Seller or its Affiliates, Records not customarily located at the Dairy Plants, all milk cases containing any Winn-Dixie trade name, and all Intellectual Property relating to any of the foregoing. Excluded Assets also will include any asset that is not included in "Lessee's Equipment and Personalty" as such term is defined in the Lease.

22.   The definition of Railroad set forth in Schedule A to the Agreement is revised hereby to state in full as follows:

"Railroad" means the rail service provider, or its successors or assigns, to the Real Estate pursuant to the applicable Spur Track Agreements, if any, relating to either the Owned Plant or the Leased Plant.

23.   The definition of Spur Track Agreements set forth in Schedule A to the Agreement is revised hereby to state in full as follows:

"Spur Track Agreements" means those certain agreements, if any, with the applicable Railroad, pursuant to which such Railroad may provide rail service to the Real Estate over the Spur Tracks.

24.   Schedule A to the Agreement is revised hereby to add the following definition:

"Wastewater Pretreatment Facilities" means the on-site wastewater pretreatment facilities at the Leased Plant, as more fully described in the Wastewater Treatment Agreement, and as contemplated under the Pretreatment Design Standard.

25.   Miscellaneous. The Agreement will continue in full force and effect as amended by this Amendment.

ASSET PURCHASE AGREEMENT – AMENDMENT
WINN-DIXIE AFFILIATES S/T SMI AFFILIATES
APRIL 30, 2008

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Amendment as of the date
first above written.

**SELLER:**

Name: SUSAN E. MAGADDINO

Name: CATHERINE B. IBOLD

**WINN-DIXIE STORES, INC.**, a Florida
corporation

By: _____
Name: Bennett L. Nussbaum
Its: Senior Vice President

Name: SUSAN E. MAGADDINO

Name: CATHERINE B. IBOLD

**WINN-DIXIE PROPERTIES, LLC**, a Florida
limited liability company

By:   Winn-Dixie Stores, Inc., a Florida
      corporation, its managing member

By: _____
Name: Bennett L. Nussbaum
Its: Senior Vice President

Name: SUSAN E. MAGADDINO

Name: CATHERINE B. IBOLD

**WINN-DIXIE WAREHOUSE LEASING, LLC**, a
Florida limited liability company

By:   Winn-Dixie Logistics, Inc., a Florida
      corporation, its managing member

By: _____
Name: Bennett L. Nussbaum
Its: Vice President

Name: SUSAN E. MAGADDINO

Name: CATHERINE B. IBOLD

**WINN-DIXIE LOGISTICS, INC.**, a Florida
corporation

By: _____
Name: Bennett L. Nussbaum
Its: Vice President

LEGAL APPROVED
ATTY: CBS
DATE: 7/30/08

12 – A

**BUYER:**

Name: GINA L. BUKKCYT

Name: CAROL L. BUCKLEY

Name: GINA L. BINKKEM

Name: CAROL L. BUCKLEY

**SOUTHEAST MILK, INC.**, a Florida agricultural
marketing cooperative

By:_____
Name:  Calvin Covington
Its:  Chief Executive Officer


**SUNSHINE STATE DAIRY FARMS, LLC**, a
Florida limited liability company

By:   Southeast Milk, Inc., a Florida agricultural
      marketing cooperative, its sole member

      By: _____
      Name: Calvin Covington
      Its:  Chief Executive Officer

12 −B

<u>Attachments</u>:

| | | |
|---|---|---|
| Schedule G | – | Assumed Contracts |
| Schedule O | – | Hammond Dairy Pre-Treatment System Preliminary Design Basis Document |
| Schedule 10.06(b) | – | Odor Criteria |
| Exhibit E-1 | – | Form of Sublease (without Nondisturbance Agreement) |
| Exhibit E-2 | – | Form of Sublease (with Nondisturbance Agreement) |
| Exhibit G | – | Form of Supply Contract |

Asset Purchase Agreement – Amendment
Winn-Dixie Affiliates S/T SMi Affiliates
April 30, 2008

**ESCROW AGENT:**

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Asset Purchase Agreement for the limited purpose of acknowledging that the Asset Purchase Agreement has been amended as stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: April _____ 2008

14