UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WINN-DIXIE STORES, INC.,

       Plaintiff,

v.                                     Case No. 3:15-cv-1143-J-39PDB

SOUTHEAST MILK, INC., NATIONAL
MILK PRODUCERS FEDERATION,
DAIRY FARMERS OF AMERICA, INC.,
LAND O'LAKES, INC., DAIRYLEA
COOPERATIVE INC., and AGRI-MARK,
INC.,

       Defendants.

_____/

## O R D E R

**THIS CAUSE** is before the Court on Defendants' Motion and Supporting

Memorandum for Summary Judgment on Statute of Limitations and Standing (Doc. 187)

and Plaintiffs' Response in Opposition (Doc. 208; Opposition).[1]

On September 23, 2015, Plaintiff Winn-Dixie Stores, Inc. ("Winn-Dixie" or

"Plaintiff") initiated this action by filing the Complaint, Demand for Jury Trial, and Request

for Injunctive Relief (Doc. 1). On August 31, 2016, Plaintiff filed the Amended Complaint

and Demand for Jury Trial (Doc. 56; Amended Complaint) against Defendants Southeast

Milk, Inc. ("SMI"), National Milk Producers Federation ("NMPF"), Cooperatives Working

Together ("CWT"), Dairy Farmers of America, Inc. ("DFA"), Land O'Lakes, Inc. ("LOL"),

_____

[1] By Order dated December 13, 2018 (Doc. 232), the Court granted Plaintiffs' Motion to Dismiss Plaintiff BI-LO Holdings, LLC, Pursuant to FRCP Rule 41(a)(2) and Incorporated Memorandum of Law (Doc. 179), dismissing Plaintiff BI-LO Holdings, LLC without prejudice subject to a condition of payment. Even though the Opposition was filed by both Plaintiffs, for purposes of this Motion the Court will refer to the only remaining Plaintiff – Winn-Dixie.

Dairylea Cooperative Inc. ("DCI"), and Agri-Mark, Inc. ("AMI") (collectively "Defendants"). Am. Compl. ¶¶ 24-30. The action involves alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, which provides in part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." See id. ¶¶ 126-31 (citing 15 U.S.C. § 1).

## I.  Standard of Law

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents,  electronically  stored  information, affidavits  or  declarations,  stipulations (including those made  for  purposes  of  the  motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the Court, by reference to the record, that there are no genuine issues of material fact to

be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II. Factual Background

### a. The Parties

Plaintiff Winn-Dixie "is a subsidiary of Southeastern Grocers, which is one of the largest supermarket chains based in the Southeast." (Doc. 188 ¶ 3, Ex. 1 at 1; Declaration of Jill M. O'Toole). Established in 1916, NMPF "is a federation of dairy cooperatives that are engaged in the production and marketing of milk and dairy products." (Doc. 189 ¶ 3; Declaration of Jerome Kozak).[2] As of August 2018, NMPF was comprised of twenty-eight member cooperatives, "which together represent approximately 30,000 dairy producers,

---

[2] Mr. Kozak is the former President and Chief Executive Officer of NMPF. Kozak Decl. ¶ 2.

accounting for the majority of the U.S. milk supply." Id. Defendants SMI, DFA, LOL, and AMI are among the twenty-eight member cooperatives in NMPF. See Motion at 3 (citing Am. Compl. ¶¶ 24-30).

### b. The Cooperatives Working Together, the Export Assistance Program, and the Herd Retirement Program

In 2003, NMPF established the Cooperative Working Together program ("CWT") "to address the excess supply of raw milk that was depressing prices paid to dairy farmers for milk . . . ." Kozak Decl. ¶ 5. CWT "is a separately-funded, producer-led program within the structure of NMPF." Id. ¶ 7. CWT was endorsed by members of Congress, including Congressman Bob Goodlatte, who was at the time the Chairman of the United States House of Representatives Agriculture Committee. Id. ¶ 14 (citing http://www.cwt.coop/testimonials/); see also O'Toole Decl. at Ex. 35 (a portion of a transcript containing Congressman Goodlatte's comments about the CWT).

To participate in the CWT, members pay a monthly assessment to NMPF "based on the amount of milk marketed by the CWT member." Kozak Decl. ¶ 14. From 2003 through 2010, "the assessments ranged from 5 to 10 cents for every hundred pounds of raw milk that CWT's members' farmers sold." Id. The CWT included two programs – the Export Assistance Program ("EAP") and the Herd Retirement Program ("HRP"). See id. ¶¶ 7, 21. The EAP "assists CWT member cooperatives with exporting eligible dairy products and establishing overseas markets for their members' milk." Id. ¶ 21. As of August 2018, the EAP was still operating. See id.

The HRP, which is at issue in the instant case, "was a CWT Program that helped dairy farmers, who chose to do so, to market their dairy cattle for beef in an effort to better align the supply and demand of raw milk." Id. ¶ 8. Essentially, the HRP operated as an

incentive to farmers "to convert the use of the farmer's asset – a herd of cows – from milking to beef by providing funds to individual dairy farmers to help bridge the gap between the generally lower beef value of their cows and the generally higher milking value of their cows." Id. The HRP ended in 2010. Id. ¶ 21.

NMPF publicized the HRP in its newsletter and advertised it in trade publications, radio advertisements, and brochures. See id. ¶ 16. NMPF created a website for the program that "disclosed how many bids were submitted by farmers, how many bids were accepted, how many cows would be culled due to the HRP, and estimated, based on economic modeling predictions, approximately how much the nation's milk output would be reduced." Id. ¶ 17. National newspapers ran articles discussing the HRP and the CWT. See O'Toole Decl. ¶¶ 8(a)-(e) (attaching newspaper articles about the HRP from Reuters News, The Washington Post, USA Today, Los Angeles Times, and Boston Globe). Local newspapers in areas where Plaintiff owned and operated processing plants also ran articles about the HRP and the CWT. See id. ¶¶ 9(a)-(e) (attaching newspaper articles about the HRP from The News-Press in Fort Myers, Florida, the Montgomery Advertiser in Montgomery, Alabama, The Palm Beach Post in West Palm Beach, Florida, the Sunday Advocate in Baton Rouge, Louisiana, and the St. Petersburg Times in St. Petersburg, Florida). Finally, the Dairy Foods magazine website posted numerous articles about the HRP and the CWT. See id. ¶¶ 10(a)-(u) (citing twenty-one articles); see also id. ¶ 38 (citing Ex. 36 "CWT Participation Growth Plan").

Between 2003 and 2010, the HRP conducted ten herd retirements. See Opp. at 7, Ex. 2 at 3-4; see also Kozak Decl. ¶ 18 ("NMPF, through CWT, conducted ten herd retirements."). Herds were retired in every state, except Alaska and Hawaii. Kozak Decl.

- 5 -

¶ 20. Every heard retirement was publicly announced. See id. ¶¶ 16-18. The HRP did not have the desired effects. See id. ¶ 19. As a result, the last herd retirement was completed in September 2010 and the HRP discontinued that same year. See id.

### III. Discussion

#### a. The Commencement of the Statute of Limitations

"Under the antitrust laws, 'a cause of action accrues and the statute [of limitations] begins to run when a defendant commits an act that injures the plaintiffs' business.'" Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 827 (11th Cir. 1999), amended in part, 211 F.3d 1224 (11th Cir. 2000) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971)). A plaintiff must file its antitrust claim within four years following a defendant's injurious act. See id. (citing 15 U.S.C. § 15b). A plaintiff may file its claim more than four years after the events that initially created the cause of action "if the action is commenced within four years after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a 'continuing antitrust violation.'" Id. at 827-28 (citing Zenith Radio Corp. 401 U.S. at 338); see also In re Photochromic Lens Antitrust Litig., No. 8:10-MD-2173-T-27EAJ, 2011 WL 4914997, at *2 (M.D. Fla. Oct. 14, 2011) (Regarding continuing violations, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . as to those damages, the [S]tatute of [L]imitations runs from the date of commission of the act." (internal quotations and citation omitted)). A plaintiff may also file its antitrust claim more than more than four years after accrual of the antitrust cause of action if the statute is tolled for some reason. See Morton's Mkt., Inc., 198 F.3d at 828 n.2.

A continuing violation of the antitrust laws is an act that "injures the plaintiff over a period of time" and "inflicts 'continuing and accumulating harm'" on the plaintiff. See id. at 828. If an act is a continuing violation of the antitrust laws, the "violation occurs each time the plaintiff is injured by the act." Id. (citing Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968)). "For example, when sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues." Id. (citing Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997)). In other words, each sale to the plaintiff starts the statute of limitation period anew, "regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." Klehr, 521 U.S. at 189 (internal quotations and citation omitted).

The law also recognizes that a conspirator may withdraw from a conspiracy. See Morton's Mkt., Inc., 198 F.3d at 837 (citation omitted). A conspirator who withdraws from a conspiracy "is no longer a member of the conspiracy and the subsequent acts of the conspirators usually do not bind him." Id. Withdrawal of a conspiracy is a complete defense when it is coupled with the Statute of Limitations. See id. Thus, if the conspirator "is not sued within the limitations period, all claims against him are time-barred [and] [h]e cannot be held liable for the acts of the other conspirators after he withdrew because his withdrawal effectively ended his membership in the conspiracy." Id. The standard for effective withdrawal is as follows:

> "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment."

Id. at 838 (quoting United States v. U.S. Gypsum Co., 438 U.S. 422, 464-65 (1978)). While "mere cessation of activity is not sufficient to establish withdrawal, a conspirator may avoid further liability for his actions if he affirmatively and completely disassociates himself from the continued operation of the conspiracy." Id. (citing United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir.1993); United States v. Lowell, 649 F.2d 950, 955 (3d Cir.1981)). "[I]t has long been necessary that the conspirator demonstrate that he 'undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives.'" Id. (quoting United States v. Finestone, 816 F.2d 583, 589 (11th Cir. 1987)); see also United States v. Young, 39 F.3d 1561, 1571 (11th Cir. 1994) ("first, the defendant must prove that he has taken affirmative steps to defeat the objectives of the conspiracy; and second, he must show either that he made a reasonable effort to communicate these acts to his co-conspirators or disclosed the scheme to law enforcement authorities.").

Plaintiff commenced this action on September 23, 2015 – five years after the last herd was retired under the HRP. Defendants argue that Plaintiff's claims are time-barred by the applicable four-year Statute of Limitations. See Motion at 9 (citing 15 U.S.C. § 15b). Defendants contend that the alleged antitrust violations do not constitute continuing violations because the only conduct that Plaintiff challenges is the HRP, which ended in September 2010. See id. at 9-11. Under Defendants' theory, any damages allegedly caused by the HRP "do not qualify as overt acts sufficient to restart the [S]tatute of [L]imitations" See id. (emphasis omitted). Although not explicitly raised by Defendants,

the Court also considers whether Defendant may have withdrawn from the alleged conspiracy with regard to the Statute of Limitations.[3]

Even though there is no dispute that the last herd retirement occurred in September 2010, Plaintiff maintains that "Defendants have not affirmatively shown that they reduced their artificially high prices or returned to competitive pricing after the last herd retirement." See Opp. at 6. Rather, Plaintiff argues that every sale to Plaintiff "from 2003-2013 began the [S]tatute of [L]imitations running anew because a horizontal agreement to restrict output (supply) is the same as price-fixing, to which the theory clearly applies." Id. at 6, Ex. 1 at 323:8-18 (Deposition of Bryan Ricchetti). In support, Plaintiff provides evidence from the parties' contemporaneous economist, Dr. Scott Brown, showing that "that the effect of each herd retirement on prices lasted 3-4 years . . . ." See id. at 6, Ex. 2 at 7 (calculating higher prices into 2012 from the herd retirements); see also id. at 6, Ex. 30 at 47:13-15, 48:8-25 (Deposition Excerpt of Edward Gallagher) ("[I]f you slaughter a three-year-old dairy cow that might otherwise be milked for two more lactations, they would have two more calves . . . if you take, in this example, a three-year-old cow and slaughtered it, then you would not have two calves that otherwise would have been born."). Plaintiff maintains that its claims based on purchases made through 2013 are timely. See id. at 7. Plaintiff argues that the individual herd retirements constituted "a new and separate act in violation" and the Statute of Limitations began to run from them all separately. See id.

---

[3] Defendants cite Morton's Mkt., Inc., which also discusses the withdrawal defense. See Morton's Mkt., Inc., 198 F.3d at 837.

"The commencement of the [S]tatute of [L]imitations is a question of fact." Morton's Mkt., Inc., 198 F.3d at 828 (citing In re Beef Indus. Antitrust Litig., MDL Docket No. 248, 600 F.2d 1148, 1169-70 (5th Cir. 1979)[4]). If there is a genuine question as to when the Statute of Limitations began to run, the Motion must be denied. See id. On this record, the Court finds that genuine issues of material fact remain as to when the Statute of Limitations began to run. Even though the last herd retirement occurred in September 2010, Plaintiff provides evidence that the alleged violations were continuing in nature. See e.g., Opp. at 6, Ex. 2, 30 (depositions of Dr. Scott Brown and Edward Gallagher discussing the effects of the HRP on milk prices into at least 2012). Defendants' publications support the same conclusion. For example, at least one publication states that

> [t]he beauty of CWT herd retirements is that the impact of each herd retirement lasts several years. . . . For example, the average impact on the All Milk Price in 2009 of $1.50 per hundredweight, . . . is the result of the 2007 herd retirement, the two 2008 herd retirements and two of the three 2009 herd retirements. Since cows taken in the third herd retirement of 2009 may not all have gone to processing, its impact is not yet included in Dr. Brown[ ]'s analysis.

O'Toole Decl. ¶ 39 at Ex. 37(part 3) at 9. The determination of when the Statute of Limitations began in light of the continuing nature of the alleged violations will be left for the jury to decide.

Separately, this record does not support a finding at this juncture that Defendants withdrew from the alleged conspiracy with regard to the Statute of Limitations. Again, there is no dispute that the last herd retirement occurred in 2010, which leads to the

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981.

inquiry of whether Defendants may have withdrawn from the conspiracy at that time. If Defendants effectively withdrew from the conspiracy in 2010, then Plaintiff's claims would be time barred unless the claims were tolled. See e.g., Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 211 F.3d 1224 (11th Cir. 2000) (amending its December 20, 1999 opinion by adding that the defendant "effectively withdrew from the conspiracy in 1985 and, as to it, these actions are not timely-filed unless the statute was equitably tolled by fraudulent concealment. If so, [the defendant] would be liable for any price-fixing activity prior to its withdrawal." (emphasis omitted)). Here, however, there is no evidence to support that Defendants affirmatively and completely disassociated themselves from the continued operation of the conspiracy involving increased milk prices caused by the HRP. Rather, Plaintiff provides evidence to support that the milk prices continued to increase after the 2010 herd retirement. See Opp. at 6, Ex. 2 at 7 (evidence from Dr. Scott Brown showing increases through at least 2012). Additionally, the Court recognizes that the HRP and the CWT were heavily publicized in various media outlets. However, there is no evidence that Defendants made reasonable efforts to communicate the conclusion of the HRP and specifically the last herd retirement in 2010, and that Plaintiff knew or should have known that the 2010 herd retirement was in fact going to conclude the HRP.[5]

---

[5] Defendants do not provide citation to evidence in their Motion, nor was the Court able to locate such evidence during its own independent review of the record. Rather, the evidence demonstrates that even though the CWT reached its 2009-10 participation goal, which included a two-year minimum commitment from the cooperatives and producers, in March 2009 the CWT nonetheless encouraged additional participation "to maximize the effectiveness of CWT's programs in 2009 and 2010 . . . ." See O'Toole Decl. ¶ 39 at Ex. 37 (part 2) at 11. Additionally, Defendants provide copies of brochures issued by the CWT including information and timelines about how to participate in 2010 herd retirements. See id. at 41, Ex. 39 at 24-25. Finally, a June 2010 publication titled "CWT Beyond 2010," stated that "[w]hen the CWT Committee met in Washington, D.C. on June 8th it began the process of considering what the program should do to maintain producer margins in 2011 and beyond." See id. at Ex. 37 (part 3) at 11.

The Court finds that genuine issues of material fact exist as to when the Statute of Limitations began in light of the continuing nature of the alleged violations and whether Defendants effectively withdrew from the conspiracy. If at trial, however, the jury finds that the alleged conspiracy did not continue into the four-year limitations period immediately preceding September 15, 2015, when Plaintiff filed its claims, or that Defendants did effectively withdraw from the conspiracy, then the claims are time-barred unless the statute was tolled.

### b. Tolling the Statute of Limitations

Plaintiff argues that the Statute of Limitations was tolled under two theories – equitable grounds of fraudulent concealment and class action tolling. See Opp. at 7-13, 21-23. The Court will consider each theory in turn.

### i. Fraudulent Concealment

If Defendants fraudulently concealed the HRP activities, then the Statute of Limitations was tolled during the time of the concealment. See e.g., Morton's Mkt., Inc., 198 F.3d at 832. If so, Plaintiffs may recover damages for all the years during which the conspiracy was fraudulently concealed and the Statute was tolled. See id. To avail itself of tolling under a fraudulent concealment doctrine, Plaintiff carries the burden of proving at trial that Defendants concealed the conduct complained of, and that Plaintiff failed, despite the exercise of due diligence on Plaintiff's part, to discover the facts that form the basis of Plaintiff's claims. See id. (quoting In re Beef Indus. Antitrust Litig., 600 F.2d at 1169).

On the instant Motion, however, Defendants as the moving parties bear the initial burden of pointing out the undisputed facts which entitle them to judgment as a matter of

law. Defendants must show that Plaintiff either knew of its claims or had notice sufficient to prompt it to investigate and that, had Plaintiff done so diligently, it would have discovered the basis for its claims. See Morton's Mkt., Inc., 198 F.3d at 832. If Defendants demonstrate such facts in the record, then Plaintiff must show that these facts are in dispute. See id. The Court resolves all doubt in favor of Plaintiff as the non-moving party. This standard is applied with "particular stringency" where Plaintiff alleges that Defendants' actions prevented Plaintiff from discovering its claims prior to the expiration of the limitations period. See id. Generally, "the issue of when a plaintiff in the exercise of due diligence should have known of the basis for [its] claims is not an appropriate question for summary judgment." Id. (collecting cases). Rather, the determination of when a plaintiff is on notice of its claims is a question of fact for a jury to decide. Id. (citing Ballew v. A. H. Robins Co., 688 F.2d 1325, 1328 (11th Cir. 1982)).

Defendants argue that Plaintiff cannot show affirmative actions by Defendants constituting concealment. See Motion at 12 (citing Hill v. Texaco, Inc., 825 F.2d 333, 335 (11th Cir. 1987)). Defendants maintain that they sought to publicize the HRP and not to conceal it. See Kozak Decl. ¶¶ 11-14, 16-17. In opposition, Plaintiff argues that a question of fact exists as to whether Defendants fraudulently concealed the HRP for tolling purposes. See Opp. at 15-21, fn.26, 27, and 32 (citing evidence relating to Plaintiff's lack of notice of the HRP or CWT). Plaintiff provides evidence that when it inquired about the increasing milk prices, Defendants represented that the increases were due to causes other than the HRP or the CWT, including higher costs of feed and diesel fuel, and the general ups and downs of the dairy industry. See Opp. at 21-23, fn. 38, 39, Ex. 14 at 95:20-97:24, Ex. 15 at 207:6-21, 208-16-209:18.

Construing all doubt in favor of Plaintiff with particular stringency, as the Court must, there is no evidence to support that Defendants sought to conceal the HRP. Defendants provide evidence that should have, at the minimum, prompted Plaintiff to investigate the HRP and the possibility of antitrust violations. See Kozak Decl. ¶¶ 16-17; see also O'Toole Decl. ¶¶ 8(a)-(e) (attaching national newspaper articles about the HRP and the CWT), ¶¶ 9(a)-(e) (attaching local newspaper articles about the HRP and the CWT), ¶¶ 10(a)-(u) (citing twenty-one Dairy Food magazine online articles including articles about the HRP and the CWT). Defendants also provide evidence that numerous United States Government Officials publicly discussed the HRP and commented on NMPF's efforts to address the imbalance of milk supply and demand. See Kozak Decl. ¶¶ 10-15 (citing numerous United States Government Officials' commentary and personal meetings discussing the HRP and CWT). For example, in November 2006, former Secretary of Agriculture Michael Johanns made the following comment:

> I also want to, if I might, commend you on your CWT or your Cooperatives Working Together program. It is refreshing to see dairy producers collaborating to address the overall balance of milk supply and demand through this voluntary program.

Id. ¶ 11; see also O'Toole Decl. ¶ 34, Ex. 32 (transcript of remarks by Agriculture Secretary Michael Johanns, dated November 2, 2006). Later, in March 2009, Secretary of Agriculture Thomas Vilsack, in a USDA news broadcast stated the following:

> I will also say to the credit of the National Milk Producers Federation and Jerry's leadership we are not going to duplicate or replicate the problems in the cattle industry that we sometimes have had in the past. By seeing a substantial and significant and immediate sale of surplus herd through the Federation there is more of a glide path to a reduction of the herd. And we expect and anticipate over a period of time that we may have as many as 250,000 to 300,000 fewer head out there. That may also provide an impact that we would like to monitor and determine.

See Kozak Decl. ¶ 13; see also O'Toole Decl. ¶ 36, Ex. 34 (transcript of a news teleconference with Agriculture Secretary Thomas Vilsack dated March 26, 2009). Congressman Robert Goodlatte endorsed the CWT stating that a continuation of the CWT is "very forward looking" is "looking out for the best interest of dairy farmers," and is "beneficial" to participants and "to the industry as a whole." See Kozak Decl. ¶ 14; see also O'Toole Decl. ¶ 37, Ex. 35 (transcript of statements made by Congressman Robert Goodlatte). The publications were widespread, diverse in types of media outlets, and were publicized in areas where Plaintiff's owned dairy plants.

The court in Morton's Mkt., Inc. reversed the district court's grant of summary judgment finding that newspaper articles regarding the defendants' bid-rigging put the plaintiffs on notice of its price-fixing scheme. See Morton's Mkt., Inc., 198 F.3d at 833. In that case, the court stated that it knew of no case "in which information regarding one sort of antitrust violation by a defendant has been held, as a matter of law, to constitute notice of all other possible violations." Id. The court held that notice of one wrong by a defendant does not trigger "a duty for potential plaintiffs to investigate all other potential wrongs the defendant might be committing . . . ." Id. at 834.

This Court is bound by Morton's Mkt., Inc. but finds it distinguishable from the instant case. Here, Defendants are not relying on other alleged antitrust violations to argue that Plaintiff had notice or could have excised due diligence to discover its claims. Rather, Defendants maintain that they did nothing to conceal the HRP or the CWT and the evidence supports the exact opposite in that Defendants sought to publicize the programs. See Motion at 13. Defendants argue, and the Court agrees, that there is no evidence that Defendants affirmatively concealed the HRP or the CWT or that Plaintiff

failed, despite the exercise of due diligence on Plaintiff's part, to discover the necessary facts to form the basis of Plaintiff's claims. That Plaintiff inquired about the increasing milk prices only to learn of causes other than the HRP or the CWT does not equate to affirmative concealment. See e.g., Hill, 825 F.2d at 336 (finding, inter alia, no affirmative concealment where the plaintiff "knew that the property was appraised at a value much lower than the price that [defendant] was asking [and] [t]hat appraisal should have put [the plaintiff] on notice . . . .").[6] Plaintiff had notice sufficient to prompt it to investigate and had Plaintiff done so diligently, it would have discovered the basis for its claims.

Plaintiff goes to great lengths to try to create an issue of fact as to whether it knew of the HRP or the CWT. See Opp. 15-21 (citing evidence that Plaintiff's employees did not know of the HRP or the CWT and did not read the various publications); see also Opp. at 15-21, fn.26, 28, 32, 33, Ex. 26 (citing evidence relating to Plaintiffs' lack of notice of the HRP or the CWT including the Deposition of Donald T. Bernos).[7] Again, construing the evidence in the light most favorable to Plaintiff, a jury could not reasonably find that despite the widely publicized articles and United States Government Officials' comments and endorsements Defendants nonetheless concealed the HRP or the CWT and prevented Plaintiff from discovering the HRP or the CWT. In light of the foregoing,

---

[6] There are two exceptions to the affirmative concealment rule. See Hill, 825 F.2d 333, 336 n.2. "The first is where the defendant has a fiduciary responsibility to make disclosure." Id. (internal citation omitted). "The second exception is where the wrong is of such a character as to be self-concealing." Id. (internal citation omitted). While it appears that neither exception is applicable to the instant case, under either of these exceptions, Plaintiff still must show that it exercised due diligence to discover its cause of action. See id.

[7] Mr. Bernos was the General Manager of the Hammond, Louisiana dairy plant owned by Winn-Dixie and testified that he learned of some "federal herd reduction program" but was not sure of the time frame or whether it was in fact the HRP at issue in this case. (See Doc. 208-27 at 28:15-17, 32:23-33:4, 36:20-23, 37:3-6 and 77:5-78:7); (see also Doc. 208-13 ¶ 4; Declaration of Donald Bernos (stating that he "had never heard of the [CWT] or its . . . [HRP]" and that as far as he knows "no one at the Hammond or Plant City plants knew of the CWT or the HRP.")).

Plaintiff's claims were not tolled by fraudulent concealment. The Motion is due to be granted as to fraudulent concealment.

## ii. Class Action Tolling

Plaintiff also argues that previously filed class action cases tolled the Statute of Limitations on Plaintiff's claims in this case from the date when the previous actions were filed in September 2011 and January 2012 involving the same subject matter. See Opp. at 7. The class action tolling doctrine provides that "the commencement of a class action suspends the applicable [S]tatute of [L]imitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Am. Pipe & Const. Co. v. Utah, 414 U.S. 538, 554 (1974). The Statute of Limitation "periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights . . . ." Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 352 (1983). It follows that "[o]nce the [S]tatute of [L]imitations has been tolled, it remains tolled for all members of the putative class until class certification is denied [and then] [a]t that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." Id. at 2397-98. In both American Pipe and Crown, the Court "addressed only putative class members who wish to sue individually after a class-certification denial." China Agritech, Inc. v. Resh, 138 S. Ct. 1800, 1806 (2018). In Resh, the Court elaborated and explained that "a putative class member, in lieu of promptly joining an existing suit or promptly filing an individual action," may not "commence a class action anew beyond the time allowed by the applicable [S]tatute of [L]imitations[.]" Id. at 1804. In other words, the class action tolling doctrine "does not permit the maintenance of a follow-on class action past expiration of the [S]tatute of [L]imitations." See id.

Plaintiff relies on a succession of class action cases that were filed against various defendants including the instant case Defendants NMPF, CWT, DFA, LOL, DCI, and AMI. Defendant SMI was not a defendant in the previously filed class actions. The class actions involved alleged violations of antitrust laws pertaining to the HRP and the CWT.[8] Initially, this Court recognizes that the instant action is not a class action.

On September 26, 2011, the class action case, Edwards v. National Milk Producers Federation, et al., was filed in the United States District Court, Northern District of California. See Opp. at 8, Ex. 3 ("Edwards").[9] The Edwards case involved instant case Defendants NMPF, CWT, DFA, LOL, DCI and AMI. (See Doc. 1 in Edwards). It appears that Edwards is on appeal in the United States District Court of Appeals for the Ninth Circuit. (See Doc. 531 in Edwards). On August 6, 2013, the United States Panel on Multidistrict Litigation ("MDL Panel") denied consolidation of Edwards and two other consolidated actions in the Northern District of California with First Impressions[10] pending in the United States District Court, Southern District of Illinois. (See Doc. 24 in Edwards CAN/3:11-cv-04766).

On January 6, 2012, a class action, Stephen L. LaFrance Holding, Inc. v. National Milk Producers Federation, et al., was filed in the United States District Court Eastern

---

[8] Defendants provide a chart (Doc. 188-53; Class Action Chart) outlining the class actions, parties, and the claims. The Class Action Chart identifies the claims that Defendants argue are either barred by the Statute of Limitations, are at least partially timely, or are not covered by Plaintiff's pleadings. See Class Action Chart at 2-3. The Class Action Chart omits information about Edwards v. National Milk Producers Federation, et al., Case No. 4:11-cv-04766 (N.D. Cal. 2011).

[9] Edwards v. National Milk Producers Federation, et al., Case No. 4:11-cv-04766 (N.D. Cal. 2011).

[10] First Impressions Salon, Inc. v. National Milk Producers Federation et al., Case No. 3:13-cv-00454 (S.D. Ill 2013).

District of Pennsylvania. See Opp. at 8, Ex. 4 ("LaFrance").[11] LaFrance involved instant case Defendants NMPF, CWT, DFA, LOL, DCI, and AMI. (See Doc. 1 in LaFrance). On July 31, 2012, LaFrance was transferred the United States District Court for the Northern District of California. (See Doc. 76 in LaFrance); see also O'Toole Decl. ¶¶ 21-23, Ex. 19-21; Stephen L. LaFrance Holding, Inc. v. National Milk Producers Federation, et al., Case No. 3:12-cv-04142 (N.D. Cali. 2012). On August 23, 2012, LaFrance was dismissed without prejudice. (See Doc. 82 in LaFrance, N.D. Cal. 2012); see also O'Toole Decl. ¶¶ 21-23, Ex. 19-21.

On December 7, 2012, LaFrance was replaced with another class action, Blakeman v. National Milk Producers Federation et al., which was filed in the United States District Court Southern District of Illinois. See id. at 8, Ex. 5 ("Blakeman").[12] Blakeman involved instant case Defendants NMPF, CWT, DFA, LOL, DCI, and AMI. (See Doc. 2 in Blakeman). On July 23, 2013, Blakeman was dismissed. (Doc. 101 in Blakeman).

Finally, on May 10, 2013, First Impressions was filed in the United States District Court Southern District of Illinois. See id. at 8, Ex. 6 ("First Impressions").[13] First Impressions involved the instant case Defendants NMPF, CWT, DFA, LOL, DCI, and AMI. (See Doc. 2 in First Impressions). On June 2, 2016, the MDL Panel denied consolidation of the instant case with First Impressions and the other consolidated cases in the Southern District of Illinois. (See Doc. 25 in First Impressions ILS/3:13-cv-00454). It

---

[11] Stephen L. LaFrance Holding, Inc. v. National Milk Producers Federation, et al., Case No. 2:12-cv-00070 (E.D. Pa. 2012).

[12] Blakeman v. National Milk Producers Federation et al., Case No. 3:12-cv-01246 (S.D. Ill 2012).

[13] See supra n.10.

appears that First Impressions is currently pending. (See generally docket in First Impressions).

Defendants concede that First Impressions provides limited tolling to Plaintiff's claims involving fresh dairy products from Defendants DFA, LOL, and AMI on or after May 22, 2009. See Motion at 15.[14] Defendants argue that purchases of raw milk, cheese, and butter, and purchases from Defendant SMI are not tolled. See id. at 15-18. Defendants further argue that Plaintiff may not piggyback its claims on LaFrance and Blakeman. See id. at 18-19.

Plaintiff relies on Edwards and LaFrance to toll the Statute of Limitations. See Opp. at 7-13. Plaintiff argues that "class action tolling applies because one of its requirements is that Defendants were on notice of the allegations of fact and law, in order to preserve evidence, which would not get stale, become lost or otherwise be unavailable, prejudicing Defendants in the later-filed action." Id. at 8. Thus, Plaintiff maintains that Defendants in this case would suffer no prejudice from unavailable evidence. See id. Additionally, Plaintiff argues that issues of fact remain as to whether raw milk is fluid milk for purposes of tolling. See id. at 9, Ex. 7 (2/11/09 Email from Defendant SMI's CEO, Calvin Covington, referring to the costs of fluid milk and referring to raw milk); see also id. at 9, Ex. 8

---

[14] Specifically, Defendants explain that with regard to fresh dairy products, First Impressions tolled

> from May 10, 2013, through September 11, 2015, Winn-Dixie's claims for fresh dairy product purchases from the Named Defendants. The limitations clock on these claims began to run again on September 11, 2015, when they were dropped by the class. Winn-Dixie filed this action twelve days later on September 23, 2015. Winn-Dixie may therefore appropriately claim American Pipe tolling on fresh dairy product purchases from the three Named Defendants beginning May 22, 2009.

Opp. at 18.

(Deposition of Michael Lichte at 82:23-24 (testifying that dairy plants "receive fluid milk off the farm.")).

Based on the Court's analysis of the previously filed class actions, the record in this case, applicable law, and the parties' arguments, the Motion is due to be granted in part and denied in part. Defendants concede, and the Court agrees that limited class action tolling applies to Plaintiff's claims for fresh dairy product purchases from Defendants DFA, LOL, and AMI on or after May 22, 2009. See Motion at 15, 18. Regarding the remaining Defendants and time periods, the Motion is due to be granted in that class action tolling does not apply to Plaintiff's claims. The instant case and the previously filed class actions do not as a matter of law align as to parties, subject matter, and time periods. Initially, the Court recognizes that Defendant SMI is omitted from all other previously filed class actions that Plaintiff relies on for tolling purposes. Additionally, on June 2, 2016, the MDL Panel issued an Order Denying Transfer of the instant case to the Southern District of Illinois. See In re Fresh Dairy Prod. Antitrust Litig. (No. III), 190 F. Supp. 3d 1353, 1355 (U.S. Jud. Pan. Mult. Lit. 2016) (stating that "the three Illinois actions have been consolidated . . . [and] have been pending for over three years, and class certification-related proceedings are well underway" whereas this action "is an individual action, has been filed only recently, and it involves a defendant (Southeast Milk, Inc.) not named in the Illinois litigation."). While Defendants, with the exception of Defendant SMI, would have presumably been on notice of claims involving the HRP, this does not end the Court's analysis. As explained in Crown,

> when a plaintiff invokes American Pipe in support of a separate lawsuit, the district court should take care to ensure that the suit raises claims that concern the same evidence, memories, and witnesses as the subject matter of the original class suit, so that the defendant will not be prejudiced. Claims

> as to which the defendant was not fairly placed on notice by the class suit
> are not protected under American Pipe and are barred by the [S]tatute of
> [L]imitations.

Crown, 462 U.S. at (internal quotations and citations omitted). The instant case differs in parties, evidence, memories, and witnesses as Plaintiff's claims relate specifically to Plaintiff's milk purchases. With presumably different parties, claims, and subject matters the Court is unable to conclude as a matter of law that Plaintiff's claims are entitled to class action tolling. With the exception of the limited class action tolling conceded to by Defendants, the Motion is due to be granted as to the class action tolling.

### c. Standing

Apart from the Statute of Limitations issue, Defendants argue that Plaintiff lacks standing. See Motion at 19-21. "Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)). To establish Article III standing, three elements must be present. See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 797 F.3d 1248, 1271 (11th Cir. 2015). "'First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" Id. (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). Next, "the plaintiff must establish a causal connection between its injury and the defendant's conduct." Id. (citing Lujan, 504 U.S. at 560). "Third, the plaintiff must show that it is likely—and not merely speculative—that a favorable decision by the court will redress the injury." Id. (citing Lujan, 504 U.S. at 561). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561.

Defendants argue that Plaintiff lacks standing on two grounds: (1) claims based on raw milk purchases that Plaintiff purchased at its former plants because Plaintiff allegedly assigned those claims to an affiliate of Defendant SMI; and (2) claims based on indirect purchases through C&S Wholesale Grocers, Inc. ("C&S"). See Motion at 19-21. Regarding the first argument, Defendant maintains that the Asset Purchase Agreement (Doc. 188-4; Agreement) "expressly transferred and assigned the relevant 'Assets' from Winn-Dixie to" Sunshine State Dairy Farms, LLC ("Sunshine"). Motion at 19; see also Agreement § 2.01 ("Upon the terms and subject to the conditions contained herein . . . Seller will sell, transfer, assign and deliver the Assets to Sunshine, and Sunshine will purchase, acquire and accept the Assets from Seller . . . ."). Assets are defined as

> all of the assets, properties and rights of Seller (including all assignable guarantees, warranties, indemnities and similar rights of Seller with respect to any of the Assets), of every type and description, real, personal and mixed, directly relating to the Dairy Plants, including the Owned Real Estate, the Subleased Real Estate, the Inventories (other than finished product Inventories to be removed from the Dairy Plants by Seller for relocation to other locations of Seller), the Equipment, the Supplies, the General Property, the Intellectual Property (other than Intellectual Property comprising or related to the Excluded Assets), the Assumed Contracts, and other fixed or tangible assets known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, wherever located and whether or not reflected on the books and records of the Seller, excluding only the Excluded Assets.

Agreement at Schedule A. The Excluded Assets include equipment listed in Schedule J, "any non-assignable and non-transferable Contracts and Permits . . . accounts receivable, [and] all finished product inventories . . . ." See id. Defendants argue that legal claims are not part of the Excluded Assets and thus must be assigned to Sunshine. See Motion at 20. Defendants also argue that Plaintiff's Corporate Representative, Graham Leary,

"admitted that raw milk sales from SMI 'related directly' to the plants." Id. (citing O'Toole Decl. ¶ 30, Ex. 28).[15]

In opposition, Plaintiff argues that the Agreement does not purport to assign the claims in the instant case. See Opp. at 24. Plaintiff maintains that the Agreement at Schedule A focuses on the tangible and intangible assets directly relating to the dairy plants and thus genuine issues of material fact remain as to what directly related to the plants. See id. In support, Plaintiff argues that Schedule D allocated the purchase price amongst the Assets and lists only the following three categories of purchased assets: (1) Land and Building; (2) Personal Property; and (3) Sublease. See id. at 24, Ex. 28 at Schedule D. In further support, Plaintiff argues that Mr. Leary's testimony raises a genuine issue of material fact in that he did not recall any other assets being sold to Sunshine other than the physical assets. See Opp. at 24, Ex. 15 at 46:5-23. Aside from Mr. Leary's testimony, Plaintiff argues that if the Agreement did assign the claims to Sunshine, such assignment is invalid as a matter of law. See id. at 25 (citing Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 437 (3d Cir. 1993)).

Regarding the second standing argument, Defendants contend that Plaintiff lacks standing to recover damages on purchases that it made indirectly through C&S. See Motion at 21. Defendants argue that as of May 1, 2013, Plaintiff ceased purchasing directly from Defendants and began to purchase all dairy products indirectly through C&S. See id. at 21; see also O'Toole Decl. ¶ , Ex. 49 at 8 No. 21 (identifying May 1, 2013, as

---

[15] Defendants cite Exhibit 28 to the O'Toole Declaration (Doc. 188-28), which is sought to be filed under seal (Doc. 193). However, Docket Entry 132-11 at page 17 provides a deposition except of Graham Leary with the cited information.

the date on which Plaintiff began purchasing Defendants' milk products through C&S).[16]

Defendants rely on Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC, to argue that

"[u]nder the direct purchaser rule, only the customer who purchased the goods or services

at issue directly from the alleged antitrust violator can recover damages." Lakeland Reg'l

Med. Ctr., Inc. v. Astellas US, LLC, 763 F.3d 1280, 1285 (11th Cir. 2014) (citing Illinois

Brick Co. v. Illinois, 431 U.S. 720, 736 (1977)). Not only does Lakeland involve a "classic

tying arrangement"[17] not necessarily present in the instant case, but the direct purchaser

rule also provides numerous exceptions, which Defendants conclusory state do not apply

here. See Motion at 21.

On this record, the Court finds that additional briefing is necessary to resolve the

issue of standing. The Court recognizes that the parties were limited in page length by

Rule 3.01 of the Local Rules of the Middle District of Florida and the bifurcated briefing

schedule issued in this case (Doc. 174). As a result, the Motion is due to be denied without

prejudice only as to the issue of standing. The Court will provide a briefing schedule.

## IV.    Conclusion

In light of the foregoing, the Motion is due to be granted in part and denied in part.

The Motion is due to be granted to the extent that Plaintiff's claims are not tolled by

---

[16] Plaintiff does not provide a response to Defendants' second standing argument. See generally Opp. at 23-25 (opposing Defendants' first standing argument and omitting any argument in the filing relating to the second standing argument involving C&S). Even without a response to Defendants' second standing argument, it remains unclear what purchases, if any, would remain at issue after May 1, 2013. See generally Am. Compl. ¶¶ 18, 111, 124, 125 (identifying the relevant time period between 2003 through 2013).

[17] "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" Lakeland Reg'l Med. Ctr., Inc., 763 F.3d at 1284 n.2 (quoting Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 461 (1992)).

fraudulent concealment or class action tolling with the limited exception provided herein and conceded to by Defendants. The Motion is due to be denied in that Plaintiff's claims are not necessarily barred by the Statute of Limitations. The Motion is also due to be denied without prejudice as to the issue of standing.

The Court is mindful of its previous Order (Doc. 174; June 6, 2018 Order) permitting a bifurcated briefing schedule in this case. With that in mind, the Court declines to comment on the merits of Plaintiff's claims at this stage. However, in light of the June 6, 2018 Order, the procedural posture of this case, including the recent dismissal of Plaintiff BI-LO, and this Order, the Court finds that an amended briefing schedule is necessary.

Accordingly, after due consideration, it is

**ORDERED:**

1. Defendants' Motion and Supporting Memorandum for Summary Judgment on Statute of Limitations and Standing (Doc. 187) is **GRANTED in part and DENIED in part** as follows:

a. The Motion (Doc. 187) is **GRANTED in part** to the extent that fraudulent concealment does not toll Plaintiff's claims.

b. The Motion (Doc. 187) is **GRANTED in part** to the extent that class action tolling does not apply to Plaintiff's claims, with the limited exception provided herein and conceded to by Defendants based on purchases of fresh dairy products from Defendants Dairy Farmers of America, Inc., Land O'Lakes, Inc., and Agri-Mark, Inc. on or after May 22, 2009.

c. The Motion (Doc. 187) is **DENIED in part** as to the issue of the Statute of Limitations.

d. The Motion (Doc. 187) is **DENIED in part without prejudice** as to the issue of standing.[18]

2. The following amended briefing schedule shall govern this case:

a. On or before **February 15, 2019**, Defendants may file a motion for summary judgment regarding only the issue of standing. The motion shall not exceed **fifteen (15) pages** in length. Plaintiff's response shall not exceed **fifteen (15) pages** in length. The Court does not anticipate granting the parties leave to file reply briefs.

b. The dispositive and Daubert motions deadline is extended up to and including **May 1, 2019**.

i. Defendants' Motion to Exclude the Opinions of Plaintiff's Expert Dr. John M. Connor with Incorporated Memorandum of Law (Doc. 190) is **DENIED without prejudice** to refiling on or before **May 1, 2019**.[19]

ii. Plaintiffs' Motion for Partial Summary Judgment and Supporting Memorandum of Law (Doc. 194) is **DENIED without prejudice** to refiling on or before **May 1, 2019**.[20]

iii. Plaintiffs' Corrected Motion to Exclude or Strike Defendants' Affirmative Defense of Lack of Standing Relating to Plaintiffs' Purchases of Raw Milk and

---

[18] As it pertains to this Motion and not the bifurcated briefing schedule, Defendants may, in their discretion, refile a motion for summary judgment regarding only the issue of standing and not the remaining issues raised in the Motion and addressed in this Order.

[19] To the extent that this Order affects Defendants' objections to Plaintiff's expert, Dr. John M. Connor, Defendants may in their discretion refile their Daubert Motion.

[20] To the extent that this Order affects Plaintiff's arguments included in its Motion for Partial Summary Judgment, Plaintiff may in its discretion refile its Motion.

Incorporated Memorandum of Law (Doc. 199) is **DENIED without prejudice** to refiling on or before **May 1, 2019.**[21]

    c. On or before **January 31, 2019**, the parties shall file a joint notice advising the Court of whether they are willing to participate in a settlement conference before the Honorable Patricia D. Barksdale, United States Magistrate Judge. If the parties are willing to participate in a settlement conference, the Court will stay (1) the February 15, 2019 deadline for Defendants to file a motion for summary judgment regarding only the issue of standing and (2) the May 1, 2019 deadline to file dispositive and Daubert motions until the settlement conference has concluded and the deadlines remain necessary. If the parties are not willing to participate in a settlement conference, the Court will set the matter for trial.

    3. The Clerk is of the Court is directed to **ADMINISTRATIVELY CLOSE** this action pending further order from the Court.[22]

    **DONE** and **ORDERED** in Jacksonville, Florida this 16th day of January, 2019.

_____
BRIAN J. DAVIS
United States District Judge

5
Copies furnished to:

Counsel of Record

_____

[21] To the extent that this Order affects Plaintiff's arguments included in its Motion to Exclude or Strike, specifically the issue regarding standing and the additional briefing required, Plaintiff may in its discretion refile its Motion.

[22] The Clerk of the Court is directed to **LEAVE PENDING** any motions unresolved by this Order.