**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WINN-DIXIE STORES, INC.,

                                        Plaintiff,

        v.

SOUTHEAST MILK, INC., *et al.*,

                                        Defendants.

Case No. 3:15-CV-01143-J-39PDB

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW**

## **TABLE OF CONTENTS**

I.   PLAINTIFF SHOULD BE GRANTED PARTIAL SUMMARY JUDGMENT UNDER
     SECTION 1 OF THE SHERMAN ACT ............................................................................ 1
     A.   Factual Background and Undisputed Facts .......................................................... 2
     B.   Defendants Engaged in a Horizontal Agreement to Reduce Milk Supply .......................... 4
     C.   Defendants' Output Restraint Violates Section 1 of the Sherman Act. ........................ 13

II.  THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN PLAINTIFF'S
     FAVOR ON THE ISSUE OF CAPPER-VOLSTEAD IMMUNITY. .............................. 15
     A.   The plain language of Capper-Volstead does not provide immunity for Defendants'
          horizontal agreement to restrict supply. ......................................................... 16
     B.   According to Capper-Volstead's legislative history, Congress did not intend to immunize
          supply restraints. ............................................................................ 18
     C.   Federal agencies have stated that production limitations are not exempt from antitrust
          liability under Capper-Volstead. ............................................................. 20
     D.   Defendants Are Large Vertically-Integrated Agribusinesses and Therefore Not Entitled to
          Capper-Volstead Immunity. .................................................................. 22
     E.   Non-Farmer Participants in the Herd Retirement Program Doom Capper-Volstead
          Immunity. ..................................................................................... 24
     F.   DFA's Domination of the NMPF and CWT Vitiates Any Capper Volstead Immunity. .. 25

III. CONCLUSION ......................................................................................... 25

i

**TABLE OF AUTHORITIES**

Cases

*Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814 (N.D.N.Y 1996) ............................ 17
*Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173 (8th Cir. 1982) .......................................... 16, 26
*Boudette v. Barnette*, 923 F.2d 754 (9th Cir. 1991) ............................................................................ 18
*California Lettuce*, 1977 WL  188550 ........................................................................................... 21, 23
*Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384 (1967) ......................................................... 26
*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) ................................................................... 14
*Circuit City Stores v. Adams*, 532 U.S. 105 (2001) ............................................................................. 19
*Estate of Covington*, 450 F.3d 917 (9th Cir. 2006) ............................................................................. 19
*Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir.1980) ............................................ 16
*Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994) ...................................................................... 17
*Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979) .............................................. 17
*Holly Sugar Corp. v. Goshen Cnty. Coop. Beet Growers Ass'n*, 725 F.2d 564 (10th Cir. 1984) ............. 19
*Hui Hsiung*, 778 F.3d at 749 ............................................................................................................... 15
*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) .............. 13
*In re Fresh & Process Potatoes Antitrust Litig.* ("*Potatoes Antitrust Litig.*"), 834 F. Supp. 2d 1141 (D.
   Idaho 2011) ...................................................................................................................................... 16
*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ..................................... 14
*In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382 ................................................ 27
*In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274 (E.D. Pa. 2009) ........................ 26
*In re Processed Egg Products Antitrust Litigation*, slip op., pp. 7-8 (E.D. Pa. Sept. 13, 2016) ................ 26
*In re Southeast Milk Antitrust Litig*, 2008 U.S. Dist. LEXIS 44541 ...................................................... 17
*In the Matter of Washington Crab Ass'n*, 66 F.T.C. 45 (1964) ............................................................... 18
*Jarecki v. G. D. Searle & Co.*, 367 U.S. 303 (1961).............................................................................. 18
*Leegin Creative Leather Prods. Inc. v. PSKS Inc.*, 551 U.S. 877 (2007) ............................................ 1, 14
*Levine v. Central Florida Medical Affiliates*, 72 F.3d 1538 (11ᵗʰ Cir. 1996) ......................................... 1
*N. Cal. Supermarkets, Inc. v. Cent. Cal. Lettuce Producers Co-op.*, 413 F. Supp. 984 (N.D. Cal. 1976) . 16
*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958) ........................................................................ 2, 14
*Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816 (1978) .............................................. 16, 25, 26
*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) .................................. 21
*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) .......................... 14
*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985) .......................... 14
*Perez v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 7318754 (N.D. Cal. 2011) .......................................... 2
*Potatoes Antitrust Litig.*, 834 F. Supp. 2d at 1155 n.9 ....................................................................... 21
*Potatoes Antitrust Litig.*, 834 F. Supp. 2d at 1156 ................................................................. 19, 21, 23
*Ratzlaf v. United States*, 510 U.S. 135 (1994) ................................................................................... 20
*Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881 (9th Cir. 2005) ...................................................... 18
*Southeast Milk Antitrust Litig.*, 2008 U.S. Dist. LEXIS 44541 ............................................................. 16
*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9ᵗʰ Cir. 1974) ............... 18
*United States v. E. Mushroom Mktg. Coop., Inc.*, 2005 WL 3412413 (E.D. Pa. 2005) ............................. 22
*United States v. Grower-Shipper Vegetable Ass'n of Cent. Cal.*, No. 30561 (N.D. Cal. 1951), *aff'd per
   curiam*, 344 U.S. 901 (1952) ............................................................................................................. 22
*United States v. Hui Hsiung*, 778 F.3d 738 (9th Cir. 2015) ..................................................................... 1
*United States v. Nat'l Bd. of Fur Farm Orgs., Inc.*, 1977 WL 1430 (E.D. Wis. 1977) .............................. 22
*United States v. Shade Tobacco Growers Agric. Ass'n*, 1954 Trade Cas. (CCH) ¶¶ 67,751 (D. Conn.
   1954) ............................................................................................................................................... 22
*United States v. Socony-Vacuum Oil Co. Inc.*, 310 U.S. 150 (1940) ...................................................... 14

ii

I.   **PLAINTIFF SHOULD BE GRANTED PARTIAL SUMMARY JUDGMENT UNDER SECTION 1 OF THE SHERMAN ACT**

Plaintiff's motion for partial summary judgment under Section 1 of the Sherman Act should be granted for two reasons. First, the record is replete with documentary and testimonial admissions that Defendants created the CWT's premature herd slaughter program – the Herd Retirement Program ("HRP") – with the express intended purpose to reduce the supply of milk and increase milk prices, and each Defendant agreed to and participated in the HRP. Defendants' own real-time economist, Dr. Scott Brown, determined that the Herd Retirement Program reduced the nation's milk supply by billions of pounds and increased the price of raw milk by billions of dollars. Defendants adopted Dr. Brown's findings to support their members' continuing investment of $490 million in the HRP.  Thus, there is no finding for a jury but that Defendants engaged in horizontal production restraints that successfully reduced the nation's supply of milk compared to a world without the Herd Retirement Program, and increased the price of raw milk, processed milk and other dairy products.

Second, the United States Supreme Court has long held that "A horizontal cartel among compet[itors] that decreases output or reduces competition in order to increase price is … *per se* unlawful."[1] An agreement subject to the *per se* standard is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."[2] Thus, Defendants' horizontal output restraints

---

[1] *United States v. Hui Hsiung*, 778 F.3d 738, 749 (9th Cir. 2015) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007)); *see also, Levine v. Central Florida Medical Affiliates*, 72 F.3d 1538, 1545-46 (11th Cir. 1996) ("the Supreme Court has held that certain kinds of agreements are unreasonable per se, such as agreements among direct competitors to fix prices or to restrict output").

[2] *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). *See also Perez v. State Farm Mut. Auto. Ins. Co*., 2011 WL 7318754, at *5 (N.D. Cal. 2011) ("the Sherman Act makes a conspiracy among competitors to restrict output

violate Section 1 of the Sherman Act under the *per se* standard.  Therefore, Plaintiff's motion for partial summary judgment should be granted.

### A.    Factual Background and Undisputed Facts

Defendant National Milk Producers Federation ("NMPF"), a trade association, not a cooperative, founded Cooperatives Working Together ("CWT").[3] NMPF's and CWT's members include Defendants Dairy Farmers of America, Inc. ("DFA"), Land O'Lakes, Inc. ("LOL"), Dairylea Cooperative Inc. ("Dairylea"), Agri-Mark, Inc., and Southeast Milk, Inc. ("SMI"), which are among the largest dairy cooperatives in the country. DFA, for example, is the largest dairy cooperative in the United States with over $13 billion in revenue.

According to DFA's corporate representative, "Cooperatives Working Together was developed at a time when dairy farmers and the dairy industry in general were experiencing too much supply relative to demand, which translated into low prices over a very extended period of time, specifically from the beginning of 2002 through the middle of 2003."[4] So CWT was formed in 2003[5] with the sole stated intention "to strengthen and stabilize milk prices" by reducing milk supplies.[6] In order to do so, "67% represent[ed] the minimum level of participation CWT needed to reach."[7] CWT reached and exceeded that level.[8] "[B]y September 2005, membership in CWT consisted of farmers who collectively represented 74% of the

---

unlawful *per se* without regard to any of its effects").

[3] Defendants' Joint Answer to Plaintiffs' Amended Complaint ("Joint Answer"), ¶ 2.

[4] Ex. 1, Deposition of John Wilson, January 8, 2015, 24:22-25:4; *see also* Ex. 2, Deposition of Jerome Kozak, February 5, 2015 22:25-23:8 ("there had been 18 months of depressed prices").

[5] Joint Answer, ¶ 2.

[6] Ex. 3 (NMPF0000006).

[7] Ex. 4 (NMPF00013488) (emphasis in original).

[8] Joint Answer, ¶ 77.

nation's milk supply, with nearly 50 dairy cooperatives … participating."[9]

From 2003 to 2010, Defendants conspired to limit the production of raw farm milk through ten rounds of "herd retirements" – premature slaughters of entire dairy herds, with productive and non-productive cows.[10]  Each Defendant paid assessments to CWT of $0.05 and later $0.10 per hundredweight of milk produced in order to pay dairy farmer members to prematurely kill their herds.[11]  CWT spent $490 million on premature herd slaughters under the HRP from 2003 to 2010.[12]  In 2009 alone, for example, "the CWT program collected $219 million from membership assessments and disbursed $217 million to farmers pursuant to the herd retirement program."[13]  One of the herd slaughters in 2009 alone removed "367 herds in 41 states" or "about 101,000 cows."[14]  CWT's own real-time economist, hired to measure the HRP's effectiveness, touted that the premature killing of more than 500,000 cows was a resounding success, increasing cumulative milk prices by over $12 billion.[15]



**Summary of Herd Retirements**

| Herd Retirement | Farms Accepted | Cows Removed | Pounds of Milk Removed (billion lbs.) | Average Herd Size |
|---|---|---|---|---|
| 2003 | 299 | 32,724 | 0.609 | 109 |
| 2004 | 363 | 50,478 | 0.908 | 139 |
| 2005 | 442 | 64,069 | 1.174 | 145 |
| 2007 | 333 | 52,783 | 1.001 | 159 |
| 2008-1 | 201 | 24,585 | 0.432 | 122 |
| 2008-2 | 186 | 50,630 | 0.976 | 272 |
| 2009-1 | 367 | 101,040 | 1.960 | 275 |
| 2009-2 | 274 | 74,113 | 1.523 | 270 |
| 2009-3 | 150 | 25,340 | 0.505 | 169 |
| 2010 | 187 | 31,159 | 0.584 | 167 |
| Total | 2,802 | 506,921 | 9.672 | 181 |

---

[9] *Id.*

[10] *Id.*, ¶ 14; Ex. 5 (NMPF0017724).

[11] Ex. 6 (NMPF0000171).

[12] Ex. 7 (NMPF0015663 (2010), NMPF0015182 (2009), DFA2013-00000832 (2008), NMPF0022779 (2007), NMPF0006267 (2006), NMPF0025997 (2004-2005)).

[13] Joint Answer, ¶ 11.

[14] *Id.*, ¶ 98.

[15] Ex. 5 (NMPF0017724); Ex. 8 (NMPF0025088).

**B.**     **Defendants Engaged in a Horizontal Agreement to Reduce Milk Supply.**

**1.**     **The express intended purpose of CWT's premature herd slaughter program was to reduce the supply of milk and increase milk prices.**

The undisputed facts shows that Defendants intended to engage in a horizontal output restraint.  Bylaws produced by NMPF, effective June 2003, stated that the CWT Program's purpose was "to improve the prices that farmers receive for their milk."[16] A June 2003 CWT brochure explained that "CWT is designed to reduce dairy inventories and milk production in order to provide meaningful financial returns to dairy producers in all parts of the country."[17] Another CWT brochure reiterates that its "objective is to help strengthen and stabilize producer prices" and "in order to achieve this goal, we will reduce national milk production."[18]

Defendants' testimony confirms these undisputed facts. According to NMPF's corporate representative, "the means by which the Herd Retirement Program operated to strengthen and stabilize prices received by milk producers was to reduce the supply of milk to be less than what it would have been without the program."[19] According to DFA's corporate representative, the Program was "an important tool to reduce the supply of milk in order to raise prices paid to producers."[20] LOL's corporate representative agreed that "the purpose of the Herd Retirement Program was to reduce the supply of milk in order to have some impact on price."[21] And Mr. Gallagher of Dairylea stated that the "primary goal" of the Herd Retirement Program "was to strengthen and stabilize milk prices by reducing the nation's

---

[16] Ex. 9 (NMPF0002504, 2550).
[17] Ex. 3 (NMPF0000006).
[18] Ex. 10 (AMFL0000218).
[19] Ex. 2, Kozak Dep. 47:7-12, 48:4.
[20] Ex. 1, Wilson Dep. 63:13-17.
[21] Ex. 11, Deposition of Thomas Wegner, January 22, 2015, 37:11-14.

supply of raw milk."[22]

## 2.    Each Defendant agreed to and participated in the CWT program.

Each Defendant cooperative has admitted that it was a member of CWT[23] and "remitted dues on behalf of their farmer members to CWT from 2003 to 2010" in order to pay other farmer members to prematurely slaughter their herds.[24] Moreover, each cooperative Defendant voted in favor of the CWT Program and to participate in it.  "[I]n March 2003 <u>DFA</u>'s corporate board passed a motion in favor of NMPF developing a supply management program" and "[i]n April 2003, DFA's corporate board passed a motion in favor of DFA fully supporting CWT."[25] The DFA board then imposed an assessment deducting the 5 cents from each of its members' checks, because "the decision was made *en masse* by the Board of Directors that … all members would participate in the program."[26] In January 2009, DFA's CEO reported to its members that it "continues to be a strong supporter of the [CWT] program" because "we need more cows removed in early 2009."[27] Later that year NMPF reported to DFA that the recent herd retirements "have in just a matter of months moved milk prices for <u>all</u> producers back to where they were a year ago."[28]

In August 2003, LOL "voted to participate in the 5-cent/cwt. CWT contribution based on direction from the Land O'Lakes Dairy Committee, who consulted with elected delegates

---

[22] Ex. 12, Deposition of Edward Gallagher, May 6, 2015, 14:21-24.
[23] Joint Answer, ¶¶ 24, 27-30.
[24] Id.
[25] Ex. 13 (NMPF0000201) (emphasis added).
[26] Ex. 1, Wilson Dep. 46:4-18.
[27] Ex. 14 (DFA2013-00001132, 1134); *see also* Ex. 15 (DFA2013-00004312, 4313) (email from DFA Senior Vice President stating that DFA has "encouraged [CWT] officials to retire as many cows as is practical").
[28] Ex. 16 (DFA2013-00003698, 3700) (emphasis in original).

and individual members at meetings and on conference calls."[29] To explain the program to its members, LOL stated that it would "be holding all meetings in conjunction with DFA and Dairylea."[39] LOL reported that while not every member support[ed] CWT,[30] LOL's directors voted to support it.[31] An LOL document indicates that in 2003, the "goal of the CWT program [w]as to reduce the nation's milk supply by 1.2 billion pounds over 12 months to increase the national all-milk price by 36 cents per hundredweight."[32] LOL's Vice President of Public Affairs reported to LOL's CEO that some on the CWT committee were "concerned with customer and product demand response . . . public perception of dairy producer 'greed' when milk prices and project[ed] all price for '04 could be a record!!!"[33] But the committee decided to move forward with implementation of the next round.[34] In 2009, LOL's Executive Vice President and COO reported to its members that LOL "strongly supports the NMPF's (CWT) program."[35]

In a 2003 letter to its members, Dairylea stated that "Dairylea and many of the nation's other dairy cooperatives fully support NMPF in [the CWT] initiative" for the purpose of controlling supply and "ultimately improving milk prices."[36] In 2004, Dairylea's President touted to its members the "tremendous success" of the CWT program in its first year and

---

[29] Ex. 17 (LOL0007425-26).
[30] Ex. 18 (LOL0006920, 6922).
[31] Ex. 19 (LOL0002507); *see also* Ex. 12, Wegner Dep. 58:2-9 ("A. In order for them to not be assessed, they would – because all members were assessed – they would, excuse me, need to have ended their membership, I beg your pardon, with Land O'Lakes. You're correct. Q. Did Land O'Lakes receive feedback from members who were opposed to participating in the Herd Retirement Program? A Yes.").
[32] Ex. 20 (LOL0000575, 77).
[33] Ex. 21 (LOL0002122) (ellipses in original).
[34] *Id.*
[35] Ex. 22 (LOL0007177-78).
[36] Ex. 23 (LOL00005407); Ex. 24 (D00027130).

describing it as "an important step in getting better milk prices for all of us."[37] Meeting minutes indicate that in 2005, a "motion was made, seconded and carried that Dairylea support efforts to continue NMPF's CWT program for another 18-month period."[38] And meeting minutes from 2007 state that Dairylea V.P. of Planning and Regulatory Affairs Ed Gallagher reported that, with respect to the "most recent CWT herd retirement," a "total of 333 bids were accepted from 39 states, which removed 52,783 cows milking over 1 billion pounds of milk."[39] At that same meeting, a "motion was … carried by the Dairylea board to support the extension of the $.10 per hundredweight member investment rate in CWT through December 31, 2008."[40]

Further, a 2003 newsletter to Agri-Mark's members states that its "Board of Directors voted at their May meeting to support the [CWT] program that is being developed by the [NMPF], of which Agri-Mark is an active member."[41] At the end of 2003, Agri-Mark's President and CEO, in a letter to its members, stated that the "CWT program that Agri-Mark is participating in should [] result in reduced national milk production and increased farm prices."[42] In 2004, Chairman of the Board Carl Peterson, in a letter to members, reported the cooperative's "record" profits.[43] Another letter that year indicated that the "Agri-Mark Board had decided to support our continued participation" in the CWT program because "its removal of almost 33,000 cows from farms has played a significant role in the rising milk prices currently underway."[44]

---

[37] Ex. 25 (D00010653).
[38] Ex. 26 (D00006717); *see also* Ex. 27 (D00009523) (2006 meeting minutes).
[39] Ex. 28 (D00008184).
[40] *Id.*; *see also* Ex. 29 (D0009780) (2008 meeting minutes).
[41] Ex. 30 (AMFL0000001).
[42] Ex. 31 (AMFL0000041).
[43] Ex. 32 (AMFL000044).
[44] Ex. 33 (AMFL0000046).

In 2005, Southeast Milk's Board voted to participate in the HRP, make mandatory its members' participation, and assess them $0.05 per hundredweight to fund the HRP.[45]  After SMI joined the HRP, the Chairman and CEO reported to its Board that SMI members expressed "lots of support" for the HRP in SMI producer meetings.[46]  In 2006, SMI's Board voted to continue its participation in CWT and its HRP at an increased level of $0.10 per hundredweight.[47] In addition, Joe Wright, SMI's Chairman and President, who was a member of the NMPF Board throughout the entire time period of the CWT and its HRP, and continues to be so to this day, voted in favor of a statement by the CWT Economic Policy Committee, of which he was also a member, "recognizing the positive impact that Cooperatives Working Together (CWT), has had on dairy farmer revenue, and fully endorses CWT being an ongoing program with the purpose of strengthening and stabilizing producer income."[48]  Finally, SMI and its members participated in the CWT and its HRP from 2003 through 2013 because Joe Wright represented SMI on the NMPF Board and CWT Committee and never voted against any motion or action relating to or in support of the CWT and its HRP.[49]

Finally, NMPF itself played an active role in ensuring that the HRP slaughters were effective. It took steps to monitor cow slaughters by regularly conducting audits of farms to make sure farmers were correctly reporting cow slaughter numbers.[50] NMPF President and CEO, Jerry Kozak, testified that farmers were required to "remove[] the ears after the cow []

---

[45] Ex. 34, Deposition of Joseph Wright, Dec. 12, 2017, 48:21-25, 112:4-8; Ex. 36, SMI001996-2004; see also Ex. 87, SMI00138 (a SMI summary of assessment collected and paid to CWT).
[46] Ex. 34, Wright Dep. 114: 17-19, 23, 115:2-5, 118:1-7.
[47] Ex. 34, Wright Dep. 141:15-23; Ex. 37, SMI002019-23.
[48] Ex. 34, Wright Dep. 96:16-25, 97:1-24, 99:8-10, 13-14; Ex. 38, NMPF0026352-55.
[49] Ex. 34, Wright Dep. 17:10-12, 18:14-16, 23:1-10, 14-25, 36: 19-20, 22, 37:6-8, and 97:22-24 ("I think I stated I voted in favor of every motion that I can remember relative to CWT as a National Milk Board member.").
[50] Ex. 2, Kozak Dep. 111:16-113:3; Ex. 39, NMPF0014011 (describing farms audited by herd retirement round).

was dead"[51] and send the ears to NMPF's offices.[52] NMPF also made changes to the HRP's conditions to improve its efficacy. For example, the program did not initially include pregnant cows (called bred heifers).[53] NMPF recognized that including bred heifers would "enhance the effectiveness of CWT's milk reduction activities,"[54] and implemented a "bred heifer option" where farmers could include their bred heifers in the HRP.[55] As Dr. Brown later confirmed in a NMPF press release, this change in policy improved the impact of the HRP on the all milk price.[56]

### 3. The Herd Retirement Program successfully reduced the milk supply.

Defendants touted the HRP's success in order to persuade their farmer members to continue to invest in the program. NMPF's corporate representative testified that NMPF believed that "the Herd Retirement Program successfully reduced the supply of milk to be less than what it would have been without the program."[57] Mr. Gallagher recommended continued investment in the CWT program, because it was part of the "holy grail" of achieving higher milk prices.[58] This testimony is consistent with the statements by NMPF President and CEO, Jerry Kozak, throughout the course of the program. According to a 2005 statement, "With

---

[51] Ex. 2, Kozak Dep. 245:8-11.

[52] Ex. 2, Kozak Dep. 113:11-114:9, 161:7-10; *see also* Ex. 40 (AMFL0004165 at 4174) (photograph depicting collection of ears); Ex. 41 (D00014870 at 14880).

[53] Ex. 12, Gallagher Dep. 39:21-40:12; Ex. 2, Kozak Dep. 132:6-25.

[54] Ex. 42 (D00020451-53, 20451).

[55] Ex. 43 (BROWN-MU_0001487 at 1508-1513) (describing Bred Heifer Pilot Program); Ex. 2, Kozak Dep. 166:20-167:24.

[56] Ex. 44 (NMPF0013958, 13958).

[57] Ex. 2, Kozak Dep. 48:6-17.

[58] Ex. 12, Gallagher Dep. 64:7-13; Ex. 45 (D00023547-557, Gallagher Dep. Ex. 8). In 2007, Mr. Gallagher analyzed an independent "Cornell study" that econometrically modeled the supply and price impact of a potential government sponsored version of the CWT program; he concluded both programs would successfully reduce supply and raise prices but recommended continuing with the successful private CWT approach instead of lobbying the federal government for a similar program. Ex. 12, Gallagher Dep. 50:23-51:4, 62:7-12, 68:19-22.

nearly two years history behind us, we can say without equivocation that CWT is having a positive impact on the lives of all dairy farmers in this country."[59] Also in 2005, CWT reported that since it "started operations in July 2003, farm-level milk prices have been consistently above historic averages."[60]

In 2006, CWT stated that an "independent economic analysis of the impact of [CWT] has found that the historic dairy self-help program has raised farmers' prices by at least 40 cents per hundredweight since it began operations in 2003;"[61] the "analysis was performed by Dr. Scott Brown of the University of Missouri, a nationally known farm policy expert who is often called on by the U.S. Congress to assess agricultural economic issues."[62] According to Dr. Brown, "the evidence is clear that this program has raised the price that all farmers have received since it first began removing cows at the end of 2003" with a "cumulative impact of . . . $1.97 billion in additional producer revenue."[63] Mr. Kozak testified that it was "important for us to continue some type of independent look at the program," so it decided to "retain Dr. Brown to periodically assess the effectiveness of the CWT program."[64] Dr. Brown performed analyses regarding the impact of the conspiracy on milk prices in 2007,[65] 2008,[66] 2009,[67] and

---

[59] Ex. 46 (NMPF0005094); Ex. 47 (NMPF0005389) ("CWT is a national program"); Ex. 44 (NMPF00013958).

[60] Ex. 48 (NMPF0005086-87).

[61] Ex. 49 (NMPF0021359-60).

[62] Id.; see also Ex. 50 (NMPF0013489) (referring to "Dr. Scott Brown of the University of Missouri and the Food & Agricultural Policy Research Institute (FAPRI)"); Ex. 51 (LOL00000340) (explaining that Dr. Brown employed the "modeling method used by FAPRI for federal government").

[63] Ex. 49 (NMPF0021359-60).

[64] Ex. 2, Kozak Dep. 59:20-60:4.

[65] Ex. 52 (NMPF0003614-15).

[66] Ex. 53 (NMPF0005737) ("When you separate out all the other factors affecting milk production, the fact remains that CWT has boosted the milk check of each farmer by 71 cents per hundredweight this year."); Ex. 54 (NMPF 00013452-463, 13461) (summarizing the "CWT Herd Retirement Impact" on milk prices from 2003 through 2008).

[67] Ex. 55 (NMPF0004232); see also Ex. 56 (DFA2013-00025855-56) (milk prices in 2009 "would have averaged $1.66 less had the CWT program not been in business – actively removing cows and, thus, reducing milk

2010.[68]

Dr. Brown's 2008 report, entitled "The Impact of the CWT Program on the U.S. Dairy Industry,"[69] depicts the reduction in cows and milk as a result of the program, with bar charts:




Dr. Brown's 2010 report, entitled "The Economic Effects of the CWT Program,"[70] also graphically depicts the reduction in cows and milk as a result of the program:



at his m

s occu                         ding the operation of

the CWT program."[71]  For example, "[s]ome of those cows would have been culled away, of

---

production in a timely manner").

[68] Ex. 57 (BROWN_MU0000391).

[69] Ex. 54 at NMPF00013455-56. While these graphs also include the effects of the less significant export program, Dr. Brown's modeling also separated out the effects of the premature herd slaughter and export programs. *See, e.g.,* Ex. 54 at NMPF00013461.

[70] Ex. 57 (BROWN-MU_0000391 at -392); Ex.58, Deposition of Scott Brown, Nov. 7, 2014, 22:24-23:5, 24:17-25:12, 26:13-24).

[71] Ex. 57, BROWN-MU_0000392).

course, and I recognize that in my analysis, just as I recognize the supply response from higher prices." [72]  In total, Dr. Brown determined that CWT's premature herd slaughters reduced the nation's milk supply by billions of pounds over the course of the conspiracy.[73]

Defendants adopted Dr. Brown's findings to support their members' continuing investment in the program. NMPF's corporate representative agreed that "when making presentations as to the effectiveness of the CWT program to milk producers, National Milk employees would rely on presentations prepared by Dr. Brown."[74] Likewise, DFA's corporate representative agreed that it "made representations over the years between 2003 and 2009 . . . to DFA's membership that the CWT program had successfully raised the all milk price for producers by reducing the supply of milk."[75] And DFA testified that it would have relied on Dr. Brown's analysis, "so from DFA's perspective, yes, there would have been even more milk produced without CWT."[76] Similarly, LOL's corporate representative testified: "I trusted Scott Brown, who is a member of the Food Ag Policy Research Institute and had been performing this analysis for a number of years by the time I started using the data. So I trusted that. And I know him well, he's a well-documented analyst of the industry. So I looked at his documents as the piece that I used in explaining it to our membership."[77] Lastly, Agri-Mark's corporate representative testified that the "only study that we know, that we looked at was the study done by Dr. Brown," and "[w]e would say to our members, this is what the Dr. Brown study said."[78]

---

[72] Ex. 59, BROWN-MU_0000073-74.
[73] Ex. 60, NMPF0002599-2648, at 2617.
[74] Ex. 2, Kozak Dep. 90:15-19.
[75] Ex. 1, Wilson Dep. 48:10-49:3.
[76] *Id*. at 60:22-61:5.
[77] Ex. 11, Wegner Dep. 48:16-49:8.
[78] Ex. 61, Deposition of Richard Stammer, January 30, 2015, 41:6-13, 20-21; and at 42:3-10 ("Our members who were funding the CWT Program, which included both the Herd Reduction and Export Assistance, obviously came

In short, the record is replete with Defendants' admissions that they agreed to create and implement a horizonal restraint on milk supply (output), with the express intended purpose and actual effect of reducing the nation's supply of milk and increasing its price. Thus, there is no finding for a jury but that Defendants engaged in horizonal production restraints and, as documented by their own real-time economist Dr. Brown, they succeeded.

### C.   Defendants' Output Restraint Violates Section 1 of the Sherman Act.

According to Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce … is declared to be illegal."[79] To establish a violation of Section 1, a plaintiff must show: (1) a conspiracy to reduce output in violation of the antitrust laws; (2) an antitrust injury – *i.e.*, the impact of the defendants' unlawful activity; and (3) damages caused by the antitrust violations.[80] Plaintiffs' motion focuses on the first element.

If a plaintiff can demonstrate a conspiracy directly through admissions by the defendant competitors that they agreed to reduce output; that is all the proof a plaintiff needs.[81]  A conspiracy to engage in a horizontal output restraint is a *per se* violation of Section 1. *Levine*, *supra*, 72 F.3d at 1545-46.[82] As the Supreme Court has explained, certain categories of

---

to us and said, do you think – what's happening, is our money having any impact? And so in communicating to our members, we would – we communicated to them what Dr. Brown, what his study showed."). *See also* Ex. 43, BROWN_MU_001487 at 1501) (showing positive producer return for money invested in Herd Retirement Program); Ex. 62, BROWN_MU_0000574 at 574-587) (same); Ex. 63, DFA2013-00000827, 832, 861) (same).

[79] 15 U.S.C. § 1.

[80] *In re Cathode Ray* Tube *(CRT) Antitrust Litig.,* 2013 WL 5391159, at *3 (N.D. Cal. Sept. 24, 2013).

[81] *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 654 (7th Cir. 2002).

[82] *See, e.g.*, *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) (horizontal price-fixing agreements are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"); *Leegin Creative Leather Prods. Inc. v. PSKS Inc.,* 551 U.S. 877, 886 (2007) ("Restraints that are per se unlawful include horizontal agreements among competitors to fix prices.").

agreements have been held to be *per se* illegal, because they "would always or almost always tend to restrict competition and decrease output."[83] Restraints on output or supply fall into this category. In its seminal decision in *Socony*, the Supreme Court held that a *per se* analysis applied when chronic oversupply of oil led to an agreement where the "only aim and result" was to raise prices.[84] Since that decision, the Supreme Court has repeatedly held that "output limitation[s] are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high."[85] Indeed, the Court emphasized that "[r]estrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."[86]

The Ninth Circuit recently reiterated that the Supreme Court's "directive … is unequivocal: A horizontal cartel among compet[itors] that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful."[87] In addition, the Eleventh Circuit has long recognized that "certain kinds of agreement are unreasonable per se, such as agreements among direct competitors to … restrict output." *Levine*, 72 F.3d at 1545-46. That is exactly what we have here: CWT and its HRP was formed by horizontal competitors – the Defendant cooperatives and their members[88] – to implement an agreement with the

---

[83] *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-90(1985). The Court will not permit "the age-old cry of ruinous competition" to be "interposed as a defense." *United States v. Socony-Vacuum Oil Co. Inc.*, 310 U.S. 150, 218, 221(1940).

[84] 310 U.S. at 213. *See also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) ("'[A] combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate … commerce is illegal *per se*.'") (quoting *Socony-Vacuum*, 310 U.S. at 223).

[85] *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85(1984).

[86] *Id.* at 107-08.

[87] *Hui Hsiung*, 778 F.3d at 749 (scheme to raise price of LCD panels was subject to per se analysis under the Sherman Act); *see also Perez*, 2011 WL 7318754, at *5 ("the Sherman Act makes a conspiracy among competitors to restrict output unlawful *per se* without regard to any of its effects").

[88] DFA's corporate representative testified: "if we learn of someone else pricing milk to their competitor at a

express intended purpose to reduce the supply of raw milk and thereby raise milk prices. Furthermore, Defendants admitted that dairy producers paid their competitors (other dairy producers) to kill dairy cows prematurely.[89] And this agreed upon restraint between competitors increased milk prices based on fundamental laws of supply and demand.[90] Such horizontal output restraints are *per se* unlawful.

## II.   THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR ON THE ISSUE OF CAPPER-VOLSTEAD IMMUNITY.

Defendants cannot dispute that they engaged in a horizontal agreement to prematurely slaughter entire dairy herds with the express intended purpose to reduce the supply of milk and increase milk prices.  Instead, they contend that their conduct is immune from antitrust liability under the Capper-Volstead Act of 1922.[91] The Act provides limited immunity from antitrust liability by permitting "[p]ersons engaged in the production of agricultural products as farmers, … [and] dairymen" to "act together in associations … in collectively processing, preparing for market, handling, and marketing … such products."[92] Capper-Volstead immunity is an affirmative defense on which Defendants have the burden,[93] and is limited.

---

lower price than what we're charging them, then we're going to match it"). Ex. 1, Wilson Dep. 124:22-24.
[89] Ex. 12, Gallagher Dep. 77:2-6.
[90] *See, e.g.*, Ex. 64, D00027114-120, Gallagher Dep. Ex. 6.
[91] *See also* Ex. 65, NMPF0017425-NMPF0017426; Ex. 66, NMPF0026178 ("CWT is only possible as a result of the limited exemption from federal antitrust laws" found in the Capper-Volstead Act); Ex. 67, LOL00002406 ("CWT will not need government approval or oversight because Capper-Volstead laws allow farmers to work together on marketing issues."); Ex. 68, D00003771.
[92] 7 U.S.C. § 291.
[93] *See Southeast Milk Antitrust Litig.*, 2008 U.S. Dist. LEXIS 44541, at *13 (E.D. Tenn. 2008); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1184 (8th Cir. 1982) (holding that "[t]he exemption is an affirmative defense"); *see also Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1039 (2d Cir.1980); *In re Fresh & Process Potatoes Antitrust Litig.* ("*Potatoes Antitrust Litig.*"), 834 F. Supp. 2d 1141, 1154 n. 8 (D. Idaho 2011); *N. Cal. Supermarkets, Inc. v. Cent. Cal. Lettuce Producers Co-op.*, 413 F. Supp. 984, 987 (N.D. Cal. 1976), *aff'd per curiam*, 590 F.2nd 369 (9th Cir. 1978).

The cooperative's activity must be explicitly recognized within the list of activities immunized by the Act.[94] As stated in *Sunkist Growers*, the "language of the Capper-Volstead Act is specific in permitting concerted efforts by farmers in the processing, preparing for market, and marketing of their products."[95] In *Nat'l Broiler Mktg. Ass'n v. United States*, the Supreme Court stated a qualifying association "could perform certain functions in preparing produce for market" without antitrust consequences.[96] More recently, in *In re Southeast Milk Antitrust Litig.*, the court stated that "to qualify for Capper-Volstead immunity, a cooperative must . . . be involved in the 'processing, preparing for market, handling, or marketing' of the agricultural products of its members."[97]  Thus, the central issue is whether the Defendants' horizontal agreement to prematurely kill more than 500,000 dairy cows, by slaughtering entire dairy herds under the Herd Retirement Program, to eliminate the cows (and their offspring) from ever producing milk, is an activity specifically exempted by the Act. As set forth below, the Defendants' horizontal agreement is not immune under the language of the Act.

### A.    The plain language of Capper-Volstead does not provide immunity for Defendants' horizontal agreement to restrict supply.

The list of permissible activities exempt from antitrust scrutiny under Capper-Volstead does not include "production." Thus, Defendants have no affirmative defense to their horizontal agreement to kill half a million cows to reduce supply. In any instance of statutory construction, the Court should start with the plain language and meaning of the words used.[98]

---

[94] 7 U.S.C. § 291.
[95] 370 U.S. at 28.
[96] 436 U.S. 816, 824-825 (1978).
[97] 2008 U.S. Dist. LEXIS 44541, at *13; *see also Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc*., 914 F. Supp. 814, 823 (N.D.N.Y 1996).
[98] *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994). *See also Group Life & Health Ins. Co. v. Royal Drug Co*., 440 U.S. 205, 231 (1979) ("exemptions from the antitrust laws are to be narrowly construed.").

Here, the key language – "processing, preparing for market, handling, and marketing" – omits producing. In contrast to "producing," each term included in the Act clearly focuses on post-production conduct relating to bringing the commodity to market.

"The doctrine of *expressio unius est exclusio alterius* 'as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.'"[99] Congress easily could have included the word "producing," in the list of permissible activities if it wanted to do so. For example, the Fishermen's Collective Marketing Act permits collective "catching, producing, preparing for market, processing, handling, and marketing."[100] But Congress chose not to include the production stage in Capper-Volstead.

Further, the list of practices identified in *Treasure Valley* as constituting "marketing" (the last activity in the list) all involve "transferring title and in moving goods from producer to consumer."[101]  In other words, "marketing" involves only *post*-production activities. That "marketing" does not include production restrictions is required by the principle of *noscitur a sociis*, *i.e.*, "a word is known by the company it keeps," which directs that a word in a list be interpreted consistently with the other words in that list "in order to avoid the giving of unintended breadth to the Acts of Congress."[102] Because here the other words in the list include only activities occurring post-production, the meaning of "marketing" cannot be expanded to

---

[99] *Silvers v. Sony Pictures Entm't, Inc*., 402 F.3d 881, 885 (9th Cir. 2005) (quoting *Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991)).
[100] 15 U.S.C. § 521; *see also In the Matter of Washington Crab Ass'n*, 66 F.T.C. 45 (1964) (construing same).
[101] *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 215 (9th Cir. 1974).
[102] *Jarecki v. G. D. Searle & Co*., 367 U.S. 303, 307 (1961).

cover production restraint.[103]

Finally, in *Potatoes Antitrust Litigation*,[104] the court held that the "language of the Capper-Volstead Act itself indicates that it does not apply to production limitations," because the explicitly permitted activities are those "done to an agricultural product after it has been planted" such that "under the plain language of the statute, coordinating and reducing acreage for planting is not allowed."[105] Similarly, Defendants' horizontal agreement to prematurely slaughter dairy cows to reduce or restrain the supply of raw milk is not allowed. In holding that "there was no finding that the cooperative controlled pre-production agricultural output" in *Holly Sugar Corp. v. Goshen Cnty. Coop. Beet Growers Ass'n*,[106] the court in *Potatoes Antitrust Litigation* concluded that "there are no cases where a court specifically approved, under the Capper-Volstead Act, a pre-production agricultural output limitation." 834 F. Supp. 2d at 1156. Finally, Dairylea's CEO admitted that cooperatives are subject to antitrust liability if they "[r]estrict members agricultural output." (Ex. 69, D00043685).

### B. According to Capper-Volstead's legislative history, Congress did not intend to immunize supply restraints.

The Supreme Court has stated that "we do not resort to legislative history to cloud a statutory text that is clear."[107] However, even if one resorted to legislative history here, in *California Lettuce*,[108] -- the one decision to examine that history, the Federal Trade

---

[103] Likewise, if there were a general catchall phrase for other activity (there is not), the canon of *ejusdem generis* would require that the activity be of a similar nature. *Estate of Covington*, 450 F.3d 917, 922 (9th Cir. 2006) (citing *Circuit City Stores v. Adams*, 532 U.S. 105, 114-15 (2001)).

[104] 834 F. Supp. 2d 1141 (D. Idaho 2011).

[105] *Id.* at 1154-55 (concluding that production restrictions are not activities protected by Capper-Volstead).

[106] 725 F.2d 564 (10th Cir. 1984).

[107] *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994).

[108] *In the Matter of Cent. Cal. Lettuce Producers Coop.*, No. 8970, 1977 WL 188550 (1977).

Commission examined the issue of production restraints, and noted "strong indications" that:

> Congress did *not* intend to allow production limits under the statute:
>
> Congress' attitude toward production controls provides an additional indication that it did not regard the corporation as the model around which the Capper-Volstead exemption would be built.  Beyond doubt, a single corporation can restrict its output, if it chooses, without incurring antitrust liability. ***Nevertheless, there are strong indications that Congress did not intend to allow farmers to use cooperatives as a vehicle by which they could effectively agree to limit production.***[109]

The FTC relied on various statements in the record, including one by Senator Capper, the Act's co-sponsor, who never intended the Act to be used by agricultural cooperatives to collectively reduce supply. Here, the very purpose and execution of Defendants' horizontal agreement was to interfere with the market by artificially balancing supply with demand – that is, restrain "overproduction" of milk to bring it closer to demand in order to increase prices.[110]

That Capper-Volstead permits cooperatives to collectively negotiate prices does not mean it also permits them to restrict production as a means to a permitted end.[111] As stated by Chief U.S. District Court Judge Winmill, "[t]his argument is unpersuasive. The reason an agricultural cooperative can fix the price at which their good is sold is because if the price rises, farmers will produce more and consumers will not be overcharged. Individual freedom to produce more in times of high prices is a quintessential safeguard against Capper-Volstead abuse, which Congress recognized in enacting the statute."[112] If a cooperative is allowed to limit production among its own members, it can "shut[] off the safety valve against private

---

[109] *Id.* at *62 n.20 (emphasis added).

[110] *See, e.g.,* Ex. 3, NMPF0000006.

[111] In addition, reliance on section 292 is unavailing because it involves the Secretary of Agriculture's ability to enjoin undue price enhancement based on activity that is immune under section 291.

[112] *Potatoes Antitrust Litig.*, 834 F. Supp. 2d at 1156 (citing *California Lettuce*, 1977 WL 188550, at *62 n.20).

abuse that ameliorates the adverse consumer impact of the Capper-Volstead exemption."[113] Of course here, this is exactly what Defendants' horizontal agreement to restrict output (supply) was meant to address and limit – farmers increasing production when prices increased.

### C.   Federal agencies have stated that production limitations are not exempt from antitrust liability under Capper-Volstead.

The interpretations of the United States Department of Justice's Antitrust Division ("DOJ") and the FTC, the prime agencies responsible for enforcing the nation's antitrust laws, are entitled to deference in construing Capper-Volstead.[114] "To the degree there is ambiguity in the statute on this issue, agencies with jurisdiction over the statute are typically entitled to *Chevron* deference, and their decisions would be persuasive."[115] The United States Department of Agriculture ("USDA") has also rejected the view that production restrictions are immune under Capper-Volstead.

In lawsuits and consent decrees, the DOJ has challenged collusive limits on production by agricultural cooperatives.[116]   In Business Review Letters, the DOJ has stated that "the

---

[113] *Id.* (alteration in original). Moreover, Capper-Volstead supporters emphasized that it would lead to an *increase*, not a decrease in production. *See*, *e.g.*, 62 Cong. Rec. 2058 (1922) (statement of Sen. Capper) ("[F]armers can do something to cut down the spread between the prices they now receive and those paid by consumers. Even though the farmers should keep all of this saving it will stimulate production, thus insuring more adequate supply of necessities."), Ex. 70; 59 Cong. Rec. 8028 (1920) (statement of Rep. Larson) ("[Cooperatives] will increase production and solve the food problem for our too rapidly increasing city population"), Ex. 71.

[114] *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 982 (2005).

[115] *Potatoes Antitrust Litig.*, 834 F. Supp. 2d at 1155 n.9.

[116] *See*, *e.g.*, *United States v. E. Mushroom Mktg. Coop., Inc*., 2005 WL 3412413 (E.D. Pa. 2005) (consent decree forbidding deed or lease restrictions that prevented land from being used for mushroom farming); *United States v. Nat'l Bd. of Fur Farm Orgs., Inc.*, 1977 WL 1430 (E.D. Wis. 1977) (consent decree barring production quotas and import restrictions on mink pelts sold in U.S.); *United States v. Shade Tobacco Growers Agric. Ass'n*, 1954 Trade Cas. (CCH) ¶¶ 67,751 (D. Conn. 1954) (consent decree barring tobacco-growers cooperative and its members from agreeing to limit the tobacco production); *United States v. Grower-Shipper Vegetable Ass'n of Cent. Cal.*, No. 30561 (N.D. Cal. 1951), *aff'd per curiam*, 344 U.S. 901 (1952) (suit challenging agreement among members of lettuce-growers' association to restrict amount of lettuce produced dismissed as moot after government won preliminary injunction and defeated motion to dismiss on Capper-Volstead grounds).

Capper-Volstead antitrust exemption applies only to marketing *and not production agreements*."[117] In its report to the task group on antitrust immunities, the DOJ explained that there is "evidence that Congress was concerned about the right or ability of cooperatives to restrict the supply of agricultural commodities,"[118] and "[i]t is not surprising that *Congress did not specifically grant the cooperatives the power to restrict supply*."[119] The DOJ concluded, "it would not be the act of a rational legislature to give the cooperatives the power to deal with overproduction, a factor which had been demonstrated was not a cause of the crisis it was addressing."[120] The issue at the time was the bargaining disparity between individual small farmers and large corporate buyers of agricultural products. The Act was intended to improve that disparity – not to permit joint production manipulation by farmer/producers.

This is consistent with *California Lettuce*, where the FTC stated, "there are strong indications that Congress did not intend to allow farmers to use cooperatives as a vehicle by which they could effectively agree to limit production."[121] The FTC rejected the argument that a cooperative setting prices was the same as permitting it to engage in "output restrictions."  In fact, the FTC determined that "[a] *different* issue would be presented if it were alleged and proven that a cooperative had sought to limit production even among its own members, thus shutting off the safety valve against private abuse that ameliorates the adverse consumer impact of the Capper-Volstead exemption."[122]

---

[117] Ex. 72, DOJ Bus. Review Letter from Edwin Zimmerman, Ass't U.S. Att'y Gen., to Ray Obrecht, Master, Colo. Grange (Oct. 2, 1968) (emphasis added).
[118] Ex. 73, Milk Marketing Report of DOJ to the Task Group on Antitrust Immunities at 68-69 (1977).
[119] *Id*. (emphasis added).
[120] *Id.*
[121] 1977 WL 188550, at *62 n.20.
[122] *Id.* (emphasis added).

Finally, USDA has stated that production controls are not entitled to Capper Volstead immunity. USDA stated "*it is not legal for cooperatives to control members' production*.  The basic role of cooperatives is to market the available supply in the most effective manner possible, not to limit production."[123]  According to USDA guidelines, "restrict[ing] [cooperative] members' agricultural output" would expose cooperatives to antitrust liability.[124]  Finally, *Potatoes Antitrust Litigation* concluded that "[f]ederal agencies have also recognized that production limitations are not permitted under Capper-Volstead."[125]  In short, Capper-Volstead does not provide immunity for Defendants' horizontal production restraints.

### D.    Defendants Are Large Vertically-Integrated Agribusinesses and Therefore Not Entitled to Capper-Volstead Immunity.

Defendants are large vertically-integrated agribusinesses and are not entitled to Capper-Volstead immunity.  Both DFA and LOL have annual revenues in excess of $13 billion.[126]  In addition, DFA has 42 plants, making branded dairy products like Borden cheese and Kemp's ice cream sold to consumers.[127]  Of course, LOL makes Land O'Lakes butter, the dominant national brand of butter, and Alpine Lace cheese.[128]

Justice Brennan questioned granting Capper-Volstead immunity to large vertically-integrated agribusinesses because they were not the focus of such immunity, observing that

---

[123] Ex. 74, USDA, Rural Bus.-Coop. Serv. Report 1, Section 3 "Cooperative Benefits & Limitations" at 17 (1980, reprinted 1990) (emphasis added).

[124] Ex. 75, USDA, "Understanding Capper-Volstead" at 3-4 (1985, reprinted 1995).

[125] 834 F. Supp. 2d at 1155 n.9.

[126] Ex. 76, Dairy Farmers of America, "DFA Reports Record Profits" http://www.dfamilk.com/newsroom/press-releases/dfa-reports-record-profits (last visited on Aug. 18, 2018);
Ex. 77, Land O'Lakes, "Land O'Lakes, Inc. Announces Record Results for 2017" available at https://www.landolakesinc.com/Press/News/2017-earnings-release (last visited on Aug. 18, 2018)

[127] Ex. 78, Dairy Farmers of America, "Dairy Farms & Dairy Farmers | Markets," http://www.dfamilk.com/our-cooperative/markets (last visited Aug. 18, 2018).

[128] Ex. 79, Land O'Lakes homepage, "Butter is Everything," https://www.landolakes.com/ (last visited Aug. 18, 2018).

agribusiness had evolved to such a point that immunity could not be applied automatically to

every agricultural business, even a cooperative:

> If, because of changes in agriculture not envisioned in 1922, Congress' purpose no
> longer can be achieved, there would be no warrant for judicially extending the
> exemption, even if otherwise it would fall into desuetude.  In construing a specific,
> narrow exemption to a statute articulating a comprehensive national policy, we must,
> of course, give full effect to the specific purpose for which the exemption was
> established.  But when that purpose has been frustrated by changed circumstances, the
> courts should not undertake to rebalance the conflicting interests in order to give it
> continuing effect.

*Nat'l Broiler*, 436 U.S. at 836.  Justice Brennan laid out a test to determine whether a vertically

integrated agribusiness would invalidate the Capper-Volstead exemption.  Looking at the Act's

history and purpose, Justice Brennan concluded:

> [The] definition of "farmer" cannot be rendered without reference to Congress' purpose
> in enacting the Capper-Volstead Act.  'When technological change has rendered its
> literal terms ambiguous, the…Act must be construed in light of [its] basic purpose.' …
> At some point along the path of downstream integration, the function of the exemption
> for its intended purpose is lost, and I seriously doubt that a person engaged in
> agricultural production beyond that point can be considered 'farmers' under the Act.
> The statute itself may provide the functional definition of farmer as persons engaged in
> agriculture who are insufficiently integrated to perform their own processing and who
> therefore can benefit from the exemption for cooperative handling, processing and
> marketing.
>
> Thus, in my view, the nature of the association's activities, the degree of integration of
> its members, and the functions historically performed by farmers in the industry are
> relevant considerations in deciding whether an association is exempt."

*Nat'l Broiler*, 436 U.S. at 835-36 (citation omitted).  It cannot be seriously disputed that LOL

is a consumer dairy products company, rather than a cooperative in the sense of what that term

meant when Capper-Volstead was enacted in 1922.  Consumers cannot imagine not finding

Land O' Lakes butter in grocery stores, which begs the question of whether the consumer

brands portion of LOL is determining its direction – which it would be hard to imagine it is

not, when it has one of the most iconic dairy brands.  Thus, if LOL is allowed to have its dairy

farmer members agree on the price of raw milk, and is allowed to agree on the price of raw milk with other large vertically-integrated cooperatives, who ultimately pays for those higher prices?  The consumers who purchase Land O' Lakes butter.  If that is true, then the Capper-Volstead Act and the immunity that it grants has definitely been perverted by the growth of cooperatives into large vertically-integrated agribusinesses.

### E.   Non-Farmer Participants in the Herd Retirement Program Doom Capper-Volstead Immunity.

The participation of a single non-farmer prevents Capper-Volstead immunity applied a cooperative.[129]   Joe Wright, SMI's President, identified several entities, including Hilmar Cheese, that participated in the HRP by collecting and paying the assessment necessary to fund the HRP's dairy herd slaughters and that were not dairy farmers, but rather were producers of cheese and other products, and definitely not cooperatives.[130]   NMPF documents show other non-producer members, such as Swiss Valley Farms and Valley Queen Cheese, a specialty cheese manufacturer and "cheese makers," respectively.[131] The participation of these non-

---

[129] Organizations with non-farmer interests are not entitled Capper-Volstead's immunity. *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 396 (1967); *Nat'l Broiler*, 436 U.S at 828-29. *National Broiler* held that a cooperative's producer and marketer members, who neither owned their own breeder flocks nor maintained facilities at which their flocks were raised, were not producers for purposes of Capper-Volstead, and the cooperative was not entitled to immunity. *Nat'l Broiler*, 436 U.S. at 828-29. Lower courts have consistently held that a single non-producer member renders the cooperative ineligible under Capper-Volstead. *See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1186 (8th Cir. 1982) ("The 'not even one' language in *National Broiler* cannot be divorced from that Court's emphasis on the economic role of such middlemen and on the intent of Congress not to permit such middlemen to participate in price-fixing."); *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 283 (E.D. Pa. 2009) ("The Supreme Court held that even one non-farmer member in a cooperative disqualifies a cooperative from claiming the Capper-Volstead exemption."); *In re Processed Egg Products Antitrust Litigation*, slip op., pp. 7-8 (E.D. Pa. Sept. 13, 2016)(granting summary judgment to plaintiffs on Capper-Volstead immunity where one member was a processor, not a farmer)(attached as Exhibit 80).

[130] Ex. 34, Wright Dep. 64:17-19 (Hilmar Cheese is a not a cooperative, but a proprietary member of CWT); Ex. 81 (NMPF0001625, Wright Dep. Exhibit 7) and Ex. 82 (NMPF001635) (Valley Queen).

[131] Ex. 83 (NMPF00008663), Ex. 84 (NMPF00013597), Ex. 81 (NMPF0001625); Ex. 85, Swiss Valley Farms, "About Us," www.swissvalley.com/about/ (last visited Aug. 18, 2018); Ex. 86 Valley Queen Cheese Factory, "About Us," www.vqcheese.com/about (last visited Aug. 18, 2018).

farmers/non-cooperatives makes Capper Volstead immunity unavailable to CWT and its HRP.

**F.     DFA's Domination of the NMPF and CWT Vitiates Any Capper Volstead Immunity.**

Capper-Volstead immunity requires that every member of a cooperative is entitled to one equal vote. *In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382, 390 fn. 12 (E.D. Pa. 2014)("The Act additionally requires that each member of the cooperative is allowed one vote"). This is referred to as the "one member, one vote" rule.  However, in the case of CWT, which was run by NMPF, DFA "dominated" the NMPF, according to Joe Wright, SMI's President. Ex. 35, Deposition of Joseph Wright, Dec. 13, 2017, 190:14-191:6. For this additional reason, Capper Volstead immunity is not available to the CWT or its Herd Retirement Program.

**III.   CONCLUSION**

For the foregoing reasons, Plaintiff requests that the Court grant their motion for partial summary judgment that (1) Defendants conspired to reduce the supply of raw milk and increase its price, and the price of processed milk and other dairy products, in violation of Section 1 of the Sherman Act, and (2) Defendants' conduct is not entitled to Capper-Volstead immunity.

Respectfully submitted May 1, 2019

/s/ Jeffrey S. York
H. Timothy Gillis
Florida Bar No. 133876
Jeffrey S. York
Florida Bar No. 987069
Shutts & Bowen LLP
1022 Park Street, Suite 308
Jacksonville, FL 32204
Phone: (904) 899-9926
Fax: (904) 899-9965
tgillis@shutts.com
jyork@shutts.com

Patrick J. Ahern, Trial Counsel
Theodore Bell
Ahern and Associates, P.C.
8 South Michigan Avenue
Suite 3600
Chicago, IL 60603
(312) 404-3760
patrick.ahern@ahernandassociatespc.com
(*Admitted Pro Hac Vice*)

*Attorneys for Plaintiff Winn-Dixie*
*Stores, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 1, 2019, I electronically filed the foregoing with the Clerk of Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Cases of this Court by using the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Jeffrey S. York
Attorney