**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WINN-DIXIE STORES, INC.,

                Plaintiff,

    v.

SOUTHEAST MILK, INC., *et al.*,

                Defendants.

Case No. 3:15-cv-01143-J-39-BJD-PDB

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE**
**OR LIMIT THE OPINIONS OF DEFENDANTS' EXPERTS (DOC. 263)**
<u>**WITH INCORPORATED MEMORANDUM OF LAW**</u>

In an attempt to meet its burden of proving liability and quantifying damages, Plaintiff Winn-Dixie Stores, Inc. ("Winn-Dixie") relies on Dr. John Connor for expert opinion on the effect of the Herd Retirement Program ("HRP") on certain prices that are relevant to whether Winn-Dixie suffered antitrust injury and damages. Defendants offer opinions from Dr. Bryan Ricchetti and Dr. Andrew Novaković to rebut Dr. Connor's assertion that Winn-Dixie was injured by the HRP and that his calculations of its damages were reliable. To demonstrate the unreliability of Dr. Connor's opinions, Defendants' experts highlighted fundamental flaws with Dr. Connor's analysis that do not require elaborate and complex models to substantiate. With professional and scientific insights from Defendants' experts, the problems with Dr. Connor's analysis become glaringly obvious.

Winn-Dixie seeks to exclude these unfavorable opinions by improperly shifting the burden of proof onto Defendants' experts. Defendants, however, are not required to offer competing models showing that injury did not occur or that damages were zero; it is enough for a defendant's experts to show why a plaintiff's proof is insufficient. Defendants' experts' critiques are well-grounded in facts, data, and scientific reasoning and are admissible under *Daubert*.

On a single issue, the existence of the HRP's procompetitive effects, Defendants bear the burden of proof. Defendants' experts apply economic expertise and reasoning to Winn-Dixie's allegations to analyze the HRP's procompetitive aspects, including pointing to relevant facts demonstrating that such effects were likely to have occurred had the challenged HRP been successful. Winn-Dixie fails to show that Defendants' expert testimony is deficient in any way that is meaningful for a *Daubert* analysis. Winn-Dixie's critiques on this point go to the weight, not the admissibility, of Defendants' expert opinions. Winn-Dixie's motion should be denied.

**STATEMENT OF LAW**

The only requirements for the admissibility of expert testimony are that

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Simmons v. Fla. Dep't of Corr.*, No. 5:14-cv-438-Oc-39PRL, 2016 WL 71116000, at *3 (M.D. Fla. Apr. 20, 2016) (Davis, J.) (quoting *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)); *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993).

For purposes of this opposition, the function to be played by the expert is critical: where a party does not bear the burden of proof, its expert is not required to produce his own model or methodology to survive a *Daubert* challenge. *Brantley v. Int'l Paper Co.*, Civ. 2:09-230-DCR, 2017 WL 2292767, at *18 (M.D. Ala. May 24, 2017) ("Contrary to the plaintiffs' argument, the defendant's experts are not required to 'produce models or methods of their own,' in rebutting the plaintiffs' expert opinions; however they must satisfy *Daubert*'s standards.") (citation omitted). A rebuttal expert's opinions may be limited to criticizing the analysis and conclusions presented by another party. *See,* e.g.*, In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1368 (N.D. Fla. 2018) ("[D]efendant's experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiff's experts.") (citation omitted); *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 7507848, at *13 (S.D. Fla. Aug. 1, 2016) ("Where defendant seeks to introduce evidence merely to cast doubt on the plaintiff's theory of causation, the expert need not definitively rule out plaintiff's theory for his testimony to be admitted.") (citation omitted).

"An expert's testimony may by supported by documentary evidence, such as peer-reviewed articles or scientific studies or testing, where the expert conducted no studies or testing on his or her own." *Simmons*, 2016 WL 71116000, at *4. Nothing in Fed. R. Evid. 702 "is

2

intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training, or education – may not provide a sufficient foundation for expert testimony." *Id.* at *4 (quoting 2000 amendments to Rule 702 advisory committee notes).

The Eleventh Circuit has explained that:

> An expert's qualifications and the reliability of his testimony do not always separate into a clear dichotomy, and, in fact, are often blurred in the case of experience-based expert testimony. Where the relevant reliability concerns may focus upon personal knowledge or experience, inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion frequently overlap to a significant degree.

*Frazier*, 387 F.3d at 1296 (internal quotations and citations omitted).  Moreover, "'[the] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury.'" *U.S. v. Williams*, 865 F.3d 1328, 1340 (11th Cir. 2017) (citation omitted). "'Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*.  "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (citation omitted).

## ARGUMENT

## I.   DR. RICCHETTI'S OPINIONS ARE ADMISSIBLE UNDER *DAUBERT*

Winn-Dixie does not, because it cannot, attack Dr. Ricchetti's qualifications as an economic expert.  He has a Ph.D. in Economics from Cornell University and is Vice President and Co-Head of Cornerstone Research's Antitrust Practice, where he has worked on matters involving antitrust and competition economics for over a decade.  He has also consulted on multiple matters assessing competition in the dairy industry, including those involving pricing

3

dynamics and raw milk production. *See* Rep. of Defs.' Expert, Dr. Bryan M. Ricchetti, dated

Feb. 20, 2018 (Doc. 263-11), at 3 (hereinafter "Ricchetti Rep."). Dr. Ricchetti applies his

training to evaluate the reliability of Dr. Connor's analyses of Winn-Dixie's injury and damages

in this case. *See id.* at 4-6. He opines that Dr. Connor's opinions are not reliable for several

fundamental reasons, including: 1) they do not establish that raw milk supplies were affected by

the challenged conduct, 2) Dr. Connor does not study the correct data to evaluate Winn-Dixie's

purchases of cheese and butter, 3) Dr. Connor does not separate the effects of legal from

allegedly illegal conduct on the prices that Winn-Dixie paid for fluid milk and fresh dairy

products, and 4) Dr. Connor does not study the rate at which raw milk OOPs are passed through

in the processed product prices that Winn-Dixie paid. *Id.* at 7-20.

To demonstrate the unreliability of Dr. Connor's model, Dr. Ricchetti presented

numerous analyses of data on raw milk supplies, on OOPs for raw milk, and on prices for

finished products. *See, e.g.*, *id.* at 42-46, 48, 52, 61-62, 67-70, 72-73,75-78, 82. These analyses

ranged from simple examples of the inconsistency of Dr. Connor's results with available data to

more complex adjustments to Dr. Connor's regression model that demonstrated the effect of

reasonable and well-founded changes on its results. *See, e.g., id.* at 44 (showing rise in milk

production combined with fall in cow numbers); *id.* at 70 (results of multiple regression model).

Each of these analyses was designed to help a non-expert trier of fact understand the flaws with

Dr. Connor's expert opinions. Where Dr. Connor's model presented a statistical black box, Dr.

Ricchetti unpacked the contents of that box in terms understandable to a lay-person.

Winn-Dixie seeks to strike Dr. Ricchetti's critiques from the record by applying a wholly

inappropriate standard that is not supported by the law. Rule 702 and *Daubert* require only that

testimony utilize the expert's specialized knowledge to assist the trier of fact, that the testimony

4

be based on facts or data, and that it appropriately applies reliable principles and methods. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Dr. Ricchetti's opinions easily meet this standard with a plethora of facts, data, and economic analyses of the facts in this case that will assist the trier of fact in understanding the complex economics at issue.

### A. Dr. Ricchetti's Rebuttal Opinions Are Reliable and Well-Founded

In his 103-page report, Dr. Ricchetti employs his economic expertise to analyze relevant facts and data using the tools of economics to assess the claims made by Dr. Connor. These analyses range from theoretical economic explanations supported by anecdotal evidence, to analyses utilizing a multiple regression model. *See, e.g.*, Ricchetti Rep. 39-40, 70. Winn-Dixie seeks to exclude all of Dr. Ricchetti's opinions as unreliable based on mischaracterizations and a misapprehension that Dr. Ricchetti was required to affirmatively disprove Winn-Dixie's case, rather than simply showing that Dr. Connor's analysis fails to prove it. These criticisms are not valid, but even if they were given some limited credit, they go only to the weight and not the admissibility of Dr. Ricchetti's opinions and analyses. *See Quiet Tech.*, 326 F.3d at 1345.

### 1. Defendants Do Not Bear the Burden of Proof

Dr. Ricchetti's report and his deposition testimony are clear: he offers opinions to rebut Dr. Connor and is not offering a competing model of effects in order to disprove Winn-Dixie's case. *See, e.g.*, Ricchetti Rep. at 6; Ricchetti Dep. (excerpts attached as Exhibit A) 26:8-20. Winn-Dixie's motion to exclude his opinion is based on a misreading of the law that a competing theory or method is necessary for Dr. Ricchetti's testimony to be admissible. It is not.

This misunderstanding is most clearly illustrated in Section III.A.4. of Winn-Dixie's brief, where it argues that because Dr. Ricchetti is not opining on the "ultimate issue" of whether the HRP reduced the supply of milk, his opinions cannot be admitted under *Daubert*. *See* Pl.'s Br. (Doc. 263) at 15. But it is Winn-Dixie, not Defendants, that bears the burden of proving the

5

ultimate issue of whether the HRP reduced the supply of milk. Defendants need not prove or disprove whether the HRP reduced the supply of milk. *See Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1070 (11th Cir. 2014) ("[T]o require [alternative theories of causation] to be proved 'would unduly tie a defendant's hands in rebutting a plaintiff's case'").[1] Defendants can introduce expert testimony to solely challenge Dr. Connor's assumptions and evidence. *See In re Abilify*, 299 F. Supp. 3d at 1368 ("[D]efendant's experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiff's experts."). This is exactly what Dr. Ricchetti does.

Dr. Ricchetti's purpose is to analyze whether Dr. Connor's assumptions underlying his injury and damage opinions are valid. Specifically, with respect to the milk supplies allegedly affected, Dr. Ricchetti evaluates whether Dr. Connor's analysis reliably linked the alleged decrease in milk production in the Southeast caused by the HRP to the alleged increase in over-order premiums ("OOPs") in the Southeast. *See, e.g.,* Ricchetti Dep. 223:18-224:17. Dr. Ricchetti concludes that Dr. Connor did not, because Dr. Connor's damages model merely assumes the number of cows retired in the Southeast is a reliable measure of the effect of the HRP on cows in the Southeast. In other words, Dr. Connor does not attempt to determine if the HRP changed the number of cows that would have been retired even in the absence of the HRP. *See* Ricchetti Rep. §§ 5 & 6, *e.g.*, ¶¶ 50, 90, 105-110. Dr. Ricchetti challenges these assumptions

---

[1] Winn-Dixie insinuates from a quotation in a superseded opinion in *In re Processed Eggs Products Antitrust Litigation*, Case No. 2:08-cv-2002 (E.D. Pa. Sept. 18, 2015), that it need not prove that the HRP affected supply to claim that it had an effect on prices. *See* Pl.'s Br. at 24. This is incorrect as a matter of logic and is not supported by the *Eggs* case. *See In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 199 (E.D. Pa. 2015) ("[T]he alleged conspiracy to restrict the supply of eggs, *if successful*, would have caused all, or virtually all, Direct Purchaser Plaintiffs to pay higher prices than they would have absent the conspiracy.") (emphasis in original). Winn-Dixie bears the burden of proving its allegations, including that the supply restraint it alleges *was successful* and *did* cause the price increases it claims.

through his analyses of raw milk production, cow culling rates, Dr. Brown's model, Dr. Connor's model, and qualitative evidence in the record. *See id.* § 6.2.2. Dr. Ricchetti need not prove that the HRP had no effect to opine that Dr. Connor fails to show that it did have an effect.

The relevance and helpfulness of Dr. Ricchetti's testimony is an entirely separate question. *Quiet Tech.*, 326 F.3d at 1341 ("courts and litigants must take care not to conflate" reliability inquiries with relevance or helpfulness inquiries). Although Winn-Dixie claims that Dr. Ricchetti's opinions are irrelevant, they are far from it. The relevance and benefits of Dr. Ricchetti's opinions are clear when they are attached to their actual purpose rather than Winn-Dixie's concocted purpose. Dr. Connor has made several assumptions in his various models and opinions, many of which do not stand up to scrutiny. *See, e.g.,* Ricchetti Rep. at 56-63. Winn-Dixie acknowledges that assumptions necessarily undergird Dr. Connor's opinions, while simultaneously arguing that Dr. Ricchetti's analysis challenging those assumptions is somehow irrelevant. Winn-Dixie's argument is meritless. For example, Winn-Dixie claims Dr. Ricchetti's opinion is not relevant because "there is no requirement" that plaintiffs prove a reduction in supply, "where [the expert] accounts for the product's relevant supply and demand." *See* Pl.'s Br. at 23. However, this is exactly Dr. Ricchetti's rebuttal assignment: to challenge Winn-Dixie's assumptions that its expert "account[s] for the products relevant supply and demand." *Id.*; *see In re Abilify*, 299 F. Supp. 3d at 1368. Dr. Ricchetti's opinion is helpful to the trier of fact because it provides a look behind the curtain of Dr. Connor's regression analysis and ultimate findings, to understand why certain factors are important, or not, or why certain information may be unreliable.

Winn-Dixie's misapprehension that a defendant's rebuttal experts are held to the same standards of proof as a plaintiff's affirmative expert stems primarily from two distinguishable

7

cases, *B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co.*, No. 1:09-CV-211, 2012 WL 1933766 (N.D. Fla. May 25, 2012) and *Advanced Telemedia, L.L.C. v. Charter Commc'ns, Inc.*, No. 1:05-CV-2662, 2008 WL 6808442 (N.D. Ga. July 17, 2008). *B-K Cypress* was a case involving expert testimony only as to damages for bad faith on an insurance contract. 2012 WL 1933766, at \*1. The parties cross-moved under *Daubert* to exclude one another's expert's opinions. *Id.* The court admitted the plaintiff's expert's testimony, and struck one of defendant's rebuttal experts for being disclosed too late. *Id.* at \*2. The defendant's other expert opined only as to the professional standards usually employed by experts in a field, but did not otherwise "offer any alternative methodology or analysis." *Id.* at \*6. That expert's opinions were therefore potentially relevant to the court's determination on the *Daubert* motion, but his testimony was not relevant to the merits of the plaintiff's damages model. By contrast, Dr. Ricchetti has offered numerous analyses of the relevant facts and data in this case. Importantly, Dr. Ricchetti has also conceded that Dr. Connor's chosen methodology (multiple regression) is sound, even if his implementation of that methodology is not. *See* Ricchetti Dep. 31:22-32:16. Moreover, as one District Court explained, *B-K Cypress* is not "persuasive" and "[six] courts from around the country . . . have held that rebuttal expert witnesses may criticize other expert's theories and calculations without offering alternatives." *3A Composites USA, Inc. v. United Indus., Inc.*, No. 5:14-CV-5147, 2015 WL 11121362, at \*2 (W.D. Ark. Nov. 10, 2015) (quotations omitted) (citing *B-K Cypress*, 2012 WL 1933766, at \*6).

*Advanced Telemedia* involved the calculation of damages under a contract. 2008 WL 6808442, at \*1-2. The court excluded the defendant's rebuttal expert because he did not "review the underlying data," "test [plaintiff's expert's] method or [defendant's expert's] own proposed [] method," and "did not explain why such efforts [were] unnecessary to refute" plaintiff's

8

expert.  *Id.* at \*1.  In contrast, Dr. Ricchetti does examine the underlying data.  Furthermore, Dr. Ricchetti does not propose an alternative method that he fails to test, but he instead criticizes Dr. Connor's implementation of his own methodology and the assumptions underlying that implementation. *See, e.g.,* Ricchetti Dep. 34:13-35:16.  Other courts have also distinguished *Advanced Telemedia* where a rebuttal expert did more than the expert in that case appears to have done.  *See Pac. Atl. Lines, Inc. v. Jah*, No. 1:09-CV-0625, 2011 WL 13176016, at \*4 (N.D. Ga. Sept. 29, 2011) (declining to apply *Advanced Telemedia*, where expert "reviewed the underlying data," "offered several reasons why [plaintiff's calculations were] unsound," and "propose[d]" alternative calculations "having reviewed the sufficiency of the underlying data").

To the extent that Winn-Dixie reads *B-K Cypress* or *Advanced Telemedia* - both district court cases - to require a defendant's expert to disprove plaintiff's theory of causation, binding precedent from the Eleventh Circuit post-dating those cases contradicts that position.  *See Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1070 (11th Cir. 2014).

In sum, Dr. Ricchetti's opinions meet the standards imposed under *Daubert* on rebuttal experts that his criticisms of Dr. Connor be reliable and helpful to the trier of fact.

### 2.    Dr. Ricchetti's Analysis of Cows Culled Is Admissible

Without actually citing Dr. Ricchetti's report, Winn-Dixie baldly asserts that Dr. Ricchetti's conclusions are all based upon a single analysis that is "univariate" and criticizes this analysis for failure to control for other factors.  *See* Pl.'s Br. at 5-8.  But Dr. Ricchetti performs many analyses in his report, including running multiple regression models very similar to those used by Winn-Dixie's expert, Dr. Connor.  *See* Ricchetti Rep. at 70, 78.  Winn-Dixie's singular focus on one of these analyses is inexplicable as *all* of the analyses underlie Dr. Ricchetti's ultimate opinion that Dr. Connor's analysis of injury and damages is unreliable.

Even if it were appropriate to focus a *Daubert* analysis on only one of Dr. Ricchetti's many corroborative analyses underlying his opinion about Dr. Connor's conclusions, the analysis to which Winn-Dixie appears to have latched on is admissible under *Daubert* on its own. Dr. Ricchetti analyzes USDA data on the number of cows culled during the relevant period in a chart in his report on page 8. This analysis is a simple but effective demonstrative to show that Dr. Connor's *assumption* about the effect of the program on the total number of milking cows is not only unsupported but likely to be wrong.

Citing only selective quotes from Dr. Novaković, Defendants' dairy expert, Winn-Dixie insinuates that univariate analysis is universally rejected in the economic profession. This is incorrect. It is a standard practice of economists to use univariate analyses. Often univariate analyses form the initial, logical building blocks for more complex analyses.[2] Although courts may reject using univariate analysis to determine causation, *see Allen v. Dairy Farmers of Am., Inc.*, 5:09-cv-230, 2014 WL 266290, at *6 (D. Vt. Jan. 23, 2014), they allow univariate analysis when it speaks to relevant questions of fact, *see, e.g., id.* at *7 (allowing univariate analysis to establish the fact there is no uniformity of prices paid where plaintiffs asserted there was).[3] While multivariate analysis may be necessary to explain a *causal* relationship, *see* Pl.'s Br. at 6, Defendants do not have a burden of proof regarding a causal relationship; Winn-Dixie does. A

---

[2] See Jeffrey Wooldridge, *Introductory Econometrics: A Modern Approach* 689 (3d ed. 2006) (explaining the role of univariate analyses in writing academic economics papers) (attached hereto as Exhibit B); A. Colin Cameron and Pravin Trivedi, *Microeconometrics Methods and Applications* 61 (New York: Cambridge University Press, 2005) (describing univariate analyses as an "essential" piece of an economics paper) (attached hereto as Exhibit C); Peter Kennedy, A Guide to Econometrics 392 (5th ed.) (discussing the role univariate analysis plays in helping economic researchers to understand their data) (attached hereto as Exhibit D).

[3] *See also Ambrose v. Booker*, 684 F.3d 683, 642 (6th Cir. 2012) (using univariate analysis to identify the existence of a racial disparity in a jury pool); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 295-96 (N.D. Cal. 1992) (allowing univariate analysis to measure payroll disparities).

defendant's burden is to put a plaintiff to its burden of proof through questioning of assumptions, and to otherwise criticize the plaintiff's expert's analysis and conclusions. *See In re Abilify*, 299 F. Supp. 3d at 1368. "[T]o require [alternative theories of causation] to be proved 'would unduly tie a defendant's hands in rebutting a plaintiff's case.'" *Aycock*, 769 F.3d at 1070.

Notably missing from Winn-Dixie's brief is any case law or authority that mandates that Defendants also provide a multivariate analysis or engage in "*ceteris paribus*" analysis. Defendants do not offer Dr. Ricchetti's univariate analysis as an alternative to Dr. Connor's multivariate analysis, nor do they offer it to establish the effect of anticompetitive conduct on price. Instead, in this instance Dr. Ricchetti uses trend analysis to demonstrate the *fact* that cow culling did not increase where Dr. Connor assumed it did, in line with what other courts have allowed. *See Allen,* 2014 WL 266290, at *6.

Winn-Dixie's criticisms also ignore that Dr. Connor himself uses univariate analysis in this case and has used univariate analysis in past cases, including to support damages calculations. *See, e.g.,* Rebuttal Rep. of Dr. John M. Connor, dated Mar. 22, 2018 (Doc. 261-10) ¶ 52, fig. 13 (conducting a univariate analysis of milk prices in Southeast relative to other regions); *see also* J. Connor Dep., dated June 22, 2019 76:4-82:12 (attached hereto as Exhibit E) (admitting that his reports rely on univariate analysis and that, in a related case, he used univariate analysis to conduct an analysis of overcharges). For all these reasons, arguments to exclude Dr. Ricchetti's opinion for employing a univariate analysis must fail.

### 3.   Winn-Dixie Incorrectly Claims That Defendants Must Identify and Then Test Dr. Connor's Missing Variables

In Section III.A.3 of their motion to exclude, Winn-Dixie also improperly seeks to shift its burden to Defendants by imposing additional standards, without support, and does so in an attempt to deflect valid, well-supported criticism. *See* Pl.'s Br. at 10-11, nn.14, 15. Winn-Dixie

11

complains that Dr. Ricchetti identified a hole in Dr. Connor's logic regarding the market power

of marketing agencies in common but did not test a variable related to this logical gap himself.

Winn-Dixie argues that *Daubert* prevents these kinds of criticisms by requiring Defendants to

employ rigorous testing of "missing variables."  It does not.  But Dr. Ricchetti did test his

hypothesis that the alleged market power of marketing agencies in common explained all of

Winn-Dixie's damages, by removing two charges set uniformly by such marketing agencies—

rBST-free surcharges and fuel surcharges.[4]  *See* Ricchetti Rep. at 70, 78.  These tests confirmed

that the exercise of alleged market power to set these charges could explain 100% of Winn-

Dixie's alleged overcharges on fluid milk and fresh dairy products.  *Id*.

Dr. Connor claims to have controlled for market power by adding a variable to his model.

*See* Connor Rebuttal Rep. at 79.  Winn-Dixie's primary complaint about Dr. Ricchetti is that he

failed to control for market power in the manner it prefers.  Nothing, however, requires that Dr.

Ricchetti adopt Dr. Connor's preferred damages model.  These competing explanations for the

appropriate way to test whether market power caused the higher prices that Dr. Connor claims go

to the weight and not admissibility of Dr. Ricchetti's analysis. *Quiet Tech.*, 326 F.3d at 1345.

Winn-Dixie repeatedly invokes *Bazemore v. Friday*, 478 U.S. 385 (1986) ("Bazemore")

and cases citing it (*see* Pl.'s Br. at 10-11 nn.14, 15) for the proposition that Defendants' experts

must test Dr. Connor's "missing variables."  This reliance is misplaced.  First, *Bazemore* was a

Title VII discrimination case in which the burden shifts from plaintiffs to defendants, and

defendants bear a burden of production to disprove plaintiffs' statistical analysis of

---

[4] Winn-Dixie does not appear to challenge Dr. Ricchetti's analysis of fuel surcharges, which
shows no damages to Class II OOPs.  *See* Ricchetti Rep. ¶¶ 127-28.  However, to the extent their
opposition can be so construed, Dr. Ricchetti properly netted these out as the record shows that
these fuel surcharges, which were set according to a formula before the HRP came into existence
and had no connection to the HRP.

discrimination. *See Smith v. Xerox Corp*, 602 F.3d 320, 326 (5th Cir. 2010) (explaining shifting rules). Antitrust cases have no such burden shifting. Second, the cases cited by Plaintiff involve different procedural postures, as they generally involve either (1) the weighing of an expert's opinion following a bench trial, or (2) attempts to exclude a regression analysis presented by the party with the burden of proof based on another expert's claim of a "missing variable"—*not*, as here, a motion to exclude the rebuttal opinion pointing out that variables are missing. Third, the cases Plaintiff cites teach that the issues should be addressed through cross-examination, as they go to weight, not admissibility. *See Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011); *Quiet Tech.*, 326 F.3d at 1346.

Winn-Dixie does not cite a single case (and Defendants are aware of none) in which *Bazemore* is relied upon for the pre-trial exclusion of an expert's rebuttal testimony criticizing a regression analysis presented by the party with the burden of proof. *Bazemore* did not create a standard that must be met by a rebuttal expert for his or her opinions to be admissible as Winn-Dixie suggests, and courts have not construed it in that manner. Winn-Dixie's reliance on those cases also ignores that Dr. Ricchetti undertook substantial analysis of the factors and methods used by Dr. Connor, as set forth above. It also ignores that Dr. Ricchetti was not simply pointing out that Dr. Connor was missing variables, but rather was pointing out that the methodology used by Dr. Connor does not fit the facts of the case – something that cannot be fixed simply by adding additional variables.

### 4. Dr. Ricchetti's Opinions "Fit" the Case

Winn-Dixie has a laundry list of miscellaneous complaints that supposedly show that Dr. Ricchetti's analyses are based upon unreliable data or incorrect facts, and therefore they do not "fit" the case. These claims are incorrect.

First, Winn-Dixie argues that Dr. Ricchetti's analysis, which controls for rBST-free surcharges, discussed above, is "flatly contradicted by the evidence." Pl.'s Br. at 16. In truth, Dr. Ricchetti's analysis relies on facts and data from the only market in which Winn-Dixie operated and purchased fluid milk, the Southeastern United States. *See* Ricchetti Rep. at 33-34. Within the Southeast, Dr. Ricchetti treated rBST-free premiums in a manner consistent with the record evidence that the premium was uniformly applied and never changed. *Id.* at 67. Winn-Dixie cites no evidence to the contrary in its brief and Dr. Connor likewise admitted in his deposition that he was not aware that any such evidence existed. *See* J. Connor Dep. June 22, 2018 156:14-22. Winn-Dixie's brief, however, claims that Dr. Ricchetti's analysis is contradicted by evidence that discusses rBST-free premiums charged to fluid milk customers in other areas of the country that have no connection to Winn-Dixie or the Southeast. *See* Pl.'s Br. at 17. The quoted passages from the deposition of an Agri-Mark witness discuss *local* supply and demand conditions in the *Northeast* during a particular period of time. *See* Stammer Dep. 94:23-25. The quoted passages from DFA likewise describe *local* supply and demand conditions affecting rBST-free surcharges in *California*. *See* Wilson Dep. 119:15-17.[5] These irrelevant examples do not contradict anything in Dr. Ricchetti's report and are not grounds for excluding his opinions.

Second, Winn-Dixie claims that Dr. Ricchetti ignored "the best data available," DFA's OOP data, "relying instead on SMI price announcements from 2006-2013." Pl.'s Br. at 14-15. Dr. Ricchetti, however, did use DFA's OOP data. *See* Ricchetti Rep. at Ex. 1. He used SMI data

---

[5] Winn-Dixie buries a misleading citation in a footnote, implying that Calvin Covington of SMI provided similar testimony that its rBST-free surcharges were subject to negotiation in the Southeast region that it serves. *See* Pl.'s Br. at 18 n. 41. The cited passage does not refer to rBST-free premiums at all, but instead discusses regulated pricing. Covington Dep. at 197-209.

for the limited purpose of supplementing certain exhibits.  *See* Ricchetti Dep. 266:10-267-20.

Winn-Dixie further argues that, because the SMI data was not "transactional" data, Dr.

Ricchetti's opinions are therefore unreliable.  Pl.'s Br. at 15.  The DFA data – which Dr. Connor

admits is "the best data available" – is not transactional data either.  *See* Rep. of Dr. John M.

Connor, dated Dec. 18, 2017 (Doc. 261-7), at 48 n.152 (acknowledging DFA data are not

transactional data).  Furthermore, Winn-Dixie provides no reason whatsoever to question the

reliability or validity of the data produced by SMI, so its use provides no basis for exclusion of

any of Dr. Ricchetti's analyses or opinions which are based on more complete information.

Third, Winn-Dixie criticizes Dr. Ricchetti's use of USDA data "in an incorrect and

misleading manner" without challenging Dr. Ricchetti's data as unreliable or his methodology as

unsound.  Winn-Dixie only complains that Dr. Ricchetti's basis for comparison is "apples to

oranges."  Pl.'s Br. at 16.  Winn-Dixie is wrong that Dr. Ricchetti's basis for comparison is

incorrect, and, further, complaints about allegedly misleading comparisons that have nothing to

do with reliability of the underlying data or methods are clearly beyond the scope of a *Daubert*

motion and an obvious topic for cross-examination, not exclusion.

Fourth, Winn-Dixie claims that "Dr. Ricchetti relies heavily on newspaper articles" to

support the observation that there was a supply response from the more than 99% of dairy

farmers who were unaffected by the HRP.  Pl.'s Br. at 15.  This claim grossly distorts Dr.

Ricchetti's report and testimony.  Dr. Ricchetti cites two newspaper articles as anecdotal

examples that illustrate that the supply response expected by economic theory actually occurred.

*See* Ricchetti Rep. ¶ 60 nn. 96, 97.  Dr. Ricchetti's testimony, which Winn-Dixie inaccurately

quotes, was that he did not "rely solely on newspaper articles in [his] report" and that he offered

"a large set of analyses about the supply response as well as empirical analysis of whether there

15

were changes in the trends in cow culling and milk production in cows, et cetera." Ricchetti Dep. 110:17-111:4.  Dr. Ricchetti's opinions should not be excluded simply because he cited corroborating news articles to support the results of other analyses.

> ### B.      Dr. Ricchetti's Analysis of Procompetitive Benefits Is Admissible

Defendants bear the burden of proof on only one issue that is the subject of Winn-Dixie's *Daubert* motion: the procompetitive aspects of the HRP.  Winn-Dixie devotes one paragraph to this issue, complaining only that Dr. Ricchetti "did not attempt to quantify the [procompetitive] efficiencies" and that Winn-Dixie believes his opinion is contradicted by the record.  *See* Pl.'s Br. at 9.  Neither is a valid reason to exclude Dr. Ricchetti's opinions.

Winn-Dixie cites no case law imposing a requirement that procompetitive benefits in antitrust cases be quantified.  In many cases, including this one, such economic benefits cannot be easily or reliably quantified, nor can analyses of them be tested.  *Cf. City of Tuscaloosa*, 158 F.3d at 566 (economic evidence is often not conducive to testing in the same manner as scientific evidence would be).  Winn-Dixie's contrary interpretations of Defendants' documents are likewise a basis for cross examination, but not for exclusion.

Dr. Ricchetti's analysis of the HRP's procompetitive benefits applies valid economic logic and reasoning in a reliable manner.  It is also supported by his analysis of relevant data concerning the supply response to the HRP.  *See* Ricchetti Rep. at 87, 36-52.  These opinions are admissible under *Daubert* and Rule 702.

## II.      DR. NOVAKOVIĆ'S OPINIONS ARE ADMISSIBLE UNDER *DAUBERT*.

Defendants' other expert, Dr. Andrew Novaković, an agricultural economist at Cornell University specializing in the dairy industry, submitted an expert report opining on the ways in which Dr. Connor's analysis and opinions were inconsistent with the economics of the dairy industry.  As with Dr. Ricchetti, Winn-Dixie does not attack Dr. Novaković's qualifications as an

expert on agricultural economics because his credentials are unassailable.  Dr. Novaković is an

expert in dairy economics, as evidenced by his long list of more than 50 peer-reviewed

publications and his honors such as being appointed chair of the first Dairy Industry Advisory

Committee by the Secretary of Agriculture, serving as a Senior Economist for the USDA Office

of the Chief Economist, and numerous awards from the U.S. Department of Agriculture and the

Agricultural and Applied Economics Association.  Winn-Dixie seeks only to exclude his

opinions based on supposed problems with the "fit" of Dr. Novaković's analyses to the facts of

the case.  To the contrary, Dr. Novaković's opinions fit this case and there is no valid basis to

exclude them under *Daubert* or Rule 702.

"[A]t its core, the *Daubert* 'fit' question is one of relevance."  *U.S. v. Williams*, 865 F.3d

at 1340.  Expert testimony therefore "fits" for *Daubert* purposes where it has a tendency to make

a fact in the case more probable.  *Id.* (citing Fed. R. Evid. 401). This case is about the pricing of

dairy products, and Dr. Novaković's expert opinions regarding supply and demand factors

influencing dairy prices clearly fit the facts of this case.

As Dr. Novaković explains in his declaration, his opinions are based on his 40 years of

experience as an economist with a primary focus on dairy markets and policy, his review of the

economic evidence pertaining to the case, and his review of Dr. Connor's analysis.  *See* Decl. of

Dr. Andrew M. Novaković, dated Feb. 20, 2018 (Doc. 261-18) at 4 (hereinafter "Novaković

Rep.").  His list of materials considered includes multiple data sources; academic articles on

cooperatives and dairy pricing; Dr. Connor's report and deposition transcript; the Complaint; a

chart of the herd retirements; Scott Brown's declaration and deposition transcript; the expert

report of Edward Gallagher, a DFA employee, filed in a different case related to the HRP; and

the declarations of business people employed by each cooperative Defendant.  See Ex. B to

17

Novaković Rep., "Websites, Documents, and Material Relied Upon," attached hereto as Exhibit

F.  His report could not be more closely tethered to the facts of this case.[6]

In particular, Dr. Novaković evaluated Dr. Connor's opinions, which depended on

analyses or assumptions about the dairy industry, for reliability and accuracy.  He concluded that

"Dr. Connor has overestimated the effect of the CWT Program" and that "Dr. Connor did not

establish that the HRP caused a reduction in milk supply."  Novaković Rep. at 6-7.  Dr.

Novaković's testimony is proffered not to provide a competing econometric analysis, but to

show that many of the fundamental assumptions underlying both Winn-Dixie's theory of the

case and Dr. Connor's analysis are flawed as a matter of agricultural economics.  *See* Novaković

Dep. (Exhibit 1 to Plaintiffs' Motion to Exclude) at 49:4-13.  Dr. Novaković's general

knowledge regarding the dairy industry is reliable because it is the culmination of 40 years spent

in the field of agricultural economics as a Professor at Cornell University with a focus on dairy

markets and policy.  *See Adams v. Lab. Corp.*, 760 F.3d 1322, 1330 (11th Cir. 2014) (district

court abused its discretion in excluding expert opinion as unreliable when it was "difficult to

imagine how [the expert's] experience could have been more extensive and relevant or

contributed more to the reliability of the methodology she used.").[7]

Winn-Dixie's list of deposition quotations amounts to Winn-Dixie's counsel asking Dr.

---

[6] Winn-Dixie's criticism (at 19) of Dr. Novaković for not relying on the depositions of business people is irrelevant, because those depositions focused on answers to questions that Plaintiffs' counsel chose to ask.  Winn-Dixie does not, because it cannot, point to testimony from those depositions that it claims Dr. Novaković should have reviewed.

[7] *See also City of Tuscaloosa,* 158 F.3d at 566 ("[T]he proper inquiry [for economic analysis] is whether the techniques utilized by the experts are reliable in light of the factors (other than testability) identified in *Daubert* and in light of other factors bearing on the reliability of the methodologies").

Novaković whether he performed analyses he never purported to perform.[8]  Winn-Dixie also

takes statements from Dr. Novaković's report that cannot realistically be refuted and of which

Dr. Novaković is aware not only because of his extensive experience, but because of basic logic,

and then accuses Dr. Novaković of being unreliable because he did not perform an econometric

test to prove these facts.

For instance, Dr. Novaković opines, after explaining discrepancies in USDA data, that

"[i]t is simply the case that available USDA data just cannot provide an accurate estimate of

normal herd dynamics."  Novaković Rep. at 40.  Winn-Dixie criticizes Dr. Novaković for not

attempting to measure any aspect of herd dynamics (at 20) without explaining why Dr.

Novaković would measure aspects of herd dynamics using unreliable data.  *See Seamon v.*

*Remington Arms Co., LLC (In re Estate of Seamon)*, 813 F.3d 983, 990 (11th Cir. 2016) (abuse

of discretion to exclude expert opinion for failing to run a test, which was not conducted because

the underlying evidence made such a test fruitless).[9]

Winn-Dixie claims that Dr. Novaković "admitted that the facts were not relevant to his

---

[8] For example, Winn-Dixie highlights Dr. Novaković's testimony that he does not have
"evidence that the dynamic that [he] refer[red] to as the incidence of female births changed from
before the [HRP] to the period of the [HRP]."  Pl.'s Br. at 21.  But this makes sense, given that
Dr. Novaković never offered an opinion that the incidence of female births changed during the
HRP.  He simply states (irrefutably, given basic logic) that the incidence of female births, among
other factors, affects herd dynamics.

[9] Winn-Dixie (at 22) also challenges Dr. Novaković for his opinion about dairy farmers, whose
bids were accepted under the HRP, who would have exited the dairy anyway.  Apart from the
ample evidence supporting this opinion, the evidence also shows that more farms went out of
business than participated in the HRP each year.  It strains credulity to think that farmers about to
stop dairy farming would have declined a financial incentive to do what they would have done
anyway.  Moreover, Dr. Novaković did not opine that a precise number of farmers would or
would not have stopped dairy farming absent the HRP; it is, once again, that such an analysis
could not be done given the absence of individual farm financial data.  Novaković Rep. at 52.
As before, Winn-Dixie does not explain how Dr. Novaković could analyze this issue when his
opinion is that there is a lack of data to do so.

opinion," which is clearly untrue.  Dr. Novaković's report contains extensive discussion and analysis of the facts related to the Herd Retirement Program, herd dynamics, and other relevant factual issues.  He of course also reviewed and comments on Dr. Connor's report and deposition transcript.  Dr. Novaković's opinions were not dependent on the specific circumstances of Winn-Dixie, rather he relied on USDA data that is publically available and which apply to the dairy industry as a whole.[10]  For these reasons, Dr. Novaković's opinions are admissible under *Daubert*.

### III.  THE OPINIONS OF DEFENDANTS' EXPERTS ARE NOT UNDULY PREJUDICIAL UNDER RULE 403

Without any support, Winn-Dixie seeks to exclude Defendants' experts' criticisms of Dr. Connor's model under Fed. R. Evid. 403 as being misleading and prejudicial. Winn-Dixie's claim of prejudice is only in the sense that Defendants' experts rebut Dr. Connor's unsupported assumptions and validly undermine the conclusion he draws from his model.  Winn-Dixie is free to cross-examine Defendants experts regarding any opinions it worries is "misleading," but this concern does not and should not outweigh the probative nature of their opinions.  *See Oceania*, 654 F.3d at 1193 (district courts should not "make ultimate conclusions as to the persuasiveness of the proffered evidence;" rather, objections to the adequacy of an expert's methodology go to weight not admissibility).  Winn-Dixie's Rule 403 challenge thus should be rejected.

### CONCLUSION

For the foregoing reasons, Winn-Dixie's Motion to Exclude should be denied in its entirety.

---

[10] *See* Novaković Rep. at Ex. B (list of materials considered by Dr. Novaković, including USDA data), attached hereto as Exhibit F.

Dated:  May 22, 2019

By:  /s/ Cindy A. Laquidara
Cindy A. Laquidara
Florida Bar No. 394246
AKERMAN LLP
Email: cindy.laquidara@akerman.com
50 North Laura Street, Suite 3100
Jacksonville, FL  32202
Telephone: (904) 798-3700
Facsimile: (904) 798-3730

*Attorneys for Defendants National Milk Producers
Federation; Southeast Milk, Inc.; Dairy Farmers of
America, Inc.; Land O'Lakes, Inc.; and Agri-Mark,
Inc.*


Jill M. O'Toole
Connecticut Bar No. 414338
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5000
Facsimile: (860) 251-5218
jotoole@goodwin.com

Diane C. Polletta
Connecticut No. 428468
SHIPMAN & GOODWIN LLP
300 Atlantic Street, Third Floor
Stamford, CT 06901-3522
Telephone: (203) 324-8100
Facsimile: (203) 324-8199
dpolletta@goodwin.com

John DiMarco
District of Columbia No. 1032127
Connecticut No. 435220
SHIPMAN & GOODWIN LLP
1875 K Street N.W., Suite 600
Washington, DC 2006
Telephone: (202) 741-4681
Facsimile: (202) 469-7751
jdimarco@goodwin.com

*Attorneys for Defendant Agri-Mark, Inc.*

21

Michael J. Beaudine, Esq.
Florida Bar No. 0772763
beaudine@lseblaw.com
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
111 N. Magnolia Avenue, Suite 1400
Orlando, Florida 32801
Telephone: (407) 481-5800
Facsimile: (407) 481-5801

*Attorneys for Defendant Southeast Milk, Inc.*

W. Todd Miller
District of Columbia Bar No. 414930
Lucy S. Clippinger
New York Bar No. 5105796
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20037
Telephone: (202) 663-7820
Facsimile: (202) 663-7849
tmiller@bakerandmiller.com
lclippinger@bakerandmiller.com

*Attorneys for Defendant Dairy Farmers of America, Inc.*

Nathan P. Eimer
Illinois State Bar No. 00735353
Scott C. Solberg
Illinois State Bar No. 6204487
Ben E. Waldin
Illinois State Bar No. 6317991
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
neimer@eimerstahl.com
ssolberg@eimerstahl.com
bwaldin@eimerstahl.com

*Attorneys for Defendant Land O'Lakes, Inc.*

22

Jonathan B. Sallet
District of Columbia Bar No. 336198
John J. Kavanagh
New York Bar No. 2858074
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
jsallet@steptoe.com
jkavanagh@steptoe.com

*Attorneys for Defendant National Milk
Producers Federation aka Cooperatives
Working Together*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 22, 2019, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Cindy A. Laquidara*
Cindy A. Laquidara