# Exhibit A

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WINN-DIXIE STORES INC.,            )
and BI-LO HOLDINGS, LLC,           )
                                   )
            Plaintiffs,            )
                                   ) No.
        vs                         ) 3:15-cv-01143-BID-
                                   ) PDB
SOUTHEAST MILK, INC.,              )
NATIONAL MILK PRODUCERS            )
FEDERATION, aka                    )
COOPERATIVES WORKING               )
TOGETHER, DAIRY FARMERS OF         )
AMERICA, INC., LAND                )
O'LAKES, INC., DAIRYLEA            )
COOPERATIVES, INC., and            )
AGRI-MARK, INC.,                   )
                                   )
            Defendants.            )

The videotaped deposition of
BRYAN RICCHETTI, PhD
Called for examination pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions taken before JO ANN LOSOYA,
Certified Shorthand Reporter within and for the
County of Cook and State of Illinois at 224 South
Michigan Avenue, Chicago, Illinois, on
March 22, 2018 at the hour of 9:30 o'clock a.m.

Page 2

APPEARANCES:

     AHERN AND ASSOCIATES, PC
     MR. PATRICK J. AHERN
     70 West Madison
     Suite 1400
     Chicago,Illinois 60601
     (312) 404-3160
     patrick.ahern@ahernandassociatespc.com
        Appeared on behalf of the Plaintiffs;

     EIMER STAHL LLP
     MR. BENJAMIN WALDIN
     MR. DANIEL D. BIRK
     MS. SARAH CATALANO
     224 South Michigan Avenue
     Suite 1100
     Chicago,Illinois  60604
     (312) 660-7631
     bwaldin@eimerstahl.com
     dbirk@eimerstahl.com
        Appeared on behalf of the Defendants.

     BAKER & MILLER PLLC
     MR. W. TODD MILLER
     2401 Pennsylvania Avenue NW
     Washington, D.C.  20037
     (202) 663-7822
     tmiller@bakerandmiller.com
        Appeared on behalf of the Defendant.

     STEPTOE & JOHNSON, LLP
     MR. JOHN J. KAVANAGH, III
     1330 Connecticut Avenue NW
     Washington, DC  20036
     (202) 429-6256
     jkavanagh@steptoe.com
        Appeared on behalf of the Defendant.

Page 3

PRESENT:

    MR. JOHN J. DiMARCO

    SHIPMAN & GOODWIN

    1875 K Street NW

    Suite 600

    Washington, DC 20006

    (202) 469-4681

    jdimarco@goodwin.com

       Appeared on behalf of Defendants.


ALSO PRESENT:

MS. LIANA ALSTON, paralegal

MR. GARETH MACARTNEY, OnPoint Analytics

MR. DAN WERNER, OnPoint Analytics


VIDEOGRAPHER: MILO SAVICH


REPORTED BY:   JO ANN LOSOYA

CSR LICENSE:   084-002437

Page 4

EXAMINATION

| Witness | Page | Line |
|---|---|---|
| Bryan Ricchetti PHD | | |
| By Mr. Ahern | 7 | 6 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

E X H I B I T S

| DESCRIPTION | PAGE |
|---|---|
| EXHIBIT 1   Report | 10 |
| EXHIBIT 2   Decision in the processed egg products antitrust litigation | 32 |
| EXHIBIT 3   Document titled "Why Continental Does Not Support the Continuation of CWT | 101 |
| EXHIBIT 4   Document titled NMPF Dairy Industry News Alert October 27, 2009 | 108 |
| EXHIBIT 5   Document titled "An International Comparison of Milk Supply Control Programs and Their Impacts | 128 |
| EXHIBIT 6   Volume 1 of the deposition of John Wilson | 141 |
| EXHIBIT 7   Slides from a presentation entitled Cover Page CWT Herd Retirement Task Force | 154 |
| EXHIBIT 8   Document entitled CWT Herd Retirement Information and Results Survey | 163 |
| EXHIBIT 9   Article from the Journal of Agribusiness | 301 |
| EXHIBIT 10  Article from John Paul Chavas | 305 |

Page 26

demand factors or variables, correct?

A.    In this type of reduced-form model, yes, you're trying to control for, generally, market factors that would affect the price of interest or the outcome of interest that you believe are independent of the challenged conduct, if properly implemented.

Q.    Now, you did not perform a regression -- your own regression analysis in this case, correct?

A.    I would say the focus of my assignment was on assessing the reliability of Professor Connor's model.

Q.    So, you did not perform your own regression model in this case, correct?

MR. WALDIN:  Objection to form, asked and answered.

BY THE WITNESS:

A.    I did run some regressions as ways to demonstrate the flaws that I believed Professor Connor's model has.

Q.    You ran one, right?

A.    I think a couple.

Q.    But you didn't -- once again, you did not perform or create your own regression model in this case, correct?

Page 31

factors are controlled for in the model, correct?

MR. WALDIN:  Objection to form.

BY THE WITNESS:

A.    I don't necessarily agree with that.

Q.    Well, what part of it don't you agree with?

A.    Well, I think generally in a case where there's a supply restraint, and in a case like this where 99 percent of the producers in the market didn't face a restraint, it's important to do an analysis of and to understand whether there was a supply response.  That's critical to assessing whether the alleged conduct had an effect, and those are, you know, principles Professor Connor discusses quite a bit.

Q.    Other than that, is there any other way that you disagree with the question that I posed?

MR. WALDIN:  Object to the form.

BY THE WITNESS:

A.    Yeah, I think that an analysis of the supply is critical to a -- in a case like this.

Q.    You would agree, though, that many reduced-form regression models focus on the effect on price in antitrust cases, correct?

A.    Yes, that's correct.  You can focus on

Page 32

price, if you do it properly.

Q.    And many of those reduced-form regression models in antitrust cases do not contain and are not required to contain a separate analysis on supply?

MR. WALDIN:  Objection to form.

BY THE WITNESS:

A.    I don't know what's required.  I'm talking about, as an economist, I think it's certainly required to assess the supply effects of an alleged supply restraint.

Q.    You have referred to the courts as accepting reduced-form regression models, correct?

MR. WALDIN:  Objection.

BY MR. AHERN:

Q.    Properly implemented, correct?

A.    Yes.

MR. BIRK:  Object to form.

(Deposition Exhibit 2 was marked for identification.)

BY MR. AHERN:

Q.    Dr. Ricchetti, the court reporter has handed you what's been marked as Exhibit 2.  This is a memorandum opinion or decision in the processed egg products antitrust litigation.  It's dated September 18, 2015, and has a tag line at the top,

Page 34

conducted by Dr. Rausser, is appropriate, because a supply reduction program, if successfully implemented, will be reflected in the prices paid by consumers, which is why restricting output equates to price fixing."

Q.    Do you agree that restricting output equates to price fixing?

MR. WALDIN:  Objection to form.

BY THE WITNESS:

A.    I agree that as a general matter that in economics, yes, you can.  You can achieve a price point by restricting supply or fixing prices.

Q.    And the second sentence says:  "Antitrust impact and damages are ultimately concerned with whether plaintiffs paid higher prices."

Do you agree with that?

A.    I agree with that.  I think that the issue here is that Professor Connor's price model is not reliable and it's missing other factors, and when you correct for it, it doesn't show any evidence of the supply effect.  And, therefore, it's important to do a corroborative analysis directly of supply as a sanity check on the price regression model.

Q.    And you -- and that's what you attempted

Page 35

to do in your report, correct?

A.    Yeah, I think analyzing supply separately is a way to sort of get at whether the regression model is achieving what would be described as properly implemented in measuring the effect of the conspiracy.

Q.    And what you did in your report is what you felt was appropriate and necessary to analyze whether or not supply was reduced, correct, in this case?

A.    I wouldn't say it that way.  I would say Professor Connor has made the assumption that every cow retired would not have been retired but for the CWT program and uses that as a measure of the conspiracy, and I did analyses to assess the reliability of that assumption.

Q.    Okay.  And so, your -- that's fine -- Strike that.

Do you agree with the statement in the last sentence that you read that says, "A supply reduction program, if successful" -- "if successfully implemented, will be reflected in the prices paid by consumers"?

A.    That's a very general statement and you would want to analyze any such program, the

Page 110

rely on says, "Low Milk Prices Have Dairy Farmers Killing Cows."

Do you see that on Page 3 of the exhibit?

A.    Yes.

Q.    And it says "Associated Press IA," which presumably stands for Iowa, correct?

MR. WALDIN:  Objection to form.

BY THE WITNESS:

A.    I think that's right.

MR. WALDIN:  Calls for speculation.

BY MR. AHERN:

Q.    Now, economists don't typically rely solely on newspaper articles, correct?

MR. WALDIN:  Objection to form.

BY THE WITNESS:

A.    Yeah, I don't rely solely on newspaper articles in my report.

Q.    Well, you're relying on this as a piece of evidence, correct?

A.    I offer a large set of analyses about the supply response which include documentary evidence that there was concerns about supply response as well as empirical analysis of whether there were changes in the trends in cow culling and milk

Page 111

production in cows, et cetera.

So, this is sort of a way to see that there were concerns of these issues, and then I look at the data as well.

Q. You know that newspaper articles are not actually admissible evidence, correct?

MR. WALDIN: Objection to form.

MR. BIRK: Calls for a legal conclucion.

MR. WALDIN: Calls for a legal conclucion.

BY MR. AHERN:

Q. Well, you used the term "documentary evidence."

A. Yeah, I didn't mean it in a technical sense. I just meant that this article I found interesting because it discussed, you know, a family that was struggling in the dairy industry and they're thinking about retiring, and then it also mentions the potential supply response.

Q. You don't know whether any of the facts in this article are true, do you?

MR. WALDIN: Objection to form.

BY THE WITNESS:

A. As I said, I'm using this document to just get a sense for what's going on in the

Page 223

So, for example, if there was a cartel that only controls 1 percent of the industry, economic principles tell us immediately that that -- such a cartel would not be effective. The principles tell you that.

And so, I'm relying on standard principles to make an inference that supply response is clearly something that you would expect in this situation. I'm pointing to some direct evidence that there was at least some supply response from some people, and then I'm also pointing to a simple trend analysis before and after of the overall culling rate.

And Professor Connor, his assignment was to isolate the effect of the CWT program, which would require isolating it from a supply response, and his measure of the conduct does not do that.

Q.    So, you don't offer an opinion in this case that the culling rates would have been -- I'm sorry. Strike that.

You don't offer an opinion in this case that the number of cows culled would have been lower without the CWT herd retirement program, correct?

A.    I said this a lot of ways. I'll try it

Page 224

again.

I think the opinion I'm offering is that the number of cows culled as a measure of the net effect of the program, I think that is unreliable. So that's what Professor Connor's offering. And so what I'm trying to figure out is whether that's a reasonable assumption.

Q. But you don't -- you don't reach a conclusion specifically that but-for the CWT herd retirement program the number of cows culled would have been lower, correct?

A. But-for the CWT program -- I don't reach any general conclusion like that. What I'm thinking about is whether the number of cows retired is a reliable measure of the net effect of the CWT program because that's the variable in Professor Connor's model. And, yeah, that's my opinion.

Q. Now, the number of cows, the total number -- you don't reach a conclusion as to whether or not the number of cows would have been higher without the program, the herd retirement program, correct?

MR. KAVANAGH: Objection to form.

BY THE WITNESS:

A. I think you are asking me within -- can

Page 266

BY THE WITNESS:

    A.    Can you be more specific?

    Q.    You had DFA OOP data that went from 2000 to 2013.  No, I can't be any more specific than that.

    A.    There is data -- yes, the DFA data exists in 2000.

    Q.    Through 2013, right?

    A.    Yes.

    Q.    And the SMI data ran from 2005 through 2013, correct?

    A.    I think the SMI data, some of it started, I think, in 2003.

    Q.    That's your testimony here today?

    A.    I would have to double-check that, but I recall that.

    Q.    So, you didn't have it for the benchmark period, right?

        MR. WALDIN:  Objection to the form.

BY THE WITNESS:

    A.    In the regression I ran, I used Professor Connor's DFA data.

    Q.    You didn't have SMI data for the benchmark period, correct?

        MR. WALDIN:  Objection as to form.

www.veritext.com    888-391-3376

Page 267

BY THE WITNESS:

A.    I didn't use that data for a benchmark analysis.

Q.    But you didn't have it for the benchmark period, correct?

MR. WALDIN:  Objection to the form.

BY THE WITNESS:

A.    It is correct that that data does not go back in time to the benchmark period, but I did not use that data for a benchmark analysis.

Q.    But you used the data to alter the DFA OOP data, correct?

MR. WALDIN:  Objection to the form.

BY THE WITNESS:

A.    We used the data where there were missing aspects of the DFA data to help augment that data.

Q.    What do you mean "missing aspects of the DFA data"?

A.    I think it was in certain plants in Florida that the DFA data didn't extend out farther.

Q.    So, from an economist's standpoint in this case, if you were doing the reduced-form regression analysis, you would not have chosen the DFA OOP data as being superior to the SMI price announcement data?

Page 331

REPORTER CERTIFICATE

I, JO ANN LOSOYA, a Certified Shorthand Reporter within and for the County of Cook and State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

Page 332

IN WITNESS WHEREOF, I do hereunto set my hand this March 30, 2018.

JO ANN LOSOYA, CSR

C.S.R. No. 84-002437