**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

Winn-Dixie Stores, Inc.,

   Plaintiff,

v.          Case No. 3:15-cv-01143-J-39PDB

Southeast Milk, Inc., *et al.*,

   Defendants.

_____/


**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

I.      BECAUSE THE HRP WAS A QUINTESSENTIAL HORIZONTAL OUTPUT RESTRAINT CONDEMNED UNDER THE PER SE RULE, THE RULE OF REASON DOES NOT APPLY ..................................................................................................................1

   A.  The HRP Was a Quintessential Horizontal Output Restraint Condemned Under the Per Se Rule. ............................................................................................1

   B.  Defendants' After-the-Fact Attempt to Recharacterize the HRP As a Beef Marketing Program Is Flatly Contradicted By the Record Evidence ............................6

   C.  Defendants' Citation to and Analysis of Certain Case Law is Incorrect and/or Distinguishable ................................................................................................9

     1. The HRP Is Exactly the Type of Quintessential Horizontal Agreement to Restrict Output that the Supreme Court Has Held *Per Se* Illegal.................................10

     2. Factors of Supply and Demand Operate Straightforwardly in the Dairy Industry, as Defendants' Representatives and Experts Admit ......................................12

   D.  Defendants Fail to Demonstrate That the HRP Had Any Procompetitive Benefits and, in Fact, It Had None.................................................................................13

   E.  Even If the Rule of Reason Applies, Plaintiff Has Met Its Burden .........................14

II.     SUMMARY JUDGMENT IS NOT APPROPRIATE BASED ON FAILURE TO SHOW HARM ...................................................................................................... 17

III.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BASED ON THE CAPPER-VOLSTED ACT OR ANY OTHER IMMUNITY ........................... 17

IV.     CONCLUSION ............................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Catalano, Inc. v. Target Sales, Inc*., 446 U.S. 643 (1980)……………………….……..2

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)………...…………………………….13

*Cont'l T.V. v. GTE Sylvania*, 433 U.S. 877 (1977)…………………………………....11

*Edwards v. Nat'l Milk Producers Fed.*, No. C 11-04766 JSW, slip op.
    (N.D. Cal. Oct. 30, 2012)…………………………………………………………12

*Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980)…...…………19

*Grp. Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205 (1979)………...…………19

*In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141 (D. Idaho 2011)..18-19

*In re Matter of Washington Crab Ass'n*, 66 F.T.C. 45 (1964)……...…………………...18

*In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, slip op.
    (E.D. Pa. May 26, 2015)………………..……………………………….………6

*In re Processed Egg Prods. Antitrust Litig.*, 2016 U.S. Dist. LEXIS 133110
    (E.D. Pa. 2016)…………………………………………………………………19

*In the Matter of Cent. Cal. Lettuce Producers Coop.*, No. 8970, 1977 WL 188550
    (1977)……………………………………………………………………...18

*Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D.Ga. 1981)………..………19

*Leegin Creative Leather Prods. Inc. v. PSKS Inc.*, 551 U.S. 877 (2007)………...............1-2, 9

*Levine v. Central Florida Medical Affiliates*, 72 F.3d 1538 (11th Cir. 1996)…………...…1-2

*Maryland & Virginia Milk Producers Ass'n v. U.S.*, 362 U.S. 458 (1960…………………..19

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)………………….……..………..………1

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)………………………………………………….…………………2

*NCAA v. Board of Regents*, 707 F.2d 1153-1154 (10th Cir. 1983)……………….…..9, 15

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co*., 472 U.S. 284 (1985)...…..2

*Perez v. State Farm Mut. Auto. Ins. Co*., 2011 WL 7318754 (N.D. Cal. 2011)……………2, 9

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016)……………………..…...10

*Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555 (11th Cir. 1991)……...………..…11

*Sunkist Growers, Inc. v. Winkler & Smith Citrus Prods. Co.*, 370 U.S. 19 (1962)………....20

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203
    (9th Cir. 1974)……………………………………………………..…18-19

*United States v. Hui Hsiung*, 778 F.3d 738, 749 (9th Cir. 2015)...………………………2-3, 9

I.      **BECAUSE THE HRP WAS A QUINTESSENTIAL HORIZONTAL OUTPUT RESTRAINT CONDEMNED UNDER THE PER SE RULE, THE RULE OF REASON DOES NOT APPLY.**

Defendants' argument that this Court should use the Rule of Reason when applying Section 1 and find no violation should be rejected because: (1) the HRP was a quintessential horizontal output restraint condemned under the Per Se Rule; (2) Defendants' after-the fact attempt to recharacterize the HRP as a program to help dairy farmers market their cows for beef is flatly contradicted by the record evidence, including numerous Defendants' admissions; (3) Defendants' citation to and analysis of certain case law is incorrect and/or distinguishable; (4) Defendants have failed to demonstrate that the HRP had any procompetitive benefits and, in fact, it had none; and (5) even if the Rule of Reason applies, Plaintiff has met its burden by showing, *inter alia*, Defendants' market power, the relevant product and geographic market definitions, other industry factors that make the HRP anticompetitive, the HRP's anticompetitive effect, and the fact that it was not outweighed by any procompetitive benefits.

A.    **The HRP Was a Quintessential Horizontal Output Restraint Condemned Under the Per Se Rule.**

In its Motion for Partial Summary Judgment, Plaintiff amply demonstrates that Defendants engaged in a horizontal agreement to restrict output (Dkt. 267 pp. 2-15). A horizontal agreement to restrict output is a *per se* violation of Section 1. *Levine v. Central Florida Medical Affiliates*, 72 F.3d 1538, 1545-46 (11th Cir. 1996) ("the Supreme Court has held that certain kinds of agreements are unreasonable *per se*, such as agreements among direct competitors to fix prices or to restrict output").[1] As the Supreme Court explained, certain

---

[1] *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) (horizontal price-fixing agreements are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"); *Leegin Creative Leather Prods. Inc. v. PSKS Inc.,* 551 U.S. 877,

categories of agreements have been held to be *per se* illegal, because they "would always or almost always tend to restrict competition and decrease output."[2] Restraints on output or supply fall into this category. In its seminal decision in *Socony*, the Supreme Court held that a *per se* analysis applied when chronic oversupply of oil led to an agreement where the "only aim and result" was to raise prices.[3] Since that decision, the Supreme Court has repeatedly held that "output limitation[s] are ordinarily condemned as a matter of law under an 'illegal *per se*' approach because the probability that these practices are anticompetitive is so high," and emphasized that "[r]estrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."[4]

The Ninth Circuit recently reiterated that the Supreme Court's "directive … is unequivocal: A horizontal cartel among compet[itors] that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful."[5] The Eleventh Circuit has long recognized that "certain kinds of agreements are unreasonable *per se*, such as agreements among direct competitors to … restrict output." *Levine*, 72 F.3d at 1545-46. That is exactly what we have here: the HRP was formed by horizontal competitors – the Defendant cooperatives and their members[6] – to implement an agreement with the express intended

---

886 (2007) ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices.").

[2] *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-90(1985).

[3] *United States v. Socony-Vacuum Oil Co. Inc.*, 310 U.S. 150, 213 (1940). *See also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) ("'[A] combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate … commerce is illegal *per se*.'") (quoting *Socony-Vacuum*, 310 U.S. at 223).

[4] *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107-08 (1984).

[5] *United States v. Hui Hsiung*, 778 F.3d 738, 749 (9th Cir. 2015)(scheme to raise price of LCD panels was subject to *per se* analysis under the Sherman Act); *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2011 WL 7318754, at *5 (N.D. Cal. Mar. 23, 2011)("the Sherman Act makes a conspiracy among competitors to restrict output unlawful *per se* without regard to any of its effects").

[6] DFA's corporate representative testified: "if we learn of someone else pricing milk to their competitor at a lower price than what we're charging them, then we're going to match it". Ex. 1, Deposition of John Wilson, January 8, 2015, 124:22-24. Defendants' argument that the HRP involved a vertical agreement should be rejected, as

purpose to reduce raw milk supply and thereby raise milk prices. Furthermore, Defendants admitted that dairy producers paid their competitors (other dairy producers) to kill dairy cows prematurely.[7] This agreed upon restraint between competitors increased milk prices based on fundamental laws of supply and demand.[8] Such horizontal output restraints are *per se* unlawful.

Defendants attempt to evade the "unequivocal directive" that the HRP is per se illegal under Section 1, arguing it did not control farmers' decisions on production. DSJM, p. 17.[9] First, this argument should be rejected because CWT engaged in concerted behavior (by an agreement among cooperatives that Defendants do not contest) to pay competing producers hundreds of millions to prematurely slaughter half a million cows.[10] This concerted behavior among horizontal competitors interfered with the free market – the HRP's stated goal and trumpeted success was to reduce the supply of milk below what it would have been without the restraint. Thus, the evidence satisfies the Per Se Rule because it establishes a "horizontal [agreement] among competitors that decreases output … in order to increase price."[11]

Second, this argument should be rejected because (a) the record and empirical evidence show that the cooperatives that agreed to create and joined the HRP had over 67% of the raw milk supply, (b) dairy farmers join cooperatives to gain market power, and (c) once a cooperative joined the HRP, its members were required to fund the HRP. First, most

---

discussed, *infra*, on p. 11.

[7] Ex. 2, Deposition of Edward Gallagher, June 17, 2015, 77:2-6.

[8] *See, e.g.,* Ex. 3, Gallagher Dep. Ex. 6 (D00027114-120).

[9] Contrary to Defendants' assertion, Plaintiff's expert did not admit that they did not control the supply of raw milk. Dr. Connor clearly found that the OOPs were increased from the HRP (Ex. 4, Expert Report of John M. Connor, Ph.D., pp. 54-60). Moreover, his report clearly notes that Defendants had sufficient market power to reduce supply (using the HRP as a facilitating mechanism) (Ex. 4, Connor Initial Report, p. 11-13, 28-32). Both Drs. Connor and Ricchetti agree that Defendants had substantial market power over pricing, and that power of pricing equates to power over supply (Ex. 5, Expert Rebuttal Report of John M. Connor, Ph.D., p. 48-51; Ex. 6, Expert Report of Bryan M. Ricchetti, Ph.D., ¶ 100).

[10] Dkt. 267, p. 3.

[11] *Hsu Hsiung*, 778 F.3d at 749.

importantly, Defendants and CWT required that 67% of U.S. dairy farmers participate in the HRP, a threshold put in place to "minimize the free rider impact,"[12] which was met and exceeded.[13] By referring to the "free rider impact," Defendants admitted that (a) the HRP controlled the raw milk production of their member farmers, and (b) they expected that having the HRP represent at least 67% of the U.S. dairy production meant that it would (i) be successful in reducing supply sufficiently to increase prices, and (ii) affect the raw milk price across the entire U.S. dairy production, not just the production represented in the HRP.  Thus, it is not plausible for Defendants to argue that they did not control the raw milk supply through the HRP when they specifically included a percentage of U.S. production of raw milk as a threshold for not only the HRP's success but whether it would go forward in the first place.

Second, Defendants' expert testified that dairy farmers gain market power by joining cooperatives.[14] In addition, Defendants' market power, including power to set prices, equates to the power to control and restrict supply.[15] Third, once a cooperative joined the HRP, its members had no choice but to fund the program, which they did in the staggering amount of $490 million, hardly an amount they would have paid if the HRP was not intended to reduce the supply of raw milk and increase and stabilize its price, and not successful in doing so.[16]

---

[12] Ex. 7, CWT *News*, March 2009 (NMPF0013488-89), at -88; Ex. 8, Deposition of Thomas Wegner, January 22, 2015, 60:12-16.

[13] Joint Answer, ¶ 77.

[14] Ex. 9, Deposition of Bryan M. Ricchetti, Ph.D., March 22, 2018, 82:1-19, 85:9-18, 90:1-10, 91:19-24, 91:25-93:25. Dr. Novakovic agreed. Ex. 10, Deposition of Andrew Novakovic Dep., March 16, 2018, 155:25-156:8. Dr. Ricchetti also testified that the 1% of the market that he was referring to was only referring to the fact that the cows slaughtered under the HRP was 1% of the number of cows (Ex. 9, Ricchetti Dep. 72:15-73:9). However, not only is this not the correct way in which to view the impact of the HRP in terms of a percentage (Ex. 5, Connor Rebuttal Report, pp. 51-53), but also Dr. Novakovic, Dr. Brown and Defendants' representatives admit that even a small change in supply can cause a large increase in price (Ex. 10, Novakovic Dep. 270:14-271:1; Ex. 11, Deposition of Dr. Scott Brown, November 7, 2014, 46:1-3, 46:8-9; Ex. 12, Deposition of Calvin Covington, December 6, 2017, 94:12-95:4, 96:15-20; Ex. 1, Wilson Dep. 64:25-65:18; Ex. 13, Wilson Dep. Ex. 4 (DFA2013-00001132-139).

[15] Dr. Ricchetti testified that market power can be exercised through either a price increase or a supply restraint, Ex. 9, Ricchetti Dep., 328:8-18.

[16] Ex. 1, Wilson Dep. 46:2-18; Ex. 10, Novakovic Dep. 166:18-167:1; Ex. 15, Deposition of Jerome Kozak, February 5, 2015, 112:23-113:3.

Finally, Defendants' experts admit that even a small reduction in supply will cause a large price increase and accelerating culling constitutes a supply reduction.[17] Therefore, Defendants' argument that they did not control the raw milk supply is contradicted by the admissions of their experts and representatives, which demonstrates that the HRP did control and/or affect at least 67% of raw milk supply and increased the raw milk price for 100% of the raw milk supply.

Defendants argue that the HRP is not a "naked" restraint because it did not limit production by dairy farmers. DSJM, pp. 18-19.[18] However, the HRP removed dairy cows from the U.S. herd sooner than they would have been removed. Thus, the HRP itself created an immediate reduction in supply. Defendants' expert admits that this is a supply reduction (Ex. 14, Expert Report of Andrew M. Novakovic, Ph.D., p. 41; Ex. 10, Novakovic Dep., 270:14-271:1). Against this clear supply reduction, Defendants essentially argue that the HRP was not effective because dairy farmers <u>could</u> have increased production. However, this argument does not affect whether the HRP was a horizontal agreement to restrict or reduce output – it clearly reduced output. Finally, Dr. Brown's contemporaneous regression analysis, which Defendants adopted to tout the HRP's success to their members (PMPSJ, pp. 9-12), accounted for a possible supply response – increased production in light of rising prices from the HRP – finding that it nevertheless caused supply to be lower that it would have been without the HRP.[19] Defendants admitted this.[20] By contrast, Defendants provide no empirical analysis (that would pass muster), as they must, that dairy farmers increased production and that increase offset the

---

[17] Dr. Novakovic agreed that the HRP "has an effect on supply" (Ex. 10, Novakovic Dep. 270:12-271:1). Dr. Scott Brown testified that "[d]airy markets tend to be very inelastic" meaning that "[s]mall changes in supplies can make for large movements in pricing when markets are very inelastic." (Ex. 11, Brown Dep. 46:1-3, 8-9.) Dr. Novakovic also testified that the demand and supply of milk is inelastic (Ex. 10, Novakovic Dep. 198:21-199:18). There is ample academic literature confirming inelastic demand and inelastic supply. (Ex. 4, Connor Initial Report, ¶¶18, 34, 41; Ex. 5, Connor Rebuttal Report, ¶¶65, 79.)

[18] *See* discussion, *supra*, fn. 10.

[19] Ex. 16, *The Impact of the CWT Program on the U.S. Dairy Industry*, August 2008 (BROWN-MU_0000574-587) at -576; Ex. 11, Brown Dep. 217:12-14.

[20] *See, e.g.*, Ex. 15, Kozak Dep. 47:7-48:17; *see* discussion, *infra*, p. 7.

HRP's clear supply reduction.[21] Indeed, a significant supply response is inconsistent with the academic literature noting inelastic supply[22] and is refuted in Dr. Connor's model, which measures the effect of CWT, net of any hypothetical supply response.[23] Finally, Defendants' expert admits that milk supply is inelastic.[24] Thus, Defendants' argument should be rejected.

Finally, Defendants' assertion that they did not engage in production restraint, so the Rule of Reason should apply, runs directly counter to the Supreme Court's directive that an output restraint shall be "ordinarily condemned as a matter of law under an illegal *per se* approach because the probability that these practices are anticompetitive is so high."[25] Indeed, the court in *In re Mushrooms Direct Purchasers Antitrust Litig.* condemned a similar supply control program as *per se* illegal. There, the defendant mushroom cooperative purchased mushroom farms and sold them with permanent deed restrictions prohibiting any future mushroom farming. Much like HRP's prematurely slaughtered cows could no longer be used to make milk, the land and facilities at issue in *In re Mushrooms* could no longer be used to grow mushrooms. The court held that this supply control program was a horizontal output restraint and a *per se* violation of the Sherman Act.[26] This Court should rule the same way.

### B. Defendants' After-the-Fact Attempt To Recharacterize the HRP As a Beef Marketing Program Is Flatly Contradicted By the Record Evidence.

Defendants' after-the-fact attempt to recharacterize the HRP as a beef marketing program is flatly contradicted by the record evidence, especially their contemporaneous

---

[21] *See* Plaintiff's Motion to Exclude or Limit The Opinions of Defendants' Experts (Dkt. 263), *passim* ("PDM").

[22] Ex. 17, Chavas, Jean-Paul and Richard M. Klemme, *Aggregate Milk Supply Response and Investment Behavior on US Dairy Farms*, 68 American Journal of Agricultural Economics 55, 55 (1986).

[23] Ex. 5, Connor Rebuttal Report, pp. 55-63.

[24] Ex. 10, Novakovic Dep. 182:11-183:9, 234:23-235:5.

[25] *NCAA*, 468 U.S. at 100.

[26] Ex. 18, *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, slip op. at 34-35 (E.D. Pa. May 26, 2015).

admissions. According to CWT's bylaws, its sole stated purpose was "to improve the prices that farmers receive for their milk,"[27] and their means was supply restraint. A June 2003 CWT brochure explains that "CWT is designed to reduce dairy inventories and milk production in order to provide meaningful financial returns to dairy producers in all parts of the country."[28] Another CWT brochure reiterates that its "objective is to help strengthen and stabilize producer prices" and "in order to achieve this goal, we will reduce national milk production."[29]

Defendants' representatives all confirmed this. NMPF's representative admitted that "the means by which the Herd Retirement Program operated to strengthen and stabilize prices received by milk producers was to reduce the supply of milk to be less than what it would have been without the program."[30] DFA's representative testified that the Program was "an important tool to reduce the supply of milk in order to raise prices paid to producers."[31] LOL's representative agreed that "the purpose of the Herd Retirement Program was to reduce the supply of milk in order to have some impact on price."[32] Mr. Gallagher of Dairylea stated that the "primary goal" of the Herd Retirement Program "was to strengthen and stabilize milk prices by reducing the nation's supply of raw milk."[33] Finally, when asked whether "the goal of the Herd Retirement Program was to accelerate the supply of beef," DFA's representative responded that it was "a program to help dairy farmers get rid of their surplus milk."[34] This is

---

[27] Ex. 19 (NMPF0002550).
[28] Ex. 20 (NMPF0000006).
[29] Ex. 21 (AMFL0000218). *See also, e.g.,* Ex. 22 (NMPF00008934); Ex. 23 (NMPF0014090, 14091); Ex. 24 (NMPF0000035, 36); Ex. 25 (NMPF0004859, 4864); Ex. 26 (AMFL0004165, 4168); Ex. 27 (NMPF0014339); Ex. 28 (LOL00058926, 58929).
[30] Ex. 15, Kozak Dep., 47:7-12, 48:4.
[31] Ex. 1, Wilson Dep., 63:13-17.
[32] Ex. 8, Wegner Dep., 37:11-14.
[33] Ex. 2, Gallagher Dep., 14:21-24.
[34] Ex. 1, Wilson Dep., 271:20-272:1. He also explained that they expected "very limited impact, if any at all" on the beef market. *Id.* at 274:3-9; *see also* Defs' Ex. 12, at 2.

not surprising. After all, CWT's members are dairy farmers – not cattle ranchers. As DFA puts it, "We're all about milk and the nearly 13,000 dairy farmer members who produce it."[35] Likewise, NMPF President and CEO testified that the HRP had two purposes, including increasing the price of milk and stabilizing the price of milk – nothing about marketing beef.[36]

That CWT paid farmer members to kill pregnant cows (bred heifers)[37] underscores that the HRP was not about marketing beef. Mr. Gallagher acknowledged that a younger cow "is generally more valuable … in the milking herd, as opposed to selling it for beef,"[38] and could have been sold to other dairy producers for more money, but CWT incentivized their slaughter to remove the productive (and more valuable) cows to reduce milk supplies[39] – not maximize return on "co-products." Mr. Gallagher also agreed that revenue from cow sales into the beef market is dwarfed by dairy related revenues.[40] Everything the HRP did was to reduce supply as much and effectively as possible. Thus, Defendants' assertion that the HRP helped "dairy farmers to market their dairy cattle for beef" is an after-the-fact fabrication (Dkt. 264, p. 3). Therefore, the reality (over which there can be no material factual dispute) is that the HRP was designed to limit the production of milk – not market dairy cows for beef.

Finally, even if Defendants had not contemporaneously admitted that the HRP was not intended to help dairy farmers market their cows for beef and was not responsible for marketing

---

[35] *See* Ex. 29, Dairy Farmers of America, *Our Mark*, accessed May 22, 2019, http://www.dfamilk.com/node/446.

[36] Ex. 15, Kozak Dep., 55:16-56:8. He also testified that each herd retirement round was timed based on the number of cows in production because "cow numbers above 9 million would increase supply relative to demand that would have the effect of lowering milk prices." *Id*., 65:3-7, 72:23-73:20.

[37] Ex. 1, Gallagher Dep. 39:21-40:12; Ex. 15, Kozak Dep. 32:6-25; Ex. 30 (D00020451); Ex. 31 (BROWN-MU_0001487, 1508-1513) (describing Bred Heifer Program); Ex. 15, Kozak Dep. 166:20-167:24.

[38] Ex. 2, Gallagher Dep. 24:24-25:6.

[39] *Id*. at 25,33.

[40] *Id*., at 29-31. *See also* Ex. 5, Connor Rebuttal Report, ¶6. Defendants also admit this in the Affidavit of Neal Rea, ¶12 (Dkt. 264-16)("our main source of income is from … raw milk …, which … accounts for … 95% of our farm's annual income").

the cows for beef, any such marketing would not mean that the supply restraint was not illegal. In *NCAA v. Board of Regents*, the NCAA argued that "in the process of 'manufacturing' football, two products are produced": the right to attend a game and the right to televise a game,[41] and that it limited "televised football in order to protect gate attendance."[42] But the Supreme Court held that output reduction in televised games was not justified by efforts to facilitate a corresponding increase in live attendance and gate revenues.[43] Indeed, "an output reduction in one market often facilitates an output increase in a competing market, but such an increase is never a defense to an anticompetitive output reduction in the primary market."[44] In other words, as here, an illegal output restraint is not absolved based on its "association with other productive joint activity."[45] Thus, this case is like *Socony* and others in which the Supreme Court has long held that production restraints should be condemned as *per se* unlawful, because it can "predict with confidence" their anticompetitive effects.[46]

## C. Defendants' Citation to and Analysis of Certain Case Law Is Incorrect and/or Distinguishable.

Against the clear, compelling case law discussed in Plaintiff's Motion for Partial Summary Judgment (*see also* PMPSJ, pp. 13-15), holding that horizontal agreements to restrict output are *per se* illegal under Section 1, Defendants attempt to avoid the force of these decisions by arguing that (1) the HRP is somehow unlike the prior horizontal agreements to restrict output held to be *per se* illegal, (2) forces of supply and demand do not operate normally in the dairy industry, (3) dairy cows are directed to two different markets, and (4) the HRP has procompetitive benefits – all in an attempt to persuade this Court that the Rule of Reason

---

[41] 707 F.2d at 1153-54 (10th Cir. 1983).

[42] 468 U.S. 85, n. 59 (1984).

[43] *Id.* at 116 (so holding both factually and legally).

[44] Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, ¶ 1912f (2d ed. 2001).

[45] *Id.* at ¶¶ 1908b, 1908f.

[46] *See* Section B(3); *Hsiung*, 778 F.3d at 749 (citing *Leegin,* 551 U.S. at 893); *Perez,* 2011 WL 7318754, at *5.

should apply. Arguments (1), (2) and (3) are dealt with in this Section and argument (4) in a separate section. This Court should reject Defendants' arguments for the following reasons.

### 1. The HRP Is Exactly the Type of Quintessential Horizontal Agreement to Restrict Output that The Supreme Court Has Held *Per Se* Illegal.

First, the case law is clear and compelling that a horizontal agreement to restrict output is *per se* illegal under Section 1. Ever since *Socony Vacuum*, the Supreme Court and lower courts have been consistent in so holding. *See* discussion, *supra*, pp. 1-3. Thus, Defendants' argument that the Per Se Rule is reserved for only those types of conduct for which courts have "considerable experience" gives way under the weight of this precedent. The Supreme Court and lower courts have "considerable experience" with horizontal agreements to restrict output.

Second, in a similar fashion, Defendants' argument that the Rule of Reason should not apply because the HRP was not a "naked restraint" should be rejected.  In so arguing, Defendants cite to *Procaps S.A. v. Patheon, Inc.,* 845 F.3d 1072 (11th Cir. 2016). However, *Procaps* dealt with an undoubtedly "new factual context," where plaintiff argued that a pre-existing joint venture agreement transformed into a Section 1 violation when its partner acquired one of plaintiff's competitors. *Id.* at 1080. Thus, that decision did not involve a typical horizontal agreement among competitors (Defendant cooperatives) to create and implement the HRP for the purpose of reducing the supply of raw milk and increase and stabilize its price. Finally, *Procaps* is distinguishable because the Eleventh Circuit first held that the concerted action requirement was not met, an issue not present here. *Id.* at 1080-82.

Defendants curiously cite to *Leegin*, as did Plaintiff. *See* fn. 1, *supra*. However, the Supreme Court there reaffirmed that the Per Se Rule applied to horizontal agreements to fix prices (551 U.S. at 886). As Defendants' experts admit, restricting supply is the same as fixing

prices.[47] (Ex. 6, Ricchetti Report, ¶ 101) Finally, Defendants' contention that the HRP was a vertical agreement, not a horizontal one, is contradicted by the undisputed facts that Defendant cooperatives are competitors and entered into an agreement to restrict output in order to reduce supply and increase and stabilize price.  Finally, the contention that the agreements with each bidding dairy farmer are vertical should be rejected because (1) the agreement challenged is to create and implement the HRP, (2) the agreement between the HRP and each successful bidder is simply evidence of the HRP's intended purpose to reduce supply and increase and stabilize prices, and (3) Defendants' experts admit that dairy farmers join a cooperative to gain market power – the cooperative's market power – and, at bottom, dairy farmers are the cooperative.[48]

Finally, the "positive reactions" from USDA and members of Congress should be rejected for several reasons.  First, Defendants admit that they never sought a formal opinion or clearance from the USDA or the DOJ that the HRP did not violation Section 1 (or was subject to immunity under the Capper-Volstead Act for that matter), and that they did not do so because the USDA does not provide such opinions or clearances.[49]  In addition, they did not seek for Congress to pass any legislation that would hold that the HRP or a program of its type was legal under Section 1 or was immune. Finally, as seen below and in Plaintiff's Motion for Partial Summary Judgment, the DOJ and the USDA have stated unequivocally that the Capper-Volstead Act does not apply to production restraints. PMPSJ, pp. 20-22. Thus, in light of the

---

[47] Defendants' reliance on *Cont'l T.V. v. GTE Sylvania*, 433 U.S. 877 (1977), is misplaced because there the Supreme Court announced that vertical price-arrangements would be subject to the Rule of Reason. *Id.* at 59. Defendants' citation to *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555 (11th Cir. 1991), is also unavailing (DSJM, p. 16). There, the Eleventh Circuit held that the Rule of Reason applied to a unilateral refusal to deal (*id.* at 1568-69), contrasting a unilateral refusal to deal with a concerted one, holding that "concerted refusals to deal are subject to the per se rule of illegality." *Id.* at 1568 (citations omitted).  Finally, the court held that the challenged arrangement was a vertical one, not a horizontal one, mandating the Rule of Reason's application. *Id.* at 1569. Thus, *Seagood Trading* has no application to the horizontal agreement to restrict output here.
[48] Ex. 10, Novakovic Dep. 155:25-156:8, 170:18-171:3; Ex. 9, Ricchetti Dep. 90:1-91:24, 93:16-25; fn. 14, *supra*.
[49] Ex. 15, Kozak Dep., 38:5-12, 39:13-17, 40:5 (USDA), 41:8-22 (DOJ).

above, statements of USDA and members of Congress, in all due respect, do not bear on the

HRP's legality under Section 1 nor whether the Per Se Rule or the Rule of Reason applies.[50]

### 2. Factors of Supply and Demand Operate Straightforwardly in the Dairy Industry, as Defendants' Representatives and Experts Admit.

Supply and demand factors operate in the dairy industry in a straightforward manner.

Dr. Novakovic admitted that demand for milk was inelastic. Ex. 10, Novakovic Dep., 198:21-

199:18; Ex. 9, Ricchetti Dep., 301:14-302:5, 316:3-12. DFA's corporate representative

testified: "you don't have to have a Ph.D. in economics to realize that if you accelerate the

slaughter of cows, that's got to be good for the milk price." (Ex. 1, Wilson Dep., 347:18-25).

Their experts and representatives would not admit (so unequivocally) that demand for milk is

inelastic if traditional forces of supply and demand were not at work.

Moreover, Defendants' argument that their output restraint is not *per se* illegal because

OOPs are not subject to competition among cooperatives based on normal principles of supply

and demand should be rejected because the court in *Edwards* held that "market forces still play

a substantial role" in the setting of OOPs.[51] In addition, Defendants' experts and

representatives admit that OOPs are subject to market forces of supply and demand.[52]

Even if some supply and demand factors do not operate in a traditional sense, that is

insufficient to eliminate the well-established precedent that a horizontal agreement to restrict

output like the HRP is *per se* illegal under Section 1. *NCAA*, 468 U.S. at 100. Finally, as

---

[50] These statements are also inadmissible as double hearsay.  The only implication from them, why Defendants are offering them, is that the HRP is legal or legitimate and/or has procompetitive benefits. Thus, they are being offered for the truth of the matter asserted, and must be excluded as double hearsay. Fed.R.Evid. 801.

[51] Ex. 32, *Edwards v. Nat'l Milk Producers Fed.*, No. C 11-04766 JSW, slip op. at 8-10 (N.D. Cal. Oct. 30, 2012)(denying motion to dismiss, noting "Plaintiffs further plead that the "over-order" price of milk is unregulated and determined solely by market forces").

[52] Ex. 1, Wilson Dep., 73:6-16, 78:10-22, 79:17-22, 101:6-103:22, 238:5-22; Ex. 12, Covington Dep., 197:11-25; Ex. 33, Deposition of Dr. Richard W. Stammer, January 30, 2015, 95:19-96:11, 117:25-118:12, 129:8-18; Ex. 10, Novakovic Dep., 189:6-6, 10-14; Ex. 9, Ricchetti Dep., 46:19-48:10.

demonstrated by Plaintiff's expert, the existence of marketing agencies in common ("MACs"), and Defendants' market power and their ability to set prices under the Capper-Volstead Act does not mean that factors of supply and demand do not apply to the production of raw milk.[53]

### D. Defendants Fail to Demonstrate That the HRP Had Any Procompetitive Benefits and, in Fact, It Had None.

The HRP did not have any procompetitive benefits – justifying application of the Rule of Reason, much less any enabling Defendants to prevail. They contend that herds slaughtered through the HRP were less productive herds – the farmers were less efficient,[54] making remaining farmers more efficient.[55] This is incorrect. First, DFA's representatives testified there was no measurement of efficiency used to determine which bids would be accepted,[56] and the HRP did not make remaining farmers more efficient.[57] Ex. 1, Wilson Dep. 89:3-7. Finally, the HRP's regional limits underscore that it was devoted to limiting output proportionately across the country – not increasing it through more efficient production.[58]

---

[53] Ex. 5, Connor Rebuttal Report, ¶¶88-97. Defendants' experts did not test these assertions, so they cannot refute Dr. Connor's results that they do not materially change his model's results, after testing them. *See* PDM, p. 11 fn. 14, pp. 10-14. Thus, Defendants' argument that Plaintiff failed to disentangle any increases in OOPs set by MACs from any unlawful increase caused by the HRP is incorrect; Dr. Connor specifically accounted for this in his model and sensitivity tests. *Id.* Moreover, Defendants' citation to *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), is misplaced because there the Supreme Court held that the class of subscribers was improperly certified since the damages model did not isolate damages for the providers' alleged swapping activities from other theories of antitrust impact which were rejected. The model thus could not establish that damages attributable to the accepted theory were susceptible of measurement across the entire class. That is clearly not the case here; Defendants do not argue that remaining herds or impact cannot be isolated from rejected ones. Rather, Defendants argue that Dr. Connor's model does not isolate anticompetitive conduct from legitimate conduct. Not only is this argument incorrect, as his model controls for legitimate conduct, but also this argument does not fall within *Comcast* for the reason set forth above, as well as the fact that *Comcast* dealt with class certification.

[54] Defendants' argument that the HRP was efficient because it prevented dumping of raw milk should be rejected because it is (1) not supported by any empirical evidence, and (2) contradicted by their own admissions. Ex. 1, Wilson Dep., 39:5-6 ("You gotta do something with it. You don't want to dump it on the ground").

[55] DSJM, p. 20 ("By removing less productive herds, the remaining herds were more efficient …"). Dr. Ricchetti does not assert that the reduced raw milk supply would lower balancing costs. Ex. 6, Ricchetti Report, p. 87.

[56] Ex. 1, Wilson Dep., p. 90; Ex. 2, Gallagher Dep. 19:23-20:3.

[57] Under economic principles, if the HRP achieved efficiency, milk prices would have decreased, not increased.

[58] Ex. 5, Connor Rebuttal Report ¶ 78 ("even if a bid-based herd retirement system were to select the least efficient herds under economic theory, the actual implementation of the CWT HRP explicitly prevented that outcome through its regional bidding zones, which ensured a nationwide supply reduction"; Ex. 2, Gallagher Dep. 16:19-18:2.

Were increasing efficiency the aim, Defendants could have designed the HRP to facilitate the sale of less efficient farmers' cows to more efficient farmers,[59] but instead it facilitated their removal from the national herd. Mr. Gallagher testified to the reason for this – if dairy farmers sell their productive cows to other dairy farmers, it would have significantly reduced the HRP's effectiveness.[60] So there can be no question that the aim and effect of the premature herd slaughters were to decrease milk production. Indeed, Defendants and their co-conspirators would not have continued to invest hundreds of millions of dollars into the HRP if its aim and effect were ultimately to increase production.[61] That simply is not plausible.[62]

Because Dr. Brown confirmed annually that output would have been higher absent the HRP,[63] the factual record here overwhelmingly demonstrates that the only aim and effect of Defendants' conspiracy were to decrease output and increase price – just as in *Socony*. Indeed, Defendants' conclusory assertions regarding the "unique and complex" nature of the CWT program ring hollow. In actuality, it is a very basic supply restraint, over which courts have considerable experience and can predict anticompetitive effects with confidence.

### E. Even If the Rule of Reason Applies, Plaintiff Has Met Its Burden.

Even under the Rule of Reason, reducing output and raising prices are "hallmarks of

---

[59] Ex. 2, Gallagher Dep. 25:18-22 ("Q. In addition to selling dairy cows to be used for beef, at some point in their lives, can dairy producers sell dairy cows to other dairy producers to be used as dairy cows? A. Yes, they can and they do.").

[60] Ex. 2, Gallagher Dep. pp. 35-36: "if the program resulted in a dairy participating in the Herd Retirement Program and culling their animals, but half of them went to another farm, then it would not result in the intended purpose of reducing the surplus milk on the market to the degree that it could possibly. And so the focus was to have a program that required the dairy farmer who was … retiring their herd, … to sell or cull all … all their milking stock for slaughter. So that there weren't productive cows from that farm that ended up at another farm." In addition, Ex. 34, Gallagher Dep. Ex. 5 at D00018228-229 notes: "The objective is to shut down the greatest volume of production at the lowest possible price."

[61] Ex. 5, Connor Rebuttal Report ¶88 notes "…if cooperatives could simply use their existing market power to legally increase prices and OOPs, there would be no justification for the existence of the CWT HRP at all, let alone for it spending $490 million in 10 separate herd retirements from 2003-2010."

[62] It was not logistically possible given the supply elasticity of the industry. Ex. 5, Connor Rebuttal Report, ¶65.

[63] Ex. 36, *CWT Committee Meeting*, June 8, 2010(NMPF0002599-2648), at -2617.

anticompetitive behavior" that place a "heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market."[64] Defendants cannot meet this burden to obtain summary judgment under the Rule of Reason.

Plaintiff will be able to establish that the HRP violated Section 1 under the Rule of Reason.[65] First, Plaintiff has established that the relevant product is raw milk and the relevant geographic market is the Southeastern U.S. (Ex. 4, Connor Initial Report, p. 26; Ex. 35, Deposition of John M. Connor, Ph.D., February 13, 2018, 125:1-5). Second, Plaintiff has established that Defendants had market power with a market share between 80%-90% in the Southeastern U.S., as their experts admit. (Ex. 4, Connor Initial Report, ¶ 22; Ex. 5, Connor Rebuttal Report, ¶ 56). *Id.* Third, Plaintiff has established that Defendants agreed to create and implement the HRP with the express, intended purpose of reducing the supply of raw milk in order to increase and stabilize its price. PMPSJ, pp. 2-9. *Id.* Fourth, Plaintiff has established that the HRP and Defendants' conduct reduced the raw milk supply compared to what it would have been without the HRP. Id., pp. 9-13. *Id.* Finally, Plaintiff has established that the HRP and Defendants' conduct did not have any procompetitive benefits (Ex. 5, Connor Rebuttal Report, ¶¶131-138), and their anticompetitive effect was not outweighed by any procompetitive benefits.[66] *Id.* Even if the Rule of Reason applies, not only can Plaintiff establish a Section 1 violation, but also Defendants are not entitled to summary judgment.

Finally, Defendants make the bald-faced assertion – their only argument why Plaintiff cannot prove a violation under the Rule of Reason – that Plaintiff's expert failed to define a relevant geographic market. (DJSM, p. 21.) This is simply false. Dr. Connor did an analysis to

---

[64] *NCAA,* 468 U.S. at 113; Areeda, *fn. 44,* ¶ 1912h ("The proffered defense must tend to show that … the effect of the challenged restraint is actually to increase rather than decrease output").

[65] *Levine*, 72 F.3d at 1551: "Rule Of Reason analysis requires the plaintiff to prove (1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the conduct has no procompetitive justification."

[66] *Id.*

determine his choice of the Southeastern U.S. For example, he analyzed: (1) WD purchase data and distribution center locations;[67] (2) USDA market definitions ("FMMOs"), citing a USDA website noting that a "marketing area is generally defined as a geographic area where handlers compete for packaged fluid milk sales;"[68] (3) HRP's bidding region geographies and related data;[69] (4) Defendants' regional councils[70] (*e.g.*, Southeastern Dairy Cooperative Association); and (5) OOPs across the southeast CWT bidding region (*e.g.,* Appalachian, Florida, and Southeast FMMOs).[71]  Finally, he testified that he was:

> being guided to some extent by physical shipments of milk at various stages, and that is how we came up with this market location… You look for a market where there is minimal leakages out and in, 10 percent, 20 percent, you know. So … that was one source of guidance …, plus we knew the location of the Plaintiff's distribution plants and processing plants, and the distance that milk is shipped, which has increased during this time period as well as prior to the time period. … these physical -- geographic markets for raw milk have -- have expanded. [B]ecause shipping costs have been reduced, highways have been improved, refrigeration has improved, the trucks get a little bit bigger, sanitation methods have improved, so you can ship it longer distances. So, we are dealing with what I think is a reasonably large area with … practically, no outward bound milk, and at certain times of the year some milk from the upper Midwest coming in, but not enough to destroy the 10 or 20 percent standard that one would use for defining a geographic market. (Ex. 35, Connor Dep., 123:5-124:15)

Therefore, Dr. Connor clearly properly defined the relevant geographic market as the Southeastern U.S., and did so consistent with the standards of the economic profession. Furthermore, in their Daubert motion, Defendants did not challenge Dr. Connor's relevant geographic market definition.[72] Finally, since they did not challenge Dr. Connor's geographic market definition in their Daubert motion, their argument is essentially that they disagree with that definition – not a basis to award them summary judgment on this issue.

---

[67] Ex. 4, Connor Initial Report, pp. 48-49; Ex. 5, Connor Rebuttal Report, p. 48; Ex. 35, Connor Dep. 78:20-79:20, 111:3-19, 123:5-124:15, 130:19-131:2.
[68] Ex. 4, Connor Initial Report, pp. 13-15; Ex. 37, United States Department of Agriculture, *Federal Milk Marketing Orders*, accessed October 22, 2018 at https://www.ams.usda.gov/rules-regulations/moa/dairy.
[69] Ex. 4, Connor Initial Report, fn 20, fn 161, pp. 49-50; Ex. 5, Connor Rebuttal Report, pp. 45, 66, and 101.
[70] Ex. 5, Connor Rebuttal Report, p. 49.
[71] Ex. 4, Connor Initial Report, pp. 48-52.
[72] Dr. Ricchetti did not challenge the choice of the southeast region regarding Class I/II OOPs. Ex. 6, Ricchetti Report, pp. 74-75.

## II.     SUMMARY JUDGMENT IS NOT APPROPRIATE BASED ON FAILURE TO SHOW HARM.

Defendants' argument that Plaintiff cannot show antitrust injury should be rejected because: (1) Dr. Brown's statements and Defendants' admissions that the HRP reduced the but-for supply of raw milk and increased the All-Milk Price, which includes the entire OOP, including the r-BST free premium and the fuel surcharge,[73] are party admissions against Defendants;[74] (2) their 1% argument must be rejected because (a) the record and empirical evidence show that the cooperatives that agreed to create and joined the HRP had over 67% of the raw milk supply, (b) Plaintiff's expert defined the relevant product as raw milk and the relevant geographic market as the Southeastern U.S., (c) dairy farmers join cooperatives to gain market power, (d) Defendants' market power (controlling 80%-90% in the Southeast), including the power to set prices, equates to the power to control and restrict supply, and (e) once a cooperative joined the HRP, its members were required to fund the HRP.[75]

## III.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BASED ON THE CAPPER-VOLSTED ACT OR ANY OTHER IMMUNITY.

As demonstrated in Plaintiff's Motion for Partial Summary Judgment, the Capper-Volstead Act does not include "producing" or "production." It cannot be disputed that the HRP was specifically intended by Defendants to reduce the number of dairy cows, thereby reducing raw milk production and its overall supply, in order to increase and stabilize its price, and the

---

[73] PDM, pp. 13-14, PMPSJ, pp. 10-13.

[74] Dr. Brown's statements are admissible as party admissions against Defendants because they adopted them in touting the HRP's effectiveness to their members (PMPSJ, pp. 10-12), he was authorized to make the statements because Defendants hired him with the express purpose of doing so, and he acted as Defendants' agent. Fed.R.Evid. 801(d)(2): "***An Opposing Party's Statement.*** The statement is offered against an opposing party and: (**B**) is one the party manifested that it adopted or believed to be true; (**C**) was made by a person whom the party authorized to make a statement on the subject; (**D**) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

[75] Defendants argue that Dr. Connor did no analysis connecting OOPs to the prices Plaintiff paid for fresh dairy products. However, he did an extensive analysis of OOPs for processed milk and other fresh dairy products, citing the SMI supply contract, his analyses showing that OOPs were correlated across all Classes of raw milk and across regions. See Plaintiff's Response in Opposition to Defendants' Motion to Strike or Exclude the Opinions of Plaintiff's Expert ("PDR"), pp. 6-8.

HRP did all of those things. In its Motion, Plaintiff also set forth a detailed, well-established analysis of statutory construction of the Act, starting with its plain language, which should be sufficient, given the lack of the words "producing" or "production," and especially that Congress knew how to/did use the word "production" in other statutes granting antitrust immunity, *e.g.*, Fishermens Collective Marketing Act.[76] Moreover, while resorting to legislative history is not necessary, it supports the conclusion that production was not included in the Act.[77] Finally, under DOJ and USDA opinions, the Act does not immunize cooperatives' conduct relating to production.[78] The courts and FTC have held the same.[79]

Against this overwhelming authority, Defendants argue that the term "marketing" in the Act can be broadly construed to cover production, relying principally on the Webster's dictionary and a book on marketing.[80] First, this argument was rejected by the Ninth Circuit in Treasure Valley.[81] Second, even if the Act's plain language was not sufficient to determine that production is not included, Defendants cite no authority for using a book on marketing to construe a federal statute.[82] Finally, their argument that the Act should be construed broadly in

---

[76] 15 U.S.C. §21; *see also In re Matter of Washington Crab Ass'n*, 66 F.T.C. 45 (1964)(construing same). *See* discussion in PMPSJ, p. 17 and fn. 100.

[77] PMPSJ, pp. 18-20.

[78] PMPSJ, pp. 20-22; In Business Review Letters, the DOJ has stated that "the Capper-Volstead antitrust exemption applies only to marketing and ***not production agreements***." *Id.* at fn. 117. The USDA has stated that "it is not legal for cooperatives to control members' production." *Id.* at fn. 123 and accompanying text. According to USDA guideline entitled "Understanding Capper-Volstead," "restrict[ing] [cooperative] members' agricultural output" would expose cooperatives to antitrust liability. *Id.* at f. 124 and accompanying text.

[79] *In the Matter of Cent. Cal. Lettuce Producers Coop.*, No. 8970, 199 WL 188550, at *62 n. 20 (1977).

[80] Defendants' contention that this Court made a finding in its January 16, 2019 decision that the HRP was a program that helped dairy farmers market their cows for beef (DSJM, p. 13), should be rejected because (1) the section of the decision referenced is entitled "Factual Background," in which the Court (a) did not make any factual findings and was citing to Mr. Kozak's declaration (Dkt. 234, pp. 3-5), and (b) quoted Mr. Kozak as stating that the purpose of the CWT was to "address the excess supply of raw milk that was depressing prices" (*id.* at p. 40), (2) Mr. Kozak's declaration contradicts his deposition testimony (*see* fn. 30), and (3) the decision dealt with the statute of limitations, to which the passage referenced by Defendants does not apply or is not relevant.

[81] In *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 215 (9th Cir. 1974), the Court held that "marketing" included "functions involved in moving goods from producer to consumer," which does not include production. *See In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1155 (D. Idaho 2011)("The key phrase of the Act, 'processing, preparing for market, handling, and marketing,' applied to acts done to an agricultural produce after it has been [produced].")

[82] Moreover, the marketing book does not say that production and marketing are the same; it merely says that, in

line with its purpose should be rejected for two reasons.[83] First, it is directly contrary to the

Supreme Court's admonition that the Act, like any statute granting antitrust immunity, must

be construed narrowly.[84] Second, the legislative history in itself, and construed by the courts

and F.T.C., demonstrates that the Act's purpose was not to include production because doing

so would actually defeat one of its purposes. PMPSJ, pp. 18-22.[85]

Defendants' argument that their anticompetitive conduct should be immunized because

the NMPF is a non-profit, non-stock organization instituted for the purpose of mutual help

(DSJM, p. 10), should be rejected because Section 6 of the Clayton Act does not stop there.

Instead, Section 6 "[does not] give[] such an entity full freedom to engage in predatory trade

practices." *Potatoes*, 834 F. Supp. 2d at 1151 (citing *Maryland & Virginia Milk Producers

Ass'n v. U.S.*, 362 U.S. 458, 465 (1960)). Moreover, Defendants claim that the only way in

which the Act does not apply to the HRP is if they engaged in predatory conduct, including

bad faith harassment. DSJM, p. 13. In so conceding, Defendants must have forgotten the

testimony of Joseph Wright, President of Southeast Milk, who testified that he received threats

---

some instances, marketing affects what products a manufacturer decides to produce. This also would not apply to processed milk because it has been offered to consumers in the same fashion for many years. Moreover, the Webster's Dictionary definitions of marketing (1) use the same language as in *Treasure Valley*, and (2) do not refer to production. Ex. 38, Webster's Dictionary. Finally, the definition from the 1992 Webster's Dictionary has the first definition as "Act of selling or of purchasing in or as in a market," nothing about production.

[83] Defendants cite to the Dairy Termination Program under the Food Security Act of 1985, as support for the contention that the HRP falls within marketing beef for slaughter. However, not only is that contrary to Defendants' contemporaneous admissions (*see* discussion, *supra*, pp. 6-8), but also the Act first stated, before the passage cited by Defendants: "(AXi) The Secretary shall establish and carry out under this paragraph a milk production termination program for the 18- month period beginning April 1,1986. (ii) Under the milk production termination program required under this subparagraph, the Secretary, at the request of any producer of milk in the United States who submits to the Secretary a bid, may offer to enter into a contract with the producer for the purpose of terminating the production of milk by the producer in return for a payment to be made by the Secretary." Only after this did the Act required the Secretary to determine the DTP's effect on the market for beef, so that the DTP would not negatively affect the market for beef.

[84] *In re Processed Egg Prods. Antitrust Litig.*, 2016 U.S. Dist. LEXIS 133110, *41 (E.D. Pa. 2016)("*Capper-Volstead* provides an exemption from the antitrust laws and, consequently, should be *narrowly construed. ...* (citing *Maryland & Virginia Milk Producers*, 362 U.S. at 464); *see also* Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 … (1979) ("exemptions from the antitrust laws are to be narrowly construed.").

[85] *Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D.Ga. 1981), cited by Defendants, is distinguishable because it merely holds that the Capper-Volstead Act immunizes marketing agencies in common and cooperatives setting prices and dividing territories, not restricting production. Likewise, *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980), dealt only with the setting of prices, not restricting production.

and intimidation from HRP members to join the HRP, and after SMI stopped paying the HRP assessments. Ex. 39, Deposition of Joseph Wright, December 12, 2017, 187:8-188:24; Ex. 40, Wright Dep. Ex. 8; Ex. 41, Wright Dep. Ex. 37. Thus, this evidence of predatory conduct at least in the form of bad faith harassment precludes summary judgment for Defendants.[86]

Defendants' argument that the HRP is protected as a marketing organization in which producers allocate their production among different end products to maximize collective income (DSJM, p. 12), citing to *Sunkist*,[87] should be rejected for at least two reasons.  First, the HRP is not "allocating production" between milk and beef.  Dairy farmers produce milk, using dairy cows to do so. When a dairy cow is no longer productive enough that its value falls below its slaughter value, it is culled and sent to slaughter. Thus, dairy farmers do not "produce" cows for beef – cattle ranchers do.  Second, *Sunkist* does not apply here because (i) the orange growers were not engaged in reducing supply,[88] and (ii) the HRP does not market or sell cows for beef.[89] The dairy farmers do. The HRP just pays them to slaughter cows early.

Finally, Defendants' contention that the HRP offered to individual farmers to voluntarily market more beef and less milk (DSJM, p. 12), should be rejected because (1) dairy farmers whose bids were accepted had to exit dairy farming entirely – not just market less milk – because they were required to sell their entire herds,[90] and (2) after 2008, they were required to stay out of dairy farming for one year.[91]

---

[86] Defendants' Section 6 argument should also be rejected because courts recognize that "the Capper-Volstead Act clarified and expanded the antitrust exemption for cooperatives found in Section 6." *Potatoes, id. at* 1151.

[87] *Sunkist Growers, Inc. v. Winkler & Smith Citrus Prods. Co.*, 370 U.S. 19 (1962).

[88] In *Sunkist Growers*, the cooperative did not conspire to reduce the number of lemons produced; rather, it created markets for lemons "not salable as fresh fruit." 370 U.S. at 21.

[89] Ex. 42, (AMFL0000595-96) (in contract, CWT explicitly disclaimed any involvement in the marketing of the participating dairy cows for beef: "***Producer shall be responsible for marketing The Cows*** and negotiating the terms of any such sale with a slaughterhouse" (emphasis added). This distinguishes *Sunkist Growers*, 370 U.S. at 21-22, where the cooperative actually engaged in marketing lemon byproducts.

[90] *Id.* at 595 ("Producer hereby offers to sell Producer's entire dairy herd, including all milking cows and dry cows").

[91] Ex. 7, CWT, *News*, March 2009 (NMPF0013488-89), at -88; Ex. 5, Connor Rebuttal Report, pp. 59-60.