# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC,

*Plaintiffs*,

v.

Southeast Milk, Inc., National Milk Producers Federation, aka Cooperatives Working Together, Dairy Farmers of America, Inc., Land O'Lakes, Inc., Dairylea Cooperatives Inc., and Agri-Mark, Inc.,

*Defendants*.

Civil Action No. 3:15-cv-01143-BJD-PDB

# EXPERT REPORT OF BRYAN M. RICCHETTI, Ph.D.

February 20, 2018

## Table of Contents

**1. QUALIFICATIONS** ........ **3**

**2. BACKGROUND AND ASSIGNMENT** ........ **4**

***2.1. Plaintiffs' claims*** ........ ***4***

***2.2. Assignment*** ........ ***6***

**3. SUMMARY OF OPINIONS** ........ **7**

**4. INDUSTRY BACKGROUND** ........ **21**

***4.1. The CWT Program*** ........ ***21***

***4.2. Raw milk production and the role of balancing by cooperatives*** ........ ***23***

***4.3. Raw milk prices and factors that affect over-order premiums*** ........ ***25***

***4.4. Winn-Dixie's purchases from Defendants*** ........ ***33***

**5. PROF. CONNOR HAS NOT DEMONSTRATED THAT CWT LOWERED RAW MILK PRODUCTION IN THE SOUTHEAST** ........ **36**

***5.1. The CWT program did not restrain the production of non-retiring farmers, nor the farmers who did retire cows and would have retired them any way*** ........ ***37***

***5.2. Prof. Connor has not considered numerous economic factors in the Southeast that raise the possibility that CWT did not reduce raw milk production*** ........ ***45***

***5.3. Dr. Brown's analysis of the CWT program—which Prof. Connor presents as evidence of CWT's effect in his report—does not support the claim that the CWT program reduced raw milk production in the Southeast*** ........ ***48***

***5.4. Conclusion*** ........ ***52***

**6. PROF. CONNOR DOES NOT PROVIDE RELIABLE EVIDENCE THAT OOPS ROSE IN THE SOUTHEAST BECAUSE OF THE CWT PROGRAM** ........ **54**

***6.1. Overview of Prof. Connor's damages model*** ........ ***55***

***6.2. Prof. Connor's damages model is fundamentally flawed for three key reasons*** ........ ***56***

***6.3. Even assuming Prof. Connor's measure of the CWT program and his other control variables are reliable, a careful review of Class I–IV OOPs in the Southeast does not support the claim that CWT herd retirements caused OOPs to rise*** ........ ***64***

***6.4. Prof. Connor's damages model does not properly account for the relationship between raw milk and processed milk prices, and raw milk and processed milk volumes*** ........ ***79***

***6.5. Conclusion*** ........ ***85***

**7. HERD REDUCTION PROGRAMS LIKE CWT COULD BE A MORE EFFICIENT MEANS OF MANAGING SUPPLY THAN DUMPING RAW MILK OR EXPORTING FINISHED DAIRY PRODUCTS** ........ **87**

**8. APPENDIX A** .......... **88**

*8.1. Curriculum vitae for Dr. Bryan Ricchetti* .......... *88*

**9. APPENDIX B** .......... **92**

*9.1. Documents relied upon* .......... *92*

**10. APPENDIX C** .......... **96**

*10.1. Class III and IV OOPs* .......... *96*

**11. APPENDIX D** .......... **102**

*11.1. Corrections to Prof. Connor's OOP data* .......... *102*

**1. QUALIFICATIONS**

1. I am a Vice President at Cornerstone Research and Co-Head of the firm's Antitrust Practice. Cornerstone Research is an economic and financial consulting firm with offices in Boston, Chicago, Los Angeles, Menlo Park, New York, San Francisco, Washington, D.C., and London. I joined Cornerstone Research in 2007, after completing my Ph.D. in Economics from Cornell University.

2. My practice focuses on antitrust and competition issues, including horizontal price fixing, vertical exclusionary practices, attempted monopolization or monopsony, class certification, antitrust impact, and damages.

3. I have worked on multiple matters assessing competition in the dairy industry. As part of that work I have analyzed pricing dynamics, market structure, and/or competition at all levels of the supply chain (e.g., raw milk production, processed milk production, wholesale milk sales, and retail milk sales). I have also co-authored a forthcoming chapter on milk pricing and regulations in the American Bar Association's ("ABA") Section of Antitrust Law's forthcoming *Handbook of Agricultural Economics*, and moderated an ABA seminar on Capper Volstead issues in antitrust.

4. Additionally, I co-authored the chapter, "Applying Econometrics to Assess Market Definition and Market Power," in the ABA Section of Antitrust Law's handbook *Econometrics: Legal, Practical, and Technical Issues*. I have also spoken at multiple ABA events for the Antitrust Section addressing issues in antitrust, including serving as the testifying expert in the mock trial at both the 2015 ABA Antitrust Spring Meeting and the 2015 ABA Antitrust Law & Economics Institute for Judges.

5. Prior to joining Cornerstone, I served as an economist at the U.S. Census Bureau and a researcher at MDRC, a public policy think tank in New York, NY. I have 17 years of experience as a professional economist implementing econometric methods on complex economic data.

6. My CV (attached as Appendix A to this report) contains a list of my professional experience and a list of my expert witness engagements for the last five years.

## 2. BACKGROUND AND ASSIGNMENT

### *2.1. Plaintiffs' claims*

7. The Plaintiffs in this case, Winn-Dixie and Bi-Lo, allege that the Defendant agricultural cooperatives participated in a program run by Defendant National Milk Producers Federation called Cooperatives Working Together ("CWT"), which allegedly was designed "to strengthen and stabilize milk prices" for the benefit of dairy farmers.[1] Plaintiffs challenge the legality of a voluntary subsidy program run by CWT, called the Herd Retirement Program.[2] Through the Herd Retirement Program, CWT paid subsidies to individual dairy farmers to sell their entire herds into the beef market.[3] The individual dairy farmers who wished to participate in the program submitted bids for the lowest amount they would accept to sell their herds for beef. CWT selected the lowest bids up to certain thresholds and paid the winning bidders subsidies once their cows were sold to the beef market.[4] CWT financed ten rounds of herd retirements between 2003 and 2010.[5]

8. Plaintiffs allege that the Herd Retirement Program reduced the number of dairy cows in the United States, causing a reduction in the nation's milk supply.[6] They further allege that this alleged reduction in milk supply led to an increase in the price of raw milk sold by dairy farmers.[7] The price of raw farm milk is regulated by the federal government, which sets minimum prices for milk sold to processors in certain geographic "order" regions.[8] Florida, for example, is in Order 6. In addition to the minimum "order" price, which accounts for approximately 90% of the price of raw farm milk, processors often also pay "over-order premiums." As I explain below, over-order premiums ("OOPs") include various surcharges and service charges and are not set by regulation. Plaintiffs allege that the Herd Retirement Program caused increases to both the regulated order prices and OOPs. I understand, however, that they are only basing their claims on the program's alleged effect on OOPs. Plaintiffs further allege that they paid higher prices for

---

[1] Amended Complaint and Demand for Jury Trial, *Winn-Dixie Stores, Inc. and Bi-Lo Holdings LLC v. Southeast Milk, Inc., et al.*, Middle District of Florida Jacksonville Division, August 21, 2016 ("Complaint"), ¶ 2.

[2] Complaint, ¶¶ 1, 4.

[3] Complaint, ¶¶ 4–6; Declaration of Thomas Balmer, Part I, April 13, 2013 ("Balmer Declaration, Part I"), ¶ 20 ("In essence, the Herd Retirement Program provided funds to individual dairy farmers to increase their incentive to sell their dairy herd for beef slaughter.").

[4] Complaint, ¶¶ 5, 9; Blamer Declaration, Part I, ¶¶ 27, 29.

[5] Complaint, ¶ 14.

[6] Complaint, ¶ 128.

[7] Complaint, ¶¶ 1, 4.

[8] Complaint, ¶¶ 98–99.

raw milk and "fresh dairy products" than they would have paid in the absence of the Herd Retirement Program's effect on OOPs.

9. Plaintiffs retained an economic expert, Professor John M. Connor ("Prof. Connor"), to assess the "feasibility of the CWT Herd Retirement Program to raise prices,"[9] and to analyze the "extent to which the CWT Herd Retirement Program increased the OOP for milk purchased by the Plaintiffs."[10] Prof. Connor asserts that the CWT program reduced the supply of raw milk by retiring cows that otherwise would have continued to produce milk.

10. Prof. Connor offers his own empirical analysis of the effect of the CWT program on OOPs in the Southeast (defined by him as Federal Orders 5, 6, and 7 – the Federal Orders that include locations where Plaintiff Winn-Dixie operates its stores).[11] Prof. Connor develops an econometric model of OOPs in the Southeast, and uses that model in order to attempt to (a) test whether OOPs for each of the four classes of raw milk increased after the CWT herd retirements, controlling for other supply and demand factors, and (b) quantify the size of the purported increase in each class of OOPs caused by the CWT herd retirements (what he calls an "overcharge").

11. Prof. Connor then estimates the volume of raw milk that was used to produce the processed milk products purchased by Winn-Dixie, and applies his "overcharges" to those estimated volumes of raw milk to arrive at an estimate of the Plaintiffs' alleged antitrust damages. Prof. Connor claims that the CWT program caused $21.4 million in antitrust damages to Winn-Dixie.[12]

12. While Prof. Connor has estimated damages for Class III and IV products, cheese and butter, I understand that those products are not identified in Plaintiffs' Complaint, which focuses on purchases by Plaintiffs of fluid milk and other "fresh milk products, including cream, half & half, yogurt, cottage cheese, cream cheese, and sour cream."[13] In my analyses below, I rebut Prof. Connor's conclusions regarding damages on Class III and IV products, but I understand from counsel that there is a legal question about whether such products are subject to Plaintiffs' damages claims.

---

[9] Report of John M. Connor, December 18, 2017 ("Connor Report"), p. 4.

[10] Connor Report, p. 4.

[11] Connor Report, pp. 48–49. In this report, I use the terms "the Southeast" and "southeastern states" to refer to the thirteen states in Federal Orders 5, 6, and 7. Prof. Connor defines the Southeast as the relevant antitrust market.

[12] Connor Report, pp. 64–65.

[13] Complaint, ¶¶ 1, 13, 15.

### *2.2. Assignment*

13. I have been asked by counsel for Defendants to review the report by Prof. Connor and to address the following topics related to his analysis of the Plaintiffs' claims that the CWT program led to a decrease in raw milk production in the Southeast, an increase in OOPs, which was passed through in the processed milk prices paid by Winn-Dixie during the relevant time period.

- Does Prof. Connor's analysis establish that CWT reduced raw milk supply and increased over-order premiums?

- Does Prof. Connor's damages model reliably control for relevant economic factors that affect OOPs?

- Does Prof. Connor's analysis reliably establish a causal connection between CWT's alleged impact on OOPs and the wholesale prices Plaintiff Winn-Dixie paid Defendants for the processed dairy products at issue?

- Does Prof. Connor's analysis correctly isolate the impact of CWT on the prices of the relevant products on which Winn-Dixie is seeking damages?

- Are there potential economic efficiencies of managing raw milk supply through a herd reduction program like CWT relative to dumping raw milk or exporting finished dairy products?

## 3. SUMMARY OF OPINIONS

14. I have reached the following opinions with regard to the topics outlined above:

### *A. Prof. Connor's analysis does not demonstrate that CWT reduced raw milk supply or increased over-order premiums*

#### 1) Prof. Connor does not analyze whether the CWT herd retirements caused a decrease in overall milk production

Plaintiffs allege that their injuries were caused by a reduction in milk supply, but they do not allege that CWT imposed any direct constraint or quota on milk supply or production. Instead, they allege that the CWT herd retirement program, which paid certain farmers to sell their cows and retire, allegedly resulted in less overall milk than there would have been without CWT's herd retirements. Importantly, CWT did not place any restrictions on farmers who did not retire, and those farmers were free to increase their own cow numbers, reduce their culling, or increase milk production in response to the herd retirements. Thus, it is not enough to show that cows were retired as a result of CWT's herd retirements. Plaintiffs must also show that the retirement of those cows resulted in a decline in milk production overall.

Prof. Connor does not offer or conduct any analysis of the effect of the CWT herd retirements on cow numbers or milk supply nationwide or in the Southeast.[14] Although he summarizes in his report the results of a different study of raw milk production conducted by Dr. Scott Brown, Prof. Connor testified that he did not rely upon any of Dr. Brown's methods or findings regarding effects on milk supply in his analysis of OOPs. Instead, in his analysis of OOPs, Prof. Connor simply assumes that the retirements reduced milk production.[15] As I explain in detail in Section 5 of this report, this assumption is unsupported by available data, contrary

[14] Prof. Connor stated the opinion in his deposition that the "relevant antitrust market" for examining impact on OOPs is the Southeastern United States. Deposition of John M. Connor, February 13, 2018 ("Connor Deposition"), p. 118 ("Mr. Miller, it was my judgment that this Southeast region we defined was a relevant antitrust market. I don't think I need to elaborate further upon that.").

[15] At his deposition, Prof. Connor opined that the fact that his damages model finds impact "indicates that supply contracted" during the period of the Herd Retirement Program (Connor Deposition, p. 165). For the many reasons I detail in Section 6, Prof. Connor's damages model is not reliable, and, thus, his assertion that it establishes that CWT caused a reduction is supply is not reliable. As I show below, the alleged "overcharge" his model finds cannot be linked to the CWT program. It is driven by other market events that occurred during that time period, and the fact that his model does not account for legal joint price-setting behavior of the cooperatives. Thus, the alleged "overcharge" his model finds cannot be taken as independent evidence of an effect of CWT on raw milk supply.

to available evidence in the record, and thus renders Prof. Connor's resulting analysis of the "effect" of CWT herd retirements on OOPs unreliable.

**2) The data show that overall milk production trends did not change during or after the Herd Retirement Program period**

Analysis of available data of raw milk production do not support Prof. Connor's assumption that CWT herd retirements reduced overall milk supply. First, as shown in Exhibit 6 and Exhibit 7 to my report (reproduced below), there was no increase in the total number of cows retired during the period of the CWT herd retirement program, and nationwide milk production during the period allegedly affected by the program actually increased, from approximately 170 billion pounds annually to over 200 billion pounds:

***The total number of cows retired each year did not increase during the period CWT was active***



***Total milk production has risen while total number of cows has fallen***




Second, as shown in Exhibit 8 to my report (reproduced below), long-run industry trends for total cow numbers nationwide and milk production nationwide did not change after CWT's herd retirements began and did not speed up or slow down during the alleged damages period. Additionally, in the Southeast, the region that Prof. Connor identifies as his relevant antitrust market, milk production has been falling for many years before the CWT program, and did not fall more quickly during the CWT program – if anything the downward trend weakened during the CWT period.

***Total raw milk production in the Southeast has fallen at the same time that raw milk production outside the Southeast has risen***




Thus, these data—which Prof. Connor did not analyze—do not support Prof. Connor's untested assumption that CWT's herd retirements reduced milk supply.

### 3) Prof. Connor's conclusion that CWT feasibly could have raised OOPs is contrary to basic economic theories with which he agrees

In addition to being unsupported by available data, Prof. Connor's assumption is inconsistent with standard economic theory, which predicts that a program like the Herd Retirement Program that does not directly restrain farmers' production decisions would be unlikely to have any effect on overall milk production, particularly in the Southeast. There are several reasons for this:

*The Herd Retirement Program involved only 1 percent of cows nationwide*—CWT's herd retirements involved the participation of only a small fraction of the dairy cows in the United States, retiring on average less than 1 percent of cows per year during the life of the program.[16] The remaining 99 percent of cows were owned by farmers who did not retire via CWT. Under well-accepted economic

[16] See Exhibit 4.

theory, control of 1 percent of supply is far below the amount of market share required to confer market power. As Prof. Connor himself explained at his deposition, a monopolist or cartel cannot increase prices or reduce supply without market power. Any attempt by a cartel without market power to raise prices by reducing supply would be offset by an increase in supply from other sellers in the market. Prof. Connor specifically testified that, without control of at least 50 percent of the market, a "cartel wouldn't be able to raise price or reduce output effectively," because "the fringe, the non-participating members of the cartel is so large that they would jump at the chance and assuming they had any excess capacity at all, they could even in a short run destroy a cartel."[17]

*The remaining 99 percent of milk production was unconstrained by CWT*—Second, Plaintiffs do not allege that CWT involved any agreement or implemented any mechanism to restrain the production decisions of the non-retiring dairy farmers in the United States who controlled 99 percent of all cows. While it is true that CWT was funded by cooperatives whose farmer members collectively produced approximately 70 percent of the nation's milk, as Prof. Connor testified at his deposition, cooperatives do not themselves produce milk or have any control over production.[18] Milk is produced by individual farmers who belong to cooperatives, and each individual farmer controls her own production decisions.[19]

Moreover, in this case, Plaintiffs do not allege a traditional production fixing conspiracy, whereby each participant in the conspiracy agreed to set its production at a fixed level or to reduce its production by a fixed amount. For example, Plaintiffs do not allege that all—or any—of the cooperatives agreed to impose limits on the amount of milk their members could produce. Of the participants in CWT, only those farmers who accepted a herd retirement subsidy agreed to reduce their milk production. Plaintiffs and Prof. Connor concede that all other dairy farmers in the United States remained free to produce at their current levels or even increase production, regardless of whether their cooperatives helped fund CWT.

---

[17] Connor Deposition, pp. 277–278.

[18] Connor Deposition, p. 161 ("Is it your opinion that the cooperatives have control over the output of the farmers? [objection removed] BY THE WITNESS: A. No. The farming stage or production stage, as you called it, is perfectly competitive, with keeping in mind that there are regulatory restraints, health regulations, dairy programs that confine -- confine -- they regard it as -- as – as limits on -- on the decision-making, but within those -- within those limits, dairy farming is the epitome of a perfectly competitive industry.").

[19] Expert Report of Andrew Novakovic, *Winn-Dixie Stores, Inc. and Bi-Lo Holdings LLC v. Southeast Milk, Inc., et al.*, February 20, 2018 ("Novakovic Report"), p. 7 ("Dairy farmers…are independent businesses, run as the owners/ managers see fit based … A group of farmers may choose to form a cooperative…").

Well-established economic principles predict that, when a subset of producers in a given industry coordinate to try to reduce market supply, they create an incentive for all other producers to increase supply. In this case, that incentive existed for the thousands of non-retiring farmers who controlled the 99 percent of cows that were not retired. Those farmers were free to increase their supply through reduced culling of their own herds, increased production from existing cows, or increasing their herd size. As Prof. Connor put it, they would "jump at the chance" to increase their own sales.[20]

Other producers could have offset any reduction in milk production by CWT's herd retirements by increasing their own production—Prof. Connor argues that the possibility that CWT's herd retirements could have been offset is unlikely because it would have taken time for non-retiring farmers to increase their own production —claiming that it would take 3 to 5 years to offset the lost production[21]—and that the herd retirements thus could have had an effect during this lag. However, facts in the record, and the design of CWT Herd Retirement Program, indicate that farmers who had not retired their herd via CWT could have increased production to offset the retirements via CWT.

For example, herd retirement rounds were announced several months before any cows were retired. The first round, for example, was announced on July 11, 2003, but it was not until mid-September that farm audits and sales began. Other farmers thus could have anticipated the coming reduction in cow numbers and immediately taken steps to increase their own production or capacity. Indeed, at the same time it announced the first round, NMPF also announced the approximate number of cows it expected to subsidize and the approximate amount of milk that those cows would have been expected to produce.

Moreover, dairy farmers can increase production without adding more cows to their herds by improving their feed mix and by reducing the number of cows that they cull. As I show below, dairy farmers typically cull 30 percent of their herds each year, but they can reduce cull rates in response to market conditions. Prof. Novakovic specifically noted that CWT's announcements could cause farmers to

---

[20] Connor Deposition, p. 278.

[21] Connor Deposition, p. 210 ("It would have taken several years, again, three, four, five years before you can fully get milking going and have the proper barns and equipment that are needed.").

lower their culling rates due to an expectation of higher prices.[22] In other words, when farmers anticipate an increase in prices or reduction in supply, they cull less.[23]

As I detail in Section 5.1, available documents and data indicate that many farmers did, in fact, respond to the CWT herd retirements by increasing production and/or adjusting their culling rates. These facts are why it is critical to analyze the trends in milk production and herd retirements before and during the CWT program. If the non-retiring farmers responded to CWT in the ways described above, we would expect to see no change in the trends in raw milk production or herd retirements. If they did not respond in the short-run as Prof. Connor claims, we should see a change in the trends. As shown in Exhibit 6, Exhibit 7, and Exhibit 8 above, there was no change in trends.

Finally, it is important to remember that less 1 percent of cows on average were retired via CWT, so even a small response by the many non-retiring farmers (either through reduced culling or increased production) could offset any effect of CWT.

**4) Prof. Connor overstates the number of cows culled as a result of CWT**

Even apart from the problems noted above, which are independently sufficient to render Prof. Connor's analysis unreliable, Prof. Connor's damages model incorrectly assumes that but-for the CWT program every cow retired with a herd retirement program subsidy would have continued to produce milk. This assumption is incorrect because, as noted above, farmers typically cull 30 percent of their herds each year. In combination with the fact that Prof. Connor did not account for the supply responses discussed above, this fact implies that Prof. Connor's model by its design significantly *overstates* any effect of CWT and is unreliable.

Moreover, the evidence shows that many of the farmers who participated in the CWT Herd Retirement Program were planning on leaving the dairy farming business anyway or were already in bankruptcy. As I detail below in Section 5.1,

---

[22] Novakovic Report, p. 49 ("By the same token, the expected removal of cows through a Herd Retirement Program may create expectations of better prices in the remaining farmers' minds and that may lead to a lower cull rate of those farmers as they factor a higher price into their own culling calculus.").

[23] Novakovic Report, p. 46 ("Farmers make culling decisions for a variety of reasons. Individual culling decisions are based on the expected future profitability of the cow relative to the current cull price. The expected future profitability is certainly a function of the expected price of milk…").

Economic theory suggests that dairy farmers already exiting or planning to exit dairy farming would be more likely to submit the lower bids for subsidies to sell their herds to offset the anticipated transaction costs of exiting dairy farming. Thus, the farmers chosen to participate in the program were more likely to be exiting independently, and assuming those farmers would not have retired their herds but-for CWT overstates the program's impact.[24]

This problem is particularly salient in the Southeast, where production of raw milk had been declining for many years before the CWT program began. In other words, dairy farmers in the Southeast had been steadily exiting the industry before the CWT Herd Retirement Program began. This long-term decline in raw milk production in the Southeast thus is consistent with the possibility that the farmers who accepted herd retirement subsidies from CWT were planning on exiting dairy farming anyways. In fact, and as noted above, the long-run decline in milk production in the Southeast did not speed up during CWT. Prof. Connor did not analyze these factors.

**5) Prof. Connor's analysis cannot separate out the effect on OOPs caused by conduct that plaintiffs do not contend is illegal**

In addition to assuming (rather than testing) that CWT caused a reduction in raw milk production, Prof. Connor's damages model analyzing OOPs suffers from another, fundamental methodological flaw: it does not reliably separate out the effect on OOPs of legal, joint price-setting by marketing agencies with monopoly or near-monopoly power in the Southeast. Based on information from counsel, I understand that, the Capper-Volstead Act permits agricultural cooperatives to act together in jointly setting prices, for instance through the use of "marketing agencies in common" (MACs). I also understand from counsel that Plaintiffs are not challenging the legality of such joint price setting.

As I explain in Section 6.2.1, dairy cooperatives in the Southeast have substantial pricing power, and they exercise that power jointly. As I discuss below, cooperatives in the Southeast, some of which were members of CWT but some of which were not, acted together in marketing agencies in common to jointly set OOPs for between 87 and 96 percent of raw milk in the region, including for the milk purchased by Winn-Dixie from Defendants. Prof. Connor does not dispute these facts. Indeed, in Section IV of his report, Prof. Connor cites to extensive academic research showing that dairy cooperatives have the power to raise prices

[24] Novakovic Report, pp. 48–49.

independent of CWT's herd retirements, particularly in the Southeast. Further, Prof. Connor endorses the basic economic principle that joint price-setting behavior can achieve the same result as a joint output restriction.

Thus, based on standard economic principles that Prof. Connor agrees with, the MACs in the Southeast had the clear ability to raise OOPs through the legal, joint price setting behavior, and could have set OOPs at the same level that the Defendants could have achieved through the alleged raw milk reduction from CWT. In other words, even if Prof. Connor had reliably estimated the Herd Retirement Program's impact on milk *supply* in the Southeast (which he hasn't), raw milk OOP *prices* allegedly paid by Winn-Dixie would not have been any different in the but-for world.

At his deposition, Prof. Connor claimed that his use of a benchmark period before CWT accounts for any joint price setting power possessed by the Defendants in the but-for world. Prof. Connor's assertion is inconsistent with the evidence, which shows that there were significant changes during the CWT period to the joint price-setting by cooperatives in the Southeast that Prof. Connor's benchmark period cannot properly account for. These include the formation and strengthening of the marketing agency in common Southern Marketing Association ("SMA") starting in 2002, the formation of DMS in 2003, and the joint implementation by SMA and other marketing agencies in the Southeast of a premium for milk made without use of the growth hormone rBST in 2008. This latter premium was implemented in response to changes in demand by consumers and processors for rBST-free milk and remained completely flat after its 2008 implementation (even though the largest CWT herd retirements occurred in 2009):

***The rBST-free premium is flat after its broad introduction in 2008***




Remarkably, and as I explain in more detail below, the implementation of these premiums account for *all* of the alleged impact on OOPs for Class I milk found by Dr. Connor's model. That finding is strong evidence that CWT herd retirements did not have any effect on OOPs for fluid milk.

### *B. Prof. Connor's damages model does not reliably control for relevant economic factors that affect OOPs*

#### 1) The relationship between OOPs and Prof. Connor's key supply and demand variables generated by his model do not make economic sense

Prof. Connor contends that his damages model can reliably measure the correlation between CWT herd retirements and OOPs in the Southeast because he controls for relevant supply and demand variables that might also have impacted prices during the relevant period. However, the relationships that Prof. Connor's model finds between key supply and demand variable and OOPs do not align with economic theory, which raises questions about whether his model can reliably measure the correlation between CWT retirements and OOPs in the Southeast.

For example, as I explain in Section 6.2.3, Prof. Connor's model finds that an increase in feed costs for farmers (the main cost input variable in his model) *lowers* OOP prices. Thus, according to the model, if input costs go up, prices go down. That runs counter to basic economics. Prof. Connor acknowledged in his deposition that these unexpected results are likely due to information missing from his model, or a technical issue called multicollinearity. This is an important limitation of Prof. Connor's model because, if his model cannot properly estimate the relationship between feed costs for cows and OOP prices, then one cannot assume that his model reliably estimates the effect of the CWT herd retirements on those prices.

**2) Prof. Connor's damages model for Class I products does not properly control for the implementation of the rBST-free premium in 2008, for changes in fuel surcharges, or the formations of SMA and DMS**

Prof. Connor purports to account for various supply and demand factors to show what OOPs would have been absent the CWT herd retirements. One such factor Prof. Connor acknowledges is important to control for is the effect of the shift to rBST-free milk during the CWT period— a shift that was driven by consumer demand and independent of CWT. Although Prof. Connor purports to control for the shift in demand by consumers for rBST-free milk, his model measures this shift with significant imprecision. For example, rather than directly net out from the OOP the rBST-free premium that was established in 2008 by MACs in the Southeast in response to the shift to rBST-free milk, Prof. Connor's model instead uses a study of rBST usage that did not collect actual data on rBST usage in 2008––the critical year when the rBST-premium caused OOPs to rise. Because Prof. Connor's model does not account for these factors accurately, it incorrectly assigns the increases in OOPs caused by implementation of rBST-free and fuel surcharge premiums to overcharges caused by CWT herd retirements.

As I show in Section 6.3.1 of this report, when I simply net the rBST-free premium out of the OOP that Prof. Connor uses in his regression model, his own model finds no "overcharge" and, thus, no damages on Class I OOPs during the CWT program at all. Class I purchases account for 87 percent of the alleged total damages toWinn-Dixie's claimed by Prof. Connor.[25]

[25] Prof. Connor's Class I damages are $18,569,334 and his total damages are $21,368,066 (Connor Report, Table 19, p. 65).

### 3) Prof. Connor's damages model for Class II OOPs does not properly control for increases in the fuel surcharge or the formation of SMA and DMS

Prof. Connor's analysis of OOPs for Class II milk suffers from a similar failing. For example, if one removes the fuel surcharge out of Prof. Connor's Class II Florida OOP data, the OOP is equal to $1.11 in every month for which data is available from January 2003 until December 2013. In other words, even though thousands of cows were retired during in the Southeast between 2000 and 2010, Class II OOPs in Florida do not change at all except for to account for fluctuations in fuel prices over which CWT had no control.

Despite these flat OOPs, Prof. Connor finds significant "overcharges" on the Class II products Winn-Dixie purchased from Florida plants. The fact that his damages model finds damages when OOPs were fixed at the same level as in the benchmark period is what economists refer to as a "false positive". This demonstrates the unreliability of Prof. Connor's Class II damages model.

### 4) The Class III and IV OOP data from the Southeast that Prof. Connor analyzed do not support his conclusion that the CWT herd retirements caused Class III and IV OOPs to rise

Prof. Connor's damages analysis of Class III and IV OOPs contains two key flaws. First and foremost, the OOPs that Prof. Connor analyzed in the Southeast are not relevant to the prices that Winn-Dixie paid for cheese or butter products made by Defendants because those products were made at plants located outside of the Southeast. For example, nearly all of the allegedly damaged Class IV purchases by Winn-Dixie were from LOL, which does not own a plant in the Southeast. LOL did not pay the Southeast OOPs for this milk; it paid whatever OOP it may have been charged in the regions where the milk was produced. Prof. Connor did not analyze those OOPs. While available data on Class III and IV OOPs from other regions is limited, the data that are available show that those OOPs were (a) generally flat during the CWT program, not correlated with CWT cow retirements, and (b) set at $0 on much of the Class III and IV milk in those regions.

Second, when I analyze the Class III and IV OOP data in the Southeast that Prof. Connor uses, I find that they do not support the conclusions that he draws. As I show in Section 6.3.4 below, OOPs for Class III and IV milk at many plants in the Southeast were fairly flat throughout the duration of the CWT program. Specifically, the only substantial increase in Class III and IV OOPs in Prof.

Connor's data occurred in 2011, after the CWT program ended. Similar to the flaw in his Class II damages model, the fact that Prof. Connor's damages model finds an "overcharge" for many years during which Class III and IV OOPs remained at pre-CWT levels establishes that his damages model does not reliably measure the effect of CWT program on OOPs.

### *C. Prof. Connor's analysis does not reliably establish a causal connection between increases to OOPs and the wholesale prices that Winn-Dixie paid for finished dairy products*

In addition to claiming damages on OOPs paid for raw farm milk that Plaintiffs purchased directly from Defendants, Plaintiff Winn-Dixie also claims damages on its direct purchases of finished processed dairy products manufactured by Defendants caused by increases to OOPs paid by Defendants to their farmers. Prof. Connor's report includes an estimation of damages on these products, for which he assumes that Defendants passed through 100 percent of his damages model's Southeast OOP overcharges in the cost of finished dairy products. Prof. Connor does not, however, conduct any analysis of the actual pass-through rate of OOP cost increases to prices paid by Winn-Dixie for processed dairy products.

As I show below in Section 6.4.1, available data indicate that there are at least two reasons why it is not reliable simply to assume that OOPs are passed through to wholesale prices. First, the OOP is a very small piece of the overall cost of raw milk. Second, as I discuss below, OOPs can sometimes move in the opposite direction of total raw milk prices because cooperatives sometimes use the OOP to offset the large swings in the regulated order price. This countercyclical pattern is noted in the academic literature and in the expert report of Prof. Novakovic, and raises the possibility that that changes in OOPs may not always be passed through to processed milk product prices when they coincide with changes in the regulated price.

### *D. Prof. Connor does not correctly isolate the processed dairy products on which Winn-Dixie is seeking to recover*

In Sections 6.4.2–6.4.4, I identify several other flaws that arise from Prof. Connor's approach of starting with the volume of *processed* milk at issue and then trying to estimate how much raw milk was used to make each processed product. First, Prof. Connor did not accurately account for the fact that different volumes of raw milk are required to produce different types of processed products purchased by Winn-Dixie. Second, Prof. Connor does not account for the fact that some

products are made from non-dairy ingredients or ingredients other than raw milk. Third, Prof. Connor does not account for the fact that raw milk may have been purchased by Defendants from third parties, and that such milk may carry no OOP. Fourth, Prof. Connor does not account for some data errors in the Winn-Dixie data that clearly misattribute the production of certain productions to the Defendants that were produced by non-Defendants (e.g., Dannon yogurt). Fifth, Prof. Connor incorrectly includes purchases from C&S Wholesale Grocers in his Class I damages base. These products were not purchased directly from Defendants, and I understand from counsel that they should therefore be excluded from estimates of alleged damages.

## 4. INDUSTRY BACKGROUND

15. In this section, I provide an overview of several aspects of the dairy industry that will be important to my analysis of the CWT program in the remainder of this report.

16. I start with a brief description of key features of the CWT herd retirement program. I then offer a discussion of the role dairy cooperatives play in balancing excess raw milk production during high production season, and provide a short overview of milk pricing and regulations—with a focus on the factors that affect OOPs. Finally, I summarize relevant facts about Winn-Dixie's purchases of processed dairy products, including locations of the Defendant plants that served them and the distribution centers to which products were delivered.

17. I understand that the expert report of Prof. Andrew Novakovic ("Novakovic Report") provides a broader discussion of the economic features of the dairy industry that are relevant to evaluating the effect of the CWT program on raw milk production and OOPs in the Southeast.

### *4.1. The CWT Program*

18. CWT was formed by Defendant NMPF in 2003.[26] Membership included the Defendant cooperatives, DFA, LOL, Agri-Mark, and SMI. The Defendants are agricultural cooperatives that gather (assemble) and market the raw milk that is produced by dairy farmers.[27] I understand that CWT's herd retirement program ("HRP") offered payments to farmers interested in retiring their full herd of dry and milking cows,[28] and that these payments were supplemental to the market rate farmers would receive if they sold their herds for beef.[29] The CWT program was funded by assessments imposed by the cooperatives on their farmer members of 5 cents per hundredweight starting in 2003, and 10 cents per hundredweight starting in 2006.[30] Farmers who wished to retire their herd in the HRP submitted bids to CWT, indicating the amount-per-cow that they would accept in order to retire their herds. CWT would then accept the lowest bids, and the

[26] Balmer Declaration, Part I, ¶ 10.

[27] I understand that cooperatives can sometimes market milk of non-members.

[28] CWT also introduced an option (but not a requirement) to retire bred heifers along with the rest of the herd. Deposition of Jerome Kozak, February 5, 2015 ("Kozak Deposition"), pp. 36, 166–167.

[29] Herd retirement bid calculator, "2007 Herd Retirement," NMPF0000143 – 46 at NMPF0000144.

[30] Deposition of John Wilson, January 8, 2015, ("Wilson Deposition 2015"), pp. 35–36.

participating farmers would send their herds to slaughter houses for processing into beef.[31] CWT carried out 10 waves of such retirements between 2003 and 2010.[32]

19. While the HRP program provided payments to those farmers who retired their herds through the CWT program, "it imposed no restrictions of any kind on the cooperatives or farmers that wished to maintain or expand their milk production."[33] Coops participating in CWT could increase the amount of raw milk they marketed, and member farmers who were not interested in retiring their herds were free to increase herd sizes and production, or limit their own culling.[34] Additionally, farmers who retired their herds via CWT were not prohibited from selling their bred heifers (and calves) to other dairy farms who could use them to produce milk.[35]

20. Furthermore, CWT did not prohibit participating farmers from re-entering the dairy market. In 2009, CWT began modified the rules of the program so that the last 10 percent of their CWT payments were conditioned on staying out of the market for at least one year—but CWT never barred reentry. Testimony in this case indicates that CWT implemented this change because there were, indeed, examples of farmers retiring via CWT and then immediately re-entering the market.[36] In fact, testimony in this case indicates that the pattern of farmers re-entering the market continued even after CWT changed its policy in 2009 to discourage such behavior, with farmers factoring the loss of the incentive into their bid price.[37]

---

[31] Balmer Declaration, Part I, ¶¶ 27, 29–31.

[32] Balmer Declaration, Part I, ¶ 21.

[33] Balmer Declaration, Part 1, ¶ 32.

[34] Balmer Declaration, Part 1, ¶¶ 31–32; Declaration of Thomas D. Wegner, September 22, 2016 ("Wegner Declaration 2016"), ¶¶ 4–5; Declaration of John Wilson, September 22, 2016 ("Wilson Declaration 2016"), ¶ 35 ("During the years of 2003-2010, when the Herd Reduction Program was in existence, there were no restrictions or quotas imposed at the regional, national, or cooperative level for milk production, raw milk or value-added product sales, or number of cows in a herd. The CWT program never involved any type of restriction or quota as to the amount of milk, butter, or cheese that any cooperative or individual farmer could produce or sell.").

[35] Kozak Deposition, pp. 133–134, 143–145.

[36] Declaration of Richard W. Stammer, September 22, 2016, ("Stammer Declaration 2016"), ¶¶ 78–79 ("But there were still other Agri-Mark farmers who participated in the Herd Retirement Program and returned to dairy farming. For example, members Greg and Sherry Lussier participated in the Herd Retirement Program in 2005, but bought a new herd the next day and continued producing milk until they sold their farm in 2008.").

[37] Stammer Declaration 2016, ¶¶ 78–79; Wilson Declaration 2016, ¶ 39.

### *4.2. Raw milk production and the role of balancing by cooperatives*

21. As noted by Prof. Connor in his report (and discussed in detail in the Novakovic Report), the supply chain in the dairy industry begins with the production of raw milk by cows, which is gathered and marketed by the cooperatives to dairy processors, retailers, and ultimately consumers. Dairy processors use raw milk as an input to produce a variety of products (including fluid milk, ice cream, yogurt, cheese, and butter). As is relevant to Winn-Dixie, dairy processors then generally sell those products to retailers, who in turn sell to consumers.[38] The USDA's Federal Milk Marketing Order (FMMO) system divides processed milk products into four classes—fluid milk products (Class I), spoonable milk products (Class II), cheese (Class III), butter (Class IV)[39]—and different dairy processors convert raw milk into each of the four broad types of classes.

22. One aspect of the dairy supply chain that Prof. Connor does not discuss in his report—but which is relevant to analyzing the CWT program—is the challenge cooperatives face in balancing seasonal fluctuations in the raw milk supply of their members with demand from their customers (particularly with regard to Class I, II, and III milk). Because cows are substantially more productive in the cooler months of winter and early spring than in the hot months of summer and early fall, raw milk production varies tremendously over the course of the year.[40] Yet consumer demand for fluid milk is, if anything, higher in the fall and winter due to demand from schools,[41] and processor demand for raw milk for Class II and III products follows its own distinctive path.[42] This mismatch between seasonal raw milk production and demand for fluid milk consumption

---

[38] See Section V of the Novakovic Report pp. 7–10 for a more detailed discussion of the channels through which dairy processors sell their products.

[39] USDA, "Federal Milk Marketing Orders," available at https://www.ams.usda.gov/rules-regulations/moa/dairy, accessed on January 22, 2018; Bob Cropp and Ed Jesse, "Basic Milk Pricing Concepts for Daily Farmers," University of Wisconsin – Extension, Cooperative Extension, 2008, pp. 1–28 at p. 11.

[40] Deposition of Calvin Covington, Volume II, December 6, 2017 ("Covington Deposition, Volume II"), p. 188 ("On monthly -- boy, I -- from memory, I can't give you what the average production was for monthly, but high months are going to be February, March, then it goes down, September a low month, then circles back up. It'll be about a 50 percent difference in production between March and September, which really causes balancing issues."); Christopher A. Wolf and Duane A. Banderbob, "Voluntary Over-Order Milk Premium Agreements and Implications for Policy Choices," *Journal of Cooperatives*, 2002, pp. 33–48 at p. 34 ("Through their processing activities, dairy cooperatives manufacture dairy products for sale and also assist in balancing out seasonal swings in milk production. Balancing is the act of converting milk in excess of fluid needs into storable products like butter, non-fat dry milk powder, and cheese. Balancing primarily takes place during spring flush production months.").

[41] Declaration of Sharad Mathur, December 5, 2013 ("Mathur Declaration"), ¶ 7 ("Class I (fluid milk) demand can be volatile; for example, when schools are in session there is a much higher demand for milk for school milk programs. During vacation periods and summer months, milk for fluid usage can exceed the demand, and the balancing costs incurred by cooperatives may vary accordingly.").

[42] Novakovic Report, pp. 29–30.

has the potential to create a surplus of raw milk in one period and a shortage in another. Dairy cooperatives help solve this imbalance in several ways.

23. First, as discussed in the Novakovic report, dairy farmers produce sufficient raw milk to ensure that there is sufficient supply to meet the contemporaneous needs of their customers (particularly their fluid milk plant customers), even during low production season.[43] The regulatory structure is designed to create strong incentives for dairy farmers to produce sufficient raw milk to meet contemporaneous fluid milk demand because fluid milk commands the highest price of any class of milk.[44]

24. Related, dairy cooperatives often enter into full supply contracts with their major Class I customers, which contractually require dairy cooperatives to deliver the raw milk demanded by their customers every day. For example, SMI had full supply contracts with some of Winn-Dixie's fluid milk plants (when Winn-Dixie owned them).[45]

25. Additionally, cooperatives own cheese, butter, and milk powder plants (Class IV) that can take on any excess raw milk produced during high season and turn it into storable products.[46] This process of converting excess milk into storable products during high production season, and ensuring that fluid milk needs are met during low production season, is a key mechanism that helps supply and demand for other classes remain in balance.

26. As I detail in Section 5 below, there are a variety of reasons why CWT could have had no effect on raw milk production. An important implication of balancing is that, even if CWT had a small effect on raw milk production, it would be very unlikely for CWT to affect Class I milk production, because demand for Class I is met first, due to its high value. As I discuss more below, 87 percent of Prof. Connor's damages come from Class I milk.

---

[43] Novakovic Report, pp. 23–24. See also, K. Charles Ling, USDA, Rural Business Cooperative Service, "The Cost of Balancing Milk Supplies: Northeast Regional Market," RBS Research Report 188, October 2001, p. ii ("If producers supplying the market raise a sufficient number of cows to produce enough milk in the lowest milk producing months in the fall to fully satisfy the highest fluid demand and operating reserves in that same season, then more milk will be produced than is needed in other seasons. The extra volume produced in these other seasons constitutes seasonal reserves.").

[44] Stammer Declaration 2016, ¶ 12; Wegner Declaration 2016, ¶¶ 10–12; Wilson Declaration 2016, ¶ 13.

[45] See supply agreements between SMI and Winn-Dixie, SMI-000130 – 135 and SMI-000113 – 29.

[46] Novakovic Report, pp. 14–15 ("Because raw milk must be processed within 48-72 hours of its production before it spoils, cooperatives typically build butter/powder plants when they need capacity primarily for balancing purposes."). Prof. Novakovic also notes that balancing can sometimes occur with Class III products.

### *4.3. Raw milk prices and factors that affect over-order premiums*

27. As Prof. Connor discusses in his report, raw milk prices are composed of two components: (a) a regulated minimum price set by the FMMO system, the Order Price, and (b) an unregulated component of the price that can be negotiated above the regulated minimum, the OOP. As noted above, the FMMO system divides processed milk products into four classes—fluid milk products, spoonable milk products, cheese, and butter. As also noted above, the USDA sets a minimum price for each class of milk using a formula that uses wholesale prices of four milk products as inputs: butter, cheese, whey, and non-fat dry milk in the previous or current month.[47]

28. Regulated minimum prices are the minimum prices that a plant must pay for raw milk. There are four separate minimum prices, one for each of the four classes of raw milk. As Prof. Connor discusses in his report, milk processors are one-step removed in the supply chain from the farm level. In between the farmer and the milk processor sits the cooperative that handles "assembly" and "marketing" of raw milk. The logistics involved in collecting and delivering as well as selling the raw milk from farmers are not covered by the regulated minimum prices. The prices charged to processors for the provision of these services by cooperatives are not regulated. These charges make up the OOP, which is the portion of the milk price that the processor pays in addition to the mandated minimum price.

29. In what follows, I review testimony in the record that identifies several key factors that affect OOPs, and that will be important for my analysis of OOPs and Prof. Connor's damages model in Section 6 below.

#### *4.3.1. OOPs reflect joint pricing efforts of cooperatives and marketing agencies in common (MACs)*

30. As I discuss in more detail in Section 6 below, an important aspect of this case is that OOPs are jointly set by Defendant cooperatives and MACs and proposed to their customers through the antitrust immunity afforded them by the Capper Volstead Act. As Prof. Connor recognizes himself, the joint setting of OOPs by cooperatives through Capper Volstead affects the level of OOPs, and needs to be taken into account when analyzing the CWT program.[48]

---

[47] Bob Cropp and Ed Jesse, "Basic Milk Pricing Concepts for Daily Farmers," University of Wisconsin – Extension, Cooperative Extension, 2008, pp. 1–28 at pp. 11–15.

[48] Connor Deposition, pp. 159–160.

31. This aspect of OOPs is particularly important in the Southeast, where the Dairy Cooperative Marketing Association ("DCMA") sets OOPs for 87 to 96 percent of the milk.[49] Further, the Southern Marketing Agency ("SMA"; a large revenue sharing MAC in the Southeast) and Dean Foods' decision to outsource procurement and handling of the raw milk it purchased from independent producers to DMS (another marketing agency that was operative in the Southeast) during the relevant period strengthened the ability of cooperatives in the Southeast to jointly determine prices.

32. SMA was a joint marketing agency in the Southern United States that was founded in 2002. Members of SMA included DFA, Lone Star Milk Producers, Maryland & Virginia Milk Producers, Arkansas Dairy Cooperative Association, and Dairymen's Marketing Cooperative.[50] SMA members pooled their revenue and expenses.[51] In essence, SMA limited any incentive for its members to attempt to undercut each other on prices offered to processors, as lower prices would negatively impact farmers from every member cooperative, including the cooperative offering the lower price. While SMA was founded in 2002, documents indicate that it implemented a variety of initiatives during CWT on an ongoing basis that would operate to increase its negotiating power over OOPs over time, after SMA began. For example, a letter from Jim Hahn of DFA to other farmer-members states that, "[t]he initiatives we have driven through SMA since mid-2005 have improved your milk price relative to the Federal Order blend price...").[52]

33. Starting in 2003, Dean Foods, a major processor in the Southeast, began outsourcing its procurement of raw milk from independent farmers to DMS, a marketing agency in common controlled in part by DFA.[53] This meant that the premiums for a large number

---

[49] Agricultural Marketing Service, USDA, "Milk in the Appalachian, Florida and Southeast Marketing Areas; Tentative Decision and Opportunity To File Written Exceptions on Proposed Amendments to Tentative Marketing Agreements and to Orders," *Federal Register* 73(41), 2008, pp. 11194–11229 at p. 11197 ("According to the DCMA witness, during December 2006 members of DCMA pooled more than 87 percent of cooperative and non-member producer milk on the Appalachian order, more than 87 percent of the cooperative and non-member producer milk on the Southeast order, and more than 96 percent of the cooperative and non-member producer milk on the Florida order.").

[50] Agricultural Marketing Service, USDA, "Milk in the Appalachian, Florida and Southeast Marketing Areas; Final Partial Decision on Proposed Amendments to Marketing Agreements and to Orders," *Federal Register* 79(45), 2014, pp. 12985–13002 at p. 12987.

[51] Southern Marketing Agency, Inc. Revenue and Cost Pool Policies and Procedures, June 21, 2002, DFA2013-00193068 – 88 at DFA2013-00193068; Southern Marketing Agency, Inc. Revenue and Cost Pool -- Principles and Practice, DFA2013-00193064 – 7 at DFA2013-00193064 – 6.

[52] Letter from Jim Hahn (Southeast Area Council) to Southeast Area Council Members, March 6, 2006, D00008371 – 2.

[53] See Outsourcing Agreement and First Amendment to Outsourcing Agreement between DMS and Dean Foods, March 2007, DFA2013-00041368 – 81, DFA2013-00039807 – 8; Dean Foods Decision to Outsource Field Milk Procurement, Talking/discussion points, January 1, 2003, D00120434; Letter from Janet R. Stecklein (Dean Foods) to Dean Foods Milk Haulers, January 7, 2003, D00120437.

of independent producers were determined by a marketing agency in common controlled by a cooperative that participated in SMA, DCMA, and Southern Dairy Cooperative Association (SDCA), which would have further reduced price competition in the Southeast.

34. Prof. Connor acknowledges in his report that Defendants in this case have price-setting power in the Southeast,[54] and noted at his deposition that controlling even 60 percent of a market (let alone 87 to 96 percent of a market) likely allows a collection of firms to elevate prices.[55] As I explain in more detail in Section 6.2, Prof. Connor's damages model does not adequately account for this critical aspect of OOP price formation, nor the changes related to SMA, DMS, nor rBST-free premiums. Although these three changes are among the most prominent examples, it is possible that other market events could also have had an effect on the prices that cooperatives were able to charge through joint price setting activities.

*4.3.2. OOPs directly cover costs of delivering and producing raw milk*

35. A major function of OOPs is to help capture the costs of services provided by the cooperatives to their customers (like balancing fluctuation in raw milk supply), as well as additional costs associated with producing or delivering raw milk (e.g., fuel costs,

[54] Connor Report, p. 6 ("There is substantial evidence that dairy cooperatives are concentrated enough to exert market power over the farm prices of raw cows' milk."); Connor Report, p. 12 ("Researchers have found that the bargaining power of dairy cooperatives in Florida is greater than that of milk processors. Recent research using a structural model to estimate oligopoly power in sequential stages of production has found that "co-operatives use their market power to raise the farm price of milk by almost 9% above marginal cost, resulting in an income transfer of more than $600 million per year" in federally regulated markets. This research found an average mark-up of $1.42/cwt in the farm price of milk across all regions of the United States; the mark-up in the Southeast and Florida was slightly higher at $1.44/cwt and $1.56/cwt, respectively.").

[55] Connor Deposition, pp. 226–227 ("Q. And does having a higher degree of concentration facilitate the creation of a cartel? A. Yes. In -- in the overviews that I have made in the last 20 years of cartel studies, and I've read hundreds of them, it's rare to find a cartel able to affect prices significantly if it does not have at least half of the market and usually a somewhat higher threshold than that. So, something like 60 percent or something would be my -- my subjective answer to a student who says, Well, how high does concentration have to be before even a little bit of market power, because I said 60 percent properly measured or little higher would -- would be breeding ground for legal or illegal collusion. Q. And would a much higher market share enable a cartel to exercise greater market power? A. There tends -- [objection removed] BY THE WITNESS: A. There tends to be a linear relationship between the degree of -- of market -- of concentration properly measured and -- and the market power outcomes, however measured, yes.").

providing rBST-free milk, or other special characteristics (high components)).[56] In his deposition, Prof. Connor acknowledged that OOPs cover services.[57]

36. For example, Calvin Covington (the former CEO of SMI) testified that in the Southeast "a big chunk of the over-order premium would go into balancing costs,"[58] one of the major services that cooperatives provide to processors. Mr. Wilson of DFA, Mr. Thomas Wegner of LOL, and Dr. Richard Stammer of Agri-Mark also testified that OOPs are affected by the costs of providing services to customers. For example, Mr. Wilson testified that OOPs typically "offset the *cost* of providing a particular marketing service,"[59] including procurement costs, laboratory costs, general and administrative costs, and balancing costs[60] (which he noted is "one of the most expensive services that coops provide to their customers").[61] Mr. Wegner from LOL and Dr. Stammer from Agri-Mark testified similarly, noting that OOPs reflect a charge for the "bundle of services" provided to customers.[62] Dr. Stammer described such services as "quality control services" and the "transportation of the milk."[63]

37. Mr. Covington also noted that OOPs in the Southeast directly capture changes in fuel prices through fuel surcharges that affect the cost of delivery. Mr. Covington noted that these charges were "put in around 2000 or 2001 when fuel went up," that they were "fairly universal" at the time, and that they "followed a schedule based upon fuel prices."[64] Like Mr. Covington, Mr. Wilson of DFA also specifically noted that a "major category of service charge increase over the last ten years has been the fuel surcharge," and that DFA and other cooperatives implemented the charge to "offset costs resulting

---

[56] For example, Bob Cropp and Ed Jesse, "Basic Milk Pricing Concepts for Daily Farmers," University of Wisconsin – Extension, Cooperative Extension, 2008, pp. 1–28 at p. 18 ("These premiums are called over-order premiums or super-pool premiums. A portion of the premium is reimbursement for services that cooperatives perform, such as full-supply commitments to handlers, transportation of milk, balancing function (*e.g.*, coordinating mil deliveries with processing schedules), and the like.").

[57] Connor Deposition, p. 28 ("Q. And by over-order premiums, this is the same thing that you referred to a little while ago as the additional amount that the processors pay for the additional services provided by the Defendants, is that correct? A. Yes.").

[58] Covington Deposition, Volume II, p. 208.

[59] Declaration of John Wilson, November 21, 2013 ("Wilson Declaration 2013"), ¶ 10.

[60] Wilson Deposition 2015, pp. 101–102.

[61] Wilson Declaration 2013, ¶ 10; see also Wilson Deposition 2015, pp. 102–103, 106.

[62] Declaration of Thomas D. Wegner, December 5, 2013 ("Wegner Declaration 2013"), ¶¶ 3, 8; Affidavit of Richard W. Stammer, December 2, 2013 ("Stammer Affidavit 2013"), ¶ 8.

[63] Stammer Affidavit 2013, ¶ 9.

[64] Covington Deposition, Volume II, p. 213.

from the sharp rise in diesel fuel prices."[65] Dr. Stammer of Agri-Mark testified that Agri-Mark charges a fuel surcharge to customers using a formula that depends directly on fuel costs.[66]

38. Mr. Wilson of DFA also discussed the introduction of an rBST-free premium in 2008 to encourage farmers to use rBST-free milk.[67] He noted that by 2008, nearly all of DFA's customers "required that their milk supply be certified rBST-free" –and that "[l]ike most coops, DFA had little choice but to try and meet this change in customer demand[.]"[68] Indeed, Winn-Dixie was one of the customers whose demand for rBST-free milk prompted the introduction of the rBST-free premium.[69] In the face of this rapid growth in demand for rBST-free milk, Mr. Wilson testified that the driving force of the rBST-free premium was to "incentivize dairy farmers to discontinue the use" of rBST because rBST allowed farmers to more efficiently produce milk.[70] Similarly, Mr. Covington testified that the rBST-free premium of $0.90, introduced in the Southeast in 2008,[71] was a way to compensate dairy farmers for the loss in raw milk production associated with moving away from rBST use.[72] Mr. Wegner also testified that LOL "increase[d] the rBST-free premium" it paid to farmers in order to encourage "additional producers" to "stop using BST."[73]

39. As I will explain in more detail in Section 6, Prof. Connor's damages model does not net out either the rBST-free premium or fuel surcharges from OOPs. This fact causes his

---

[65] Wilson Declaration 2013, ¶ 18; Wilson Deposition 2015, p. 118.

[66] Stammer Affidavit 2013, ¶ 15.

[67] Wilson Declaration 2013, ¶¶ 12–17. See also Wilson Deposition 2015, pp. 151–154.

[68] Wilson Declaration 2013, ¶¶ 14–15. See also Wilson Deposition 2015, pp. 139–40 ("…the data that's been shared with you, if you dig into that deep enough, you'll find that a big chunk of the country converted over to rbST free in February of 2008, and there were certainly some isolated pockets prior to then, but that was the big change. And that's when two of the biggest processors in the country said we have to have rbST-free milk on all of our milk. And that by the very nature of the volume demanded meant that we could no longer just pick and choose some producers who were not using bST to supply small quantities. Now we had to have all the milk, including the reserve supply, for these customers, all the milk had to be rbST free" and "It's when the big customers, and again the key date is February of 2008, that's when it really became a big deal and we started -- we had no choice but to pay farmers a premium to get them to no longer use bST. And the processors understood that, so through negotiation, we were able to convince them that they would pay extra for it, for that service.").

[69] Deposition of Frank Johns, December 8, 2017, p. 26 ("The paragraph directly below the numbers, "The rBST-free premium of 90 cents per hundredweight. Class I prices include the premium of 90 cents per hundredweight," was only a part of the price announcements once Winn-Dixie made a request for this special characteristic milk.").

[70] Wilson Deposition 2015, pp. 151; see also Wilson Deposition 2015, pp. 117, 140–141, 151–153.

[71] Wilson Declaration 2013, Exhibit 2, DFA-NE2009-003684.

[72] Covington Deposition, Volume II, p. 214.

[73] Deposition of Thomas D. Wegner, January 22, 2015 ("Wegner Deposition, Volume I"), pp. 144–145.

model to attribute increases in OOPs from the rBST-free premium and the fuel surcharge during the CWT period to the CWT herd retirements and, ultimately, to damages. In fact, once the rBST-free premium is netted out of the Class I OOP, Prof. Connor's own damages model finds no damages on Winn-Dixie's purchases of Class I milk.

*4.3.3. OOPs are affected by local market factors*

40. Testimony in the record also indicates that OOPs are affected by local market supply and demand factors that can differ across regions. For example, Mr. Wilson testified that OOPs are affected by "the competitive forces really that are in existence at any given point in time in that local area," and there are "many factors that cause [OOPs] to differ from region-to-region."[74] Mr. Lichte, Vice President of Dairy Marketing and Business Planning at DFA, also testified that OOPs depend upon local market conditions.[75] Mr. Wegner testified that OOPs are "negotiated on a regional, local, or even individual basis and are not uniform across regions, customers, or classes of milk."[76]

41. Exhibit 1 shows Class I OOPs for different regions across the country. As is clear, the levels of OOP vary substantially across regions, as do the trends. For example, in Arizona and California in 2008, OOPs were 50 cents or lower, whereas in Florida they reached $4.50. I find that monthly changes in OOPs in the three southeastern Orders (Orders 5, 6, and 7) are highly correlated (above 0.90), but contrary to Prof. Connor, that monthly changes in OOPs in the Southeast are less correlated with other regions (and uncorrelated with the Pacific Northwest, Northeast, Upper Midwest, and California).[77]

42. It is worth noting that Prof. Connor asserts that, due to spatial integration, milk prices should tend to equalize across regions (net of transportation costs). In making this assertion, Prof. Connor presents a simple analysis showing that OOPs in Orders 5, 6, and 7 are correlated, and uses that analysis to assert that "OOPs are highly correlated across geographies, which is consistent with my assessment that the milk market is spatially integrated." This fact is not surprising, given the existence of the MACs in those three Federal Orders that control the pricing of over 87 to 96 percent of milk. However, as the testimony and analysis above indicate, this is not true for OOPs across the country as a whole.

---

[74] Wilson Deposition 2015, pp. 79, 105; Wilson Declaration 2013, ¶¶ 6, 8, 10.

[75] Deposition of Michael Lichte, February 10, 2015 ("Lichte Deposition"), pp. 14–15.

[76] Wegner Declaration 2013, ¶ 10.

[77] Workpaper 2.

**EXHIBIT 1**
***Class I OOPs differ across different regions***




Source: DFA City-Level OOPs, DFA2013-00037604

43. At his deposition, Prof. Connor made the specific assertion that Class III and IV OOPs in the Northeast are correlated with those in the Southeast.[78] In Section 6 below, I re-visit this question as it relates to Prof. Connor calculation of Class III and IV damages, and find that the data do not support his claim.

*4.3.4. OOPs can be sticky and can move in the opposite direction of regulated prices*

44. Mr. Wegner and Mr. Stammer both noted that OOPs can oftentimes be sticky, and not responsive to short-run market variations. For example, Mr. Wegner discussed how various customers purchase milk products pursuant to contracts, and that LOL "attempts to maintain stable, predictable base premiums" where possible "and generally does not

[78] Connor Deposition, p. 244 ("Okay. Well, the OOPs in the Southeast are going to be correlated with the OOPs in the Northeast or -- yeah, Pennsylvania is Northeast. So, while they may not be exactly at the same level, they will tend to move similarly over time.").

adjust premiums based on short-term market fluctuations."[79] Mr. Stammer, with Agri-Mark, offered a similar representation, and provided an example; he also testified that some customers put pressure on the firm to refrain from increasing prices.[80]

45. As I detail in Section 6 below, the Class I–IV OOPs that Prof. Connor relies on in his damages analysis all display this pattern. In other words, the OOPs sometimes remain fixed at the exact same level for every month for *multiple years* in a row, even while thousands of cows are being retired via the CWT program. For example, after netting out the fuel surcharge, SMI's Class II OOPs in Florida were fixed at $1.11 in every month for which data was available from January 2003 to December 2013.

46. The Novakovic Report additionally notes that OOPs can sometimes be adjusted in the *opposite* direction of changes in the regulated price to help offset large swings in the regulated price.[81] Mr. Wilson testified that DFA sometimes negotiated such "countercyclical pricing" with customers, lowering OOPs when regulated prices were high and vice-versa.[82] Academic papers have also noted this countercyclical pattern.[83] As

---

[79] Wegner Declaration 2013, ¶ 15.

[80] Stammer Affidavit 2013, ¶¶ 10–11 ("Generally, the OOP Agri-Mark charges does not change in response to short-term market effects. The OOP generally does not change from month-to-month; rather, it will change over much longer intervals, such as every twelve months or more. An example of the relative stability of Agri-Mark's OOP can be seen by examining the OOP charged to Agri-Mark's largest Class I milk customer, H.P. Hood LLC ("Hood"), for deliveries of fluid milk to its Class I processing plant in Agawam, Massachusetts. Attached hereto as Exhibit A is a true and accurate summary of the OOP charged to Hood for deliveries to this plant between 2003 and 2012. Over this ten year period of time, the OOP changed only five times. Indeed, the OOP did not change for long periods of time, such as from July 2003 to April 2005, and from June 2008 to December 2012."). Mr. Stammer testified that it was "certainly" a "common competitive dynamic" in "the markets [Agri-Mark] operate[s] in" where a customer would "put pressure on Agri-Mark as a supplier to reduce price based on what Agri-Mark's competitor may do" (Deposition of Richard W. Stammer, January 30, 2015, pp. 181–182.).

[81] Novakovic Report, p. 25 ("…regulated prices can change dramatically in a relatively short period of time without an alignment to the local market and local market issues. Because of this volatility, some sellers and buyers of raw milk have explicitly agreed to "countercyclical" pricing programs, where the over order price will adjust automatically in the opposite direction from the change in the regulated price.").

[82] Wilson Deposition 2015, p. 72 ("The only time that that comes into play is there have been times where we had an agreed-upon arrangement with certain customers that was -- it was commonly called countercyclical pricing. And it was negotiated with those customers so that when the regulated pricing were very low, the over-order premiums would increase, and conversely when the regulated prices were high, the over-order premiums would decrease. And that is really the only time that there was a connection between regulated prices and over-order premiums.").

[83] Christopher A. Wolf and Duane A. Banderbob, "Voluntary Order-Order Milk Premium Agreements and Implications for Policy Choices," *Journal of Cooperatives*, 2002, pp. 33–48 at p. 40 ("The premiums also offer some degree of insulation for milk producers from variation in minimum milk prices. The fluid price volatility that occurs in federal orders is caused mainly by variability in manufactured product markets, which determine the base price used to derive the minimum class prices. Federal orders do not insulate class or blend prices from extreme variation in the base price because the class prices are linked to the base price by fixed differentials. The ability to adjust premiums facilitates their use to stabilize farm milk revenue. Specifically, a premium increase (decrease) can at least partially offset a decline

the Novakovic Report explains, the regulated component of the price can change dramatically in a relatively short period of time based on national markets for wholesale commodities that can have little connection to local milk supply conditions. Milk processors therefore sometimes face large price increases (or farmers sometimes face large price decreases). Cooperatives and processors sometimes try to manage such large swings in the regulated component of the price for processors and/or farmers by attempting to adjust the OOP in the opposite direction of the regulated price change.

### *4.4. Winn-Dixie's purchases from Defendants*

47. Plaintiff Winn-Dixie operates supermarkets throughout the Southeastern U.S., and has its headquarters is in Jacksonville, Florida. Prior to 2008, Winn-Dixie owned its own processing plants, including plants in Hammond, Louisiana and Plant City, Florida. Winn-Dixie ultimately sold these plants to defendant SMI in 2008.[84] Together with SMI's Gustafson's plant, these plants account for approximately 98 percent of Class I milk at issue. Exhibit 2 maps the location of these plants, along with the fraction of total Class I milk at issue associated with each location. The data Prof. Connor uses in his damages analysis spans 65 cities and 81 plants, the vast majority of whom did not sell to Winn-Dixie; the majority of sales are associated with the three plotted locations below.

48. According to its purchasing data, Winn-Dixie distributed the processed products it bought from the Defendants to its individual stores though 11 Winn-Dixie distribution centers, five of which were located in Florida.[85] The others were located in North Carolina, Kentucky, Alabama, Louisiana, and Georgia. Exhibit 3 shows a map of the locations of the distribution centers, and includes the percentage of challenged purchases that passed through each distribution center. The distribution centers are located in the Southeast, Appalachian, and Florida Federal Milk Marketing Orders. Approximately 65 percent of raw milk at issue was associated with processed product purchases in Florida, and 85 percent was associated with purchases in Florida and Alabama.

49. Given that SMI is the supplier of raw milk to the plants from which Winn-Dixie purchased most of its Class I milk products, one can look at where SMI farmers are

---

(increase) in the federal order minimum milk price. This results in a premium that generally moves opposite the milk price-stabilizing farm milk price.").

[84] Supply Contract, SMI-000009 – 112 at SMI-000009, April 20, 2008 ("Supplier has acquired the Winn-Dixie Group's Dairy Processing Plants (the "Acquired Plants") located in Plant City, Florida and Hammond, Louisiana, pursuant to an Asset Purchase Agreement, dated as of February 26, 2008 (The "Asset Purchase Agreement"), executed by Supplier and certain members of the Winn-Dixie Group.").

[85] See backup to Exhibit 2 and Winn-Dixie's purchasing data, WD1143-000299 – 300.

located in order to understand where the raw milk that Winn-Dixie used to make those products was produced. Data on SMI farmer locations indicate that over 93 percent of their farmers are located in either Florida or Georgia during the period 2003 to 2010.[86]

**EXHIBIT 2**

***Nearly all Class I milk at issue (98 percent) comes from three locations in Florida and Louisiana***




Source: Connor Sales Data; Connor Report, Table 17

Note: The plants shown are Gustafson's Dairy; Sunshine Dairy, Plant City; and Sunshine Diary, Hammond. SMI purchased the plants located in Plant City, FL and Hammond, LA from Winn-Dixie in 2008. The plotted plants represent approximately 98% of total Class I volume at issue. The size of each plant's dot is proportional to the volume of raw milk required for processed products that it sold to Winn-Dixie, and the labels show each plant's share of the total volume sold between

[86] Declaration of Shana Wooten, February 9, 2018, p. 2.

**EXHIBIT 3**

***Winn-Dixie's distribution centers are located in the Southeast***




Source: Connor Sales Data; Connor Report, Table 17

Note: The distribution centers shown are those that purchased products from the vendors listed in Table 17 of Prof. Connor's report. The size of each dot is proportional to the volume of raw milk required to produce all processed products that are purchased from the respective distribution center, and the labels show each distribution center's share of the total volume purchased between April 2004 and August 2013.

**5. PROF. CONNOR HAS NOT DEMONSTRATED THAT CWT LOWERED RAW MILK PRODUCTION IN THE SOUTHEAST**

50. The central allegation by the Plaintiffs in this matter is that the CWT program led to a decrease in raw milk production, which in turn led to higher OOPs and higher prices on the processed milk products that Winn-Dixie purchased in the Southeast. Despite the importance of this claim, Prof. Connor has not independently analyzed any data on the trends in raw milk production nationally or in the Southeast to assess how it changed during the CWT period. His damages model simply assumes that the total number of cows retired in the Southeast is a reliable measure of the effect of CWT on raw milk production in the Southeast.

51. As I explain below, the design of the CWT program includes two key features that limited its ability to reduce the supply of raw milk, neither of which Prof. Connor directly analyzes. First, on average, CWT retired less than 1 percent of milking cows in the nation on average during the lifetime of the program, and did not have any mechanism to limit the production of non-retiring farmers who owned the remaining 99 percent of cows not retired. Standard antitrust economics tell us that any such farmer would have an incentive to respond to the CWT retirements by increasing their own production (either by limiting culling, adding cows, improving feed, or investing in more efficient milking equipment). Second, many of the cows that were retired would have retired anyway through the normal culling process.

52. As I explain below, overall trends in raw milk production and cow retirements are consistent with CWT having no effect on raw milk supply. Additionally, there are economic forces specific to the Southeast that would limit the ability CWT to have an effect in that region.

53. Finally, the only economic analysis of the effect of CWT on raw milk supply that Prof. Connor cites as support for the conclusions in his report is Dr. Brown's analysis of the effect of CWT on milk production, even though he stated at his deposition that he does not thoroughly understand or support Dr. Brown's methodology. As I explain below, Dr. Brown's model has a fundamental flaw—it incorrectly *assumes* that every cow retired via the CWT program would not otherwise have been retired. Dr. Brown did not test whether any of those cows would have retired without CWT, nor whether non-retiring farmers changed their behavior in response to the CWT herd retirements.

### *5.1. The CWT program did not restrain the production of non-retiring farmers, nor the farmers who did retire cows and would have retired them any way*

54. In reaching his opinion that the CWT was an "effective cartel," Prof. Connor asserts that "CWT had control of almost 70% of assembly of the national supply of marketed farm milk."[87] He makes no assertion that CWT had any control of the production of farm milk. In fact, Prof. Connor testified at his deposition that cooperatives do not control the production decisions of their individual farmers members, and that dairy farming is the "epitome of a perfectly competitive industry."[88]

55. Exhibit 4 reports the number of cows retired via CWT relative to the total number of cows for each year from 2003 – 2010. As it shows, on average, less than one percent of the total number of cows were retired due to CWT in each year. Given that the CWT herd retirements were announced publicly in advance of the retirements through a call for bids,[89] the non-retiring farmers who owned the 99 percent of cows that did not retire could respond to the announced retirements by either reducing the number of cows they culled during the normal culling process, or adding more cows to their herds to shift out production. As noted above, Prof. Connor testified at his deposition that cooperatives do not control the production decisions of individual farmers.

56. Indeed, this is a well-known challenge that any group of conspirators face when trying to effectuate a horizontal conspiracy: every producer in the industry, whether or not a member of the conspiracy, has an increased incentive to increase supply and meet demand in the marketplace that the supply reduction has left unmet.[90] Antitrust analysis recognizes that effective cartels must control a larger share of supply to be effective.[91]

---

[87] Connor Report, p. 32.

[88] Connor Deposition p. 161, ("Q. Is it your opinion that cooperatives have control over the output of farmers? [objection removed] A. No. The farming stage or production stage, as you called it, is perfectly competitive, with keeping in mind that there are regulatory restraints, health regulations, dairy programs that confine -- confine -- they regard it as -- as – as limits on -- on the decision-making, but within those -- within those limits, dairy farming is the epitome of a perfectly competitive industry.").

[89] Kozak Deposition, p. 165 ("[E]ach time there was going to be a bid announcement, specifically as it related to the Herd Retirement Program, once the date was selected, we would immediately send out a -- a public relations release. And when a herd retirement was completed and we had the results, we would also immediately issue publicly a release.").

[90] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Reading, MA: Addison Wesley, 2004), p. 126.

[91] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Reading, MA: Addison Wesley, 2004), p. 184 ("If the cartel only controls a small share of the relevant market, which includes all close substitutes, noncooperating firms undercut the cartel and prevent it from raising the industry price").

**EXHIBIT 4**
***Share of cows retired through CWT, as a fraction of all cows***

| | Year | Total Herd Size | Cows Retired Via CWT | |
|---|---|---|---|---|
| | | | Number | % |
| 1. | **2003** | 9,081,000 | 32,724 | 0.36% |
| 2. | **2004** | 9,010,000 | 50,478 | 0.56% |
| 3. | **2005** | 9,050,000 | 64,069 | 0.71% |
| 4. | **2006** | 9,137,000 | 0 | 0.00% |
| 5. | **2007** | 9,189,000 | 52,783 | 0.57% |
| 6. | **2008** | 9,314,000 | 75,215 | 0.81% |
| 7. | **2009** | 9,202,000 | 200,761 | 2.18% |
| 8. | **2010** | 9,123,000 | 31,159 | 0.34% |
| | **Average** | **9,138,250** | **63,399** | **0.69%** |

Source: USDA, Annual National Cow Inventory; NMPF0018345 – 54

57. Prof. Connor recognizes these principles. At his deposition, he testified that if even 50 percent of supply is controlled by producers outside of a cartel, those producers can "destroy" the cartel.

> "Q. Oh, Ok. SO I -- Let me rephrase. How much market share would the colluders have to have in order to have -- have monopoly power? A. Well, at least 50 -- at least 50 percent. I have -- I've looked at concentration – actual concentration levels of many -- a dozen scores of cartels and it's maybe there may be one cartel below 50 percent control of its market…
>
> Q. And if you go much below 50 percent, the cartel wouldn't be able to raise price or reduce output effectively? A. Yes, because the fringe, the non-participating members of the cartel is so large that they would jump at the chance and assuming they had any excess capacity at all, they could even in a short run destroy a cartel."[92]

58. Even if we assume, counter to fact, that the non-retiring farmers were somehow "participants" in the alleged conspiracy as Prof. Connor suggests in his report,[93] these

[92] Connor Deposition, pp. 277–278.

[93] Prof. Connor asserts that, "[o]nce the Board of a cooperative, including but not limited to the Defendants, voted to "join" or "participate in" the CWT program, participation by its member producers (dairy farmers) in the CWT Herd Retirement Program was mandatory" (Connor Report, p. 3). Importantly, Prof. Connor does not dispute the fact that CWT imposed no restraints on the production decision of non-retiring farmers.

farmers (who control 99 percent of the cows) would still have an economic incentive to respond to the retirements by increasing raw milk production.[94] At his deposition Prof. Connor specifically noted that without an enforcement mechanism to limit supply responses by all participants, a cartel is unlikely to be effective:

> "So, private cartels do, in fact, require a regulatory mechanism. They have to detect cheating on the parts of their members, they have to have a -- a way of doing that. Once they detect cheating, they have to have a method of -- of punishing the cheaters, or else because there is always an incentive to cheat in a cartel, there is always an incentive to try to grab just a little more market share than you were allotted or a little higher price, a little lower price, because then your market share will go up and you'll benefit at the expense of your fellow members of the cartel.
>
> "So, in -- the enforcement mechanism is very important for a cartel to be successful. Cartels often are very fragile. On average as far as we know they last about seven years in modern times. And whether that -- you regard that as fragile or not is a -- is -- is open to interpretation."[95]

59. As Prof. Connor himself acknowledges, the CWT program had no mechanism to control or enforce the production decision of all non-retiring farmers both in participating cooperatives and outside of CWT, who owned over 99 percent of the cows. This feature of CWT makes it highly unlikely that CWT could have effectively restricted the supply of raw milk in a meaningful way.

60. These concerns are not just theoretical. A variety of documents in the record indicate that the Defendants were concerned about farmers responding to the herd retirement announcements by changing their own production decisions. For example, a document from NMPF stated that "every time the CWT bought cows, dairymen responded with herd expansion or construction of new facilities," and concluded that the "benefits" of the CWT "have been limited."[96] A document from DFA expressed similar concerns, noting

---

[94] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Reading, MA: Addison Wesley, 2004), pp. 136–144; John Connor, *Global Price Fixing*, (Berlin: Springer-Verlag, 2008), p. 23 ("If a cartel agreement is successful in raising market price, individual firms in the cartel can make even more profit by "cheating," that is, selling some of their output at prices below the agreed-upon price. Cartel members incur costs in monitoring the sales activities of co-conspirators. Moreover, one or more of the participants must be prepared to discipline deviants once they are detected.").

[95] Connor Deposition, pp. 228–229.

[96] "Why Continental does not support the continuation of CWT," NMPF0017606 – 09, at NMPF0017606.

that while, "many farmers call it quits, others are increasing their herds."[97] LOL documents also noted a concern that farmers were expanding production in response to the herd retirements.[98] Mr. Wegner of LOL and Mr. Wilson of DFA indicated that on average, LOL and DFA members increased production during the operation of the Herd Retirement Program.[99]

61. There is also evidence farmers responded to CWT by delaying culling. Mr. Stammer of Agri-Mark noted this possibility as a concern for CWT, stating that he "was aware that during the 2003 to 2010 time period, Agri-Mark farmers would defer culling in times of good milk prices[.]"[100] Prof. Novakovic discusses this dynamic in his report, noting that the announcements of CWT herd retirements could create expectations of better prices for remaining farmers, which could lead to lower cull rates in the short-run.[101]

62. Additionally, as noted above in Section 4.1, documents in the record indicate that even some of the same farmers that retired their herds via the CWT program subsequently returned to dairy farming.[102] In fact, starting in 2009, CWT began to track farmers who retired their herds and then re-entered the market. In the Southeast, about 9 percent of farmers re-entered the business within one year or less.[103]

63. Prof. Connor does not account for any of these factors. The only argument he offers about the potential supply response to CWT is that it would have taken several years for farmers to adjust their production.[104] As detailed above, the evidence does not support this claim. Adjustments to culling decisions can occur immediately, and documents in the record indicate that many farmers increased production and herd sizes coincident with the

---

[97] Newsletter, "NMPF Dairy Industry News Alert," October 27, 2009, DFA2013-00002903 – 20 at DFA2013-00002906.

[98] "An International Comparison of Milk Supply Control Programs and Their Impacts," September 2010, LOL00005813 – 5895 at LOL00005889.

[99] Wegner Declaration 2016, ¶ 5; Wilson Declaration 2016, ¶ 38.

[100] Stammer Declaration 2016, ¶ 74.

[101] Novakovic Report, p. 49 ("By the same token, the expected removal of cows through a Herd Retirement Program may create expectations of better prices in the remaining farmers' minds and that may lead to a lower cull rate of those farmers as they factor a higher price into their own culling calculus.").

[102] See, for example, Balmer Declaration, Part I, ¶ 33; Stammer Declaration 2016, ¶ 78; CWT Presentation, "CWT Herd Retirement Task Force, "August 20, 2007, NMPF0002124 – 41 at NMPF0002134"; Email chain from Rick Smith to John Wilson et al., "Fw: from a Northern Wisconsin member "Fw: My View"," October 26, 2009, DFA2013-00006702 – 8 at DFA2013-00006704; and CWT Presentation, "CWT Herd Retirement Information & Results Survey Round 3 - 2005," 2005, NMPF0003470 – 76 at NMPF0003475 – 76.

[103] See Workpaper 3.

[104] Connor Deposition, p. 210 ("It would have taken several years, again, three, four, five years before you can fully get milking going and have the proper barns and equipment that are needed.").

CWT retirements. Further, because less than 1 percent of cows on average were retired via CWT, even a small response by the many non-retiring farmers (either through reduced culling or increased production) could offset any effect of CWT.

64. In addition to not accounting for evidence of a supply response from non-participating farmers, Prof. Connor also does not consider the fact that many of the cows retired via CWT would have retired anyway, thereby limiting its effect. Cow retirement is a standard practice in the dairy industry that occurred on a scale much larger than the CWT program both before and during the lifetime of program.[105] Exhibit 5 summarizes data on national culling behavior during the CWT period. It indicates that approximately 30 percent of *all* cows nationally were retired every year (2.6 million cows per year, on average) during the CWT program, and that, on average, the cows retired through CWT between 2003 and 2010 comprised only 2.5 percent of those cows retired. In order to measure the true, incremental effect of CWT on cows, it is critical to assess how many of the cows retired via CWT would have retired through the normal culling and retirement process without CWT.

65. For example, if the farms that retired via CWT exhibited average culling behavior, the data in Exhibit 5 show that approximately 30 percent of the cows at those farms (on average) would have been retired through the normal culling process even without CWT. Documents and testimony in the record indicate that CWT members were concerned that cows retiring from the program would have retired anyway. For example, a LOL document noted that a "significant portion of the reduction" in herd size associated with the conduct at issue "would have likely taken place without the program."[106] Mr. Wilson of DFA testified that, "several DFA farmers who participated in the Herd Retirement Program intended to retire, for a variety of reasons, regardless of the Herd Retirement Program."[107] Mr. Stammer testified that farmers at Agri-Mark were concerned that "the Herd Retirement Program was just giving money to farmers who were going out of business anyway."[108]

---

[105] Novakovic Report, pp. 39, 41.

[106] "An International Comparison of Milk Supply Control Programs and Their Impacts," September 2010, LOL00005813 – 5895 at LOL00005889.

[107] Wilson Declaration 2016, ¶ 39.

[108] Stammer Declaration 2016, ¶ 80.

**EXHIBIT 5**

***CWT herd retirements accounted for only a small fraction of all cow retirements***

| | Year | Total Herd Size | Culled Dairy Cows | | Cows Retired Via CWT | | Culled Cows Not Explained by CWT | |
|---|---|---|---|---|---|---|---|---|
| | | | Number | % | Number | %[1] | Number | % |
| 1. | **2003** | 9,081,000 | 2,859,900 | 31.5% | 32,724 | 1.1% | 2,827,176 | 98.9% |
| 2. | **2004** | 9,010,000 | 2,362,700 | 26.2% | 50,478 | 2.1% | 2,312,222 | 97.9% |
| 3. | **2005** | 9,050,000 | 2,252,100 | 24.9% | 64,069 | 2.8% | 2,188,031 | 97.2% |
| 4. | **2006** | 9,137,000 | 2,353,500 | 25.8% | 0 | 0.0% | 2,353,500 | 100.0% |
| 5. | **2007** | 9,189,000 | 2,496,900 | 27.2% | 52,783 | 2.1% | 2,444,117 | 97.9% |
| 6. | **2008** | 9,314,000 | 2,591,200 | 27.8% | 75,215 | 2.9% | 2,515,985 | 97.1% |
| 7. | **2009** | 9,202,000 | 2,815,300 | 30.6% | 200,761 | 7.1% | 2,614,539 | 92.9% |
| 8. | **2010** | 9,123,000 | 2,807,200 | 30.8% | 31,159 | 1.1% | 2,776,041 | 98.9% |
| | **Average** | **9,138,250** | **2,567,350** | **28.1%** | **63,399** | **2.5%** | **2,503,951** | **97.5%** |

Source: USDA, Annual National Cow Inventory; USDA, Annual National Cows Retired; NMPF0018345 – 54

Note: [1] Percentages represent the number of cows retired through CWT as a fraction of all culled dairy cows.

66. Related, the farms that were chosen for retirement were the farmers with the lowest bids. Standard economics tells us that the bids of each farmer should be at least as high as their best estimate of the net present economic value of their farm's profits into the future, including whatever risks the farmers face. Thus, bids lower than the net present value of their farm's profits into the future would typically not make economic sense because they would lose money if the bid was accepted.[109] Thus, farms with the lowest bids were likely a set of farms with relatively lower profitability, and, in turn, relatively higher probability of exiting the industry independent of the CWT program. Prof. Novakovic discusses these economics in his report.[110] For example, Mr. Stammer testified that "many" of Agri-Mark's farmers "were operating at a loss before and during the years of the CWT program," and that "the Herd Retirement Program allowed them the opportunity to receive additional compensation compared to what they would have received if they had independently retired their herds."[111]

67. One way to measure the net effect of CWT on herd retirements and milk production is to examine whether long-run trends in the industry changed significantly during the CWT period. If the CWT retirements were sufficiently large to overcome the potential supply responses from non-retiring farmers discussed above and the fact that many

[109] Stephen A. Ross, Randolph W. Westerfield, and Jeffery Jaffe, *Corporate Finance*, (New York, NY: McGraw-Hill, 2002), p. 94.

[110] Prof. Novakovic observes the same economic incentives in his report. Novakovic Report, pp. 48–50 ("Economic logic dictates that an HRP that is based on a bidding decision will receive rational bids in which farmers who need the lowest incentive to exit will offer the lowest bid. Insofar as the program accepts the lowest bids, it will make payments to farmers that likely were on the cusp of an exit decision anyway and likely had the least profitable herds.").

[111] Stammer Declaration 2016, ¶ 72.

farmers would have retired anyway, we would expect to see a significant rise in the overall trend of culling, or a significant decrease in the overall trend in milk production. As I show below, we do not see such changes in trends.

68. For example, Exhibit 6 tracks the total number of cows retired each year before and after the CWT program. The total number of cows retired in the U.S. did not increase during the period CWT was active—in fact, the total number of cows retired fell. I have run a statistical test to see if the number of cows culled during CWT rose relative to the periods before and after. That test shows that the number of cows culled was statistically significantly lower during the CWT period. All else equal, I would expect to see the opposite pattern if CWT led to an increase in overall herd retirements. The fact that we do not is consistent with the possibility that retiring farms would have retired anyway, and/or non-retiring farmers changed their culling and production decisions in response to the CWT retirement announcements. Prof. Connor has not analyzed these trends.

**EXHIBIT 6**

***The total number of cows retired each year did not increase during the period CWT was active***




Source: USDA, Annual National Cows Retired

Note: The graph reports the total number of cows retired per year at the national level. [1] "*" indicates significance at the 5% level.

69. Additionally, as shown in Exhibit 7, the total number of milk cows across the U.S. has generally fallen in the U.S. since 1993 (blue line), while the total milk production in the U.S. has risen (red line).[112] I test whether the number of cows declined at a faster rate during the CWT program than they had before the program. I find that the decline in the number of cows did not increase during the program. This result is contrary to Prof. Connor's hypothesis that the CWT retirements were in excess of normal culling.

**EXHIBIT 7**

***Total milk production has risen while total number of cows has fallen***




Source: USDA, Annual National Cow Inventory; USDA, Annual National Milk Production

Note: This graph reports the total number of cows and the total milk production at the national level. [1], [2] "*" indicates significance at the 5% level.

70. Additionally, I tested whether the annual increases in milk production were dampened during CWT. I find that they were not—i.e., the average annual change in raw

[112] These trends are driven by the fact that average production per cow of raw milk across the whole U.S. has steadily risen, in part due to production shifting from smaller farms to larger, more efficient farms. USDA, "Profits, Costs, and the Changing Structure of Dairy Farming," U.S. Department of Agriculture Economic Research Report Number 47, September 2007 (For example, at p. i: "U.S. dairy production is consolidating into fewer but larger farms. This report uses data from several USDA surveys to detail that consolidation and to analyze the financial drivers of consolidation. Specifically, larger farms realize lower production costs."); USDA, "Economic Effects of U.S. Dairy Policy and Alternative Approaches to Milk Pricing," Report to Congress, July 2004, Figures 2.5, 2.8, 2.9.

milk production trend is statistically the same as the period before CWT was in effect. Again, all else equal, I would expect to see the opposite pattern in the data if CWT led to a decrease in cows and a decrease in raw milk production. The fact that I do not is, again, consistent with the possibility that non-retiring farmers changed their culling and production decisions in response to the CWT retirement announcements. Prof. Connor has not analyzed these data either.

### *5.2. Prof. Connor has not considered numerous economic factors in the Southeast that raise the possibility that CWT did not reduce raw milk production*

71. At his deposition, Prof. Connor stated that the Southeast was the "relevant antitrust market" for his analysis.[113] Further, his damages analysis focused only on retirements and OOPs in the Southeast. Despite his focus on the Southeast, he did not analyze several economic factors that are specific to milk production in the Southeast—the region where Winn-Dixie operates—that raise further questions about whether the CWT program had any effect on raw milk production in the Southeast.

72. First, it is important to note that the CWT program was relatively smaller on average in the Southeast region that Prof. Connor analyzes. The number of cows retired in the southeastern states was small compared to many other states. For example, the average total number of cows and fraction of cows retired in southeastern states in each year of the CWT program was smaller than outside the Southeast.[114] Additionally, documents from NMPF indicate that through 2008, regional safeguards were put in place by the CWT program to ensure that retirements in the Southeast were not disruptive to local milk supplies.[115]

73. Second, not only was the size of the CWT program relatively small in the Southeast, raw milk production has been shifting away from the Southeast to other regions for the past 30 years. As shown in Exhibit 8, we see that the trends in raw milk production in the Southeast diverge sharply from the rest of the country. Specifically, since 1993 raw milk production has *risen* by over 40 percent outside of the Southeast, while raw milk

---

[113] Connor Deposition, p. 118 ("Mr. Miller, it was my judgment that this Southeast region we defined was a relevant antitrust market. I don't think I need to elaborate further upon that.").

[114] Workpaper 4.

[115] CWT pamphlet, "The Need for Regional Safeguards," NMPF0000004 – 5 at NMPF0000004 ("The safeguard limits will be tightest in the Northeast (Region 1), Southeast (Region 2) and Upper Midwest (Region 3). The safeguards are less stringent in the Southwest (Region 40 and West (Region 5)."); Memo, Jerry Kozak,"CWT Gears Up For New Round of Activity," NMPF0005259 – 60 at NMPF0005259; Newsletter, "CWT News Watch," July 28, 2008, NMPF0007136 – 41 at NMPF0007138; Memo, NMPF0010842 – 4.

production in the Southeast has *fallen* by over 25 percent.[116] In other words, the Southeast has been shrinking while the rest of the country has been expanding. One reason for this pattern is that milk has been shifting West over time because the cost of milk production is much lower there.[117] This is important because it raises the possibility that cow retirements in the Southeast via CWT were likely to occur anyway.

**EXHIBIT 8**

***Total raw milk production in the Southeast has fallen at the same time that raw milk production outside the Southeast has risen***




Source: USDA, Annual Milk Production by State; USDA, Annual National Milk Production

Note: [1] The Southeast region is defined as Orders 5, 6, and 7 which include Alabama, Arkansas, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia. [2] Total milk production outside of the Southeast is equal to total national milk production less total milk production in the Southeast region. [3] "*" indicates significance at the 5% level.

74. In fact, if we look at the average annual change in raw milk production in the Southeast in the years before the CWT program reported in Exhibit 8, we see no evidence

[116] See backup to Exhibit 8.

[117] USDA, "Economic Effects of U.S. Dairy Policy and Alternative Approaches to Milk Pricing," Report to Congress, July 2004, p. 5 ("While milk production for fluid use remains concentrated near large population centers, production of milk for manufacturing uses is increasingly located in low-cost areas—the West and Southwest…. Milk producers in the West have been found to have a significant cost advantage over producers in other regions because their operations are significantly larger[.]").

that production declined more quickly during the CWT period. I run a statistical test of whether the average annual decrease in milk production in the Southeast that preceded CWT sped up during the CWT program, and find that it did not. If anything, the decrease slowed a bit. This pattern is the opposite of what we would expect if CWT reduced raw milk production in the Southeast, and is consistent with the possibility detailed above that the herds that retired in the Southeast via CWT would have retired anyway.

75. One additional economic factor that could have limited the impact of the CWT program on raw milk production in the Southeast is that the supply of Class I milk takes priority over supply of other classes of milk, due to its higher price, followed by Class II milk. This fact is particularly important in the Southeast because, as shown in Exhibit 9, Class I and II utilization is higher in the Southeast than any region in the U.S (due, in part, to the fact that all non-Class I milk has been shifting away from the Southeast over time).[118] This is yet another reason why any effect of CWT was likely smaller (if not non-existent) in the Southeast.

76. This fact is also important for Prof. Connor's damages analysis, because Class I milk products are by far the largest share of Winn-Dixie's purchases of raw milk and processed milk products from Defendants. Approximately 87 percent of Prof. Connor's estimated damages across all four classes of milk ($18.6M out of $21.4M) are from Class I purchases, and 93 percent of Prof. Connor's estimated damages from Class I and II milk are from Class I purchases ($18.6M out of $20M).[119] Yet Class I is the class of milk that is least likely to be affected by CWT.

77. It is worth noting that in his deposition, Prof. Connor opined that his damages model establishes that the quantity of raw milk production in the Southeast was suppressed by the CWT program. Specifically, he asserts that the fact that his damages model shows OOPs were elevated proves that CWT successfully limited supply in the Southeast.[120] As I detail carefully in Section 6 below, Prof. Connor's damages model has a variety of flaws that render it incapable of measuring the effect of CWT on OOPs and/or supply.

---

118 USDA, "Economic Effects of U.S. Dairy Policy and Alternative Approaches to Milk Pricing," Report to Congress, July 2004, p. 5 ("While milk production for fluid use remains concentrated near large population centers, production of milk for manufacturing uses is increasingly located in low-cost areas—the West and Southwest.").

119 Connor Report, Table 19.

120 Connor Deposition, pp. 165–166 ("Q. Did you do any analysis of whether the retirements themselves reduced the supply of milk in the Southeastern US? A. Not directly, but this model indicates that supply contracted ... The fact that cows removed increased the price is evidence that the supply contracted, the net supply.").

Thus, Prof. Connor's damages model cannot be taken as reliable evidence that CWT caused a reduction in milk supply.

**EXHIBIT 9**

***The combined utilization rates of Class I and Class II milk is close to 100% in the Southeast***




Source: USDA, Utilization of Producer Milk

Note: The Southeast Orders 5, 6, and 7 are Appalachian, Florida, and Southeast, respectively. Order 135 (Western) was excluded from this analysis as there are gaps in the Class II Utilization Rate data for this order.

### *5.3. Dr. Brown's analysis of the CWT program—which Prof. Connor presents as evidence of CWT's effect in his report—does not support the claim that the CWT program reduced raw milk production in the Southeast*

78. Prof. Connor does no direct empirical analysis of raw milk production to support that CWT reduced raw milk supply. In fact, the only empirical evidence that Prof. Connor points to at all regarding the milk supply is Dr. Brown's analysis of the CWT program. As detailed in the Connor Report, CWT retained Dr. Scott Brown (an Assistant Extension Professor of Agricultural and Applied Economics at the University of Missouri) in 2006 to estimate the potential effect of CWT on raw milk production and raw milk prices.[121]

[121] Connor Report, pp. 35–36.

By applying a statistical model developed at the Food and Agricultural Policy Research Institute at the University of Missouri ("FAPRI") to the specific question of the CWT program, Dr. Brown estimated by how much milk production would have increased if all of the cows retired via CWT in each year and in each state were added back into the existing herds.[122]

79. Prof. Connor states in his report that Dr. Brown's model, "estimates what the total national supply of raw milk would have been without the CWT Herd Retirement Program," and that it considers a "but-for scenario" in which "CWT Herd Retirement Program never occurred."[123] Prof. Connor then cites directly to Dr. Brown's analysis to opine that "the CWT Herd Retirement program caused a significant reduction in U.S. raw dairy milk from 2003 to at least 2010.[124] He also states that "Dr. Brown's analysis clearly supports the notion that supply of milk was materially reduced because of the CWT Herd Retirement Program."[125] In reaching this opinion, Prof. Connor has offered no independent analysis of raw milk production trends nationally or in the Southeast. Despite citing to Dr. Brown's analysis in his report, at his deposition Prof. Connor testified that he did not read Dr. Brown's deposition or declaration, and that it was "very hard to figure out what particular methods he used to arrive at [his conclusions]."[126]

80. In the remainder of this sub-section, I explain how Dr. Brown's analysis is fundamentally flawed and designed in such a way that overstates any effect of CWT on raw milk supply.

*5.3.1. Dr. Brown testified that he did not test whether herds that retired via CWT would have retired in the absence of the program*

81. First, contrary to Prof. Connor's above assertion, Dr. Brown did not attempt to construct a "but-for" world in which the CWT Herd Retirement program never occurred. Instead, he made an important simplifying assumption in his analysis. He assumed that

---

[122] Workbook, Dr. Brown's data and analyses ("Brown Data"), BROWN-MU_0003745; Deposition of Scott Brown, November 7, 2014 ("Brown Deposition"), at pp. 211–212.

[123] Connor Report, pp. 39–40.

[124] Connor Report, p. 7.

[125] Connor Report, p. 44.

[126] Connor Deposition, pp. 60, 197 ("Q. But you don't think you actually did review the dep – [Dr. Scott Brown's] deposition that was taken in 2014? A. No, I did not review his deposition. Q. Okay. Did you review the – his declaration from 2016 […] ? A. I don't think – I don't think I – I read that either" and "I was not inspired by his report. I did not use any of the concepts or the methods underlying his report. And to be frank, it's very hard to figure out what particular methods he used to arrive at these. His model is a bit of a black box.").

any cows retired via CWT *would not* have otherwise been retired, and then estimated the effect on raw milk production of adding those cows back into the herds.

> "Q. Did you make any assumptions about whether the cattle that were retired as part of the CWT program, whether they otherwise may or may not have been retired in the absence of the CWT program?
>
> A. I did not. I assumed a herd retirement would have not occurred had it not been for the herd retirement event.
>
> Q. Is it possible in your opinion that some of the cattle that you have included in the model as retired only as a result of CWT would have been culled without CWT? […]
>
> A. Yes."[127]

82. Dr. Brown further testified that his assumption that all cows retired via the CWT program would not have otherwise been retired was the "most common" criticism of his model.[128]

83. In order to reliably estimate the number of incremental cows that were actually on net removed by CWT compared to a but-for world without CWT, Dr. Brown would need to first account for the many factors detailed above in Sections 5.1 and 5.2 in order to determine (a) how many cows that retired via CWT would have retired any way, and (b) how many non-participating farmers changed their behavior in response to CWT. Dr. Brown's analysis does not do this, and, thus, will significantly overstate any effect of CWT. In fact, Prof. Connor testified that studies sponsored by industry participants, like Dr. Brown's was sponsored by CWT, are likely to overstate results in favor of industry participants because industry participants "are only going to try to fund research that reflects well on the performance of their industry."[129]

---

[127] Brown Deposition, p. 210.

[128] Brown Deposition, pp. 211–212.

[129] Connor Deposition, p. 89 ("If it was privately funded, I think many economists now are trying to be upfront and fully -- fully transparent about the sources of their funding because a -- a -- a piece of research funded solely by an industry source might be considered somewhat biased because the -- the industries are only going to try to fund research that reflects well on the performance of their industry.").

*5.3.2. Dr. Brown's analysis—which overstates the effect of CWT—shows that CWT had a limited effect on milk production in the Southeast states where Winn-Dixie operates*

84. Despite the fact that Prof. Connor's damages model focuses specifically on retirements in the Southeast, Prof. Connor focuses only on Dr. Brown's analysis of the effect of CWT on total *national* raw milk production.[130] As I detail in this section, Dr. Brown's state-by-state analysis (which Prof. Connor ignores) shows that the estimated effect of the CWT program in the relevant Southeast states on raw milk production actually reverses in 2009. Given that Dr. Brown's model is fundamentally flawed in a way that substantially *overstates* any effect of CWT, his findings that the program had no effect in the Southeast starting in 2009 directly undermine Prof. Connor's damages analysis, which finds its largest overcharges in 2010 onward.[131]

85. Exhibit 10 depicts the estimated effect of CWT from Dr. Brown's model on raw milk production in the Southeast states that Prof. Connor analyzes. The bars show Dr. Brown's estimated reduction in milk in the Southeast as a fraction of total milk production in the Southeast for a given year. As is clear from this graph, Dr. Brown's estimated reduction in raw milk production in the Southeast (which, again, overstates the effect of CWT) is tiny—in the years before 2009, the average reduction Dr. Brown finds is just 0.22 percent of the total raw milk production.[132] Dr. Brown's estimated reduction in milk production completely disappears by 2009. In fact, the negative bars in Exhibit 10 starting in 2009 indicate that Dr. Brown's model finds that CWT led to *an increase* in raw milk production in the Southeast. Given that Dr. Brown's model is flawed in a way that *overstates* any effect of the CWT program, these patterns contradict Prof. Connor's claims that CWT reduced raw milk production in the Southeast.

86. In sum, Dr. Brown's model—which Prof. Connor offers as evidence that that CWT reduced national raw milk production—is fundamentally unreliable because it assumes that all cows retired would not have retired. This means that by its very construction, the model overstates any effect of CWT. Even though Dr. Brown's model overstates the effect of CWT, it finds that CWT program had no effect on raw milk production in the Southeast after 2009. Prof. Connor ignores these issues when citing to Dr. Brown.

[130] In Section V of the Connor report, where Prof. Connor details Dr. Brown's analysis, Prof. Connor discusses only Dr. Brown's analysis of national milk production.

[131] Connor Report, Table 16.

[132] Workpaper 5.

**EXHIBIT 10**

***Dr. Brown's model finds a very small effect of CWT on milk production in the Southeast***




Source: Brown Data; USDA, Annual Milk Production by State

Note: Estimated reduction in milk production is measured as the difference between Dr. Brown's estimated milk production but-for CWT and actual milk production in the Southeast.

### *5.4. Conclusion*

87. The central allegation in this matter is that the CWT program led to a decrease in raw milk production, which led to an increase in OOPs. Yet Prof. Connor offers no independent empirical analysis of how CWT affected raw milk production. As discussed above, the design of the CWT program raises serious questions about whether CWT could affect raw milk supply. Less than 1 percent of cows were retired on average, and all non-retiring farmers were free to increase their production or adjust their culling behavior in response to the retirement announcements. Further, culling cows is a normal part of the dairy business, with approximately 30 percent of cows culled every year. In fact, documents in the case indicate that the participating cooperatives were concerned that many of the farmers who retired were likely to retire anyway and that many non-participating farmers had changed their behavior in response to CWT.

88. Additionally, trends in raw milk production and cow retirements during the CWT period exhibit patterns that are inconsistent with the CWT program reducing cows and

milk production. Further, the Southeast marketplace is characterized by several factors that make it even less likely to be impacted by the CWT program (e.g., CWT was smaller in the Southeast, production in the Southeast had been contracting for years prior to the CWT program, Class I and II milk utilization is high in the Southeast).

89. The only empirical analysis of raw milk production Prof. Connor points to support his opinion that CWT led to a reduction in raw milk production is the analysis of Dr. Brown. As discussed above, Dr. Brown's own testimony indicates that he did not in fact test whether the cows retired via CWT would have been retired anyway for reasons independent of CWT. Instead, Dr. Brown made the simplifying assumption that every cow retired via CWT would not have otherwise retired. Further, even if Dr. Brown's analysis is taken at face value, it finds very limited effect of CWT in the Southeast—despite the fact that it makes the flawed assumption that all cows retired via CWT would not have otherwise retired.

## 6. PROF. CONNOR DOES NOT PROVIDE RELIABLE EVIDENCE THAT OOPS ROSE IN THE SOUTHEAST BECAUSE OF THE CWT PROGRAM

90. In this section, I turn to an analysis of Prof. Connor's damages model. I first provide an overview of Prof. Connor's damages model in Section 6.1. Then, in Section 6.2, I identify three critical methodological flaws of Prof. Connor's damages model that render it incapable of reliably measuring the effect of CWT on OOPs.

- First and foremost, Prof. Connor's but-for world is fundamentally flawed because it does not account for the antitrust immunity that farmer cooperatives have to jointly set prices. This is critically important because OOPs for 87 to 96 percent of the raw milk in the Southeast are jointly negotiated by DCMA, which means CWT cooperatives have significant pricing power in the Southeast that they would have had even in the but-for world where the CWT program did not occur. Prof. Connor's claim that his benchmark period allows him to control for this fact is not true.

- Second, Prof. Connor has not analyzed whether CWT lowered milk production in the Southeast. He instead uses in his damages model the number of cows retired via CWT in southeastern states as his measure for the effect of CWT, ignoring the numerous complicating factors discussed above in Section 5. As I show below, Prof. Connor's assumed effect of the CWT program vastly overstates any possible effect of CWT on raw milk production in the Southeast, rendering his damages model unreliable.

- Third, the estimated effects of key supply and demand variables on OOPs in Prof. Connor's damages models do not make economic sense. For example, his model finds that feed costs (the main cost variable in his model) *lowers* OOPs. If his model cannot reliably estimate the effect of feed costs on OOPs, it cannot be assumed that his model reliably estimates the effect of the CWT herd retirements on OOPs.

91. In Section 6.3, I then show that, even if (counter to fact) we accept Prof. Connor's flawed approach and his unreliable estimate of the CWT program on raw milk production, the underlying patterns in Class I–IV OOPs do not support an inference that herd retirements caused OOPs to rise. For example, Prof. Connor's damages model does not properly control for increases in the rBST-free premium, fuel surcharges for Class I and II milk that occurred during the CWT period, and the formations of SMA and DMS,

which were completely independent of the CWT program. Once I fully account for such changes in the OOPs, there is no relationship between Class I OOPs in the Southeast and the herd retirements. Prof. Connor's damages model also uses the wrong data to analyze the effect of CWT on Class III and IV products purchased by Winn-Dixie (products that are not included in Plaintiffs' Complaint). The vast majority of Class III and IV products Winn-Dixie purchased were *not* produced in the Southeast. Thus, Class III and IV OOPs in the Southeast are not relevant to the prices of those products, nor to any analysis of potential damages.

92. Finally, in Section 6.4, I explain how Prof. Connor's damage analysis does not properly account for the fact that he estimates an overcharge on raw milk prices and then calculates damages on processed product volumes. First, Prof. Connor does not account for the possibility that increases in OOPs on raw milk were not "passed through" to prices for processed milk products that Winn-Dixie purchased. Second, Prof. Connor does not reliably measure, or isolate, the relevant volume of raw milk used to make processed milk products at issue.

### *6.1. Overview of Prof. Connor's damages model*

93. In order to calculate damages, Prof. Connor uses what he refers to as a "panel, fixed-effects, reduced-form price regression,"[133] which is a type of regression widely used in assessing antitrust damages.[134] Properly implemented, such a model can be used to control for relevant supply and demand factors that can influence the prices at issue in the case, and then measure the incremental effect of the challenged conduct on price, controlling for the factors in the model.[135]

94. Prof. Connor estimates four separate regression models: one each for Class I, Class II, Class III, and Class IV OOPs. Prof. Connor uses monthly OOP data from DFA's Southeast Council for the period January 2000 to December 2013, which tracks monthly OOPs for each of the four classes of milk at 65 different cities in Federal Orders 5, 6, and 7. Before running his regressions, Prof. Connor deflates the OOP series by the CPI index to account for inflation. For each of his four models, Prof Connor includes the same set of

---

[133] Connor Report, p. 55.

[134] ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, (American Bar Association, 2014), pp. 38–39; Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, 2008, pp. 724–728.

[135] ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, (American Bar Association, 2014), pp. 38–39; Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, 2008, pp. 724–728.

control variables for “supply and demand factors shown to influence dairy prices.”[136] These control variables include: The annual population of the metropolitan area; the share of the state population aged 14 and below; average annual disposable income by state; indicators for U.S. outbreaks of “mad cow disease”; regional diesel fuel prices; the percent of cows treated with rBST; the monthly price of alfalfa; the average hourly wage of farm workers; monthly commercial electricity prices; and annual government expenditures on dairy subsidies by state.

95. To capture the purported effects of the CWT retirements on OOPs, Prof. Connor includes five different “conduct” variables. These variables are: the number of cows retired by the CWT program in the Southeast in the prior 12 months (including the current month), the number of cows retired in the prior 13–24 months, the prior 25–36 months, the prior 37–48 months, and the prior 49–60 months. Prof. Connor asserts that, by including the number cows retired in each of the prior five years, his model can measure “the lingering effects of prior herd retirements” that arises from the fact that cows typically produce milk for five years.[137]

96. Prof Connor defines the “estimated overcharge” as the sum of the coefficients on his five conduct variables.[138] The logic of this approach is straightforward. If any given CWT herd retirement affects OOPs this year and for the next four years, then to get the total effect on OOPs of that herd retirement the effects of each of the last five years must be added together. Consistent with Prof. Connor’s modeling, in my analysis below whenever I test whether the estimated overcharge is positive, I test of whether the sum of the coefficients of Prof. Connor’s five conduct variables is statistically significant and greater than zero.[139]

### *6.2. Prof. Connor’s damages model is fundamentally flawed for three key reasons*

97. As I detail in this section, Prof. Connor’s damages model is not capable of measuring any alleged effect of CWT on OOPs for three critical reasons.

98. First and foremost, Prof. Connor’s model starts from a faulty premise. Prof. Connor assumes that but-for the herd retirement program, cooperatives would not have been to

---

[136] Connor Report, p. 55.

[137] Connor Report, p. 56.

[138] Connor Report, p. 57 (“More specifically, the estimated overcharge from collusive behavior during month m and year y is calculated as $\beta_1 C_{m,y} + \beta_2 C_{m,y\text{-}1} + \beta_3 C_{m,y\text{-}2} + \beta_4 C_{m,y\text{-}3} + \beta_5 C_{m,y\text{-}4}$.”).

[139] Jeffery M. Wooldridge, *Introductory Econometrics: A Modern Approach*, (Madison, OH: South-Western, 2003), pp. 139–142.

set OOPs at the levels observed during CWT. However, this is not consistent with the fact that the cooperatives had strong price-setting power in the Southeast. As I discuss below, the price-setting power of cooperatives in the Southeast implies that the OOPs that existed in the real-world could have been achieved even without CWT. Second, the most important variables in Prof. Connor's regression—his "conduct variables" which capture the alleged "overcharge"—cannot reliably measure the effect of CWT on raw milk supply. Third, and closely related, the effects of the other supply and demand variables in his model on OOPs do not make economic sense.

*6.2.1. Damages must be measured against prices that would have existed "but-for" the CWT program, which includes the ability to jointly set prices*

99. An important feature of the dairy industry that needs to be accounted for when analyzing the alleged impact of CWT on OOPs is the Capper Volstead Act. Specifically, counsel has instructed me to assume that, under the Capper Volstead Act, individual cooperatives and groups of cooperatives are permitted to engage in joint price setting activities when marketing raw milk and in joint direction of supplies of raw milk to various uses, including disposing of excess raw milk in various ways. I also understand that the Plaintiffs in this case are not challenging the Defendants' ability to cooperate to jointly set prices or direct supplies of milk that has already been produced—they are challenging only the Defendants' CWT's herd retirement program.

100. Given these facts, in order to assess Plaintiffs' claim that the CWT program caused OOPs to be elevated, one must compare the OOPs charged in the actual world to the OOPs that would have been charged in a "but-for" world where Defendants are still allowed to jointly negotiate and set OOPs through their Capper Volstead antitrust immunity.[140] This issue is particularly important in the Southeast, where OOPs for 87 to 96 percent of raw milk OOPs are negotiated jointly by DCMA.[141] Given the substantial

[140] ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, (American Bar Association, 2010), p. 53 ("The essential starting point for any damages quantification is the but-for premise that the defendant's violation did not occur. That premise is the foundation for constructing a hypothetical "but-for world," which, when compared to the plaintiffs' actual experience, should isolate the effect of the violation on the plaintiff from the effects of all other events. A quantification of the difference between the plaintiff's experience in the but-for and actual world determines the amount of damages.); See also Allen, M. et al., "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, (Washington DC: The National Academies Press, 2011) p. 432 ("Thus, a proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only the loss caused by the harmful act.").

[141] Agricultural Marketing Service, USDA, "Milk in the Appalachian, Florida and Southeast Marketing Areas; Tentative Decision and Opportunity To File Written Exceptions on Proposed Amendments to Tentative Marketing Agreements and to Orders," *Federal Register* 73(41), 2008, pp. 11194 –11229 at p. 11197 ("According to the DCMA witness, during December 2006 members of DCMA pooled more than 87 percent of cooperative and non-member producer milk on the

control that DCMA has over pricing in the Southeast, they would have had the pricing power—and legal means to use that power—to set OOPs at the same level they achieved during the CWT period in a but-for world without CWT.

101. In general, as a matter of economics, it is well understood that restricting supply and fixing prices are two ways for an alleged cartel to achieve the same results. In fact, Prof. Connor agrees with these economic principles. Specifically, in his report he writes:

> "[W]hen the members [of a cartel] collectively raise prices substantially, the quantity demanded by customers falls only slightly. Alternatively, a cartel like the CWT can agree to cut output by a small amount and customers will greatly bid up the prices of that supply. In either case, both of which are "price fixing" conduct broadly defined, the large extra revenues the cartel makes by selling at the higher price more than compensate for the small revenues lost because output contracted."

102. In other words, if the Defendants possessed market power *before* the CWT program as Prof. Connor claims,[142] and used that market power to restrict the supply of raw milk, it follows as a matter of standard economic principles that they could have instead used that market power to legally engage in the joint setting of OOPs to raise prices directly (and reduce supply). Indeed, Prof. Connor agrees that the Defendant cooperatives possess market power over prices in the Southeast.[143] Thus, the proper but-for world for Prof. Connor's analysis is not the period before CWT began, but a world during CWT where Defendants would still have pricing power in the Southeast. In such a but-for world, Defendants could likely achieve the same prices they achieved in the real world, thus eliminating any alleged overcharge caused by CWT.

---

Appalachian order, more than 87 percent of the cooperative and non-member producer milk on the Southeast order, and more than 96 percent of the cooperative and non-member producer milk on the Florida order.").

[142] Connor Report, p. 38 ("I conclude that the participants in the CWT Herd Retirement Program had sufficient market power and represented an effective cartel that could substantially increase prices with a relatively small reduction in supply.").

[143] Connor Report, p. 6 ("There is substantial evidence that dairy cooperatives are concentrated enough to exert market power over the farm prices of raw cows' milk."); Connor Report, pp. 12–13 ("Researchers have found that the bargaining power of dairy cooperatives in Florida is greater than that of milk processors. Recent research using a structural model to estimate oligopoly power in sequential stages of production has found that "co-operatives use their market power to raise the farm price of milk by almost 9% above marginal cost, resulting in an income transfer of more than $600 million per year" in federally regulated markets. This research found an average mark-up of $1.42/cwt in the farm price of milk across all regions of the United States; the mark-up in the Southeast and Florida was slightly higher at $1.44/cwt and $1.56/cwt, respectively.").

103. At his deposition, Prof. Connor asserted that his model accounts for the Defendants' joint price setting behavior because the Defendants' price-setting power existed in his benchmark period before CWT began. He asserted that this allowed him to estimate the incremental effect of CWT relative to a baseline where Defendants are exercising their joint pricing power.[144] This assumption, however, is flawed because the level of joint price setting activity changed during the relevant time period. As discussed in Section 4 above, SMA was formed in 2002 and increased its activities thereafter, DMS was formed in 2003, and the implementation of the rBST-free premium in response to growing demand for this rBST-free milk occurred in 2008. Prof. Connor's benchmark period cannot account for these changes in joint price-setting activity, and thus his model incorrectly attributes the resulting changes in OOP caused by these activities to the CWT program.[145]

104. In fact, Prof. Connor himself testifies that his model cannot isolate the effect of CWT from legal joint-price setting: "Q. If the co-ops were acting jointly in the setting of price prior to the implementation of the Herd Retirement Program, would your model be able to isolate the effect of that joint action from the effect of the Herd Retirement Program? [objection deleted] BY THE WITNESS: A. No."[146] This is a major flaw in his model.

*6.2.2. Prof. Connor's use of the number of cows retired via the CWT program in the Southeast as a proxy for the effect of CWT on raw milk production in the Southeast renders his damages model unreliable*

105. The second fundamental flaw in Prof. Connor's damages model is that it does not include any measure of the effectiveness of the alleged conspiracy. The theory of harm

---

[144] Connor Deposition, p. 157 ("And as far as we know, they had some market power during the non- -- non- -- non-collusive period, the three-and-a-half years that we have of non-collusive period, and that may well have continued throughout the collusive period, but our model distinguishes the source of additional market power that came from the CWT program. So, the market power question is an in -- an interesting one. We are basically assuming that whatever power they had over price prior to the CWT program was maintained more or less the same during the collusive period that began in late 2003.").

[145] At his deposition, Prof. Connor noted that cartels often take several years to strengthen their impact on the market. See Connor Deposition, pp. 273–274 ("A. "The basic task of a cartel is to set a uniform market transaction price. Uncertainty about the costs of monitoring and policing the agreement will often imply that a cartel will start with a price well below the monopoly price. As experience, trust and discipline grow, the price will ratchet up towards the profit maximizing monopoly price, thus a cart" -- Q. All right. You can -- you can -- yeah, you can stop there. […] Q. Doctor, when you wrote those sentences, did you believe that they were correct? [objection removed] BY THE WITNESS: A. Yes. BY MR. BIRK: Q. And do you believe that they are correct today? [objection removed] BY THE WITNESS: A. I would probably have phrased it slightly differently…"). Given this fact, the effect of SMA and DMS on joint price-setting in the Southeast would continue to grow during the CWT period.

[146] Connor Deposition, p. 159.

underlying Prof. Connor's damages model is that the CWT program reduced the supply of raw milk in the Southeast, and the reduction in raw milk caused an increase in OOPs on raw milk in the Southeast. Winn-Dixie was then harmed by the elevated OOPs either through its own purchases of raw milk from Defendants, or by its purchases of processed milk products from Defendants.

106. Given this theory of harm, in order to test whether CWT elevated OOPs in the Southeast (and caused damages), any damages model needs to have a reliable measure of the effect of CWT program on raw milk production in the Southeast as an input, and then have some way of testing whether that reduction caused an increase in OOPs. The first step is important because, for the many reasons detailed in Section 5 above, it is quite possible that the program did not reduce raw milk supply in the Southeast. If that is true, then—under the Plaintiffs' theory of harm—OOPs would not be affected by the program, and any increase in the OOPs measured by the damages model must be caused by some other market factor and not CWT.

107. Prof. Connor's damages model does not employ this approach. Instead, the variables Prof. Connor uses in his damages model to capture the effect of the CWT program on raw milk production in the Southeast are the number of cows retired via the CWT program in the Southeast. For the many reasons detailed in Section 5, this is not a reliable measure of the effect of CWT on raw milk supply. Indeed, Prof. Connor offers no direct empirical analysis of the effect of the CWT program on raw milk production.

108. One tangible way to show that Prof. Connor's measure of the reduction of cows caused by CWT vastly overstates any potential effect of CWT is to compare it with Dr. Brown's measure of the reduction in cows caused by CWT—which is itself an *overstatement* of the effect of CWT for the reasons explained in Section 5. Exhibit 11 plots two lines for the thirteen southeastern states in Prof. Connor damages model: the estimated reduction in cows caused by CWT that Prof. Connor relies on in his model (as measured by the number of cows retired in the current year and prior four years), and the estimated reduction in cows caused by CWT from Dr. Brown's model.[147]

[147] Dr. Brown's estimate of the effect of CWT on the number of cows in any given year accounts for the effects of not only cow retirements in the current year, but also in the lagged years. Prof. Connor notes this feature of Dr. Brown's model in his report at p. 41: "The U.S. All Milk Price is specified in [Dr. Brown's] model as a function of current and lagged milk production, as well as U.S. exports of dairy products. Inclusion of current and lagged milk production variables reflects the effects of milk supply on the equilibrium All Milk Price, including the fact that herd retirements that restrict the supply of milk in any given year can impact prices for several years into the future."

109. What we see in Exhibit 11 is that Prof. Connor's measure of CWT's effect diverges sharply from Dr. Brown's comparable measure. Dr. Brown's estimate of the reduction in cows caused by CWT (the red line in Exhibit 11) starts to fall steadily after 2009, and actually becomes negative in 2011. In contrast, Prof. Connor's estimate of the reduction of cows caused by CWT steadily *rises* after 2009 (and is higher in every year after 2009 than in all of the years before 2009). Given that Dr. Brown's estimate of the effect of CWT on cows is flawed and actually *overstates* any actual effect of CWT (because it includes the unrealistic assumption that all cows retired via CWT would not have otherwise retired), the fact that Prof. Connor's measure of the effect of CWT on cows is significantly larger than Dr. Brown's establishes that it is unreliable, and in turn renders all of his damages model unreliable.

**EXHIBIT 11**

***Prof. Connor's estimated reduction in herd size differs from Dr. Brown's***




Source: Augmented Connor Data; Brown Data

Note: [1] This is the sum of Connor's current and four lag variables on the number of cows retired due to CWT.

110. Although Prof. Connor makes no attempt to study the relationship between the number of cows retired and milk production in the Southeast, Dr. Brown did conduct such an analysis and Prof. Connor cites to that analysis in his report as evidence of

CWT's effect. Exhibit 12 depicts the estimated change in raw milk production in the Southeast caused by CWT from Dr. Brown's model plotted against the overcharges from Prof. Connor's damages model for each of the four classes of milk. The patterns are striking. Even using Dr. Brown's estimated effect of CWT, which significantly *overstates* the effect of CWT on raw milk production, we see that Prof. Connor's alleged "overcharges" are highest during a period when Dr. Brown's flawed model finds that CWT *increased* the raw milk supply. This chart establishes the inherent unreliable nature of Prof. Connor's measure of the effect of CWT, his model in general, and his overcharges. Whatever "overcharges" his model finds cannot be reliably attributed to CWT's effect on raw milk supply.

**EXHIBIT 12**

***Prof. Connor's estimated overcharges are higher when Dr. Brown's estimated reductions in milk production are lower***




Source: Connor Report Backup; Brown Data; USDA, Annual Milk Production by State

Note: Estimated reduction in milk production is measured as the difference between Dr. Brown's estimated milk production but-for CWT and actual milk production in the Southeast.

*6.2.3. The estimated relationships between key supply and demand factors and OOPs in Prof. Connor's model do not make economic sense*

111. Prof. Connor includes a set of supply and demand controls in his regressions, and reports their estimated impact on OOPs in his Table 15. Prof. Connor's estimated relationships between his control variables and OOPs do not align with basic economic principles regarding costs and factors and prices, and demand factors and price.

112. For example, Prof. Connor includes alfalfa prices as a control, because feed is a key driver of the farmers' costs of raw milk production—but his regressions show that increases in feed prices *decrease* OOPs for Class I milk (but not Class II milk). In his deposition, Prof Connor admits that this finding is counter to the standard economic intuition regarding price-cost relationships.[148] Similarly, the fraction of state population under 14 years old has an estimated effect of *decreasing* Class I and II OOPs, as do state population and disposable income. These variables have the opposite sign for the regressions modeling Class II and IV OOP relationships.

113. Prof. Connor explained these unexpected results at his deposition by stating that they could be picking up other factors omitted from the model.[149] Prof. Connor also suggests that his unexpected estimates may be due to multicollinearity, and provides conflicting comments on whether multicollinearity issues might taint his herd retirement variables as well.[150] These problems, of course, could just as easily apply the coefficients on his herd retirement variables, rendering those coefficients and Prof. Connor's overcharges unreliable.

---

[148] Connor Deposition, pp. 178–179 ("Q. Alfalfa prices are representative of the feed cost side? A. Yes. Q. And yet the results here would suggest that as the price of alfalfa goes up, the OOPs go down? A. For Class I, yes. Q. Okay. Is that the expected value there? A. No. The expected values are the ones we did get for Class II, III, and IV, which are positive. We would expect costs, if costs rise that the price would also rise because the cost increases are being passed on, passed through the system -- Q. Okay. A. -- the vertical system.").

[149] Connor Deposition, p. 175 ("For example, rB -- rBST being used at the farm level and alfalfa hay turned out to be positively correlated. We don't know why, but it happens to be the case. There is no -- there is no physical explanation, no market explanation for it, but they happen to be correlated. As a result, it's quite possible there would be sign changes that would appear in the econometric model that are not due to the fact that it's mis-measuring but the fact that it happens to be mimicking the change over time of another variable.").

[150] Connor Deposition, p. 177 ("Q. When you have multicollinearity, does it affect all of the variables that you have? [objection removed]... BY THE WITNESS: A. The results -- in -- when multicollinearity occurs, it usually affects the signs and sizes of the other independent variables. Multicollinearity is only a feature of the relationship among independent variables. It is not -- it does not affect the -- the cows removed variable, for example, so…").

114. The fact the relationships Prof. Connor estimates in his regression models do not make economic sense, and are not even consistent across the different classes of milk, is another reason to doubt the reliability of his damages model altogether.

***6.3. Even assuming Prof. Connor's measure of the CWT program and his other control variables are reliable, a careful review of Class I–IV OOPs in the Southeast does not support the claim that CWT herd retirements caused OOPs to rise***

115. The three flaws detailed above render Prof. Connor's damages model unreliable. In this section, I show that, even if assumed (counter to fact) that Prof. Connor's measure of the CWT program (and his other control variables) are reliable, a closer examination of trends in OOPs in the Southeast indicates that there is little to no evidence that OOPs increased because of the CWT program.

*6.3.1. Prof. Connor's own model finds no damages on Class I purchases once the rBST-free premium is netted out of OOPs*

116. As Prof. Connor acknowledges in his report, the shift toward rBST-free fluid milk and the steady rise of fuel prices during the CWT program are two relevant factors that are independent of the CWT program that need to be controlled for in a damages analysis.[151] At his deposition, he reiterated this position, noting that the shift to rBST-free milk was driven by consumer demand.[152] As I discuss below, OOPs in the Southeast include premiums that *directly capture* the effect of these two costs factors during the CWT period. Rather than netting out the relevant premiums for rBST-free milk and fuel costs from OOPs, Prof. Connor leaves these premiums in the OOPs and *indirectly* controls for them with imperfect proxies. When I simply net out the rBST-free premium, Prof. Connor's own damages model finds no damages on Class I products.[153]

117. Prof. Connor attempts to control for the shift away from rBST milk using a variable from the USDA that estimates the share of cows in the U.S. that were treated with rBST

---

[151] Connor Report, pp. 52–54.

[152] Connor Deposition, p. 48 ("So organic and BST -- so-called BST-free milks have become -- milks and milk products have become a greater proportion of the total amounts sold, of dairy products sold. Q. And so those are examples of where consumer demand changes start to send the signal back to the farm level to change, essentially, production towards -- A. Yes. Q. -- organic – [objection removed] BY MR. MILLER: Q. -- or -- or BST-free milk? A. Yes, those are good examples.").

[153] I understand that generally, consumers demanded rBST-free fluid milk but were much less insistent on the use of rBST-free milk to make other fresh dairy products, cheese, or butter. As a result, little milk was sold in Class II, III, or IV that carried an rBST-free premium.

from 2000 – 2013.[154] The USDA data Prof. Connor uses are based on surveys taken by the USDA in 2000, 2005, and 2010, and are otherwise based on projections in the remaining years. In other words, the USDA did not collect actual data on the share of cows treated with rBST in any years other than 2000, 2005, and 2010.[155]

**EXHIBIT 13**

***Prof. Connor's data does not reliably measure changes in rBST use***




Source: Augmented Connor Data

Note: Connor's data on the percent of cows treated with rBST is from the USDA's Economic Research Service data on recent costs and returns of milk.

118. This feature of the data can be seen in Exhibit 13, which plots Prof. Connor's data. As the exhibit shows there are very steady levels of rBST use from 2000 – 2004 and from 2005 – 2009, and then two drops in rBST use in the two years the surveys were conducted (2005 and 2010). What this pattern indicates is that the USDA series does not do a reliable job of measuring changes in rBST use in the years in which a survey was not

[154] Connor Report, p. 53.

[155] USDA, "Milk Cost of Production Estimates," available at https://www.ers.usda.gov/data-products/milk-cost-of-production-estimates/milk-cost-of-production-estimates/#Monthly, accessed on January 25, 2018 ("Monthly milk cost-of-production (COP) estimates, and annual milk COP estimates by State and size of operation are shown below. Estimates since 2010 are based on the 2010 Agricultural Resource Management Survey (ARMS) data from milk producers. Estimates for 2005 through 2009 are based on the 2005 ARMS data from milk producers.").

conducted. More importantly, this variable does not directly link the effect of demand for rBST free Class I fluid milk to OOPs for Class I fluid milk.

119. A simpler and more reliable approach to account for the effect of rBST use on OOPs is to directly net-out from OOPs the rBST-free premium that cooperatives negotiated to cover the increased costs associated with producing rBST-free milk. This premium captures the direct effect on OOPs of the shift to rBST-free milk that occurred during the CWT program. Exhibit 14 plots the rBST-free premium over time. SMI first introduced the premium at 50 cents in June 2007 at its own plants in Florida.[156] In February 2008, SMI and the remaining Southeast cooperatives increased the premium to 90 cents for all plants.[157] The rBST-free premium remains constant after this point at 90 cents. The implementation of these premiums coincided with a shift to 100 percent rBST-free fluid milk purchases at major grocery store chains in the Southeast and elsewhere in the country.[158] Prof. Connor's control variable for rBST use does not account for the effect of the change in the rBST-free premium on OOPs because his variable is flat in 2008, and does not change until 2010 due to the survey design.

120. Perhaps more importantly, Prof. Connor offers no analysis or explanation for why a jointly negotiated increase in premiums (which, as noted above, I understand is legally allowed under the Capper Volstead Act) that occurred in response to an independent market event should be included in an analysis of the alleged anticompetitive effect of the CWT program. As I detailed above, given the pricing power DCMA had in the Southeast, there is no reason to believe that Defendants would not have imposed the same rBST-free premium in a world without CWT. Further, the pattern of the premium—flat before 2007 and flat from 2008 onward—is not consistent with CWT retirements having any relation to the premium—the largest cow retirements occurred after 2008, yet the rBST-free premium did not move.

121. The fuel surcharge presents a similar methodological problem. Prof. Connor attempts to control for the effect of fuel prices on OOPs by including regional diesel fuel

---

[156] SMI Pricing Announcements; for example, see SMI Pricing Announcement, June 1, 2007, SMI-001782.

[157] Wilson Declaration 2013, ¶¶ 16–17 and Exhibit 2 [DFA-NE2009-003684].

[158] EnsembleIQ, "Publix Switches to Hormone-free Private Label Milk," May 1, 2007, available at https://progressivegrocer.com/publix-switches-hormone-free-private-label-milk, accessed on February 19, 2018; The Kroger, Col., Press Release, "Kroger to Complete Transition to Certified rBST-free Milk by Early 2008," August 1, 2007, available at https://www.thekrogerco.com/corpnews/corpnewsinfo_pressreleases_08012007.html, accessed on February 19, 2018; Walmart, "Wal-Mart Offers Private Label Milk Produced without Artificial Growth Hormone," March 21, 2008, available at https://corporate.walmart.com/_news_/news-archive/2008/03/24/wal-mart-offers-private-label-milk-produced-without-artificial-growth-hormone, accessed on February 19, 2018.

prices from the U.S. Energy Information Administration in his regression model. Cooperatives in the Southeast, however, have negotiated a fuel surcharge that factors directly into the OOP; this surcharge captures the effect of rising fuel prices on OOPs. The fuel surcharge is based on a formulaic schedule, which is driven by diesel prices.[159] Rather than simply net the fuel surcharge out of OOPs, Prof. Connor leaves the fuel surcharge in the OOP, and then indirectly controls for the effect of fuel on OOPs using the diesel price. As with his approach to control for rBST-free premiums, this approach is less reliable than directly netting out the fuel surcharge, which captures the full, direct effect of fuel changes on OOPs. And, as with the rBST-free premium, it is an example of a jointly negotiated increase in OOPs that I understand is protected under the Capper Volstead Act.

**EXHIBIT 14**

***The rBST-free premium is flat after its broad introduction in 2008***




Source: SMI Pricing Announcements; Wilson Declaration 2013, ¶¶ 16–17 and Exhibit 2 [DFA-NE2009-003684].

Note: In June 2007, an rBST-free premium of $0.50 was introduced for SMI plants in Florida. In February 2008, the rBST-free premium increased to $0.90 for all plants in the Southeast. I understand that prior to June 2007, there was no rBST-free premium.

[159] See, for example, SMI Pricing Announcement, March 23, 2007, SMI-001655.

122. Exhibit 15 and Exhibit 16 plot (a) the base OOP (net of the fuel surcharge and the rBST-free premium), (b) the OOP with the fuel surcharge, and (c) the OOP with the fuel surcharge and the rBST-free premium at the Gustafson's plant in Green Cove Springs (Exhibit 15) and the Winn-Dixie/Sunshine Dairy plant in Plant City, Florida (Exhibit 16), two plants where fuel surcharge data is available back to 2000. Plants in these two cities account for approximately 65 percent of the Class I milk at issue.[160]

**EXHIBIT 15**

***Increases in Class I OOPs over time were largely driven by increases in the rBST-free premium: Green Cove Springs, FL (Gustafson's)***




Source: Augmented Connor Data; SMI Pricing Annoucements

Note: [1] Ryan, Jacksonville, Florida OOPs were used as a proxy for Florida Zone 1 prices due to gaps in Gustafson's, Green Cove Springs, Florida data. [2] The rBST-free premium in Green Cove Springs, Florida began in June 2007 at $0.50 and increased to $0.90 in February 2008, after which it remained steady.

123. As is clear, there is a general rise in average OOPs during the CWT period if we include the rBST-free premium and fuel surcharge in the OOP (the blue line). For example, as shown in Exhibit 16, at the Plant City plant the average increase in OOPs during the CWT period was $1.04 when the rBST-free premium and fuel surcharge are included in the OOP (the blue line). However, when the rBST-free premium and fuel

[160] Workpaper 6.

surcharge are excluded from the OOP (the green line), we see that, while the OOPs fluctuate up and down between 2000 and 2009, they do not generally rise. As shown in the table embedded in Exhibit 16, the increase in OOPs during the CWT period for the green line (which removes the fuel surcharge and rBST-free premium) is only $0.04, which is $1.00 lower than the blue line, which *includes* the rBST-free premium and fuel surcharge. In other words, the rBST-free premium and fuel surcharge account for almost all of the average increase in OOPs during the CWT period. For reference, Prof. Connor's average overcharge on Class I OOPs during the CWT period is $0.58, which is *smaller* than the increases in the rBST-free premium and fuel surcharge over this period.

**EXHIBIT 16**

***Increases in Class I OOPs over time were largely driven by increases in the rBST-free premium: Plant City, FL***




Source: Augmented Connor Data; SMI Pricing Annoucements

Note: [1] Velda, Winter Haven, Florida OOPs were used as a proxy for Florida Zone 2 prices due to gaps in Superbrand, Plant City, Florida data. [2] The rBST-free premium in Plant City, Florida began in June 2007 at $0.50 and increased to $0.90 in February after which it remained steady.

124. Prof. Connor's decision to not directly account for the rBST-free premium is critically important because that single component of the OOPs account for *all* of the alleged "damages" that his regression model finds for Class I milk. Exhibit 17 reports

results from Prof. Connor's regression model when I net-out the rBST-free premium from his Class I OOP variable and remove his unreliable control variable for rBST use.[161] Recall from above that Prof. Connor defines the "overcharge" in his model as the sum of the effects of his five different conduct variables. The proper test for whether any wave of herd retirement led to a statistically significant increase in OOPs is, therefore, a test of whether the sum of the effect of his five conduct variables (i.e., retirements in the current year and each of the four prior years) is statistically significantly greater than zero.

**EXHIBIT 17**

***Accounting for changes in the rBST-free premium renders the impact of CWT on Class I OOPs insignificant, and reduces estimated overcharges***

| | Connor Model | Removing rBST-free Premium and % rBST control [1] |
|---|---|---|
| 1. **Coefficients** | | |
| 2. **Current year** | -0.001 | -0.027 * |
| 3. **1-year lag** | 0.067 * | 0.008 * |
| 4. **2-year lag** | 0.016 * | -0.003 |
| 5. **3-year lag** | 0.044 * | -0.001 |
| 6. **4-year lag** | 0.041 * | -0.020 * |
| 7. **Sum of coefficients [2]** | 0.168 * | -0.045 * |
| 8. **Observations** | 7,694 | 7,863 |
| 9. **Total damages** | $18,569,334 | -$4,629,145 |

Source: Conoor Report Backup; Augmented Connor Data; SMI Pricing Announcements

Note: "*" indicates significance at the 5% level. [1] This model removes the rBST-free premium from Class I OOPs. The rBST-free premium is $0.50 from June 2007 to January 2008 for SMI's Plant City and Gustafson's plants, and $0.90 after January 2008 for all plants. This model also excludes the control variable for the percent of cows treated with rBST. The model is estimated on data that includes OOPs for plants in Florida using SMI Pricing Announcements starting from 2011. The damages calculation uses all coefficients only if their sum is significantly different from zero at the 5% level. [2] "*" indicates that the sum of coefficients is significantly different from 0 at the 5% level.

125. What we see in Row 7 of Exhibit 17 is that the cow retirements in the current year and prior four years collectively have a significant, *negative* effect of on OOPs—i.e., they *lower* OOPs. In other words, once we net-out the rBST-free premium from the OOP

[161] When conducting my analyses, I augment and correct Prof. Connor's OOP data in several ways. First, Professor Connor's data on OOPs in Florida goes only through December 2010. I use data from SMI's pricing announcements to extend these series through the end of his damages period. Second, Prof. Connor did not import numerous observations when creating his dataset. He also makes several other errors when generating his OOP dataset. These errors and my corrections are detailed in Appendix C. I have also run versions of the models in Exhibit 17 where I include Prof. Connor control variables for rBST use. That model also find no damages. See Workpaper 7.

(which testimony in this case indicates was set independently of the CWT program), Prof. Connor's own model finds no evidence that OOPs were elevated by cow retirements.[162] Thus, even if we assumed counter to fact that every cow retired via CWT was not otherwise retired (as Prof. Connor does), there are still no damages to Class I purchases. As noted above, Prof. Connor's estimated damages from Class I milk account for 87 percent of his overall damages.

*6.3.2. Once fuel surcharges are netted out of Class II OOPs, there is no evidence that Class II OOPs rose at plants that represent the vast majority of supply to Winn-Dixie*

126. Prof. Connor finds a significant overcharge for Class II OOPs. As noted above, this finding is driven by the two fundamental flaws in his model—he has the wrong but-for world and the wrong measure of the effect of CWT. In addition to these flaws, a closer examination of the underlying Class II OOPs that Winn-Dixie paid raise further questions about the reliability of his damages model for Class II products.

127. Exhibit 18 uses SMI data to plot the Class II OOPs at plants in Florida (Order 6). About 86 percent of the Class II milk at issue is associated with processed products Winn-Dixie bought from plants in Florida.[163] Exhibit 18 charts the Class II OOP with and without the fuel surcharge, which was introduced in January 2006, and which was reported in SMI's Pricing Announcements. Comparing the blue line (which includes the fuel surcharge) to the red line (which nets out the fuel surcharge), we see that the upward trend in Class II OOPs is driven entirely by the fuel surcharge. In fact, the red line is completely flat. The Class II OOP, adjusting for the fuel surcharge, was equal to $1.11 in every month for which the SMI Pricing Announcements are available.[164]

128. The patterns in Exhibit 18 are important because, as noted above, the fuel surcharge is determined completely independent of the CWT program. In fact, the fuel surcharge is set formulaically based on the diesel price, which means any movement in that fuel surcharge cannot be caused by the CWT program—such movements reflect nothing more than changes in underlying diesel prices that affect the formula. Further, approximately

---

[162] I have run Prof. Connor's model netting out fuel surcharges at plants for which I have fuel surcharge information for the full period 2000 – 2013. That model also finds no damages. See Workpaper 7.

[163] Workpaper 1.

[164] In the DFA data Prof. Connor relies on, the Class II OOP in Florida are also flat after adjusting for the fuel surcharge, only deviating from $1.11 for 19 of the 167 months of data available during the 14-year period from January 2000 to December 2013. Workpaper 8.

86 percent of raw milk associated with Winn-Dixie's Class II purchases came from plants in Florida.[165]

**EXHIBIT 18**

***Class II OOPs did not consistently increase with CWT herd retirements: Order 6***




Source: Augmented Connor Data; SMI Pricing Announcements

Note: The SMI Pricing Announcements report a single Class II OOP for all plants in Order 6.

129. One way to see the disconnect between Prof. Connor's damages model and the underlying OOPs paid by Winn-Dixie, is in Exhibit 19. That Exhibit plots the Class II "overcharges" from Prof. Connor's Class II damages model. As it shows, they fluctuate and increase during the period even as OOPs in Order 6 remain constant at the exact same level they were before CWT began. It is highly unlikely that Winn-Dixie paid an overcharge on any purchases from plants in Florida due to CWT, given that OOPs never changed during the CWT period. The fact that Prof. Connor's damage model applies an overcharge to such purchases is yet another reason that it is unreliable, and unable to measure damages for Class II products. This issue, when a damages model find "damages" in situations where damages should not exist (sometimes referred to as "faulty

[165] Workpaper 1.

predictions" or "false positives"), has been recognized by courts as evidence that a damages model lacks reliability.[166]

**EXHIBIT 19**

***Prof. Connor's estimated Class II overcharge is not representative of the Class II OOP in Order 6***




Source: SMI Pricing Announcements; Connor Report Backup

Note: The SMI Pricing Announcements report a single Class II OOP for all plants in Order 6.

130. It is also worth noting that documents in the record indicate that SMA, a MAC that was founded in 2002, helped elevate Class II OOPs in Orders 5 and 7 during the class period. For example, a letter from Jim Hahn of DFA in March 2006 identifies "initiatives we have driven through SMA since mid-2005" that "improved your milk price relative to the Federal Order blend price."[167] One initiative Mr. Hahn highlights is an increase by DCMA of Class II OOPs by 38 cents. Prof. Connor's includes Class II OOPs from Orders 5 and 7 in his damages model, yet his model cannot separate out the effect of

---

[166] Christine Siegwarth Meyer, Lauren J. Stiroh, and Claire Xie, "Demonstrating Faulty Predictions in Class Certification Analysis," *Antitrust* 30(2), 2016 at p. 2 ("A faulty prediction can arise when an econometric model inappropriately finds impact or overcharges in populations where the plaintiffs' theory of harm would predict that no impact should exist, or finds no effect where the allegations indicate one should be present…").

[167] Letter from Jim Hahn (Southeast Area Council) to Southeast Area Council Members, March 6, 2006, D00008371 – 2.

CWT on Class II OOPs from such legal joint price setting activities that occurred coincident with CWT. In addition to finding overcharges in Order 6 where Class II OOPs were flat, this is another reason why his Class II damages estimates are unreliable.

*6.3.3. Prof. Connor did not analyze Class III and IV OOPs in the regions where the Class III and IV products that Winn-Dixie purchased were manufactured*

131. In addition to the two flaws detailed in Section 6.2, Prof. Connor's analysis of damages associated with Class III and IV OOPs is fundamentally unreliable for two additional reasons. First and foremost, Prof. Connor analyzed the wrong set of Class III and IV OOPs. Specifically, Prof. Connor analyzes OOPs from the Southeast, when in fact, the relevant Class III and IV products were produced outside the Southeast. Second, even if we assume that Class III and IV OOPs in the Southeast are the relevant OOPs, Prof. Connor's model is flawed and does not reliably measure the effect of CWT herd retirements on Class III/IV OOPs in the Southeast.

132. As mentioned above, Prof. Connor analyzed the wrong set of Class III and IV OOPs. This can be seen in Exhibit 20, which lists the cooperative or vendor from which Winn-Dixie purchased processed cheese and butter products, the share of those purchases each vendor was responsible for, and the share of each vendor's plants located in the Southeast. For example, LOL produced nearly *all* of Winn-Dixie's Class IV products, accounting for the vast majority of Class III and IV products purchased by Winn-Dixie, yet LOL does not have a single plant in Orders 5, 6, or 7.

133. I am aware of a source of data that allows me to analyze Class III and IV OOPs outside the Southeast. The USDA produced a set of reports that tracked average annual Class III and IV OOPs by Federal Orders from 2004 – 2012 (except Federal Order 1).[168] Exhibit 21 shows Class II and IV OOPs for Orders 33 and 30 (the Mideast and Upper Midwest); these two areas represent a large part of the cheese and butter production in the country, including plants operated by Defendant Land O'Lakes. These data show that Class IV OOPs in Order 30 were flat during the CWT period, while Class IV OOPs in Order 33 fluctuated up and down throughout the period. Class III OOPs trended similarly. Furthermore, OOPs in Orders 30 and 33 are not consistently, positively

[168] I understand that these reports are no longer produced by the USDA, and that 2012 is the last year for which they are available.

correlated with OOPs in Orders 5, 6, and 7—the OOPs Prof. Connor uses when estimating Class III and IV damages.[169]

**EXHIBIT 20**

***The majority of Winn-Dixie's Class III and Class IV processed product purchases from the defendants were from plants outside the Southeast [1]***

| | Vendor Name [2] | Total Sales | % of Total Sales | % Plants produced Class III and IV products within Order 5, 6, and 7 [3] |
|---|---|---|---|---|
| 1. | **Land O Lakes** | $56,400,155 | 67.89% | 0% |
| 2. | **Dairy Farmers of America** | $24,617,986 | 29.63% | 0% – 23% [4] |
| 3. | **Cabot Creamery** | $1,216,476 | 1.46% | 0% |
| 4. | **WD Yogurt (High Point)** | $345,435 | 0.42% | |
| 5. | **Superbrand Dairy** | $311,822 | 0.38% | |
| 6. | **Sunshine Dairy Ice Cream** | $182,020 | 0.22% | |
| | **Total** | **$83,073,895** | **100.00%** | |

Source: WD1143_000299; WD1143_000300; Dairy 100, 2004 – 2013

Note: [1] Plant location information is based on the annual Dairy 100 Report. Winn-Dixie sales data contains sales from April 2004 – August 2013. [2] Vendor names are shown as they appear in Winn-Dixie sales data. [3] Percentages represent the fraction of plants producing Class III and IV products that are located in Order 5, 6 and 7. Percentages are only shown for Cabot Creamery, Land O' Lakes, and Dairy Farmers of America since they supply more than 98 percent of Class III and IV sales to Winn-Dixie. [4] A percentage range is shown here since the ratios vary year to year. Only plants with product information listed in the Dairy 100 are included in these ratios.

134. These USDA data also indicate that on average, over 98 percent of Class IV milk in Order 30, and about 17 percent of Class IV milk in Order 33, had an OOP of zero dollars from 2004 – 2012.[170] While such data do not allow me to run a formal regression analysis, the patterns are not consistent with OOPs risping during the CWT period. In fact, the data raise the distinct possibility that OOPs were zero for some or perhaps all of the raw milk used to produce Class III and/or IV products that Winn-Dixie purchased from Defendants during this period.

135. Even if we assumed (counter to fact) that the Class III and IV OOPs in the Southeast that Prof. Connor analyzes in his damages model were relevant for Winn-Dixie's purchases of Class III and IV products, a proper analysis of the relationship between those OOPs and the CWT program indicates that the CWT program could not have been the cause of any changes in Class III and IV OOPs in the Southeast.

[169] Workpaper 9.

[170] Workpaper 10.

**EXHIBIT 21**

***Class III and IV OOPs in the Mideast (Order 33) and Upper Midwest (Order 30), where Land O'Lakes operates***




Source: USDA Over-Order Charges on Producer Milk Annual Summary; NMPF0026129; NMPF0026131 – 32; NMPF00026134; NMPF0026136; NMPF0026138; NMPF0026140; NMPF0026142; NMPF0026144

Note: When calculating herd retirement in Orders 30 and 33, I included data for the following states: Minnesota, North Dakota, Wisconsin, Indiana, Michigan, Ohio and West Virginia. The correlations between the total number of cows retired in the last five years in Orders 30 and 33 and the Class III and IV OOPs are 0.54, 0.63, 0.35 and 0.05 respectively.These correlations are not statistically significant at 5% significance level. The OOPs are the weighted annual average of the monthly OOPs.

136. Exhibit 22 plots the Class III OOP in Order 5 from the DFA data Prof. Connor relies on. There are two patterns to notice. First, the largest increase in Class III OOPs comes in 2011, *after* the CWT herd retirement program was over. Indeed, Class III OOPs were nearly flat between January 2000 and December 2010, increasing from $0.95 to only $1.01.[171] In other words, despite the fact that thousands of cows were retired via the CWT program from 2003 – 2010, the Class III OOPs in Order 5 increased by only $0.06.

[171] The patterns for Class III and IV OOPs across Orders 5, 6, and 7 are similar (see Appendix C).

**EXHIBIT 22**

***Class III OOPs did not consistently increase with CWT herd retirements: Order 5***




Source: Augmented Connor Data

Note: The Class III OOP is the average of Class III OOPs for all plants in Order 5.

137. Even though OOPs barely increased between 2000 and 2010, Prof. Connor's damages model still finds an "overcharge" in every year from 2005 – 2010 (as high as 32 cents in 2009).[172] In other words, Prof. Connor's model concludes that the CWT program caused Class III and IV OOPs to rise by 32 cents in 2009 even though the actual OOPs hardly moved. Such a pattern highlights the unreliability of Prof. Connor's model—his model finds "damages" during a time period when OOPs could not have been elevated by the CWT program. As noted above, this issue (sometimes referred to as "faulty predictions" or "false positives") has been recognized by courts as evidence that a damages model lacks reliability.

138. A more formal way to see this fact is in Exhibit 23. In this exhibit, I re-run Prof. Connor's damages model for Class III and IV OOPs for the period January 1, 2000 to December 31, 2010. In other words, I have removed the data from *after* the CWT

[172] Connor Report, Table 16.

program ended. What I find is that Prof. Connor's own model finds no damages when data from 2011 and onward are excluded. This can be seen in the last two columns in Row 7. The fact that there is not a "*" next to the two numbers means that there is not a statistically significant relationship between OOPs and herd retirements, and therefore damages are indistinguishable from zero. This is another form of the "false positive" analysis discussed above. If a damages model finds no damages for a subgroup of the data where, according to Plaintiffs' claims, there should in fact be damages, it should be taken as evidence that the model is not reliable.[173]

**EXHIBIT 23**

***Prof. Connor's model finds no Class III or IV damages associated with CWT herd retirements prior to 2010***

| | Connor Model | | Connor Model, 2000 – 2010 [1] | |
|---|---|---|---|---|
| | **Class III** | **Class IV** | **Class III** | **Class IV** |
| 1. **Coefficients** | | | | |
| 2. **Current year** | -0.004 | -0.003 | 0.007 | 0.008 |
| 3. **1-year lag** | 0.006 | 0.006 | 0.005 | 0.005 |
| 4. **2-year lag** | 0.023 * | 0.023 * | 0.002 | 0.002 |
| 5. **3-year lag** | 0.018 * | 0.018 * | 0.009 | 0.009 |
| 6. **4-year lag** | 0.035 * | 0.035 * | 0.014 * | 0.013 * |
| 7. **Sum of coefficients [2]** | 0.079 * | 0.079 * | 0.037 | 0.036 |
| 8. **Observations** | 7,694 | 7,694 | 6,625 | 6,625 |
| 9. **Total damages** | $165,271 | $1,227,246 | $0 | $0 |

Source: Augmented Connor Data; Connor Report Backup

Note: "*" indicates significance at the 5% level. [1] This model is identical to Prof. Connor's, except that it excludes data from 2011 to 2013. The damages calculation uses all coefficients only if their sum is significantly different from zero at the 5% level. [2] "*" indicates that the sum of coefficients is significantly different from 0 at the 5% level.

*6.3.4. Dr. Brown's analysis is not relevant to the question of whether the CWT program impacts OOPs in the Southeast*

139. Prof. Connor's also cities to Dr. Brown's model as evidence that CWT increased OOPs in the Southeast. Specifically, Prof. Connor opines that "it is clear that Dr. Brown's model shows that the CWT Herd Retirement Program substantially increased the All

[173] Christine Siegwarth Meyer, Lauren J. Stiroh, and Claire Xie, "Demonstrating Faulty Predictions in Class Certification Analysis," *Antitrust* 30(2), 2016 at p. 2 ("The predictions of the overcharge model are faulty if the same indicator variable in the same model is found to be significant for groups that, under the plaintiffs' theory, were unharmed by the alleged behavior or insignificant for groups that allegedly suffered harm.").

Milk Price above its competitive level."[174] Prof. Connor additionally notes that the All Milk Price is "the average price received by farmers for their milk, representing the total amount paid to a farmer, including the blend price and the OOP, which includes a market premium, service charges, an rBST-free premium, and a fuel surcharge."[175]

140. It is important to clarify that, while the All Milk Price does include the OOP, Dr. Brown has testified that his model *does not* test whether the CWT program affected OOPs specifically. Dr. Brown states in his declaration that, within his model, it is changes in the "regulated minimum prices that change the prices that farmers would receive for their milk," and "not any change in over-order premiums above the regulated price."[176] In fact, Dr. Brown explicitly testified that he "did not analyze the impact, if any, of the CWT program on the premiums charged or earned by dairy farmers," and that his model "assumes that the premiums received by farmers are the same with and without the CWT program."[177] Prof. Connor acknowledged this fact at his deposition.[178]

### *6.4. Prof. Connor's damages model does not properly account for the relationship between raw milk and processed milk prices, and raw milk and processed milk volumes*

141. In his damages analysis, Prof. Connor estimates his overcharge on the price of raw milk, and then applies that overcharge to the volumes of processed milk products that Winn-Dixie purchased directly from Defendants. In using this method, Prof. Connor's analysis includes two flaws.

142. First, Prof. Connor must assess whether the alleged overcharge on OOPs was passed through to the wholesale price that Winn-Dixie actually paid. Prof. Connor offers no analysis of pass-through for any of the allegedly damaged volume, and instead assumes complete pass-through of 100 percent.

143. Second, Prof. Connor must figure out how much raw milk was used to make each processed dairy product that Winn-Dixie purchased from Defendants, and then apply the relevant overcharge and pass-through rate to that volume. As I discuss below, Prof. Connor has not properly assessed the reliability of Winn-Dixie's data in several ways, nor

[174] Connor Report, p. 47.

[175] Connor Report, p. 41.

[176] Declaration of Dr. Scott Brown, November 22, 2013 ("Brown Declaration 2013"), ¶ 9.

[177] Brown Declaration 2013, ¶ 14.

[178] Connor Deposition, p. 198 ("Q. Did Dr. Brown find that the Herd Retirement Program affected over-order premiums? A. No, that was not his objective, so we went beyond his analysis in that sense.").

has he accounted for substantial variations in the amount of raw milk used to process different dairy products sold to Winn-Dixie by Defendants.

144. These two flaws in Prof. Connor's damages methodology mean that, even if Prof. Connor's overcharges based on OOPs were correct, his measure of damages is inaccurate.

*6.4.1. Prof. Connor did not analyze whether increases in OOPs were passed through to increases in wholesale prices on purchases of processed milk products that Winn-Dixie made from Defendants*

145. An important feature of this case is that, after Winn-Dixie sold its processing plants to SMI, the alleged conspiracy operated on an input price (raw milk) into the final processed dairy products that Winn-Dixie purchased rather than directly on the price of the product Winn-Dixie purchased. Because of this complication, one must quantify whether and to what extent an anticompetitive elevation of the input price is "passed through" to the price of the final product at issue.[179] Thus, even if CWT inflated OOPs as alleged, Prof. Connor must demonstrate that this increase was passed through to the price of the processed milk products that Winn-Dixie bought.

146. Prof. Connor has offered no analysis of this question. He has simply assumed that if OOPs were elevated by the CWT program, the elevation of OOPs are passed through dollar for dollar to the price of the relevant processed milk product. In his deposition, he acknowledged that he is assuming 100 percent pass-through.[180] While I have not attempted to assess the pass-through rate of OOPs to processed milk prices (that is Prof. Connor's burden), below I identify factors that suggest that the pass-through rate of OOPs to wholesale price is likely much lower than one, and could even be close to zero.

147. First, it is important to understand that the OOP is a small portion of the total price of processed fluid milk. For example, from 2004–2013, the class I OOP at SMI's Hammond plant averaged about 1.36 percent of the average price of Class I processed products Winn-Dixie purchased from that plant. Similarly, the average Class I OOP in at

---

[179] Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, 2008, p. 727.

[180] Connor Deposition, pp. 247–248 ("Q. And that increased over-order premium is then – is that – are you assuming that that is incorporated into the price of the butter products that Land O' Lakes then sells as finished products. A. Yes. I don't know to what extent, but, yes very likely would be transmitted because of what we know about price transmission in the dairy industry, it would be transmitted almost 100 percent, maybe a little lower.").

SMI's Plant City plant in Order 6 was typically about 1.73 percent of the average total price of Class I processed products Winn-Dixie purchased from that plant.[181]

148. Second, as discussed above in Section 4 (and in more detail in the Novakovic report), because OOPs are sometimes used to offset large swings in the regulated price, OOPs can sometimes move in the *opposite direction* of the total raw milk price. Exhibit 24 shows an example of how this can happen. It plots the trend in Class I OOPs at the Sunshine State Dairy in Hammond, LA against the trend average price of Class I processed products sold at that plant. Note that when the OOP falls in 2011, the wholesale price rises. In fact, the correlation between the two lines is negative.

149. It is important to understand that the patterns in Exhibit 24 do not in any way contradict the large academic literature which has found relatively high pass-through rates of 0.65 to 1 between the total raw milk price and wholesale and retail prices.[182] The important difference between the academic literature and the analysis in Exhibit 24 is that, rather than focusing on pass-through of *the total* raw milk price, Exhibit 24 focuses on the pass-through of just the OOP. Because the OOP and the total raw milk price can sometimes move in opposite directions due to the OOP responding to the regulated price, it is possible that an increase in OOPs can be accompanied by a decrease in the total raw milk price and a decrease in wholesale prices.

[181] Workpaper 11.

[182] For example: Byeong-Il Ahn and Daniel A. Sumner, "Estimation of relative Bargaining Power in Markers for Raw Milk in the United States," *Journal of Applied Economics* 15(1), 2012, pp. 1–23; Daniel A. Lass, M. Adanu, and P. G. Allen, "Impacts of the northeast dairy compact on New England retail prices," *Agricultural and Resource Economics Review* 30(1), 2001, pp. 83–92; Benaissa Chidmi, Rigoberto A. Lopez, and Ronald W. Cotterill, "Retail Oligopoly Power, Dairy Compact, and Boston Milk Prices," Food Marketing Policy Center Research Report No. 83, October 2004.

**EXHIBIT 24**

***Class I processed product prices did not rise with OOPs: Sunshine State Dairy, Hammond Plant***




Source: Connor Sales Data; SMI Pricing Announcements

Note: [1] I understand that vendor name "SUNSHINE DAIRY(MILK)NON-FL DCS" is SMI's Sunshine State Dairy in Hammond, Louisiana. OOPs exclude fuel surcharge and the rBST-free premium of $0.90. Daily pegged OOP changes are calculated by pegging daily OOPs to the OOP on May 1, 2008. [2] The chart includes all Class I item codes in the Winn-Dixie sales data used by Prof. Connor. Each item price is pegged to the price at which it first appears in the dataset. There are two instances when the daily price change was greater than 100 percent followed by a return to normal levels, both instances have been excluded.

*6.4.2. Prof. Connor has not accounted for differences in product characteristics when computing the volume of raw milk at issue, rendering his damages calculation unreliable*

150. In his damages calculation, Prof. Connor converts the volume of processed product purchased by Winn-Dixie from Defendants into raw-milk equivalents using the conversion factors reported in his Table 18. That is, despite calculating his overcharge on raw milk OOPs, Prof. Connor does not apply the overcharges on raw milk OOPs to the actual raw milk volumes used to produce the processed products purchased by Winn-Dixie from Defendants. He instead takes the volumes of processed milk products and applies a series of conversion factors to translate those volumes into estimated raw milk volumes.

151. Specifically, Prof. Connor uses six conversion factors, one for each of the following products: butter, whole milk cheese, cottage cheese, plain yogurt, ice cream, Class I fluid milk.[183] A problem with this approach is that Winn-Dixie purchased a plethora of distinct dairy products from Defendants, many of which do not have conversion factors that line up with the six conversion factors he uses.

152. For example, Prof. Connor uses a single conversion factor across all types of ice cream—a product category that accounts for 77.4 percent of all Class II milk at issue.[184] Prof. Connor assumes each gallon of ice cream will require 12 pounds of milk. SMI documents, however, indicate that different styles and flavors of ice cream require different raw-milk inputs, often less than 12 pounds per gallon.[185] For example, Producing eight cartons of "1/2 GAL WD Classic Vanilla IC" (four gallons of ice cream) requires only 1.072 gallons of milk—about 9.22 pounds.[186] Therefore producing a single gallon of this ice cream requires only 2.3 pounds, or roughly 80 percent less than the 12 pounds that Prof. Connor assumes should be used to produce that amount of ice cream. Prof. Connor's damages methodology does not account for these nuances in the raw milk associated with each product.

*6.4.3. Prof. Connor does not account for products not made from ingredients besides raw milk*

153. Prof. Connor also assumes that all products are made from raw milk, but many products sold by Defendants are made in whole or in part from other dairy inputs that need not carry an OOP. For example, butter is often made directly from cream that is purchased separately from raw milk. That cream often comes from dairy processors who have excess cream. For those purchases of cream, typically no OOP is paid by the Defendant to its cream supplier.[187]

---

[183] Connor Report, Table 18; Prof. Connor's backup confirms that he uses these six conversion factors.

[184] Workpaper 12.

[185] For example, see SUPP_0000020, a schedule of products associated with supply contract between SMI's Plant City plant and Winn-Dixie.

[186] For example, see Schedule B3 in SUPP_0000020. 1.072 gallons times 8.6 pounds per gallon equals about 9.22 pounds.

[187] Declaration of John M. Ellenberger, September 22, 2016 ("Ellenberger Declaration"), ¶ 6 ("Not all of the dairy products produced by Land O'Lakes are made exclusively from raw milk. Land O'Lakes also purchases other dairy ingredients like excess sweet cream from other dairy processors in order to make butter. In some cases, it also purchases non-fat dry milk to increase the solids content of the milk it uses for cheese production. The prices Land O'Lakes pays for these other dairy ingredients are often directly linked to their value in the regulatory minimum milk pricing schemes (i.e. when Land O'Lakes purchases sweet cream, the price it pays for that product is often determined by value in the regulatory formula for cream).").

154. In addition, butter and cheese may contain *non*-dairy ingredients, like salt, curdling agents, preservatives, and oils.[188] Prof. Connor does not account for this in his damages calculation. As noted above, he simply applies his conversion factor uniformly across products within six broad categories.

155. As just one example, Professor Connor assumes that one pound of butter requires 21.2 pounds of milk. Even if this conversion factor is correct, when he applies this conversion factor to a given butter product, he assumes that product contains no other ingredients. However, not all butter products are made from milk alone. For example, LOL butter products "LOL SPREADABLE BUTTER/CANOLA," "LOL SPREAD BUTR W/CANOLA," "LOL LT SPREAD BUTTER/CANOL," and "LOL LIGHT BUTTER W CANOLA" all presumably contain canola oil. Prof. Connor's simple conversion factor does not account for this, and therefore he may be overstating the amount of milk inputs associated with these products. This is not a trivial point: a full 9.9% of Class IV milk at issue is associated with these four products alone.[189]

*6.4.4. Prof. Connor does not account for raw milk purchased by Defendants from third parties, which may carry no OOP*

156. Prof. Connor's damages calculations also assume that all raw milk used by Defendants to produce processed products comes from Defendants' member farmers. But this is also not necessarily true. Some raw milk is purchased from third-parties, and the record indicates that defendants do not always pay an OOP on such milk. For example, John Ellenberger of LOL stated "although some of Land O'Lakes' internally operated plants rely heavily on member milk, none of its plant are supplied exclusively using the coop's own member milk" and that "[f]or milk acquired from third parties, Land O'Lakes always attempts to negotiate competitive milk prices from external suppliers and in some cases it is able to secure milk at the regulated minimum price without payment of a premium."[190] Prof. Connor does nothing to adjust for the fact that some raw milk volume may have no OOP in his damages calculation.

---

[188] Ellenberger Declaration, ¶ 7 ("In addition, butter and cheese both contain non-dairy ingredients. Both butter and cheese production make use of salt as an ingredient. Many cheese production processes must use curdling agents. Certain spreadable butter products made by Land O'Lakes also contain other types of oils. Sometimes products also contain other additives like food coloring or preservatives. The cost of these non-dairy ingredients often change in ways that are different than, and unrelated to, the costs of the Class III and IV raw milk used for cheese or butter production.").

[189] Workpaper 13.

[190] Ellenberger Declaration, ¶¶ 4–5.

*6.4.5. Prof. Connor has not accounted for obvious errors in the Winn-Dixie data*

Winn-Dixie's data contains errors regarding who manufactured certain products, and Mr. Connor does not attempt to account for these errors in any way. For example, the following products are listed as having been purchased form Land O'Lakes, when they clearly pertain to brands unaffiliated with LOL operations: TM 2% RED FAT MILK, YOP LT BLUEBERRY 4PK, DAN LNF COCONUT VAN 4PK. Prof. Connor incorrectly attributes these product sales to Land O'Lakes, erroneously including them in his damages base. These discrepancies cast doubt on the reliability of Prof. Connor's calculations.

*6.4.6. Prof. Connor incorrectly includes indirect purchases from C&S Wholesale Grocers in his Class I damages base*

157. When calculating estimated Class I damages for August through December 2013, Prof. Connor uses a dataset called "Milk Purchases from C and S after warehouse transfer 2013.xlsx."[191] Importantly, this document appears to contain information on processed product purchases by Winn-Dixie from C&S Wholesale Grocers, *not* products purchased directly from Defendants. I understand from counsel that these sales should be excluded from the damages base, as they do not reflect direct purchases from Defendants. Excluding these purchases results in a reduction of Prof. Connor's Class I damages of $888,190.[192]

***6.5. Conclusion***

158. In sum, Prof. Connor's damages analysis is fundamentally flawed for two critical reasons. First, because of the antitrust immunity granted to Defendants to jointly set prices, Prof. Connor must consider a but-for world in which CWT did not exist but Defendant cooperatives could still engage in joint price setting behavior. This is particularly important in this case because OOPs are set by DCMA, which controlled 87-96 percent of raw milk in the Southeast. Further, the actions of SMA during the relevant period, the "outsourcing" of Dean Food's independent producers to DMS, and the implementation of the rBST premium in 2008 are events that coincide with the herd retirements that are legal under the Capper Volstead Act, but that Prof. Connor's benchmark model cannot account for. This fact renders Prof. Connor's analysis unreliable by design because it cannot isolate any changes in OOPs caused by CWT from

[191] Connor Report, p. 61, footnote 203.

[192] Connor Report, p. 65, footnote 209.

changes in OOPs caused by legal price setting behavior. Further, given DCMA's overall pricing power, there is no reason to believe that any OOPs that DCMA established in the real world would not also arise in the but-for world without CWT. A logical consequence of this is that there are no damages.

159. Second, in order to reliably isolate alleged damages from the CWT program, Prof. Connor's damages model must link changes in OOPs in the Southeast to the effect of the CWT program in the Southeast on cows/raw milk production. But, as I detail above, his estimate of the effect of the CWT program in the Southeast is wholly unreliable. It is also different from Dr. Brown's estimate, and when Dr. Brown's estimate is used, Prof. Connor's model finds no damages on Class I and II products.

160. In addition to these two fundamental methodological flaws, even if we assume (contrary to fact) that Prof. Connor's estimate of the effect of the CWT program in the Southeast is reliable, there is also no reliable evidence that Class I OOPs rose in the Southeast in response to the CWT program. As detailed above, the average increase in OOPs during the CWT period in the Southeast was almost entirely the result of the implementation of an rBST-free premium and a rise in fuel surcharges, neither of which is related to the CWT herd retirements (and both of which are examples of joint price setting behavior that I understand are covered by Defendants' antitrust immunity under the Capper Volstead Act). Further, Prof. Connor's damages model erroneously finds damages for Class II, III, and IV OOPs even though many of those OOPs *never* changed from pre-period levels for long periods during the CWT period. Further, for Class III and IV, Prof. Connor's analysis is unreliable because he has analyzed the wrong set of OOPs.

161. Prof. Connor has also performed no analysis of whether, and to what extent, OOPs are passed through to processed milk product prices. For any purchase of processed milk products that Winn-Dixie made where it did not directly purchase the raw milk itself, i.e., after it sold its plants to SMI in 2008, Prof. Connor must establish that any alleged increase in OOPs would pass through to the processed milk price. He has not presented any analysis of this question. Because OOPs sometimes move in the opposite direction of regulated prices, it is possible that an increase in OOPs corresponds to a decrease (or no increase) in the total price of raw milk or the price of processed milk products.

162. Finally, Prof. Connor's method of calculating the relevant volumes of raw milk at issue is unreliable for numerous reasons.

**7. HERD REDUCTION PROGRAMS LIKE CWT COULD BE A MORE EFFICIENT MEANS OF MANAGING SUPPLY THAN DUMPING RAW MILK OR EXPORTING FINISHED DAIRY PRODUCTS**

163. I have been asked to assess whether, using the tools of economics, whether there are potential economic efficiencies to CWT's use of a herd retirement program to manage supply instead of other supply management activities, like the dumping of excess milk or exports of storable dairy products overseas.

164. One feature of CWT that might make it more efficient than other forms of supply management is that the program was voluntary, and used a bidding system to incentivize individual farmers to sell their cows into the beef market. As discussed above in Section 5, this mechanism would tend to encourage less efficient producers to sell their cows for beef and more efficient producers to increase their dairy herds and cull fewer cows for beef marketing, thus raising the possibility that CWT, on net, shifted production toward more efficient producers who were able to produce milk at a relatively lower cost. Dumping excess milk does not involve any mechanism to incentivize specific types of farmers to limit production.

165. Second, as I detailed in Section 5 above, because CWT retired less than 1 percent of total cows on average each year, and placed no restraints on non-retiring farmers, there is little concern that CWT would limit cooperatives' ability to respond to changes in demand conditions as they normally would. With or without CWT, almost all of the cows and farmers would be able to respond to the market as necessary with extra supply. Indeed, as I detail in Section 5, there is a variety of evidence in the record that individual farmers increased production during the duration of the program. This feature mitigates any concern that the herd retirement program might limit producers' collective ability to respond to short-run marketplace events that require a shift out of supply. The design of the CWT program and the facts of the dairy industry leave the "safety valve" open, allowing nearly all farmers to react to higher prices with responsive production decisions.

Bryan M. Ricchetti
February 20, 2018

# 8. APPENDIX A

## *8.1. Curriculum vitae for Dr. Bryan Ricchetti*

**BRYAN RICCHETTI, Ph.D.**
**Vice President**

**Cornerstone Research**

181 West Madison Street, 43rd Floor • Chicago, IL 60602-4558

312.345.7320 • fax 312.345.7399

bricchetti@cornerstone.com

### ACADEMIC BACKGROUND

9/02 – 7/07 **Cornell University** Ithaca, New York

*Ph.D., Economics, Applied Econometrics*

9/95 – 5/99 **Hamilton College** Clinton, New York

*B.A., Economics with Honors, Phi Beta Kappa, Magna Cum Laude*

### PROFESSIONAL EXPERIENCE

9/07 – Present **Cornerstone Research, Inc.** Chicago, Illinois

*Vice President and Co-Head of Antitrust Practice*

- Lead economic analysis in complex litigation and regulatory matters, with specialization in antitrust, labor, class actions, market manipulation, and product misrepresentation matters.
- Industry focus includes: food and agriculture, the economics of distribution, and sports economics.

*Representative Consulting Experience*

- *Alleged Monopoly and Foreclosure in Home Recreation Industry.* Assessed claims of attempted monopoly and foreclosure by large distributor of home recreation products against class of retailers. Analysis of class certification, impact, and damages.
- *Merger in Food Distribution Industry.* Analyzed potential competitive effects of a proposed merger between two large distributors.

- *Regulatory matters involving state-level alcohol laws.* Analyzed the economic impact of changes to state-level laws related to the distribution of beer, wine, and liquor in one state, and retail sale of liquor in another state.
- *Walker Process/Sham Litigation in Gaming Industry.* Analyzed liability and damages issues for firm blocked from entering market due to alleged sham litigation.
- *Monopsony Wage Fixing Cartel in Service Industry.* Analyzed claims of monopsony wage suppression in service industry. Class certification, liability, and damages analysis.
- *Monopsony Wage Fixing Case for Student Athletes.* Analyzed potential competitive effects of compensation arrangements for college athletes.
- *Alleged Collusion in Dairy Industry.* Analyzed pricing dynamics, market structure, and competition at all levels of the supply chain (e.g., raw milk production, processed milk production, wholesale milk sales, and retail milk sales).
- *Wage Discrimination Class Certification Matter.* Analyzed class certification issues with regard to claims of gender discrimination.
- *LIBOR Manipulation Matters.* Oversaw econometric analysis to estimate the effect of the alleged conduct on price trends.
- *Product Misrepresentation Matters in High Tech Industry.* Assessed claim that prices of consumer electronics products were inflated due to allegedly misleading marketing and advertising campaigns. Analyzed class certification issues.

9/03 – 9/07 **US Census Bureau** Ithaca, New York

*Economist*

- Conducted econometric analysis related to research program on data confidentiality. Performed complex statistical modeling of key labor market outcomes. Authored internal papers and presentations.

7/99 – 7/2002 **MDRC** New York, New York

*Research Analyst*

- Conducted economic and statistical analyses of the effect of welfare-to-work programs on labor market outcomes. Coauthored reports.

**EXPERT TESTIMONY**

*Wal-Mart Puerto Rico, Inc. v. Juan C. Zaragoza-Gomez,* U.S. District Court, District of Puerto Rico. Retained by Plaintiff in statistics role. Filed declaration on 1/26/16. Deposed and testified at trial.

*Dunmars v. Board of Trustees of Community College District No. 510 and Jorie Menclewicz,* U.S. District Court, Northern District of Illinois, Eastern Division. Retained by Plaintiff for damages analysis in lost wages matter. Report filed on 3/18/16.

*Scott Swanson v. Epic Systems Corporation,* U.S. District Court, Western District of Wisconsin. Retained by Defendant to evaluate regression analysis in age discrimination matter. Report filed on 9/5/17.

*Boston Chapter, NAACP, Inc., et al. v. Nancy B. Beecher et al.*, and *Pedro Castro er al., v. Nancy B. Beecher et al.*, U.S. District Court, District of Massachusetts. Analysis of qualified labor pool for entry-level police and firefighers. Report filed on 10/11/17.

Data Breach matter. Retained as statistics expert to analyze patterns of alleged data breach. Case resolved before report or testimony.

Antitrust matter. Retained to analyze allegedly anticompetitive horizontal agreement. Case resolved before report or testimony.

**ARTICLES AND PRESENTATIONS**

Moderator, "The Capper Volstead Act - Lessons from the Trenches," ABA Teleconference Panel, December 9, 2016.

Panelist, 43rd Annual Fordham Conference on Antitrust Law and Policy, Economic Workshop – "Preparing for Deposition and Dealing with *Daubert* Challenges"

Expert Witness, Mock Trial, ABA Antitrust Spring Meetings, Spring 2015 (Case involved antitrust issues raised by a hypothetical college athletic association's restrictions on amateur player compensation)

Expert Witness, Mock Trial, Antitrust Law & Economics Institute for Federal Judges, October 2015 (Case involved antitrust issues raised by a hypothetical college athletic association's restrictions on amateur player compensation)

Co-author, "Applying Econometrics to Assess Market Definition and Market Power," *Econometrics: Legal, Practical, and Technical Issues*, American Bar Association Section of Antitrust Law.

Co-author, "Antitrust Impact in Indirect Purchaser Class Actions: The Need for Rigorous Analysis of Pass-Through," in the forthcoming Spring 2015 ABA Antitrust Distribution and Franchising Committee Newsletter

"Interpreting Comcast: Judge Koh's Decision in Brazil v. Dole Foods," in the Winter 2015 ABA Agriculture and Food Committee Newsletter.

Contributor, "How Effective Are Different Welfare-to-Work Approaches? Five-Year Adult and Child Impacts for Eleven Programs." December 2001, New York: MDRC.

Co-Author, ABA Handbook, Chapter on Pricing Regulations in the Dairy Industry, *Forthcoming.*

"Turnover as a Gateway to Symmetric Information: Testing Patterns of Entry into Personnel Records," *Cornell University Dissertation*, August 2007.

"Piece-Rates, Salary, Performance and Job Level," *Cornell University Dissertation*, August 2007.

"Testing Disclosure Risk in the proposed SIPP-IRS-SSA Public Use Files," *U.S. Census Bureau Disclosure Review Board*, November 2006.

## HONORS AND AWARDS

| | |
|---|---|
| Walter Galenson Fellowship in Labor Economics, Cornell University | Spring 2005 |
| Scholarship Prize in Economics, Hamilton College | Spring 1998 |

# 9. APPENDIX B

## *9.1. Documents relied upon*

**Expert Reports**

Expert Report of John M. Connor and backup, *Winn-Dixie Stores, Inc. and Bi-Lo Holdings LLC v. Southeast Milk, Inc., et al.*, December 18, 2017.

Expert Report of Andrew Novakovic, *Winn-Dixie Stores, Inc. and Bi-Lo Holdings LLC v. Southeast Milk, Inc., et al.*, February 20, 2018.

**Produced Data**

BROWN-MU_0003745, Workbook, Dr. Brown's data and analyses

DFA2013-00037604, DFA City-Level OOP Data

DFA2013-00037605; DFAWD-00000030; DFA Southeast Council OOP Data

NMPF0008695 – 701; NMPF0086704 – 7; NMPF0026128 – 29; NMPF0026131 – 32; NMPF00026134; NMPF0026136; NMPF0026138; NMPF0026140; NMPF0026142; NMPF0026144; NMPF Data

SMI-001654 – 1925; SMI-007361 – 7464; SMI-016317 – 77; SMI Pricing Announcements

SMI-019144 – 5, Over-Order Premium Rates for Central Florida

WD1143_000299 – 300, Winn-Dixie Sales Data

**Depositions**

Deposition of Calvin Covington, Volume II, December 6, 2017

Deposition of Dr. Scott Brown, November 7, 2014

Deposition of Frank Johns, December 8, 2017

Deposition of Jerome Kozak, February 5, 2015

Deposition of John M. Connor, February 13, 2018

Deposition of John Wilson, January 8, 2015

Deposition of Michael Lichte, February 10, 2015

Deposition of Richard W. Stammer, January 30, 2015

Deposition of Thomas D. Wegner, January 22, 2015

**Declarations**

Declaration of Dr. Scott Brown, November 22, 2013

Declaration of Dr. Scott Brown, September 16, 2016

Declaration of John M. Ellenberger, September 22, 2016

Declaration of John Wilson, November 21, 2013

Declaration of John Wilson, September 22, 2016

Declaration of Richard W. Stammer, September 22, 2016

Declaration of Shana Wooten, February 9, 2018

Declaration of Sharad Mathur, December 5, 2013

Declaration of Thomas Balmer, Part I, April 13, 2013

Declaration of Thomas D. Wegner, December 5, 2013

Declaration of Thomas D. Wegner, September 22, 2016

**Academic Articles and Reports**

Agricultural Marketing Service, USDA, "Milk in the Appalachian, Florida and Southeast Marketing Areas; Tentative Decision and Opportunity To File Written Exceptions on Proposed Amendments to Tentative Marketing Agreements and to Orders," *Federal Register* 73(41), 2008, pp. 11194–11229

Agricultural Marketing Service, USDA, "Milk in the Appalachian, Florida and Southeast Marketing Areas; Final Partial Decision on Proposed Amendments to Marketing Agreements and to Orders," Federal Register 79(45), 2014, pp. 12985–13002

Benaissa Chidmi, Rigoberto A. Lopez, and Ronald W. Cotterill, "Retail Oligopoly Power, Dairy Compact, and Boston Milk Prices," Food Marketing Policy Center Research Report No. 83, October 2004

Bob Cropp and Ed Jesse, "Basic Milk Pricing Concepts for Daily Farmers," University of Wisconsin – Extension, Cooperative Extension, 2008

Byeong-Il Ahn and Daniel A. Sumner, "Estimation of Relative Bargaining Power in Markers for Raw Milk in the United States," *Journal of Applied Economics* 15(1), 2012, pp. 1–23

Christine Siegwarth Meyer, Lauren J. Stiroh, and Claire Xie, "Demonstrating Faulty Predictions in Class Certification Analysis," *Antitrust* 30(2), 2016

Christopher A. Wolf and Duane A. Banderbob, "Voluntary Over-Order Milk Premium Agreements and Implications for Policy Choices," Journal of Cooperatives, 2002

Daniel A. Lass, M. Adanu, and P. G. Allen, "Impacts of the northeast dairy compact on New England retail prices," *Agricultural and Resource Economics Review* 30(1), 2001

K. Charles Ling, USDA, Rural Business Cooperative Service, "The Cost of Balancing Milk Supplies: Northeast Regional Market," RBS Research Report 188, October 2001

USDA, "Economic Effects of U.S. Dairy Policy and Alternative Approaches to Milk Pricing," Report to Congress, July 2004

USDA, "Profits, Costs, and the Changing Structure of Dairy Farming," U.S. Department of Agriculture Economic Research Report Number 47, September 2007

**<u>Books and Book Chapters</u>**

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, (American Bar Association, 2014)

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, (American Bar Association, 2010)

Allen, M. et al., "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, (Washington DC: The National Academies Press, 2011)

Daniel L. Rubinfeld, "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, (American Bar Association, 2008)

Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Reading, MA: Addison Wesley, 2004)

Jeffery M. Wooldridge, *Introductory Econometrics: A Modern Approach*, (Madison, OH: South-Western, 2003)

John Connor, *Global Price Fixing*, (Berlin: Springer-Verlag, 2008)

Stephen A. Ross, Randolph W. Westerfield, and Jeffery Jaffe, *Corporate Finance*, (New York, NY: McGraw-Hill, 2002)

**<u>Websites</u>**

EnsembleIQ, "Publix Switches to Hormone-free Private Label Milk," May 1, 2007, available at https://progressivegrocer.com/publix-switches-hormone-free-private-label-milk, accessed on February 19, 2018

The Kroger, Col., Press Release, "Kroger to Complete Transition to Certified rBST-free Milk by Early 2008," August 1, 2007, available at https://www.thekrogerco.com/corpnews/corpnewsinfo_pressreleases_08012007.html, accessed on February 19, 2018

Walmart, "Wal-Mart Offers Private Label Milk Produced without Artificial Growth Hormone," March 21, 2008, available at https://corporate.walmart.com/_news_/news-archive/2008/03/24/wal-mart-offers-private-label-milk-produced-without-artificial-growth-hormone, accessed on February 19, 2018

USDA, "Federal Milk Marketing Orders," available at https://www.ams.usda.gov/rules-regulations/moa/dairy, accessed on January 22, 2018

USDA, "Milk Cost of Production Estimates," available at https://www.ers.usda.gov/data-products/milk-cost-of-production-estimates/milk-cost-of-production-estimates/#Monthly, accessed on January 25, 2018

USDA, "Federal Milk Marketing Order Areas," available at https://www.ams.usda.gov/sites/default/files/media/Federal%20Milk%20Marketing%20Orders%20Map.pdf, accessed on February 18, 2018

**Produced Documents**

D00008371 – 2, Letter from Jim Hahn (Southeast Area Council) to Southeast Area Council Members, March 6, 2006

D00120434, Dean Foods Decision to Outsource Field Milk Procurement, Talking/discussion points

D00120437, Letter from Janet R. Stecklein (Dean Foods) to Dean Foods Milk Haulers, January 7, 2003

DFA2013-00002903 – 20, Newsletter, "NMPF Dairy Industry News Alert," October 27, 2009

DFA2013-00006702 – 8, Email chain from Rick Smith to John Wilson et al., "Fw: from a Northern Wisconsin member "Fw: My View"," October 26, 2009

DFA2013-00039807 – 8, First Amendment to Outsourcing Agreement between Dairy Marketing Services and Dean Foods Company, March 2007

DFA2013-00041368 – 81, Outsourcing Agreement between Dairy Marketing Services and Dean Foods Company, January 1, 2003

DFA2013-00193064 – 7, Southern Marketing Agency, Inc., "Revenue and Cost Pool -- Principles and Practice"

DFA2013-00193068 – 88, Southern Marketing Agency, Inc. Revenue and Cost Pool Policies and Procedures, June 21, 2002

LOL00005813 – 5895, "An International Comparison of Milk Supply Control Programs and Their Impacts," September 2010

NMPF0000004 – 5, CWT pamphlet, "The Need for Regional Safeguards"

NMPF0000143 – 46, Herd retirement bid calculator, "2007 Herd Retirement"

NMPF0002124 – 41, CWT Presentation, "CWT Herd Retirement Task Force, "August 20, 2007

NMPF0003470 – 76, CWT Presentation, "CWT Herd Retirement Information & Results Survey Round 3 - 2005," 2005

NMPF0005259 – 60, Memo, Jerry Kozak, "CWT Gears Up Fort New Round of Activity"

NMPF0007136 – 41, Newsletter, "CWT News Watch," July 28, 2008

NMPF0010842 – 4, Memo

NMPF0017606 – 09, "Why Continental does not support the continuation of CWT"

NMPF0018345 – 54, CWT Herd Retirements

SMI-000009 – 112, Supply Contract between Winn-Dixie Stores, Inc. and Sunshine State Dairy Farms, LLC

SMI-000113 – 29, Milk Supply Agreement between Winn-Dixie Stores, Inc. and Southeast Milk, Inc.

SMI-000130 – 135, Milk Purchase Agreement between Dairy Marketing Association, Inc. and Winn-Dixie Stores, Inc.

SUPP_0000002 – 151, Product and Pricing Schedules between Winn-Dixie and SMI

**Legal Documents**

Amended Complaint and Demand for Jury Trial, *Winn-Dixie Stores, Inc. and Bi-Lo Holdings LLC v. Southeast Milk, Inc., et al.*, Middle District of Florida Jacksonville Division, August 21, 2016

Affidavit of Richard W. Stammer, December 2, 2013

**Other Data**

Dairy 100, *Dairy Foods*, 2004 – 2013

USDA, Annual Milk Production by State, available at https://quickstats.nass.usda.gov, accessed on December 28, 2017

USDA, Annual National Cow Inventory, available at https://quickstats.nass.usda.gov, accessed on January 4, 2018

USDA, Annual National Cows Retired, available at https://quickstats.nass.usda.gov, accessed on December 28, 2017

USDA, Annual National Milk Production, available at https://quickstats.nass.usda.gov, accessed on December 28, 2017

USDA, Cow Inventory by State, available at https://quickstats.nass.usda.gov, accessed on February 18, 2018

USDA, Utilization of Producer Milk, 2000 – 2013

USDA, Over-Order Charges on Producer Milk Annual Summary, 2004 – 2012

And any other documents cited in this report.

## 10. APPENDIX C

### *10.1. Class III and IV OOPs*

**EXHIBIT 25**

***Class III OOPs did not consistently increase with CWT herd retirements: Order 5***




Source: Augmented Connor Data

Note: The Class III OOP is the average of Class III OOPs for all plants in Order 5.

**EXHIBIT 26**

***Class III OOPs did not consistently increase with CWT herd retirements: Order 6***




Source: Augmented Connor Data

Note: The Class III OOP is the average of Class III OOPs for all plants in Order 6.

**EXHIBIT 27**

***Class III OOPs did not consistently increase with CWT herd retirements: Order 7***




Source: Augmented Connor Data

Note: The Class III OOP is the average of Class III OOPs for all plants in Order 7.

**EXHIBIT 28**

***Class IV OOPs did not consistently increase with CWT herd retirements: Order 5***




Source: Augmented Connor Data

Note: The Class IV OOP is the average of Class IV OOPs for all plants in Order 5.

**EXHIBIT 29**

***Class IV OOPs did not consistently increase with CWT herd retirements: Order 6***




Source: Augmented Connor Data

Note: The Class IV OOP is the average of Class IV OOPs for all plants in Order 6.

**EXHIBIT 30**

***Class IV OOPs did not consistently increase with CWT herd retirements: Order 7***




Source: Augmented Connor Data

Note: The Class IV OOP is the average of Class IV OOPs for all plants in Order 7.

## 11. APPENDIX D

### *11.1. Corrections to Prof. Connor's OOP data*

166. Prof. Connor's OOP data has several flaws that I correct in my Augmented Connor Data.

- When cleaning DFA2013-00037605, Prof. Connor did not import 77 plant-month level records. I import these observations and include them in the data.

- He also duplicated 16 records for Broadacre, Powell; Coburg Dairy, Charleston; Dairy Fresh, Winston Salem; Kroger, Lynchburg; Mayfield, Athens; Regis, Charleston; Southern Belle, Somerset; U.C. Milk, Madisonville; White Wave, Mt. Crawford; Forest Hills, Memphis; Hiland, Fayetteville; Hiland, Fort Smith; Hiland, Springfield; Jasper Milk Products, Joplin; Turner, Fulton; and Turner/Coleman, Little Rock in April 2011; I delete these duplicate entries.

- He assigns 164 plant-month observations to the incorrect state. I correct this error.

- He assigns 34 plant-month observations to the incorrect Order. I correct this error.

- In three instances, Prof. Connor enters incorrect values for maximum credits or OOPs. I correct these errors.[193]

[193] Workpaper 14.