# EXHIBIT 18

TON

670

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT PURCHASER ANTITRUST LITIGATION | : | Master File NO. 06-0620 |
| THIS DOCUMENT RELATES TO: All Actions | : | |
| O'NEILL, J. | | May 26, 2015 |

FILED
MAY 26 2015
MICHAEL E. KUNZ, Clerk
By ______ Dep. Clerk

## MEMORANDUM

Before me in this antitrust litigation are: certain defendants' motion to adjudicate plaintiffs' antitrust claims under the rule of reason[1] (Dkt. No. 492), plaintiffs' opposition to defendants' motion seeking application of the rule of reason and cross-motion for partial summary judgment on their Sherman Act § 1 claim (Dkt. No. 495) and the responses and replies to each motion (Dkt. Nos. 496, 498, 501-08, 511).[2] I held oral argument on the motions on February 4, 2014. Following oral argument, plaintiffs filed a letter brief (Dkt. No. 624) and defendants filed a letter response. (Dkt. No. 630.) After considering all of the above, and as is further set forth below, I will grant in part and deny in part moving defendants' motion. I will deny plaintiffs' cross-motion for partial summary judgment.

---

[1] Moving defendants are: the Eastern Mushroom Market Cooperative (EMMC), Robert A. Feranto, Jr. t/a Bella Mushroom Farms; Brownstone Mushroom Farms, Inc.; Brownstone Farms, Inc.; Brownstone Mushroom Farm; To-Jo Fresh Mushrooms, Inc.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Kaolin Mushroom Farms, Inc.; South Mill Mushroom Farms, Inc.; Southmill Mushroom Sales, Inc.; Modern Mushroom Farms, Inc.; C&C Carriage Mushroom Co.; Sher-Rockee Mushroom Farm, LLC; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms, Inc.; Louis M. Marson, Jr., Inc.; Monterey Mushrooms, Inc.; and John Pia (Dkt. No. 513). Pursuant to a stipulation filed on November 13, 2014, plaintiffs' claims against defendants Gaspari Bros., Inc., LRP Mushrooms, Inc., and Michael Pia have been dismissed with prejudice. Dkt. No. 613.

[2] Also now pending in this action are several motions in limine seeking to exclude expert testimony, various other motions for summary judgment and the direct purchaser class plaintiffs' motion for class certification of the putative class of direct purchasers. Dkt. Nos. 513, 514, 515, 516, 518, 520, 521, 583, 584, 638, 641.

ENTERED
MAY 26 2015
CLERK OF COURT

Case 2:06-cv-00620-BMS Document 670 Filed 09/26/18 Page 2 of 36

## BACKGROUND

Plaintiffs in this putative antitrust class action are purchasers of mushrooms. Dkt. No. 185 (Revised Consolidated Class Action Compl.) at ¶ 1.[3] The putative "direct purchaser class consists of more than a thousand purchasers of agaricus mushrooms." Dkt. No. 496 (Pls.' Statement of Facts) at ¶ 1. Defendants include the Eastern Mushroom Marketing Cooperative and other entities that were members of the EMMC or were affiliates of members of the EMMC. See Dkt. No. 496 (Pls.' Statement of Facts) at ¶¶ 27-28. Under the 2001 EMMC membership agreement, the stated "objective of the Cooperative" was:

> to improve conditions in the mushroom industry for the mutual benefit of its members as producers by promoting, fostering and encouraging the intelligent and orderly marketing of mushrooms through cooperation; eliminating speculation, waste and fluctuating prices, making the distribution of agricultural byproducts between producers and consumers as direct as can be efficiently done, thereby eliminating any manipulation of the price by middlemen, stabilizing the marketing of agricultural products, encouraging efficiency and economy in marketing; preventing the demoralizing of markets resulting from dumping and predatory practices; mitigating the recognized evils of a marketing system under which prices are set for the entire industry by the weakest producer; and fostering the ability of the members of this Cooperative to obtain prices for their mushrooms in competitive markets, which are fair prices but not prices inflated beyond the reasonable value of such products by reason of artificially created scarcity of such products or other predatory trade practices which would injure the public interest.

Dkt. No. 497, Ex. 50 (Executed Membership Agreement for Bella Farms) at 2.

In their revised consolidated class action complaint, plaintiffs claim, inter alia, that in

---

[3] Pursuant to my Order of June 5, 2006 consolidating seven previously filed antitrust class actions and one non-class action, on June 26, 2006, plaintiffs filed a consolidated amended class action complaint against defendants. Dkt. No. 49. On November 13, 2007, plaintiffs filed a revised consolidated class action amended complaint (Dkt. No. 185) pursuant to my Order of November 9, 2007 (Dkt. No. 184) which granted plaintiffs leave to file a complaint consolidating the June 26, 2006 complaint and an October 27, 2006 complaint by former class representative Theodore J. Katsiroubas – which were brought on behalf of the same putative class.

seeking to achieve their objective, defendants violated Section 1 of the Sherman Act through the EMMC's implementation of a supply control scheme – purchasing and leasing mushroom farms in order to place deed restrictions on the properties prohibiting the conduct of business related to the production of mushrooms. Dkt. No. 185 at ¶ 94; see also id. at ¶¶ 69, 73-81. Specifically, plaintiffs claim that

> [t]hrough membership dues and a "Supply Control Assessment," EMMC collected approximately $6 million from its members during 2001-2002. EMMC, acting as an agent of its members, then spent approximately $3 million to purchase four mushroom farms and to acquire lease options on two additional mushroom farms in the eastern United States for the purpose of shutting them down and reducing the mushroom production capacity available for nonmember non-conspirators to grow mushrooms in competition with the Defendants.

Id. at ¶ 72. Defendants do not contest "that the EMMC, despite various members' contrary opinions, did buy and/or lease certain properties that, at some point in time, were operated as mushroom farms that were unprofitable and closed at the time of the EMMC's purchase." Dkt. No. 505 (Defs.' Counter-Statement of Material Facts) at 7. Nor do they contest "that deed restrictions were imposed on these properties when they were later sold by the EMMC." Id. Defendants contend, however, that "not all EMMC members supported or participated in the supply control program." Id.[4]

Plaintiffs also claim that defendants violated Section 1 of the Sherman Act by "conspir[ing] among themselves and in conjunction with nonmember distributors to set

---

[4] On December 16, 2004, the United States Department of Justice filed an antitrust complaint against the EMMC after an eighteen-month investigation of the EMMC's membership activities, qualifications as a cooperative and marketing practices. See United States v. E. Mushroom Mktg. Coop., Inc., No. 04- 5829 (E.D. Pa. Dec. 16, 2004). On September 9, 2005, the EMMC and the DOJ entered into a consent judgment that required the EMMC to nullify deed restrictions that had been placed on six properties that the EMMC had sold or transferred. See Dkt. No. 497, Ex. 21. The consent judgment also prohibited the EMMC from placing restrictions on other properties for ten years. Id.

artificially-inflated prices" for mushrooms. See Dkt. No. 185 at ¶ 93. On January 9, 2001, the EMMC held "a general membership meeting to discuss and sign the membership agreement." Dkt. No. 497, Ex. 27 (EMMC January 9, 2001 Meeting Minutes) at 1. "Pricing policies and minimum pricing for fresh mushroom products by region were discussed. Minimum price for individual products were discussed and agreed to by region." Id. Members of the EMMC agreed "not to sell or otherwise dispose of mushrooms except as provided under the terms of [the membership] Agreement and the Articles of Incorporation and Bylaws of the Cooperative." Dkt. No. 497, Ex. 50 (Executed Membership Agreement for Bella Farms) at 4, ¶ 6. EMMC members agreed "to sell mushrooms to all customers only on the terms authorized by the Cooperative." Id. at 5, ¶ 7. They also agreed "to handle and market all crops of mushrooms under [their] control during the term of [the membership] Agreement, pursuant to the terms and conditions of [the membership] Agreement and the Articles of Incorporation and Bylaws of the Cooperative." Id. at 4, ¶ 3 (emphasis added). Members agreed that they would "arrange or negotiate with buyers for the sale of mushrooms produced by or for [the member]." Id. at 4, ¶ 4.

Effective February 2001, the EMMC adopted a minimum pricing policy that established minimum pricing for various types, grades, sizes and packaging modes of mushrooms. See Dkt. No. 497, Ex. 9 (EMMC Current Policies, Revision Date Feb. 13, 2001). The agreement with respect to pricing applied to "sales to the retailers, wholesalers and to the non-members." Dkt. No. 497, Ex. 33 (A. David Carroll, Jr. Dep.) at 130:5-18; see also Dkt. No. 497 at Ex. 37 (Michael Basciani Dep.) at 75:18-24 ("Q. . . . one of the policies that the EMMC adopted was to try to set prices for – the downstream price that shippers got when they sold their product to wholesalers and retailers, correct? A. Yes, sir."). In other words, the EMMC set floor pricing for mushrooms that came out of packaging operations, not for mushrooms that came out of

growing operations. See Dkt. No. 497 at Ex. 39 (Michael P. Cardile Dep. at 145:9-147:4.).

Under the policy which was revised effective February 13, 2001, members agreed, inter alia, that "[t]he pricing listed for each product is the minimum price for that product delivered to a customer in a region." Dkt. No. 497, Ex. 9 (EMMC Current Policies, Revision Date Feb. 13, 2001) at 1. The policy provided that the

> FOB[5] pricing minimum for each product is equal to $.50 less than the delivered price for the region [in which] the farm is located. For example, the minimum FOB price for a farm in the Mid Atlantic region is $.50 less than the delivered price for that product in the Mid Atlantic region.

Id. The policy provided that "[n]on-member mushroom farms are to be sold to at the same FOB price as customers." Id. Under the policy, "[n]o pricing is set for member-to-member (sideways sales within the cooperative. The members buying and selling will agree individually to the pricing for each sideway[s] sale." Id. The policy also provided that "[m]embers with off site Distribution Facilities" – "defined as off site distribution facilities owned (51% or greater ownership by the member and whose sales pricing is controlled by the member)" – "must sell to other wholesalers at or above the minimum pricing for that product." Id.

When the EMMC met on March 12, 2002, "[a] pricing list for every product sold was distributed." Dkt. No. 497, Ex. 28 (EMMC Meeting Minutes March 12, 2002) at 2. At the March meeting the cooperative discussed a Budget Audit Committee which was "to do mandatory individual audits on members. They will take the minimum pricing list and match it to members' books." Id. at 1. The EMMC met again on April 9, 2002, where, inter alia, "[a] motion was made, seconded and so adopted to increase the price of retail washed, sliced

---

[5] FOB or "free on board" means that goods are "delivered free of charge on the means of conveyance, such as air, rail, or sea." Free on board, Black's Law Dictionary (10th ed. 2014). The term allocates "the rights and duties of the buyer and the seller of goods with respect to delivery, payment, and risk of loss, whereby the seller must clear the goods for export, and the buyer must arrange for transportation." Id.

mushrooms by $.20 per [p]ound and have the product so labeled by a vote of 20 to 4." Dkt. No. 497, Ex. 29 (EMMC Meeting Minutes April 9, 2002) at 3. Under the EMMC policy revised on April 24, 2002, members were "never permitted to offer pricing below EMMC minimums to obtain the current business of a non-member in an new or shared account." Dkt. No. 497, Ex. 11 (EMMC Current Policies, Revision Date, Apr. 24, 2002) at 4. Members were "never permitted to offer prices below the EMMC minimums to counter a purported offer from an EMMC member." Id. The policy also set forth a procedure to petition for matching price permission for members wishing to make offers below EMMC minimum prices. Id. at 4-5. In light of the above, plaintiffs assert that "[d]efendants engaged in naked-price fixing [sic]." Dkt. No. 185 at ¶ 93.

Moving defendants do not contest the EMMC's implementation of a minimum pricing policy.[6] Dkt. No. 505 (Defs.' Counter-Statement of Material Facts) at 2 ("it is not disputed that the EMMC issued minimum price lists and distributed them to [ ] the member Defendants"). Instead, they assert that "the EMMC made little or no effort to enforce the regulations regarding the Minimum Pricing Policy." Id. They contend that "the EMMC minimum pricing policy was not actually followed by each and every member of the EMMC." Id. at 4-5. They contend that "[t]he evidence of record does not substantiate Plaintiffs' contention that EMMC pricing applied to all sales made by all non-EMMC distributor entities as opposed to the grower member entities."[7] Id. at 5. Moving defendants also contend that the EMMC was "an attempt to stabilize

[6] Defendant M.D. Basciani & Sons contests plaintiffs' contentions that "the EMMC adopted and amended various minimum pricing policies for mushrooms" and that "all EMMC members agreed to follow the EMMC minimum pricing policies." Dkt. No. 502 (M.D. Basciani & Sons, Inc.s' Resps. To Pls.' Statement of Undisputed Facts) at 1-2. It contends instead that "[d]uring the time that M.D. Basciani was a member of the EMMC, the EMMC provided it with documents labeled 'EMMC Current Policies,' which documents, being in writing, speak for themselves." Id.

[7] Moving defendants also contend that the members of the EMMC "voted to

prices for fresh mushrooms in order to prevent the industry from turning to an oligopoly, controlled by [ ] three or four large-scale producers rather than a large number of smaller, family owned farms." Dkt. No. 501 (Defs.' Rule of Reason Reply) at 5. They assert that dire market conditions existed for mushrooms at the time of the EMMC's formation, including the Sixth Circuit's voiding of the Mandatory Assessment Provisions of the Mushroom Promotion Research and Consumer Information Act of 1990 (a statute that had funded the advertising and promotion of mushrooms) and the bankruptcy and closing of Money's Mushrooms, then the largest mushroom producer in United States and Canada. See Dkt. No. 492 (Defs.' Rule of Reason Mot.) at ¶¶ 6, 7. Finally, moving defendants assert that

> [t]hey formed the EMMC pursuant to the advice of counsel and under the good faith belief that under the Capper-Volsted Act, they could as constituted act cooperatively to promote and jointly market their mushrooms and stabilize the prices [for mushrooms] paid by the large retail and institutional middlemen without exposure to antitrust liability.

Dkt. No. 492 (Defs.' Rule of Reason Mot.) at ¶ 9.[8]

---

voluntarily abandon the Minimum Pricing Policy in August of 2005 . . . ." Dkt. No. 492 (Defs.' Rule of Reason Mot.) at ¶ 12.

[8] Plaintiffs argue that "absent Capper-Volstead immunity, [d]efendants' conduct is simply naked price fixing subject to condemnation under the per se rule." Dkt. No. 624 (Pls. Letter Br.) at 3. Moving defendants, in support of their motion seeking application of the rule of reason, assert that "the DOJ concluded that the EMMC was an agricultural cooperative organized pursuant to the Capper-Volsted Act . . . and did not challenge the EMMC's Minimum Pricing Policy." See Dkt. No. 492 (Defs.' Rule of Reason Mot.) at ¶ 12. I am not bound by the DOJ's conclusion with respect to the applicability of the Capper-Volsted Act immunity and, as is set forth below, have previously found that the protections of the Capper-Volsted Act were not available to the EMMC. See In re Mushroom Direct Purchaser Antitrust Litig., 655 F.3d 158, 162 (3d Cir. 2011) ("Neither DOJ determination – that EMMC acted anticompetitively or that EMMC was a properly formed Capper-Volstead cooperative – is binding upon the District Court or th[e] Court [of Appeals].").

On March 26, 2009, after the close of Phase I discovery, I denied certain defendants' motions for summary judgment and plaintiffs' cross motion for summary judgment on the issue of Capper-Volstead immunity. I found that the inclusion of Mario Cutone Mushroom Co. Inc. (M. Cutone), a non-grower distributor, in the EMMC's membership was sufficient to destroy Capper-Volstead immunity. In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d

Under the EMMC membership agreement, each member agreed that it was "one of numerous producers engaged in the production and marketing of mushrooms." Dkt. No. 497, Ex. 50 (Executed Membership Agreement for Bella Farms) at 1. Each member "expressly represent[ed] and warrant[ed] that it [was then] engaged in the production of mushrooms, that it [was] in a position to control the mushrooms subject to [the] Agreement and that it [would] be able to perform according to [the] Agreement." Id. at 7, ¶ 14. Each member also agreed that it "competes with other members for the same customers." Id. at 4, ¶ 4.

Plaintiffs contend that "the EMMC's membership did not include solely growers [of mushrooms]. The EMMC's membership included . . . non-grower members . . . . In addition, the members of the EMMC included several integrated companies that processed, packaged, shipped and marketed mushrooms in addition to growing mushrooms." Dkt. No. 496 (Pls.'

---

274, 283-86 (E.D. Pa. 2009). I also found that the Act's exemption did not extend to protect cooperatives that conspire with entities not engaged in agricultural production as was the case with Kaolin/South Mill and its distribution entities and LRP-M/ Manfredini Enterprises. Id. at 286-91 (E.D. Pa. 2009) ("for the EMMC and its members to fix prices with affiliated distributors when the distribution entities are not a single economic unit with their affiliated member grower constitutes a conspiracy that destroys the EMMC's Capper-Volsted exemption"). I denied defendants' request to certify my Order for appeal pursuant to 28 U.S.C. § 1292(b). Dkt. No. 315. Defendants then filed an interlocutory appeal which was dismissed by the Court of Appeals for the Third Circuit on August 23, 2011. The Court of Appeals found that a prejudgment order denying the protections of the Capper-Volstead Act was not a collateral order subject to interlocutory appeal. In re Mushroom, 655 F.3d at 167.

On January 6, 2014, certain defendants filed a motion seeking reconsideration of my March 26, 2009 Capper-Volstead decision. On October 14, 2014, I denied defendants' motion for reconsideration. In re Mushroom Direct Purchaser Antitrust Litig., 54 F. Supp. 3d 382, 395 (E.D. Pa. 2014). I found that neither American Needle, Inc. v. National Football League et al., 560 U.S. 183 (2010), nor Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820 (3d Cir. 2010), required reversal of my prior finding that the membership of M. Cutone in the EMMC destroyed the EMMC's immunity from antitrust liability under the Capper-Volstead Act. In re Mushroom, 54 F. Supp. 3d, at *390-91. I also found that reconsideration did not require reversal of my prior finding that EMMC member-grower Kaolin and the non-EMMC member South Mill distribution entities do not constitute a single economic entity. Id. at 388-89.

I certified my reconsideration decision on the Capper-Volsted questions for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Id. at 394-95. On December 2, 2014, the Court of Appeals denied M.D. Basciani, Inc. and the EMMC's petitions for leave to file an interlocutory appeal. Dkt. No. 614.

Case 2:06-cv-00620-BMS Document 670 Filed 05/26/15 Page 9 of 36

Statement of Facts) at ¶ 3 (citations omitted). At oral argument, plaintiffs' counsel explained that "some of the EMMC members were also distributors . . . . [T]he members of the EMMC, some of them were growers and distributors, [and] some of them were just growers and had . . . relationships with distributors." Dkt. No. 628 (Oral Arg. Tr.) at 55:12-18; see also Dkt. No. 497, Ex. 9 (EMMC Current Policies, Revision Date Feb. 13, 2001) at 1 (addressing pricing for EMMC "[m]embers with off site Distribution Facilities"). As was explained in a January 23, 2001 letter from then-EMMC counsel to John Pia, President of the EMMC:[9]

> Among the EMMC membership there are several different organizational structures used for the conduct of business. As we know, all EMMC members are "producers", i.e. mushroom growers and farmers.[10] However, because of internal operational/organizational choices or relationships with affiliates and/or wholly owned operational/organizational choices or relationships with affiliates and/or wholly owned subsidiaries, almost all of the producer/member organizations also either process, package, market and or sell mushrooms. Generally speaking, this is accomplished in the following ways:
>
> a. by a single legal entity performing all related tasks;
>
> b. by a parent, and a wholly owned-subsidiary which separate the growing and sales function into separate but related legal entities;
>
> c. by related legal entities which share common or similar ownership and which are generally operated by a core family control group; and
>
> d. in the case of the Mushroom Alliance, on a

---

[9] The letter was produced pursuant to a "limited waiver of the attorney-client privilege." Dkt. No. 492 (Defs.' Rule of Reason Mem.) at 12 n. 3.

[10] Of course, subsequent to this letter, the Court determined that not all of the EMMC members were producers given the inclusion of M. Cutone, a non-grower distributor, in the EMMC's membership, an inclusion that I found was sufficient to destroy Capper-Volstead immunity. See In re Mushroom, 621 F. Supp. 2d at 289-90; see also In re Mushroom, 54 F. Supp. 3d at 391 ("M. Cutone was a non-grower member [of the EMMC] who had the power to participate in the control and policymaking of the association through voting. . . . M. Cutone cannot become a grower for the purposes of satisfying the Capper-Volsted Act's requirements by asserting the single-entity defense in this context.")

> cooperative basis similar to, but smaller than, EMMC.

Dkt. No. 492, Ex. A. at 1-2. The letter further explained that

> EMMC is organized in a "non-traditional" sense in terms of the "classic" cooperative. Most, but not all, agricultural cooperatives differ from EMMC in that they tend to combine grower organizations for the collective purpose of consolidating and sharing the "getting-to-market" function for agricultural products, i.e., processing, handling, sales and marketing. These "classic" coops include organizations like Land O'Lakes, Sunmaid, Welch's, Sunkist and Ocean Spray. EMMC is not like those cooperatives given that EMMC members will continue to conduct independent businesses.

Id. at 3. Plaintiffs assert that "although certain owners of the growing companies may have created downstream packaging and distribution companies for various reasons, in some instances the owners of packaging and distribution companies created growing operations in order to participate in the EMMC." Dkt. No. 496 (Pls.' Statement of Facts) at ¶ 2.

On the record now before the Court, the members of the EMMC included both grower-only entities and vertically integrated entities whose operations included both growing and distribution of mushrooms. See Dkt. No. 492, Ex. A. at 1-2 ("almost all of the producer/member organizations also either process, package, market and/or sell mushrooms"); Dkt. No. 497, Ex. 1 at EMMC-DOJ-03544-45 (EMMC Response to Civil Investigative Demand No. 22366, identifying "each member's business activities since January 1, 2000"). As I have previously found the EMMC members also included one non-grower distributor for a non-EMMC member grower: Mario Cutone Mushroom Co. Inc.[11] In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d 274, 285 (E.D. Pa. 2009).

Specifically, defendants include the following entities which plaintiffs claim "[j]oined the EMMC at some time during the period from 2001 to 2005": (1) Robert A. Feranto, Jr., t/a Bella

[11] M. Cutone was a distributor for grower and non-EMMC member, non-defendant M&V Enterprises. Unlike the other EMMC members, it was not itself a grower of mushrooms.

Mushroom Farms; (2) Brownstone Mushroom Farms; (3) Cardile Mushrooms, Inc.; (4) Country Fresh Mushroom Co.; (5) Forest Mushrooms Inc.; (6) Franklin Farms Inc.; (7) Gino Gaspari & Sons; Inc., (8) Giorgi Mushroom Company; (9) Kaolin Mushroom Farms, Inc.; (10) Leone Pizzini & Son, Inc.; (11) LRP-M Mushrooms, Inc.;[12] (12) Modern Mushroom Farms, Inc.; (13) Oakshire Mushroom Farm, Inc.; (14) Phillips Mushroom Farms, Inc.; (15) Harvest Fresh Farms, Inc.; (16) Louis M. Marson, Inc.; (17) Mario Cutone Mushroom Co. Inc.; (18) M.D. Basciani & Sons, Inc.; (19) Monterey Mushrooms, Inc.; (20) Masha & Toto, Inc.; (21) W&P Mushroom, Inc.; (22) Mushroom Alliance, Inc.;[13] (23) Kitchen Pride Mushrooms; (24) JM Farms, Inc.; and (25) United Mushroom Farms Cooperative, Inc.[14] Dkt. No. 496 (Pls.' Statement of Facts) at ¶ 27.

Defendants also include the following non-members of the EMMC who are "distributors who were affiliated with members of the EMMC": Cardile Brothers Mushroom Packaging, Inc.; C&C Carriage Mushroom, Co.; To-Jo Mushrooms, Inc.;[15] Sher-Rockee Mushroom Farm; and

---

[12] "LRP-M sold all of the mushrooms it grew to Manfredini Enterprises, its affiliated distributor." In re Mushroom, 54 F. Supp. 3d at 389. To date, the Court has not been presented with facts which would be "determinative of whether LRP-M and Manfredini Enterprises are separate decisionmakers pursuing separate economic interests." Id.

[13] The Mushroom Alliance, Inc. was a small cooperative whose members included Country Fresh (who was also an EMMC member on its own for some period of time), JM Farms, Kitchen Pride and Creekside.

"Creekside has negotiated a settlement with both the class plaintiffs and the individual Giant Eagle and Publix plaintiffs. Stipulations of dismissal have been entered in the individual actions, and Creekside is currently working with the class plaintiffs to prepare a Motion for Preliminary Approval of the class settlement." Dkt. No. 218 at ECF p. 2 n.3; see also Dkt. No. 213.

[14] Moving defendants assert that "many of the Defendants listed above resigned from the EMMC during the time period in question. Dkt. No. 505 (Defs.' Counter-Statement of Material Facts) at ¶ 27. Defendants contend that "[t]hese resignations began shortly after the EMMC was formed, beginning with Defendants[ ] Cutone, M&T, and the Mushroom Alliance (including Country Fresh, Creekside, Kitchen Pride and JM)." Id. at ¶ 27.

[15] To-Jo Fresh Mushrooms, Inc. is an affiliate of EMMC member Brownstone Mushroom Farms. See Dkt. No. 497, Ex. 3 (Linda Pizzini Johnson Dep.) at 191:6-24 (explaining that ToJo was a packager/shipper and Brownstone was the grower).

South Mill Mushroom Sales, Inc.[16] Dkt. No. 496 (Pls.' Statement of Facts) at ¶ 28. Moving defendants assert that "it is significant that the downstream affiliate Defendants were never members of the EMMC and did not themselves agree to follow any of its rules and regulations regarding pricing." Dkt. No. 505 (Defs.' Counter-Statement of Material Facts) at 2, ¶ 16. Sher-Rockee Mushroom Farm is another non-EMMC member defendant, but it is not a distributor. Instead, it "is a grower that sold mushrooms exclusively to C&C Carriage Co. or Modern Mushroom Farms." Dkt. No. 505 (Defs.' Counter-Statement of Material Facts) at 12, ¶ 28.[17]

**STANDARD OF REVIEW**

Moving defendants move under Rules 16(c)(2)(A) and (D) of the Federal Rules of Civil Procedure for a pre-trial order "providing that Plaintiffs' antitrust claims against Defendants be adjudicated under the Rule of Reason." Dkt. No. 492 (Defs.' Rule of Reason Mot.) at 1. Rule 16(c)(2) provides, in relevant part, that "[a]t any pretrial conference, the court may consider and take appropriate action on . . . formulating and simplifying the issues, and eliminating frivolous claims or defenses" and "avoiding unnecessary proof and cumulative evidence, and limiting the use of testimony under Federal Rule of Evidence 702." Fed. R. Civ. P. 16(c)(2)(A) and (D). Moving defendants argue that their motion is necessary to "formulat[e] and simplify[ ] the issues" and avoid "unnecessary proof" and contend that it concerns the resolution of a "purely legal question" as to the standard to be used to adjudicate plaintiffs' claims. Dkt. No. 492 (Defs.' Rule of Reason Mem.) at 3-4. In support of their motion, moving defendants cite to

---

16 I previously decided that "Kaolin/South Mill and its distribution entities are separate decisionmakers pursuing separate economic interests" and that they "cannot constitute a single entity . . . ." In re Mushroom, 54 F. Supp. 3d at 389; see also In re Mushroom, 621 F. Supp. 2d at 279 ("The Kaolin/South Mill distribution centers were not EMMC members, did not grow mushrooms but sold mushrooms grown by defendant Kaolin.").

17 Except as is set forth herein, I will not here further specify whether any specific defendant was a grower-only, a distributor-only or an integrated grower-distributor because I find that questions of fact remain with respect to the organizational structure of many of the defendants.

North Jackson Pharmacy, Inc. v. Caremark RX, Inc., 385 F. Supp. 2d 740 (N.D. Ill. 2005), where the Court decided to apply the rule of reason to the plaintiff's antitrust claim pursuant to Rule 16. Dkt. No. 492 (Defs.' Rule of Reason Mem.) at 3-4. In North Jackson, the Court explained that "the proper standard to be applied to North Jackson's Sherman Act claim[ ]is one of law that can be resolved based on the allegations of the [complaint] and facts that neither party disputes." 385 F. Supp. 2d at 743 (emphasis added); see also Procaps S.A. v. Patheon Inc., 36 F. Supp. 3d 1306, 1323 (S.D. Fla. 2014) ("Determining whether the rule of reason analysis or per se analysis applies in a given case is a question of law for the Court."); In re Se. Milk Antitrust Litig., 801 F. Supp. 2d 705, 718 (E.D. Tenn. 2011) ("the weight of authority supports defendants' argument that determination of the appropriate rule of law to be applied is a question of law to be decided by the Court"). At the same time, "while the mode of analysis is certainly a question of law, 'underpinning that purely legal decision are numerous factual questions.'" In re Blue Cross Blue Shield Antitrust Litig., 26 F.Supp.3d 1172, 1186 (N.D. Ala. 2014), quoting In re Wholesale Grocery Prods. Antitrust Litig., 752 F.3d 728, 733-34 (8th Cir. 2014).

Plaintiffs contend in their initial brief that moving defendants' Rule 16 motion is instead akin to a motion for "partial summary judgment" which "should be judged pursuant to the standards of Fed. R. Civ. P. 56(a)." Dkt. No. 498 (Pls.' Opp'n Mem.) at 5. Plaintiffs also ask me to enter partial summary judgment in their favor finding that the EMMC and its members along with distributors affiliated with EMMC members engaged in a per se illegal horizontal conspiracy to fix prices and restrict supply." Dkt. No. 495 at 1. Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary

judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

At oral argument counsel for plaintiffs noted plaintiffs' "agree[ment] that the facts are undisputed with respect to whether the rule of reason or the per se rule applies" and conceded that "the result is going to be the same" whether the question is analyzed under Rule 56 or Rule 16. Dkt. No. 628 (Oral Arg. Tr.) at 26:5-11. Given that the parties are in accord that there are no relevant facts in dispute, I will proceed to select the appropriate mode of antitrust analysis as a question of law. See Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 829 n.7 (3d Cir. 2010) ("The selection of a mode of antitrust analysis is a question of law.").

## DISCUSSION

### I. Rule of Reason vs. Per Se Rule

Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish their claim under Section 1, plaintiffs must show: (1) that each defendant was "a party to a contract, combination . . . or conspiracy" and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010) (citations omitted). The reasonableness of a restraint of trade

under Section 1 of the Sherman Act is judged according to the rule of reason, the per se rule or the intermediate quick look analysis. "[T]he three modes of analysis should be viewed as a single inquiry that, depending on the circumstances, may sometimes be conducted by applying various presumptions." Deutscher Tennis Bund, 610 F.3d at 831. "[T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment." California Dental Ass'n v. Federal Trade Comm'n, 526 U.S. 756, 780-81 (1999); see also Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 104 n.26 (1984) (noting that no "bright line separat[es] per se from Rule of Reason analysis"). "[I]n deciding what rubric to apply, the Court is engaged more in art than science. An overly-formalistic and literal approach is to be avoided." In re ATM Fee Antitrust Litig., 554 F. Supp. 2d 1003, 1016 (N.D. Cal. 2008), citing Broad. Music, Inc. v. Columbia Broad., 441 U.S. 1, 9 (1979); see also Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 887 (2007) (citation and internal quotation omitted) ("[A] departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing."); United States v. Brown Univ. in Providence in State of R.I., 5 F.3d 658, 670 (3d Cir. 1993) ("the test for determining what constitutes per se unlawful price-fixing is one of substance, not semantics"). "Regardless of the standard used, the purpose of the inquiry is always to assess the effect of the conduct on competition . . . 'whether or not the challenged restraint enhances competition.'" Deutscher Tennis Bund, 610 F.3d at 830, quoting NCAA, 468 U.S. at 104. The determination of whether a challenged practice warrants treatment under the rule of reason or the per se rule is important because that determination affects the quantum of proof plaintiffs must offer to sustain their claim. See Rossi v. Standard Roofing, Inc., 156 F.3d 452, 461 (3d Cir. 1998).

Case 2:06-cv-00620-BMS Document 670 Filed 05/26/15 Page 16 of 36

The Supreme "Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) (citations omitted); see also State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) (holding that whether a restraint is unreasonable and in conflict with the Act is normally evaluated under the "rule of reason"); Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 509 (4th Cir. 2002) ("if the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market, courts must apply a full rule-of-reason analysis"). "[T]here is a strong presumption in favor of the rule of reason because applying the per se rule carries the risk of condemning activity that promotes competition." Procaps, 36 F. Supp. 3d at 1323.

> [C]ourts cannot act perfunctorily when distinguishing restraints that merit a per se approach from those that deserve rule of reason analysis, and only if a restraint clearly and unquestionably falls within one of the handful of categories that have been collectively deemed per se anticompetitive can a court be justified in failing to apply an appropriate economic analysis to make this determination.

Expert Masonry, Inc. v. Boone Cnty., Ky., 440 F.3d 336, 343 (6th Cir. 2006).

"The rule of reason requires the fact-finder to 'weigh [ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" Deutscher Tennis Bund, 610 F.3d at 830, quoting Brown Univ., 5 F.3d at 668. Analysis under the rule of reason requires application of a burden shifting framework that first obligates a plaintiff to show that the challenged conduct has produced anti-competitive effects within the market. Brown Univ., 5 F.3d at 668. When a plaintiff meets this burden, the burden shifts to the defendants to show that the challenged conduct promotes a

sufficiently procompetitive justification; upon this showing, the plaintiff may rebut by showing that the restraint was not reasonably necessary to achieve the procompetitive objective. Id. In applying the rule of reason, the fact finder "must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." State Oil, 522 U.S. at 10. The inquiry focuses on whether the restraint "is one that promotes competition or one that suppresses competition." Deutscher Tennis Bund, 610 F.3d at 830, quoting Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 691 (1978).

Certain conduct "presumed to unreasonably restrain competition" is not analyzed under the rule of reason, but rather is analyzed as per se illegal "without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." In re Flat Glass Antitrust Litig., 385 F.3d 350, 356 (3d Cir. 2004), quoting Rossi, 156 F.3d at 461. "[P]er se analysis, permits courts to make 'categorical judgments' that certain practices, including [some types of] price fixing,[18] horizontal output restraints, and market-allocation agreements, are illegal per se. Cont'l Airlines, Inc., 277 F.3d at 509. "Per se rules of illegality are judicial constructs . . . and are based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition." Brown Univ., 5 F.3d at 670 (citations omitted). "For the sake of business certainty and litigation efficiency, [the Supreme Court has] tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable." Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344 (1982). But, "[o]ver the past several

---

[18] Continental Airlines was decided prior to the Supreme Court's decision in Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 882 (2007), which held that vertical price restraints, once found to be per se illegal, are to be "judged by the rule of reason," as is further set forth herein.

Case 2:06-cv-00620-BMS Document 670-1 Filed 05/26/15 Page 18 of 36

decades, the Supreme Court has narrowed the applicability of per se analysis expressing a reluctance to apply this standard 'in the context of business relationships where the economic impact of certain practices is not immediately obvious.'" RDK Truck Sales & Serv. Inc. v. Mack Trucks, Inc., No. 04-4007, 2009 WL 1441578, at *4 (E.D. Pa. May 19, 2009), quoting State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) (further citations omitted); see also Behrend v. Comcast Corp., No. 03-6604, 2012 WL 1231794, at *11 ("The authorities agree that this 'modern approach' to antitrust analysis should apply where the rationale of the per se rule does not neatly fit the industry involved.") (E.D. Pa. April 12, 2012); In re Se. Milk, 801 F. Supp. 2d at 719 ("the category of agreements to be analyzed under a per se analysis has been shrinking over the last few years"). "Per se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." Texaco, 547 U.S. at 5 (internal quotation and citation omitted); see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 103-04 (1984) ("Per se rules are invoked when [the] surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."). "[T]he per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." Leegin, 551 U.S. at 886-87 (citations omitted); see also In re Sulfuric Acid Antitrust Litig., 703 F.3d 1004, 1011-12 (7th Cir. 2012) ("The per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever."). This form of analysis is applied where a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441

U.S. 1, 19-20 (1979); see also Major League Baseball Props. Inc. v. Salvino, Inc., 542 F.3d 290, 340 n.10 (2d Cir. 2008) (Sotomayor, J., concurring) ("When empirical analysis is required to determine a challenged restraint's net competitive effect, neither a per se nor a quick-look approach is appropriate . . . ."). "To justify a per se prohibition a restraint must have manifestly anticompetitive effects, and lack . . . any redeeming virtue." Leegin, 551 U.S. at 886 (internal quotations omitted); see also In re Se. Milk, 801 F. Supp. 2d at 717 ("A per se rule is inappropriate where the effects of a particular restraint are unclear, even where aspects of the restraint may appear to be facially anti-competitive.") (citation omitted).[19]

### A. Price Fixing Claim

To determine whether the rule of reason or the per se rule applies to the claimed agreements to fix prices and restrict the supply of mushrooms, I must first consider the nature of the relationships between the parties to the agreements. Whether any agreement by defendants to restrain the trade of mushrooms is horizontal or vertical in nature is relevant to my determination of whether the rule of reason or the per se rule should be applied to plaintiffs' Sherman Act Section 1 claim. See In re Se. Milk Antitrust Litig., 739 F.3d 262, 272 (6th Cir. 2014) ("When determining whether to use the per se rule or the rule of reason, courts must

---

[19] An abbreviated rule of reason analysis, "quick look," is applied in those cases where the per se rule is inappropriate but where "no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." Brown Univ., 5 F.3d at 669 (internal quotation marks omitted). The "quick look" analysis is used in cases where "[s]ome restraints of trade are 'highly suspicious' yet 'sufficiently idiosyncratic that judicial experience with them is limited.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 317 (3d Cir. 2010), quoting 11 Herbert Hovenkamp, Antitrust Law ¶ 1911a (2d ed. 2005). Under this "intermediate" standard, "the competitive harm is presumed, and 'the defendant must promulgate some competitive justification' for the restraint." Deutscher Tennis Bund, 610 F.3d at 830, quoting Brown Univ., 5 F.3d at 669. The Court presumes "adverse competitive impact prevails and [ ] condemns the practice without ado" if the defendant provides no legitimate competitive justifications, but "must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis" if "sound procompetitive justifications" are set forth. Deutscher Tennis Bund, 610 F.3d at 830, quoting Brown Univ., 5 F.3d at 669. Neither plaintiffs nor defendants have argued that a quick look analysis is warranted in this case.

consider the type of restraint at issue – whether it is horizontal or vertical."). "The labels attached to the conduct by the [parties] are not determinative . . . , i.e. that plaintiffs repeatedly state that the conspiracy they allege is a horizontal, per se illegal conspiracy to fix prices . . . does not make it so." In re Se. Milk, 801 F. Supp. 2d at 718.

"'An arrangement is said to be 'horizontal' when its participants are (1) either actual or potential rivals at the time the agreement is made; and (2) the agreement eliminates some avenue of rivalry among them.'" In re Sulfuric Acid Antitrust Litig., 743 F. Supp. 2d 827, 867 (N.D. Ill. 2010); quoting 11 H. Hovenkamp, Antitrust Law ¶ 1901b, p. 203 (2d ed. 2005). Horizontal price fixing is conduct wherein "competitors at the same market level agree to fix or control the prices they will charge for their respective foods or services." Brown Univ., 5 F.3d at 670 (emphasis added); see also Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints."). Horizontal price fixing has generally been held to be per se illegal. Brown Univ., 5 F.3d at 670, citing F.T.C. v. Superior Ct. Trial Lawyers Ass'n, 493 U.S. 411, 435-36 (1990); see Leegin, 551 U.S. at 886 ("Restraints that are per se unlawful include horizontal agreements among competitors to fix prices."); In re Flat Glass, 385 F.3d at 356 (finding horizontal price fixing to be per se unreasonable); see also Maricopa Cnty. Med. Soc'y, 457 U.S. at 344-47 ("We have not wavered in our enforcement of the per se rule against price fixing."); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."). However, "[n]ot all arrangements among actual or potential competitors that have an impact on price are per se violations of the Sherman Act or even unreasonable restraints." Broad. Music, Inc. v. Columbia

Broad. Sys., Inc., 441 U.S. 1, 23 (1979). The Supreme Court has explained that

> Mergers among competitors eliminate competition, including price competition, but they are not per se illegal, and many of them withstand attack under any existing antitrust standard. Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.

Id.

"Vertical conspiracies, on the other hand, involve agreements among actors at different levels of market structure to restrain trade, 'such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market.'" In re Se. Milk, 801 F. Supp. 2d at 718, quoting Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir. 1988). Vertical price restraints, once also found to be per se illegal, are now "judged by the rule of reason." Leegin, 551 U.S. at 882; see also Mooney v. AXA Advisors, L.L.C., 19 F. Supp. 3d 486, 498 (S.D.N.Y. 2014) ("agreements between persons or entities at different levels of a market structure, such as between a manufacturer and distributor – commonly referred to as 'vertical restraints' – are analyzed under the rule of reason"). In Leegin, the Supreme Court overturned its prior precedent which had permitted the application of per se liability to vertical restraints.[20] It found that "a manufacturer might be able to achieve the procompetitive benefits of resale price maintenance by integrating downstream and selling its products directly to consumers." 551 U.S. at 903. The Supreme Court explained that its prior precedent,

> tilts the relative costs of vertical integration and vertical agreement

[20] In Dr. Miles Med. Co. v. John D. Park & Sons Co., 220 U.S. 373, 408 (1911), the plaintiff, a manufacturer of medicines, sold its products only to distributors who agreed to resell them at set prices. The Supreme Court found the manufacturer's control of resale prices to be unlawful, explaining that the pricing agreements would advantage the distributors, not the manufacturer, and thus the arrangement was analogous to a combination among competing distributors, which the law treated as void. Dr. Miles, 220 U.S. at 407-08.

> by making the former more attractive based on the per se rule, not on real market conditions. . . . This distortion might lead to inefficient integration that would not otherwise take place, so that consumers must again suffer the consequences of the suboptimal distribution strategy. And integration, unlike vertical price restraints, eliminates all intrabrand competition.

Id. Accordingly, the Supreme Court determined that continued adherence to the per se rule against vertical price restraints was inappropriate. Id. The Supreme Court explained:

> [a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, per se unlawful. . . . To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason.

Leegin, 551 U.S. at 893 (2007) (citation omitted).

In their motion, moving defendants contend that the conspiracy alleged by plaintiffs "is more akin to a vertical agreement between the Defendant growing companies who were members of the EMMC and their downstream packaging and distribution companies (most of which are also defendants in this case) who actually sold mushrooms to customers." Dkt. No. 492 (Defs.' Rule of Reason Mot.) at ¶ 13. They argue that "the essential alleged price-fixing activity complained of here involved a vertical agreement to sell mushrooms at EMMC minimum prices between the corporate defendants who were EMMC member/growers and the corporate defendants and non-defendants who were the downstream packagers and distributors of the mushrooms." Dkt. No. 492 (Defs.' Rule of Reason Mem.) at 2. In their response to plaintiffs' motion, moving defendants assert that "there were a series of vertical arrangements between the EMMC member companies and the separately incorporated downstream non-EMMC member companies that packaged and sold the mushrooms but were not, themselves subject to the EMMC's policies and regulations." Dkt. No. 501 (Defs.' Rule of Reason Reply) at

4. Moving defendants argue that "[s]ince the non-member downstream companies actually sold most of the mushrooms to the purchasers, these vertical arrangements were essential to the success of the EMMC's minimum pricing policy." Id. Moving defendants contend that because the claimed conspiracy to fix prices typifies a vertical, rather than a horizontal conspiracy, it should be subject to analysis under the rule of reason. Id. They contend that

> it is well-established that the Rule of Reason applies where the claims of price-fixing involve agreements that are vertical in nature, precisely like those between the Cutone family-owned grower and the Cutone family-owned distributor, between Kaolin/Southmill and its distribution companies in Texas, Louisiana and Georgia and between LRPM (the grower) and its packager and distributor, Manfredini Enterprises, Inc.

Dkt. No. 492 (Defs.' Rule of Reason Mem.) at 10-11.

Plaintiffs contend, in their response to moving defendants' motion, that there was "a horizontal conspiracy among mushroom growers and distributors to fix prices and restrict the supply of mushrooms." Dkt. No. 496 (Pls.' Statement of Facts) at ¶ 3. They assert that "the growers, packagers and shippers [in the EMMC] are horizontal competitors, not parts of a vertical distribution chain." Id. at ¶ 3; see also Dkt. No. 498 (Pls.' Opp'n Mem.) at 8. Plaintiffs assert that their "claim is that horizontal competitors consisting of growers and their associated distributors conspired to sell at fixed prices and restrict supply. In contrast, a resale price maintenance claim would challenge prices independently set by the growers and imposed on downstream resellers." Dkt. No. 508 (Pls.' Reply in Support of Cross-Motion) at 4 n.3. In support of their argument plaintiffs note that the EMMC's written policies referred to transactions between members – to which minimum pricing did not apply – as 'sideways' sales." Dkt. No. 496 (Pls.' Statement of Facts) at ¶ 3. Plaintiffs assert that "[t]he fact that some members of the EMMC had vertical relationships with distributors who were bound to sell at

EMMC prices does not change the fact that the EMMC brought together horizontal competitors to fix prices and restrict supply." Id. They argue that "[w]hile the 'vertical' relationships of some EMMC members with non-member distributors destroyed the EMMC's Capper-Volsted immunity," Dkt. No. 498 (Pls.' Opp'n Mem.) at 3-4, the growers, packagers and shippers in the EMMC "are horizontal competitors, not parts of a vertical distribution chain." Id. at 8. Plaintiffs contend that "[t]he fact that a horizontal conspiracy among competitors has 'vertical aspects' . . . does not transform a horizontal agreement subject to per se condemnation into a vertical agreement." Id. at 9.

At oral argument, however, the parties painted a picture of a more complex conspiracy – one which is neither purely vertical or purely horizontal. Moving defendants argued that the alleged price fixing conspiracy is "a hybrid . . . . [T]here is a horizontal conspiracy amongst the members of the EMMC, which are the growers, and then they sold through their distributors. And we're saying that those resale price agreements were each vertical between each grower and each distributor." Dkt. No. 628 (Oral Arg. Tr.) at 7:4-9. Moving defendants argued that

> the growers and their distributors are two separate levels of commerce. The growers do not sell to the class or the individual Plaintiffs <u>except for those few growers [who] are fully integrated vertically</u>. . . . [T]he distributors don't grow what they sell to the class. . . .
>
> To the extent that a distributor agreed to sell at a minimum price, that was an agreement between itself and the grower who was a member of the EMMC. . . . [W]ith the exception of [non-grower] Cutone as a member of the EMMC, with that exception there is no evidence that a distributor had an agreement with the EMMC about minimum prices. The only evidence may be that there was an agreement between – that a grower instructed its distributor to sell at the EMMC price. That's a vertical resale price maintenance agreement and nothing more.

Id. at 10:2-17 (emphasis added). Moving defendants conceded that "there is a[n] . . . alleged

horizontal conspiracy among the EMMC members, but with respect to those who use distributors, that those are each individual vertical resale price maintenance agreements as they're alleged." Id. at 7:14-18. Moving defendants further argued that "we have a situation where you have an agreement at the producer level which is in large part carried out through some unknown agreements with [distributors] – on a vertical basis" and that, "there's virtually no evidence that there was any evidence that there was any conspiracy at the distributor level." Id. at 45:23-24, 46:7-9.

Plaintiffs agreed with moving defendants at oral argument "that this is a hybrid agreement, it's a horizontal agreement with facilitating vertical agreements. So those vertical agreements between the growers and the distributors facilitated the horizontal agreement between the growers to fix the prices." Id. at 26:16-21. Plaintiffs argued, however, that the horizontal element to their claims is what matters: "the agreement of the EMMC members to set prices and limit supply." Id. at 31:10-12. They argued that the

> growers in the EMMC all got together and horizontally agreed to set the price. And the price that they agreed to set was not the price that they sold to the distributor, but they agreed that when they had a relationship with a distributor, they would set that distributor's price. And that's that horizontal agreement between the growers to impose this . . . price on [their] distributors.

Id. at 29:18-23. Plaintiffs characterize the conspiracy which is subject to their claims as "an agreement where competitors <u>with distribution interests</u> entered into a horizontal conspiracy to fix distribution prices." Dkt. No. 624 (Pls.' Letter Br.) at 4 (emphasis added). They argue that "the membership of a distributor in the EMMC only serves to reinforce that the EMMC was a front for horizontal distributor-level price fixing. . . . [T]he EMMC was used to coordinate the horizontal-distributor-level prices of mushrooms either by the EMMC members themselves <u>or their related distributors</u>." Id. (emphasis added). Plaintiffs also assert that

Case 2:06-cv-00620-BMS Document 670 Filed 05/26/15 Page 26 of 36

> the fact that M. Cutone was a member of the EMMC does not alter the fact that the EMMC fixed the prices of horizontal competitors. The EMMC was formed by growers *and* their related distributors to fix *distribution* prices. This is horizontal conduct by competitors at the same level of distribution to fix prices, not the kind of vertical resale price maintenance imposed by a manufacturer that is potentially precompetitive and entitled to be considered under the rule of reason.

Id. at 2.

I find that there are both horizontal and vertical agreements in play in the alleged conspiracy in this case and am thus faced with the question of what rule of decision to apply in such a circumstance. Plaintiffs have argued that "when you have [a] hybrid a[greement] involving both horizontal – a horizontal agreement facilitated by vertical agreements [–] that the horizontal part of that agreement is subject to the per se rule." Dkt. No. 628 (Oral Arg. Tr.) at 27:1-4. They assert that "[t]he law is that the horizontal part of the agreement is judged by the per se rule. If there's an attack on [the] vertical part of the agreement, that vertical part of the agreement is subject to the rule of reason." Id. at 30:18-25. Moving defendants contend that "the vertical aspect of the resale price maintenance agreements to facilitate the alleged horizontal agreement . . . requires the rule of reason to be applied in this case . . . ." Id. at 12:4-7. Two post-Leegin cases from the Court of Appeals are instructive.

In the first case, Toledo Mack Sales and Service, Inc. v. Mack Trucks, Inc., 530 F.3d 204 (3d Cir. 2008), the plaintiff alleged a Sherman Act § 1 claim involving a two-part conspiracy: it claimed first, that defendant Mack, a manufacturer of heavy-duty trucks, entered into a competition-restricting agreement with its authorized dealers, and second, that Mack dealers entered into agreements with each other not to compete on price. See id. at 530 F. 3d at 210. "At the close of evidence at trial, the District Court granted Mack's motion for judgment as a matter of law on Toledo's Sherman Act claim." Id. at 216. On appeal, the Court of Appeals

bifurcated its consideration of the restraints claimed by the plaintiff. First, the Court held that "[i]t is readily apparent that, if there were an agreement among Mack dealers as alleged, it involved horizontal competitors colluding to control prices, and therefore, would be per se unlawful." Id. at 221. The Court then considered Toledo's evidence of an unlawful agreement between the dealers and Mack. The Court explained that, "[i]n contrast to horizontal price-fixing agreements between entities at the same level of a product's distribution chain, the legality of a vertical agreement that imposes a restriction on the dealer's ability to sell the manufacturer's product is governed by the rule of reason." Id. at 224, citing Leegin, 551 U.S. at 906-07. The Court continued, explaining that "[t]he rule of reason analysis applies even when, as in this case, the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers." Toledo Mack, 530 F.3d at 225, citing Leegin, 551 U.S. at 893. In a footnote, the Court explained "[a]fter Leegin, vertical agreements to set prices are no longer per se unlawful but subject to the rule of reason. . . . In light of Leegin, we conclude that the rule of reason, not per se analysis, applies to the vertical agreement Toledo alleges was in existence here." Toledo Mack, 530 F.3d at 225 n.15.

In the second case, In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300, 336 (3d Cir. 2010), on appeal from orders of dismissal under Rule 12(b)(6), the Court of Appeals considered several agreements involving insurance brokers – middlemen like the distributor defendants in this case – and insurance companies who provided insurance – similar to the grower defendants in this case who provided mushrooms to the distributors. Certain agreements in the case – the "broker centered conspiracies" – were agreements made only between individual insurance companies and the insurance brokers. The Court of Appeals found that it

was not possible to "plausibly infer a horizontal agreement among a broker's insurer partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker." Id. at 327. Because there were not "plausible grounds to infer a horizontal agreement," the Court explained that the plaintiffs had not pled "a per se violation of § 1 of the Sherman Act," although this did "not mean that [the] defendants' alleged treatment of insurance purchasers was praiseworthy – or even lawful . . . ." Id. at 335-36.

The plaintiffs in the Insurance Brokerage case had also alleged that certain insurance companies had engaged in bid-rigging – "quintessentially collusive behavior subject to per se condemnation" – through a broker that had a vertical relationship with each company. Id. at 336. The insurance company defendants argued that the vertical involvement of the broker required their horizontal conspiracy to be judged under the rule of reason. With respect to the bid-rigging allegations, the Court of Appeals explained, "'defendants cannot escape the per se rule [for certain horizontal restraints of trade] simply because their conspiracy depended upon the participation of a 'middle-man', even if that middleman conceptualized the conspiracy, orchestrated it . . . and collected most of the booty.'" Id. at 337, quoting United States v. All Star Indus., 962 F.2d 465, 473 (5th Cir. 1992) (omission in original). The Court "agree[d] that [the] plaintiffs' allegations portray a conspiracy masterminded and directed by defendant broker Marsh, but this fact does not make implausible the inference of a horizontal agreement among the insurers." In re Ins. Brokerage, 618 F.3d at 337. "Marsh may have been an essential conduit and coordinator, but the insurers' agreement to provide protective bids to one another was also instrumental to the operation of the asserted broker-centered conspiracy." Id. at 338. Ultimately, the Court found that the plaintiffs' allegations were sufficient to "suggest a plausible horizontal agreement among the insurers" and that while, "[o]n the complaint's own account, the

conspiracy was instigated, coordinated and policed by Marsh" this did "not belie the alleged horizontal agreement." Id. at 344. The Court cautioned that "[i]f all horizontal agreements that exist to facilitate vertical ones . . . must be tested by the rule of reason, then per se condemnation of hub-and-spoke conspiracies would appear to be impossible."[21] Id. at 347.

Neither Toledo Mack nor Insurance Brokerage provide a perfect analogy to the facts now before me. By plaintiffs' own characterization, the claimed mushroom price-fixing conspiracy is a horizontal and vertical "hybrid," and there are "intermediate vertical distributors . . . identified . . . as . . . conspirators in the conspiracy." Dkt. No. 628 at 54:12-13; 88:4-7. Plaintiffs contend that "those vertical agreements between the growers and the distributors facilitated the horizontal agreement between the growers to fix the prices." Id. at 26:18-21. If the EMMC members' agreement had been an agreement to fix the prices which EMMC members themselves charged for the sale of mushrooms they themselves grew to third-party distributors, I would find that the per se rule should apply to their agreement. Clearly such an agreement would "involve[ ] horizontal competitors colluding to control prices, and therefore, would be per se unlawful." Toledo Mack, 530 F.3d at 221. But the conspiracy alleged here involves an agreement by the members of the EMMC to fix not the prices which they themselves charged, but rather the prices charged by vertically oriented distributors – some of whom are integrated with EMMC members and some of whom are not. The agreement of the EMMC members is thus also distinguishable from the horizontal bid-rigging agreement in Insurance Brokerage, as there the agreement

21 In reaching its conclusion in Insurance Brokerage, the Court also noted that the defendants were "unable to identify among plaintiffs' allegations any procompetitive venture to which the insurers' alleged horizontal agreement not to compete for incumbent business could reasonably be deemed integral." In re Ins. Brokerage, 618 F.3d at 346. In contrast in this case, defendants argue that "there is substantial evidence that the EMMC member companies believed that the minimum pricing and supply control policies were necessary to prevent further farm closings and bankruptcies heralded by the bankruptcy of a large Canadian-based mushroom producer operating several growing, packaging and distribution facilities in the United States." Dkt. No. 501 at 6.

between the insurance companies mandated conduct to be undertaken by the insurance companies themselves – the provision of protective bids to one another – and did not mandate any particular conduct by the vertically oriented broker. Here, absent cooperation from the vertically oriented distributors, integrated and not, the EMMC's agreement to fix mushroom distribution prices would be meaningless.

Further, to the extent that non-EMMC member distributor defendants followed the EMMC's mushroom pricing policies, they are clearly vertically oriented such that their conduct in the claimed conspiracy should be subject to the rule of reason. "In contrast to horizontal price-fixing agreements between entities at the same level of a product's distribution chain, the legality of a vertical agreement that imposes a restriction on the [distributor's] ability to sell the [grower's] product is governed by the rule of reason." Toledo Mack, 530 F.3d at 224, citing Leegin, 551 U.S. at 906-07. As I have previously explained, there is not necessarily a "unity of interest between the growers and the distributors in this case." In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d 274 (E.D. Pa. 2009). "[T]he growers are selling to distributors who sell at EMMC prices. . . . In this relationship, the price fixing does not protect the economic interests of the grower and therefore the entities' interests are not congruent." Id.

And finally, here I cannot ignore the presence in the claimed conspiracy of the EMMC-member defendants with integrated growing and distribution operations. The effect of the presence of similar entities with dual roles in the claimed conspiracies was not addressed in either Toledo Mack or Insurance Brokerage. I find that the inclusion of these integrated entities is sufficient to prevent me from finding that the claimed conspiracy in this case is a clear parallel to other conspiracies which have been subjected to per se liability. It has been held that the "per se rule is inapplicable" where a defendant is "both a manufacturer and a retail distributor of its

Case 2:06-cv-00620-BMS Document 670 Filed 05/26/15 Page 31 of 36

products." House of Brides, Inc. v. Alfred Angelo, Inc., No. 11-7834, 2014 WL 64657, at *5 (N.D. Ill. Jan. 8, 2014) (finding that such an arrangement is a "'dual distribution' system" and that "[r]estraints in dual distribution systems are analyzed under the rule of reason") (citations omitted); see also AT & T Corp. v. JMC Telecom, LLC, 470 F.3d 525, 531 (3d Cir. 2006) ("Vertical restraints are generally not per se violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level, i.e., have some form of horizontal relationship (a/k/a/ dual distributor arrangement) . . . ."); Beyer Farms, Inc. v. Elmhurst Dairy, Inc., 35 F. App'x 29 (2d Cir. 2002) ("Beyer alleged in its complaint that Elmhurst and Bartlett were engaged in a dual-distributorship relationship, or both a vertical and horizontal relationship. Had Beyer alleged a purely horizontal relationship between Elmhurst and Bartlett, Beyer would have alleged a per se violation of § 1 of the Sherman Act. Because Beyer did not so plead, its complaint was subject to scrutiny under the 'rule of reason.'"). The presence of the integrated defendants prevents me from simply bifurcating my consideration of the claimed agreement to fix mushroom distribution prices into horizontal and vertical components with the former being subject to per se liability and the latter subject to consideration under the rule of reason. Because I am unable to untangle the vertical and horizontal aspects of the conduct of the integrated defendants in the alleged conspiracy to fix mushroom distribution prices, I find that it is appropriate to apply the rule of reason to the entirety of plaintiffs' claim that defendants violated Section 1 of the Sherman Act by "conspir[ing] among themselves and in conjunction with nonmember distributors to set artificially-inflated prices" for mushrooms. Dkt. No. 185 at ¶ 93. See In re Aluminum Warehousing Antitrust Litig., No. 13-2481, 2014 WL 4277510, at *25 (S.D.N.Y. Aug. 29, 2014) ("Most antitrust claims are evaluated under the rule of reason. . . . Most vertical agreements and

Case 2:06-cv-00620-BMS Document 670-1 Filed 05/26/15 Page 32 of 36

mixed agreements (those with both horizontal and vertical aspects) are analyzed in this manner.") (emphasis added); see also Dimidowich v. Bell & Howell, 803 F.2d 1473, 1481 (9th Cir. 1986) (finding that the rule of reason applied where the alleged conspirators were "in a 'hybrid arrangement composed of both a dual distributorship and a horizontal relationship" because the Court did "not have enough experience with this type of arrangement to say with any confidence that a concerted refusal to deal in this context almost always will be anticompetitive"); Black Box Corp. v. Avaya, Inc., No. 07-6161, 2008 WL 4117844, at *18 (D.N.J. Aug. 29, 2008) ("Here, there was a dual distributor arrangement in the market for PBX systems and a horizontal relationship in the service and maintenance aftermarket. . . . [T]his Court does not have enough experience with this type of arrangement to say that it will almost always be anticompetitive. Therefore, the Court concludes that a Rule of Reason analysis is appropriate.").

As counsel to the EMMC explained in 2001, the EMMC is not a "classic" cooperative:

> Most, but not all, agricultural cooperatives differ from EMMC in that they tend to combine grower organizations for the collective purpose of consolidating and sharing the "getting-to-market" function for agricultural products, i.e., processing, handling, sales and marketing. . . . EMMC is not like those cooperatives given that EMMC members will continue to conduct independent businesses.

Dkt. No. 492, Ex. A. at 3. "It is a bad idea to subject a novel way of doing business (or an old way in a new and previously unexamined context, which may be a better description of this case) to per se treatment under antitrust law." In re Sulfuric Acid Antitrust Litig., 703 F.3d 1004, 1011 (7th Cir. 2012). "[E]ven if the agreement is horizontal in the way Plaintiffs now claim, applying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of per se violations." In re Se. Milk, 739 F.3d at 273 (finding that, "especially at the summary judgment stage, [it was] not a 'clear cut' case of an obviously

anticompetitive trade restraint").

Where "there is evidence [the growers] were the impetus for a vertical price restraint, there is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer." Leegin, 551 U.S. at 897-98. This can be determined, however, through application of the rule of reason which is "designed and used to eliminate anticompetitive transactions from the market." Id. at 898; see F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 459 (1986) ("[A] refusal to compete with respect to the price term of an agreement[ ] impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them. Absent some countervailing procompetitive virtue – such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services . . . – such an agreement limiting consumer choice by impeding the ordinary give and take of the market place . . . cannot be sustained under the Rule of Reason.") (citations and internal quotations omitted).[22]

[22] "A plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 298 (1985). "[E]ven when the per se label has been applied to a category of anticompetitive conduct, the cases establish that courts may still look to see whether the economic effects of a particular practice in a particular industry justify abandoning a rule of reason analysis" as the default position. Behrend v. Comcast Corp., No. 03-6604, 2012 WL 1231794, at *11 (E.D. Pa. Apr. 12, 2012). Certain pro-competitive conditions "can render an industry practice 'substantially different from the classic' horizontal restraints subjected to per se treatment." Id. at *12, quoting Eichorn v. AT & T Corp., 248 F.3d 131, 139 (3d Cir. 2001) (further citations omitted).

Moving defendants argue that their price fixing conduct should be subject to the rule of reason because "the historical procompetitive benefits of growers forming the EMMC [were] clear": to "salvage their farms and the mushroom industry as a whole" during claimed dire market conditions. Dkt. No. 492 (Defs.' Rule of Reason Mem.) at 16-18. Plaintiffs assert that "the EMMC agreement has no redeeming efficiency producing benefits and was admittedly implemented for the purpose of limiting competition." Dkt. No. 624 (Pls.' Letter Br.) at 1-2. Plaintiffs argue that

> [d]efendants' horizontal conspiracy to fix prices and limit supply created neither a new product nor expanded production. . . . Nor did the EMMC integrate the abilities of its members in any way to

## D. Supply Control Claim

Despite my conclusion that the rule of reason should be applied to plaintiffs' price fixing claims, I find that plaintiffs' claim that the supply control program violated Section 1 of the Sherman Act is instead subject to per se antitrust liability. "An agreement among competitors to restrict the production of a certain good equates to a price-fixing agreement, because conspiracies to limit output are designed to raise, stabilize, or otherwise fix the price of goods." In re Sulfuric Acid Antitrust Litig., 743 F. Supp. 2d 827, 867 (N.D. Ill. 2010); see also Westinghouse Elec. Corp. v. Gulf Oil Corp., 588 F.2d 221, 226 (7th Cir. 1978) ("an agreement to restrict the production of uranium unquestionably is a price fixing arrangement"). The claimed supply control conspiracy is different from the claimed conspiracy to fix the distribution prices of mushrooms because no secondary agreements with vertically aligned distribution entities were

---

> create a new and more efficient way of competing. After joining the EMMC, [d]efendants remained separate competitors with separate brands, sales forces and customers. . . . The only benefit of membership was that the EMMC fixed distribution prices and limited supply to keep prices high.

Dkt. No. 624 (Pls.' Letter Br. at 3).

I do not here decide that the procompetitive benefits argued by moving defendants are sufficient on their own to justify application of the rule of reason. I write only to note that the Court of Appeals for the Seventh Circuit has held that "[e]ven price fixing by agreement between competitors [and] . . . . other agreements that restrict competition . . . are governed by the rule of reason, rather than being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'" In re Sulfuric Acid, 703 F.3d at 1011-12, citing Broad. Music, Inc. v. Columbia Broad., 441 U.S. 1, 24 (1979), and Polk Bros., Inc. v. Forest City Enters., Inc., 776 F.2d 185, 189 (7th Cir. 1985). The Seventh Circuit has also held that "[a] court must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason." Polk Bros., 776 F.2d at 189 (emphasis added); see also Procaps S.A. v. Patheon Inc., 36 F. Supp. 3d 1306, 1328 (S.D. Fla. 2014) ("[D]etermining whether an agreement is 'naked' requires a broader examination of whether the restraint would be likely to increase economic efficiency and render markets more, rather than less, competitive. . . . If the net plausible effects might be procompetitive, then courts will apply the rule of reason to strike the balance.") (citations and internal quotations omitted). But cf. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221-22 (1940) ("[Congress] has no more allowed genuine or fancied competitive abuses as a legal justification for [price-fixing] schemes than it has the good intentions of the members of the combination.").

necessary to implement the claimed supply control agreement. Instead, the claimed agreement to purchase or lease properties in order to remove them from mushroom production is a straightforward agreement among the members of the EMMC. Such an agreement "facially appears to be one that would always or almost always tend to restrict competition and decrease output." Broad. Music, Inc., 441 U.S. at 19-20. As such, the claimed conduct giving rise to plaintiffs' supply control claim is a restraint on competition which is per se unreasonable.

**II. Plaintiffs' Motion for Partial Summary Judgment**

In their motion for partial summary judgment, plaintiffs argue that because the defendants' "agreement to engage in price fixing and output restrictions was per se illegal and therefore not subject to any defense based on market conditions or business justification," I "should enter summary judgment establishing the liability of the EMMC, its members, and distributors affiliated with EMMC members." Dkt. No. 498 (Pls.' Opp'n Mem.) at 19. But at oral argument, plaintiffs conceded that summary judgment would be inappropriate if the Court were to find that the rule of reason governs plaintiffs' claims. Dkt. No. 628 at 90:14-19 ("if it's rule of reason, we'll have to show that there was actually some anti-competitive effect"). Because that is precisely what I have found with respect to plaintiffs' price fixing claims under Section 1 of the Sherman Act, I will deny plaintiffs' motion to the extent that it seeks partial summary judgment on those claims.

To the extent that plaintiffs seek summary judgment with respect to their supply control claims under Section 1 of the Sherman Act, I will deny summary judgment as well. Even though I find these claims are subject to per se liability, I find that questions of fact remain with respect to whether each defendant "participate[d]" or "knowingly acquiesce[d]" in the alleged anticompetitive activity. See Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1017 (3d

Case 2:06-cv-00620-LMS Document 670-1 Filed 05/26/15 Page 36 of 36

Cir. 1994); see also In re Processed Egg Prod. Antitrust Litig., 821 F. Supp. 2d 709, 723 (E.D. Pa. 2011) ("[M]ere membership in a trade group . . . cannot alone sufficiently plead agreement to a conspiracy.")

An appropriate Order follows.