# EXHIBIT 35

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

| | |
|---|---|
| WINN-DIXIE STORES, INC., and | ) |
| BI-LO HOLDINGS, LLC, | ) |
| Plaintiffs, | ) |
| vs. | ) 3:15-cv-1143-BJD-PDB |
| SOUTHEAST MILK, INC., et al., | ) |
| Defendants. | ) |

VIDEOTAPED DEPOSITION

OF

JOHN M. CONNOR, PH.D.

Tuesday, February 13, 2018

9:04 a.m.

Reported by:

Juliana F. Zajicek, RPR, CSR

Job No. 20714

Page 78

A. No. I only regard -- I only remember three. Was there possibly someone else from OnPoint on that call? I think so. So there might have been four people on the call, yeah.
Q. Did you take notes on that call?
A. Yes, I did.
Q. Do you still have those notes?
A. No. I have destroyed them.
Q. Why did you destroy them?
A. I didn't need them anymore. I took out the information necessary for my expert report and threw it away.
Q. Did you discuss -- before you destroyed them, did you discuss that with counsel?
A. I did not.
Q. What did --
A. I assume you mean counsel in this case?
Q. Yes.
A. Yes.
Q. What did you discuss with Mr. Leary?
A. Mr. Leary told us about his background with Winn-Dixie, which is quite extensive, and he -- he discussed the two processing plants that Winn-Dixie owned up until 2008, plants which received raw fluid

Page 79

milk, one being in -- in Florida and another one in, oh, is it Mississippi or Alabama. Missi- -- oh, I can't remember, but close to the Florida panhandle. So there were -- they had two.
And then I learned at a later date about their distribution centers where they accepted milk products. They have about 11 of them in the -- in that region, in Bidding Region 2 as defined by CWT.
So we understood the -- the mechanics of the product flow from Defendants and other, perhaps other companies that assemble milk, to these processing plants. He also explained what happened after the plants were sold and the pricing agreement that Winn-Dixie had with the new owners of the plant.
And it is from that discussion that I came away thinking that the methods of arriving at the OOPs, over-order premiums, had not changed substantively between the ownership period prior up to 2008 and the non-ownership period, if you want to call it that, from 2008 to 2013.
Q. So, when Winn-Dixie was operating those two plants, did they pay an over-order premium?
A. Yes.
Q. And to whom did they pay an over-order

Page 80

premium?
A. Well, primarily DFA, but also other -- other milk assembly companies or cooperatives.
Q. Was DFA Winn-Dixie's only milk supplier?
A. I do not believe so.
Q. Was it its principal milk supplier?
A. I think it was the -- the largest single supplier of raw milk during the relevant period.
Q. Okay. After Winn-Dixie sold the plants, did it continue to pay an over-order premium?
A. Yes.
Q. And was it designated as such on its invoices?
A. I do not know. I did see a few, but I don't remember the -- the term that was used there, but I suspect that it was -- the over-order premium with adjustments for credits, credit adjustments, perhaps. I don't remember the exact term used for it, though.
Over-order premium is a -- is a curious term as it only is found, as far as I know, having looked at all 50 or so of the food processing industries in my career, it's the only one, only -- there are three or four milk industries as defined by

Page 81

the standard industrial code. It is the only industry that uses over-order premium as a -- as a term -- term of art for the price charged to the processors less, of course, the price of -- of raw milk.
Q. So, do customers of processors generally pay an over-order premium?
A. Yes.
MR. AHERN: Object to the form.
Are you saying customers of processors?
MR. MILLER: Correct.
BY THE WITNESS:
A. Oh, customers of. It will become embedded in the -- in the price that the customers of the processors have to pay.
So, processors pay more than the price of raw milk for the services and for the profitability of -- of the assembly firms. Then when processors sell to either wholesalers or retailers, they, too, have a -- a margin, an over-order premium, you could call it, but it is not called an over-order premium at that stage, it's simply a markup, a markup on all of the costs incurred in processing the milk plus, of course, a reasonable -- a profit which may or may not be a perfectly competitive profit. So that's how it

Page 110

a reasonable basis, it captures the conduct of CWT program because it was a bidding region, and it captures the changes in raw milk because it was three Federal MMOs that we were covering, which are virtually coextensive with Bidding Region 2.
It just seemed like a -- a good choice for us, but I admit that other economists who wanted to do a regional analysis might contract the area or expand it slightly, but I think ours is -- is defensible.
BY MR. MILLER:
Q. Let's focus -- I want to focus now only on the period when Winn-Dixie owned the plants.
A. 2008 prior.
Q. Prior to 2008.
Was it charged a different OOP depending on where the milk came from?
A. No. The prices were where it was delivered, not where it came from, but where it was delivered.
Q. So, for the period while Winn-Dixie owned the plants, why would you use data other than the two -- the data that relates to the two plants that Winn-Dixie operated?
MR. AHERN: Objection; asked and answered. He

Page 111

just answered it.
BY THE WITNESS:
A. They had distribution points scattered pretty much around the geographic area that we chose. We thought it was a reasonable approach. We intended to do a regional analysis, true, the OOPs, particularly those on the border areas, those OOPs are probably, and as far as -- based on the analysis that I did for Edwards, are, in fact, closely related, the -- the -- highly correlated, just as the law of one price would suggest.
But we wanted to create a procurement zone because it mimicked -- it -- it mimicked the -- the size of the -- of the milk being supplied. Yes, more milk was supplied from areas very close to the two plants, yes, and the farther you get away the less and less the supply was, perhaps, to the -- well, to the 11 distribution areas, excuse me, let me -- let me -- let me alter that.
So, I really don't understand your question other than what I've said before.
BY MR. MILLER:
Q. That's a very long answer for a question you didn't understand. So let me try a different way.

Page 112

Did the products that were sent to the distribution centers differ from the products that were made at the Winn-Dixie plants?
MR. AHERN: Object to the form.
BY THE WITNESS:
A. Well, I'm confused. The distribution centers are not necessarily processing plants.
BY MR. MILLER:
Q. Yeah, so, let me ask that a different way then.
A. So, you are -- you are --
Q. Let me ask it a different way.
A. -- putting two things together there that are incompatible.
Q. Did the distribution plants receive milk from Winn-Dixie other than the milk that Winn-Dixie produced at its two processing plants?
MR. AHERN: Object to the form.
BY THE WITNESS:
A. You are talking about distribution centers receiving milk from processing plants that Winn-Dixie owned, but those processing plants turned out -- turned packaged -- you know, turned out packaged milk products. Why would they --

Page 113

BY MR. MILLER:
Q. A distribution center receives fluid milk products, correct?
A. Yes. They are -- they are sited so --
Q. Let -- let --
A. They are sited so that --
Q. Hang on.
A. -- they can -- they can serve the -- the stores that Winn-Dixie owns and -- and they are essentially -- it's essentially backward vertical integration from retailing into wholesaling and so those distribution centers typically serve one large metro area and surrounding areas. I -- I understand the -- I understand the structure of this system.
Q. Right.
They receive fluid milk from the Winn-Dixie processing plants, correct?
A. Yes.
Q. Okay. Did the OOP that Winn-Dixie was charged by Dairy Farmers of America change depending on where Winn-Dixie was shipping the milk?
MR. AHERN: Object to the form.
BY THE WITNESS:
A. Shipping the milk from where?

Page 122

BY THE WITNESS:
A. Excuse me for popping off, but --
BY MR. MILLER:
Q. Dr. Connor, you're the one who --
A. -- that is such a basic mistake, I can't believe it.
Q. Dr. Connor, you put in the notion of an antitrust market, so I'm trying to explore with you what that means.
A. No. You are trying to tell me that I haven't read every opinion on the Supreme Court on this issue --
Q. So what --
A. -- and that is true.
Q. What's the basis --
A. But even if I had read it, I wouldn't be able to opine on it. You know that.
Q. What's the basis for your opinion that the market depends on -- the antitrust market depends on where the plaintiffs are located?
MR. AHERN: I'm going to object to that. That -- that -- that mischaracterizes his testimony in connection with this case.
MR. MILLER: It's irrelevant.

Page 123

MR. AHERN: In connection with this case. He has already testified as to how he chose what he chose in this case.
BY THE WITNESS:
A. We are -- we are being guided to some extent by physical shipments of milk at various stages, and that is how we came up with this market location. It's the old Hogarty and I forget the other -- concept.
BY MR. MILLER:
Q. Elzinga?
A. And -- yes. And I think that's -- so you -- and -- and I would return to my Robinson Crusoe analogy as well.
You look for a market where there is minimal leakages out and in, 10 percent, 20 percent, you know. So that was -- that was one source of guidance, if you like, plus we knew the location of the Plaintiff's distribution plants and processing plants, and the distance that milk is shipped, which has increased during this time period as well as prior to the time period. The markets have -- these -- these physical -- geographic markets for raw milk have -- have expanded.

Page 124

Dr. Manchester, the USDA's chief economist on milk, produced reports in the 1970s that identified more than 200 separate milk markets in the early 1970s. He was probably correct. Now, because shipping costs have been reduced, highways have been improved, refrigeration has improved, the trucks get a little bit bigger, sanitation methods have improved, so you can ship it longer distances.
So, we are dealing with what I think is a reasonably large area with minimal outward, probably, practically, no outward bound milk, and at certain times of the year some milk from the upper Midwest coming in, but not enough to destroy the 10 or 20 percent standard that one would use for defining a geographic market.
Q. Is it your opinion that the relevant antitrust market in this case for the production of raw milk is the Southeastern United States?
A. It will do.
Q. Is it your opinion that the relevant antitrust market in this case for the production of raw milk is the Southeastern United States?
A. It is a reasonable assumption for our purposes to define it in that fashion, yes.

Page 125

Q. Is it your opinion that the relevant antitrust market in this case for the assembly and marketing of raw milk is the Southeastern United States?
A. Yes.
Q. Is it your opinion that the relevant antitrust market in this case for the processing of raw milk into fluid milk products is the Southeastern United States?
A. It depends.
Q. What does it depend on?
A. It depends on the class.
Q. Is it your opinion that the relevant antitrust market in this case for the processing of raw milk into fresh dairy products is the Southeastern United States?
MR. AHERN: Object to the form.
BY THE WITNESS:
A. Tell me what you mean by fresh dairy products, please. It has been bandied about in very different definitions, as you know.
BY MR. MILLER:
Q. I'm -- I'm using it in the way that you would use it in your report.

market for purposes of this case?
A. We used the -- the definition supplied to us by the industry itself, basically, and by USDA who considers those milk -- either -- those Milk Marketing Orders to be reasonable markets for raw milk. They've changed over time. I mean, there used to be many, many more of them. They've consolidated over time for the reasons that I've mentioned concerning transport economics.
Q. Does USDA define the Milk Marketing Orders for antitrust purposes?
A. Not that I know of. But they are using the Hogarty -- Hogarty and what was the other man's name?
Q. Elzinga.
A. Elzinga. Oh, yes, Ken Elzinga, my -- my opponent in so many of these -- of these cases. Ken Elzinga, how could I forget him.
Anyway, it is, I think, implicit in our -- in our choice, and it was im -- probably implicit in the choice that -- that the ag USDA administrators made as well as -- as well as the CWT program. I mean, they defined the bidding areas, and we thought, Well, that bidding area is pretty reasonable because



of the distribution plants that -- that our -- our client the Plaintiff owned.
Q. Can you --
A. So we --
Q. Can you --
A. -- we were inspired.
Q. Can you point me to any USDA statements saying that they used the Elzinga-Hogarty test in setting up the Milk Marketing Orders?
A. No, there are none in my materials reviewed as far as I know that would have that statement. And I understand there has been some legal developments on Elzinga and Ho -- Hogarty and Elzinga or Elzinga and Hogarty. I understand there have been some legal developments, but I'm not going to opine on those.
Q. Does Winn-Dixie have cost plus agreements with its other suppliers of finished dairy products other than SMI?
A. I haven't -- I haven't seen any such supply contracts, so other than -- other than the SMI -- SMI contracts with -- with Winn-Dixie after 2008.
Q. So, in analyzing, again, this question,



the second aspect, which is about increasing the OOP for milk purchased by Plaintiffs where Winn-Dixie is purchasing directly from one of the Defendants a finished product, how do you know what OOP is included in that product?
A. Well, whatever suppliers they were, they had to -- had to pay an OOP in order to get the milk delivered to them. So, from somewhere in the Southeast. You are talking about non-SMI suppliers, right?
Q. Correct.
A. Well, that's my answer then.
Q. Were all of the supplies that you identify, and I think we can, if you want, for ease of reference, take a look at your Table 17, your vendors.
Are all of the -- the supplies or sales that are listed here, would those be from plants in the Southeast?
A. Not all.
Q. Which ones are not from plants in the Southeast?
A. I think Cabot Creamery is owned by a cooperative in the Northeast, and I don't -- I honestly don't know whether Cabot Creamery has, let's



say, cheese plants outside of the Northeast. I -- I just don't know. It wasn't part of my preparation for this, but so that's one of the more likely ones where cheese is being shipped and purchased by -- by Winn-Dixie.
Q. So let me -- let's just focus on Cabot Creamery for a moment.
How do you know what over-order premium would be associated with the sales that Cabot Creamery made to Winn-Dixie?
A. The over-order premiums in the Northeast track those in the Southeast, in general. There is -- they are articulated, they are harmonized, they are connected because it is a national market.
Q. What analysis did you do to confirm that the over-order premiums in the Northeast were correlated with the over-order premiums in the Southeast?
A. I used a correlation analysis among all of the DFA cities nationwide.
Q. So you -- where can we find that in your work papers?
A. It is in my reports in Edwards, so I knew it existed, I knew the correlations were there, and I