**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

Winn-Dixie Stores, Inc.,

Plaintiff,

v. Case No. 3:15-cv-01143-BJD-JBT

Southeast Milk, Inc., *et al.* ,

Defendants.
_______________________________/

**PLAINTIFF'S MOTION *IN LIMINE* #16 TO PRECLUDE DEFENDANTS FROM PRESENTING EVIDENCE CONCERNING PURPORTED GOOD INTENTIONS OR "REASONS," "PROCOMPETITIVE" BENEFITS AND INEFFECTIVENESS OF THE HERD RETIREMENT PROGRAM**

**TABLE OF CONTENTS**


**I. GOOD INTENTIONS MAY NOT BE CONSIDERED....................................1**

**II. THIS COURT SHOULD PRECLUDE DEFENDANTS' PURPORTED PROCOMPETITIVE JUSTIFICATIONS ........................................................2**

**A. The Court Should preclude Defendants' Purported Procompetitive Justifications If It Holds that the Per Se Rule Applies.........................................2**

**B. The Type of Purported Procompetitive Justifications Offered by Defendants May Not Be Considered ...................................................................3**

**1. Defendants' Purported Procompetitive Justifications Cannot Be Considered Because the HRP Reduced Output and Increased Prices. ...................................................................................... 6**

**2. Defendants' Purported Procompetitive Justifications Were Not Motivating Factors for the HRP........................................................... 8**

**3. Defendants Do Not Provide Legitimate, Recognized Procompetitive Justifications to Warrant Their Presentation to the Trier-Of-Fact....10**

**III. EVIDENCE THAT THE HRP WAS NOT SUCCESSFUL SHOULD BE EXCLUDED..............................................................................................12**

**IV. CONCLUSION ..........................................................................................12**

**TABLE OF AUTHORITIES**


**Cases** **Page(s)**

*Accord Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560 (11th Cir. 1983) .......... 4, 5, 10

*Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934 (5th Cir. 1975) .......... 4

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994) .......... 5

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .......... 3, 4, 6

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) .......... 4

*Levine v. Central Florida Medical Affiliates* 72 F.3d 1538 (11th Cir. 1996) .......... 2

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958) .......... 2

*Nat'l Collegiate Ass'n v. Bd. of Regents of the Univ. of Oklahoma*, 468 U.S. 85 (1984) .......... 5, 6, 8,10

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) .......... 5,7

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) .......... 4

*Reed Elsevier, Inc. v. Muchnick.*, 559 U.S. 154 (2010) .......... 5

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) .......... 6

*United States v. Brown Univ. in Providence in State of R.I.*,
5 F.3d 658
(3d Cir. 1993) ....................................................................................................5

*United States v. Philadelphia Nat'l Bank*,
374 U.S. 321 (1963) .........................................................................................10

*United States v. Topco Assocs.*,
405 U.S. 596 (1972) ........................................................................................ 1

*U.S. v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ..............................................................................2, 10, 12

**Statutes**

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*
§ 15.02[B] (4th ed. 2017) ..................................................................................4

**Other Authorities**

Herbert Hovenkamp, *The Rule of Reason*,
70 Fla. L. Rev. 81 (2018)...............................................................................4, 3

American Bar Ass'n, Antitrust Law Developments,
79 (4TH ed. 1997).............................................................................................12

Pursuant to Federal Rules of Evidence 401, 402 and 403, and for the reasons set forth herein, Plaintiff respectfully submits this Motion *in Limine* to preclude Defendants from presenting evidence or argument at trial concerning their purported good intentions or "reasons," procompetitive benefits for the adoption, implementation, and enforcement of the Herd Retirement Program ("HRP"), and the HRP's purported ineffectiveness. The Supreme Court has held repeatedly that good intentions or "reasons" may not be considered in determining whether a challenged restraint violates Section 1 of the Sherman Act. In addition, the Supreme Court has repeatedly held that the types of justifications posited by the Defendants here – that the HRP helped farmers retiring or failing to exit dairy farming, taking out of the industry farmers who were less efficient, and helped dairy farmers market their cows for beef – are not the type of justifications that can be considered in a Section 1 analysis. Finally, the Supreme Court had held that the purported ineffectiveness of an antitrust conspiracy is not relevant and thus cannot be considered. For these reasons, this Court should grant this Motion *in Limine*.

## I. GOOD INTENTIONS MAY NOT BE CONSIDERED.

Defendants may not introduce evidence of their purported good intentions or "reasons" because such intentions may not be considered when analyzing whether a restraint violates Section 1 of the Sherman Act. *United States v. Topco Assocs.*, 405 U.S. 596, 610 (1972). In *Topco*, the Supreme Court held:

> In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated ***because they are well intended or because they are allegedly developed to increase competition***.

*Id.* (citations omitted and emphasis added). Thus, any good intentions or "reasons" proffered by Defendants in support of the HRP – such as helping farmers to retire, to exit dairy farming or to help farmers market their dairy cows for beef – may not be considered by the jury. Therefore,

Defendants should be precluded from introducing evidence at trial or making any arguments relating to their purported good intentions or "reasons" in creating and implementing the HRP.

## II. THIS COURT SHOULD PRECLUDE DEFENDANTS' PURPORTED PROCOMPETITIVE JUSTIFICATIONS.

This Court should preclude Defendants from introducing evidence of purported procompetitive justifications for several reasons. First, if the Court holds that the Per Se Rule applies to the HRP, there is no analysis of procompetitive justifications. Second, even under the Rule of Reason, the types of purported procompetitive justifications that Defendants are likely to set forth are not the type recognized by the Supreme Court.

### A. The Court Should Preclude Defendants' Purported Procompetitive Justifications If It Holds that the Per Se Rule Applies.

If the Court holds that the Per Se Rule applies to the HRP, there is no analysis of procompetitive justifications. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) (horizontal price-fixing agreements are "conclusively presume to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or ***the business excuse for their use***")(emphasis added). It is well-established that horizontal agreements to restrict output are generally considered *per se* unlawful under the Sherman Act. *Levine v. Central Florida Medical Affiliates*, 72 F.3d 1538, 1545-46 (11th Cir. 1996)("the Supreme Court has held that certain kinds of agreements are unreasonable per se, such as agreements among direct competitors to fix prices or restrict output"). Finally, the Supreme Court has held that motivations such as financial disaster and ruinous competition, proffered by Defendants here, may not be considered under the Per Se Rule. *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-22 (1940) (specifically involving application of the Per Se Rule to a horizontal agreement among competitors to purchase surplus

product in order to take it out of the market and reduce supply).[1] Thus, because the Per Se Rule should apply to analyze whether the HRP violates Section 1 of the Sherman Act, this Court should preclude Defendants from introducing evidence at trial and otherwise arguing any purported procompetitive justifications.

### B. The Type of Purported Procompetitive Justifications Offered by Defendants May Not Be Considered.

This Court should preclude Defendants from introducing evidence at trial and otherwise arguing that there are purported procompetitive justifications for the HRP. First, under the Rule of Reason, a purported procompetitive justification that reduces output and increases price cannot be considered. Second, a purported procompetitive justification must have been considered by the Defendants at the time that they created and implemented the HRP – their argument that the purpose of the HRP was to help dairy farmers market their cows for beef is an after-the-fact justification that is also flatly contradicted by Defendants' statements at the time that (1) the HRP's purpose was to reduce the supply of milk and did not mention Defendants' after-the-fact purported justification, and (2) the HRP would have little to no effect on the beef market. Finally, in the same vein as the first argument, the purported procompetitive justification must not be antithetical to the goals of Section 1 of the Sherman Act.

Even if the Rule of Reason applies to the HRP, the Supreme Court explained in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("*Leegin*"), that:

> The rule of reason requires courts to conduct a fact-specific assessment of "market power and market structure . . . to assess the [restraint]'s actual effect" on competition. The goal is to "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best

[1] *See also* Plaintiff's Motion *in Limine* re Statements from Farmers and Evidence about Farmer Profitability, pp. 2-4, filed contemporaneously herewith.

interest."

*Ohio v. Am.* Express *Co*., 138 S. Ct. 2274, 2284 (2018) ("*AMEX*") (*quoting Leegin*, 551 U.S. at 886). Under this standard:

> [T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*AMEX*, 138 S. Ct. at 2284 (citing 1 J. Kalinowski, Antitrust Laws and Trade Regulation § 12.02[1] (2d ed. 2017); P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law § 15.02[B] (4th ed. 2017); *Capital Imaging Assoc., P.C. v. Mohawk Valley Med.* Assocs., *Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).[2]

As an initial matter, any proffered procompetitive justifications must have been a motivating factor for the restraint. *See* Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 107 (2018) ("*RoR*") ("If the defendants have a procompetitive justification, it must have been a motivating factor for the restraint, and the defendants should be able to establish it rather easily"). The allegedly procompetitive rationale(s) must also serve the "consumer's best interest"—not simply the manufacturer's self-interests. *See AMEX*, 138 S. Ct. at 2284; *LePage's Inc. v. 3M*, 324 F.3d 141, 163 (3d Cir. 2003) ("[A] defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to § 2 monopolization.").

---

[2] *Accord Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1573 (11th Cir. 1983) ("*ITEK Corp*.") (explicitly endorsing burden shifting approach under the rule of reason as to prongs one and two); *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934, 947 (5th Cir. 1975) ("[A] manufacturer should be required to demonstrate, as we have noted, the absence of means less restrictive of competition to achieve the same end.").

Moreover, the asserted justification may not undermine ethical obligations or the policy goals of the United States. Professor Herbert Hovenkamp has explained:

> Not every proffered justification will save a restraint, even if the justification has factual support. For example, in *NCAA* the defendants offered the rationale that restrictions on the number of broadcasts per team were necessary in order to level the playing field between more popular and less popular teams. . . . The Court properly rejected these rationales, not because the defendants failed to meet their burden to prove them, but on policy grounds. As a general matter, it is not a defense to collusion that its purpose is to protect weaker participants. Every cartel does that by creating a price umbrella that permits less efficient firms to survive.

*See RoR* at 110.[3] As the Eleventh Circuit has explained, "merely offering a rationale for a … restraint will not suffice; the record must support a finding that the restraint in fact is necessary to enhance competition and does indeed have a pro-competitive effect." *ITEK Corp.*, 717 F.2d at 1576.[4]

The burden is on the party offering the rationale to demonstrate its *necessity*. *Id.* at 1573, 1577 (offering party must demonstrate that "restrictions were reasonably necessary to achieve that legitimate purpose"); *Nat'l Collegiate Ass'n v. Bd. of Regents of the Univ.of Oklahoma*, 468 U.S. 85, 113 (1984) ("*NCAA*") (noting that the defendant faces "a heavy burden of establishing an affirmative defense" to restraint on trade).[5]

---

[3] *See also United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 669 (3d Cir. 1993) (holding that the proffered justification must "promote[] a sufficiently pro-competitive objective"); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688 (1978) ("Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason.") ("*Professional Engineers*").

[4] Other Circuits are in accord. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1183 (1st Cir. 1994) ("In general, a [procompetitive] justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons[,] . . . while the desire to maintain a monopoly market share or thwart the entry of competitors would not."), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

[5] Rooting out purported justifications for the HRP that are pretextual, or that cannot be shown to be sufficiently procompetitive under the law will have the salutary effects of shortening the duration of trial

**1. Defendants' Purported Procompetitive Justifications Cannot Be Considered Because the HRP Reduced Output and Increased Prices.**

Defendants' purported procompetitive justifications cannot be considered because the HRP reduced output and increased prices, according to Defendants' own repeated admissions at the time. The Supreme Court had repeatedly rejected procompetitive benefits that amount to "a frontal assault on the basic policy of the Sherman Act." *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 695 (1978). In that case, the Court stated that the test of illegality is whether the agreement in question is "unreasonably restrictive of competitive conditions." *Id.* at 690. The purpose of the Rule of Reason analysis is limited. It "is to form a judgment about the competitive significance of the restraint." *Id*. at 692. The relevant question is whether the challenged conduct has "adverse effects" on marketplace competition such as the reduction of market output or the increase in market price. *U.S. v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993); *NCAA*, 468 U.S. at 113-14 (procompetitive effects "increase output, and reduce the price"); *State Oil Co. v. Khan*, 522 U.S. 3, 14-16 (1997) (procompetitive means that the conduct "results in lower consumer prices").

Ethical or moral considerations such as health or welfare play no role in a proper Rule of Reason analysis because such considerations are not relevant to the impact of the agreement on the competitive market conditions. The controlling authority is *National Society of Prof. Engineers*. There, the members of a professional association agreed to a rule that prohibited its members from simultaneously negotiating price with the same prospective client. The Supreme Court held that the rule violated the Rule of Reason because it "impedes the ordinary give and

---

and avoiding juror confusion. *See Leegin,* 551 U.S. at 898-99 ("Courts can, for example, devise rules over time for offering proof, or even presumptions where justified, to make the rule of reason a fair and efficient way to prohibit anticompetitive restraints and to promote procompetitive ones.").

take of the marketplace." *Id*. at 692-93. The defendants argued that the rule was "reasonable" because, in its absence, engineering firms would perform "inferior work with the consequent risk to public safety and health." *Id*. at 693. The Supreme Court held that the asserted welfare defense was irrelevant, as a matter of law.[6] The Court explained:

> Contrary to its name, the rule [of reason] does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that falls within the realm of reason. Instead, it focuses directly on the challenged restraints' impact on competitive conditions.

435 U.S. at 688. The Supreme Court further noted that it had never accepted the argument that a restraint on competition could be justified on the basis of "public safety and health" (435 U.S. at 693-94),[7] and held that (1) the "asserted defense rests on a fundamental misunderstanding of the rule of reason" (*id*. at 681), and (2) that an attempt to justify an injury to marketplace competition "on the basis of the potential threat that competition poses to the public safety and … ethics … is nothing less than a frontal assault on the basic policy of the Sherman Act." *Id*. at 695. In so holding, the Supreme Court reiterated that the inquiry required by the Rule of Reason "is confined to a consideration of impact on competitive conditions." *Id*. at 690.

Furthermore, the Supreme Court, in applying this test focused on the impact on competitive conditions, held in *NCAA* that, where the purported procompetitive justifications are offered in support of a restraint of trade, they cannot be considered if the restraint reduced output (and increased prices). Thus, the Court held:

> There is therefore no predicate in the findings for petitioner's efficiency justification. Indeed, petitioner's argument is refuted by the District Court's finding concerning price and output. ***If the NCAA's television***

[6] The Supreme Court had granted *certiorari* to "determine whether the District Court should have considered the factual basis for the proffered welfare justification before rejecting it." 435 U.S. at 681.

[7] The court further held that the Rule of Reason "makes obsolete once prevalent arguments, such as whether [anticompetitive] arrangements would be socially preferable to competition." 435 U.S. at 690 n.16.

> ***plan produced procompetitive efficiencies, the plan would increase output and reduce the price of televised games.*** The District Court's contrary findings accordingly undermine petitioner's position. In light of these findings, it cannot be said that "the agreement on price is necessary to market the product at all.

*NCAA*, 468 U.S. at 114 (citation omitted and emphasis added). Here, while we do not have a District Court's findings, we have repeated admissions from the Defendants that the HRP reduced the supply of raw milk and increased its price.[8] Thus, under *NCAA* and other Supreme Court decisions, Defendants' purported procompetitive justifications cannot be considered because, as under the television plan in *NCAA*, under the HRP, "[h]ere production has been limited, not enhanced." *Id.* at 114-115.

**2. Defendants' Purported Procompetitive Justifications Were Not Motivating Factors for the HRP.**

Defendants cannot show that their purported justification for the HRP that it helped dairy farmers market their cows for beef was a motivating factor for the HRP. In fact, there is nothing in the record evidence that indicates that the HRP was motivated by helping dairy farmers market their cows for beef. Instead, the motivating factor quoted over and over by Defendants was that the intended purpose and the expected and actual effect of the HRP was to reduce the supply of raw milk and raise the price of raw milk, processed milk and products made from raw milk.[9] Furthermore, Defendants specifically disavowed that the HRP's purpose was to help farmers market their dairy cows for beef, as opposed to the real purpose of reducing the supply of raw milk.[10] Moreover, the intent of the HRP with respect to the beef market for dairy cows

---

[8] Kozak Dep. 48:6-21, 55:16-56:8; Gallagher Dep. 20:4-25; Wilson Dep. 48:8-49:3, 60:22-61:5.

[9] NMPF0000006-9, at 06, CWT General Information (CWT … is intended to strengthen and stabilize milk prices by balancing supply with demand. CWT is designed to reduce dairy inventories and milk production in order to provide meaningful financial returns to dairy producers in all parts of the country."); *see also* AMFL0000218-19, at 18 (same).

[10] Deposition of John Wilson, 271:20-272:1: "Q. … is it DFA's position that the goal of the Herd Retirement Program was to accelerate the supply of beef? A. DFA's position with CWT was to use a program to help dairy

was expressed at the time as the exact opposite of the Defendants' after-the-fact justification now. At the time, the Defendants were quite careful to explain over and over that the HRP would have little to no effect on the beef market for dairy cows.[11] Therefore, Defendants cannot meet the first prong of proffering a purported procompetitive justification that helping dairy farmers market their cows for beef was a motivating factor at the time for the creation and implementation of the HRP.

With respect to Defendants' assertion that the HRP removed dairy farmers who were less efficient, once again, this contention is belied by the HRP itself and the way in which Defendants implemented it. For example, there were no criteria in the selection of bids made under the HRP with respect to how efficient a dairy farmer was.[12] In addition, just because a farmer decided to exit the dairy business did not mean that he was less efficient, and farmers exiting the dairy business without the HRP were no more or less efficient than farmers exiting with the HRP. Wilson Dep., 94:17-96:8. Finally, by purportedly removing less efficient dairy farmers, the HRP did not make the remaining dairy farmers more efficient. Wilson Dep., 88:25-89:7. Thus, Defendants cannot meet the first prong of proffering a purported procompetitive justification that the HRP removed less efficient dairy farmers, making the remaining dairy farmers more efficient, was a motivating factor at the time for the creation and implementation of the HRP.

---

farmers get rid of their surplus milk.").

[11] D000027114-20, at 27117 ("National Milk will try to manage the program in a way to have the slightest possible impact on beef markets. In the short-term though, beef markets may be slightly reduced"): Wilson Dep., 273:16-20: "A. I remember discussion about … administering the program, the CWT program in such a way, that it would not be negatively impacting beef prices."); Wilson Dep., 274:4-9: "A. …dairy cows being a relatively small percentage of the total beef business, … it's going to be a very limited impact, if any at all, that the CWT Herd Retirement Program would have had … on the beef market.").

[12] Wilson Dep., 90:8-16: "Q. As part of the Herd Retirement Program, was there a measurement component of efficiency used to determine which producers' bids would be accepted under the Herd Retirement Program? A. … the decision was simply based on the bid that the farmer submitted within the parameters of the regional safeguards.").

**3. Defendants Do Not Provide Legitimate, Recognized Procompetitive Justifications to Warrant Their Presentation to the Trier-Of-Fact.**

Boilerplate claims that the HRP will benefit dairy farmers by helping them market their cows for beef is simply too generalized and too self-interested to constitute a valid procompetitive justification in this litigation. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 371 (1963) ("We are clear, however, that a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial."). In addition, once again, motivations of financial disaster and ruinous competition are not proper justifications to consider when assessing the anticompetitive and potential procompetitive impact of Defendants' conduct. *See e.g. Socony-Vacuum*, 310 U.S. at 221-22.

In addition, even if the justification of helping farmers retire or exit the business was a legitimate one (which it is not),[13] Defendants have failed to show that the HRP was a "reasonably necessary" way to help farmers retire and exit the business. *See ITEK Corp.*, 717 F.2d at 1577 (offering party must demonstrate that "restrictions were reasonably necessary to achieve that legitimate purpose"); *NCAA*, 468 U.S. at 113 (defendant faces "a heavy burden of establishing an affirmative defense" to restraint on trade). "[M]erely offering a rationale for a … restraint will not suffice". *Id.* at 1575. Here, the dairy farmers had been retiring and failing and exiting the dairy business before, during and after the HRP.[14]

Second, in light of the first point, Defendants cannot establish that there was no lesser restrictive alternative to the HRP. If farmers had been retiring and exiting the business before,

[13] *See* discussion, *infra*, at pp. 2-3.

[14] Deposition of Edward Gallagher 25:18-22: "Q. … can dairy producers sell dairy cows to other dairy producers to be used as dairy cows? A. They can and they do."); Kozak Dep. 191:20-23: "Q. Another way to exit the business is to sell the dairy cows at auction to other dairy farmers, correct? A. Yes.").

during and after the HRP, then there clearly was and is a less restrictive way to help farmers retire or exit the business. Under the old way, farmers retiring or exiting the business would sell their cows to another dairy farmer, but that would not have reduced supply as the HRP did and Defendants intended.[15] Defendants admit that, as a general rule, the value of a milking cow was higher than its slaughter value.[16] Thus, contrary to what Defendants must show in order to proffer purported procompetitive justifications, slaughtering entire herds as required by the HRP was the most restrictive means and the one designed to specifically create the greatest reduction in supply.

Third, the Defendants' own statements belie that the true purpose of the HRP was to helping farmers retiring or exiting the business. More than once, Defendants stated at the time that the HRP was expressly not about farmers exiting the business. Rather, it is about farmers who want to stay in business and make more money.[17]

For all of the reasons stated above, this Court should preclude Defendants from introducing evidence at trial and otherwise arguing purported procompetitive justifications for the HRP.

---

[15] Wilson Dep. 51:7-25: "Q. Pursuant to the program, if a producer elected to participate in a bid to kill its herd, was that producer required to kill its entire herd? A. As part of the herd reduction, excuse me I keep saying reduction. As part of the Herd Retirement Program yes. He had to slaughter the entire herd. Q. Why was that? A. Well, the effect of the program would have been greatly reduced if in fact the farmer would have been able to just sell some of his cows to a neighboring dairy farmer and those cows would have continued to be in production. Again, the point of the whole program was to reduce the supply of milk, … the only way that was going to happen is if … you accelerate the slaughter of dairy cows.").

[16] Gallagher Dep. 24:24-25:12.

[17] DFA2013-00003698-3701 (12/13/09 DFA email attaching CWT NEWS, December 2009 ("There is a misconception that CWT is a program for producers who want to exit the dairy industry. The fact is that CWT exists for dairy farmers who want to stay in business and produce milk profitably.").

## III. EVIDENCE THAT THE HRP WAS NOT SUCCESSFUL SHOULD BE EXCLUDED.

This Court should preclude Defendants from introducing evidence at trial or otherwise arguing that the HRP was not successful. The Supreme Court has held that whether or not an antitrust conspiracy is successful is not a defense to whether or not the conspiracy (the restraint) is a violation of Section 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 224 n. 59. There, the Court held that any such assertions are irrelevant, because it is well-settled law that:

> [C]onspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. It is the 'contract, combination … or conspiracy, in restraint of trade or commerce' which §1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other.

*Id.* (citations omitted and emphasis added); *see Maricopa County Med. Soc.*, 457 U.S. at 345 (following *Socony-Vacuum Oil Co.*); *see also* AMERICAN BAR ASS'N, ANTITRUST LAW DEVELOPMENTS, 79 (4TH ed. 1997). Defendants will most surely attempt to introduce evidence at trial that the HRP was not successful in raising or maintaining the price of raw milk. Defendants' Motion for Summary Judgment (ECF 264), p. 1. Based on the controlling Supreme Court precedent, this Court should preclude Defendants from doing so.

## IV. CONCLUSION

For the foregoing reasons, pursuant to Federal Rules of Evidence 401, 402, and 403, Plaintiff respectfully requests that the Court grant this Motion *in Limine* and exclude evidence and argument relating to Defendants' (1) purported good intentions or "reasons" in creating and implementing the HRP, (2) purported "procompetitive" justifications for the HRP, and (3) contention that the HRP was ineffective or not successful.

Dated: November 25, 2019

Respectfully submitted,

*/s/ Jeffrey S. York*
H. Timothy Gillis
Florida Bar No. 133876
Jeffrey S. York
Florida Bar No. 0987069
Shutts & Bowen LLP
1022 Park Street, Suite 308
Jacksonville, FL 32204
Phone: (904) 899-9926
Fax: (904) 899-9965
tgillis@shutts.com
jyork@shutts.com

*/s/ Patrick J. Ahern*
Patrick J. Ahern (admitted Pro Hac Vice)
Theodore Bell (admitted Pro Hac Vice)
Ahern and Associates, P.C.
8 South Michigan Avenue
Suite 3600
Chicago, IL 60603
(312) 404-3760
patrick.ahern@ahernandassociatespc.com
theo.bell@ahernandassociatespc.com

*Attorneys for Plaintiff*

## CERTIFICATE OF GOOD FAITH CONFERENCE

In accordance with Local Rule 3.01(g), prior to the filing of this Motion, the undersigned certifies that counsel for Plaintiff conferred with counsel for Defendants and counsel for Defendants opposes the relief requested by this Motion.

*/s/ Jeffrey S. York*
Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 25, 2019, I electronically filed the foregoing with the Clerk of Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Cases of this Court by using the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

*/s/ Jeffrey S. York*
Attorney